# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

IN RE: APPLE INC. SMARTPHONE
ANTITRUST LITIGATION

*This Document Relates to:*
*All Direct Purchaser Plaintiff Actions*

Case No. 24-MD-3113 (JXN-LDW)

## HAUSFELD LLP'S & SUSMAN GODFREY LLP'S RESPONSE TO THE "MAJORITY PLAINTIFFS" GROUP'S PROPOSED LEADERSHIP SLATE FOR THE DIRECT PURCHASER CLASS

i

1005758.1

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................1

II.  THE MP PROPOSAL IS INEFFICIENT AND UNWIELDY .........................2

III. THE MP PROPOSAL IGNORES JUDICIAL ADVICE GIVEN TO COURTS
     ON CLASS LEADERSHIP APPOINTMENTS...................................6

IV.  THE MP PROPOSAL RELIES ON INAPPOSITE CASES INVOLVING
     VERY DIFFERENT CLAIMS AND IGNORES RECENT ANTITRUST
     LEADERSHIP PRECEDENTS ..........................................................9

V.   THE MPS' JUSTIFICATIONS FOR THEIR PROPOSED STRUCTURE ARE
     UNAVAILING................................................................................17

VI.  CONCLUSION .............................................................................26

1005758.1

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*City of Providence, Rhode Island v. AbbVie Inc.*,
No. 20-CV-5538 (LJL), 2020 WL 6049139 (S.D.N.Y. Oct. 13, 2020).............. 19

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
No. 17-cv-00564 NC, 2017 WL 4224723 (N.D. Cal. Sept. 22, 2017) ................. 5

*Four in One Co. v. SK Foods L.P.*,
No. 2:08-cv-03107, 2009 WL 747160 (E.D. Cal. Mar. 20, 2009) ..................... 13

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
240 F.R.D. 56 (E.D.N.Y. 2006) .......................................................... 18

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
2:19-md-02904 (D.N.J.)................................................................... 10

*In re Apple Inc. Device Performance Litig.*,
2018 WL 11360203 (N.D. Cal. May. 15, 2018)........................................... 11, 12

*In re Bystolic Antitrust Litig.*,
No. 20-cv-5735 (LJL), 2020 WL 6700830 (S.D.N.Y. Nov. 12, 2020) .............. 15

*In re California Gasoline Spot Mkt. Antitrust Litig.*,
No. 3:20-cv-03131-JSC (N.D. Cal.) .................................................... 16

*In re Capital One Consumer Data Sec. Breach Litig.*,
No. 1:19-MD-2915-AJT (E.D. Va.)..................................................... 11

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. 07-5944 SC, 2008 WL 2024957 (N.D. Cal. May 9, 2008)......................... 13

*In re Crude Oil Commodity Futures Litig.*,
2012 WL 569195 (S.D.N.Y. Feb. 14, 2012)................................................ 15, 16

*In re Deva Concepts Prod. Liab. Litig.*,
No. 1:20-cv-01234-GHW, 2020 WL 4368362 (S.D.N.Y. July 30, 2020)........... 12

*In re Enzo Biochem Data Sec. Litig.*,
No. CV-23-4282 (GRB)(AYS), 2023 WL 6385387 (E.D.N.Y. Sept. 29, 2023)  11

*In re Gerber Prod. Co. Heavy Metals Baby Food Litig.*,
No. 1:21-cv-269 (MSN/JFA), 2022 WL 1494378 (E.D. Va. May 10, 2023)...... 12

*In re Google Play Dev. Antitrust Litig.*,
No. 3:20-cv-05792 (N.D. Cal.) ........................................................................... 16

*In re European Gov't Bonds*,
19-cv-02601 (S.D.N.Y.) ...................................................................................... 17

*In re Int. Rate Swaps Antitrust Litig.*,
No. 16-MD-2704, 2016 WL 4131846 (S.D.N.Y. Aug. 3, 2016)........................ 15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
No. 11 MD 2262 (NRB), 2011 WL 5980198 (S.D.N.Y. Nov. 29, 2011) ........... 16

*In re Nat'l Football League Players' Concussion Injury Litig.*,
307 F.R.D. 351 (E.D. Pa. 2015).................................................................... 3, 4, 5

*In re Nat'l Prescription Opiate Litig.*,
No. 1:17-md-2804 (N.D. Ohio) ...................................................................... 9, 10

*In re Nelnet Servicing, Inc.*,
No. 4:22CV3181, 2023 WL 1108253 (D. Neb. Jan. 20, 2023) .......................... 11

*In re Parking Heaters Antitrust Litig.*,
310 F.R.D. 54 (E.D.N.Y. 2015) .......................................................................... 14

*In re RealPage, Inc., Rental Software Antitrust Litig.*,
No. 3:23-md-3071 (M.D. Tenn.)..................................................................... 16, 17

*In re Shop-Vac Mktg. & Sales Practices Litig.*,
No. 4:12-md-2380, 2013 WL 183855 (M.D. Pa. Jan. 17, 2013)........................ 18

*In re SSA Bonds Antitrust Litig.*,
No. 16 CIV. 3711 (ER), 2016 WL 7439365 (S.D.N.Y. Dec. 22, 2016)........ 14, 15

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
No. 3:07-cv-05634-CRB (N.D. Cal.)................................................................... 18

*In re Warner Music Grp. Data Breach*,
No. 20 CIV. 7473 (PGG), 2021 WL 725728 (S.D.N.Y. Feb. 22, 2021) ............. 11

*Kjessler v. Zaappaaz, Inc.*,
   No. 4:17-CV-3064, 2018 WL 8755737 (S.D. Tex. Aug. 31, 2018) ............... 8, 12

*Kamakahi v. Am. Soc. for Reprod. Med.*,
   No. C 11-01781 SBA, 2012 WL 892163 (N.D. Cal. Mar. 14, 2012).................. 12

*United States, et al. v. Apple, Inc.*,
   No. 2:24-cv-04055 (D.N.J.) .......................................................................... 22, 25


**Rules**

Fed. R. Civ. P. 23 ...............................................................................*passim*


**Other Authorities**

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 10.221 ...................................... 8, 9

*The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency
   in the Large Class Action*,
   54 U. Chi. L. Rev. 877 (1987) ............................................................................. 6

*Third Circuit Task Force Report, Selection of Class Counsel*,
   208 F.R.D. 340 (2002) .................................................................................. 6, 7, 8

## I.   INTRODUCTION

Plaintiffs Shoshi Goldfus and Ira Polly, who have moved for the appointment of Hausfeld LLP ("Hausfeld") and Susman Godfrey LLP ("Susman") as Interim Co-Lead Counsel for the proposed Direct Purchaser Plaintiff ("DPP") Class (together, the "Proposed Co-Leads"), hereby respond to the motion for leadership presented by the so-called "Majority Plaintiffs" ("MP").

The choice between the Hausfeld-Susman leadership proposal and the MP proposal could not be starker, and the conclusion that the Hausfeld-Susman proposal will best serve the interests of the proposed DPP Class could hardly be clearer. Hausfeld and Susman have proposed a lean, efficient leadership structure helmed by the country's two most elite antitrust firms who, both separately and together, have a demonstrated track record of shepherding the country's highest-stakes cases through trial. The MPs, by contrast, have proposed a top-heavy leadership structure that is unmoored from the needs of the case, that lacks any coherent justification for the sheer number of firms involved or the vaguely defined roles they would play, and that inherently invites inefficiency, duplication of work, and inflation of attorneys' fees.

The MPs' leadership proposal is not in the best interest of the proposed DPP Class and their prosecution of the case, nor is it justified by any of the supposed rationales proffered by the MPs. The proposal—comprised of 16 separate firms,

arranged into vaguely defined committees, without clear lines of responsibility or accountability—is unnecessary, inefficient, and runs contrary to virtually every authority on the appointment of class counsel. It conflicts with the guidance given by the United States Court of Appeals for the Third Circuit and the Federal Judicial Center ("FJC") on how lead counsel for class actions ought to be appointed. It conflicts with the Advisory Committee Notes accompanying the 2003 amendments to the Federal Rules of Civil Procedure that added Rule 23(g), which deals with appointment of interim class counsel. And it is inconsistent with how contested leadership has been decided by numerous courts in recent antitrust class actions. A responsible general counsel of a private corporation or public entity would find the MP proposal ill-advised at best and, respectfully, this Court should not impose such an ill-advised structure on the proposed DPP Class.

Asking which of the competing proposals best serves the interests of the class —the lean and efficient Hausfeld-Susman proposal, or the sprawling, inefficient, and labyrinthine MP proposal—is a question that virtually answers itself. This Court should grant Hausfeld's and Susman's motion to serve as Interim Co-Lead Class Counsel for the proposed DPP Class.

## II.  THE MP PROPOSAL IS INEFFICIENT AND UNWIELDY

The MPs have proposed one of the most convoluted leadership structures in the recent history of antitrust class actions. It consists of: (a) four co-lead counsel;

1005758.1

(b) an "Executive Committee" of seven more firms; and (c) a "Steering Committee" of yet another five firms, for a total of ***16 law firms***. MP Brief at 3. It is unclear what the division of tasks, if any, between the "Executive" and "Steering" committees would be. The proposed MP co-leads say no more than that they will "assign tasks ranging from briefing to depositions, to document review, to the development of expert testimony to members of the proposed Executive Committee and Steering Committee." *Id.* In their respective complaints, the 16 firms proposed for leadership have identified a total of ***nearly 60 attorneys*** who are expected to work on this case, though there undoubtedly would be even more attorneys and staff from these firms who would be billing time behind the scenes—ranging from other lawyers to paralegals, secretaries, IT professionals, etc.

The MPs' proposed structure has appeared before in a case in this Circuit—a ***mass tort*** case involving one of the proposed MP co-leads here: *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-MD-2323-AB (E.D. Pa.) ("*Concussion*"). *See* MP Brief at 18. In that case, there was a leadership structure of: (a) two (rather than four) co-leads; (b) a six-firm executive committee (rather than seven, and including the two co-leads among those six firms) comprised of twelve people; and (c) a nine-person steering committee. *See Concussion* ECF Nos. 64, 70.

The *Concussion* case was originally brought in 2011 as a mass tort suit against the National Football League ("NFL") and NFL Properties (collectively, the "NFL

parties") by 73 former professional football players who alleged that the NFL parties failed to protect them from the chronic risks created by concussive and subconcussive head injuries. By April of 2015, nearly 5,000 players had filed a total of over 300 similar suits against not only the NFL parties, but also, in many instances, five separate Riddell parties who manufactured and sold football helmets. *Concussion*, 307 F.R.D. 351, 361 & n.2 (E.D. Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016), *cert. denied sub nom. Gilchrist v. NFL*, 580 U.S. 1030 (2016).

Only years later was a proposed *class settlement* with the NFL parties initially submitted for approval, first in June of 2014 and as amended in early 2015. After many months of negotiation, a settlement was reached that included funding for individual medical examinations and compensation for individual player injuries. *Id.* at 364–65. Two settlement classes were created: one of retired players who had a qualifying diagnosis at the time of preliminary approval of the settlement, and another of retired players who had no such diagnosis at that time. *Id.* at 365. To obtain treatment and monitoring, each class member had to register with the claims administrator and submit a claim package within a specified time period. *Id.* at 367. The court ultimately approved the class settlements and carried forward the leadership structure created in the prior mass tort actions. *Id.* at 373.

As this summary reflects, the *Concussion* case contrasts starkly with this one. Unlike here, no one contested the *Concussion* leadership class counsel structure

(decided four years previously, when it was a mass action). Moreover, such an action on behalf of individual NFL players with multiple defendants is markedly different from the present antitrust class action against one defendant: Apple, Inc. ("Apple"). *See In re: Apple Inc. Smartphone Antitrust Litig.*, No. 24-MD-3113 (JXN-LDW) (D.N.J.) ("*Apple Smartphone Litig.*"). As explained in *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-cv-00564 NC, 2017 WL 4224723, at *5 (N.D. Cal. Sept. 22, 2017):

> In a mass tort action, . . . each plaintiff was a real party in interest to the complaints, meaning that they were named as plaintiffs in the complaints. . . . In a putative class action, like the one before the Court, one or more plaintiffs seek to represent the rest of the similarly situated plaintiffs, and the "named plaintiffs" are the only plaintiffs actually named in the complaint. *See* Fed. R. Civ. P. 23.

Unlike *Concussion*, the representative plaintiffs here assert claims typical of the class: that a single monopolist—Apple—engaged in unilateral conduct in violation of the Sherman Act by precluding competition with respect to certain markets where it has a dominant share, thereby injuring class members. Apple is an integrated company and sole defendant; it is not being accused of any conspiracy with others to further its monopoly. And the various class actions here are not being brought on a clean slate: They were initiated in the wake of a lawsuit by the United States Department of Justice ("DOJ") and multiple states that was filed on March 21, 2024. While the Proposed Co-Leads' pleadings go beyond the DOJ allegations— reflecting their own reasoned and independent research—the private lawsuits

5

depend to a significant degree on the allegations in the governmental complaint, and the private plaintiffs indisputably will benefit from any discovery obtained by the governmental regulators.

In light of all of the foregoing, a leadership structure involving 16 law firms and at least 60 counsel representing the DPP Class is excessive, unnecessary, and unsupported by any legal precedent.[1]

## III. THE MP PROPOSAL IGNORES JUDICIAL ADVICE GIVEN TO COURTS ON CLASS LEADERSHIP APPOINTMENTS

The MPs cite *Third Circuit Task Force Report, Selection of Class Counsel*, 208 F.R.D. 340 (2002) ("Task Force Report") in support of their application. MP Brief at 9. That Task Force Report warns, however, that top-heavy leadership structures can be inherently suspect:

> *[V]oluntary agreements among lawyers may create cartel-like groupings that favor some lawyers and disfavor others on the basis of factors that have little to do with ability or fees, and such agreements may also result in overstaffing and padded hours. In order to reach a "deal", lead counsel may have to "cut in" so many lawyers that the representation of the class becomes inefficient and the ultimate fee request becomes inflated[2].*

---

[1] To be clear, the Hausfeld and Susman firms have worked well with many of the MP firms in the past and, indeed, are working with some of them now in other ongoing cases. Our alternative leadership proposal simply reflects a legitimate disagreement with respect to how this case should be managed to best serve the interests of the proposed DPP Class.

[2] In support of this determination, the Task Force Report cited with approval, at footnote 24, the following article: John C. Coffee, *The Regulation of Entrepreneurial*

. . .

> The court has an obligation to determine whether counsel chosen through private ordering is indeed qualified and capable of providing effective representation to the class. ***The court should reject the counsel arrangement if the best interests of the class will not be served. Moreover, the court should rightly be concerned if private ordering has resulted in excessive staffing of the case by various law firms who have cut a deal.*** The court at the outset should scrutinize the staffing arrangement and should not hesitate to intervene by removing counsel if it appears that ***lawyers are simply in the case as part of a negotiating process for everyone to get a piece of the pie***.

Task Force Report, 208 F.R.D. at 348, 416 (footnotes omitted; emphases added).

Here, it is no coincidence that the MPs' leadership proposal would result in a leadership position being awarded to every single firm supporting that MP leadership slate.

And the Task Force Report continues, emphasizing the importance of efficiency in leadership structuring:

> In passing on the propriety of multiple counsel, the court should not be content with conclusory assertions that multiple counsel is necessary to assure input from more class members or to avoid disputes among counsel for various plaintiffs. As the [Securities & Exchange Commission] has put it, "***lead counsel should be able to explain to the court why and how the use of additional law firms promotes the***

_____

*Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. CHI. L. REV. 877, 908 (1987) (observing that under private ordering, competing groups have sometimes invited other attorneys into the action in order to secure their vote for lead counsel, and that the result of some private ordering is a "political compromise," the price of which is "often both overstaffing and an acceptance of the free-riding or marginally competent attorney, whose vote gave him leverage that his ability did not").

*effective, efficient prosecution of the litigation, rather than serving the interests of the law firms*."

*Id.* at 417 (footnote omitted; emphases added).

The Third Circuit is not alone in expressing these concerns. The Advisory Committee Notes to the 2003 amendment that created Fed. R. Civ. P. 23(g) warned that "the court should be alert to the need for adequate staffing of the case, *but also to the risk of overstaffing or an ungainly counsel structure.*"[3]

The FJC's Manual for Complex Litigation (Fourth) (2020 printing) likewise has this to say on committees of counsel in class actions: "Often called steering committees, coordinating committees, management committees, executive committees, discovery committees, or trial teams. *Committees are most commonly needed when group members' interests and positions are sufficiently dissimilar to justify giving them representation in decision making.*" § 10.221 (emphases added); *see also Kjessler v. Zaappaaz, Inc.*, No. 4:17-CV-3064, 2018 WL 8755737, at *5 (S.D. Tex. Aug. 31, 2018) ("*Kjessler*") (holding that appointment of an executive or steering committee is not appropriate where there are no "cognizable dissimilarities among the current Plaintiffs . . . in terms of their 'interests and positions'"). The FJC further warned that such committees "*can lead to*

_____

[3] Fed. R. Civ. P. 23(g), Advisory Committee's Note to 2018 Amendment (emphases added).

*substantially increased costs* . . . ." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 10.221 (emphases added).

Here, there has been *no attempt* by the MPs to show in this single-defendant case that the individual firms who seek to represent the DPP Class in the MP leadership proposal have such differing interests as to justify a 16-firm leadership structure. This creates the definite prospect of an inefficiently handled case and duplicative billing—exactly what the Third Circuit and FJC say should be discouraged.

## IV. THE MP PROPOSAL RELIES ON INAPPOSITE CASES INVOLVING VERY DIFFERENT CLAIMS AND IGNORES RECENT ANTITRUST LEADERSHIP PRECEDENTS

In support of their proposed leadership structure, the MPs point to mass tort cases, as well as product liability cases, data breach cases, or other class actions outside the antitrust context. MP Brief at 37–38. These citations are inapposite. They are not helpful to evaluating leadership in this *antitrust* case.

**The Opioids Case**. The MPs rely most heavily on the 22-firm leadership structure adopted in *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804 (N.D. Ohio) ("*Opioids*"), and cite it throughout their brief. *See* MP Brief at 1, 2, 3, 18, 19, 36, 37. But they fail to note the numerous distinctions between that case and this one. In *Opioids*, various types of governmental entities brought claims for both economic and non-economic damages, and there were also claims raised by

9

disparate groups of other entities (*e.g.*, Native American tribes, third-party payers, hospitals, and classes of similarly-situated individuals). Additionally, there were dozens of different types of defendants, including various manufacturing and marketing defendants (*e.g.*, Purdue Pharma, Mallinckrodt, Janssen, Endo, and Allergan), and various distributor and diversion defendants (*e.g.*, McKesson, Amerisource Bergen, Cardinal Health, chain stores, and independent distributors). *See Opioids*, ECF No. 34 at 5–6. Nothing like that exists in this case with respect to Apple, where the primary claims are for aggregate economic damages to the DPP Class as a whole and involve a single antitrust defendant.

**Data Breach Cases**. The principal data breach case that the MPs cite in support of their applications is *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2:19-md-02904 (D.N.J.) ("*AMCA*"). MP Brief at 37 (citing *AMCA*, ECF No. 115). But there, ***five different class complaints were on file***: one against Quest Diagnostics Inc. and Optus 360, LLC; a second against Laboratory Corporation of America Holdings; a third against CareCentrix; a fourth against Sonic Healthcare U.S.A., Inc.; and a fifth against Inform Diagnostics, Inc. *See AMCA*, ECF Nos. 104–07, 193. The order cited by the MPs appointed one overall lead counsel and separate co-lead counsel and committees for each ***group of defendants then being sued***, as well as with respect to bankruptcy proceedings. That situation is dramatically different from this case.

10

More typically, recent data breach decisions have ***rejected*** oversized leadership structures. *E.g.*, *In re Enzo Biochem Data Sec. Litig.*, No. CV-23-4282 (GRB) (AYS), 2023 WL 6385387, at *3–4 (E.D.N.Y. Sept. 29, 2023) (appointing two co-lead counsel—including Hausfeld—and refusing to appoint an executive committee); *In re Nelnet Servicing, Inc.*, No. 4:22CV3181, 2023 WL 1108253, at *6 (D. Neb. Jan. 20, 2023) (appointing two co-lead counsel rather than three, saying "the court must balance desire to create a 'dream team' with several co-lead firms against the competing considerations of efficiency and economy") (cleaned up); *In re Warner Music Grp. Data Breach*, No. 20 CIV. 7473 (PGG), 2021 WL 725728, at *3–4 (S.D.N.Y. Feb. 22, 2021) ("*Warner Music*") (appointing two lead counsel and refusing to appoint a five-firm executive committee); *In re Capital One Consumer Data Sec. Breach Litig.*, No. 1:19-MD-2915-AJT (E.D. Va.), ECF No. 210 (appointing three co-leads and declining to appoint a requested steering committee).

**Product Liability Litigation.** The product liability cases cited by the MPs are also distinguishable. The MPs' principal example is the decision in *In re Apple Inc. Device Performance Litig.*, No. 5:18-md-02827-EJD, 2018 WL 11360203 (N.D. Cal. May. 15, 2018) (ECF No. 99), *see* MP Brief at 37, as if to imply that any lawsuits against Apple require complex webs of counsel. There, however, the plaintiffs filed a 305-page complaint containing: (a) claims involving ten different Apple iPhones as well as 13 different Apple iPads; (b) one federal law claim; (c)

11

five California law claims; (d) 12 common law claims; (c) two claims under the laws of the United Kingdom; and (e) 57 claims under various state or territorial laws. *See In re Apple Inc. Device Performance Litig.*, ECF No. 145. The claims here, which turn largely on a unified body of federal antitrust law, are far more straightforward.

Moreover, other product liability or consumer class leadership rulings have dispensed with large committee structures. *See, e.g.*, *In re Gerber Prod. Co. Heavy Metals Baby Food Litig.*, No. 1:21-cv-269 (MSN/JFA), 2022 WL 1494378, at *3 (E.D. Va. May 10, 2023) ("*Gerber*") (the court refused to create an executive committee, citing five recent product liability class leadership decisions to show that "[c]ourts routinely deny requests for appointment of executive committees where plaintiffs fail to demonstrate that such appointment is necessary[,]" and observing that "[t]his action . . . is comprised of lawsuits with substantially identical common law and state consumer law claims . . . that are not so complex as to warrant a multi-firm counsel structure"); *In re Deva Concepts Prod. Liab. Litig.*, No. 1:20-cv-01234-GHW, 2020 WL 4368362, at *4 (S.D.N.Y. July 30, 2020) (commending counsel for eliminating formal executive committee); *Kjessler*, 2018 WL 8755737, at *5 (rejecting need for a three-firm steering committee where "each Plaintiff in this consolidated action has asserted similar, if not identical wrongful conduct"); *Kamakahi v. Am. Soc. for Reprod. Med.*, No. C 11-01781 SBA, 2012 WL 892163, at *3 (N.D. Cal. Mar. 14, 2012) (declining to appoint a three-firm executive

12

committee where plaintiff did not "identif[y] any diverse interest among the parties").

**Antitrust Cases**. What *is* most relevant here is what was done in recent analogous *antitrust* class actions. Courts faced with contested leadership structures in antitrust class action cases have favored more streamlined approaches with fewer lead counsel and often no subordinate committees whatsoever. For example, in *Four in One Co. v. SK Foods L.P.*, No. 2:08-cv-03107, 2009 WL 747160 (E.D. Cal. Mar. 20, 2009), the court chose a two-firm leadership structure (including Hausfeld), saying that it "believes that the appointment of more than two co-lead counsel, and anything other than a single liaison counsel, *would engender duplication of effort not in the best interest of either a focused or efficient class representation*." *Id.* at *3 (emphases added).

Likewise, in *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-5944 SC, 2008 WL 2024957 (N.D. Cal. May 9, 2008), the court chose a single lead counsel saying:

> The Court is convinced, however, that a single firm will usually provide more effective and efficient representation than a group of two or more firms. A single firm is already organized with internal levels of communication and management structure. *A group of firms, on the other hand, must create these structures. This will tend to increase the risk that items may fall through the cracks. Moreover, as the Advisory Committee Note [to Fed. R. Civ. P. 23(g)] states, "the court should be alert to . . . the risk of overstaffing" and the possibility of "an ungainly counsel structure."*

13

*Id.* at 1 (emphases added).

Similarly, in *In re Parking Heaters Antitrust Litig.*, 310 F.R.D. 54 (E.D.N.Y. 2015), the court appointed Hausfeld and the Roberts Law Firm (which supports the Hausfeld-Susman effort here) as co-leads for direct purchasers. In so ruling, the court said:

> The parties themselves were unable to reach a consensus about how to make such a leadership structure work, and I doubt that judicial fiat will succeed in creating a workable committee where the parties themselves did not. Moreover, particularly in light of the extent to which prior proceedings may have clarified some of the issues in dispute in these consolidated cases, ***there seems no need for the inevitable redundancies and inefficiencies attendant to a four-firm leadership structure***.

310 F.R.D. at 57–58 (emphases added; footnote omitted).

In that same case, one of the proposed MP co-lead counsel here sought to be appointed sole lead for indirect purchasers over a competing two-firm proposal. That firm contended there that "only one lead counsel is necessary and that a joint leadership structure would be 'overkill, inefficient and promote attorney lodestar over maximizing class member recovery.'" *Id.* at 58.

Likewise, in *In re SSA Bonds Antitrust Litig.*, No. 16 CIV. 3711 (ER), 2016 WL 7439365 (S.D.N.Y. Dec. 22, 2016), the court found that although all leadership applicants were adequate, it would only choose two and rejected a proposed executive committee, saying:

14

> [T]he Court finds that appointing a formal committee of plaintiffs' counsel is neither necessary nor beneficial to the interests of the class in this case. ***The creation of a formal committee is "most commonly needed when group members' interests and positions are sufficiently dissimilar to justify giving them representation in decision making." MCL § 10.221. None of the parties advocating for an executive committee in this case take the position that putative class members have divergent interests. Rather, those supporting the establishment of a committee seem to do so solely out of a desire to assist lead counsel with resources . . . .*** Taking into consideration that committees can lead to substantially increased costs and duplication of efforts, *see* MCL § 10.221, the Court finds that appointing only Quinn Emanuel and Robbins Geller will be "sufficient to address the various complexities that arise, while keeping unnecessary costs to a minimum."

2016 WL 7439365, at *3 (emphases added) (quoting *In re Crude Oil Commodity Futures Litig.*, No. 11 CIV. 3600 WHP, 2012 WL 569195, at *2 (S.D.N.Y. Feb. 14, 2012), and citing *In re Int. Rate Swaps Antitrust Litig.*, No. 16-MD-2704 (PAE), 2016 WL 4131846, at *4 (S.D.N.Y. Aug. 3, 2016) (appointing only two co-leads and "further find[ing] that appointing two interim co-lead counsel is most likely to produce efficient and effective representation" and determining that the creation of a formal committee "would lead to unnecessary duplication of work and hinder efficient decision making")).

Similarly, in *In re Bystolic Antitrust Litig.*, No. 20-cv-5735 (LJL), 2020 WL 6700830, at *2 (S.D.N.Y. Nov. 12, 2020), the court appointed two co-leads and said that "[t]he request to appoint an executive committee is denied. '[C]ommittees of counsel can lead to substantially increased costs and unnecessary duplication of

efforts. At this preliminary stage of the litigation, . . . a leadership structure consisting of two co-lead counsel will be sufficient to address the various complexities that may arise, while keeping unnecessary costs to a minimum[.]'" (quoting *In re Crude Oil Commodity Futures Litig.*, 2012 WL 569195, at *2).

Finally, as noted in the Hausfeld-Susman application, the two firms have been individually or jointly appointed to two-firm leadership structures in a number of recent important antitrust cases that involved numerous defendants, some of which were headquartered overseas. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2011 WL 5980198, at *4 (S.D.N.Y. Nov. 29, 2011); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS) (S.D.N.Y.); *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, Case No. 1:19-cv-21551 (S.D. Fla.).[4]

The MPs point to the recent leadership structure in *In re RealPage, Inc., Rental Software Antitrust Litig.*, No. 3:23-md-3071 (M.D. Tenn.) ("*RealPage*"), ECF No. 278, where three co-leads, a steering committee of eight firms, and one

---

[4] Indeed, in other recent antitrust cases, several of the proposed MP co-leads joined with the Hausfeld firm in much more leanly staffed leadership structures. *See, e.g.*, *In re California Gasoline Spot Mkt. Antitrust Litig.*, No. 3:20-cv-03131-JSC (N.D. Cal.), ECF No. 167 (appointing the Hausfeld firm and Girard Sharp as interim class counsel, with no committees of any kind); *In re Google Play Dev. Antitrust Litig.*, No. 3:20-cv-05792 (N.D. Cal.), ECF No. 79 (appointing the Hausfeld firm, Hagens Berman, and Sperling Slater as interim co-lead counsel, with no committees of any kind).

1005758.1

liaison counsel were appointed. MP Brief at 37. But in that case, there were several distinct proposed groups of plaintiffs, such as multifamily renters or renters of student housing, as well as distinctions drawn between various areas of the United States, which were asserted to justify separate lead counsel and/or separate committee counsel. *See, e.g.*, *RealPage*, ECF Nos. 257–59.

The only other antitrust case cited by the MPs as precedent for their sprawling structure is *In re European Gov't Bonds*, 19-cv-02601 (S.D.N.Y.), *see* MP Brief at 37–38, which involved an agreed leadership structure of four firms with no committees and a total of ***13 different defendants across five different banking groups***. *See In re European Gov't Bonds*, ECF Nos. 35, 87, 200. Those same types of complexities are not present here with respect to the proposed DPP Class.

## V.  THE MPS' JUSTIFICATIONS FOR THEIR PROPOSED STRUCTURE ARE UNAVAILING

Given that no case law or guidance supports their bloated proposal, the MPs posit three explanations to support their proposal. None of them justify their requested leadership structure.

***First***, they contend that the majority of DPPs' counsel support them. MP Brief at 5. Of course, every single one of those firms supporting the MPs has a title in the MPs' proposed leadership structure, so their support is hardly surprising. Moreover, "appointment of counsel 'is not supposed to be a popularity contest, and the number of attorneys supporting a given candidacy is not included among the factors set forth

in Rule 23(g).'" *In re Shop-Vac Mktg. & Sales Practices Litig.*, No. 4:12-md-2380, 2013 WL 183855, at *3 (M.D. Pa. Jan. 17, 2013) (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, 240 F.R.D. 56, 58 (E.D.N.Y. 2006)); *see also In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 3:07-cv-05634-CRB (N.D. Cal.), ECF No. 130 (order appointing two co-leads—the Cohen Milstein firm (later substituted out in favor of the Hausfeld firm) and the Cotchett firm (proposed by the MPs as an executive committee member here)—despite the fact that the latter firm asserted that it had the support of nearly all counsel that filed actions).[5]

> ***Second***, the MPs suggest that they have the better ability to support and staff this action. MP Brief at 38. That is again inaccurate. As explained in the Hausfeld-Susman leadership application, those firms have more than ample resources to litigate this case and are willing to commit substantial personnel and other resources to doing so. *See Apple Smartphone Litig.*, ECF No. 19-2 Exh. C (listing of counsel from Hausfeld who are already working on this matter), Exh. D (same for the Susman firm). Additionally, and as contemplated in the Court's Case Management Order No. 1, *id.* ECF No. 7—where the Court asked how leadership candidates

---

[5] The MPs also point out that they support and would be able to work closely with a group of attorneys asserting claims only on behalf of Apple Watch purchasers. MP Brief at 5. That is equally true of the Hausfeld-Susman team. Both Hausfeld and Susman have long working relationships with the attorneys and firms involved in the Apple Watch-only claims, and they have agreed with them to coordinate the two cases as efficiently and collaboratively as possible.

propose "to maintain communication and input from lawyers not part of the leadership structure"—Hausfeld and Susman are mindful that they can call upon other counsel to use their skills and expertise as needed.[6]

In addition, both firms are committed to staffing the litigation with attorneys from diverse backgrounds and seniority levels who will complement each other and strengthen the Hausfeld-Susman "virtual firm." *See id.* ECF No. 19-1 at 12, 26; *e.g.*, *id.* ECF No. 19-2 Exh. C at 14 (Hausfeld CV);[7] *see also id.* ECF No. 19-2 Exh. F at 1, 6 (Lite DePalma CV); *see also, e.g.*, *City of Providence, Rhode Island v. AbbVie Inc.*, No. 20-CV-5538 (LJL), 2020 WL 6049139, at *6 (S.D.N.Y. Oct. 13, 2020) ("Commitment to diversity . . . is a relevant factor for the Court" just as it is for "a

---

[6] As discussed in Hausfeld's and Susman's leadership application, the law firms of Lite DePalma Greenberg & Afanador, LLC ("Lite DePalma"); Critchley Kinum & Luria; Barrack Rodos & Bacine; Connolly Wells & Gray, LLP; Bonsignore LLC; and the Roberts Law Firm support the leadership application of their proposed leadership application and join in this opposition.

[7] Susman and Hausfeld have been strikingly similar in their unwavering commitments to fellowships and scholarships to foster diversity in their ranks and in the profession. *See, e.g.*, *Diversity, Equity, Inclusion*, HAUSFELD, https://www.hausfeld.com/en-us/about-us/diversity-equity-inclusion/ (last visited Aug. 21, 2024); Brenda Sapino Jeffreys, *Susman Godfrey Leaning in to Diversity in Response to Questions About Diversity Programs*, THE AMERICAN LAWYER (Oct. 30, 2023, 11:53 AM), https://www.law.com/americanlawyer/2023/10/30/susman-godfrey-leaning-in-to-diversity-in-response-to-questions-about-diversity-programs/; *Diversity*, SUSMAN GODFREY, https://www.susmangodfrey.com/diversity/ (last visited Aug. 21, 2024).

19

consensus of corporate general counsel" of leading U.S. companies seeking the best representation).

**_Third_**, the MPs suggest that all firms are on an equal footing in this case, having essentially done little more than rely on what the DOJ and states pled. MP Brief at 10. That also is not accurate, for numerous reasons.

Example one. The Hausfeld firm, which filed the **_first_** private class action case in this matter (which it solely drafted) and the Susman firm, which filed a separate complaint, relied on and used sources other than the governmental complaint. In 2020, The House Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary published a Majority Report on its "Investigation of Competition in Digital Markets" ("Report"), an entire section of which was devoted to Apple, its iOS, and its App Store.[8] The Report referenced and discussed some of the underlying materials and conduct cited in the complaint filed by the DOJ and the states. A number of those documents are publicly available on

---

[8] *See* HOUSE SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND ADMINISTRATIVE LAW OF THE COMMITTEE ON THE JUDICIARY, 116th CONG., INVESTIGATION OF COMPETITION IN DIGITAL MARKETS, MAJORITY STAFF REPORT AND RECOMMENDATIONS (2020), https://democrats-judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

the House Judiciary Committee's website.[9] Rather than merely parroting the DOJ complaint, in drafting the first-filed private complaint in these proceedings, the Hausfeld firm, which was already aware of those materials, did independent research and included that research (much of which relied on information from the Report and those documents) in its complaint, something that the complaints filed by the MPs did not do (other than some subsequently filed pleadings, which used the Hausfeld allegations as a template). This underscores the fact that the Hausfeld and Susman firms took the time to learn and begin to master the case long before formal discovery has commenced. *See* Fed. R. Civ. P. 23(g)(i).

Example two. In addition to including information from the Judiciary Committee investigation described above, the Hausfeld and Susman firms, because of their research on how Apple works, were able to add to their respective complaints original allegations concerning the admissions of Phillip Shoemaker ("Shoemaker"), Apple's former Director of App Review, who ran the Apple app store during its formative years. In 2019, he wrote an article saying that the App Store rules were often "arbitrary" and "arguable," and that "Apple has struggled with using the App

---

[9] *See* U.S. House Committee on The Judiciary Democrats, *Online Platforms and Market Power*, https://democrats-judiciary.house.gov/online-platforms-and-market-power/ (last visited Aug. 21, 2024).

Store as a weapon against competitors."[10] Shoemaker noted that "Apple has complete and unprecedented power over their customers' devices. The decisions they make with regards to third-party apps need to be above reproach, and currently are not."[11]

Example three. The Hausfeld and Susman firms' due diligence and research has continued since the filing of their complaints. Shortly afterwards, for instance, Hausfeld began consulting with an economic expert who can serve both firms.

Example four. Similarly, the Hausfeld and Susman firms are prepared in advance for dealing with arguments that Apple made in response to claims made by the DOJ and the states, which Apple is likely to repeat with respect to any consolidated DPP complaint. One such issue that Apple has raised, in its letter to the Court on its intended dismissal motion against the DOJ's and the states' complaint and in the motion itself, is that there is no cognizable separate market for "premium smartphones." *See United States, et al. v. Apple, Inc*., No. 2:24-cv-04055 (D.N.J.), ECF No. 86-1 at 35–36. But the Proposed Co-Leads were fully aware of this potential issue and have accessed the summaries of shares in the Global Premium

---

[10] Phillip Shoemaker, *Apple v. Everybody*, MEDIUM (Mar. 29, 2019), https://medium.com/@phillipshoemaker/apple-v-everybody-5903039e3be#:~:text=Over%20the%20years%2C%20Apple%20has,t%20know%20how%20to%20respond.

[11] *Id.*

Smartphone Market that were created by Counterpoint Research, whose analysis for 2023 is that Apple has 71% of that market.[12] This analysis contradicts Apple's contentions on market power and reflects industry recognition that "premium smartphones" are a distinct product market.

Hausfeld and Susman are also conversant with Apple's ***own*** differentiation between its high-priced iPhone Pro line and cheaper iPhones in the United States. This differentiation was recently acknowledged by Apple: Apple plans to introduce "Apple Intelligence" (a form of artificial intelligence) with iOS 18 this fall, but its maximum capabilities will only be available on higher priced iPhone Pros due to hardware limitations, a fact that has disadvantaged iPhone customers.[13]

Example five. The lawyers in Hausfeld's UK office are already fully conversant with some of the anticompetitive tactics in which Apple has engaged. *See Apple Smartphone Litig.*, ECF No. 19-1 at 10. That office filed a collective

---

[12] *See Global Premium Smartphone Market Continues to See Record Sales in 2023*, COUNTERPOINT (Jan. 2, 2024), https://www.counterpointresearch.com/insights/global-premium-smartphone-market-continues-record-growth-2023/.

[13] *See* Ewan Spence, *How Apple's Decisions Have Hurt Millions of iPhone Users*, FORBES (updated June 16, 2024), https://www.forbes.com/sites/ewanspence/2024/06/15/apple-iphone-16-pro-a17-apple-intelligence-limited-ai-old-iphone-support/.

action against Apple in the U.K. Competition Appeal Tribunal ("CAT") back in 2021. As explained on Hausfeld's website:

> [Apple] is accused of using its dominant position by imposing restrictive terms on app developers, stifling efforts by other would-be distributors to offer app purchasers better value for money, reaping excessive profits. Apple has also allegedly abused its dominant position by blocking users' ability to pay for many app services other than through the company's own App Store Payment System, which typically also includes the 30% commission payment to Apple. It is argued that this practice is monopolistic and unlawful, and that Apple would be unable to charge customers such an excessive mark-up if its devices were open to competitors.[14]

In June of 2022, the CAT determined that the claims could proceed as a collective action.[15]

The significance of European Commission ("EC") decisions and investigations against Apple and the close familiarity of Hausfeld's European offices with those efforts is extremely valuable to the class for the prosecution of these same issues here. For example, the EC issued a Statement of Objections to Apple for excluding third-party mobile wallet service providers from getting access to the Near

---

[14] *Apple Faces Legal Demand to Repay 20 Million UK Customers Related to Excessive and Unlawful App Store Charges*, HAUSFELD (May 11, 2021), https://www.hausfeld.com/en-us/news/apple-faces-legal-demand-to-repay-20-million-uk-customers-related-to-excessive-and-unlawful-app-store-charges/.

[15] *A Green Light for the Kent Collective Claim Against Apple*, HAUSFELD (July 1, 2022), https://www.hausfeld.com/en-de/news/a-green-light-for-the-kent-collective-claim-against-apple/.

Field Communication technology in iPhones (used with Apple Pay).[16] In 2024, the EC got Apple to agree to a set of "commitments" to open up that technology to others and has asked for public comments on those commitments.[17] The DOJ and the states specifically noted this development in paragraph 115 of their amended complaint. *See United States, et al. v. Apple, Inc.*, ECF No. 51 at 46.

Example six. Dr. Thomas Höppner, a partner in Hausfeld's German office, is recognized as "probably the antitrust and regulatory lawyer who has by far the best grasp of the issues and regulation of Big-Tech, both in fact and in law, in all of Europe." *Apple Smartphone Litig.*, ECF No. 19-1 at 9. He is thoroughly familiar with Apple's anticompetitive practices in both Europe and the United States and has written extensively on them.[18] He can provide invaluable assistance to the Hausfeld

---

[16] *See* Arianna Podesta & Maria Tsoni, *Antitrust: Commission Sends Statement of Objections to Apple over Practices Regarding Apple Pay*, COMISIÓN EUROPEA (May 2, 2022), https://ec.europa.eu/commission/presscorner/detail/es/ip_22_2764.

[17] *See* Lea Zuber & Sara Simonini, *Antitrust: Commission Seeks Feedback on Commitments Offered by Apple over Practices Related to Apple Pay*, COMISIÓN EUROPEA (Jan. 19, 2024), https://ec.europa.eu/commission/presscorner/detail/es/ip_24_282.

[18] *See, e.g.*, Thomas Höppner *et al.*, *Taking a Bite at the Apple: Ensuring a Level-Playing-Field for Competition on App Stores* (June 12, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3394773; Symposium with Thomas Höppner, *Monopolization and Abuse: Application to Platforms and Digital Markets* (Feb. 8, 2020), https://www.law.nyu.edu/conferences/2020-Bigness-Antitrust-Conference; *Thomas Höppner*, LINKEDIN, https://www.linkedin.com/posts/thomas-höppner-7ba59a70_eu-to-hit-apple-with-

---

25

and Susman firms in prosecuting this case. No MP counsel has equivalent or superior credentials. *See* Fed. R. Civ. P. 23(g)(ii)–(iii).

In short, the Hausfeld-Susman team has extensive knowledge about Apple and will litigate this case more effectively and efficiently than any of the competing firms. And the Hausfeld and Susman firms are the ***only*** proposed co-leads who have taken two major rule of reason class action antitrust cases through trial.

## VI. CONCLUSION

For all of the foregoing reasons, the undersigned counsel respectfully request that the Court reject the MP leadership slate and appoint instead the Hausfeld and Susman firms as co-leads for the proposed DPP Class.

---

first-ever-fine-in-500mn-activity-7164998001285939200-irM8 (last visited Aug. 21, 2024); Hausfeld Podcast with Thomas Höppner, *Global Giant Apple: The Evil Side of the Love Brand*, HAUSFELD (Nov. 1, 2022), https://www.hausfeld.com/what-we-think/perspectives-podcasts/global-giant-apple-the-evil-side-of-the-love-brand-podcast/; Thomas Höppner, *Apple ATT: App Tracking Transparency Between Data Protection and Competition Restriction*, JENTIS https://www.jentis.com/en/article/app-tracking-transparency-between-data-protection-and-competition-restriction/ (last visited Aug. 21, 2024); Thomas Höppner *et al.*, *Privacy by Default, Abuse by Design: EU Competition Concerns About Apple's New App Tracking Policy* (June 4, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3853981; Karin Matussek, *Apple Privacy Changes Face Industry Complaint in Germany (1)*, BLOOMBERG NEWS (Apr. 26, 2021), https://news.bloomberglaw.com/privacy-and-data-security/apple-privacy-changes-face-industry-complaint-in-germany-1.

Dated: August 22, 2024

Respectfully submitted,

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

*/s/ Joseph J. DePalma*
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: (973) 623-3000
jdepalma@litedepalma.com

**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Mindee J. Reuben
Steven J. Greenfogel*
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: (215) 854-4060
mreuben@litedepalma.com
sgreenfogel@litedepalma.com

*Counsel for Plaintiff Ira Polly and the Proposed Class*

**HAUSFELD LLP**
Michael D. Hausfeld*
Melinda R. Coolidge*
Sarah R. LaFreniere*
Nicholas Murphy*
Theodore DiSalvo*
888 16th Street, NW Suite 300
Washington, DC 20006
Tel: (202) 540-7200
mhausfeld@hausfeld.com
mcoolidge@hausfeld.com
slafreniere@hausfeld.com
nmurphy@hausfeld.com
tdisalvo@hausfeld.com

27

Katie R. Beran
325 Chestnut Street
Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
kberan@hausfeld.com

Scott Martin*
Daniel P. Weick*
33 Whitehall Street
14th Floor
New York, NY 10004
Tel: (646) 357-1100
smartin@hausfeld.com
dweick@hausfeld.com

Michael P. Lehmann*
Megan E. Jones*
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
mlehmann@hausfeld.com
mjones@hausfeld.com

*Counsel for Plaintiffs Goldfus and Polly and their respective Proposed Classes*

**SUSMAN GODFREY LLP**
William Christopher Carmody*
Shawn J. Rabin*
Cory Buland*
Mark Musico*
Elisha Barron*
One Manhattan West, 50th Floor
New York, NY 10001-8602
Tel: (212) 336-8330
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
cbuland@susmangodfrey.com

28

mmusico@susmangodfrey.com
ebarron@susmangodfrey.com

*Counsel for Plaintiff Polly and the Proposed Class*

**CRITCHLEY, KINUM & LURIA, LLC**
Michael Critchley
75 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 422-9200
mcritchley@critchleylaw.com

*Counsel for Plaintiff Goldfus and the Proposed Class*

**BARRACK, RODOS & BACINE**
William J. Ban*
Eleven Times Square
640 8th Avenue, 10th Floor
New York, NY 10036
Tel: (212) 688-0782
wban@barrack.com

Andrew J. Heo
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 297-1484
aheo@barrack.com

Gerald J. Rodos
Daniel E. Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 963-0600
grodos@barrack.com
dbacine@barrack.com

*Counsel for Plaintiff Louis Levine and the*

*Proposed Class*

**CONNOLLY WELLS & GRAY, LLP**
Stephen E. Connolly*
Gerald D. Wells, III
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Tel: (610) 822-3700
sconnolly@cwglaw.com
gwells@cwglaw.com

*Counsel for Plaintiff Matthew Crocco and the Proposed Class*

**ROBERTS LAW FIRM US, PC**
Michael Roberts*
Erich Schork*
1920 McKinney Ave., Suite 700
Dallas, TX 75201
Tel: (501) 821-5575
mikeroberts@robertslawfirm.us
erichschork@robertslawfirm.us

*Counsel for Plaintiff ULTRA HOME SET LLC and the Proposed Class*

**BONSIGNORE    TRIAL    LAWYERS, PLLC**
Robert J. Bonsignore*
23 Forest St.
Medford, Massachusetts 02155
Tel: (781) 350-0000
rbonsignore@classactions.us

*Counsel for Plaintiffs Barbara Aceto, Eraldo Aguiar, Marisa Filter, Brian Rodgers, Mauricio Hernandez, Ana Deluca, Patricia Yaneth Cornejo Oraheta, Amy Cross, John Miller, and the Proposed Class*

30

*admitted pro hac vice

31