IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION | Case No. 2:24-md-3113(JXN)(LDW) |
|  | MDL No. 3113 |
|  | Hon. Julien X. Neals, U.S.D.J. |
|  | Hon. Leda D. Wettre, U.S.M.J. |
|  | *Oral Argument Requested* |
|  | *Document Filed Electronically* |

**MEMORANDUM IN SUPPORT OF APPLE INC.'S MOTION TO DISMISS CONSOLIDATED COMPLAINTS OF DIRECT AND INDIRECT IPHONE PURCHASERS AND DIRECT APPLE WATCH PURCHASER**

WALSH PIZZI O'REILLY FALANGA LLP
100 Mulberry Street, 15th Floor
Newark, NJ 07102

GIBSON, DUNN & CRUTCHER LLP
1700 M. Street, N.W.
Washington, D.C. 20036

KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................3

I.    IPHONE, APP STORE, AND WATCH...........................................................4

II.   PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINTS ...........6

    A. iPhone Purchaser Plaintiffs' Complaints .......................................................7

    B. Watch Plaintiff's Complaint ........................................................................11

LEGAL STANDARD ............................................................................................ 13

ARGUMENT ........................................................................................................... 13

I.    PLAINTIFFS FAIL TO ALLEGE THE RELEVANT MARKETS.... 14

    A. iPhone Purchaser Plaintiffs Fail To Define The Relevant Markets............15

    B. Watch Plaintiff Fails To Define A Plausible Single-Brand Market ..........24

II.   PLAINTIFFS LACK ANTITRUST AND ARTICLE III STANDING 28

    A. iPhone Purchaser Plaintiffs Lack Antitrust Standing To Seek Damages ...29

        1. Antitrust Injury .......................................................................................29

        2. Indirect Causal Connection ....................................................................36

        3. Speculation ..............................................................................................40

        4. Existence of More Direct Plaintiffs And Duplicative Damages ..............44

        5. Indirect iPhone Purchasers' State Law Antitrust Claims Fail For The
           Same Reasons ............................................................................................45

    B. Watch Plaintiff Lacks Antitrust Standing ...................................................45

    C. All Plaintiffs Lack Article III Standing........................................................52

        1. All Plaintiffs Fail To Plead Injuries That Are Fairly Traceable To The
           Challenged Conduct..................................................................................52

        2. All Plaintiffs Fail to Plead Redressability As To Their Claims For
           Injunctive Relief ......................................................................................53

3. Indirect iPhone Purchasers Lack Standing To Bring State Law Claims Where They Neither Reside Nor Purchased An iPhone ........................... 55

**III. THE COURT SHOULD DISMISS THE WATCH COMPLAINT FOR FAILURE TO STATE AN ANTITRUST CLAIM ................................. 57**

A. Watch Plaintiff's Section 2 Claims Should Be Dismissed Because The Watch Complaint Does Not Plausibly Allege Anticompetitive Conduct ... 57

1. Apple's Alleged Refusal To Share APIs with Smartphone Rivals Is a Lawful Refusal to Deal ................................................................. 59

2. Apple's Alleged App Review Guideline Restrictions on Companion and Sister Apps Are Lawful Refusals to Deal ........................................... 64

3. Apple's Refusal To Engineer Interoperability with Competing Smartwatches Is a Lawful Refusal to Deal ................................................. 69

B. Watch Plaintiff's Section One And Cartwright Act Claims Should be Dismissed ............................................................................................. 73

1. Watch Plaintiff Does Not Plead Any Concerted Action .......................... 73

2. At a Minimum, Watch Plaintiff Does Not Plead a Per Se Claim ............. 75

**IV. THE VAST MAJORITY OF THE STATE LAW CLAIMS SHOULD ALSO BE DISMISSED FOR ADDITIONAL REASONS .................... 78**

A. The California Unfair Competition Law Claim Brought By All Plaintiffs Should Be Dismissed ............................................................................ 78

B. Seventeen State Law Antitrust Claims Should Be Dismissed ................... 81

C. Fourteen State Law Consumer Protection Claims Should Be Dismissed .. 85

D. The State Law Unjust Enrichment Claim Also Fails ................................. 87

E. Recovery Under Eleven State-Law Claims is Limited to Time Periods Shorter Than the Sherman Act's Limitation Period .................................. 89

**CONCLUSION ................................................................................. 90**

   
# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbott Lab'ys v. Durrett*,
  746 So. 2d 316 (Ala. 1999) ................................................................................. 83

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) .......................................................... 61, 63, 65

*In re Aftermarket Filters Antitrust Litig.*,
  2009 WL 3754041 (N.D. Ill. 2009) ................................................................. 85

*Alaska Airlines Inc. v. United Airlines, Inc.*,
  948 F.2d 536 (9th Cir. 1991) ............................................................................ 21

*AliveCor, Inc. v. Apple Inc.*,
  592 F. Supp. 3d 904 (N.D. Cal. 2022) ....................................................... 27, 50

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
  228 F.3d 429 (3d Cir. 2000) ................................................................. 34, 36, 40

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
  592 F.3d 991 (9th Cir. 2010) ................................................................ 70, 71, 72

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
  190 F.3d 1051 (9th Cir. 1999) .................................................................. 29, 34

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ........................................................................ 72

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  361 F. Supp. 324 (E.D.N.Y. 2019) .................................................................. 26

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010) ................................................................................... 74, 75

*In re Amitiza Antitrust Litig.*,
  2024 WL 4250224 (D. Mass. Aug. 21, 2024) ................................................. 84

*Anderson v. Apple Inc.*,
  500 F. Supp. 3d 993 (N.D. Cal. 2020) ............................................................. 80

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
  34 F. Supp. 3d 465 (D.N.J. 2014) .................................................................... 28

*Apperson v. Fleet Carrier Corp.*,
  879 F.2d 1344 (6th Cir. 1989) .......................................................................... 51

iii

*Apple Inc. v. Pepper*,
    587 U.S. 273 (2019)................................................................35

*Apple Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008)................................25, 27, 73

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................13, 25

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)................................................................59

*Assam Drug Co. v. Miller Brewing Co.*,
    798 F.2d 311 (8th Cir. 1986) .................................................19

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
    Carpenters*,
    459 U.S. 519 (1983).............................. 2, 29, 36, 40, 47, 49, 50

*AT&T Corp. v. JMC Telecom, LLC*,
    470 F.3d 525 (3d Cir. 2006) .....................................................77

*Bakay v. Apple Inc.*,
    2024 WL 3381034 (N.D. Cal. Jul. 11, 2024) ............... 32, 39, 44, 50, 51, 55, 75

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*,
    118 F.3d 178 (3d Cir. 1997) .....................................................29

*Beverage v. Apple Inc.*,
    101 Cal. App. 5th 736 (2004) .............................................79, 85

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982)................................................................34

*Borough of Lansdale v. Phila. Elec. Co.*,
    692 F.2d 307 (3d Cir. 1982) .....................................................14

*Broadcom Corp. v. Qualcomm Inc.*,
    501 F.3d 297 (3d Cir. 2007) .........................................19, 32, 42, 58

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)................................................................25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)................................................................29

*Burdell v. Grandi*,
    152 Cal. 376 (1907) ................................................................84

iv

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) ......................................................................57, 73

*Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*,
    613 F.2d 727 (9th Cir. 1979) ..............................................................................71

*Catlin v. Washington Energy Co.*,
    791 F.2d 1343 (9th Cir. 1986) ............................................................................20

*In re Cattle & Beef Antitrust Litig.*,
    687 F. Supp. 3d 828 (D. Minn. 2023)...........................................................46, 47

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ................................................................................78, 79

*Chagares v. Monmouth Med. Ctr.*,
    2022 WL 3588103 (D.N.J. Aug. 22, 2022) ................................................28, 47

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001) ..............................................................................79

*In re Cipro Cases I & II*,
    61 Cal. 4th 116 (2015) .......................................................................................84

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021) ..............................................................................49

*City of Pittsburgh v. W. Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998) .........................................................................43, 52

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013).............................................................................................53

*Commonwealth v. Chesapeake Energy Corp.*,
    247 A.3d 934 (Penn. 2021)..................................................................................85

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984)......................................................................................73, 74

*Coronavirus Reporter v. Apple Inc.*,
    85 F.4th 948 (9th Cir. 2023)................................................................................23

*Coronavirus Reporter v. Apple Inc.*,
    2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ..................................................27

*D.R. Ward Constr. Co. v. Rohm and Haas Co.*,
    470 F. Supp. 2d 485 (E.D. Pa. 2006)..................................................................45

v

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   2015 WL 3988488 (N.D. Ill. Jun. 29, 2015)......................................46

*Davis v. Fed. Election Comm'n*,
   554 U.S. 724 (2008)............................................................52, 57

*De Filippo v. Ford Motor Co.*,
   516 F.2d 1313 (3d Cir. 1975) ...................................................77

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   362 F. Supp. 3d 510 (N.D. Ill. 2019).............................................46

*Delaware Health Care, Inc. v. MCD Holding Co.*,
   893 F. Supp. 1279 (D. Del. 1995)................................................16

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011) ..........................................83

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   516 F. Supp. 2d. 1072 (N.D. Cal. 2007)........................................83

*Eagle v. Star-Kist Foods*,
   812 F.2d 538 (9th Cir. 1987) ..............................................39, 49

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)........................................................20, 22

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006)........................................................80, 88

*In re Effexor Antitrust Litig.*,
   337 F. Supp. 3d 435 (D.N.J. 2018) .............................................83

*Eichorn v. AT&T Corp.*,
   248 F.3d 131 (3d Cir. 2001) ...................................................25

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021)...................... 5, 25, 26, 27, 63, 64, 77

*Epic Games, Inc. v. Apple Inc.*,
   67 F.4th 946 (9th Cir. 2023) ............................................20, 24, 76

*Est. of Johnson v. Adkins*,
   513 So. 2d 922 (Miss. 1987).....................................................89

*Ethypharm S.A. France v. Abbott Lab'ys*,
   707 F.3d 223 (3d Cir. 2013) ..............................................32, 34

*F.D.A. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)..........................................................................53

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal. 2015).........................................30, 33

*Fineman v. Armstrong World Indus., Inc.*,
  980 F.2d 171 (3d Cir. 1992) ........................................................21, 23

*First Priority Emergency Vehicles, Inc. v. REV Ambulance Grp.*
*Orlando, Inc.*,
  2020 WL 2029344 (D.N.J. Apr. 28, 2020).......................................21

*In re Flonase Antitrust Litig.*,
  284 F.R.D. 207 (E.D. Pa. 2012)..........................................................81

*In re Flonase Antitrust Litig.*,
  692 F. Supp. 2d 524 (E.D. Pa. 2010)..................................................89

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
  703 F.2d 534 (9th Cir. 1983) ......................................................72, 73

*In re Fragrance Direct Antitrust Litig.*,
  2025 WL 579639 (D.N.J. Feb. 21, 2025)....................................55, 56

*Freeman Indus. LLC v. Eastman Chem. Co.*,
  172 S.W.3d 512 (Tenn. 2005) ............................................................83

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986)............................................................................16

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) .............................33, 58, 59, 61, 63

*Gibson v. Cendyn Grp., LLC*,
  148 F.4th 1069 (9th Cir. 2025) ..........................................................74

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*,
  960 F. Supp. 701 (S.D.N.Y. 1997) .....................................................26

*In re Google Play*,
  — F.4th —, 2025 WL 2167402 (9th Cir. 2025).........................16, 62

*Gordon v. Lewiston Hosp.*,
  423 F.3d 184 (3d Cir. 2005) ..............................................................17

*Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*,
  723 F.3d 1019 (9th Cir. 2013) ...........................................................19

*Green Country Food Market v. Bottling Grp., LLC*,
371 F.3d 1275 (10th Cir. 2004) ...........................................................26

*H-Quotient, Inc. v. Knight Trading Grp., Inc.*,
2005 WL 323750 (S.D.N.Y. Feb. 9, 2005) .........................................82

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015) ...............................................30, 32, 34

*Home Depot USA, Inc. v. Lafarge N. Am., Inc.*,
59 F.4th 55 (3d Cir. 2023) .........................................................23, 24

*Host Int'l, Inc. v. MarketPlace PHL, LLC*,
32 F.4th 242 (3d Cir. 2022) .........................................28, 58, 63, 72

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
424 F.3d 363 (3d Cir. 2005) ...........................................................81

*IDT Corp. v. Bldg. Owners & Managers Ass'n Int'l*,
2005 WL 3447615 (D.N.J. Dec. 15, 2005)........................................28

*Ill. Tool Works Inc. v. Indep. Ink., Inc.*,
547 U.S. 28 (2006)...........................................................................22

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)....................................................................35, 81

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) .........................................................23

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010) ......................................................76, 77

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
924 F.3d 57 (2d Cir. 2019) ..............................................................44

*Jones v. Micron Tech. Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019)..............................................39

*Julian v. TTE Tech., Inc.*,
2020 WL 6743912 (N.D. Cal. Nov. 17, 2020) ..................................80

*Kloth v. Microsoft Corp.*,
444 F.3d 312 (4th Cir. 2006) ...........................2, 39, 40, 43, 44, 50

*Laydon v. v. Coöperatieve Rabobank U.A.*,
55 F.4th 86 (2d Cir. 2022) ..............................................................49

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)............................................................................76

*Levine v. Vilsack*,
  587 F.3d 986 (9th Cir. 2009) ...........................................................54

*Lexmark Int'l., Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)..........................................................................47

*Llacua v. Western Range Ass'n.*,
  930 F.3d 1161 (10th Cir. 2019) .......................................................77

*Loeb Indus., Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) ...........................................................39

*Long v. SEPTA*,
  903 F.3d 312 (3d Cir. 2018) ............................................................56

*Lorain Journal Co. v. United States*,
  342 U.S. 143 (1951)....................................................................67, 68

*Lorenzo v. Qualcomm Inc.*,
  603 F. Supp. 2d 1291 (S.D. Cal. 2009).......................................33, 84

*Lorix v. Crompton Corp.*,
  736 N.W.2d 619 (Minn. 2007) ........................................................47

*Low v. LinkedIn Corp.*,
  900 F. Supp. 2d 1010 (N.D. Cal. 2012)...........................................89

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................28, 52, 53

*Lutter v. JNESO*,
  86 F.4th 111 (3d Cir. 2023) .............................................................53

*Masters v. Wilhelmina Model Agency, Inc.*,
  2003 WL 145556 (S.D.N.Y. Jan. 17, 2003) ...................................90

*In re Microsoft Corp. Antitrust Lit.*,
  127 F. Supp. 2d 702 (D. Md. 2011)............................................51, 52

*Mielo v. Steak 'N Shake Operations, Inc.*,
  897 F.3d 467 (3d Cir. 2018) ............................................................56

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)..........................................................................73

*Mueller Co. v. U.S. Pipe & Foundry Co.*,
  2003 WL 22272135 (D.N.H. Oct. 2, 2003) ......................................................86

*Murthy v. Missouri*,
  603 U.S. 43 (2024) .......................................................................................53, 54

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
  838 F.3d 421 (3d Cir. 2016) .......................................................................71, 72

*Nationwide Biweekly Admin., Inc. v. Super. Ct.*,
  9 Cal. 5th 279 (2020) ........................................................................................79

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015) .......................................................................55, 56

*New York v. Facebook, Inc.*,
  549 F. Supp. 3d 6 (D.D.C. 2021) ........................................................60, 67, 68

*New York v. Meta Platforms, Inc.*,
  66 F.4th 288 (D.C. Cir. 2023) ..............................................64, 66, 67, 68

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ..........................................................................26

*In re Niaspan Antitrust Litig.*,
  42 F. Supp. 3d 735 (E.D. Pa. 2014) .................................................................88

*In re Novartis & Par Antitrust Litig.*,
  2019 WL 3841711 (S.D.N.Y. 2019) ................................................................89

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) ......................................... 58, 60, 61, 62, 64, 69

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ..........................................................................................80

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018) ..........................................................14, 18, 40, 48, 76

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ................................................................64, 66, 67

*Orson, Inc. v. Miramax Film Corp.*,
  79 F.3d 1358 (3d Cir. 1996) .............................................................................76

*Pac. Bell Tel. Co. v. linkLine Comm.*,
  555 US 438 (2009) ..........................................................................19, 62, 68, 75

*In re Packaged Ice Antitrust Litig.*,
  779 F. Supp. 2d 642 (E.D. Mich. 2011) ......................................................83, 87

*In re Packaged Seafood Prods. Antitrust Litig.*,
  242 F. Supp. 3d 1033 (S.D. Cal. 2017) ...............................................................88

*Penn. Prison Soc. v. Cortes*,
  508 F.3d 156 (3d Cir. 2007) ...............................................................................53

*PhantomALERT v. Apple Inc.*,
  762 F. Supp. 3d 8 (D.D.C. 2025) ........................................................................80

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  230 F.R.D. 61 (D. Mass. 2005) ...........................................................................84

*Pierre v. Apple Inc.*,
  Case No. 3:23-cv-05981-VC, Dkt. 49 (N.D. Cal., Mar. 26, 2024) ....................75

*Ponti v. Burastero*,
  112 Cal. App. 2d 846 (1952) ..............................................................................84

*Ponzio v. Mercedes-Benz USA, LLC*,
  447 F. Supp. 3d 194 (D.N.J. 2020) .....................................................................57

*Province v. Cleveland Press Pub. Co.*,
  787 F.2d 1047 (6th Cir. 1986) ............................................................................34

*Public Interest Research Grp. of N.J. v. Magnesium Elektron, Inc.*,
  123 F.3d 111 (3d Cir. 1997) ...............................................................................28

*QSGI, Inc. v. IBM Glob. Fin.*,
  2012 WL 1150402 (S.D. Fla. Mar. 14, 2012) ....................................................86

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ........................................... 1, 15, 20, 24, 25, 26, 27

*Quelimane Co. v. Stewart Title Guar. Co.*,
  19 Cal. 4th 26 (1998) ..........................................................................................85

*Ragner Tech. Corp. v. Berardi*,
  324 F. Supp. 3d 491 (D.N.J. 2018) ...............................................................15, 20

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
  631 F.2d 10 (2d Cir. 1980) .................................................................................42

*In re Refrigerant Compressors Antitrust Litig.*,
  2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ...................................................86

*Robinson v. HP, Inc.*,
  2025 U.S. Dist. LEXIS 193700 (N.D. Ill. Sep. 30, 2025) .................................71

*Rossi v. Standard Roofing*,
  156 F.3d 452 (3d Cir. 1998) ...............................................................................73

*Rubenstein v. The Gap, Inc.*,
  14 Cal. App. 5th 870 (2017) ...............................................................................78

*Ruiz v. Bradford Exch., Ltd.*,
  --- F.4th ---, 2025 WL 2473007 (9th Cir. Aug. 28, 2025)..................................80

*Sandee's Catering v. Agri Stats, Inc.*,
  2020 WL 6273477 (N.D. Ill. Oct. 26, 2020) ......................................................88

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
  22 F.4th 103 (2d Cir. 2021) ................................................................................39

*Serpa Corp. v. McWane, Inc.*,
  199 F.3d 6 (1st Cir. 1999)...................................................................................35

*Sheet Metal Workers Local 441 Health & Welfare Plan v.
GlaxoSmithKline, PLC*,
  737 F. Supp. 2d 380 (E.D. Pa. 2010)..................................................................83

*SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc.*,
  772 F. Supp. 2d 660 (E.D. Pa. 2011)..................................................................33

*SmithKline Corp. v. Eli Lilly & Co.*,
  575 F.2d 1056 (3d Cir. 1978) .............................................................................15

*Snowdy v. Mercedes-Benz USA, LLC*,
  2024 WL 1366446 (D.N.J. Apr. 1, 2024).....................................................56, 57

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*
  841 F.3d 827, 843 (10th Cir. 2016) ....................................................................61

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ..............................................................................80

*Spokeo, Inc. v. Robins*,
  576 U.S. 330 (2016)............................................................................................13

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
  171 F.3d 912 (3d Cir. 1999) ........................ 38, 40, 41, 42, 43, 44, 45, 48, 49, 52

*Stromberg v. Qualcomm Inc.*,
  14 F.4th 1059 (9th Cir. 2021) .............................................................................81

*In re Suboxone Antitrust Litig.*,
    64 F. Supp. 3d 665 (E.D. Pa. 2014) ...................................................87

*Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*,
    902 F.3d 735 (7th Cir. 2018) ...........................................................46

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) .......................................................................14

*In re Terazosin Hydrochloride Antitrust Litig.*,
    160 F. Supp. 2d 1365 (S.D. Fla. 2001) ............................................87

*Tijerina v. Volkswagen Grp. of Am., Inc.*,
    2023 WL 6890996 (D.N.J. Oct. 19, 2023) .......................................57

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ............................................................25

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) ............................................................77

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) ............................................42

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992) ............................................................22

*Tuck Beckstoffer Wines LLC v. Ultimate Distributors, Inc.*,
    682 F. Supp. 2d 1003 (N.D. Cal. 2010) ...........................................78

*United States v. Brewbaker*,
    87 F.4th 563 (4th Cir. 2023) ......................................................76, 77

*United States v. Colgate Co.*,
    250 U.S. 300 (1919) .......................................................................58

*United States v. Dentsply International, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ............................................................67

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) .......................................................................14

*United States v. Google LLC*,
    747 F. Supp. 3d 1 (D.D.C. 2024) ....................................................26

*United States v. Microsoft Corp.*,
    253 F. 3d 34 (D.C. Cir. 2001) .......................................17, 22, 43, 69

*United States v. Trans-Missouri Freight Ass'n*,
    166 U.S. 290 (1897) ........................................................................................58

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
    108 F. Supp. 2d 549 (W.D. Va. 2000) ..........................................................21

*In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*,
    2022 WL 1013945 (D.N.J. Apr. 5, 2022) ......................................................56

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .............................................. 51, 52, 58, 63, 65, 70

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) .............................................................................30

*Warren Gen. Hosp. v. Amgen Inc.*,
    643 F.3d 77 (3d Cir. 2011) .............................................................................35

*In re Wellbutrin XL Antitrust Litig.*,
    260 F.R.D. 143 (E.D. Pa. 2009) ...............................................................55, 88

*Wilson v. Gen. Motors Corp.*,
    921 A.2d 414 (N.J. 2007) ...............................................................................90

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ...........................................................................57

## Statutes

15 U.S.C. § 1 ......................................................................................................57

15 U.S.C. § 2 ......................................................................................................57

Ark. Code Ann. § 4-75-315 ...............................................................................82

Arkansas Code Ann. § 4-88-113(f)(1) ...............................................................47

Cal. Bus. & Prof. Code § 16720 ........................................................................57

Cal. Bus. & Prof. Code § 17200 ........................................................................78

Haw. Rev. Stat. § 480-13.3(a) ...........................................................................82

N.H. Rev. Stat. Ann. § 358-A.2 .........................................................................86

N.J. Stat. Ann. § 56:9-12(a) (eff. Aug. 5, 2022) ...............................................90

TN Code § 47-25-102, amended by 2024 Tenn. Acts, Ch. 776, § 2
    (eff. 4/23/2024) ............................................................................................90

## Other Authorities

David Glasner & Sean P. Sullivan, *The Logic of Market Definition*, 83
    Antitrust L.J. 293 (2020)......................................................................16

David Millon, *The Sherman Act and the Balance of Power*, 61 S. Cal.
    L. Rev. 1219 (1988)...........................................................................85

P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application* (4th and 5th eds. 2013-23)
    .................................................................... 8, 25, 28, 37, 43, 63, 84

## Rules

Fed. R. Civ. P. 8(a)(2).............................................................................87

Fed. R. Civ. P. 12(b)(1)..........................................................................13

Fed. R. Civ. P. 12(b)(6)..........................................................................13

## Constitutional Provisions

TN. Const. Art. 1 § 20.............................................................................90

## INTRODUCTION

Apple builds products consumers love.  They are popular because they are state-of-the-art, secure, reliable, and easy to use—not because Apple misuses monopoly power it does not have.  Nevertheless, three groups of plaintiffs bring damages claims alleging they paid too much for certain devices: Four bought iPhones from Apple ("Direct iPhone Purchasers"), twenty-five bought iPhones from resellers ("Indirect iPhone Purchasers"), and one bought an Apple Watch ("Watch Plaintiff").  Many of their allegations echo the Government's.  But echoes fade fast: Private litigants like Plaintiffs face unique burdens, including statutory standing requirements their attenuated theories cannot meet.  What is more, Watch Plaintiff advances different claims in admitted tension with the Government's.  Although the Government's case will proceed for now, Plaintiffs' complaints should not.

*First*, an antitrust complaint must define the markets relevant to the case.  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997).  iPhone Purchaser Plaintiffs concede (unlike the Government) that their case is about alleged conduct in "several aftermarkets" they do not define.  IIPP Compl. ¶ 85 (ECF 109).  Watch Plaintiff claims (unlike the Government) that iPhone is its own market—an implausible attempt to pretend away Google, Samsung, and other "meaningful competitors" that runs afoul of many decisions dismissing claims premised on a single-brand market.  DIPP Compl. ¶ 164 (ECF 87); *accord* Gov't

1

Action, ECF 51 ¶ 127.  Because Plaintiffs either skip market definition altogether or offer implausible ones, their claims should be dismissed.

*Second*, Plaintiffs fail to allege antitrust standing.  Because Plaintiffs sue for individual damages, they have to show a tight cause-and-effect connection between the conduct they challenge and their alleged harm.  Plaintiffs' theories are too indirect, too attenuated, and too speculative to establish that connection.  iPhone Purchaser Plaintiffs link the alleged aftermarket restrictions on developers to smartphone overcharges only through a winding series of speculative suppositions. Watch Plaintiff similarly asks the Court to jump through at least five inferential steps to show Apple's conduct result in alleged supracompetitive Watch prices.  Private damages claims cannot go so far beyond "the first step," *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534 (1983), or rely on so much guesswork, *Kloth v. Microsoft Corp*., 444 F.3d 312, 324 (4th Cir. 2006).

*Third*, Watch Plaintiff's federal claims are independently deficient.  While the Court concluded the Government "d[id] not allege Apple is failing to deal with its smartphone rivals," Gov't Action, ECF 283 at 22, Watch Plaintiff alleges Apple refused to assist its *smartwatch* rivals in the *smartwatch* market to the detriment of *smartwatch* purchasers.  A company has no duty to deal with its rivals in this context. Nor can Plaintiff evade that result by adding a Section 1 claim that tries (and fails)

to reinvent Apple's agreement for providing developers with tools, technologies, and services into a supposed agreement to "boycott" other smartwatch makers.

*Fourth*, Plaintiffs' new state-law theories fail too. They pile on more than fifty state-law claims that were not brought by the Government. But the number of new counts is exceeded only by the number of new flaws these claims introduce. They too should be dismissed.

Plaintiffs try in vain to invent competing theories about how Apple supposedly charges monopoly prices, but today's iPhone 17 is light years ahead of the first model and yet, adjusted for inflation, costs about the same. Apple's products are popular by force of excellence, not force of exclusion. Plaintiffs do not state a claim, and the Court should dismiss their Complaints.

## BACKGROUND

Despite many doubters at the time of its launch, Apple "revolutionized communication, information, and entertainment when it developed the iPhone." IIPP Compl. ¶ 1. Packed with "cutting-edge technology," iPhone "offered high-end hardware" with "a mobile operating system that mimicked the functionality and ease of use of a computer." *Id*.; DIPP Compl. ¶ 4. Apple later released Apple Watch, a smartwatch that remains "years ahead" of the competition. DIPP Compl. ¶ 129. There is no dispute that Apple's innovations "gave it an advantage over competitors," IIPP Compl. ¶ 1, and propelled it to become the "most profitable

3

consumer electronics company in the world," Watch Compl. ¶ 1 (ECF 86)—a position it retains by dint of its relentless innovation.

## I.    iPhone, App Store, and Watch

Apple released the first iPhone in 2007.  DIPP Compl. ¶ 4; IIPP Compl. ¶ 23.  It was not the first smartphone, but it "improved substantially" on the competition.  DIPP Compl. ¶ 43.  That included innovative hardware like "its now ubiquitous touchscreen, a camera, and a consumer-friendly interface." *Id.* ¶¶ 4, 43; *accord* IIPP Compl. ¶ 23.  Apple also built a powerful, proprietary operating system called iOS, which allowed iPhone to run apps.  IIPP Compl. ¶ 23.  In the face of industry skepticism, consumers loved the "premium device" and Apple vaulted into the market over its incumbents.  IIPP Compl. ¶ 22; *see* DIPP Compl. ¶ 43.

At the start, Apple developed all native iOS apps—like Calendar, Messages, Safari, and Photos.  DIPP Compl. ¶ 44; *accord* IIPP Compl. ¶ 23.  To enable and support third-party developers to make native apps too, Apple created for developers' benefit a software kit with "the digital tools for building native apps on Apple's operating system."  DIPP Compl. ¶ 44.  Apple then released the App Store as the central place for users to download native apps from third-party developers.  *Id.* ¶ 47; IIPP Compl. ¶¶ 24, 27.  This created a symbiosis: Apple offers a vast library of tools and services to developers pursuant to the Developer Program Licensing Agreement ("DPLA")—all the while improving its software and hardware to offer

4

an ever-richer array of technology—and developers in turn create a wide variety of apps that consumers enjoy. *See* DIPP Compl. ¶¶ 44–45, 48; IIPP Compl. ¶¶ 71–72.

Apple has long "differentiate[d] itself" by making and marketing its devices as "easy to use," emphasizing "privacy and security." DIPP Compl. ¶ 41; IIPP Compl. ¶ 181. Through App Review, Apple uses advanced technological tools and human reviewers to check each app in an endeavor "to provide a safe experience for users to get apps and a great opportunity for all developers to be successful" through a "highly curated App Store." Ex. 1; *see also* DIPP Compl. ¶¶ 47, 58; IIPP Compl. ¶ 74. While Plaintiffs deride this as the stuff of "an erratic despot," DIPP Compl. ¶ 58, these are procompetitive measures for balancing the interests of consumers and developers on Apple's App Store—consistent with Apple's "historic . . . mode of competing" through a "user-friendly, reliable, safe, private, and secure" experience. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 985 (N.D. Cal. 2021).

Plaintiffs never claim that another mobile device is more secure, private, or user-friendly than iPhone. Even with "meaningful competitors" like Samsung and Google, Americans prefer iPhone—about 65% of the alleged smartphone market or 70% of a purported "premium smartphone market" according to Plaintiffs, although those figures are lower if measured by devices instead of revenue. DIPP Compl. ¶¶ 24, 164, 225; *accord* IIPP Compl. ¶¶ 40, 218. And as Apple pours tens of billions of dollars into research and development each year, IIPP Compl. ¶ 42, Plaintiffs

allege iPhone's appeal is even stronger for potential first-time purchasers: "[N]early 90% of teenagers," Plaintiffs say, "expect their first smartphone purchases to be iPhones." DIPP Compl. ¶¶ 225, 228; *accord* IIPP Compl. ¶ 41. That bespeaks iPhone's enormous consumer appeal as such purchasers by definition face no "switching costs" and did not allegedly face the alleged anticompetitive behavior.

Over time, Apple has released additional products that pair with iPhone. *See* DIPP Compl. ¶ 176. That includes Apple Watch, a smartwatch introduced in 2015 that seamlessly integrates with iPhone. IIPP Compl. ¶ 129; *see also* Watch Compl. ¶¶ 5, 109, 139. Like native iOS apps, Apple provides watchOS app developers with far-ranging tools, technologies, and services and vets all apps for compliance with the Guidelines. *See* Watch Compl. ¶¶ 45–48, 114. Apple Watch is popular with iPhone users, and "79% of iPhone users with smartwatches" allegedly "use[] an Apple Watch." *Id.* ¶ 225. More broadly, Apple allegedly has a "60% share of the smartwatch market" as it competes with rival watchmakers like Garmin, Google, and Samsung. *Id.* ¶¶ 189–90, 225.

## II.    Plaintiffs' Consolidated Amended Complaints

Across the three Complaints, Plaintiffs assert "different—and inconsistent"— theories. Watch Appt. Mot., ECF 20-1, at 6. The twenty-nine iPhone Purchaser Plaintiffs seek to piggyback on the Government: They claim Apple "leverage[s]" its alleged "control" over developers in "several aftermarkets" to maintain a monopoly

over smartphones, for which it purportedly charges supracompetitive prices. IIPP Compl. ¶¶ 19, 24, 29, 85; *accord* DIPP Compl. ¶¶ 5, 240. Watch Plaintiff, Joseph Giamanco, instead claims Apple has monopolized an "iOS-connected smartwatch market" by restricting smartwatch competitors' access to Apple's proprietary technologies. Watch Compl. ¶¶ 8, 32–41, 103, 131.

## A.    iPhone Purchaser Plaintiffs' Complaints

iPhone Purchaser Plaintiffs seek to "parallel" the Government's allegations. ECF 98 at 2. They allege a "'lock in' strategy" whereby Apple "decid[es] which [application programming interfaces] are available to developers" and "sets the conditions for apps it allows on the Apple App Store." IIPP Compl. ¶¶ 4, 29, 74–75; *accord* DIPP Compl. ¶¶ 1, 47–48. The so-called "pillars" of this alleged scheme focus on five areas: "super" apps, "cloud-streaming" apps, messaging apps, smartwatches, and digital wallets. IIPP Compl. ¶ 85; *accord* DIPP Compl. ¶¶ 10, 80. According to the Complaints, Apple imposes specific guidelines on super-app and cloud-streaming developers, while refusing to give messaging, wallet, and smartwatch app developers access to certain software application programming interfaces ("APIs")—though iPhone Purchaser Plaintiffs concede Apple has changed many of the challenged practices. DIPP Compl. ¶¶ 82, 97, 104, 111, 118,

131–37, 152; IIPP Compl. ¶¶ 92, 104, 113–18, 122–27, 144–50.[1]

iPhone Purchaser Plaintiffs do not allege that Apple imposes restrictions on consumers. Rather, they acknowledge (unlike the Government) that Apple's "challenged anticompetitive conduct primarily occurs" in "aftermarkets to the smartphone product markets." IIPP Compl. ¶ 85; *accord* DIPP Compl. ¶¶ 62, 80, 156. An "aftermarket is a type of derivative market consisting of consumable goods . . . that must be used for the proper functioning of some primary [foremarket] good." P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 564b (4th and 5th eds. 2013–23). But iPhone Purchaser Plaintiffs do not define the bounds of these alleged aftermarkets or say whether Apple has monopoly power in them. IIPP Compl. ¶ 85. Regardless, they contend that Apple leverages its conduct in "these aftermarkets" to "artificially raise[] the switching costs in the" separate and distinct "smartphone markets." *Id.*

Take as an example cloud streaming game apps. iPhone Purchaser Plaintiffs allege "Apple wielded its power over app distribution" to require cloud-streaming games "be submitted [and reviewed] as a stand-alone app"—which, they say, increases the cost and time to release games. DIPP Compl. ¶¶ 102–03; *accord* IIPP Compl. ¶¶ 108–09. That is an alleged restriction on developers in a market in which

---

[1] For instance, Plaintiffs allege that Apple rescinded the cloud-streaming policies that supposedly had made such apps "unattractive" and offered developers access to digital-wallet technology. DIPP Compl. ¶¶ 104, 153; IPP Compl. ¶¶ 110, 151.

they offer such apps for download, not the alleged smartphone market in which consumers buy iPhones. *See* IIPP Compl. ¶ 85. And it is this alleged restriction on developers' ability to "distribute . . . cloud streaming apps" that iPhone Purchaser Plaintiffs contend has a subsequent effect—many steps down the line—of imposing "friction" between switching phones. DIPP Compl. ¶¶ 165–66, 173; *accord* IIPP ¶¶ 169–71. This kind of stepwise theory repeats with the other supposed examples of the alleged "monopoly playbook." *See, e.g.*, DIPP Compl. ¶ 68 (alleging Apple's WebKit requirement inhibits browser apps' ability to "ent[er] on iOS" or "differentiat[e] from Safari," which leads to switching costs for iPhone consumers).

iPhone Purchaser Plaintiffs offer little to transmute the challenged aftermarket restrictions to the alleged harm in the smartphone market—prices consumers pay for iPhones. *See* DIPP Compl. ¶¶ 250–51; IIPP Compl. ¶¶ 166, 169–71. For example, they say each "'pillar' of the 'lock in' scheme contributes" to higher iPhone prices but identify no decline in prices from Apple's decisions to lift some of the challenged restrictions. IIPP Compl. ¶ 170. And even though iPhone Purchaser Plaintiffs' entire theory rests on the premise that facilitating "entry for competition" will drive down prices, they elsewhere allege that iPhone prices are unresponsive to "the entry of other competitors." IIPP Compl. ¶¶ 3, 170; *see also* DIPP Compl. ¶¶ 86, 228.

Nevertheless, Plaintiffs seek damages from Apple for alleged "overcharges" they paid when buying iPhones—from Apple in the case of Direct iPhone Purchasers

9

and from carriers or other retailers in the case of Indirect iPhone Purchasers.  DIPP Compl. ¶ 173; IIPP Compl. ¶ 246.   While they assert iPhone prices "increased significantly over the years," DIPP Compl. ¶ 223, the alleged inflation-adjusted price of a baseline iPhone model has gone up less than 10% since 2007:



*See* DIPP Compl. at 70.[2]  In fact, the alleged inflation-adjusted prices have trended down for several years—meaning it cost more to buy an iPhone SE in 2016 than an iPhone 16e today even though the latter has eight times the memory, exponentially more processing power, a larger display, and countless new capabilities.

Direct iPhone Purchasers bring claims under Section 2 of the Sherman Act for monopolization or attempted monopolization as well as under California's Unfair Competition Law ("UCL").  DIPP Compl. ¶¶ 252–95.  Indirect iPhone Purchasers

---

[2] All alleged prices are drawn from Direct iPhone Purchasers' table, DIPP Compl. at 70, and adjusted to 2025 inflation-adjusted rates using the United States Bureau of Labor Statistics CPI Inflation Calculator.

10

bring 58 claims: four Section 2 claims (for injunctive relief only); a UCL claim; 37 claims under state antitrust laws; 15 claims under state consumer-protection statutes; and a claim for unjust enrichment under the laws of every state except Ohio, federal territories, and the District of Columbia.  IIPP Compl. ¶¶ 251–782 & n.31.

## B.    Watch Plaintiff's Complaint

Watch Plaintiff flips the script.  Where iPhone Purchaser Plaintiffs contend Apple seeks to sell *more Watches* to "anchor users to the iPhone and expand its smartphone monopoly," Watch Plaintiff alleges that Apple "*restrict[s] output* of iOS-connected smartwatches" to increase their prices.  ECF 20-1 at 6 (emphasis added); *see* Watch Compl. ¶¶ 43–44.  While Watch Plaintiff's allegations overlap with iPhone Purchaser Plaintiffs', they are at odds in several important ways.  *See, e.g.*, Sep. 16, 2025 CMC Tr. at 56:3–8 (representing the Watch Complaint has "a different relevant market" and "different alleged anticompetitive conduct").

Start with the alleged markets.  Like iPhone Purchaser Plaintiffs, Watch Plaintiff recognizes that the alleged conduct occurs in an aftermarket distinct from any smartphone market.  *See* Watch Compl. ¶¶ 199–200, 210.  But he defines these markets differently: He starts with an "iOS smartphones" (i.e., iPhone-only) market. *Id.* ¶ 202.  He then alleges a market for "iOS-connected smartwatches" based on the notion that the "smartphone a customer owns is highly determinative of the smartwatch that customer will buy."  *Id.* ¶ 212.  Thus, the alleged relevant market

11

contains smartwatches sold "to users of iPhones." *Id.* ¶ 213.[3]

Watch Plaintiff claims Apple monopolizes the alleged iOS-connected smartwatch market through three principal means. First, he alleges Apple "depriv[es] [smartwatch] competitors of key technologies" by refusing to license to them Apple's private messaging-, notification-, and wallet-related APIs. *See* Watch Compl. ¶¶ 30, 59, 107, 111–12. Second, he alleges Apple declines to cooperate with rival watchmakers by delaying approval of their companion apps (needed for pairing the smartwatch and smartphone) and by refusing to authorize "iOS sister apps" (which "enhance" the smartwatches) that advertise or promote "competitor smartwatches." *Id.* ¶¶ 34–35, 115–19, 122, 126. Third, he asserts Apple designs or updates its own iOS software in ways that limit interoperability for competitor smartwatches by "continually updating and redesigning" iOS, adopting designs that do not award parity to rivals, and "refus[ing] to share sufficient information" about hardware and software releases so that "smartwatch competitors can[not] ensure their device operations are not disrupted." *Id.* ¶¶ 3, 5, 36, 131, 143–44, 162, 182.

Watch Plaintiff then states in a lone paragraph without elaboration that "Apple's conduct enabled it to charge . . . supracompetitive prices for Apple Watches" and "purchasers of Apple Watches . . . paid supracompetitive prices for

---

[3] Watch Plaintiff alleges in the alternative a "market for smartphones" and separate "market for smartwatches" that includes "wrist-worn devices that tell time and extend and improve the capabilities of smartphones." Watch Compl. ¶¶ 205, 219.

those devices" as a result.  Watch Compl. ¶ 243.  He asserts five claims: two asserting *per se* violations of Section 1 of the Sherman Act and California's antitrust statute; two under Section 2 of the Sherman Act, one for monopolization and another for attempted monopolization; and a final claim under the UCL.  *Id.* ¶¶ 252–97.

## LEGAL STANDARD

The Court must dismiss a complaint if the plaintiff fails to allege standing or a valid claim.  *See* Fed. R. Civ. P. 12(b)(1) & 12(b)(6).  Thus, the complaint "must clearly allege facts demonstrating each element" of standing.  *Spokeo, Inc. v. Robins*, 576 U.S. 330, 338 (2016) (cleaned up).  And it also must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## ARGUMENT

All three Complaints should be dismissed.  As private litigants, Plaintiffs face different hurdles than the Government.  But the allegations Plaintiffs have offered to surmount them lay bare four independent problems—none of which this Court resolved in the Government's case.  First, Plaintiffs fail to adequately delineate the proffered markets that expand beyond those alleged by the Government.  Second, Plaintiffs fail to establish antitrust and Article III standing required to bring their claims.  Third, Watch Plaintiff fails to plead a cognizable antitrust violation.  And

finally, Plaintiffs' myriad state law theories suffer from several defects.[4]

## I.    Plaintiffs Fail To Allege The Relevant Markets

The first step in an antitrust case is to define the relevant markets. *See Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 543 (2018).  The relevant markets describe "the area[s] of effective competition." *Id.*  Each is defined by the set of products "reasonably interchangeable by consumers for the same purposes" (the product market), *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956), and the territorial "area in which the seller operates, and to which the purchaser can practicably turn for supplies" (the geographic market), *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 331–32 (1961).

Market definition is essential because "'[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.'"  *Amex*, 585 U.S. at 543.  In other words, a company's economic power can only be assessed within the framework of the relevant markets in which they compete.  *Id.*  And the effects of challenged conduct can only be determined based on their impact on a well-defined market.  *Id.* at 543 n.7; *see also* Gov't Action, ECF 283 at 11 (explaining same).  Thus, "[t]he interplay between relevant market and monopoly power is generally crucial to a § 2 case," *Borough of Lansdale*

---

[4] All Plaintiffs' claims suffer from additional defects, including those raised in the Government Action. *See* Gov't Action, ECF 86-1.  Apple preserves those arguments and reserves the right to raise those arguments at a later time.

14

*v. Phila. Elec. Co.*, 692 F.2d 307, 313 (3d Cir. 1982), and "[i]n [Section] 2 cases, the search for 'the relevant market' must be undertaken and pursued with relentless clarity." *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978).

The Complaints here either fail entirely to define markets that are relevant to their claims (iPhone Purchasers) or describe markets so implausible that they fail on their face (Watch Plaintiff). Both failures are fatal. *See, e.g.*, *Queen City Pizza*, 124 F.3d at 433 (affirming dismissal of complaint for failure to allege relevant markets).

## A.     iPhone Purchaser Plaintiffs Fail To Define The Relevant Markets

iPhone Purchaser Plaintiffs do not define all markets relevant to their claims. They allege Apple monopolized a smartphone market—or an invented subset of "performance smartphones." DIPP Compl. ¶¶ 207–14; IIPP Compl. ¶¶ 204–8. But they concede "Apple's challenged anticompetitive conduct primarily occurs" in other markets—what they call "aftermarkets" for "super apps, cloud-streaming apps, messaging apps, smartwatches and digital wallets." IIPP Compl. ¶ 85. It is Apple's "conduct in these aftermarkets," iPhone Purchaser Plaintiffs say, that "raises the switching cost[s] in the smartphone markets" as part of a supposed "'lock in' scheme." *Id.*; *accord* DIPP ¶ 80 (alleging Apple "reinforces the moat" around iPhone by "stifling" other "products and services"). While iPhone Purchaser Plaintiffs thus acknowledge these markets' relevance to their claims, they do not properly define them. *See, e.g.*, *Ragner Tech. Corp. v. Berardi*, 324 F. Supp. 3d 491,

509 (D.N.J. 2018) (dismissing case for insufficiently defining relevant market).

1.   The purpose of market definition "is to determine whether an arrangement has the potential for genuine adverse effects on competition." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986).   The relevant markets therefore are those "relevant to the theory of harm at issue." *In re Google Play*, — F.4th —, 2025 WL 2167402, at \*7 (9th Cir. 2025); *accord* David Glasner & Sean P. Sullivan, *The Logic of Market Definition*, 83 Antitrust L.J. 293, 312 (2020).   Where a plaintiff's theory rests on using conduct in one market to monopolize another, courts require the plaintiff to define all alleged markets "in which the alleged anticompetitive conduct takes place." *Delaware Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279, 1289 (D. Del. 1995); *see also infra* § I.A.2 (collecting cases).

iPhone Purchaser Plaintiffs advance a multi-market theory here but fail to define the markets in which the challenged conduct takes place.   They assert Apple "stifl[es]" the growth of certain "cross-platform apps" and "technologies" to lock consumers into Apple's services and discourage them from switching from iPhone to Android devices.   DIPP Compl. ¶¶ 40, 80, 98; IIPP Compl. ¶¶ 91, 104.   That is, Apple allegedly maintains a "moat" against smartphone competition by leveraging its "control" or "power" to restrain competitive forces in other, non-smartphone "aftermarkets."   DIPP Compl. ¶¶ 79–80, IPP Compl. ¶¶ 85, 131, 133, 170.   Because the Court must consider "facts peculiar to the business *to which the restraint is*

16

*applied*," it must define and analyze the markets in which the restraints are applied. *Gordon v. Lewiston Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (emphasis added).

Consider iPhone Purchaser Plaintiffs' theory about messaging apps. Plaintiffs claim that by withholding from developers the APIs used to enable SMS messages, Apple gives iMessage an advantage over cross-platform rivals like WhatsApp and Facebook Messenger, DIPP Compl. ¶¶ 113–17; IIPP Compl. ¶¶ 117–18, which in turn supposedly "makes it more difficult" for consumers "to switch smartphones," DIPP Compl. ¶ 121. Whether that is true will depend on the nature of competition between messaging apps, including whether cross-platform apps would actually be "more valuable and attractive to users" with SMS features (such that users switched to these apps from iMessage), *id.* ¶ 116, and whether apps like WhatsApp have struggled to "grow their network" and "attract more users" relative to iMessage as a result of Apple's alleged conduct, *id.* ¶ 117; *see also* IIPP Compl. ¶¶ 113–26. In short, Plaintiffs must show Apple's alleged conduct distorts competition among messaging apps to show that it subsequently inhibits smartphone competition.

Whether and how Apple restrained competition among messaging technologies requires examining the bounds and commercial realities of this alleged aftermarket. To start, what *is* a messaging app and what other apps are in that market? *See United States v. Microsoft Corp*., 253 F. 3d 34, 81–2 (D.C. Cir. 2001) (reversing liability on Section 2 claim for "failure to articulate and identify evidence

. . . as to (1) what constitutes a browser . . . and (2) why certain other products are not reasonable substitutes[.]"). And does Apple have sufficient power in the relevant aftermarket, whatever its metes and bounds, to distort competition for messaging technologies? What kind of messaging competition would emerge but for the challenged restraints? How would consumer adoption of messaging apps change as a result? Answering those (and other) questions is a prerequisite to understanding any supposed effects on smartphone competition—making the purported "aftermarket" for messaging apps relevant to Plaintiffs' claims. *See Amex*, 585 U.S. at 543 n.7 ("Vertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market.").

The same is true for the other alleged "pillars." IIPP Compl. ¶ 85. Whether cloud-streaming and "super apps" ultimately will "put competitive pressure" on the App Store (IIPP Compl. ¶ 171; *see* DIPP Compl. ¶ 166)—thereby "disintermediat[ing]" users from iOS and eventually lowering switching costs (IIPP Compl. ¶ 75; DIPP Compl. ¶ 178)—depends on how developers' offerings and consumers' preferences would have evolved *in the aftermarkets* without the challenged conduct. So too for smartwatches, digital wallets, and any other "third-party apps and services" Plaintiffs implicate: Whether the alleged conduct prevents smartphone switching turns first on unique competitive dynamics within the

18

admitted aftermarkets.  DIPP Compl. ¶ 156.

iPhone Purchaser Plaintiffs admit these competitive dynamics are relevant as their theory turns on Apple's supposed use of "control" and "power" in the alleged aftermarkets.  IIPP Compl. ¶ 79; DIPP Compl. ¶ 53.  But those words are meaningless unless Apple has actual economic power—the ability to "exclude competition"—in the alleged aftermarkets.  *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007).  Without the ability to exclude competition, Apple could not have "adopt[ed] restraints that have anticompetitive effects" at all, *Assam Drug Co. v. Miller Brewing Co.*, 798 F.2d 311, 316 (8th Cir. 1986), much less foreclosed the evolution of competing aftermarket technologies that, Plaintiffs claim, would eventually reduce smartphone switching costs.  *See Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) (ability to control a "market for [one's own] products" is irrelevant where the relevant market is broader).  And insofar as Plaintiffs challenge Apple's refusal to assist rivals in any of those markets (*see infra* § I.A.2), they must show Apple has monopoly power in the markets in which it refuses to deal.  *See Pac. Bell Tel. Co. v. linkLine Comm.*, 555 US 438, 448 n.2 (2009).  All of this requires analysis conducted within the confines of well-defined markets.

Nor are these the only ways these alleged aftermarkets are relevant to the case.  To the extent it has a competitive effect at all, Apple's conduct is easily justified by

its procompetitive benefits. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992). An alleged restriction on developers or users of wallet apps, messaging apps, and smartwatches, for example, can benefit consumers in those allegedly restrained markets—even if it does not enhance smartphone competition directly. *See, e.g.*, *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 989 (9th Cir. 2023) (restrictions on app distribution justified by device *and* app transactions effects). And understanding the complete effect of Apple's alleged conduct in such markets requires defining them for the exact same reason that, as the iPhone Purchaser Plaintiffs admit, they must define a smartphone market to measure alleged anticompetitive effects therein. *See* ECF 98 at 4.

Despite their relevance, iPhone Purchaser Plaintiffs do not define these "aftermarkets," IPP Compl. ¶ 85, much less support their putative definitions with factual allegations. *See Queen City Pizza*, 124 F.3d at 438 (requiring markets be defined with supporting factual allegations); *see also* DIPP Compl. ¶¶ 207–18. And any "fleeting reference[s]" cannot suffice "in a complex case like this one, where plaintiffs bring multiple antitrust claims based on multiple and alternative relevant market theories." *Queen City Pizza*, 124 F.3d at 444. iPhone Purchaser Plaintiffs must at least amend their claims to properly define the "market[s], distinct from the [alleged] (monopoly) market," in which the "challenged activities" occur. *Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1349 (9th Cir. 1986); *see also, e.g.*, *Ragner*

20

*Tech.*, 324 F. Supp. 3d at 509–10 (dismissing antitrust claims for deficient alleged markets); *First Priority Emergency Vehicles, Inc. v. REV Ambulance Grp. Orlando, Inc.*, 2020 WL 2029344, at *3–4 (D.N.J. Apr. 28, 2020) (same).

**2.**  iPhone Purchaser Plaintiffs' only substantive response is that they need not define the aftermarkets where the alleged conduct happened because they do not seek damages for monopolization of those markets.  ECF 98 at 4.  That is wrong.  In cases like this one—alleging a company exploits its position in certain markets to suppress competition in another—courts require *all* relevant markets to be defined.

The closest analogue is monopoly leveraging, a theory that resembles iPhone Purchaser Plaintiffs' in that it involves "employ[ing] monopoly power" in one market "to gain a monopoly" in a second market.  *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 198 (3d Cir. 1992); *see, e.g.*, IIPP Compl. ¶ 87 (alleging Apple used "control [over] app creation and app distribution" in app aftermarkets to "cement" its smartphone monopoly); DIPP Compl. ¶ 75 (similar).  Courts across the country—including the Third Circuit—require leveraging plaintiffs to define both the first and second markets.  *See, e.g.*, *Fineman*, 980 F.2d at 197–99; *Alaska Airlines Inc. v. United Airlines, Inc.*, 948 F.2d 536, 545 n.12 (9th Cir. 1991); *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549, 580 (W.D. Va. 2000).

So too for other multimarket theories.  In tying cases, for example—where a defendant uses its power over one good (the tying product) to force purchasers to

21

buy another (the tied product) in a different market, *Kodak*, 504 U.S. at 462—both markets must be defined. *See Ill. Tool Works Inc. v. Indep. Ink., Inc.*, 547 U.S. 28, 46 (2006) (must define tying market); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 494 n.38 (3d Cir. 1992) (must define tied market).

Even if iPhone Purchaser Plaintiffs refuse to categorize their claims within these or any other established theories of harm, the Supreme Court recognized in *Kodak* the need to assess all markets implicated by a claim involving "aftermarkets." There, Kodak refused to supply copier parts to third-party servicers of Kodak copiers in order to monopolize the repair business for itself. *Kodak*, 504 U.S. at 456–58. The Supreme Court discussed *three* relevant markets—the initial market for copiers, the aftermarket for copier parts where Kodak refused to sell parts, and another aftermarket for repair services that Kodak sought to monopolize—and remanded for additional factfinding into "[t]he extent to which [competition in] one market prevents exploitation of another market." *Id.* at 466–72. Just as the Supreme Court required "data on the equipment, service, [and] parts markets" in *Kodak*, 504 U.S. at 466, Plaintiffs must define all relevant markets for the analyses ahead in this case.[5]

---

[5] *United States v. Microsoft* does not hold otherwise. *See* ECF 98 at 4. Rather than distinct markets, that case involved "middleware" (e.g., Netscape and Java) that were "potential substitutes" to Windows in the PC operating system market. *Microsoft*, 253 F.3d at 53–55, 79. Because Microsoft excluded those products through various actions—including its licensing of Windows to PC manufacturers within that relevant market—only one operating systems market needed to be defined for the Government's monopolization theory. *Id.* at 52–54, 58. But the court

That iPhone Purchaser Plaintiffs "do not seek damages for purchases in any 'aftermarket'" is irrelevant.  ECF 98 at 4.  Even in multimarket cases, plaintiffs often seek damages stemming from injuries in just one market.  *See, e.g.*, *Fineman*, 980 F.2d at 186; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1201 (9th Cir. 1997).  But those plaintiffs still must define all markets relevant to their theory of competitive harm.  Indeed, Watch Plaintiff recognizes this burden: He posits Apple uses "monopoly power" in the "iOS smartphone" market "to exercise control over the relevant smartwatch market" and therefore defines markets for both products separately.  Watch Compl. ¶¶ 198, 201–19.  Unless iPhone Purchaser Plaintiffs do so too, the Court "need not proceed" with this case, since it is impossible to "sensibly or seriously" analyze market power or the alleged harm to competition.  *Coronavirus Reporter v. Apple Inc.*, 85 F.4th 948, 957 (9th Cir. 2023).

**3.**  iPhone Purchaser Plaintiffs also argue that the sufficiency of their market allegations is "law of the case" because the Court found the Government's allegations about alleged smartphone and "performance" smartphone markets adequately pleaded.  ECF 98 at 2, 4.  But "[t]he law of the case doctrine cannot be applied across distinct actions in [a] multidistrict proceeding."  *Home Depot USA,*

---

rejected the Government's claim for attempted monopolization that implicated a different, undefined market.  *Id.* at 81.  Plaintiffs do not contend messaging apps, digital wallets, or the like are potential smartphone substitutes and admit Apple's conduct, unlike Microsoft's, occurs outside the alleged monopolized market.

*Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 61–62 (3d Cir. 2023). Regardless, it is inapplicable here because Apple is not challenging iPhone Purchasers' alleged definitions of the smartphone or performance smartphone markets. Apple challenges their failure to define other markets relevant to their claims in view of iPhone Purchaser Plaintiffs' allegations implicating the alleged aftermarkets. *See, e.g.*, IIPP Compl. ¶¶ 85, 86, 170, 226. That issue was neither presented nor "resolved" by the Court's earlier decision. *Home Depot*, 59 F.4th at 61.

## B.     Watch Plaintiff Fails To Define A Plausible Single-Brand Market

Although Watch Plaintiff attempts to match market to conduct by defining watch and smartphone markets relevant to his claims, those markets do not "include all reasonably interchangeable products." *Queen City Pizza*, 124 F.3d at 438. His claims start with a supposed "iOS smartphones" foremarket—i.e., a market limited only to iPhone. Watch Compl. ¶ 202. He then alleges Apple monopolized and unreasonably restrained a related market for "iOS-connected smartwatches." *Id*. ¶¶ 255–56, 262, 272. While he avoids the term, this is an aftermarket theory: Aftermarkets exist where "demand for a good is entirely dependent on the prior purchase of a durable good in a foremarket," *Epic Games*, 67 F.4th at 976, and Watch Plaintiff alleges iOS-connected smartwatches "presuppose that a user owns a smartphone" and exist to "extend and improve the capabilities of the iPhone." Watch Compl. ¶¶ 200, 212. These allegations stumble twice.

24

**1.** The iPhone-only foremarket, which diverges sharply from the Government's alleged markets, is implausible. Watch Compl. ¶ 202. It describes a single-brand market, comprised only of "a manufacturer's own products." *Apple Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008). Such markets are "extremely rare," *id.*, "presumptively invalid," Areeda & Hovenkamp ¶ 563d, and routinely "dismiss[ed] on the pleadings," *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001); *see also Epic Games*, 559 F. Supp. 3d at 1021 (collecting cases). In particular, the Third Circuit has repeatedly rejected single-brand theories that seek to exclude reasonably interchangeable substitutes. *See Queen City Pizza*, 124 F.3d at 436–40; *Eichorn v. AT&T Corp.*, 248 F.3d 131, 147–48 (3d Cir. 2001).

The alleged iPhone-only market is implausible because there are admitted "alternative[s] to iPhones in the United States." Watch Compl. ¶ 24. Substitution turns on products' "reasonable interchangeability of use," *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), and, like iPhone devices, Android smartphones make calls, access the internet, run apps, and have myriad other overlapping capabilities. IIPP Compl. ¶ 81; DIPP Compl. ¶ 62; Watch Compl. ¶ 201. Every other plaintiff in this litigation thus recognizes that iPhone has "meaningful competitors" in the smartphone market. DIPP Compl. ¶ 164; *see also id.* ¶¶ 208, 215; IIPP Compl. ¶¶ 167, 194; Gov't Compl. ¶¶ 23, 127, 155, 186. And "judicial experience," *Iqbal*, 556 at 679, is no different: Without fail, courts have found that

Apple has competitors "in the smartphone market." *Epic Games*, 559 F. Supp. 3d at 955; *accord United States v. Google LLC*, 747 F. Supp. 3d 1, 37 (D.D.C. 2024).

Watch Plaintiff attempts to plead otherwise by alleging that "switching" between iPhones and Androids is "uncommon." Watch Compl. ¶¶ 202–04. But the question is not what products are "reasonable alternatives" for "iOS smartphone users" as he suggests. *Id*. ¶ 203. The inquiry is about which products are "reasonably interchangeable by consumers"—in general—"for the same purpose." *Queen City Pizza*, 124 F.3d at 438; *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038 (9th Cir. 2008) ("[C]onsumers do not define the boundaries of the market; the products or producers do."). So even if iPhone's "brand or certain features" make it uniquely attractive to some, Android devices are "possible substitutes[s]" that defeat single-brand allegations. *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 324, 343–44 (E.D.N.Y. 2019); *see also Green Country Food Market v. Bottling Grp., LLC*, 371 F.3d 1275 (10th Cir. 2004) ("intense" brand loyalty does not create a single-brand market).

Indeed, claiming iPhone is its own market because users prefer it over Androids is like saying "a consumer is 'locked into' Pepsi because she prefers the taste." *Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.). Courts have rejected that argument on the pleadings time and time again, including others targeting Apple's products.

In *Psystar*, the court rejected an alleged macOS-only market because Apple's operating system "performs the same functions as other operating systems." 586 F. Supp. 2d at 1198–1200. And in *Coronavirus Reporter v. Apple Inc.*, the court rejected the same "single-brand foremarket of iOS smartphones" trotted out here. 2021 WL 5936910, at *10 (N.D. Cal. Nov. 30, 2021). Watch Plaintiff's claims should be dismissed for this reason alone. *See, e.g.*, *Epic Games*, 559 F. Supp. 3d at 955 (failure to properly define relevant foremarket defeats aftermarket claim).

**2.** The alleged "iOS-connected smartwatch" aftermarket is also deficient because it too fails to "include all reasonably interchangeable products." *Queen City Pizza*, 124 F.3d at 438. Consumers can switch to "Google and Samsung . . . smartwatches that connect only to Android smartphones." Watch Compl. ¶ 215. The only allegation Watch Plaintiff offers to the contrary is that a hypothetical monopolist of "smartwatches that connect[] to iPhones" could profitably raise prices. *Id.* ¶ 216. But this "merely restate[s] a commonly used test for market definition without providing any factual basis for the claim." *Psystar*, 586 F. Supp. 2d 1190. Watch Plaintiff does not allege, as he must, that Apple (and other iPhone-compatible watch makers) are unconstrained by Android-compatible devices. *See AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 915–16 (N.D. Cal. 2022) (recognizing broader alleged smartwatch market).[6]

---

[6] Apple does not argue at this stage that Watch Plaintiff's "alternative" markets for

## II.    Plaintiffs Lack Antitrust And Article III Standing

Both Article III and antitrust standing are "threshold requirement[s]."
*Chagares v. Monmouth Med. Ctr.*, 2022 WL 3588103, at *4 (D.N.J. Aug. 22, 2022)
(antitrust standing); *accord Public Interest Research Grp. of N.J. v. Magnesium
Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997) (Article III standing). Article III
sets forth the "constitutional minimum" to bring a claim: concrete injury in fact,
fairly traceable to the challenged action, that will likely be redressed by a favorable
decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In addition, "a
private antitrust plaintiff"—"[u]nlike the United States government"—"must show
[antitrust] standing to sue." Areeda & Hovenkamp ¶ 335a; *see also Animal Sci.
Prods., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 497 (D.N.J. 2014)
(antitrust standing serves a "critical gatekeeper role" in private damages cases).

Antitrust standing is "far more limiting" than Article III standing. *Host Int'l,
Inc. v. MarketPlace PHL, LLC*, 32 F.4th 242, 249 (3d Cir. 2022). It turns on five
factors: (1) "a causal connection between the antitrust violation and the harm to [the
plaintiff]"; (2) whether the plaintiff suffered antitrust injury, meaning an injury "of

---

smartphones and smartwatches are inadequately defined. Watch Compl. ¶¶ 205,
219. But Watch Plaintiff cannot proceed on that "alternative" theory alone because
he alleges injuries only in markets limited to "iPhone owners." *Id.* ¶ 44. He does
not offer the necessary allegations of anticompetitive effects in his "alternative"
markets that include Android owners. *See, e.g., id.* ¶¶ 24, 205; *IDT Corp. v. Bldg.
Owners & Managers Ass'n Int'l*, 2005 WL 3447615, *8 (D.N.J. Dec. 15, 2005)
(dismissing claim for failing to allege anticompetitive effects in relevant markets).

a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws"; (3) the "directness or indirectness of the asserted injury" including whether the "damages claim is also highly speculative"; (4) the existence of more direct victims; and (5) the potential for "problems of identifying damages and apportioning them." *AGC*, 459 U.S. at 538–45.

## A.    iPhone Purchaser Plaintiffs Lack Antitrust Standing To Seek Damages

iPhone Purchaser Plaintiffs fail at the start because they do not allege antitrust injury—"a necessary but insufficient condition of antitrust standing." *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997). Regardless, the remaining considerations cut against antitrust standing too.

### 1.    Antitrust Injury

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). As a "corollary" of the "Supreme Court's . . . emphasi[s]" on protecting "participants in the relevant market," an antitrust "plaintiff [must] have suffered its injury in the market where competition is being restrained." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999). Thus, plaintiffs lack antitrust injury where they "allege that they suffered antitrust injury in the form of supracompetitive pricing in [one market], which is not the market in which the alleged anticompetitive

29

conduct occurred." *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1027–28 (N.D. Cal. 2015). Put differently, "non-market participants generally do not have antitrust standing." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 173 (3d Cir. 2015); *accord W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010). iPhone Purchase Plaintiffs fail this blackletter test.

**1.** There is a mismatch between the smartphone markets in which iPhone Purchaser Plaintiffs claim injury and the markets in which third-party participants are allegedly restrained. iPhone Purchaser Plaintiffs admit the "pillars" of Apple's alleged scheme are "acts in the various aftermarkets" and that "it is within these aftermarkets . . . that Apple's challenged anticompetitive conduct primarily occurs." IIPP Compl. ¶ 85; *see also* DIPP Compl. ¶ 251. For example, iPhone Purchaser Plaintiffs allege Apple restricts developers' distribution of "super apps" in an unspecified aftermarket, DIPP Compl. ¶¶ 82–96, IIPP Compl. ¶¶ 92–103; restricts developers' creation and distribution of cloud-gaming apps in an unspecified aftermarket, DIPP Compl. ¶¶ 97–107, IIPP Compl. ¶¶ 104–12; restricts developers' access to certain messaging-related APIs in an unspecified aftermarket, DIPP Compl. ¶¶ 108–23, IIPP Compl. ¶¶ 113–26; restricts developers' access to certain APIs for purposes of wallet apps in an unspecified aftermarket, DIPP Compl. ¶¶ 137–53, IIPP Compl. ¶¶ 137–55; and restricts smartwatch developers' API access in an unspecified aftermarket, DIPP Compl. ¶¶ 124–36, IIPP Compl. ¶¶ 127–36.

30

The Court recognized as much already. In confronting the Government's allegations, it observed the alleged conduct "discourages *developers* from creating apps," "prevents *third-party developers*" from creating certain messaging functionality, "degrades the functionality of *third-party cross-platform smartwatches*," and "preclud[es] *banks, merchants, and other parties*" from developing wallet apps. Gov't Action, ECF 283 at 25–26 (emphases added). iPhone Purchaser Plaintiffs repeat those allegations. *See, e.g.*, DIPP Compl. ¶¶ 10, 113, 132, 153, 166, 169; IIPP Compl. ¶¶ 30, 118, 134, 151, 171. And what they add is only more alleged restraints *on developers* in markets other than the alleged smartphone markets. *See, e.g.*, DIPP Compl. ¶ 156; IIPP Compl. ¶ 157.

Yet having staked the case on alleged aftermarket restrictions on developer conduct, iPhone Purchaser Plaintiffs seek damages for alleged overcharges on iPhone purchases. DIPP Compl. ¶¶ 250–51; IIPP Compl. ¶ 244. As they acknowledge, that is an alleged harm in an alleged smartphone (or performance smartphone) market—a market in which Apple (or other retailers) sell smartphones to consumers. *See* ECF 98 at 2; DIPP Compl. ¶¶ 208–18; IIPP Compl. ¶¶ 205–12. Because the iPhone Purchaser Plaintiffs do not allege that they suffered their injury as participants in the supposed aftermarkets in which Apple purportedly restrains developers, their alleged knock-on overcharge in a "distinct" smartphone market is not antitrust injury. Watch Compl. ¶ 210.

31

The Third Circuit consistently rejects theories, like this one, where the alleged injury is the "byproduct[] of anticompetitive restraints in separate markets." *Hanover 3201 Realty*, 806 F.3d at 175. In *Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223 (3d Cir. 2013), for example, a plaintiff drug company lacked standing to sue its competitor because the claim "crossed markets and was attenuated from the anticompetitive conduct." *Hanover 3201 Realty*, 806 F.3d at 173 (describing *Ethypharm*, 707 F.3d at 225). Likewise, in *Broadcom*, the Third Circuit rejected a Sherman Act claim based on a cross-market theory where Broadcom's theory started with Qualcomm's alleged monopoly maintenance "in various markets for 3G CDMA technologies and chipsets" and wound its way to an injury to Broadcom in markets for "WCDMA technology and UMTS chipsets." 501 F.3d at 319–20.

Indeed, courts have applied this rule to the same theories advanced here. For example, iPhone Purchaser Plaintiffs challenge Apple's requirement that internet browser apps (e.g., Safari, Chrome, or FireFox, among many others) use Apple's open-sourced browser engine, WebKit. DIPP Compl. ¶¶ 49, 156; IIPP Compl. ¶¶ 76, 157. But another court dismissed a class action brought by a putative class of iPhone purchasers challenging the same conduct under the same theory because the restraint and the alleged injury occurred in "distinct markets." *Bakay v. Apple Inc.*, 2024 WL 3381034, *7 (N.D. Cal. Jul. 11, 2024).

Other examples abound. In *Feitelson*, plaintiffs claimed that their Android

32

phones would have cost less if Google had not entered into agreements to make Google the default search engine on their smartphones. 80 F. Supp. 3d at 1024. But this theory did not allege a viable antitrust injury because "Plaintiffs allege[d] that they suffered antitrust injury in the form of supracompetitive pricing in Android phones" in a market distinct from the one "in which the alleged anticompetitive conduct occurred." *Id.* at 1027–28; *see also, e.g.*, *SigmaPharm, Inc. v. Mutual Pharmaceutical Co., Inc.*, 772 F. Supp. 2d 660, 672–74 (E.D. Pa. 2011) (no antitrust injury where plaintiff was not an "adversely affected market participant in the *restrained* market"); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1301–02 (S.D. Cal. 2009) (similar). In short, courts reject antitrust claims, like those here, that jam together conduct from one market with injury in another.

Plaintiffs are wrong to suggest they can circumvent this problem by claiming Apple's conduct reduced the quality of messaging apps, digital wallets, and the like. *See* ECF 98 at 2, 4. Because the iPhone Purchaser Plaintiffs have not defined aftermarkets for messaging, super apps, smartwatches or the like, they cannot claim to suffer an injury as consumers in these undefined markets. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("[A]ctual or alleged harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law."). And to the extent they claim the unavailability of these third-party apps (or the features thereon) affect iPhone's quality-adjusted price, DIPP Compl. ¶¶ 250–51; IIPP

Compl. ¶ 244, that is an alleged injury *in the smartphone markets*—steps removed from the challenged restraints in undefined aftermarkets.

**2.** Plaintiffs do not fit within the sole exception to this rule where the alleged injury is "the very means by which the defendants carried out their illegal ends." *Hanover 3201 Realty*, 806 F.3d at 173. That exception applies when the plaintiff is "directly targeted for harm by parties ultimately wishing to inflict a derivative harm on a competitor." *Id.* at 172. Thus, in a case involving "a group of psychiatrists conspir[ing] to boycott a bank until the bank ceased making loans to psychologists," "the bank would no doubt be able to recover" even though it did not participate in the same market as the psychologists and psychiatrists. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 n.21 (1982). But this exception is "narrow," *Am. Ad Mgmt.*, 190 F.3d at 1057 n.5, and it does not apply here.

Plaintiffs don't assert Apple targets consumers "as a fulcrum" to injure developers (the "participants" in the aftermarkets). *Province v. Cleveland Press Pub. Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986). They claim the opposite: that Apple restrains third parties in alleged aftermarkets to harm consumers. The Third Circuit has refused to "extend[]" this exception to anything like this case. *Ethypharm*, 707 F.3d at 237. This Court should not do so here. *See, e.g.*, *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 438 (3d Cir. 2000) (no standing for "ancillary victims of ripple effects" whose "injuries were not the 'means' by which the

34

[defendants] achieved their alleged conspiracy"); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158–63 (2d Cir. 2016) (similar); *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 13 (1st Cir. 1999) (similar).

**3.** Nor can iPhone Purchaser Plaintiffs escape the market mismatch by pointing to *Apple Inc. v. Pepper*, 587 U.S. 273 (2019). *See* ECF 98 at 2, 4. That case addressed whether purchasers of apps were "direct purchasers" within the meaning of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)—which limits private damages actions to parties who purchased goods *directly* from a defendant. *Pepper*, 587 U.S. at 278. That has no bearing here: "[W]hich persons have been injured by an illegal overcharge [as direct purchasers] for purposes of section 4 [of the Clayton Act] is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages." *Illinois Brick*, 431 U.S. at 728 n.7. This case involves the second problem, and the Third Circuit rejects attempts to "conflate[] the different components of antitrust standing." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 92 (3d Cir. 2011).

If anything, iPhone Purchaser Plaintiffs' reference to *Pepper* underscores their standing problem. The app purchasers there alleged that they paid supracompetitive prices for apps in a *retail market for the sale of apps*. 587 U.S. at 278. That means apps are downloaded in—and developers are allegedly restrained in—markets distinct from the one in which iPhones are bought and sold. *Id.* at 276. To the extent

35

iPhone Purchaser Plaintiffs purport to challenge similar conduct targeted at developers in this case, they only accentuate their alleged injury's remoteness from the challenged restraints.

### 2. Indirect Causal Connection

iPhone Purchaser Plaintiffs assert that Apple "thwart[s]" developers from creating disruptive technologies that, if adopted, could make it easier for consumers to switch between devices, which, in turn, would increase pressure on Apple to lower prices. *See* DIPP Compl. ¶¶ 1, 10, 100, 127, 142, 165, 221; IIPP Compl. ¶¶ 1, 30, 74–77, 87–89, 106, 124, 130, 142, 166–71. Connecting each "pillar" of conduct to smartphone competition entails bespoke, multi-step theories of causation. Because that violates "[t]he general tendency of the law . . . not to go beyond the first step," *AGC*, 459 U.S. at 534, the "sheer remoteness" of Plaintiffs' theory is fatal, *Allegheny Gen. Hosp.*, 228 F.3d at 443 (affirming dismissal for lack of antitrust standing).

Take cloud-gaming apps as an example. iPhone Purchaser Plaintiffs posit that if Apple removed various policies on iPhone as to cloud-gaming apps, developers would create more (or better) cloud-gaming apps for iOS devices. *See, e.g.*, IIPP Compl. ¶¶ 108–10; DIPP Compl. ¶¶ 10–11, 102–04. Then, they assume, app developers would develop the same cloud-gaming apps for non-iPhone smartphones and that cloud-gaming apps would operate identically across all platforms (and the attendant differences in battery life, screen resolution, and the like). *See* IIPP Compl.

36

¶¶ 107, 174; DIPP Compl. ¶¶ 8, 101, 169.  The theory continues that these iOS-compatible, cross-platform cloud-gaming apps would lower switching costs for users, because users could play the same games on different smartphones.  IIPP Compl. ¶¶ 169–70; DIPP Compl. ¶ 165.

Yet even this chain captures only half of the inferences iPhone Purchaser Plaintiffs need.  If cross-platform cloud gaming doesn't catch on or isn't a meaningful driver of smartphone purchasing decisions, it will not have any effect on iPhone prices.  *See* Areeda & Hovenkamp ¶ 402b2 n.7 (consumer preferences drive market prices).  So Plaintiffs' theory next presumes that a sufficient mass of users adopt cloud-gaming apps and that the ability to access such apps on any device leads users to switch away from iPhone (rather than, say, *to* iPhone).  IIPP Compl. ¶ 112; DIPP Compl. ¶ 107.  That in turn leads to competitive pressure on Apple that, Plaintiffs further contend, would lead Apple to respond by lowering iPhone prices. IIPP Compl. ¶¶ 16–17, 173; DIPP Compl. ¶¶ 168, 251.

iPhone Purchaser Plaintiffs' smartwatch allegations illustrate the same point. They challenge Apple's alleged API-access restrictions for third-party smartwatches.  *See* DIPP Compl. ¶¶ 131–36; IIPP Compl. ¶¶ 133–36.  If Apple were to lift these restrictions for third-party smartwatches, the theory goes, smartwatch operating system developers would jump to integrate those APIs into their products. *See* DIPP Compl. ¶¶ 131–34; IIPP Compl. ¶¶ 133–36.  And if that happened, the

37

development of new or modified smartwatch operating systems using these APIs would attract new smartwatch manufacturers to the market, and those manufacturers would introduce new Apple Watch alternatives. *See* DIPP Compl. ¶¶ 124, 127–28, 131–35; IIPP Compl. ¶¶ 127, 130–31, 133–36. By this point, Plaintiffs are already beyond the first step yet remain far away from any effect on iPhone prices.

To bridge the remaining gap, Plaintiffs assume consumers would adopt these new smartwatches over Apple Watch for reasons unknown. *See* DIPP Compl. ¶¶ 126–27; IIPP Compl. ¶¶ 129–30. And now wearing new watches, Plaintiffs say, some subset of consumers would feel less beholden to buy a new iPhone when they replace their phone. *See* DIPP Compl. ¶¶ 128–29, 163, 165; IIPP Compl. ¶¶ 131, 168–69. Plaintiffs again assume that this describes a meaningful share of the smartphone market such that switching costs for a significant amount of smartphone purchasers are reduced and Apple responds by reducing iPhone prices. DIPP Compl. ¶¶ 126–28, 135–36, 163, 165–66, 173; IIPP Compl. ¶¶ 129–30, 170–71.

These are but two of many "tortured path[s]" carved by iPhone Purchaser Plaintiffs' Complaints. *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 930 (3d Cir. 1999). With regard to messaging, mobile wallet, and super apps, each theory similarly starts at developer-facing policies and presumes from there a series of perfectly aligned dominoes where changes by Apple lead to changes by developers, which lead to changes by consumers, which lead to

pricing changes by Apple.  *See* DIPP Compl. ¶¶ 91–92, 98, 111–21, 138–47, 165–66, 173; IIPP Compl. ¶¶ 102–03, 118–20, 144–48, 166, 170–71.

In no case here can "[t]he chain of causation between the injury and the alleged restraint" be described as "lead[ing] *directly* to the '*immediate victims*' of any alleged antitrust violation."  *Eagle v. Star-Kist Foods*, 812 F.2d 538, 541–42 (9th Cir. 1987) (emphases added).  And when considered cumulatively, this case requires dozens of inferential steps to connect specific restrictions on subsets of developers to a broad effect on iPhone prices in a separate market.  Courts reject claims much less attenuated than this one.  *See, e.g.*, *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115–17 (2d Cir. 2021) (bond purchasers lacked antitrust standing to sue banks for LIBOR manipulation); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484–85 (7th Cir. 2002) (purchasers of scrap copper lacked standing to sue traders for conspiracy to fix copper futures prices); *Bakay*, 2024 WL 3381034 at *7 (iPhone purchasers lacked standing to sue Apple for Guidelines on third-party browser apps); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 912–13 (N.D. Cal. 2019) (cell-phone and computer purchasers lacked antitrust standing to sue manufacturers who fixed prices of chip components).

Nor should the Court defer a decision as Plaintiffs suggest.  ECF 98 at 4.  In cases like this one, "[t]he problem is not one of discovery and specific evidence, but of the nature of the injury claimed."  *Kloth*, 444 F.3d at 324.  Here, Plaintiffs don't

just take "the first step following the harmful behavior"—they leap across a canyon of conjecture far beyond the limits of private antitrust actions. *In re Amex*, 19 F.4th at 140. That is fatal as alleged. *See, e.g.*, *Allegheny Gen. Hosp.*, 228 F.3d at 441 (affirming dismissal on the pleadings); *Steamfitters*, 171 F.3d at 934, 937 (same).

### 3. Speculation

For similar reasons, Plaintiffs' theory also is speculative. At each step, they rely on assumptions about how third parties would react and behave—"independent factors"—that take their theory far beyond the bounds of proximate causation. *AGC*, 459 U.S. at 542. This too precludes standing: Courts do not adjudicate damages cases by "creat[ing] in hindsight a technological universe that never came into existence" to "speculative[ly] . . . determine the relevant benefits and detriments that non-[Apple] products would have brought to the market and the relative monetary value to a diffuse population of end users." *Kloth*, 444 F.3d at 324 (cleaned up).

iPhone Purchaser Plaintiffs' case is predicated on just such a hypothetical world rife with speculation about the ways developers, competitors, consumers, and Apple itself would have acted. Start again with cloud gaming: Because "powerful hardware" is supposedly "unnecessary" for games "played via cloud-streaming apps," Plaintiffs suggest that "users with access to cloud-streamed games *may be* more willing to switch from an iPhone to a smartphone with less expensive hardware." DIPP Compl. ¶ 100 (emphasis added); *accord* IIPP Compl. ¶ 106.

40

But maybe not. Internet-connected gaming is only part of the value proposition to some smartphone users; many others do not use such apps at all. Plaintiffs do not allege, for example, that the availability of cloud-gaming apps on Androids has led consumers to switch from more-powerful Android models to less-expensive ones. *See* DIPP Compl. ¶¶ 97–107; IIPP Compl. ¶¶ 104–12. And even if many iPhone users cared about cloud-gaming, Plaintiffs can only speculate that a change in Apple's cloud-gaming policy—which they claim would make iPhone more attractive—would lead iPhone purchasers to switch *away* from Apple devices to Androids. *See* DIPP Compl. ¶ 97; IIPP Compl. ¶ 104.

Also telling is Plaintiffs' disagreement about what would happen if Apple changed its challenged smartwatch-related policies. iPhone Purchaser Plaintiffs contend that if Apple gave smartwatch competitors access to certain technologies, those watches would become more popular, consumers would switch phones, and iPhone prices would fall. DIPP Compl. ¶¶ 124–34, 166; IIPP Compl. ¶¶ 127–36, 166. By contrast, Watch Plaintiff posits that "few customers can or will abandon the iPhone just to improve the functioning of their smartwatch"—implying that the availability of new watches would not induce the kind of smartphone switching iPhone Purchaser Plaintiffs presume. Watch Compl. ¶ 43. These conflicting conclusions spotlight the inherent uncertainty in iPhone Purchaser Plaintiffs' theory of the case. *See Steamfitters*, 171 F.3d at 929, 932 (no standing where "damages

41

claims are quite speculative (and very difficult to measure)").

iPhone Purchaser Plaintiffs' other pillars are similarly speculative. They concede, for example, that Apple implemented "Rich Communication Services" messaging protocol in 2024. DIPP Compl. ¶ 118; IIPP Compl. ¶ 122. Plaintiffs presumed this would allow cross-platform messaging apps to flourish, increase switching, and drive down prices. *See* DIPP Compl. ¶¶ 113–21, 163, IIPP Compl. ¶¶ 118–26, 166. They do not allege any of that happened. And their other "pillars" require the same series of unintuitive assumptions to end in lower iPhone prices— especially since Plaintiffs allege iPhone prices do not necessarily respond to "the entry of other competitors" in any particular aftermarket. IIPP Compl. ¶¶ 3, 170; *see also* DIPP Compl. ¶¶ 87, 91–92, 138–47, 166. Plaintiffs' "highly speculative" claims should be dismissed. *Broadcom*, 501 F.3d at 320; *see also Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13–14 (2d Cir. 1980) (rejecting "hopeless[ly] speculat[ive]" theory with "countless . . . market variables"); *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1117 (E.D. Cal. 2002) (similar).

The problem only deepens when confronting the amount of any supposed iPhone overcharge. *See Steamfitters*, 171 F.3d at 928–29. Inflation-adjusted iPhone prices have gone down, not up, over the last nine years. *Supra* at 10. And Plaintiffs offer no allegation about what prices should have prevailed during the relevant period, let alone any way to quantify the effect of each supposed restriction on

42

iPhone prices.  *See* DIPP ¶¶ 163–69; IIPP ¶¶ 166–74.  The challenge is even steeper for the Indirect iPhone Purchasers: They buy from wireless carriers and retail outlets that can "deviat[e]" from Apple's pricing, creating yet another layer of independent decisionmaking between the restraints and the price consumers ultimately pay.  IIPP Compl. ¶¶ 246–48.  Taken together, Plaintiffs' damages are beyond "difficult to measure" and so speculative that they "may never occur" at all.  *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998); *see also* Areeda & Hovenkamp ¶ 335c5 (dismissal is appropriate "especially early in the litigation" where "damage measurements will be unduly speculative").[7]

In comparing their case to *United States v. Microsoft*, 253 F.3d 34, Plaintiffs all but admit the insurmountable standing problems here.  *See* ECF 98 at 4.  A putative consumer class action followed the government's *Microsoft* case, and the court found their claims too speculative to support antitrust standing.  *Kloth*, 444 F.3d at 324.  That is because the plaintiffs there, as iPhone Purchaser Plaintiffs here, asked the court to imagine changes to many different products, speculate as to the "benefits and detriments" of those changes, and assign monetary value for damages

---

[7] It is no answer that "antitrust plaintiffs routinely rely on expert evidence of what would have occurred in the hypothetical but-for world."  ECF 98 at 5.  The Third Circuit rejected this argument in *Steamfitters*, explaining "aggregation and statistical modeling" do nothing in cases where damages "are completely incapable of determination" and in any event "does not eliminate from our analysis of the *AGC* factors the speculative (though potentially measurable) nature of plaintiffs' damages."  171 F.3d at 929.

to each.  *Id.*  This Court should not entertain such speculative claims here either. *See, e.g.*, *IQ Dental Supply, Inc. v. Henry Schein, Inc*., 924 F.3d 57, 67 (2d Cir. 2019) (rejecting antitrust claim requiring the "creation of an 'alternative universe'").

### 4.    Existence Of More Direct Plaintiffs And Duplicative Damages

iPhone Purchaser Plaintiffs also lack antitrust standing because their theory implies "more directly" impacted parties who "could vindicate the policies underlying the antitrust laws." *Steamfitters*, 171 F.3d at 927.  The "fact that the causal chain requires several additional links to draw a line between Plaintiffs' injuries and Apple's alleged misconduct necessarily means that there are other more direct and immediate" potential plaintiffs to bring this case.  *Bakay*, 2024 WL 3381034 at *7.  That includes the developers upon whom the alleged restraints actually operate.  *See* Gov't Action, ECF 283 at 25–26.  Indeed, developers have already brought claims incorporating some of Plaintiffs' allegations.  *See, e.g.*, *Korean Publishers Ass'n v. Apple Inc*., No. 25-04438 (N.D. Cal.), ECF 44.

In addition, Plaintiffs point to other, non-developer participants in the restrained aftermarkets as more direct alleged victims.  *See* ECF 98 at 2.  This in particular raises the specter of duplicative (or at least difficult to disentangle) recovery.  For example, if consumers could sue as the direct users of a lower-quality messaging feature as Plaintiffs suggest, then that relief is, by Plaintiffs' apparent estimation, indistinguishable from the "quality adjusted" overcharge claimed here.

44

*See, e.g.*, DIPP Compl. ¶¶ 116–17; IIPP Compl. ¶¶ 120–21.   While these considerations are less significant than the "focus" on speculation and attenuation, *Steamfitters*, 171 F.3d at 921, they too militate against standing here.

### 5.   Indirect iPhone Purchasers' State Law Antitrust Claims Fail For The Same Reasons

Indirect iPhone Purchasers also fail to establish antitrust standing to bring their thirty-eight state law antitrust claims.  *See* App'x 1-A.[8]  According to "the standing limitations associated with each state antitrust statute," *D.R. Ward Constr. Co. v. Rohm and Haas Co*., 470 F. Supp. 2d 485, 496 (E.D. Pa. 2006), thirty-four states adhere to the five-factor *AGC* directly, and four jurisdictions apply a proximate causation analysis that mirrors the analysis above in relevant part.  Thus, all of the state law antitrust claims fail on antitrust standing grounds.

**1.**  Because thirty-four states adhere to *AGC*, the Indirect iPhone Purchasers' claims under those laws fail for the same reasons above.  *See* App'x 2.  Four state supreme courts—Connecticut, Iowa, Nebraska, and Nevada—have explicitly held that *AGC* applies to claims under their respective state antitrust laws.  *See id*.  And even without an authoritative decision from the state's highest tribunal, courts in Michigan, North Carolina, North Dakota, and Tennessee similarly apply *AGC* to

---

[8] Because Indirect iPhone Purchasers do not specify under which portion of the statutory scheme they bring Count LV (under Vermont law), this count is addressed both as a state-law antitrust claim and as a state-law consumer protection claim.

claims under their antitrust laws. *Id.* Accordingly, Counts XIII, XIX, XXIV, XXX, XXXI, XXXII, XLI, XLII, LIII should be dismissed. *See supra* § II.A.1–4.

Twenty-five additional states have decided to harmonize state and federal antitrust law by statute or decision. *See* App'x 2. And as a general matter, a "harmonization provision (either statutory or common law) . . . is sufficient to permit a district court to apply federal antitrust-standing law—including *AGC*—to claims brought under that state's antitrust laws." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.* ("*DFA III*"), 2015 WL 3988488, *6 (N.D. Ill. Jun. 29, 2015); *accord In re Cattle & Beef Antitrust Litig.*, 687 F. Supp. 3d 828, 843 (D. Minn. 2023); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 541–47 (N.D. Ill. 2019). Counts VI, VII, XI, XII, XIV, XVI, XVII, XVIII, XX, XXI, XXII, XXVI, XXVII, XXXIII, XXXV, XXXVII, XXXIX, XLIII, XLVII, XLIX, LI, LIV, LV, LVI, and LVIII thus should be dismissed as well.[9]

**2.** That leaves only four jurisdictions—Minnesota, Montana, Arkansas, and Puerto Rico—that have not adopted *AGC*. *See* App'x 2. But these states have not "thrown . . . proximate causation out the window." *Supreme Auto Transp.*, 902 F.3d at 744. They too limit standing through the traditional inquiries of "foreseeability,

---

[9] Even if *AGC* did not apply under one or more of these state laws, "[p]roximate causation is an essential element that plaintiffs must prove in order to succeed on any of their [state law] claims." *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018). Thus, Indirect iPhone Purchasers' state-law antitrust claims must be dismissed for the reasons below even if *AGC* did not apply.

proximate cause, remoteness, and relation of the injury to the purposes of the antitrust laws." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007); *see also In re Cattle & Beef Antitrust Litig.*, 687 F. Supp. 3d at 841, 845 (Minnesota and Montana); *Centene Corp. v. Merck & Co., Inc.*, 2025 WL 2538858, *16 (D.N.J. Sep. 4, 2025) (recognizing the Puerto Rico Supreme Court rejected the pleading requirement of antitrust injury, but "*not* antitrust standing"); Arkansas Code Ann. § 4-88-113(f)(1) (Arkansas).

Inquiries into attenuation and speculation under *AGC* mirror this traditional proximate cause analysis. *See AGC*, 459 U.S. at 532–33; *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014). For the same reasons (*see supra* § II.A.2–3), Plaintiffs cannot satisfy these states' limits either. *See, e.g.*, *In re Cattle & Beef Antitrust Litig.*, 687 F. Supp. 3d at 841. Accordingly, Counts IX, XXV, XXIX, and XLVI should be dismissed.

## B.    Watch Plaintiff Lacks Antitrust Standing

Watch Plaintiff also fails to meet the "threshold requirement" of antitrust standing. *Chagares*, 2022 WL 3588103, at *4. Like iPhone Purchaser Plaintiffs' claims, Watch Plaintiff's case is fraught with attenuation, speculation, and a risk of duplicative and difficult-to-apportion damages. *See AGC*, 459 U.S. at 538–45.

**1.** Watch Plaintiff "necessarily fail[s]" the first-step rule because his alleged injuries are "too remotely connected in the causal chain from any wrongdoing."

47

*Steamfitters*, 171 F.3d at 928.  He seeks damages for an alleged overcharge that, he says, stems from the "contractual and technical means Apple has used to monopolize the iOS-connected smartwatch market."  Watch Compl. ¶ 32.  That includes alleged restrictions on APIs that "limit competing smartwatches' functionalities," *id.* ¶ 48; enforcement of App Review Guidelines to "delay the launch" of companion apps and "limit the discoverability" of sister apps that support competitor smartwatches, *id.* ¶¶ 115, 118; and hardware and software designs that "disrupt and degrade the performance of competitor smartwatches" that interoperate with Apple devices, *id.* ¶ 131.  Even assuming (without conceding) that this conduct occurs in the alleged smartwatch market, it is too attenuated to pass muster.  *See, e.g.*, *In re Amex*, 19 F.4th at 140–41 (in-market theory overly attenuated because of derivative injury).

Connecting it to Watch Plaintiff's alleged injury—paying too much for Apple Watch—requires several inferential steps.  First, Plaintiff imagines a world where Apple lifts contractual restrictions on APIs, changes the App Store Guidelines to improve the visibility of apps supporting competing smartwatches, and removes technical restrictions that impede the functionality of competing smartwatches.  *See, e.g.*, Watch Compl. ¶¶ 48–49, 107, 130, 162.  That, he assumes, leads to developers investing more resources or integrating those functionalities into their apps or operating systems for competing smartwatches.  *See, e.g.*, *id.* ¶¶ 35–37, 111, 130.  Watch Plaintiff then presumes that the development of new, modified, or more

discoverable apps and modified smartwatch operating systems will lead more smartwatches to enter or expand in the market; that a meaningful share of iPhone owners would look to buy these alternative smartwatches; and that Apple would respond by lowering Apple Watch prices. *See, e.g.*, *id.* ¶¶ 2–3, 7, 43–44.

Watch Plaintiff's theory thus hands off the baton at least five times before reaching the alleged injury. *See AGC*, 459 U.S. at 534. Courts routinely dismiss cases with far less attenuated theories. *See, e.g.*, *Eagle*, 812 F.2d at 541–42 (rejecting two-step causal chain as too remote); *Steamfitters*, 171 F.3d at 928 (same for three-step theory); *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458–59 (9th Cir. 2021) (similar). In short, Plaintiff's "tortured path" is what "the proximate cause requirement is intended to weed out." *Steamfitters*, 171 F.3d at 930.

**2.** Watch Plaintiff's theory is also too speculative for antitrust standing because "'countless other market variables could have intervened to affect . . . pricing,'" including the independent decisions of smartwatch makers, app developers, and consumers. *Laydon v. v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 99 (2d Cir. 2022). For example, Plaintiff's theory of supracompetitive pricing for Apple Watch depends on speculation about how smartwatch manufacturers and app developers would respond to Apple lifting its alleged contractual and technical restrictions; how consumers' behavior would change in response to these hypothetical investments; and how Apple Watch pricing might change in response

49

to these events.  *See* Watch Compl. ¶¶ 42–44, 130.  As noted above, courts have rejected similar theories that require creating a "technological universe that never came into existence."  *Kloth*, 444 F.3d at 324; *see also supra* § II.A.3.

**3.**    Watch Plaintiff also alleges the "existence of an identifiable class" of potential plaintiffs with more direct claims.  *AGC*, 459 U.S. at 542.  Once again, the "additional links in the causal chain" between Watch Plaintiff's alleged injury and Apple's alleged conduct "necessarily means that there are other" potential plaintiffs who may be "less removed" from the alleged conduct.  *Bakay*, 2024 WL 3381034 at *7.  The Complaint alleges, for example, that "three of the largest tech companies in the world—Google, Meta, and Samsung—have either exited or chosen never to enter the market for iOS-connected smartwatches," while others were "forced out of business (Pebble) or temporarily exited the market (Motorola)."  Watch Compl. ¶ 189.  And even beyond the competing smartwatch makers supposedly harmed by Apple's alleged restrictions on interoperability, Watch Plaintiff alleges app developers are more directly impacted than he is.  *See, e.g.*, Watch Compl. ¶¶ 40–43, 128; *see also, e.g.*, *AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 910–11 (N.D. Cal. 2022) (antitrust suit brought by smartwatch app developer based on alleged restrictions in Apple's APIs).

Any injury that consumers purportedly suffer from Apple's alleged conduct is purely derivative of the injury that competing smartwatch makers or app

50

developers allegedly suffer.   In *Trinko*, the concurring justices recognized that consumers who complained that a defendant (there, Verizon) was refusing to deal with their own carrier (there, AT&T) lacked standing to sue under the "reasoning in [*AGC*]." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 417–18 (2004) (Stevens, J., concurring).   As in Plaintiff's theory here, "whatever antitrust injury [consumers] suffered because of [defendant's] conduct was purely derivative of the injury that [the carrier] suffered." *Id.* at 417.

While Watch Plaintiff discounts the *Trinko* concurrence as "not binding," ECF 98 at 7, no justice disagreed with the opinion or called it into question.   Nor was there reason to do so: Justice Stevens' opinion aligns with well-worn antitrust standing law under which the "existence of an identifiable, [allegedly] more-directly harmed class of victims with the incentive to sue . . . weighs against granting standing to a more remote plaintiff."   *Bakay*, 2024 WL 3381034, at *7 (finding "browser developers" and "third-party . . . developers" to be "far less removed from the alleged misconduct" than purchasers); *see, e.g.*, *In re Microsoft Corp. Antitrust Lit.*, 127 F. Supp. 2d 702, 711 (D. Md. 2011) ("[C]ompetitors would be more direct victims of Microsoft's antitrust violations."); *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1352 n.8 (6th Cir. 1989) (similar).

**4.** Finally, "calculating plaintiffs' damages . . . would be not only complex but virtually impossible."   *In re Microsoft*, 127 F. Supp. 2d at 711.   Watch Plaintiff's

convoluted damages theory requires "speculat[ion] to determine the relative benefits and detriments that non-[Apple] products would have brought to the market and the relative monetary value of [Apple] and non-[Apple] products to a diffuse population of end users." *Id.* That such injuries "may never occur" makes damages "impossible to prove," *City of Pittsburgh*, 147 F.3d at 268–69, and, even if "potentially measurable," militates against standing, *Steamfitters*, 171 F.3d at 929.

## C.    All Plaintiffs Lack Article III Standing

Article III "[s]tanding is not dispensed in gross." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). Each "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (cleaned up). Plaintiffs suffer from three distinct Article III standing issues: They fail to plead injuries "fairly trace[able]" to the challenged conduct, their claims for injunctive relief are not "redress[able]," and Indirect iPhone Purchasers cannot invoke state laws where they neither resided nor suffered injury. *Lujan*, 504 U.S. at 560–61.

### 1.    All Plaintiffs Fail To Plead Injuries That Are Fairly Traceable To The Challenged Conduct

Plaintiffs cannot show their alleged injuries are traceable to Apple's alleged conduct rather than the "independent action[s] of some third part[ies] not before the court." *Lujan*, 540 U.S. at 560. Plaintiffs' claims rest on speculation about the independent actions of third-party app developers, consumers, and competing smartphone or smartwatch manufacturers. *See supra* § II.A–B. Each of their

theories rests on "speculation" and "guesswork" about a "chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413–14 (2013). As a result, Plaintiffs' injuries are not "fairly traceable" to Apple's alleged conduct. *Id.* at 414; *see also F.D.A. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (plaintiffs "attempting to show causation generally cannot rely on speculation about the unfettered choices made by independent actors not before the courts" (cleaned up)); *Lutter v. JNESO*, 86 F.4th 111, 127–28 (3d Cir. 2023) (similar).

### 2. All Plaintiffs Fail To Plead Redressability As To Their Claims For Injunctive Relief

For similar reasons, Plaintiffs fail to plausibly plead that an injunction would redress their alleged injuries. "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61; *see also Penn. Prison Soc. v. Cortes*, 508 F.3d 156 (3d Cir. 2007) (observing that Article III requires a "*substantial likelihood of remedy*—rather than mere speculation—that the requested relief will remedy the alleged injury in fact"). Given the "bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court," courts "have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (cleaned up). The Court should not endorse such a theory here.

Plaintiffs rely on just-so theories. *See supra* § II.A–B. If Apple redesigns its

products and changes its policies, Plaintiffs assume scores of third parties will respond in very specific ways. *See id*. They proclaim that app developers and smartwatch makers will design new products (e.g., new "super apps," cloud-gaming apps, or wallet apps) or will redesign existing products (e.g., third-party messaging apps or smartwatches) to incorporate myriad specific features that Plaintiffs claim are currently lacking. *See id.* And according to Plaintiffs, these new features will make it easier for consumers to switch *away* from Apple's products. *See id.* All this, they assume, will lead enough iPhone or Apple Watch users to buy other companies' devices, will increase competitive pressure, and will force Apple to further lower Apple Watch and iPhone prices. *Id.*

To achieve that end and avoid further alleged injury, Plaintiffs need more than an injunction against Apple. They at a minimum also need third-party app developers and smartwatch makers to design products in particular ways *and* Android device makers to allow the relevant cross-platform technologies on their platforms. Plaintiffs only "speculat[e]" that third parties would act precisely as they assume without a court order compelling them to do so, let alone that consumers would start to switch devices in droves as a result. *Murthy*, 603 U.S. at 72. They therefore fail to allege an injury redressable by injunctive relief. *See, e.g.*, *Levine v. Vilsack*, 587 F.3d 986, 997 (9th Cir. 2009) (no standing because redress depended on "conclusory and speculative" allegations about the "likely actions of third

parties"); *Bakay*, 2024 WL 3381034, at *7 (no standing because claim depended on speculation about third-party conduct).

### 3. Indirect iPhone Purchasers Lack Standing To Bring State Law Claims Where They Neither Reside Nor Purchased An iPhone

Indirect iPhone Purchasers have an additional standing problem in states where no named plaintiffs reside or purchased an iPhone. "Named plaintiffs are the individuals who seek to invoke the court's jurisdiction and they are held accountable for satisfying jurisdiction." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 364 (3d Cir. 2015). Accordingly, named plaintiffs lack standing to assert claims under the "laws of states in which they do not reside and were not injured." *In re Fragrance Direct Antitrust Litig.*, 2025 WL 579639, at *18 (D.N.J. Feb. 21, 2025). The alternative would allow "named plaintiffs in a proposed class action, with no injuries in relation to the laws of certain states referenced in their complaint, to embark on lengthy class discovery with respect to injuries in potentially every state in the Union"—"the precise problem that the limitations of standing seek to avoid." *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 155 (E.D. Pa. 2009).

Indirect iPhone Purchasers' Complaint is brought by individuals from California, New Mexico, Florida, New York, Pennsylvania, Illinois, North Carolina, Michigan, New Jersey, Arizona, Tennessee, Massachusetts, Missouri, Maryland, Wisconsin, Oregon, Connecticut, Utah, New Hampshire, and Maine who allegedly purchased an iPhone in their home states (except one Wisconsin Plaintiff, who

bought her phone in Minnesota). IIPP Compl. ¶¶ 43–67. Accordingly, the 24 claims pressed under the laws of *other* states should be dismissed, and Count V should be dismissed insofar as it invokes laws outside the 21 states in which named plaintiffs reside and made their purchases. *See* App'x 7.

To be sure, a small minority of cases have declined to dismiss claims on this basis. *See, e.g.*, *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig*., 2022 WL 1013945, *4 (D.N.J. Apr. 5, 2022). But they allow named plaintiffs to bring state claims on behalf of consumers in every state based on a misreading of two Third Circuit decisions. As other courts have explained, the first case—*Mielo v. Steak 'N Shake Operations, Inc*., 897 F.3d 467 (3d Cir. 2018)—"concerned a putative class action arising under a violation of *federal* law." *Snowdy v. Mercedes-Benz USA, LLC*, 2024 WL 1366446, *6 (D.N.J. Apr. 1, 2024) (emphasis in original). And the second, *Neale v. Volvo Cars*, held that Article III's "'cases or controversies' requirement is satisfied so long as a class representative has standing." 794 F.3d at 362. Neither addresses a plaintiff's standing to bring a claim under the law of a state in which he did not live or suffer injury. *See Snowdy*, 2024 WL 1366446 at *6.

The better-considered position is that "named plaintiffs themselves still must satisfy Article III standing requirements '*for each claim they seek to press*.'" *In re Fragrance Direct*, 2025 WL 579639 at *18 (quoting *Long v. SEPTA*, 903 F.3d 312, 323 (3d Cir. 2018)) (cleaned up) (emphasis added). That rule is consistent with

Supreme Court precedent requiring a plaintiff to "demonstrate standing for each claim," *Davis*, 554 U.S. at 734, and has been adopted by the majority of judges in this District.  *See Snowdy*, 2024 WL 1366446, at *6; *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 223 (D.N.J. 2020); *Tijerina v. Volkswagen Grp. of Am., Inc.*, 2023 WL 6890996, at *8 (D.N.J. Oct. 19, 2023).  The Court should adopt that view too and dismiss Counts VI, VIII–IX, XII, XIV, XVII, XIX–XX, XXVI, XXIX–XXXI, XXXII, XLII, XLVI–XLVIII, XLIX–LII, and LV–LVII.

## III.  The Court Should Dismiss The Watch Complaint For Failure To State An Antitrust Claim

Beyond its threshold flaws, Watch Plaintiff's Complaint fails to state an antitrust claim.   Section 2 of the Sherman Act prohibits actual or attempted monopolization. 15 U.S.C. § 2.  Section 1 of the Sherman Act and California's state-law analogue prohibit "concerted action" that imposes "an unreasonable restraint on trade."  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011); *see* 15 U.S.C. § 1; Cal. Bus. & Prof. Code § 16720.  Each claim requires "anticompetitive conduct."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 269 n.9 (3d Cir. 2012).  Watch Plaintiff alleges none: Apple's alleged restrictions on rival smartwatches are lawful refusals to deal, unilateral decisions that do not restrain trade.

## A.    Watch Plaintiff's Section 2 Claims Should Be Dismissed Because The Watch Complaint Does Not Plausibly Allege Anticompetitive Conduct

To state a claim under Section 2 of the Sherman Act, a plaintiff must allege

the "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Trinko*, 540 U.S. at 407.  While "anticompetitive conduct may take a variety of forms," *Broadcom*, 501 F.3d at 308, courts have "develop[ed] considerably more specific rules for common forms of alleged misconduct," *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013).

One such category is a refusal to deal.  Since the Sherman Act's inception, courts have recognized that a "private business . . . can sell to whom [it] pleases" and "may cease to do any business whenever [its] choice lies in that direction." *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 320–21 (1897).  Antitrust law therefore "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise [its] own independent discretion as to parties with whom [it] will deal."  *United States v. Colgate Co.*, 250 U.S. 300, 307 (1919); *accord Trinko*, 540 U.S. at 408.

There is only "one, limited exception to this general rule that there is no antitrust duty to deal."  *Qualcomm*, 969 F.3d at 993.  At "the outer boundary" of Section 2, *Trinko*, 540 U.S. at 409, a duty to deal can arise "among competitors" where (and "only" where) "the parties have a history of dealing paired with facts suggesting 'a willingness to forsake short-term profits to achieve an anticompetitive end.'" *Host Int'l*, 32 F.4th at 250 n.7 (quoting *Trinko*, 540 U.S. at 409); *see generally*

58

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605–11 (1985).

Watch Plaintiff challenges three categories of conduct.  First, he alleges Apple "restrict[s] access to APIs," which prevents competitor smartwatches from integrating with Apple devices in certain ways.  Watch Compl. ¶ 103; *see also, e.g.*, *id.* ¶¶ 48, 53–113.  Second, he claims Apple prevented competing smartwatch makers from distributing iOS apps in certain ways on the App Store (or directly distributing apps to iOS users outside the App Store).  *See, e.g.*, *id.* ¶¶ 115, 118–30. Third, he accuses Apple of designing its own hardware and software in ways that "disrupt and degrade the performance of competitor smartwatches" seeking to interoperate with Apple devices.  *Id.* ¶ 131; *see also, e.g.*, *id.* ¶¶ 132–87.  While the Court declined to apply the refusal to deal doctrine in the Government's case because the complaint there did "not allege Apple is failing to deal with its smartphone rivals," Gov't Action, ECF 283 at 22, Watch Plaintiff squarely challenges Apple's alleged refusal to deal with smartwatch rivals in the smartwatch market.  *See* ECF 98 at 7 (conceding at least some allegations involve refusals to deal).  His Section 2 claims therefore should be dismissed.

### 1. Apple's Alleged Refusal To Share APIs with Smartphone Rivals Is a Lawful Refusal to Deal

Watch Plaintiff's first theory challenges Apple's alleged refusal to "deal under the terms and conditions preferred by [its] rivals."  *Qualcomm*, 969 F.3d at 993. According to the Complaint, Apple's smartwatch rivals use companion apps that

"rely on APIs to exchange information [with] an iPhone" and thereby carry out "[c]ore smartwatch functions." Watch Compl. ¶¶ 33, 47. Watch Plaintiff claims Apple "designat[es] certain APIs private"—meaning Apple will not license those APIs to "competitor smartwatches" for their own use. Watch Compl. ¶¶ 30, 59, 107, 111–12. This, he says, "deprives [smartwatch] competitors of key technologies." *Id.* ¶¶ 30, 48–49. That is not anticompetitive conduct.

1. An alleged "policy of not offering API access to competitors" is an alleged refusal to deal with rivals. *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 27 (D.D.C. 2021). Unlike the allegations in the Government's case, Watch Plaintiff challenges Apple's alleged attempts to "limit[], disrupt[], and degrade[] the capabilities of competitor smartwatches" by refusing to assist smartwatch rivals to the alleged detriment of competition in the "smartwatch market." Watch Compl. ¶¶ 7, 25, 27, 32. To use the Court's words, this firmly fits the "logic behind" the refusal to deal doctrine. Gov't Action, ECF 283 at 21–22.

The Tenth Circuit's pathmarking decision in *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013), assessed a similar claim. There, Novell claimed Microsoft violated Section 2 by "withdrawing access" to APIs that were "key" to Novell's efforts to offer software alternatives to Word and Excel. *Id.* at 1067–69. Like Watch Plaintiff, Novell alleged that the API restrictions "ma[de] it harder for [rivals] to produce" competing products while making "Microsoft's own [product] .

60

. . more immediately attractive to users." *Id.* at 1068–69. The Tenth Circuit rejected that theory, holding Microsoft's refusal to "share" its APIs with its competitors was "unilateral behavior—choosing whom to deal and on what terms—[that] is protected by the antitrust laws." *Id.* at 1074.

The same is true here. The challenged API restrictions—that is, Apple's alleged "designation of APIs reserved for the Apple Watch as 'private'" and purported limitation of "public APIs to whatever purposes Apple deems appropriate," Watch Compl. ¶ 48—are virtually indistinguishable from the conduct at issue in *Novell*. The challenged conduct in both cases is a decision to withhold particular APIs from competitors seeking to use those APIs to offer "the same effective experience" through their competing products. *Novell*, 731 F.3d at 1068–69. For the same reasons, Apple too "has no duty to share (or continue to share) its intellectual or physical property with a rival." *Id.* at 1074.

Other decisions are in accord. In *Qualcomm*, the Ninth Circuit held that decisions about when to "license" chips to "rival chip suppliers" that "hampered or slowed" those rivals' ability to compete were lawful refusals to deal. 969 F.3d at 994. And the Tenth Circuit rejected similar claims in *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, where an app developer challenged a rival developer's refusal to share a software toolkit that the plaintiff needed for its competing app to function. 841 F.3d 827, 843 (10th Cir. 2016); *see also Aerotec Int'l, Inc. v. Honeywell Int'l,*

*Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("withholding of parts and technical data" from rival was lawful refusal to deal); *Google*, 747 F. Supp. 3d at 181–83 (declining to provide "feature parity" to rivals was lawful refusal to deal).  Apple's alleged limits on the "terms and conditions" under which it shares proprietary technology with smartwatch rivals is a lawful refusal to deal too.  *linkLine*, 555 U.S. at 450.

    **2.**  Watch Plaintiff cannot point to any "affirmative interference" with a rival's business to evade the refusal to deal doctrine.  ECF 98 at 7 (quoting *Novell*, 731 F.3d at 1076).  Such conduct involves "failing to leave [one's] rivals alone" rather than "failing to come to their aid"—such as "some assay . . . into the marketplace" that "limit[s] the abilities of third parties to deal with rivals (exclusive dealing)," "require[s] third parties to purchase a bundle of goods rather than just the ones they really want (tying)," or "defraud[s] regulators or consumers."  *Novell*, 731 F.3d at 1072.  Apple's alleged limit on rivals' access to APIs is not exclusive dealing, tying, or any other form of interference with other smartwatch makers' ability to work with other platforms.  *See* Watch Compl. ¶¶ 27, 130.  They are lawful decisions by Apple about what proprietary technology it will license to its rivals in the alleged smartwatch market.  *See Novell*, 731 F.3d at 1078.

    As the leading antitrust treatise explains, "[t]here is no duty to sell something that [Apple] is using only internally or to share some facility that [Apple] is using for its own internal production but is not in the business of sharing with others."

Areeda & Hovenkamp ¶ 772d3.  Indeed, Watch Plaintiff's true gripe appears to lie in Apple's supposed deprivation of "inputs to competitors."  ECF 98 at 6.  Far from exclusive dealing, tying, or the like, that complaint sounds in the essential facilities doctrine—a theory of liability in which "competitors are denied access to an input that is deemed essential, or critical, to competition."  *Aerotec*, 836 F.3d at 1184.  Setting aside the fact the Supreme Court has "never recognized" such a claim, *Trinko*, 540 U.S. at 411, it is just "a variation on a refusal to deal" that fails for the same reasons (including the failure to define the upstream market, *see supra* § I.B).  *Aerotec*, 836 F.3d at 1184; *see also Epic Games*, 559 F. Supp. 3d at 1051 (rejecting claim that the "iOS platform is an essential facility" because the "doctrine does not require distribution in the manner preferred by the competitor").

**3.**  Watch Plaintiff does not allege facts satisfying *Aspen Skiing*'s narrow exception.  *See* ECF 98 at 7.  That exception applies "only if the parties have a history of dealing paired with facts suggesting 'a willingness to forsake short-term profits to achieve an anticompetitive end.'"  *Host Int'l*, 32 F.4th at 250 n.7.  But Watch Plaintiff does not point to a single alleged API restriction that Apple did not previously impose.  Nor does he contend that Apple "sells [the relevant private APIs] in the existing market to other similarly situated customers."  *Qualcomm*, 969 F.3d at 994; *see also* Areeda & Hovenkamp ¶ 772d3 ("[T]he doctrine does not apply where the requested assets are 'not otherwise marketed or available to the public.'").

63

Apple still allows third-party smartwatches to connect to iPhones and furnishes them with public APIs like it does for every developer. *See* Watch Compl. ¶¶ 194, 213.

Even if Apple terminated a pre-existing course of dealing, Apple's alleged conduct is not "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075. On the face of the Complaint, Apple has multiple reasons to restrict access to its APIs—from its interest in protecting the security, privacy, and operability of iPhone, *Epic Games*, 559 F. Supp. 3d at 1038, to increasing Apple Watch sales. *See Novell*, 731 F.3d at 1068, 1074–75 (rational desire to maximize overall profits rendered Microsoft's decision to "[w]ithdraw access" to "particularly key" APIs lawful); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 294, 304–06 (D.C. Cir. 2023) (similar). As Judge Posner wrote decades ago, "[c]onsumers would be worse off if a firm . . . had a duty to extend positive assistance to new entrants, or having extended it voluntarily a duty to continue it indefinitely." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986).

### 2. Apple's Alleged App Review Guideline Restrictions on Companion and Sister Apps Are Lawful Refusals to Deal

Watch Plaintiff also alleges that Apple uses the App Review Guidelines "to limit competition with the Apple Watch." Watch Compl. ¶ 114. This comes in two alleged forms. One, Apple supposedly "delay[s] the launch of smartwatch competitors' companion apps," which are needed to pair a smartwatch with the iPhone. *Id.* ¶¶ 34, 115–117. Two, Apple allegedly limits "support for competitor

64

smartwatches by iOS sister apps" (those that "enhance the way [a] smartwatch works

. . . or works with an iPhone," *id.* ¶ 34) through a Guideline that says apps should

not "include names icons, or imagery of other mobile platforms in [their] app or

metadata, unless there is specific, approved interactive functionality." *Id.* ¶¶ 118–

21. This Guidelines theory does not allege anticompetitive conduct either.

**1.** Start with Watch Plaintiff's allegations about delaying smartwatch

competitors' apps. Aside from withholding APIs (*see supra* § II.B), Watch Plaintiff

claims Apple overcame the "then-leading maker of iOS-compatible smartwatches,"

Pebble, by "refus[ing] to approve the Pebble Time iOS app ahead of the launch of

the Pebble Time smartwatch." Watch Compl. ¶¶ 5, 116. This is a straightforward

"refusal to cooperate with a rival": Just as Verizon failed to fill (or timely fill) its

competitors' orders in *Trinko*, these allegations claim Apple provided "insufficient

assistance in the provision of service to rivals." 540 U.S. at 404–05, 410; *see also*,

*e.g.*, *Aerotec*, 836 F.3d at 1184–85 (imposing a "Kafkaesque" process for

competitors' orders while giving "priority access" to others is lawful refusal to deal).

The same is true for Watch Plaintiff's theory that Apple "prevent[s] iPhone

users from finding apps that . . . will seamlessly integrate with or support a

competitor's smartwatch" by limiting sister apps' ability to reference competing

devices. Watch Compl. ¶¶ 120–21. Apple's enforcement of Guideline 2.3.10—

which limits when and how developers reference "other mobile platforms," *id.*

65

¶ 119—is at most a refusal to allow its own platform to be used to assist rivals (e.g., through discoverability on the App Store).  As the Seventh Circuit explained, a plaintiff "cannot conscript [its] competitor's salesmen to sell [its] product" precisely because companies have no "general duty to help . . . competitors . . . . survive or expand." *Olympia Equip.*, 797 F.2d at 375–78.

Watch Plaintiff's allegations parallel the rejected challenge to Facebook's "core products policy" and "competitor integration policy" in *Meta*, 66 F.4th at 294, 305. These policies "allegedly discouraged developers from creating apps that bridged different social media networks" and "prohibit[ed] developers from using Facebook's Platform to duplicate Facebook's core products." *Id.* (cleaned up).  The plaintiffs complained they "cut off competitors from access to [its] immensely valuable network" and "degrade[d] the functionality and distribution of potential rivals' content." *Id.* at 305–06 (cleaned up).  But the court rejected that theory, reasoning that it was merely "another way of saying that Facebook refused to deal with its rivals on the rivals' preferred terms." *Id.* at 306.  So too here.

**2.** Watch Plaintiff cannot avoid the "refusal-to-deal framework" merely because Apple's Guidelines govern all sister apps—even if made by a developer that does not make smartwatches themselves.  ECF 98 at 6.  The entire point of these sister apps, Watch Plaintiff says, is that they are "[d]esigned for [c]ompeting [s]martwatches" to "advertise," to "support," and to "work closely with [those]

competitor smartwatches." Watch Compl. ¶¶ 118, 121–22. Because Apple has no obligation to "lend its facilities to its potential competitors," it follows that Apple need not expand its competitors' access to its platform—including as a place to advertise their competing products. *Meta*, 66 F.4th at 305; *see also Olympia Equip.*, 797 F.2d at 377–78 (giving a company "a free ride on its competitor's sales force . . . . is the antithesis of competition").

Watch Plaintiff's arguments (ECF 98 at 6–7) are those the D.C. Circuit rejected in *Meta*. There too, the plaintiffs sought to cast the restriction on developers' ability to link to competing platforms as a form of "conditional dealing." 66 F.4th at 304. But the court rejected that argument: Facebook's "policy simply regulated the acceptable features of apps specifically built to be used on Facebook itself; it does not appear to have prevented an app developer from building a separate version of its app that could be accessed and used within the website of another [competing] service." *Facebook*, 549 F. Supp. 3d at 33; *accord Meta*, 66 F.4th at 304. Apple's Guidelines are no different: They govern native iOS apps, and Watch Plaintiff acknowledges that third-party developers can and do create apps that work with rival smartwatches—including on other platforms. *See* Watch Compl. ¶ 34.

In reaching its ruling, the *Meta* court also distinguished the two principal authorities on which Watch Plaintiff relies: *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), and *United States v. Dentsply International, Inc.*, 399 F.3d 181 (3d

67

Cir. 2005).  In *Lorain Journal*, a newspaper "refused to accept local advertisements" from any advertiser who advertised with a competitor.  342 U.S. at 148.  Similarly, the manufacturer in *Dentsply* "block[ed]" competitors from "access[ing] . . . key dealers" by preventing the dealers that sold its product from "add[ing] further tooth lines to their product offering[s]."  399 F.3d at 185–89.  But like Facebook's competitor integration policy, Apple's Guidelines are "nothing like the exclusive dealing" in those cases.  *Meta*, 66 F.4th at 304.

The key distinction is that *Lorain Journal* and *Dentsply* "involve[d] 'a very special form of exclusive dealing, namely, a refusal to sell to [customers or third-party dealers] who purchase[d] from the monopolist's competitor[s]."  *Facebook*, 549 F. Supp. 3d at 32.  That conduct is a form of exclusive dealing because it forecloses rivals' ability "to make agreements" with customers.  *Id.*  But just as Facebook's competitor integration policy "limit[ed] only how canvas apps on Facebook operate," Apple's Guidelines for iOS apps "leave[] [third-party] app developers entirely free to develop applications for [Apple's] competitors."  *Meta*, 66 F.4th at 304.  This is a mere refusal to deal on the terms and conditions a counterparty prefers—not the imposition of exclusivity that prevents app developers from working with rival smartwatch manufacturers.  *linkLine*, 555 U.S. at 449–50.[10]

---

[10] Nor can Plaintiff rely on the D.C. Circuit's earlier decision in *Microsoft*.  There, Microsoft "engag[ed] in a variety of exclusionary acts," including actual and de-facto exclusive dealing that suppressed middleware technologies that were poised to

**3.**  Watch Plaintiff is therefore forced to thread a "narrow-eyed needle," *Novell*, 731 F.3d at 1074, but again cannot satisfy *Aspen Skiing*'s exception.  The Complaint never says Apple did not previously impose Guideline 2.3.10 or that it otherwise permitted app listings to reference "other mobile platforms" outside of "specific, approved interactive functionality."  Watch. Compl. ¶ 119.  Nor does it allege that any such change would be "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1075.  Watch Plaintiff's Guidelines theory thus fails.

### 3.    Apple's Refusal To Engineer Interoperability with Competing Smartwatches Is a Lawful Refusal to Deal

Watch Plaintiff last claims that Apple "updates and redesigns iOS in ways that disrupt and degrade the performance of competitor smartwatches" and "introduces new hardware and software that it knows or has reason to know will disrupt or substantially disable competitor smartwatches."  Watch Compl. ¶¶ 131, 157.  But failing to design interoperability is no less protected than deciding not to deal despite the ability to do so.  As courts have explained, a company has no "duty to help its competitors survive or expand" when designing (or redesigning) its hardware or

---

become operating system competitors (i.e., the only nascent competition).  253 F.3d at 54, 58–78.  By contrast, Apple did not engage in exclusive dealing akin to "licensing Windows to [original equipment manufacturers ("OEM") in a manner that] prevented many OEMs from distributing browsers other than [Internet Explorer]" to consumers.  *Id.* at 60–61; *see* Watch Compl. ¶¶ 197, 230 (acknowledging Apple does not restrict competing smartwatch makers' ability to sell their devices to consumers).

software products.  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1002 (9th Cir. 2010); *see also Trinko*, 540 U.S. at 407, 410 ("den[ying] interconnection services to rivals" is a lawful refusal to deal).

**1.**  Watch Plaintiff seeks to condemn several innovations introduced by Apple.  For example, Watch Plaintiff challenges location tracking warnings—a software feature that "sends iPhone users prompts when third-party apps, including competitor smartwatch companion apps, are accessing iPhone users' location in the background."  *Id.* ¶ 165.  Watch Plaintiff also challenges Apple's software design for running apps in the background, like "Low-Power Mode," which allegedly restricts "the ability of competitor smartwatches to complete basic tasks in the background," *id.* ¶¶ 137, 145–46; *see also id.* ¶¶ 135–36, 183; display notifications, *id.* ¶ 149; health-data visibility, *id.* ¶ 154; Bluetooth controls, *id.* ¶ 175; and other undefined hardware and software "updates" that "introduce bugs, delays, and connection issues," *id.* ¶ 157.  The theory behind these allegations is that Apple "restrict[s]" the "capabilit[ies] o[f] competitor smartwatches" while "impos[ing] no comparable restrictions on the Apple Watch."  *Id.* at ¶¶ 134, 146, 152.

But courts consistently reject arguments like Watch Plaintiff's that a company must design its own products to interoperate with competitors.  In *Tyco*, for example, the Ninth Circuit held that Tyco could lawfully introduce a new, improved sensor system even though it was incompatible with rivals' sensors.  *See* 592 F.3d at 1000–

70

02.  In another case, the court held IBM did not have to "constrict[] its product development so as to facilitate sales of rival products" because it had no duty to design its products in a manner that helped rivals "survive or expand." *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 744 (9th Cir. 1979); *see also, e.g.*, *Robinson v. HP, Inc.*, 2025 U.S. Dist. LEXIS 193700, *24–27 (N.D. Ill. Sep. 30, 2025) (dismissing Section 2 claim because software update allegedly preventing HP printers from using competitors' ink cartridges was lawful refusal to deal).

Instead, "any firm . . . may generally bring its products to market whenever and however it chooses." *Berkey Photo*, 603 F.2d at 286.  Decisions about how to design and redesign products are thus "necessarily tolerated by the antitrust laws" where they provide "some new benefit to consumers." *Tyco*, 592 F.3d at 1000.  It is beyond dispute that Apple Watch itself—and features like low-power mode, Bluetooth controls, and health-related software—have provided at least "some new benefit to consumers." *Id.*; *see infra* at 72–73.  Whether any challenged features also aimed to disadvantage rival products is not the bailiwick of antitrust courts, which deliberately refrain from becoming "tribunals over innovation sufficiency." *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 440 (3d Cir. 2016).

**2.**  To be sure, Watch Plaintiff asserts Apple's introduction of new hardware and software has "no procompetitive justification." *See, e.g.*, Watch Compl. ¶¶ 144, 152, 155, 163, 172, 182.  But that is a legal conclusion entitled to no presumption of

truth on a motion to dismiss. *Twombly*, 550 U.S. at 555. It also is beside the point because courts do not "balance[e] the benefits or worth of a product improvement against its anticompetitive effects," *Tyco*, 592 F.3d at 1000, nor require any particular justification where a company's refusal to interoperate does not involve terminating a prior, profitable course of dealing, *Host Int'l*, 32 F.4th at 250 n.7.

Regardless, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (cleaned up). Here, for example, Apple's design of the Health App provides a "central repository for health data collected from a variety of sources," including "Apple Watch and competitor smartwatches," "third-party apps," and "iPhone itself." Watch Compl. ¶ 153. The Control Center allows iPhone users to "quickly disconnect Bluetooth headphones, speakers or other devices." *Id.* ¶ 179. And Apple's location tracking warnings provide iPhone users with more control over when and how their location is tracked. *Id.* ¶ 166. These and other benefits preclude Section 2 liability. *See Tyco*, 592 F.3d at 1002 (rejecting challenge to "product improvement" that "caused the incompatibility" of competing products); *Mylan*, 838 F.3d at 438–39 (similar).

Ultimately, "[t]he creation of technological incompatibilities, without more, does not foreclose competition; rather, it increases competition by providing consumers with a choice among differing technologies." *Foremost Pro Color, Inc.*

72

*v. Eastman Kodak Co.*, 703 F.2d 534, 542 (9th Cir. 1983). Encouraging such innovation is key to "providing competing manufacturers the incentive to enter the new product market by developing similar products of advanced technology." *Id.* The Court should not turn that incentive on its head by subjecting Apple to "inevitably costly and protracted discovery," *Twombly*, 550 U.S. at 558, for the design decisions it made in bringing better products to market for consumers.

## B.    Watch Plaintiff's Section One And Cartwright Act Claims Should be Dismissed

Watch Plaintiff cannot avoid the refusal to deal doctrine by invoking Section 1 of the Sherman Act or California's Cartwright Act. Watch Compl. ¶¶ 273, 284; *see Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 760 (1984) (refusal to deal does not violate Section 1). His allegations independently fail to state a claim under either act because Apple's unilateral decisions are not "concerted action," let alone per se unreasonable. *Burtch*, 662 F.3d at 221.

### 1.    Watch Plaintiff Does Not Plead Any Concerted Action

The antitrust laws recognize a "basic distinction between concerted and independent action." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984). "Unilateral activity, no matter what its motivation, cannot give rise to a [Section] 1 violation." *Rossi v. Standard Roofing*, 156 F.3d 452, 465 (3d Cir. 1998) (internal citation omitted); *see Psytar*, 586 F. Supp. 2d at 1203–04 (same for Cartwright Act). After all, "a vigorous competitor may leave th[e] impression" that

it "'restrain[s] trade' unreasonably" when it "capture[s] unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result." *Copperweld*, 467 U.S. at 767. A threshold question therefore is "whether the challenged anticompetitive conduct stems from independent decision or from an agreement." *Twombly*, 550 U.S. at 553 (cleaned up). This turns on whether the challenged conduct is concerted action that "joins together separate decisionmakers" and thereby "deprives the marketplace of independent centers of decisionmaking." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010).

Watch Plaintiff fails to plead any concerted action. He claims the DPLA is concerted action between Apple and rival smartwatch makers to reduce smartwatch output. *See, e.g.*, Watch Compl. ¶¶ 40, 42, 45–52. But nothing in the DPLA concocts such an agreement. The DPLA sets out the terms under which Apple makes available its proprietary tools, technologies, and services to developers of native iOS apps. *Id.* ¶¶ 40, 114. On its face, it does not purport to restrict the ability of third-party smartwatch manufacturers to bring their devices to market. *See id*. The DPLA thus does "not restrain trade *in the relevant market*" and cannot give rise to a Section 1 claim. *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1082 (9th Cir. 2025).

Put another way, the supposed concerted action—developers' agreement in the DPLA to be bound by the Guidelines and use only public APIs—does not give rise to alleged anticompetitive effects in the smartwatch market. *See* Watch Compl.

¶¶ 272, 283.   But for the DPLA, developers could not make iOS-compatible smartwatch apps at all.  *See, e.g.*, *id*. ¶ 40.  What Watch Plaintiff challenges is not the provision of tools and technologies but Apple's unilateral decisions about which APIs to license and how to enforce the Guidelines.  *See id*. ¶¶ 48–49, 54, 99, 103, 111, 130.  Those decisions are unilateral acts by Apple alone, *see supra* at 60–62, and do not "deprive[] the marketplace of independent centers of decisionmaking." *Am. Needle*, 560 U.S. at 195.

Other courts have recognized as much, dismissing similar claims invoking the DPLA but instead premised on Apple's unilateral enforcement of the Guidelines and refusal to license certain tools to developers.  *See Bakay*, 2024 WL 3381034, at *4 (dismissing Section 1 claim alleging developers agreed to abide by Apple's App Review Guidelines); *Pierre v. Apple Inc*., No. 23-05981, Dkt. 49 at 1 (N.D. Cal., Mar. 26, 2024) (similar).  And myriad other decisions similarly reject Section 1 claims predicated on a defendant's "unilaterally implemented . . . [p]olicy." *Baar*, 295 F. Supp. 3d at 465.  Plaintiff thus fails to plead the threshold requirement of an agreement that restrains trade.  *linkLine*, 555 U.S. at 448.

## 2.    At a Minimum, Watch Plaintiff Does Not Plead a Per Se Claim

Even if Apple's unilateral conduct could amount to concerted action, Watch Plaintiff fails to plausibly allege that it is per se unlawful.  The "usual standard" used to determine whether conduct unreasonably restrains trade is the holistic "rule of

reason." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010). The

per se rule is confined to restraints with "'manifestly anticompetitive'" effects that

"'lack . . . any redeeming virtue.'" *Leegin Creative Leather Prods., Inc. v. PSKS,*

*Inc.*, 551 U.S. 877, 886 (2007). It is used "only after courts have had considerable

experience with the type of restraint at issue" and "can predict with confidence that

it would be invalidated in all or almost all instances under the rule of reason"—like

"horizontal agreements among competitors to fix prices or to divide markets." *Id.*

at 886–87. Watch Plaintiff has not pled any such agreement.

To start, the per se rule applies only to "horizontal agreements"—those

between "competitors" at the same level of distribution. *See, e.g.*, *Amex*, 585 U.S.

at 540–1; *Leegin*, 551 U.S. at 888, 893. The DPLA is an agreement between Apple,

as a platform operator, and third-party developers. Watch Compl. ¶ 40. Such

"vertical" agreements—set "'between firms at different levels of distribution'"—are

subject to the rule of reason. *Amex*, 585 U.S. at 541; *see also, e.g.*, *Epic Games*, 67

F.4th at 997 (applying the rule of reason to the DPLA); *Orson, Inc. v. Miramax Film*

*Corp.*, 79 F.3d 1358, 1371 (3d Cir. 1996) (same for licensing agreement).

The fact that some developers also manufacture competing smartwatches,

ECF 98 at 7, at most creates a "hybrid" relationship with horizontal and vertical

elements. *United States v. Brewbaker*, 87 F.4th 563, 573–83 & 583 n.14 (4th Cir.

2023). Courts "adjudg[e] hybrid restraints with vertical and horizontal aspects under

76

the rule of reason." *Id.* at 583 n.14; *see also Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) ("The rule of reason analysis applies even when . . . the purpose of the vertical agreement . . . is to support illegal horizontal agreements."); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) (similar). That includes the DPLA itself: Even though the *Epic* plaintiff was "a potential competitor" that "wanted to open a competing iOS game store," the court analyzed the DPLA under the rule of reason. 559 F. Supp. 3d at 1036, 1052.

Nor can Watch Plaintiff cast Apple's App Review Guidelines as "a per se illegal group boycott." Watch Compl. ¶ 284. He does not allege any facts indicating that developers take part in formulating the content or enforcement of those guidelines, much less that they did so with the "purpose . . . to exclude" rival smartwatch makers. *De Filippo v. Ford Motor Co.*, 516 F.2d 1313, 1318–20 (3d Cir. 1975). Nor would that allegation be plausible: It would be self-defeating for smartwatch app developers, "including makers of sister apps for third-party smartwatches," to boycott smartwatch makers. Watch Compl. ¶ 284; *see, e.g.*, *Llacua v. Western Range Ass'n.*, 930 F.3d 1161, 1181 (10th Cir. 2019) (affirming dismissal of antitrust claims that did "not make economic sense"). At a minimum, the Court therefore should dismiss Watch Plaintiff's Section 1 and Cartwright Act claims insofar as they seek to depart from "the usual standard" of the rule of reason. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 315.

**IV.    The Vast Majority Of The State Law Claims Should Also Be Dismissed For Additional Reasons**

Each Complaint's claim under California's Unfair Competition Law—and nearly all of Indirect iPhone Purchasers' grab bag of state antitrust, consumer protection, and unjust enrichment claims, *see* App'x 1—should be dismissed on one or more independent grounds.

**A.    The California Unfair Competition Law Claim Brought By All Plaintiffs Should Be Dismissed**

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  This creates "three varieties" of claims. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Plaintiffs invoke two: All Plaintiffs bring claims under the "unlawful" prong of the UCL; Direct iPhone Purchasers and Watch Plaintiff also assert "unfair" theories. IIPP Compl. ¶¶ 331–37; DIPP Compl. ¶ 285; Watch Compl. ¶¶ 293–94.  Each fails.

**1.**  Because the UCL's "unlawful" prong "borrows violations of other laws" and "makes [them] actionable under the UCL," where a "plaintiff cannot state a claim under the 'borrowed law,' it cannot state a UCL claim either."  *Tuck Beckstoffer Wines LLC v. Ultimate Distributors, Inc.*, 682 F. Supp. 2d 1003, 1019– 20 (N.D. Cal. 2010); *accord Rubenstein v. The Gap, Inc.*, 14 Cal. App. 5th 870, 880 (2017).  Here, Plaintiffs' UCL claims are based on the same factual predicates as their antitrust claims.  *See* IIPP Compl. ¶¶ 331–37; DIPP Compl. ¶¶ 290–91; Watch

Compl. ¶¶ 293–96.  Plaintiffs' failure to state Sherman Act or Cartwright Act claims

therefore require dismissal of Plaintiffs' UCL claim under the "unlawful" prong.

*See, e.g.*, *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 374 (2001).

**2.**  An unfairness claim requires the plaintiff to allege an "incipient violation

of an antitrust law" or conduct that otherwise "violates the policy or spirit of one of

those laws."  *Cel-Tech*, 20 Cal. 4th at 187.  Plaintiffs' claims fail at the start because

where, as here, the "same conduct is alleged to be both an antitrust violation and an

'unfair' business act or practice for the same reason . . . the determination that the

conduct is not an unreasonable restraint of trade necessarily implies that the conduct

is not 'unfair' toward consumers."  *Chavez*, 93 Cal. App. at 375; *accord Beverage*

*v. Apple Inc.*, 101 Cal. App. 5th 736, 755 (2004).  And there is nothing incipient or

otherwise offensive afoot: Plaintiffs claim Apple's conduct is long-running, and they

specify no way in which the alleged conduct is "unfair within the meaning of the

unfair competition law" given the failure of their antitrust claims.  *Cel-Tech*, 20 Cal.

4th at 184; *see also, e.g.*, DIPP Compl. ¶¶ 4, 73–80; IIPP Compl. ¶¶ 6, 86–90; Watch

Compl. ¶¶ 7, 31, 115–16.

**3.**  The UCL, moreover, authorizes only equitable remedies, not damages.

*Nationwide Biweekly Admin., Inc. v. Super. Ct.*, 9 Cal. 5th 279, 301 (2020).  Because

federal courts "must apply traditional equitable principles," plaintiffs must allege the

prerequisites to the equitable relief they seek—including the inadequacy of legal

remedies. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020);

*see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs do

not do so here: They seek treble damages, a legal remedy, for the same alleged

monetary losses (and then some) to the present—with no explanation of how that

would be inadequate even if Apple's conduct is "continuing." ECF 98 at 2 n.2; *see*

IIPP Compl. ¶ 343; DIPP Compl. ¶¶ 293, 300; Watch Compl. ¶¶ 299, 301.

Nor can Plaintiffs punt this issue by suggesting *Sonner*'s rule has "minimal

application at the pleading stage." ECF 98 at 3 n.2. "When a case is initially filed

in federal court and the defendant demonstrates that equitable jurisdiction is lacking,

a court must dismiss the case." *Ruiz v. Bradford Exch., Ltd.*, --- F.4th ---, 2025 WL

2473007, at *4 (9th Cir. Aug. 28, 2025). Indeed, *Sonner* itself faulted "the operative

complaint" for failing to "allege that Sonner lacks an adequate legal remedy" and

applied Supreme Court precedent affirming the dismissal of a complaint for the same

reason. *Sonner*, 971 F.3d at 844 (citing *O'Shea v. Littleton*, 414 U.S. 488, 502

(1974)). For this reason, courts routinely dismiss UCL claims on the pleadings

where the plaintiff fails to allege the prerequisites to equitable relief. *See, e.g.*,

*PhantomALERT v. Apple Inc.*, 762 F. Supp. 3d 8, 23 (D.D.C. 2025); *Anderson v.

Apple Inc.*, 500 F. Supp. 3d 993, 1009–10 (N.D. Cal. 2020); *Julian v. TTE Tech.,

Inc.*, 2020 WL 6743912, at *4–5 (N.D. Cal. Nov. 17, 2020).

*    *    *

80

Plaintiffs' UCL claims thus fail and should be dismissed. If the Court permits any UCL claim to proceed, however, it should limit the claim to California residents because "applying California law to [a] nationwide class" would "improperly impair[]" other States' interests by making California's "enforcement policy" the law of the land. *Stromberg v. Qualcomm Inc*., 14 F.4th 1059, 1074 (9th Cir. 2021).

## B. Seventeen State Law Antitrust Claims Should Be Dismissed

Indirect iPhone Purchasers bring 38 claims under state antitrust laws. IIPP Compl. at 114–91; *see* App'x 1-A. While all those claims fail for lack of standing (*see supra* § II.A.5), nearly half suffer from at least one of six further, fatal flaws.

**1.** *No Cause of Action for Indirect Purchasers*. Six state antitrust laws under which Indirect iPhone Purchasers bring claims adhere to *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), under which indirect purchaser plaintiffs—that is, plaintiffs who did not deal *directly* with the defendant in a transaction—are "ineligible to recover damages [under the federal antitrust laws] for [allegedly] passed-on overcharges." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 369 (3d Cir. 2005); *see* App'x 3-A. Five of these jurisdictions—Florida, Missouri, Montana, Puerto Rico, and South Carolina—have declined to pass "'*Illinois Brick* repealers' enabling an indirect purchaser to bring an antitrust claim under state law." *In re Flonase Antitrust Litig*., 284 F.R.D. 207, 214 n.9 (E.D. Pa. 2012); *see* App'x 3-A. And a sixth, Arkansas, only allows indirect-purchaser actions to be brought by the

attorney general, Ark. Code Ann. § 4-75-315—precluding private indirect-purchaser actions. *See* App'x 3-A. The Court should dismiss Counts IX, XVI, XXVII, XXIX, XLVI, and XLIX.

    **2.** *Failure to Comply With Notice Requirements*. Five claims should be dismissed because Indirect iPhone Purchasers failed to give required notice. Arizona, Colorado, Nevada, and Utah law each require plaintiffs to notify the state attorney general before filing suit. *See* App'x 3-B. The Hawaii Antitrust Act requires plaintiffs to serve the complaint on the Hawaii attorney general within seven days of filing—after which plaintiffs may proceed only if the attorney general declines to take up the case. *See* Haw. Rev. Stat. § 480-13.3(a); *see also* App'x 3-B. Because Indirect iPhone Purchasers do not allege they satisfied these requirements, the Court should dismiss Counts VII, XII, XVII, XXXII, and LIV.

    **3.** *Failure to Meet Intrastate Effects or Conduct Requirement.* Three more claims—under Alabama, Tennessee, and New York law—should be dismissed because Indirect iPhone Purchasers allege no particularized in-state conduct or effects. *See* App'x 1-A. Indirect iPhone Purchasers suggest "nationwide antitrust violations, the antitrust impact of which was felt within each state," suffice. ECF 98 at 5. Not so. New York's Donnolly Act does not reach conduct that "primarily affected interstate commerce" and was "not limit[ed] . . . to any particular state." *H-Quotient, Inc. v. Knight Trad. Grp., Inc.*, 2005 WL 323750, at *5 (S.D.N.Y. Feb. 9,

2005).  Alabama similarly "does not provide a cause of action for damages resulting

from [alleged conduct] in interstate commerce"—requiring "monopolistic activities"

within the state.  *Abbott Lab'ys v. Durrett*, 746 So. 2d 316, 339 (Ala. 1999).  So too

for Tennessee.  *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 524

(Tenn. 2005).  The Court should dismiss Counts VI, XXXIX, and LIII.

**4.**  *No Allegations of Concerted Action.*  Two of Indirect iPhone Purchasers'

claims—under Kansas and New York law—proscribe only concerted action.  *See*

App'x 1-A.  But Indirect iPhone Purchasers allege only that Apple engaged in

unilateral monopolization.  *See* IIPP Compl. ¶¶ 216–17, 225–27.  That is fatal to

Counts XX and XXXIX.  *See In re Effexor Antitrust Litig.*, 337 F. Supp. 3d 435,

461–62 (D.N.J. 2018) (dismissing claims under Kansas and New York antitrust

statues); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline,*

*PLC*, 737 F. Supp. 2d 380, 399 (E.D. Pa. 2010) (similar).

**5.**  *No Cause of Action for Consumer Class Actions.*  Illinois, Montana, and

South Carolina antitrust law do not authorize putative class claims.  *See* App'x 1-A.

These requirements are substantive limitations that bar class claims under these

statutes, including when they are brought in federal court.  *See In re Digital Music*

*Antitrust Litig.*, 812 F. Supp. 2d 390, 415–16 (S.D.N.Y. 2011); *In re Packaged Ice*

*Antitrust Litig.*, 779 F. Supp. 2d 642, 661 n.4 (E.D. Mich. 2011); *In re Dynamic*

*Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d. 1072, 1103–04

(N.D. Cal. 2007); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 84 (D. Mass. 2005); *In re Amitiza Antitrust Litig.*, 2024 WL 4250224, *16 (D. Mass. Aug. 21, 2024). The Court therefore should dismiss Counts XVIII, XXIX, and XLIX insofar as they are brought on behalf of the putative class.

**6.** *Non-Existent Claim.* Indirect iPhone Purchasers' California common law claim fails because "common law monopoly is not cognizable under California law." *Lorenzo*, 603 F. Supp. 2d at 1306. Rather, the common law recognized that *contracts* conferring a monopoly were "against public policy and void." *Burdell v. Grandi*, 152 Cal. 376, 379 (1907). It did not proscribe unilateral action. Areeda & Hovenkamp ¶ 104; *see also Ponti v. Burastero*, 112 Cal. App. 2d 846, 853 (1952) (the "common-law doctrine that monopolies are odious and therefore illegal refers to franchises and agreements in restraint of trade").

Indirect iPhone Purchasers suggest *In re Cipro Cases I & II*, 61 Cal. 4th 116 (2015), holds otherwise. ECF 98 at 5. But while the *Cipro* plaintiff purported to bring a claim under the "common law prohibition against monopolies," 61 Cal. 4th at 133, the court did not endorse a common law theory of unilateral monopolization. To the contrary, *Cipro* involved a settlement agreement that the plaintiff claimed "create[d] or perpetuate[d] monopolies." *Id.* at 129. The court then referenced the "common law prohibition against *restraints of trade*" to explain the backdrop of California's statutory proscription on unlawful combinations. *Id.* at 136 (emphasis

added).  And under that statute, the Cartwright Act, "[s]ingle firm monopolization is

not cognizable."  *Beverage*, 101 Cal. App. 5th at 749.

There is therefore no basis to recognize a common law tort for unilateral

monopolization.  And even if there were, Indirect iPhone Purchasers could not state

a damages claim: The common law permitted no private right of action for damages.

David Millon, *The Sherman Act and the Balance of Power*, 61 S. Cal. L. Rev. 1219,

1261 (1988); *accord Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 37

(1998).  The Court should dismiss Count XI.

## C.    Fifteen State Law Consumer Protection Claims Should Be Dismissed

Aside from the California UCL (*see supra* § IV.A), Indirect iPhone Purchasers

bring sixteen claims under state consumer-protection laws, and in addition to the

Article III issues with many of these claims, *supra* § II.C.3, fifteen exhibit further

fatal flaws.  IIPP Compl. at 114–93; *see also* App'x 1-B.

**1.**  *No Allegations of Unconscionable or Deceptive Conduct.*  Indirect iPhone

Purchasers fail to plead "deceptive conduct," *In re Aftermarket Filters Antitrust

Litig.*, 2009 WL 3754041, at *10–11 (N.D. Ill. 2009), beyond a mere "cause of action

for antitrust damages," *Commonwealth v. Chesapeake Energy Corp.*, 247 A.3d 934,

939 (Penn. 2021), as they must under twelve states' consumer-protection statutes.

*See* App'x 4.  Their only relevant allegations are conclusory assertions that "Apple

concealed, suppressed, and omitted to disclose material facts."  IIPP Compl. ¶ 559.

And the Complaint elsewhere admits that Apple publicized the alleged policies at issue—such as by publishing its App Review Guidelines on its website. *See* IIPP Compl. ¶¶ 74, 100, 108; *see also, e.g.*, *FTC v. Amazon.com, Inc.*, 2024 WL 4448815, at \*16–17 (W.D. Wash. Sept. 30, 2024) (dismissing New Jersey consumer-protection claim due to lack of material misrepresentation of fact). And although Florida law does not require an allegation of unconscionable or deceptive conduct, it too fails where, as here, a plaintiff's claim is based on the "same allegations as its [deficient] antitrust claim." *QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 1150402, at \*4 (S.D. Fla. Mar. 14, 2012). Accordingly, the Court should dismiss Counts VIII, XV, XVIII, XXXVI, XXXVIII, XL, XLIV, XLV, XLVIII, LII, LV, LVII, and LIX.

**2.** *Failure to Meet Intrastate-Conduct Requirement.* New Hampshire law requires the "'use' of an 'unfair method of competition' or 'unfair or deceptive act' in New Hampshire." *Mueller Co. v. U.S. Pipe & Foundry Co.*, 2003 WL 22272135, at \*6 (D.N.H. Oct. 2, 2003); *see also* N.H. Rev. Stat. Ann. § 358-A.2. Indirect iPhone Purchasers include only conclusory allegations of intrastate conduct, IIPP Compl. ¶¶ 541, 543–45, which do not suffice for the reasons described above. *See supra* § IV.B.3. Count XXXIV should be dismissed. *See In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at \*18 (E.D. Mich. Apr. 9, 2013).

**3.** *End-Run Around Illinois Brick.* Missouri does not allow indirect purchasers to use its consumer-protection statute to pursue antitrust theories, lest it

serve as an end-run to its adherence to the bar on indirect-purchaser claims.  *See In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 702 (E.D. Pa. 2014); *see also* App'x 3-A.  Count XXVIII should be dismissed.

## D.    The State Law Unjust Enrichment Claim Also Fails

Indirect iPhone Purchasers try to backstop their antitrust claims with an unjust enrichment theory under the laws of "all or nearly all states and territories" as well as the District of Columbia.  IIPP Compl. ¶ 287 & n.31.  That runs afoul of pleading rules and is substantively unsound.  The Court should dismiss Count V.

**1.** *Improper Compound Pleading*.  A complaint must give "fair notice of what the . . . claim is." *Twombly*, 550 U.S. at 555.  By lumping together the laws of "all or nearly all states and territories," IIPP Compl. ¶ 287, Indirect iPhone Purchasers instead engage in improper "compound pleading."  *See* Fed. R. Civ. P. 8(a)(2).  State unjust enrichment laws "vary widely," *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d at 668, and Plaintiffs do not explain what state laws (besides Ohio) are excluded by their invocation of "nearly all states."  IIPP Compl. ¶ 287.  It also is impossible to discern whether they mean to plead claims under each of Puerto Rico, the Northern Mariana Islands, Guam, and the Virgin Islands' laws or only some subset of territories.  And in each case, the Complaint gives Apple no notice of which factual allegations supposedly support which state-law claims.  Such "very poorly pled" claims, *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365,

1379 (S.D. Fla. 2001), are routinely dismissed. *See In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 149 (E.D. Pa. 2009); *Sandee's Catering v. Agri Stats, Inc.*, 2020 WL 6273477, at *12 (N.D. Ill. Oct. 26, 2020). The Court should do so here.

**2.** *End-Run Around Illinois Brick.* Because unjust enrichment is an equitable remedy, it cannot be used to obtain "relief where the state has clearly made a policy determination that no such relief should lie." *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1088–89 (S.D. Cal. 2017). "The vast majority of courts" therefore hold unjust enrichment claims fail under state laws "where plaintiffs are otherwise barred from recovery under relevant antitrust and consumer protection statutes." *Id.* at 1088; *accord In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 763 (E.D. Pa. 2014). That includes seventeen jurisdictions here. *See* App'x 5-A; *see also Niaspan*, 42 F. Supp. 3d at 763 (collecting cases). The Court should dismiss Count V insofar as it invokes those jurisdictions' laws.

**3.** *Failure to Plead Inadequate Remedy at Law.* Plaintiffs must plead that existing legal remedies are "inadequate" to pursue equitable remedies like unjust enrichment in federal court. *eBay*, 547 U.S. at 391. Many state laws independently impose such an obligation too. *See* App'x 5-B. Because Plaintiffs do not allege as much, *see supra* § IV.A.3, their unjust enrichment claim fails across the board.

**4.** *Duplicative.* Because Indirect iPhone Purchasers' unjust enrichment theory duplicates their statutory theories (*see supra* 85–86), it is a "parasitic" claim

that fails for the same reasons. *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542, n.13 (E.D. Pa. 2010). That precludes unjust enrichment under Alabama, Arizona, Arkansas, California, Colorado, Connecticut, D.C., Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin law. *See In re Novartis & Par Antitrust Litig.*, 2019 WL 3841711, *7 (S.D.N.Y. 2019).

**5.** *State-Specific Issues.* Two other doctrines impose an additional bar on the unjust enrichment claim. First, California and Mississippi do not recognize a standalone cause of action for unjust enrichment. *See Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1031 (N.D. Cal. 2012); *Est. of Johnson v. Adkins*, 513 So. 2d 922, 926 (Miss. 1987). Second, eighteen states require a plaintiff to plead a *direct* benefit conferred upon the defendant by the plaintiff. *See* App'x 5-C. Indirect iPhone Purchasers do not satisfy this requirement because they purchased iPhone devices from third parties—which at most confers a noncognizable indirect benefit on Apple. *See* IIPP Compl. ¶ 246. For these reasons, too, the Court should dismiss Count V.

**E.    Recovery Under Eleven State-Law Claims Is Limited To Time Periods Shorter Than the Sherman Act's Limitation Period**

Indirect iPhone Purchasers seek to bring claims on behalf of "persons and

entities who purchased a new iPhone indirectly and not for resale between March 23, 2020 to Present."  IIPP Compl. ¶ 235.  But six claims are limited to damages accruing after March 23, 2021 (three years before the filing of the earliest indirect purchaser complaint); after March 23, 2022 under Count XXIX; and after March 23, 2023 under Count XLIV.  *See* App'x 6.  The Court should dismiss those claims insofar as they seek untimely damages.  *See, e.g.*, *Masters v. Wilhelmina Model Agency, Inc.*, 2003 WL 145556, at *9–10 (S.D.N.Y. Jan. 17, 2003).

Further, Indirect iPhone Purchasers cannot recover damages under Counts XXXV and XXXVI accruing before August 5, 2022, because New Jersey adhered to *Illinois Brick*'s bar on indirect-purchaser claims until that date, N.J. Stat. Ann. § 56:9-12(a) (eff. Aug. 5, 2022), and forbade its consumer-protection statute from circumventing that limit, *Wilson v. Gen. Motors Corp.*, 921 A.2d 414, 417 (N.J. 2007).  Similarly, Tennessee's antitrust statute (Count LIII) reached only concerted action (and not unilateral conduct) until its April 23, 2024 amendment, *see* TN Code § 47-25-102, amended by 2024 Tenn. Acts, Ch. 776, § 2 (eff. 4/23/2024), and Plaintiffs cannot recover damages accruing before that date, *see* TN. Const. Art. 1 § 20 ("[N]o retrospective law . . . shall be made.").

## CONCLUSION

Apple respectfully requests that the Court dismiss Plaintiffs' Consolidated Amended Complaints.

Dated:  October 6, 2025

Respectfully submitted,

/s/ Liza M. Walsh

Cynthia E. Richman (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel.:    (202) 955-8500
Email:  crichman@gibsondunn.com

Daniel G. Swanson (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel.:    (213) 219-7000
Email:  dswanson@gibsondunn.com

Joseph R. Rose (*pro hac vice*)
Julian W. Kleinbrodt (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel.:    (415) 393-8200
Email:  jrose@gibsondunn.com
          jkleinbrodt@gibsondunn.com


Connor S. Sullivan (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel.:    (415) 351-4000
Email:  cssullivan@gibsondunn.com

Liza M. Walsh
Douglas E. Arpert
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
Tel.:    (973) 757-110
Email:  LWalsh@walsh.law
          DArpert@walsh.law

Craig S. Primis, P.C. (*pro hac vice*)
Matthew J. Reilly, P.C. (*pro hac vice*)
K. Winn Allen, P.C. (*pro hac vice*)
Luke P. McGuire (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel.:    (202) 389-5000
Email:  craig.primis@kirkland.com
          matt.reilly@kirkland.com
          winn.allen@kirkland.com
          luke.mcguire@kirkland.com

Devora W. Allon, P.C. (*pro hac vice*)
Alexia R. Brancato, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.:    (212) 446-5967
Email:  devora.allon@kirkland.com
          alexia.brancato@kirkland.com

*Counsel for Defendant Apple Inc.*