# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| —————————————— | : | Case No.: 24-md-3113-JXN-LDW |
| IN RE: APPLE INC. SMARTPHONE | : | |
| ANTITRUST LITIGATION | : | |
| | : | MDL No. 3113 |
| *This Document Relates to:* | : | |
| *All Direct Purchaser Plaintiff Actions* | : | |
| —————————————— | : | |

# OPPOSITION TO APPLE'S MOTION TO DISMISS THE DIRECT
# IPHONE PURCHASERS' COMPLAINT

## Table of Contents

BACKGROUND ................................................................................4

I.    Apple launches the iPhone and seizes the benefits of third-party apps .....................................................................5

II.   Apple restricts iPhone technologies that would facilitate switching ......................................................................5

      A.    Super Apps ....................................................................6

      B.    Cloud Streaming Apps ..................................................7

      C.    Cross-Platform Messaging ............................................8

      D.    Smartwatches ...............................................................9

      E.    Digital Wallets..............................................................9

III.  Apple harms competition and overcharges consumers.......................10

LEGAL STANDARD ........................................................................11

ARGUMENT ....................................................................................11

I.    The Direct Purchasers Have Defined the Relevant Markets...............11

II.   The Direct Purchasers' Pleadings Adequately Establish Their Standing.................................................................15

      A.    Antitrust Injury............................................................16

      B.    Causal Connection .......................................................21

      C.    Directness of the Injury................................................24

      D.    The Existence of More Direct Plaintiffs and Duplicative Damages ................................................26

III.  The Direct Purchasers Have Adequately Alleged Their UCL Claim ....................................................................27

CONCLUSION .................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
  948 F.2d 536 (9th Cir. 1991) ...........................................................................14

*American Ad Management, Inc. v. General Telephone Co. of California*,
  190 F.3d 1051 (9th Cir. 1999) ..........................................................................19

*Apple Inc. v. Pepper*,
  587 U.S. 273 (2019)..........................................................................................27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................5

*Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC")*,
  459 U.S. 519 (1983).................................................................................*passim*

*Atkinson v. Luitpold Pharmaceuticals, Inc.*,
  2020 WL 4518022 (E.D. Pa. Aug. 6, 2020) .......................................................4

*Bakay v. Apple Inc.*,
  2024 WL 3381034 (N.D. Cal. July 11, 2024), *aff'd by unpublished opinion*, 2025 WL 3012822 (9th Cir. Oct. 28, 2025) ...........................17, 21, 23

*Baldwin v. University of Pittsburgh Medical Center*,
  636 F.3d 69 (3d Cir. 2011) ...............................................................................11

*Biederman v. FCA US LLC*,
  765 F. Supp. 3d 920 (N.D. Cal. 2025).........................................................4, 28

*Bistrian v. Levi*,
  696 F.3d 352 (3d Cir. 2012) .............................................................................11

*Bonjorno v. Kaiser Aluminum & Chemical Corp.*,
  752 F.2d 802 (3d Cir. 1984) .............................................................................24

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) .................................................................20

*Catlin v. Washington Energy Co.*,
  791 F.2d 1343 (9th Cir. 1986) ..............................................................14

*DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677 (2d Cir.
  2009) .......................................................................................................27

*Delaware Health Care, Inc. v. MCD Holding Co.*,
  893 F. Supp. 1279 (D. Del. 1995)..........................................................14

*Doe v. CVS Pharmacy, Inc.*,
  982 F.3d 1204 (9th Cir. 2020) ..............................................................28

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992)...............................................................................15

*Ethypharm S.A. France v. Abbott Laboratories*,
  707 F.3d 223 (3d Cir. 2013) .................................................................19

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal 2015).....................................................21

*Fineman v. Armstrong World Industries, Inc.*,
  980 F.2d 171 (3d Cir. 1992) .................................................................14

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
  806 F.3d 162 (3d Cir. 2015) ............................................................19, 20

*Heckman v. Live Nation Entertainment, Inc.*,
  2025 WL 1141266 (C.D. Cal. 2025) ......................................................18

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
  547 U.S. 28 (2006).................................................................................15

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)..........................................................................25, 29

*In re Horizon Healthcare Services Inc. Data Breach Litigation*,
  846 F.3d 625 (3d Cir. 2017) .................................................................11

*In re Lower Lake Erie Iron Ore Antitrust Litigation,*
  998 F.2d 1144 (3d Cir. 1993) ........................................................16, 21, 24, 26

*In re Warfarin Sodium Antitrust Litigation,*
  214 F.3d 395 (3d Cir. 2000) ...............................................................................18

*Jones v. Micron Technology Inc.,*
  400 F. Supp. 3d 897 (N.D. Cal. 2019).................................................................23

*Kloth v. Microsoft Corp.,*
  444 F.3d 312 (4th Cir. 2006) ...............................................................................25

*Lexmark International, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014)..............................................................................................26

*Lifewatch Services Inc. v. Highmark Inc.,*
  902 F.3d 323 (3d Cir. 2018) ................................................................................23

*Loeb Industries, Inc. v. Sumitomo Corp.,*
  306 F.3d 469 (7th Cir. 2002) ...............................................................................23

*Lorenzo v. Qualcomm Inc.,*
  603 F. Supp. 2d 1291 (S.D. Cal. 2009) ...............................................................21

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)..............................................................................................27

*Nacarino v. Chobani, LLC,*
  668 F. Supp. 3d 881 (N.D. Cal. 2022).................................................................29

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group*
  *PLC,*
  22 F.4th 103 (2d Cir. 2021) .................................................................................23

*SigmaPharm, Inc. v. Mutual Pharmaceutical Co.,*
  772 F. Supp. 2d 660 (E.D. Pa. 2011)...................................................................21

*Sonner v. Premier Nutrition Corp.,*
  971 F.3d 834 (9th Cir. 2020) ...........................................................................4, 28

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,*
  171 F.3d 912 (3d Cir. 1999) ................................................................................23

*Stewart v. Kodiak Cakes, LLC,*
   537 F. Supp. 3d 1103 (S.D. Cal. 2021) ...............................................................29

*Stromberg v. Qualcomm Inc.,*
   14 F.4th 1059 (9th Cir. 2021) ..............................................................................29

*Sullivan v. UBS AG,*
   149 F.4th 206 (2d Cir. 2025) ...............................................................................23

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,*
   959 F.2d 468 (3d Cir. 1992) .................................................................................15

*United States v. Apple Inc.,*
   2025 WL 1829127 (D.N.J. June 30, 2025)...................................................*passim*

*United States v. Live Nation Entertainment, Inc.,*
   2025 WL 835961 (S.D.N.Y. Mar. 14, 2025)...................................17, 18, 19, 21

*United States v. Microsoft Corp.,*
   253 F.3d 34 (D.C. Cir. 2001)...........................................................................13, 14

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.,*
   108 F. Supp. 2d 549 (W.D. Va. 2000)..................................................................14

*Weizman v. Talkspace, Inc.,*
   705 F. Supp. 3d 984 (N.D. Cal. 2023)..................................................................28

**Statutes**

California's Cartwright Act ......................................................................................29

Sherman Antitrust Act ........................................................................4, 11, 27, 28

**Rules**

Rule 12(b)(6).............................................................................................................11

This Court's Order denying Apple's motion to dismiss the Government Complaint also requires denial of Apple's motion to dismiss the Direct iPhone Purchasers' Complaint ("DIP Complaint"). *United States v. Apple Inc.*, 2025 WL 1829127 (D.N.J. June 30, 2025) ("MTD Denial"). In every material respect, DIPs' allegations parallel the allegations that this Court already held sufficient to plead a claim for unlawful monopolization against Apple. DIPs plead the same relevant markets and anticompetitive conduct as the Government Plaintiffs. And DIPs' alleged harm—the quintessential antitrust injury of overcharging consumers—flows directly from Apple's same anticompetitive conduct with respect to the iPhone, in the same smartphone markets, as alleged in the Government Complaint.

Apple tries to sidestep the MTD Denial by mischaracterizing the DIP Complaint as "unlike" the Government Complaint. Apple says DIPs "concede (unlike the Government) that their case is about alleged conduct in several aftermarkets." ECF 132-1 ("MTD") at 1. That "concession" is the centerpiece of Apple's two lead arguments: (1) DIPs have failed to define the relevant aftermarkets; and (2) DIPs have failed to allege an antitrust injury because they are not participants in those aftermarkets. The aftermarkets "concession" is so essential to Apple's motion that Apple repeats it another five times. *See id.* at 8 (twice), 15, 19, 30.

DIPs made no such concession. The word "aftermarkets" does not even appear in the DIP Complaint. Apple does not even cite the DIP Complaint for three of six

references to the aftermarkets "concession." *See id.* at 1, 8, 15. For another reference, Apple cites DIP Complaint paragraph 251, which simply alleges Apple's "unlawful conduct" "artificially inflated prices." *Id.* at 30. For the remaining references, Apple cites three paragraphs of the DIP Complaint that directly track the Government Complaint. *See id.* at 8 (citing DIP Compl. ¶¶ 62, 80, 156, identical to Gov. Compl. ¶¶ 48, 59, 120); *id.* at 19 (citing DIP Compl. ¶ 53, identical to Gov. Compl. ¶ 45). The Court should deny Apple's motion because it relies on a fictitious reading of the DIP Complaint in an attempt to conjure "deficiencies" that do not exist.

In reality, like the Government Plaintiffs, DIPs allege a single-market theory of monopolization: (1) "Apple has monopoly power *in the smartphone and performance smartphone markets*," DIP Compl. ¶ 222 (emphases added unless otherwise noted); and (2) Apple maintained that power "by delaying, degrading, or outright blocking technologies that would increase competition *in the smartphone markets* by decreasing barriers to switching to another smartphone," *id.* ¶ 8. There is no daylight between the DIP Complaint and Government Complaint with respect to the relevant markets and Apple's anticompetitive conduct in those markets.

In any event, Apple merely repackages arguments this Court already rejected. Apple's fundamental argument—that there is a "mismatch" between DIPs' allegations about Apple's smartphone monopoly and DIPs' allegations about Apple's anticompetitive conduct, *e.g.*, MTD at 30—is the same argument Apple

made against the Government Complaint, and which the Court rejected, *see* Gov. MTD at 3, 28–29; MTD Denial at *6–8, 13–15. Apple disguises its arguments in different doctrinal language—involving aftermarkets, tying, and monopoly leveraging—but that is no basis for this Court to reconsider its prior well-reasoned decision.

Specifically, this Court already rejected Apple's argument that markets beyond the relevant smartphone markets must be defined at this stage. Apple complained that the Government Plaintiffs did not adequately allege an adverse effect on competition in the smartphone markets, but instead in other "implicated" markets that the "complaint does not attempt to define." Gov. MTD at 28. Rejecting the argument, this Court approved the Government Plaintiffs' market definitions, which are identical to those alleged by DIPs. MTD Denial at *6–8.

Similarly, this Court already rejected Apple's argument about failure to plead anticompetitive harms in the smartphone markets. Apple faulted the Government Plaintiffs for failing to "allege facts plausibly showing Apple's challenged conduct *outside* the relevant markets produced substantial anticompetitive effects *inside* the relevant markets." Gov. MTD at 29. Rejecting the argument, this Court approved the allegations that Apple's restrictions on various components of its smartphones—super apps, cloud streaming apps, messaging apps, smartwatches, digital wallets, and other cross-platform technologies—caused anticompetitive effects in the

smartphone markets. MTD Denial at *1–4, 13–14. DIPs' substantially identical allegations are equally sufficient to plead that Apple has acted "in a manner to protect its monopoly power in the smartphone and performance smartphone market," thereby harming consumers in those markets. *Id*. at *14.[1] DIPs have more than adequately stated a claim for relief under the Sherman Act.

For much the same reasons, Apple cannot seriously contend that DIPs failed to plead unlawful or unfair business practices sufficient to state a claim for violation of California's UCL. Apple is thus left to rely on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), to argue that DIPs failed to allege the inadequacy of legal remedies. But DIPs *have* alleged the inadequacy of legal remedies, *see* DIP Compl. ¶¶ 293–94, and the "majority of district courts in the Ninth Circuit have not interpreted *Sonner* to require dismissal of equitable claims at the pleading stage." *Biederman v. FCA US LLC*, 765 F. Supp. 3d 920, 944 (N.D. Cal. 2025).

Respectfully, the Court should deny Apple's motion.

## BACKGROUND

Apple has dug a moat around the iPhone to fend off fair competition. Apple impairs technologies that would facilitate switching to other smartphones. DIPs filed

---

[1] The Court's rulings in the MTD Denial are law of the case and bar Apple's attempt to relitigate those rulings in the instant motion. *See Atkinson v. Luitpold Pharms., Inc.*, 2020 WL 4518022, at *5 (E.D. Pa. Aug. 6, 2020) ("Law of the case doctrine is applicable where a court adheres to a prior ruling in a closely related case.").

this lawsuit on behalf of Apple's victims: consumers who are trapped in the Apple ecosystem, allowing Apple to overcharge them, among other injuries. This Court must accept DIPs' allegations as true in evaluating Apple's motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## I.    Apple launches the iPhone and seizes the benefits of third-party apps

Apple debuted the iPhone in 2007. DIP Compl. ¶ 41. It was not the first of its kind but an improvement over existing smartphones with its touchscreen, camera, and user-friendly interface. *Id.* ¶ 43. Still, the iPhone was rudimentary compared to what it would become. At launch, the iPhone had only thirteen apps available. *Id.* ¶ 44. Within a year, Apple invited third parties to develop apps for the iPhone by releasing the "digital tools for building native apps on Apple's operating system." *Id.* Those developers have enriched Apple because the iPhone's value increases with each new app. *Id.* ¶ 64. Apple has not returned the favor.

## II.    Apple restricts iPhone technologies that would facilitate switching

Third-party apps threaten Apple's dominance in the smartphone markets by decreasing user dependence on the iPhone. *Id.* ¶ 46. Apple has disarmed that threat by imposing self-preferencing controls on iPhones. *Id.* § IV.B.

*First*, Apple has limited app distribution on the iPhone to the App Store. *Id.* ¶ 47. That allows Apple to control the iPhone's apps through the App Review Guidelines, which impose restrictions and give Apple sole discretion in enforcing

5

them. *Id.* Apple has abused that power "by delaying, degrading, or outright blocking technologies that would increase competition in the smartphone markets by decreasing barriers to switching to another smartphone, among other things." *Id.* ¶ 8. In the words of Apple's former app review director, Apple's "complete and unprecedented power over their customers' devices" gave Apple a "weapon against competitors" in the smartphone markets. *Id.* ¶ 59.

*Second*, Apple has limited the iPhone's Application Program Interfaces ("APIs") available to third-party apps. *Id.* ¶ 48. Those APIs are the "key points of connection between apps and the iPhone's operating system." *Id.* ¶ 9. Apple has walled off a significant class of APIs by designating them as "private," thus prohibiting their use by third-party developers under Apple's nonnegotiable Developer Program License Agreement ("DPLA"). *Id.* ¶ 48. Again, Apple uses the DPLA to restrict "technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power" in the smartphone markets. *Id.*

DIPs have provided the following illustrations of Apple's efforts to stifle competition in the smartphone markets by limiting or prohibiting disruptive technologies on the iPhone. They are the same illustrations that the Government Plaintiffs provide at paragraphs 60–118 of their complaint and that the Court already approved in its prior MTD Denial. *See* MTD Denial at *13–14.

A.    **Super Apps**

Super apps host mini programs. DIP Compl. ¶ 83. They reduce dependence on the iPhone because users "can access the same interface, apps, and content they desire on any smartphone where the super app is also present." *Id.* ¶ 86. In Apple's words, when the use of super apps goes up, "iOS stickiness goes down." *Id.* ¶ 87.

Apple has "created, strategically broadened, and aggressively enforced its App Store Guidelines to effectively block apps from hosting mini programs" on the iPhone. *Id.* ¶ 89. For example, Apple has required super apps to display mini programs in a flat, text-only list without any icons or tiles, and it has banned super apps from categorizing mini programs. *Id.* ¶ 91. Those arbitrary restrictions diminish one of the main value drivers of super apps—easy navigability compared to the App Store—thus diminishing their potential to disrupt the iPhone's market dominance. *Id.* ¶¶ 90–91.

### B.    Cloud Streaming Apps

Cloud streaming apps allow smartphones to run computationally intensive programs without actually processing them. *Id.* ¶ 99. Instead, the smartphone connects to a remote server that runs the program and streams it back to the smartphone. *Id.* Cloud streaming apps thus reduce user dependence on the iPhone's expensive hardware. *Id.* ¶ 97. In Apple's words, a consumer using cloud streaming apps could "buy[] a [expletive] Android for 25 bux at a garage sale" and "have a solid cloud computing device" that "works fine." *Id.*

Apple prevented consumers from making that switch by blocking cloud streaming apps in the first place. Apple imposed requirements under the App Review Guidelines that no cloud streaming app could satisfy. *Id.* ¶ 102. For example, Apple spent years requiring developers to submit individual streaming games and updates for standalone approval. *Id.* ¶ 103. That cost-prohibitive requirement, among others, long prevented the emergence of any cloud-streaming app for the iPhone, shielding iPhone consumers from that disruptive technology. *Id.* ¶¶ 102, 107.

## C.    Cross-Platform Messaging

Cross-platform messaging is the exchange of messages between different messaging platforms. The more seamless the exchange, the lower the switching cost for iPhone users, because consumers can just as easily use the platforms available on other, more affordable smartphones to communicate with the supermajority of smartphone users who use Apple Messages. *Id.* ¶¶ 116–17, 120. In Apple's words, facilitating cross-platform messaging on the iPhone "would simply serve to remove [an] obstacle to iPhone families giving their kids Android phones." *Id.* ¶ 121.

That understanding has motivated Apple's efforts to degrade cross-platform messaging on the iPhone. *Id.* ¶ 113. Among other impediments, Apple has refused to allow iPhone consumers to use the "text to anyone" functionality on third-party messaging apps or to receive messages from Android phones using the superior Rich Communication Services ("RCS") protocol. *Id.* ¶¶ 113, 118. Apple has also

stigmatized Android users by making their messages appear in a green bubble rather than a blue one. *Id.* ¶ 120. Those artificial distinctions have led iPhone users to believe third-party messaging platforms are inherently inferior, thus deterring them from switching to Android phones. *Id.*

## D.    Smartwatches

Smartwatches are wrist-worn devices that perform various functions when paired with a smartphone. *Id.* ¶ 125. Smartwatches are expensive, so users are less likely to purchase a smartphone that is incompatible with their smartwatch. *Id.* Apple exploits that barrier in two ways.

First, Apple designed the Apple Watch to be incompatible with third-party smartwatches. *Id.* ¶ 126. Switching to third-party smartphones thus would require users to abandon their expensive Apple Watch. *Id.* In Apple's words, that dynamic "may help prevent iPhone customers from switching." *Id.* ¶ 128.

Second, Apple limits the compatibility of third-party smartwatches with the iPhone—including, for example, the ability to respond to notifications or operate when Bluetooth is disabled. *Id.* ¶¶ 131–33. Third-party smartwatches make it easier to switch to third-party smartphones because they are cross-compatible. *Id.* ¶ 127. Accordingly, Apple imposes anticompetitive restraints on third-party smartwatches to deter consumers from switching to third-party smartphones. *Id.* ¶ 131.

## E.    Digital Wallets

9

Digital wallets are apps that allow users to store and use passes and credentials, such as credit cards and personal identification. *Id.* ¶ 138. Allowing users to transfer all their passes and credentials through a single app would make it easier to switch from an iPhone to another smartphone. *Id.* ¶ 142.

Apple degrades the functionality of cross-platform digital wallets on the iPhone. *Id.* ¶ 151. For example, Apple has denied cross-platform digital wallets the ability to incorporate tap-to-pay functionality, *id.* ¶¶ 144, 147, and has prohibited their use for in-app payments, *id.* ¶ 150. Those limitations, among others, have forced iPhone consumers to use the Apple Wallet. *Id.* ¶ 151. The Apple Wallet cements users into the Apple ecosystem because it is unavailable on other smartphones. *Id.* "Thus, switching to a different smartphone [would] require[] leaving behind the familiarity of an everyday app, setting up a new digital wallet, and potentially losing access to certain credentials and personal data stored in Apple Wallet." *Id.* ¶ 141. In Apple's words, Apple Wallet "drive[s] more sales of iPhone and increase[s] stickiness to the Apple ecosystem." *Id.*

## III.    Apple harms competition and overcharges consumers

Apple's anticompetitive conduct has harmed smartphone competition by delaying, degrading, and prohibiting smartphone technologies that would make it easier for iPhone users to switch to other smartphones. *Id.* ¶ 163. That reduced competition has harmed iPhone users, who have paid supra-competitive prices for

the iPhone, *id.* ¶ 173, and suffered the consequences of "reduced choice, slower innovation, and a degraded user experience," *id.* ¶ 174. DIPs have filed this lawsuit to remedy the harms that iPhone consumers have suffered and will continue to suffer if Apple's anticompetitive conduct is allowed to continue.

## LEGAL STANDARD

The Third Circuit has established a three-part test for evaluating Rule 12(b)(6) motions, *see Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012), and motions to dismiss for failure to plead Article III or statutory standing, *see In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017); *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73–74 (3d Cir. 2011). *First*, the Court should "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian*, 696 F.3d at 365. *Second*, the Court should "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." *Id.* *Third*, the Court should "look for well-pled factual allegations, assume their veracity, and then determine whether they plausibly give rise to an entitlement to relief." *Id.* The Court should deny Apple's motion because DIPs' well-pleaded allegations establish their entitlement to relief under the Sherman Antitrust Act and the UCL.

## ARGUMENT

## I.    The Direct Purchasers Have Defined the Relevant Markets

Apple's complaint that DIPs have failed to define "all" the relevant markets, MTD at 15 & Part I.A, should be rejected out of hand. DIPs have adequately defined the relevant market as the smartphone or performance smartphone market in the United States. DIP Compl. ¶¶ 207–21. DIPs' market definitions are identical to those in the Government Complaint, which this Court already held sufficient to state a claim. *See* MTD Denial at *6–8. In approving those definitions, the Court rejected Apple's argument that "[t]he alleged conduct . . . occurred in the other 'implicated' markets that the complaint does not attempt to define." Gov. MTD at 28.

Apple nevertheless relitigates the MTD Denial based on the falsehood that DIPs "concede (unlike the Government) that their case is about alleged conduct in 'several aftermarkets' they do not define." MTD at 1. DIPs make no such concession. DIPs do not even use the word "aftermarket" in their Complaint. Tellingly, Apple does not cite the DIP Complaint for three of six references to the alleged aftermarket "concession." *See id.* at 1, 8, 15. For two of the other references, Apple cites paragraphs of the DIP Complaint that match allegations in the Government Complaint verbatim—the complaint Apple insists is somehow "unlike" the DIP Complaint. *See id.* at 8 (citing DIP Compl. ¶¶ 62, 80, 156, identical to Gov. Compl. ¶¶ 48, 59, 120); *id.* at 19 (citing DIP Compl. ¶ 53, identical to Gov. Compl. ¶ 45).

The reality is that DIPs have pleaded the same single-market monopolization theory as the Government Plaintiffs. Both allege "Apple has monopoly power in the

12

smartphone and performance smartphone markets." DIP Compl. ¶ 222; Gov. Compl. ¶ 180. Both allege Apple used that power to restrict "technologies that would increase competition in the smartphone markets by decreasing barriers to switching to another smartphone." DIP Compl. ¶ 8; Gov. Compl. ¶ 8. Both allege Apple acted anticompetitively to restrict the technological features of the iPhone, including "super apps, cloud streaming apps, messaging apps, smartwatches, and digital wallets." DIP Compl. ¶ 80; Gov. Compl. ¶ 59. As the Court already held, "allegations of this nature . . . indicate that Apple acts in a manner to protect its monopoly power *in the smartphone and performance smartphone market*." MTD Denial at *14.

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), remains instructive. *See* MTD Denial at *12. There, the "primary focus" of the plaintiffs' monopolization claim was "Microsoft's attempts to suppress middleware's threat to its operating system monopoly." *Id*. at 54. Microsoft argued that the District Court erred by excluding "middleware" from the relevant market definition. *Id.* at 53. The Circuit rejected Microsoft's argument because "market definition is meant to identify products reasonably interchangeable by consumers," and "middleware is not now interchangeable with Windows." *Id.* at 54. Thus, "the District Court had good reason for excluding middleware from the relevant market." *Id.*

Pursuant to *Microsoft*, DIPs need not include super apps, cloud streaming apps, or other cross-platform technologies in their market definitions at this stage—

13

let alone define markets for them separately. DIPs and the Government Plaintiffs have alleged Apple used its smartphone monopoly to suppress those technologies because they would facilitate switching from the iPhone—much like Microsoft used its operating system monopoly to suppress middleware because it would facilitate switching from Windows. Just as the *Microsoft* plaintiffs needed only to define the market for products reasonably interchangeable with Windows, DIPs need only define the market for products that are reasonably interchangeable with the iPhone.

Apple's cited cases addressing multimarket theories have no bearing on the adequacy of DIPs' Complaint. *First*, Apple cites cases addressing monopoly-leveraging claims, in which the plaintiff alleged the defendant employed monopoly power in a primary market to gain an unfair advantage in a secondary market.[2] But the DIP Complaint does not include such allegations. DIPs, like the Government Plaintiffs, allege Apple employed its monopoly power in the smartphone markets to maintain and expand its monopoly power in the smartphone markets by impeding disruptive technologies on the iPhone. The markets relevant to those allegations are the smartphone markets that the Court has already deemed sufficiently defined.

---

[2] *See* MTD at 16, 20–21; *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991); *Catlin v. Wash. Energy Co.*, 791 F.2d 1343 (9th Cir. 1986); *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 108 F. Supp. 2d 549 (W.D. Va. 2000); *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279 (D. Del. 1995).

*Second*, Apple cites cases addressing tying claims, in which the plaintiff alleged an agreement by the defendant to sell one product but only on the condition that the buyer also purchase a different product.[3] The analogue here would be an allegation that Apple agrees to sell the iPhone only on the condition that consumers purchase other Apple products. DIPs allege nothing of the sort.

*Third*, Apple cites *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), where the Supreme Court addressed antitrust claims based on a derivative-aftermarkets theory of market power. *See* MTD at 22. The plaintiffs alleged the defendant possessed sufficient market power to support those claims in a derivative aftermarket even if it did not possess sufficient market power in the foremarket. *See id.* at 464–65, 481. Again, just like the Government Plaintiffs, DIPs' monopolization claim does not depend on Apple's power in any "derivative aftermarket." DIPs allege Apple maintained its monopoly power in the smartphone markets by abusing its power in those markets.

## II.    The Direct Purchasers' Pleadings Adequately Establish Their Standing

DIPs have also adequately alleged antitrust and Article III standing. The Third Circuit has distilled *Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC")*, 459 U.S. 519 (1983), into a five-factor test.

---

[3] *See* MTD at 21–22; *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468 (3d Cir. 1992).

15

*See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993). Every factor supports DIPs' standing to bring this suit.

### A.    Antitrust Injury

Apple begins with the second element of the *AGC* test: "whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress." *Id.* at 1165. Apple again ignores that this Court's MTD Denial already decided this issue in DIPs' favor.

Inherent in this Court's holding that the Plaintiff States have *parens patriae* standing (MTD Denial at *16–17) is the conclusion that DIPs have suffered an antitrust injury. This Court recognized that the Plaintiff States had adequately alleged harm to "substantial segments of their residents who use smartphones" based on "Apple's anticompetitive conduct that entrenches its monopoly over, and drives up prices within, U.S. smartphone markets." *Id.* at *17. DIPs are those smartphone-purchasing individuals—in the Plaintiff States and nationwide—who have been injured in the smartphone markets due to Apple's anticompetitive conduct.

Apple tries to evade the MTD Denial by reasserting divergences between the DIP Complaint and Government Complaint that do not exist. Apple reinvokes the "aftermarkets concession" to argue there is a "*mismatch* between the smartphone markets in which iPhone Purchaser Plaintiffs claim injury and the markets in which

16

third-party participants are allegedly restrained." MTD at 30. As discussed, that "concession" is a fabrication and mischaracterization of the DIP Complaint.

Moreover, Apple made the same "market mismatch" argument in the Government Action, and this Court rightly found it meritless. Specifically, Apple argued the "*disconnect* between the complaint's conduct allegations and the alleged harm to smartphone competition requires dismissal." Gov. MTD at 27. This Court disagreed and held that the Government Plaintiffs adequately alleged Apple's conduct with respect to various "components" of its smartphones caused anticompetitive effects in the smartphone markets. MTD Denial at *2–4, 13–14. DIPs' nearly identical allegations are sufficient to plead that Apple acted "in a manner to protect its monopoly power in the smartphone and performance smartphone market," *id*. at *14, thereby harming consumers in those markets.

The Court's rejection of Apple's "mismatch" theory in the MTD Denial applies equally to foreclose Apple's challenge to DIPs' antitrust standing. Regardless of the "market definitions one employs, where a defendant unlawfully maintains its monopoly over a product through a course of exclusionary conduct focusing on that product, consumers of that product alleging that they were overcharged suffer a cognizable injury." *United States v. Live Nation Entm't, Inc.*, 2025 WL 835961, at *5 (S.D.N.Y. Mar. 14, 2025), distinguishing *Bakay v. Apple Inc.*, 2024 WL 3381034 (N.D. Cal. July 11, 2024), *aff'd by unpublished opinion*, 2025 WL 3012822 (9th Cir.

Oct. 28, 2025) (MTD at 32); *accord Heckman v. Live Nation Entm't, Inc.*, 2025 WL 1141266, at *4–5 (C.D. Cal. 2025). DIPs, like the Government Plaintiffs, have alleged exactly that: Apple engaged in exclusionary conduct with respect to cross-platform technologies for the iPhone. That conduct is and always was focused on protecting Apple's smartphone monopoly. As a result, DIPs have been overcharged. Nothing more is required to plead antitrust injury.

Apple's own admissions further undermine its "mismatch" argument, because they confirm that the focus of Apple's anticompetitive conduct was to protect its smartphone monopoly. As DIPs have alleged, based on statements of Apple employees recounted in the Government Complaint, Apple's anticompetitive restraints on cross-platform technologies for the iPhone were intended to "prevent iPhone customers from switching" to a competing smartphone, DIP Compl. ¶ 128, to protect the "stickiness" of iPhone usage, *id.* ¶¶ 87, 141, and to avoid a world where "all that matters is who has the cheapest [smartphone] hardware," *id.* ¶ 97. As the admitted "target of [the] antitrust violation[s]" at issue, DIPs "clearly suffer antitrust injury." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000).

At a minimum, based on Apple's admissions, it was "clearly foreseeable" that restrictions on cross-platform technologies would harm DIPs. *Live Nation*, 2025 WL 835961, at *5 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982)). DIPs' injuries are "inextricably intertwined" with Apple's anticompetitive conduct,

and "flow[] from that which makes [Apple's] acts unlawful." *Id.* (quoting *McCready*, 457 U.S. at 484). Finding that DIPs did not suffer an "antitrust injury under these circumstances—on the pleadings no less—would 'engraft artificial limitations on the § 4 remedy,' precisely what the Supreme Court has forbidden." *Id.* (quoting *McCready*, 457 U.S. at 472).

Accordingly, the cases Apple cites for the proposition that non-market participants do not suffer antitrust injury are inapposite or contrary to Apple's position. In Apple's lead case, *American Ad Management, Inc. v. General Telephone Co. of California*, 190 F.3d 1051, 1057, 1060 (9th Cir. 1999) (cited MTD at 29), the Circuit Court actually *reversed* the District Court's grant of summary judgment for the defendant and recognized that consumers (like DIPs) "are most likely to suffer antitrust injury." Apple's remaining cites are misdirected because they involve plaintiffs who (1) were nonparticipants in the restrained market, or (2) were participants in *a* restrained market but failed to establish that their market was the target of the defendant's anticompetitive conduct. Neither scenario applies to DIPs.

*First*, DIPs are undisputed participants in the relevant smartphone markets. That distinguishes *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 235 (3d Cir. 2013) (cited MTD at 32), where the plaintiff was "forbidden to compete in the relevant market." It also distinguishes *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 172 (3d Cir. 2015) (cited MTD at 32, 34), where

the plaintiff "admit[ted] it [was] neither a competitor nor a consumer" in the relevant market. Apple argues DIPs do not fall under *Hanover*'s exception for nonmarket participants whose injuries are the "means by which the defendants carried out their illegal ends." MTD at 34. But DIPs do not need that exception because they fall under the "ordinar[y]" rule that "consumers . . . in the restrained market" suffer antitrust injury. *Hanover*, 806 F.3d at 177.

*Second*, restraining the smartphone markets was the aim of Apple's challenged conduct. That distinguishes the other cases Apple cites for the proposition that DIPs did not suffer an antitrust injury because they did not participate in the restrained markets. Take the Third Circuit's decision in *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) (cited MTD at 32). Broadcom alleged it was injured in the "WCDMA technology and UMTS chipset markets" by Qualcomm's monopolization of the "3G CDMA technology and chipset markets." *Id.* at 320. The Third Circuit affirmed the dismissal of that claim, but not by establishing a bright-line rule that a plaintiff cannot suffer an antitrust injury in one market if the anticompetitive conduct also affects other markets. Instead, the Court based its decision on the "insufficient factual allegations that Qualcomm . . . **intended** to cause harm to Broadcom in the WCDMA technology and UMTS chipset markets." *Id.* As discussed above, no such deficiency exists in the DIP Complaint or the Government Complaint.

20

In fact, far from barring antitrust claims premised on anticompetitive conduct that also affects other markets, Apple's cases recognize that an antitrust injury exists where the injury "is the precisely intended consequence of the defendants' anticompetitive conduct." *SigmaPharm, Inc. v. Mut. Pharmaceutical Co.*, 772 F. Supp. 2d 660, 673 (E.D. Pa. 2011) (cited MTD at 33). The same distinction applies to the other nonbinding decisions Apple cites, including *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019 (N.D. Cal 2015); *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291 (S.D. Cal. 2009); and *Bakay*, 2024 WL 3381034 (cited MTD at 32–33).

All told, Apple cannot defeat DIPs' heartland antitrust standing based on "legalese" about other affected markets. *Live Nation*, 2025 WL 835961, at *5. DIPs, like the Government Plaintiffs, have alleged Apple maintained its smartphone monopoly through exclusionary conduct focused on the iPhone. Apple knew the effect its conduct would have on DIPs. DIPs' injuries are, accordingly, exactly the kind of harm that the antitrust laws are intended to redress.

### B.    Causal Connection

Apple next addresses the first half of the first *AGC* factor: "the causal connection between the antitrust violation and the harm to the plaintiff." *Lower Lake Erie*, 998 F.2d at 1165. Incredibly, however, Apple omits the second half: "the intent by the defendant." *Id.* Apple must have known the "intent" factor favors DIPs, so chose to ignore it. DIPs allege "Apple has acted with specific intent to monopolize,

21

and to destroy effective competition in, the performance smartphone market in the United States." DIP Compl. ¶ 265. DIPs back up that allegation with specific allegations about Apple's professed desire to "lock customers into our ecosystem." *Id.* ¶ 4; *see also, e.g.*, *id.* ¶¶ 87, 97, 121, 128, 141. Reducing smartphone competition was the point of Apple's anticompetitive scheme, and DIPs are the intended victims.

Apple's intent aside, the "causal connection" factor favors DIPs' standing. In litigation, Apple tries to spin elaborate and attenuated chains of causation; but, in real life, Apple recognized the direct causal link between its conduct and reduced smartphone competition. *E.g.*, *id.* ¶¶ 87, 97, 121, 128, 141. For example, Apple recognized that removing restrictions on cross-platform messaging would likely result in "iPhone families giving their kids Android phones." *Id.* ¶ 121. Similarly, Apple recognized that the Apple Watch's iPhone-only compatibility "may help prevent iPhone customers from switching" to other smartphones, *id.* ¶ 128. In Apple's own examples, the causal connection between Apple's anticompetitive conduct and reduced smartphone competition could not be more immediate. Apple quotes "[t]he general tendency of the law . . . not to go beyond the first step" of a causal chain, MTD at 36, but these examples demonstrate a "first step" relationship between Apple's anticompetitive conduct and reduced smartphone competition.

In any event, Apple's imagining of intervening "steps" that might interrupt the chain of causation bears little relationship to how courts have assessed the

"causal connection" factor. *See Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 342 (3d Cir. 2018) (rejecting argument "that intervening factors . . . cut the causal chain"). As the Second Circuit explained in *Sullivan v. UBS AG*, 149 F.4th 206, 224 (2d Cir. 2025), "the first-step rule and traditional proximate cause considerations require drawing a line between those whose injuries resulted from their *direct transactions with the defendants* and those whose injuries stemmed from their deals with third parties. . . . The former suffices while the latter does not." Consistent with *Sullivan*, courts find a direct causal connection between conduct and injury where, as here, the plaintiffs transact with the defendant in the restrained market. *Id.* The cases Apple mischaracterizes as "much less attenuated than this one," MTD at 39, involved plaintiffs who (1) were not participants in the restrained market, *see Bakay*, 2024 WL 3381034, at *7; or (2) did not transact directly with the defendant in the restrained market but, rather, purchased the at-issue products from third parties.[4]

The first *AGC* factor weighs in favor of antitrust standing because DIPs bought their iPhones directly from Apple in the restrained smartphone markets. There is only one step between Apple's anticompetitive conduct and DIPs' injury.

---

[4] *See* MTD at 39; *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 114 (2d Cir. 2021) (LIBOR bonds); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484–85 (7th Cir. 2002) (scrap copper); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 923 (3d Cir. 1999) (cigarettes); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 912–13 (N.D. Cal. 2019) (cellphones and computers containing chip components).

### C.    Directness of the Injury

For similar reasons, the third factor of the *AGC* test favors DIPs: "the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims." *Lower Lake Erie*, 998 F.2d at 1165. Apple argues this factor weighs against antitrust standing because DIPs' claim "is predicated on . . . a hypothetical world rife with speculation about the ways developers, competitors, consumres, and Apple itself would have acted." MTD at 40. But all antitrust claims require plaintiffs to "construct[] a hypothetical world free of the defendants' exclusionary activities." *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir. 1984). That hypothetical world is a feature, not a defect, of any antitrust claim, "so long as [the] theory is not wholly speculative." *Id.*

DIPs' allegations are far from speculative. They rest on the basic economic principle that a seller can increase prices by increasing switching costs. DIPs have applied that principle in alleging Apple was able to charge higher prices by increasing the difficulty of switching to other smartphones. They have supported that theory with concrete examples of five technologies that Apple restricted on the iPhone because they would have facilitated consumer switching. DIPs have also corroborated their theory with Apple's internal statements acknowledging the disruptive potential of each technology. DIP Compl. ¶¶ 87, 97, 121, 128, 141. As discussed, those statements refute Apple's litigation position that DIPs' theory is

"highly speculative." MTD at 42. Apple recognizes that each technology is likely to facilitate consumer switching to other smartphones, as DIPs have alleged.

Apple places great weight on *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006) (cited MTD at 40, 43–44), but that decision has no bearing on the adequacy of DIPs' claims. *Kloth* evaluated four theories of antitrust liability asserted by *indirect* purchasers, and found only *one* of them speculative—that Microsoft deprived consumers of "technologically superior products." *Id.* at 324. Because that theory involved only "generalized or abstract societal harms," plaintiffs could not "claim that they, as distinct from others in society, were specifically injured." *Id.* The Court also concluded that plaintiffs could not pursue an overcharge theory, but only because they were *indirect* purchasers barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *Kloth*, 444 F.3d at 319–23, 325.

DIPs, by contrast, do not assert generalized societal harms, but rather allege they have been specifically injured as direct consumers who paid supra-competitive prices to Apple. Moreover, while the *Kloth* plaintiffs did not allege Microsoft's degradation of their computers was "aimed at lessening competition," *Kloth*, 444 F.3d at 325, DIPs have alleged Apple's restrictions on the iPhone were aimed at lessening competition in the smartphone markets, DIP Compl. ¶¶ 8, 10, 74, 265, 282. Those distinctions explain all the other cases Apple incorrectly string cites for the proposition that DIPs' claim is too speculative. *See* MTD at 42.

25

Apple is also wrong that DIPs' "problem only deepens when confronting the amount of any supposed iPhone overcharge." *Id.* According to Apple, DIPs do not have antitrust standing because their damages are "so speculative that they may never occur at all." *Id.* at 43. DIPs' experts will disprove that argument in their disclosures. In the meantime, Apple's argument fails under the well-established principle that the "potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014) (emphasis in original).

DIPs have adequately alleged that Apple proximately injured them by restricting technologies that would have made it easier to switch from the iPhone.

**D.    The Existence of More Direct Plaintiffs and Duplicative Damages**

Apple concludes its antitrust standing argument with a combined section on the fourth and fifth factors of the *AGC* test: "the existence of more direct victims" and "the potential for duplicative recovery or complex apportionment of damages." *Lower Lake Erie*, 998 F.2d at 1165–66. These factors favor DIPs. Contrary to Apple's argument that app developers are the most direct victims of Apple's anticompetitive conduct, DIPs are the direct victims of the overcharge injury they allege. That injury did not pass through any intermediary, nor is it duplicative of the

26

developers' lost-profits damages. *See DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009). The Supreme Court confirmed as much in *Apple Inc. v. Pepper*, 587 U.S. 273, 287 (2019), where it contemplated the possibility that "downstream iPhone consumers" and "upstream app developers" could both bring antitrust suits against Apple. The Court held the possibility of one suit did not bar the other because "the two suits would rely on fundamentally different theories of harm and would not assert dueling claims to a 'common fund.'" *Id.* That holding defeats Apple's argument that DIPs lack antitrust standing because their damages are duplicative.

*   *   *

The Court should deny Apple's motion to dismiss for lack of antitrust standing. The Court should also deny Apple's motion to dismiss for lack of Article III standing, which sets a similar but lower standard than *AGC*. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). DIPs' injury isn't just "traceable" to the challenged conduct—it was Apple's express aim. *See supra* § II.A. That injury is redressable by damages and equitable relief, and Apple is incorrect that DIPs' claim rests on speculation about the intervening actions of third parties. *See supra* § II.C.

## III. The Direct Purchasers Have Adequately Alleged Their UCL Claim

Apple has also failed to identify any inadequacy in DIPs' UCL pleadings.

*First*, DIPs have satisfied the UCL's "unlawfulness" prong because they have adequately alleged Sherman Act violations. *Contra* MTD at 78–79.

*Second*, DIPs have adequately alleged that Apple engaged in "unfair" business practices under any of the definitions percolating in the California Courts of Appeal. *See Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1214–15 (9th Cir. 2020). Apple's conduct "violate[d] the policy or spirit" of the Sherman Act. *Id.* at 1214. Apple's conduct was "substantially injurious to customers" because it forced them to pay substantial overcharges. *Id.* And the "impact" of Apple's conduct outweighs any "reasons, justifications, and motives" that Apple might offer for it, *id.* at 1215, including privacy and security, *see* DIP Compl. ¶¶ 180–88.

*Third*, DIPs have adequately alleged the inadequacy of legal remedies. *Contra* MTD at 79–80. DIPs allege the need for restitution and an injunction because "Apple has been unjustly enriched" and "[t]he illegal conduct alleged herein is continuing and there is no indication that Apple will not continue such activity into the future." DIP Compl. ¶¶ 293–94. No more is required. *Weizman v. Talkspace, Inc.*, 705 F. Supp. 3d 984, 990 & n.3 (N.D. Cal. 2023) (parties asserting UCL claim do not need to "explain in great detail why [their] legal remedies are insufficient, *id.* at 990 n.3").

Apple invokes the Ninth Circuit's decision in *Sonner*, but that case involved a strategic amendment on the eve of trial. 971 F.3d at 845. Accordingly, "[t]he majority of district courts in the Ninth Circuit have not interpreted *Sonner* to require

28

dismissal of equitable claims at the pleading stage." *Biederman*, 765 F. Supp. 3d at 944; *see, e.g.*, *Nacarino v. Chobani, LLC*, 668 F. Supp. 3d 881, 897 (N.D. Cal. 2022); *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1160 (S.D. Cal. 2021).

*Fourth*, DIPs are entitled to pursue their UCL claim on behalf of a nationwide class. *Contra* MTD at 81. Apple's reliance on *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1074 (9th Cir. 2021), is misplaced because that case addressed a conflict between *Illinois Brick* and California's Cartwright Act, which is an *Illinois Brick* repealer. There is no conflict between *Illinois Brick* and the UCL, which is not an *Illinois Brick* repealer but a consumer protection statute. *Illinois Brick* does not even apply to DIPs' antitrust claims because they are direct purchasers.

## CONCLUSION

The Court should deny Apple's motion to dismiss DIPs' complaint.

Dated: November 20, 2025

William Christopher Carmody
Shawn J. Rabin
Cory Buland
Mark Musico
SUSMAN GODFREY LLP
One Manhattan West, 50th Floor
New York, NY 10001-8602
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
cbuland@susmangodfrey.com
mmusico@susmangodfrey.com

Christopher A. Seeger
SEEGER WEISS, LLP
Ridgefield Park, NH 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com

Dena Sharp
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
dsharp@girardsharp.com

Respectfully submitted,

*/s/ James E. Cecchi*
James E. Cecchi
CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
jcecchi@carellabyrne.com

Steven W. Berman
HAGENS BERMAN SOBOL
SHAPIRO, LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

Melinda R. Coolidge
HAUSFELD LLP
1200 17th Street, N.W., Suite 600
Washington, DC 20036
Telephone: (202) 540-7200
mcoolidge@hausfeld.com

*Co-Lead Interim Class Counsel for Direct Purchasers' Track*

Joseph J. DePalma
LITE DEPALMA GREENBERG
& AFANADOR, LLC
570 Broad Street, Suite 1201
Newark, NJ 017102
Telephone: (973) 623-3000
jdepalma@litedepalma.com

Michael Critchley Sr.
CRITCHLEY, KINUM & LURIA, LLC
75 Livingston Avenue
Roseland, NJ 07068
Telephone: (973) 422-9200
mcritchley@critchleylaw.com
*Trial Counsel/Direct Purchasers' Track*

*Liaison Counsel for Direct Purchasers' Track*

## <u>CERTIFICATE OF SERVICE</u>

I, James E. Cecchi, hereby certify that on November 20, 2025, I served a copy of Direct Purchaser Plaintiffs' Opposition to Apple's Motion to Dismiss the Direct iPhone Purchasers' Complaint on all counsel of record by the Court's ECF notification system.

<u>/s/   *James E. Cecchi*      </u>
JAMES E. CECCHI
