# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION<br><br>*This Document Relates to:*<br><br>*Giamanco v. Apple Inc.*,<br>24-cv-7238-JXN-LDW | Case No. 24-md-3113-JXN-LDW<br><br>MDL No. 3113<br><br>Hon. Julien X. Neals, U.S.D.J.<br>Hon. Leda D. Wettre, U.S.M.J.<br><br>*Oral Argument Requested* |

## DIRECT APPLE WATCH PURCHASER PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS

**MCELROY, DEUTSCH,
MULVANEY & CARPENTER, LLP**
1300 Mount Kemble Avenue
Morristown, NJ  07962

**KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C.  20036

**KOREIN TILLERY LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601

**MOLOLAMKEN LLP**
300 North LaSalle Street
Chicago, IL  60654

# **TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................1

STATEMENT OF FACTS .........................................................................2

    A.    Apple Monopolizes the Markets for iOS-Connected
           Smartwatches and iOS Smartphones ...................................................2

    B.    Apple Interferes with Smartwatch Rivals, App Developers, and
           Consumers To Stymie Smartwatch Competition .................................3

           1.    Apple's Contractual Restrictions ...............................................3

           2.    Apple's Interferences with Rivals and Third Parties .................4

    C.    Apple's Anticompetitive Acts Harm Consumers and
           Competition ...........................................................................................5

LEGAL STANDARD ................................................................................6

ARGUMENT ..............................................................................................6

I.    Watch Purchasers Allege Relevant Markets ....................................6

    A.    Watch Purchasers Plead a Market for iOS-Connected
           Smartwatches (or Alternatively, for Smartwatches) ...........................7

    B.    Apple's Challenge to Watch Purchasers' Product Markets Fails ........8

II.    Watch Purchasers Allege Antitrust and Article III Standing ........................11

    A.    Watch Purchasers Plead Antitrust Standing.......................................11

    B.    Watch Purchasers Plead Article III Standing......................................13

III.    Watch Purchasers Plead Anticompetitive Conduct.......................................15

    A.    Apple Engaged in Exclusionary Conduct ..........................................16

1.    Apple Engages in a Comprehensive, *Microsoft*-Like Scheme .................................................................17

2.    Apple's Scheme Restrains Third Parties and Rivals' Dealings with Third Parties ....................................19

B.    The Refusal-To-Deal Doctrine Does Not Apply ...............................20

1.    Apple's Comprehensive Scheme Is Directed at Third Parties..............................................................21

2.    Apple Affirmatively Interferes with Rivals ............................24

3.    If Refusal To Deal Applies, Watch Purchasers Still State a Claim ...............................................................27

C.    Apple's Challenge to the § 1 and Cartwright Act Claims Fails .........28

IV.    Watch Purchasers Allege a UCL Claim .......................................30

CONCLUSION ..........................................................................30

# TABLE OF AUTHORITIES

Page(s)

CASES

*Adkins v. Rumsfeld,*
    450 F. Supp. 2d 440 (D. Del. 2006) .................................................................15

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
    836 F.3d 1171 (9th Cir. 2016) .........................................................................23

*Affinity Credit Union v. Apple Inc.,*
    No. 22-cv-04174, 2023 WL 12064154 (N.D. Cal. Sept. 27, 2023) ..................11

*AliveCor, Inc. v. Apple Inc.,*
    592 F. Supp. 3d 904 (N.D. Cal. 2022) .............................................................11

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
    592 F.3d 991 (9th Cir. 2010) ...........................................................................24

*In re Am. Express Anti-Steering Rules Antitrust Litig.,*
    361 F. Supp. 3d 324 (E.D.N.Y. 2019) ..............................................................10

*Am. Needle, Inc. v. NFL,*
    560 U.S. 183 (2010) ........................................................................................28

*Apperson v. Fleet Carrier Corp.,*
    879 F.2d 1344 (6th Cir. 1989) .........................................................................13

*Apple, Inc. v. Psystar Corp.,*
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) .........................................................9, 28

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) ........................................................................................27

*Associated Gen. Contractors of Cal., Inc. v. Cal.
State Council of Carpenters,*
    459 U.S. 519 (1983) ........................................................................................11

*Baar v. Jaguar Land Rover N. Am., LLC,*
    295 F. Supp. 3d 460 (D.N.J. 2018) ..................................................................29

*Bakay v. Apple Inc.*,
No. 24-cv-00476, 2024 WL 3381034 (N.D. Cal. July 11, 2024) ...................... 13

*Barry's Cut Rate Stores Inc. v. Visa, Inc.*,
No. 05-md-1720, 2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019) ...................... 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................ 28

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) .................................................................... 26

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2016) ...................................................................... 6

*Byers v. Intuit, Inc.*,
564 F. Supp. 2d 385 (E.D. Pa. 2008) ........................................................ 14

*Cal. Comput. Prods., Inc. v. IBM Corp.*,
613 F.2d 727 (9th Cir. 1979) ................................................................... 26

*Castro v. Sanofi Pasteur Inc.*,
No. 11-cv-7178, 2012 WL 12516572 (D.N.J. Aug. 6, 2012) ........................... 11

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) ................................................................... 12

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) ................................................................................ 28

*Coronavirus Rep. v. Apple Inc.*,
No. 21-cv-05567, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) ..................... 10

*Deslandes v. McDonald's USA, LLC*,
81 F.4th 699 (7th Cir. 2023) ................................................................... 29

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
111 F.4th 337 (4th Cir. 2024) ............................................................ 15, 27

*Eagle v. Star-Kist Foods, Inc.*,
812 F.2d 538 (9th Cir. 1987) ................................................................... 12

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ................................................................6, 9, 11

*Eichorn v. AT&T Corp.*,
   248 F.3d 131 (3d Cir. 2001) ...........................................................10

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ......................................................28, 29

*Fernandez v. CoreLogic Credco, LLC*,
   593 F. Supp. 3d 974 (S.D. Cal. 2022)..............................................30

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ......................................................23, 27

*Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*,
   960 F. Supp. 701 (S.D.N.Y. 1997) ..................................................10

*In re Google Play Store Antitrust Litig.*,
   147 F.4th 917 (9th Cir. 2025) ...........................................................8

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*,
   371 F.3d 1275 (10th Cir. 2004) .........................................................9

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
   423 F.3d 374 (3d Cir. 2005) ............................................................11

*Hartig Drug Co. Inc. v. Senju Pharm. Co.*,
   836 F.3d 261 (3d Cir. 2016) ............................................................14

*Heatransfer Corp. v. Volkswagenwerk, A.G.*,
   553 F.2d 964 (5th Cir. 1977) .............................................................8

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
   424 F.3d 363 (3d Cir. 2005) ............................................................13

*ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*,
   249 F. Supp. 2d 622 (E.D. Pa. 2003)..................................................9

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ............................................................29

*Joyce v. Jaguar Land Rover N. Am., LLC*,
    768 F. Supp. 3d 674 (D.N.J. 2025) ........................................................................7

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) ...............................................................................13

*Laydon v. v. Coöperatieve Rabobank U.A.*,
    55 F.4th 86 (2d Cir. 2022) ...................................................................................12

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ...............................................................15, 16, 19

*Lifewatch Servs. Inc. v. Highmark Inc.*,
    902 F.3d 323 (3d Cir. 2018) ...........................................................................6, 8

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)............................................................15, 16, 19, 23

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993) .........................................................................12, 13

*Marin Cnty. Bd. of Realtors, Inc. v. Palsson*,
    16 Cal. 3d 920 (1976) ..........................................................................................28

*In re Microsoft Corp. Antitrust Litig.*,
    127 F. Supp. 2d 702 (D. Md. 2001).....................................................................13

*Murthy v. Missouri*,
    603 U.S. 43 (2024)................................................................................................14

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd.*,
    838 F.3d 421 (3d Cir. 2016) ................................................................................26

*New York v. Facebook, Inc.*,
    549 F. Supp. 3d 6 (D.D.C. 2021)..................................................................22, 24

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023).........................................................21, 22, 23, 28

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ...............................................................*passim*

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)....................................................................................29

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
  797 F.2d 370 (7th Cir. 1986) ..................................................................23, 27

*Pac-12 Conf. v. Mountain W. Conf.*,
  No. 24-cv-6685, 2025 WL 2781313 (N.D. Cal. Sept. 30, 2025) ......................29

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009).....................................................................................23

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) .........................................................................10

*Robinson v. HP, Inc.*,
  No. 24-cv-164, 2025 WL 2802077 (N.D. Ill. Sept. 30, 2025) ..........................26

*Rossi v. Stand. Roofing, Inc.*,
  156 F.3d 452 (3d Cir. 1998) .........................................................................28

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015) .........................................................................26

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
  841 F.3d 827 (10th Cir. 2016) ......................................................................23

*Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
  171 F.3d 912 (3d Cir. 1999) .........................................................................12

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .........................................................................10

*TruePosition, Inc. v. Sunon, Inc.*,
  No. 05-cv-3023, 2006 WL 1451496 (E.D. Pa. May 25, 2006) ..........................30

*Tucker v. Apple Comput., Inc.*,
  493 F. Supp. 2d 1090 (N.D. Cal. 2006).........................................................25

*United States v. Apple, Inc.*,
  No. 24-CV-4055, 2025 WL 1829127 (D.N.J. June 30, 2025) ...................*passim*

*United States v. Colgate*,
250 U.S. 300 (1919)........................................................................21

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005) ...............................................19, 20, 23

*United States v. eBay, Inc.*,
968 F. Supp. 2d 1030 (N.D. Cal. 2013)...........................................29

*United States v. Google LLC*,
747 F. Supp. 3d 1 (D.D.C. 2024).....................................................23

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001)....................................................*passim*

*United States v. Microsoft Corp.*,
87 F. Supp. 2d 30 (D.D.C. 2000)......................................................18

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021)........................................................................14

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...........................................................13, 20, 28

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ..........................................................25

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010) .............................................................15

*Weichsel v. JP Morgan Chase Bank, N.A.*,
65 F.4th 105 (3d Cir. 2023) ............................................................13

## STATUTES

15 U.S.C. § 1 ...................................................................................28

15 U.S.C. § 2 ...................................................................................16

## Other Authorities

P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. 2025)..............................................8, 9

## **INTRODUCTION**

Apple dominates American smartwatch markets.  iPhone owners who purchase smartwatches have few options besides the Apple Watch.  That's because Apple has deliberately interfered with rivals, suppliers (app developers), and consumers to prevent competition on the merits.  iPhone owners cannot send text messages from a competitor smartwatch because Apple precludes it.  App developers cannot advertise their apps' compatibility with a competitor smartwatch because Apple contractually forbids it.  iPhone owners cannot maintain a stable connection between their iPhone and a competitor smartwatch because Apple technologically prohibits it.  This conduct has crushed or driven away competitors.  Once Apple entered the market, Samsung and Pebble exited.  Potential competitors Google and Meta declined to enter.  Thus, Apple can charge Watch Purchasers supracompetitive prices for their Apple Watches.  The D.C. Circuit found illegal monopolization from a similar campaign in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc).

Apple primarily argues it has no "duty to deal" with rivals.  But, as this Court held, that doctrine does not shield Apple's conduct directed at third parties like customers and app developers.  Nor does it protect Apple's affirmative interference with rivals.  Watch Purchasers' allegations paint a clear picture of Apple engaging in a comprehensive scheme that is not immunized by the refusal-to-deal doctrine.

Apple's other arguments fare no better.  Watch Purchasers plausibly allege an iOS-connected smartwatch market, just as *Microsoft* found a market for Intel-compatible operating systems.  As customers overcharged by a monopolist, Watch Purchasers have standing.  Apple's challenges to the § 1, Cartwright Act, and UCL claims fail as well.

## STATEMENT OF FACTS

### A.    Apple Monopolizes the Markets for iOS-Connected Smartwatches and iOS Smartphones

Smartwatches are wrist-worn devices that tell time and connect to smartphones to extend their capabilities.  Compl. ¶¶23, 176.  Non-Apple smartwatches connect to iOS (the iPhone's operating system) through "companion" apps for iPhone that competitor smartwatch manufacturers offer on the App Store. *Id.* ¶¶34, 36, 38.  Companion apps rely on Application Programming Interfaces (APIs), which are sets of rules, protocols, and functions that allow devices like smartwatches and smartphones to connect. *Id.* ¶¶45-47.

Consumers value feature-rich smartwatches, but they do not consider smartwatch choice and operability when they purchase a smartphone.  Compl. ¶217. Consumers are unlikely to switch to a smartphone with a different operating system just to access other smartwatches. *Id.* ¶¶203-04, 217.  Users invest significant time in learning an operating system and customizing their device. *Id.*  Switching requires learning a new system and transferring files, photos, music, and customizations. *Id.*

2

Because Android-compatible smartwatches cannot be used with an iPhone, iOS-connected smartwatches and Android smartwatches are not reasonable substitutes. *Id.* ¶213. iPhone owners need smartwatches that work well with their iPhones.

### B. Apple Interferes with Smartwatch Rivals, App Developers, and Consumers To Stymie Smartwatch Competition

Apple monopolizes the market for iOS-connected smartwatches (or, alternatively, the market for all smartwatches) by impeding competition on the merits. Apple imposes contractual restrictions on consumers, app developers, and smartwatch rivals, and it uses technological impairments to interfere with rivals' dealings with third parties. Compl. ¶¶1-7.

#### 1. Apple's Contractual Restrictions

Apple's restrictions start with iPhone user contracts. Those include the iOS and iPadOS Software License Agreement ("iOS License Agreement"), which forbids iPhone users from obtaining – and therefore developers from offering – apps outside Apple's App Store. Compl. ¶¶40-41.

To offer an app on the App Store, a developer must agree to the Developer Program License Agreement (DPLA). Compl. ¶¶40, 45. The DPLA prohibits developers from using certain APIs. *Id.* ¶¶45-49. That prohibition prevents them from offering iPhone users apps that provide core smartwatch functionalities, like sending, receiving, or reacting to text messages, *id.* ¶¶53-67; limiting other notifications, *id.* ¶¶96-107; or using mobile wallets stored on their iPhone, *id.*

¶¶108-13.  The DPLA incorporates the App Review Guidelines.  *Id.* ¶40.  Among other things, those guidelines prohibit developers from informing consumers in App Store listings that their apps function with rival smartwatches, and give Apple discretion over app distribution on the App Store.  *Id.* ¶¶42, 118-30.

### 2.    *Apple's Interference with Rivals and Third Parties*

Apple interferes with its competitors' dealings with iPhone owners.  When Apple launched the Apple Watch, it used the app review process to delay the release of the iOS-connected app for Pebble Time – then a major smartwatch competitor, which Apple crushed.  Compl. ¶¶116-17.

Apple also prevents rivals and third parties from developing alternatives for functions (like texting) that Apple blocks through the DPLA.  One developer tried to engineer its own code to offer smoother iPhone-to-Android messaging, but Apple kicked it off the App Store and redesigned iOS to stop that practice.  Compl. ¶¶61-63.  Smartwatch competitors developed a messaging service through cellular carriers, but Apple blocked the messages from the iPhone Messages app and newly required a separate phone number for non-Apple smartwatches.  *Id.* ¶¶68-80.  Apple thus prevented iPhone owners from texting on their non-Apple watches.

Apple's technological interventions impair iPhone owners' ability to use non-Apple smartwatches by disrupting the connection between iPhones and non-Apple smartwatches, *id.* ¶¶156-63, 175-82; spamming iPhone users with "scare screens"

4

that mislead them into not sharing data with their non-Apple smartwatches, *id.* ¶¶164-74; reducing privacy for iPhone users with non-Apple smartwatches, *id.* ¶¶149-52; and preventing the transfer of health information from a non-Apple Watch to an iPhone, *id.* ¶¶153-55. Significantly, Apple also reduced the time allowed for iPhone companion apps to communicate with non-Apple smartwatches from three minutes to ten seconds, thus preventing competitor smartwatches from providing up-to-date information. *Id.* ¶¶135-44, 183-87.

Apple's restrictions and impairments have evolved and escalated over time in ways that iPhone owners cannot predict. Compl. ¶217. Apple does not impair its Apple Watch in these ways. *See, e.g.*, *id.* ¶¶139, 146, 151, 164, 175, 186, 217.

### C.    Apple's Anticompetitive Acts Harm Consumers and Competition

As a result of Apple's restrictions, several competitors stopped selling iOS-connected smartwatches, and others never tried. Compl. ¶¶5, 71, 88, 93-95, 188-89. Samsung, Google, and Meta all either exited the iOS-connected smartwatch market or declined to enter. *Id.* ¶¶5, 86-88, 91-94. Pebble, Apple's biggest smartwatch competitor when it launched the Apple Watch, exited after Apple delayed the release of Pebble's companion app and stymied Pebble's attempts to offer texting with iPhones through a cellular carrier. *Id.* ¶¶5, 68-80, 116-17; *see also id.* ¶106.

The lack of competition allows Apple to exercise monopoly power in the iOS-connected smartwatch market (or, alternatively, the smartwatch market). Compl.

¶¶1, 198, 223-42. Apple's anticompetitive campaign has left iPhone owners with few smartwatch choices, and enables Apple to charge supracompetitive prices for the only smartwatch that works well with their iPhones: the Apple Watch.

## LEGAL STANDARD

The defendant bears the burden to show plaintiffs have not stated a claim. *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360, 361 n.11 (3d Cir. 2016). Factual allegations are deemed true and construed most favorably to plaintiffs. *Id.*

## ARGUMENT

## I.    WATCH PURCHASERS ALLEGE RELEVANT MARKETS

Watch Purchasers adequately plead a market for iOS-connected smartwatches in the United States and, in the alternative, a market for smartwatches in the United States. To plead an antitrust market, plaintiffs must allege facts supporting a relevant product and geographic market. *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018). Well-pleaded product markets encompass the product(s) at issue and their substitutes. *United States v. Apple, Inc.*, No. 24-cv-4055, 2025 WL 1829127, at *6-7 (D.N.J. June 30, 2025); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n.15 (1992). Because that "'can be determined only after a factual inquiry into the commercial realities,'" courts routinely deny challenges to market definition in a motion to dismiss. *Apple*, 2025 WL 1829127, at *6.

Apple concedes (at 27-28 n.6) that Watch Purchasers plead product markets for smartwatches and smartphones. And Apple never challenges the geographic

6

market in the United States. *See* Mot. 24-27. Watch Purchasers' complaint therefore cannot be dismissed for failure to define a market. And Watch Purchasers allege anticompetitive effects and injuries – "supracompetitive prices for Apple Watches" – in those markets. Compl. ¶¶188-96, 243. Because Apple's argument to the contrary (at 27-28 n.6) is raised only in a footnote, it is waived. *See Joyce v. Jaguar Land Rover N. Am., LLC*, 768 F. Supp. 3d 674, 697 n.30 (D.N.J. 2025). Apple's challenge to the iOS-connected smartwatch market and the separate but related iOS smartphone market boil down to a denial of Watch Purchasers' allegations, which is not a basis for dismissal. *Apple*, 2025 WL 1829127, at *6-7.

## A.    Watch Purchasers Plead a Market for iOS-Connected Smartwatches (or Alternatively, for Smartwatches)

Watch Purchasers allege a product market for iOS-connected smartwatches. Compl. ¶223. iOS-connected smartwatches are not interchangeable with smartphones, other wearables, or ordinary watches. *Id.* ¶¶210-11. Nor are they interchangeable with Android-connected smartwatches, which do not work with iPhones. *Id.* ¶213. Apple has approximately 79% of the iOS-connected smartwatch market, and more than 60% of the smartwatch market. *Id.* ¶¶5, 190. That is sufficient to plead monopoly power. *See Apple*, 2025 WL 1829127, at *9.

The iOS-connected smartwatch market is analogous to the "Intel-compatible PC operating systems" market the D.C. Circuit recognized in *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc). The court rejected the

argument that the market definition improperly excluded Apple MacOS, because the government had proven switching costs would prevent users from substituting MacOS for Windows in response to a price increase.  253 F.3d at 52; *see also In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 930 (9th Cir. 2025) (Android-only markets); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 980 (5th Cir. 1977) (market for Volkswagen-only air conditioners).  The same is true here:  Watch Purchasers allege that high switching costs allow Apple to increase Apple Watch prices without causing iPhone users to substitute Android phones and smartwatches. Compl. ¶¶202-04, 216-17; *see Apple*, 2025 WL 1829127, at *7-8, *10 (acknowl-edging high cost of switching between Apple and Android smartphones and accepting consumer-behavior allegations to overcome challenge to market definition); *see, e.g.*, *Lifewatch*, 902 F.3d at 337-40 (reversing dismissal).

### B.    Apple's Challenge to Watch Purchasers' Product Markets Fails

Apple's market-definition challenge is very narrow.  As to the iOS-connected smart***watch*** market, Apple asserts only in passing (at 24) that it is "an aftermarket," and (at 27) that it is implausible.  But the iOS-connected smartwatch market is not an aftermarket.  As Apple recognizes (at 8), an aftermarket is "a type of derivative market consisting of consumable goods or replacement components that must be used for the proper functioning of some primary good."  P. Areeda & H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their*

*Application* ¶564b (5th ed. 2025); *accord ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 639 n.1 (E.D. Pa. 2003).  A smartphone does not require a smartwatch – iOS-connected or otherwise – to function properly.

Nor is the iOS-connected smartwatch market implausible.  Watch Purchasers properly allege that, because consumers will not substitute Android-compatible smartwatches for iOS-connected smartwatches, the latter is a relevant market.  *See* pp. 2-3, *supra*.  Apple's "plausibility" challenge amounts to a denial of Watch Purchasers' well-pleaded facts, which is not a basis to dismiss.  *See* p. 7, *supra*.

Apple focuses (at 25-27) on challenging the iOS smart*phone* market as a single-brand "foremarket."  Even if iOS-connected smartwatches are an aftermarket and iOS smartphones are the foremarket, Watch Purchasers' allegations are sufficient.  Substitutability is the touchstone when defining a market.  Apple's authorities (at 25) acknowledge that single-brand markets are appropriate when there are "significant differences" between that brand and others.  Areeda & Hovenkamp ¶563d; *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008); *see also Kodak*, 504 U.S. at 482 ("[O]ne brand of a product can constitute a separate market.").  Watch Purchasers allege those "significant differences" between Apple and Android smartphones.  *See* Compl. ¶¶202-04, 241-42.

Apple's cases (at 25-27) are distinguishable.  In some, the court concluded at summary judgment that the brand competed with substitutes.  *See, e.g.*, *Green*

*Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004); *Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir. 2001).  In others, the pleadings lacked facts explaining why other products were not substitutes.  *See, e.g.*, *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705-06 (S.D.N.Y. 1997); *Coronavirus Rep. v. Apple Inc.*, No. 21-cv-05567, 2021 WL 5936910, at *10 (N.D. Cal. Nov. 30, 2021).  And in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (at, *e.g.*, 1, 24-27), the entire premise of plaintiffs' claim was that there were substitutes – the same pizza ingredients available elsewhere at lower prices.  *See also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 346 (E.D.N.Y. 2019) (lack of substitutability due to contractual restrictions).  Meanwhile, *Todd v. Exxon Corp.*, 275 F.3d 191, 195 (2d Cir. 2001), reversed dismissal on market definition.

Apple argues (at 25) that the iOS smartphone market is also implausible.  But again, that is just a denial of Watch Purchasers' well-pleaded allegations.  Watch Purchasers allege that, once a consumer has purchased a smartphone, iOS smartphones and Android smartphones – the only two types – are not substitutes.  Compl. ¶¶202-04, 217, 241-42.  The vast majority of iPhone users continue to purchase iPhones because of the high switching costs.  *Id.*  Those costs distinguish the iPhone from Apple's Pepsi example (at 26):  Consumers can easily switch to Coke if the price of Pepsi increases, but they cannot easily switch between iOS and

Android ecosystems. *Id.*; *see Microsoft*, 253 F.3d at 52. Indeed, other courts have recognized that – due to high switching costs – the iPhone can be a single-brand foremarket. *See, e.g.*, *Affinity Credit Union v. Apple Inc.*, No. 22-cv-04174, 2023 WL 12064154, at *4 (N.D. Cal. Sept. 27, 2023) (recognizing iOS-specific foremarket); *see also AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d 904, 916 (N.D. Cal. 2022) (watchOS app aftermarket).[1]

## II.    WATCH PURCHASERS ALLEGE ANTITRUST AND ARTICLE III STANDING

### A.    Watch Purchasers Plead Antitrust Standing

Watch Purchasers bought smartwatches at supracompetitive prices, and thus have antitrust standing to seek redress for their "quintessential antitrust injuries." *Castro v. Sanofi Pasteur Inc.*, No. 11-cv-7178, 2012 WL 12516572, at *6 (D.N.J. Aug. 6, 2012); *see Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 530 (1983) ("*AGC*") (antitrust laws create "remedy for consumers . . . forced to pay excessive prices"). Apple does not contest Watch Purchasers' antitrust injury. Apple argues (at 28-29, 47-52) that Watch Purchasers lack antitrust standing under the other *AGC* factors – causation, speculation, directness, and complexity of damages. Those arguments all fail.

---

[1] Apple does not assert the *Kodak* factors apply. Correctly so; those apply when the foremarket is competitive*, see Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 382-83 (3d Cir. 2005), and Watch Purchasers allege Apple's monopoly power in the iOS smartphone and smartphone markets, Compl. ¶¶1, 198, 223-42.

***Causation.***  Watch Purchasers plausibly plead causation.  The causal chain has one link:  Apple's anticompetitive conduct allowed it to acquire a monopoly and charge supracompetitive prices that Watch Purchasers paid.  Compl. ¶243.  The "directly impacted" consumers who paid supracompetitive prices can show causation.  *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1168 (3d Cir. 1993).  Apple cites no case (at 49) involving direct purchasers.  In *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 918-19, 930 (3d Cir. 1999), and *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 539-40 (9th Cir. 1987), unions claimed they lost money because their workers were injured by the antitrust defendants.  And in *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458, 461 (9th Cir. 2021), Oakland lacked antitrust standing because it did not buy from defendants, unlike cities that obtained an NFL team at supracompetitive prices.

***Concreteness.***  Watch Purchasers' allegations are concrete – they describe Apple's conduct, and competitors' and app developers' conduct, before and after Apple's exclusionary acts.  *E.g.*, Compl. ¶¶5, 71, 86-88, 91-94, 106.  The Third Circuit has rejected the argument similar to Apple's here (at 49-50) that a supracompetitive-pricing theory depends on speculation about third parties.  *Lower Lake Erie*, 998 F.2d at 1171.[2]

---

[2] Apple's cases (at 49-50) are irrelevant.  The plaintiff in *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 98-100 (2d Cir. 2022), did not transact with the

***Directness.***  As consumers who paid inflated prices, Watch Purchasers are the most direct victims of Apple's anticompetitive conduct.  Compl. ¶243.  That competitors or app developers might also have claims against Apple does not defeat Watch Purchasers' claims.  *See Lower Lake Erie*, 998 F.2d at 1170 ("[P]resence of . . . another direct victim does not dilute the causal connection"); *contra* Mot. 50.[3]

***Calculable Damages.***  Watch Purchasers' damages are readily calculable. Overcharge damages are common in antitrust cases and provable – not "impossible." Mot. 51; *see Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 375 (3d Cir. 2005).  Apple's concern (at 52) for injuries that "may never occur" is irrelevant; Watch Purchasers already paid supracompetitive prices.  Compl. ¶243.

## B.    Watch Purchasers Plead Article III Standing

For Article III standing, plaintiffs must plead injury in fact, traceability, and redressability.  *Weichsel v. JP Morgan Chase Bank, N.A.*, 65 F.4th 105, 111 (3d Cir. 2023).  As to Watch Purchasers, Apple disputes only traceability and redressability.

---

defendant.  And the plaintiff in *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) sought not overcharge damages but compensation for the amorphous "'denial of the benefit of technologically superior products.'"

[3] Apple's cases did not involve direct purchasers.  *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 417 (2004) (Stevens, J., concurring); *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 709-10 (D. Md. 2001); *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1351-52 (6th Cir. 1989).  To the extent *Bakay v. Apple Inc.*, No. 24-cv-00476, 2024 WL 3381034 (N.D. Cal. July 11, 2024), found other direct victims' claims precluded consumers', it is inconsistent with *Lower Lake Erie*, 998 F.2d at 1170.

13

*Traceability*.  An injury is "fairly traceable" to the defendant's conduct where the plaintiff makes "specific" allegations that a monopolist's "anticompetitive behavior" caused price increases.  *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 272 (3d Cir. 2016).  Watch Purchasers plausibly allege Apple's anti-competitive behavior, Compl. ¶¶32-187; the effects of that behavior, *id.* ¶¶188-96; and how the behavior allowed Apple to charge supracompetitive prices, *id.* ¶¶192-94.  That suffices, and Apple's cases (at 53-55) – none of which involved plaintiffs who bought directly from a defendant – do not say otherwise.

*Redressability*.  Watch Purchasers plead that their injury will "likely" be redressed by injunctive relief.  *Uzuegbunam v. Preczewski*, 592 U.S. 279, 285 (2021).  Courts regularly conclude that enjoining a monopolist is "likely [to] redress . . . [the] injury of paying supracompetitive fees."  *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, No. 05-md-1720, 2019 WL 7584728, at *16 (E.D.N.Y. Nov. 20, 2019); *e.g.*, *Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385, 401 n.39 (E.D. Pa. 2008) (plaintiffs overcharged tax-prep fees had standing for injunction against service).

Apple's cases (at 53-54) look nothing like the facts Watch Purchasers allege here.  *Cf. Murthy v. Missouri*, 603 U.S. 43, 57-73 (2024) (users had no traceable harm for injunction against government because social media platforms were responsible for alleged censorship).  Any assertion about whether an injunction will be sufficient to remedy Watch Purchasers' injury (at 53-54) raises a fact issue, not a

basis to dismiss. *See Adkins v. Rumsfeld*, 450 F. Supp. 2d 440, 448 (D. Del. 2006) (rejecting standing challenge to injunctive claims where fact issues implicated).

## III.   WATCH PURCHASERS PLEAD ANTICOMPETITIVE CONDUCT

Apple's wide-ranging scheme of contractual and technological interference with third-party dealing follows the playbook *Microsoft* found anticompetitive. And just like the Government, Watch Purchasers allege that Apple's exclusionary conduct is directed at both rivals (app developers) and third parties (consumers). *See Apple*, 2025 WL 1829127, at *13; *see also Lorain Journal Co. v. United States*, 342 U.S. 143, 152-53 (1951). Apple's restraints also interfere with how iPhone owners use ***their own phones*** to prevent them from using their preferred smartwatches.

Cherry-picking allegations in isolation, Apple argues (at 59-73) each is a permissible refusal to deal. This Court rejected that argument in the Government case and should reject it again now. *See Apple*, 2025 WL 1829127, at *11-12. The Court must assess Apple's conduct "as a whole" – not each specific restraint in isolation. *Id.* at *13 n.10 (quoting *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003)); *see also, e.g.*, *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354-55 (4th Cir. 2024) (reversing summary judgment where court examined conduct in "court-made subcategories" including refusal to deal because jury could find conduct anticompetitive in "totality"); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 108 (3d Cir. 2010) (considering as a whole

allegations of scheme to exclude rival).

The Court cannot, for example, consider Apple's refusal to share its own APIs in isolation; it must consider that allegation alongside Apple preventing competitors from developing their own feature-enabling code and preventing iPhone owners from downloading apps outside the App Store. *See* pp. 3-5, *supra*. The refusal-to-deal doctrine does not shield such a scheme. *See Microsoft*, 253 F.3d at 70-71; *Duke*, 111 F.4th at 354-55. It does not apply to schemes involving substantial conduct directed at third parties. *See Apple*, 2025 WL 1829127, at *12. And it does not apply to schemes involving "direct interference with rivals." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013).

### A.    Apple Engaged in Exclusionary Conduct

A monopolist willfully acquires or maintains monopoly power in violation of §2 when it competes on some basis other than the merits. *See LePage's*, 324 F.3d at 147. At this stage, Watch Purchasers need only allege "'a *prima facie* case'" of anticompetitive conduct. *Apple, Inc.*, 2025 WL 1829127, at *12. Anticompetitive conduct includes exclusionary restrictions on third parties or consumers, *see id.* at *11-12; *Lorain Journal*, 342 U.S. at 152-53, and technological restrictions designed to reduce "usage of rivals' products," *Microsoft*, 253 F.3d at 65.

Apple engages in those anticompetitive behaviors. To lock out competitors, Apple uses contractual and technological restraints – including on iPhone users.

16

Apple forces every iPhone user to agree to the iOS License Agreement, which requires them to get apps only from the App Store. *See* Compl. ¶41. The ***only*** way an iPhone user can access a non-Apple smartwatch companion app – or an app developer can offer such an app – is through the App Store. *See id.* ¶¶41, 45.

That restraint is crucial to Apple's scheme. Once every smartwatch maker and app developer is corralled into the App Store, Apple forces them to agree to the DPLA and App Review Guidelines. *See* Compl. ¶¶40-45. Then, through those contracts, Apple imposes restriction after restriction. That scheme is anticompetitive.[4]

### 1. *Apple Engages in a Comprehensive,* Microsoft-*Like Scheme*

Apple follows the *Microsoft* playbook that was declared illegal. Microsoft used a web of contractual and technological restrictions to exclude rival internet browsers that threatened its operating system monopoly. *Microsoft*, 253 F.3d at 58-67, 70-71. Apple uses similarly overlapping contractual and technological restraints to reduce iPhone users' adoption of rival smartwatches.

For example, Apple's DPLA blocks smartwatch makers – and other app developers – from creating iPhone apps that provide essential features for non-Apple smartwatches. *See* Compl. ¶¶45-49. Like the exclusive-dealing and license agreements that Microsoft used to prevent third parties from offering rival browsers

---

[4] Watch Purchasers do not raise an "essential facilities" theory. *See* Mot. 62-63.

on computers running Windows, these restrictions limit how third parties can deal with Apple's rivals. *Microsoft*, 253 F.3d at 61-62. DPLA restrictions – reinforced by the iOS License Agreement – prevent smartwatch competitors from offering apps that enable users to text with iPhones, *see* Compl. ¶¶53-67; limit other notifications users receive on their smartwatch from their iPhone, *see id.* ¶¶96-107; or use mobile wallets on their smartwatch that are stored on their iPhone, *see id.* ¶¶108-13. Those impairments are "something other than competition on the merits." *Microsoft*, 253 F.3d at 65; *see, e.g.*, Compl. ¶¶81-95.

Apple also imposes "technological shackles" to impede competition. *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 39 (D.D.C. 2000); 253 F.3d at 64-67. Apple purposefully redesigns iOS to degrade privacy for iPhone users with non-Apple smartwatches, Compl. ¶¶149-52; pushes iPhone updates that force phones to disconnect from rival smartwatches, *id.* ¶¶156-63, 175-82; limits delivery of health information from smartwatch rivals to the iPhone, *id.* ¶¶153-55; and confuses and alarms iPhone users with misleading "scare screens" warning them to limit data sharing with rival smartwatches, *id.* ¶¶164-74. After entering the smartwatch market, Apple changed iOS to progressively reduce the time companion apps can communicate with non-Apple smartwatches from three minutes to just ten seconds. *See* Compl. ¶¶135-144, 183-87. These changes degraded an essential function and impeded Apple's rivals. *Id.* Of course, Apple does not impose any of these

18

impairments on the Apple Watch.  *See* p. 5, *supra*.

Those degradations are similar to the ones found anticompetitive in *Microsoft*, where Microsoft removed Internet Explorer from the "Add/Remove" function and wrote its operating system code to "cripple Windows" if a user tried to delete browser-specific code.  253 F.3d at 64-67.  Apple's scheme is similarly anti-competitive:  It significantly reduces use of its rivals' product through something other than competition on the merits so Apple can overcharge consumers.  *See id.* at 65; *LePage's*, 324 F.3d at 147.

### 2. Apple's Scheme Restrains Third Parties and Rivals' Dealings with Third Parties

Apple's contractual restraints interfere with relationships between app developers and consumers – third parties, as opposed to Apple's smartwatch rivals.  *See Lorain Journal*, 342 U.S. at 152-53; *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191-97 (3d Cir. 2005) (holding refusal to sell to authorized dealers offering rival products to be anticompetitive); *Apple*, 2025 WL 1829127, at *11-12.

For example, the iOS License Agreement (one of the iPhone user contracts) interferes with iPhone owners' ability to do business with app developers.  Compl. ¶41.  Meanwhile, Apple's App Review Guidelines threaten developers who mention the name of a rival smartwatch in their apps or metadata, making it hard for iPhone owners to find those apps.  *Id.* ¶¶42, 118-30.  Those agreements restrict third parties' business dealings and are thus anticompetitive.  *See Lorain Journal*, 342

U.S. at 152-53; *Dentsply*, 399 F.3d at 185, 191-97.  Indeed, Apple has invoked the guidelines to block listings that merely identify the app as compatible with non-Apple smartwatches.  *E.g.*, Compl. ¶127; *see also id.* ¶¶42, 118-30.  And when Apple launched the Apple Watch, it used the review process to delay the launch of the iPhone app for one of its biggest smartwatch rivals.  *See id.* ¶¶116-17.  These actions – like the contractual restrictions in *Microsoft* – reduce use of rival smartwatches by preventing app developers from offering smartwatch features that consumers desire.  *See* 253 F.3d at 62, 70-71.[5]

### B.    The Refusal-To-Deal Doctrine Does Not Apply

Apple does not deny that its restrictions harm iPhone owners, developers, and rivals.  Instead, Apple defends (at 57-67) its restrictions as "lawful" "refusals to deal."  But that doctrine forecloses liability in "narrow" settings, *Novell*, 731 F.3d at 1076, not present here – namely, where a defendant refuses to provide rivals with a product or service, but otherwise leaves them free to compete unimpeded, *see Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408

---

[5] Apple's footnoted argument (at 68-69 n.10) that *Microsoft* does not apply ignores how Apple restricts app developers from selling apps if they provide competing features – just as Microsoft prevented computer manufacturers from distributing competing browsers.  253 F.3d at 60-61.  That Apple does not outright prohibit rivals from selling to iPhone owners does not make Apple's actions legal.

(2004).[6]  The refusal-to-deal doctrine does not shield exclusionary conduct directed at third parties, much less restrictions on how iPhone owners use their own phones. *Apple*, 2025 WL 1829127, at \*12; *Microsoft*, 253 F.3d at 65.  As Apple concedes (at 62), "affirmative interfer[ence]" with a rival's business – *i.e.*, "failing to leave [one's] rivals alone" – is not a refusal to deal.  *Novell*, 731 F.3d at 1072, 1076.  That is dispositive.  Watch Purchasers allege many ways Apple affirmatively interferes with rivals and third parties to block competition on the merits.

> ### 1.    *Apple's Comprehensive Scheme Is Directed at Third Parties*

As this Court recognized, the refusal-to-deal doctrine does not apply to conduct directed at third-party "developers and smartphone users."  *Apple*, 2025 WL 1829127, at \*12.   Watch Purchasers allege that unlawful conduct in spades, including the iOS Agreement's restriction on iPhone users, the DPLA and App Review Guidelines' limitations on app developers, and the technical degradation of rival smartwatches that prevents iPhone users from benefiting from them.  *See* pp. 3-5, *supra*.  Apple's refusal-to-deal argument relies primarily on *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023) and *Novell*, 731 F.3d 1064.  But those cases involved conduct directed exclusively at competitors.

---

[6] There is no unlimited right to refuse to deal.  *See United States v. Colgate*, 250 U.S. 300, 307 (1919).  Apple's quote (at 58) omits critical language:  "***In the absence of any purpose to create or maintain a monopoly*** . . . ." *Id.* (emphasis added).

In *Meta*, plaintiff-states challenged Meta's policy of preventing competitors from accessing Facebook's platform and APIs. *See* 66 F.4th at 305. Applying the refusal-to-deal doctrine, the court rejected plaintiff-states' claims, which would have required Meta to allow social-media competitors to use Facebook API access to "duplicate Facebook's core products." *Id.*; *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 20, 27-29, 33 (D.D.C. 2021). By contrast, Watch Purchasers challenge Apple's policies restricting smartwatch makers and third parties from offering their own functionalities. Moreover, Apple does not merely block use of certain of its own APIs. *See Meta*, 66 F.4th at 301-02. It affirmatively prevents competitors from developing their own alternatives for services like texting with iPhones, interferes with the dealings of third-party app developers, and restricts Apple's own consumers – all to monopolize the market. *See* pp. 4-5, *supra*.

*Novell* (cited Mot. 60-61) is similarly inapposite. There, Microsoft initially shared its APIs with rival software makers to encourage them to develop Windows-compatible products, but later stopped sharing them. *Novell*, 731 F.3d at 1067-69. Unlike Apple here, Microsoft did not prevent its competitor Novell from developing its own APIs (which Novell did, *id.* at 1069), and did not restrict users from using Novell products or other third parties from supplying inputs to Novell.

The other cases Apple cites similarly involved conduct restricting rivals' efforts to piggy-back on a defendant's investment to avoid having to compete

independently. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450-51 (2009) (not required to sell to competitors); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 995 (9th Cir. 2020) (not required to license patents to rivals); *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 831, 843 (10th Cir. 2016) (app creator not required to license to competitor); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179, 1184-85 (9th Cir. 2016) (servicer not required to teach rival how to repair units); *United States v. Google LLC*, 747 F. Supp. 3d 1, 183-84 (D.D.C. 2024) (Google not required to build feature for Microsoft on search-engine tool); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 377-78 (7th Cir. 1986) ("no right" to "conscript . . . competitor's salesmen to sell [rival's] product").

Because smartwatches connect to the iPhone through apps only, and iPhone apps can be offered only on the App Store, app developers are forced to deal with Apple's rivals on Apple's terms. *See* Compl. ¶¶41-43. That is why the most analogous cases are not *Meta* and *Novell*, but *Lorain Journal* and *Dentsply*. In those cases, courts held monopolists' refusal to sell to third parties that did business with their competitors to be unlawful exclusionary conduct. *Lorain Journal*, 342 U.S. at 152-54 (denying newspaper advertising to customers who bought ads from rival radio station); *Dentsply*, 399 F.3d at 185, 191-94 (generally refusing to sell fake teeth to dealers who bought from rival supplier). The *Meta* district court distinguished those cases because the plaintiff-states did not allege that Facebook "conditioned

23

access" to APIs on developers agreeing not to deal with Facebook's rivals. 549 F. Supp. 3d at 32. But Watch Purchasers allege just that – Apple conditions developers' access to iPhone owners on developers agreeing not to do business with Apple's smartwatch rivals in a manner Apple prohibits. Compl. ¶¶40-43, 45-50, 114-30.[7]

### 2. *Apple Affirmatively Interferes with Rivals*

As Apple concedes (at 62), the refusal-to-deal doctrine does not apply to "'affirmative'" or "direct interference with rivals." *Novell*, 731 F.3d at 1076. By delaying rivals' apps, slashing background-execution time, prohibiting competitors from offering services like texting, and purposefully redesigning iOS to degrade iPhone users' experience with non-Apple smartwatches, Apple affirmatively interferes with rivals rather than merely refusing to deal. *See* pp. 4-5, *supra*.

Citing *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010), Apple argues (at 69-71) that its updates and redesigns of iOS are a "lawful refusal to deal" and not anticompetitive "where they provide 'some new benefit to consumers.'" But *Tyco* did not analyze the redesign there as a refusal to deal. And technological restrictions – design-related or otherwise – that "reduc[e] usage of rivals' products" for reasons other than the merits are anticompetitive. *Microsoft*, 253 F.3d at 65. This Court recognized that when it found the Govern-

---

[7] Apple's discretion over its intellectual property does not excuse its conduct as a matter of law. *Apple*, 2025 WL 1829127, at *14; *see* Mot. 60-61.

ment's allegations about Apple imposing technological limits on rival smartwatches properly state anticompetitive conduct. *Apple*, 2025 WL 1829127, at *12. Watch Purchasers allege Apple introduced specific iOS design changes that disrupted rival smartwatches. Compl. ¶¶ 156-63, 175-82; *see Tucker v. Apple Comput., Inc.*, 493 F. Supp. 2d 1090, 1099 (N.D. Cal. 2006) (allegations that Apple "actively modif[ied] the iPod[]" to be incompatible with third-party music files not analyzed as refusal to deal).

Apple's claims (at 69-73) that its restrictions are procompetitive require a factual inquiry that cannot be resolved on the pleadings. *Apple*, 2025 WL 1829127, at *14 (collecting cases); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 460 (7th Cir. 2020) (justifications "not amenable to resolution on the pleadings"). Indeed, Watch Purchasers allege many facts – not "legal conclusion[s]" (at 71-72) – about Apple implementing product changes for anticompetitive reasons, not to improve its products. Compl. ¶¶ 131-87. Watch Purchasers allege Apple's limits on background execution for rival smartwatches are "not technologically necessary" – Apple did not impose them before releasing the Apple Watch, and does not impose them on Apple Watches now. Compl. ¶¶ 136-38, 144. Android's limits are much longer. *Id.* ¶ 144. Apple ignores those allegations, and others. *See, e.g., id.* ¶ 148 (Low Power mode), ¶ 152 (notification privacy), ¶ 155 (health data), ¶¶ 162-63 (updates), ¶¶ 172-74 (scare screens).

Apple's other cases (at 71) are not to the contrary. *Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Ltd.*, 838 F.3d 421, 440-41 (3d Cir. 2016), and *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 744 (9th Cir. 1979), involved failures of proof after discovery and trial, respectively. In *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 285-86 (2d Cir. 1979), the court rejected after trial plaintiff's claim that Kodak's "simultaneous release" of two complementary products was anticompetitive. Watch Purchasers' claims are not based on anything of the sort.[8]

Apple also claims (at 65) that it merely refused to deal when, around the time Apple launched its own Apple Watch, it delayed the launch of the iPhone app for smartwatch rival Pebble Time. *See* Compl. ¶¶116-17. But a carefully timed unilateral termination ***is*** anticompetitive where it is part of a larger scheme to stifle competition. *See, e.g.*, *Duke*, 111 F.4th at 366 (declining to determine as a matter of law whether unilateral termination "in isolation" was refusal to deal but concluding allegations together showed anticompetitive conduct); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 653-54 (2d Cir. 2015) (product withdrawal as part of broader scheme to coerce buyers is anticompetitive). Watch

---

[8] Apple (at 71) gets the holding wrong in *Robinson v. HP, Inc.*, No. 24-cv-164, 2025 WL 2802077 (N.D. Ill. Sept. 30, 2025). The court dismissed the §2 claim not because there was a "lawful refusal to deal," but because plaintiffs failed to allege "HP possessed sufficient market power." *Id.* at *10. Without that defect, the alleged "unilateral design change may [have] support[ed] liability." *Id.*

Purchasers allege that affirmative interference was part of Apple's broader scheme to suppress competition – much of which Apple ignores. *See, e.g.*, Compl. ¶¶61-63, 68-80 (describing Apple's interference with attempts to offer alternative smartwatch messaging). The Court must consider all of Apple's alleged conduct together. *Apple*, 2025 WL 1829127, at *13. It should reject Apple's invitation to dismiss the few specific allegations that Apple does challenge.

        3.     *If Refusal to Deal Applies, Watch Purchasers Still State a Claim*

Even if the Court concludes that the refusal-to-deal framework applies, Watch Purchasers meet the *Aspen Skiing* exception. A refusal to deal is illegal when the defendant unilaterally terminates a prior voluntary course of dealing and in doing so indicates a willingness to forgo short-term profits. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603-10 (1985); *see, e.g.*, *Duke Energy*, 111 F.4th at 363-66. Watch Purchasers allege that by allowing smartwatch makers to connect to the iPhone, Apple generated demand for iPhones from customers loyal to the rival smartwatches. By then driving away rival smartwatches, Apple sacrificed iPhone sales in the short term with the goal of obtaining monopoly profits from the smartwatch market in the long term. *See, e.g.*, Compl. ¶¶31, 126.

Apple's arguments (at 63-64) raise fact questions that cannot be resolved now, *see Apple*, 2025 WL 1829127, at *12-14, as its own cases show, *see, e.g.*, *Qualcomm*, 969 F.3d at 994 (decided after trial); *Olympia*, 797 F.2d at 371-72 (same); *Novell*,

731 F.3d at 1066-69 (same); *Meta* (distinguished *supra* p. 22). *Trinko* involved a regulated market, where the Supreme Court concluded regulatory supervision displaced the need for antitrust enforcement. 540 U.S. at 411-12.

### C.    Apple's Challenge to the §1 and Cartwright Act Claims Fails

Sherman Act §1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . ." 15 U.S.C. §1. The Cartwright Act is substantially similar. *See Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976). The DPLA is a contract, so section §1 applies. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023). Apple ignores *Epic*'s holding, despite citing the decision (at 20, 24, 76). Apple posits (at 73-74) a separate "concerted action" requirement, but cites conspiracy cases where there was no actual contract (a contract, by itself, satisfies the concerted-action requirement of §1). None of those cases suggests the concerted-action requirement applies to separate entities – Apple and competitor smartwatch makers – that entered into a contract.[9] And Apple's argument (at 74) that the DPLA does not restrict smartwatch

---

[9] *E.g.*, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 759 (1984); *Rossi v. Stand. Roofing, Inc.*, 156 F.3d 452, 465-67 (3d Cir. 1998); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). *Psystar* involved tying. 586 F. Supp. 2d at 1195. *American Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010), considered whether multiple parties were a single enterprise that could not conspire with itself.

competitors contradicts Watch Purchasers' allegations.  *See* pp. 2-3, *supra*.[10]

Restraints under § 1 can be unreasonable either "under the 'rule of reason,'" or "*per se*."  *Ohio v. Am. Express Co.*, 585 U.S. 529, 540-41 (2018).  Watch Purchasers adequately plead both.  *See* pp. 15-20, *supra* (rule-of-reason analysis).

Watch Purchasers state a per se claim because the DPLA plainly restrains horizontal competition between Apple and its smartwatch rivals – that is the premise of Apple's refusal-to-deal arguments.  *See* Compl. ¶¶ 40, 45.  In any event, dismissal is inappropriate before discovery.  *See, e.g.*, *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 705 (7th Cir. 2023) (reversing dismissal of *per se* claim because "classification of a restraint as ancillary is a defense"); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1040 (N.D. Cal. 2013) (declining to decide on motion to dismiss); *Pac-12 Conf. v. Mountain W. Conf.*, No. 24-cv-6685, 2025 WL 2781313, at *7 (N.D. Cal. Sept. 30, 2025) (same).  Moreover, even if the DPLA is a "hybrid" agreement, those can be per se illegal too.  *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 346-47 (3d Cir. 2010).

---

[10] To the extent Apple suggests the DPLA is a contract of adhesion and therefore outside the scope of § 1, *Epic Games* rejected that argument.  67 F.4th at 982.  The cases Apple cites (at 75) concluding otherwise are unpublished and controlled by *Epic Games*.  And in *Baar v. Jaguar Land Rover N. Am., LLC*, 295 F. Supp. 3d 460, 465 (D.N.J. 2018) (Mot. 75), the allegations themselves "ma[de] clear" defendants acted "unilaterally."  Conversely, Watch Purchasers allege formation of a contract.

## IV.  WATCH PURCHASERS ALLEGE A UCL CLAIM

Apple asserts (at 78-81) the same arguments for all plaintiffs' UCL claims. Watch Purchasers incorporate here the arguments made by Direct iPhone Purchasers and Indirect iPhone Purchasers.  Additionally, contrary to Apple's assertion (at 81), class members outside California can pursue UCL claims because Apple's conduct occurred in and emanated from California.  *See* Compl. ¶289; *Fernandez v. CoreLogic Credco, LLC*, 593 F. Supp. 3d 974, 991-92 (S.D. Cal. 2022); *TruePosition, Inc. v. Sunon, Inc.*, No. 05-cv-3023, 2006 WL 1451496, at *5 (E.D. Pa. May 25, 2006) (collecting California state court cases).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Apple's motion to dismiss.

Dated: November 20, 2025

Steven F. Molo
smolo@mololamken.com
Lauren F. Dayton
ldayton@mololamken.com
Eric Posner
eposner@mololamken.com
Matthew E. Gold
(*appearance forthcoming*)
mgold@mololamken.com
**MOLOLAMKEN LLP**
300 North LaSalle Street
Chicago, IL  60654
Tel.: (312) 450-6700

Kayvon M. Ghayoumi
kghayoumi@mololamken.com
Caroline A. Veniero
cveniero@mololamken.com
**MOLOLAMKEN LLP**
600 New Hampshire Ave, N.W.
Washington, D.C.  20037
Tel.: (202) 556-2000

George A. Zelcs
gzelcs@koreintillery.com
David Walchak
dwalchak@koreintillery.com
Daniel Epstein
depstein@koreintillery.com
**KOREIN TILLERY LLC**
205 North Michigan, Suite 1950
Chicago, IL  60601
Tel.: (312) 641-9750

Respectfully submitted,
By: /s/ Thomas R. Curtin
Thomas R. Curtin
tcurtin@mdmc-law.com
Kathleen N. Fennelly
kfennelly@mdmc-law.com
**MCELROY, DEUTSCH,
    MULVANEY & CARPENTER, LLP**
1300 Mount Kemble Avenue
Morristown, NJ  07962
Tel.: (973) 993-8100

David C. Frederick
dfrederick@kellogghansen.com
Aaron M. Panner
apanner@kellogghansen.com
Alex A. Parkinson
aparkinson@kellogghansen.com
Scott K. Attaway
sattaway@kellogghansen.com
Ariela M. Migdal
amigdal@kellogghansen.com
Katherine V. Tondrowski
ktondrowski@kellogghansen.com
**KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C.  20036
Tel.: (202) 326-7900

Stephen M. Tillery
stillery@koreintillery.com
Carol O'Keefe
cokeefe@koreintillery.com
**KOREIN TILLERY LLC**
505 N 7th Street, Suite 3600
St. Louis, MO  63101
Tel.: (312) 241-4844

*Co-Lead Interim Class Counsel for Direct Apple Watch Purchaser Plaintiffs*