**WALSH PIZZI O'REILLY FALANGA**

THREE GATEWAY CENTER
100 Mulberry Street, 15th Floor
Newark, NJ 07102

T: 973.757.1100
F: 973.757.1090

**WALSH.LAW**

Liza M. Walsh
Direct Dial: (973) 757-1100
lwalsh@walsh.law

January 22, 2026

**VIA ECF**

Honorable Julien Xavier Neals, U.S.D.J.
United States District Court
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

Re:   *In re: Apple Inc. Smartphone Antitrust Litigation*
        Civil Action No. 2:24-md-03113-JXN-LDW (MDL 3113)

Dear Judge Neals:

Defendant Apple Inc. respectfully submits this letter to inform the Court of the Ninth Circuit's recent decision in *AliveCor, Inc. v. Apple Inc.*, --- F.4th ---, No. 24-1392 (9th Cir. Jan. 8, 2026). The decision supports Apple's pending motion to dismiss Watch Plaintiff's claims under Section 2 of the Sherman Act. *See* ECF 132-1. A copy of the decision is enclosed as Exhibit 1.

In *AliveCor*, the plaintiff developer brought Section 2 antitrust claims contending that Apple used its control over watchOS application programming interfaces ("APIs") to monopolize an alleged aftermarket for Apple Watch apps used to detect certain heart conditions. Ex. 1 at 5–6. Plaintiff had developed an Apple Watch app to detect and monitor atrial fibrillation, which relied on heartrate data that Apple generated through an algorithm (known as "HRPO") and provided to developers through an API. *Id.* at 5–7. When Apple introduced an improved algorithm that produced more accurate readings during exercise ("HRNN"), it stopped giving developers API access to HRPO data. *Id.* at 8–9. Around the same time, Apple introduced its own competing heartrate analysis feature. *Id.* at 9. AliveCor claimed that Apple removed developers' access to HRPO data to "break" competing software, thereby monopolizing the relevant aftermarket for such apps. *Id.* at 10. The district court granted summary judgment to Apple because replacing the old HRPO algorithm with the new HRNN algorithm was a product improvement, a category of beneficial conduct protected from antitrust liability, as a company "'has no duty to help its competitors survive or expand when introducing an improved product design,' even if the monopolist could have made alternate design choices that would be compatible with a competitor's products." *Alivecor, Inc. v. Apple Inc.*, 2024 WL 591864, at *15 (N.D. Cal. Feb. 13, 2024) (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1002 (9th Cir. 2010)).

The Ninth Circuit affirmed. Ex. 1 at 6. To begin, the Ninth Circuit reaffirmed the black letter rule that product improvements are *per se* lawful: a company that designs its products to offer new consumer benefits does not violate Section 2 unless there is "'some associated *anticompetitive*

Honorable Julien Xavier Neals, U.S.D.J.
January 22, 2026
Page 2

conduct.'" *Id.* at 16 (quoting *Tyco*, 592 F.3d at 998–99).  The court therefore declined to entertain any challenge to Apple's decision to make "the product change itself." *Id.* at 20.

The court instead focused on Apple's withholding of API access to HRPO data—the decision that AliveCor alleged was separate anticompetitive conduct "associated" with the product change.  Ex. 1 at 20.  As Apple argued the Court should do here, *see* ECF 148 at 28–29, the Ninth Circuit began by determining whether this conduct fell within the "'well-defined categories'" of conduct for which there are "specific rules." Ex. 1 at 17.  The court held that "AliveCor's central theory—that Apple 'sought to break' competing technology by 'denying third parties access to HRPO-generated data'"—"maps perfectly onto the refusal-to-deal doctrine." *Id.* at 17, 20.  As the court explained, the old "HRPO data was an input to [Apple's] Workout Mode that Apple shared with third-party developers of heart monitoring apps—in other words, Apple's *competitors* [in an alleged app market]—so that it could be an input into those competitors' products too." *Id.* at 20.  Because AliveCor sought to compel Apple to continue providing access to such data to restore the "functionality" of its competing apps, its theory "squarely" implicated "the general rule that there is no duty to deal with competitors." *Id.* at 20–21.

The same is true here: Watch Plaintiff, "at bottom, seeks a ruling that Apple [is] obligated to provide its [property] to its competitors." Ex. 1 at 16, 18.  He alleges that Apple degrades the functionality of competing smartwatches by limiting access to APIs, imposing restrictions on App Store marketing, and designing its software to limit interoperability.  *See, e.g.*, Watch Compl. ¶¶ 48, 115, 118, 131.  Just as Apple refused to provide competitive access to an "input into . . . competitors' products" in *AliveCor*, Ex. 1 at 20, the challenged restrictions here involve Apple's alleged refusal to provide access to technologies supposedly needed to allow rival smartwatches to pair with iPhone ("companion apps") or to enhance the performance of rival smartwatches ("sister apps") in the smartwatch market.  Watch Compl. ¶¶ 25, 27, 34; *see* ECF 148 at 31–32.  As *AliveCor* makes clear, a plaintiff cannot "attempt[] to 'recast' Apple's conduct as something else when the substance of that conduct is a refusal to deal." Ex. 1 at 21.  The "substance" of the conduct at issue here is exactly that—it is undisputed that the ability of non-Apple smartwatches to connect or interact with the iPhone is at the core of Watch Plaintiff's case.  Those "claims raise the exact free-riding concerns animating the general rule that there is no duty to deal with competitors" and therefore "fail as a matter of law." *Id.* at 13, 26.

The Ninth Circuit rejected the argument, repeated by Watch Plaintiff here, that "'Apple Watch is a platform designed to interoperate with third-party apps' and that 'changing a product' that functions as an 'interoperable complement to other products in a way to kill competition is analyzed as its own form of potentially anticompetitive conduct.'" Ex. 1 at 20; *see* ECF 141 at 18–19, 24–25.  As the court observed, such a theory either challenges the product improvement itself or implicates a "denial of access" to which the refusal-to-deal doctrine applies.  Ex. 1 at 20.  So too here.  *See* ECF 148 at 33–34.  And like AliveCor, Watch Plaintiff cannot escape the refusal-to-deal doctrine by relying on *United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001).  *See* Ex. 1 at 21 n.3; *see, e.g.*, ECF 141 at 19.  Apple's alleged conduct in this case and *AliveCor*—allegedly withholding access to technologies that would improve competing products—is not

"analogous" to the claims against Microsoft, which involved exclusive dealing, tying, and other conduct distinct from refusals to deal. *See* Ex. 1 at 21 n.3; ECF 148 at 29.[*]

Consistent with *AliveCor*, the Court should dismiss Watch Plaintiff's claims as a matter of law for the reasons addressed in Apple's pending motion to dismiss. *See, e.g.*, *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 405 (2004) (affirming dismissal on pleadings of claim challenging lawful refusals to deal).

We thank Your Honor for your continued attention to this matter.

                                        Respectfully submitted,

                                        *s/Liza M. Walsh*

                                        Liza M. Walsh

cc:     All Counsel of Record (via ECF)

---

[*] What is more, the court in *AliveCor* found that "AliveCor's argument about lack of interoperability makes little sense" because the affected app "continues to be available for use on Apple devices." Ex. 1 at 20. Watch Plaintiff likewise cannot plausibly claim that Apple's alleged conduct prevents interoperability when his complaint recognizes that rival smartwatches, companion apps, and sister apps all "continue[] to be available for use on [or with] Apple devices." *Id.*; *see* Watch Compl. ¶¶ 33–34.