

**TAYLOR HOLLINGER** / *ASSOCIATE*
**d** 215.875.3087 | thollinger@bergermontague.com

May 13, 2026

**VIA ECF**
Honorable Leda Dunn Wettre, U.S.M.J.
United States District Court
Martin Luther King Federal Building
50 Walnut Street
Newark, New Jersey 07102

> **Re:** ***In re Apple Inc. Smartphone Antitrust Litigation,***
> **No. 2:24-md-03113-JXN-LDW (D.N.J.)**

Dear Judge Wettre,

The parties in the above-referenced matter respectfully submit this joint status letter, as directed by the Court's April 6, 2026 Order. Dkt. No. 175.

## I.    Deposition Protocol

The parties appreciate the Court's assistance and guidance at the April 27, 2026 remote conference regarding deposition protocol topics. As set forth in the April 13, 2026 Joint Letter, Dkt. No. 179, and at the April 27 hearing, the parties have reached many agreements governing depositions in this Action, including:

- Formal deposition notices are not required
- Exhibits
- Cooperation to reduce burden on witnesses
- Depositions to presumptively take place in person
- Objections
- Reservation of rights
- Non-party deposition scheduling
- Time excluded from depositions
- Depositions excluded from the total count
- Court reporter arrangements
- 30(b)(6) time allocation for discovery 30(b)(6) depositions

The parties also agreed that Apple would not seek discovery relating to the MDL Plaintiffs and Government Plaintiffs exchanges regarding deposition coordination (*e.g.*, regarding scheduling, division of time, topics, custodians, exhibits, questions, outlines, etc.).

1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103
215.875.3000 | *BERGERMONTAGUE.COM*



Further, the parties understand this Court to have made certain rulings at the April 27, 2026 conference, namely:

1. That the MDL Plaintiffs are entitled to seven hours of deposition time for all Apple 30(b)(1) witnesses, in addition to the time agreed upon in the Government Action, consistent with MDL Plaintiffs' preferred position on the length of depositions from the April 13, 2026 Joint Letter. Transcript of Hearing at 32:2-5, *In re Apple Inc. Smartphone Antitrust Litig.*, No. 2:24-md-3113 (D.N.J. Apr. 27, 2026).

2. That the MDL Plaintiffs must provide written notice to Apple and allow Apple 15 business days, consistent with Apple's proposal on contacting former Apple employees in the April 13, 2026 Joint Letter, before the MDL Plaintiffs may contact any former Apple employee about a potential deposition. Hr'g Tr. at 45:9-10.

### *Plaintiffs' Position*

In light of the Court's discussion and rulings, the MDL Plaintiffs believe only two deposition protocol disputes warrant attention from the Court, subject to the MDL Plaintiffs learning more information from Apple about incremental agreements reached in the Government Action: i) Notice and Due Process; and ii) Number of Depositions.

**a. Notice and Due Process**

***Proposed Provision****: If full productions of documents related to noticed witnesses are not provided sufficiently in advance of their deposition to allow deposing parties to meaningfully review and utilize those documents in the deposition, or are provided less than 14 days prior to the witness's deposition, then deposing parties must be permitted to re-depose the witness after such document production is complete.*

**Substantial Completion.** The MDL Plaintiffs and Apple agree that Apple is required to substantially complete production of each witness's custodial file fourteen days prior to that witness's deposition, consistent with the Court's guidance at the April 27 Case Management Conference. *See* Hr'g Tr. at 16:20-23. MDL Plaintiffs' proposal also confirms that, consistent with the Court's guidance, the MDL Plaintiffs will be entitled to re-depose <u>any</u> Apple custodial witness—not just those first eight depositions—should that witness's custodial file not be substantially complete and produced at least 14 days prior to the start of that deposition, or sufficiently in advance of their deposition to allow deposing parties to meaningfully review and utilize those documents in the deposition. Hr'g Tr. at 20:5-17 ("[I]f I have to rule, I will rule that [Plaintiffs] have the right to have substantial document production from that custodian before that deposition and that they will—if they go forward in the first deposition without having that substantial completion of production as to that custodian, that I am going to allow them a limited redeposition.").



**Early Deposition Bifurcation.** Apple further proposes that for the first eight depositions—which have been noticed by the Government Plaintiffs and cross-noticed by the MDL Plaintiffs—the MDL Plaintiffs should decouple those eight deposition dates from the Government Action. Practically speaking, Apple proposes that the first eight depositions have one day of testimony in the Government Action in the immediate future, and the MDL Plaintiffs have a second day of testimony with these eight witnesses following substantial completion of the witness's custodial documents.

MDL Plaintiffs agree with this proposal in principle. The Government Plaintiffs will take those first eight depositions in the near future, starting at the end of May. MDL Plaintiffs will then depose these eight witnesses at a later date, after Apple certifies substantial completion of production of their custodial documents.

MDL Plaintiffs also agree to compromise with Apple as to its preparation of these eight witnesses in between the "Government Day" and "MDL Day." MDL Plaintiffs will not seek to limit Apple's ability to appropriately prepare these witnesses in advance of the MDL's deposition.

However, MDL Plaintiffs do not agree to apply this compromise position to the remaining fact depositions in this case—the majority of which will likely be on two consecutive days.[1] Specifically, Apple should not be permitted to "freely confer with and prepare" witnesses in the intervening time between depositions after these first eight fact depositions. New Jersey Court Rule 4:14-3(f) prohibits communications between counsel and witness during a deposition. "Once the deponent has been sworn, there shall be no communication between the deponent and counsel during the course of the deposition." Courts in this district have likewise found that substantive witness preparation during depositions is not permitted and is discoverable to the extent it does occur. *See, e.g.*, *Tramontano v. N.J. Transit Rail Operations, Inc.*, 2023 WL 3248238, at *10 (D.N.J. May 4, 2023) ("counsel and the deponent are prohibited from engaging in private, off-the-record conferences during any breaks in a deposition, except for the purpose of deciding whether to assert a privilege, because they interfere with the deposing attorney's pursuit of the truth.") (citing *Hall v. Clifton Precision*, 150 F.R.D. 525, 528-29 (E.D. Pa. 1993)); *Chassen v. Fid. Nat. Title Ins. Co.*, 2010 WL 5865977, at *1 (D.N.J. July 21, 2010) (permitting a second deposition to discover attorney-client conversations held during deposition breaks). This compromise position is an exception from the standard and should not be extended beyond the first eight bifurcated depositions.

---

[1] For the avoidance of confusion, in the event that MDL Plaintiffs begin their questioning on day one and continue on day two, Apple should not be permitted to speak to the deponent about substantive aspects of the deposition in that interval (except as to those substantive topics expressly permitted under New Jersey Court Rule 4:14-3(f)). Similarly, if the MDL Plaintiffs start a deposition and the Government Plaintiffs begin questioning on day one and continue into day two, the same restriction should apply.



Apple has also proposed that it should be permitted to prepare witnesses "freely and without restriction" for all depositions where the Government and MDL depositions are not on consecutive days. However, MDL Plaintiffs cannot agree to permit such improper witness preparation in instances where scheduling does not permit consecutive days. For instance, Apple's proposal would permit it to discuss the deposition with a witness over the weekend if the deposition occurs on Friday and Monday, or on an intervening day where the deposition takes place on Tuesday and Thursday. MDL Plaintiffs' compromise proposal treats all remaining fact depositions similarly and will enable more efficient scheduling around witness availability, and should therefore be accepted.

MDL Plaintiffs' agreement is also contingent on the bifurcated depositions being considered either "[f]urther testimony from a witness who has already been deposed provided by the parties' agreement or the Court's order," or cross-noticed depositions that the Government Plaintiffs noticed in the Government Action, such that they fit within the agreement the parties previously entered (*see* Apr. 13 Joint Letter, Dkt. No. 179 at 2-3, "Depositions Excluded from Total Count") and will not count against any party's deposition cap or any ultimate limit to the number of incremental Rule 30(b)(1) depositions the MDL Plaintiffs may separately notice in the MDL.

Subject to these clarifications, MDL Plaintiffs agree to compromise with Apple to bifurcate the first eight fact depositions.

### b. Number of Depositions

*Proposed provision: MDL Plaintiffs may cross notice any deposition noticed in the Government Action and each MDL track (i.e., Direct iPhone Purchaser Plaintiffs, Indirect iPhone Purchaser Plaintiffs, and Direct Apple Watch Purchaser Plaintiffs) may notice 20 additional fact witness depositions (including both party and nonparty witnesses). Apple may notice all class representatives without limit, and may notice 10 additional fact witness depositions. For the avoidance of confusion, this provision assumes that, in the Government Action with which this action will coordinate depositions, Apple and the Government Plaintiffs will each be allowed to notice 50 fact witness depositions. If the Government Plaintiffs do not use 50 fact witness depositions, then MDL Plaintiffs shall be allowed the remainder.*

MDL Plaintiffs reiterate their proposal on the total number of depositions appropriate in the MDL Action from the parties' April 13, 2026 Joint Letter. *See* Apr. 27, 2026 Hr'g Tr. 32:25-33:2 ("I think some of the caps floating around in the MDL plaintiffs' proposal, I guess they look relatively reasonable."). The MDL Plaintiffs' proposal on the number of fact witness depositions provides predictability that will allow the MDL Plaintiffs to plan ahead and advance this litigation efficiently. Furthermore, MDL Plaintiffs' proposal would establish a cap that applies to both party and non-party depositions. Each of the interested parties have different balances of discovery needs—some, like the Indirect iPhone Purchaser Plaintiffs and Apple may need



relatively more non-party discovery, whereas others, like the Direct iPhone Purchaser Plaintiffs and Direct Apple Watch Purchaser Plaintiffs, may need relatively more party discovery. Establishing a general cap (that applies to both party and non-party depositions) allows the parties to determine for themselves how best to expend deposition resources without the Court putting a thumb on the scale for any particular party. Apr. 27, 2026 Hr'g Tr. at 33:10-11 ("I want there to be parity between plaintiffs' side and defense side so that it's fair to everyone.").

Apple implicitly proposes a cap of thirty (or possibly less) Apple witness depositions in the Government Action, which may be cross-noticed by the MDL Plaintiffs, along with only ten additional MDL witnesses. This proposal plainly fails to account for the separate needs of each of the MDL tracks. Apple minimizes the separate needs of the MDL Plaintiffs in this moment when it is trying to justify minimizing Plaintiffs' discovery rights, but in the near future Apple will turn around and argue that the MDL Plaintiffs have not developed sufficient evidence for class certification of their three respective classes. Apple cannot have it both ways, and the MDL Plaintiffs are entitled to sufficient discovery and development of evidence in their respective cases with a reasonable cap that allows the parties to determine for themselves how best to expend deposition resources without the Court putting a thumb on the scale for any particular party.

In defense of its proposed cap of 10 incremental depositions in the MDL Action, Apple cites *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2006 WL 6487632, D.N.J. Aug. 22, 2006. But *Alaska Elec. Pension Fund* was not an MDL action, and it did not reach the question of whether the plaintiffs were entitled to more than ten depositions. *Id.* at *6. With respect to discovery limitations, MDLs are different and less limiting, as courts commonly recognize. *See, e.g.*, *In re Bard IVC Filters Products Liability Litig.*, No. 2:15-md-02641, ECF No. 2239, at 1 (D. Ariz. June 21, 2016) (noting "[a]ny Federal Rule of Civil Procedure and/or Local Rule purporting to limit the number of depositions shall not apply in this MDL proceeding."); *In re C.R. Bard, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:10-md-02187, ECF No. 243, at 2 (S.D. W. Va. June 7, 2012) (same); *In re General Motors LLC Ignition Switch Litig.*, 2015 WL 13820855, at *2 (S.D.N.Y. Feb. 23, 2015) ("The presumptive limit on the number of depositions that either side may take does not apply in the MDL Proceeding, and thus the MDL Plaintiffs and MDL Defendants need not seek leave under Fed. R. Civ. P. 30(a)(2) to take in excess of 10 depositions, respectively.").

Apple's proposal is further unreasonable, given that Apple has signaled it will depose each and every class representative in the MDL, meaning under Apple's proposal, there will be more MDL class representative depositions than Apple's own witnesses. Yet, particularly in antitrust cases, courts routinely recognize that proof is in the hands of defendants. *See, e.g.*, *Mylan Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, 2026 WL 201152, at *8 (W.D. Pa. Jan. 27, 2026) (quoting *Poller v. Columbia Broad Sys.*, 368 U.S. 464, 473 (1962)). This is certainly not the parity this Court had in mind. Hr'g Tr. at 33:10-11 ("I want there to be parity between plaintiffs' side and defense side so that it's fair to everyone.").



### *Apple's Position*

#### a. Production of Documents Before Deposition

The parties agree that production of documents from the custodial files of a witness should be substantially complete fourteen days prior to that witness's deposition, consistent with the Court's guidance at the April 27 Case Management Conference. *See* Apr. 27, 2026 Hr'g Tr. at 16:20–23 (suggesting that Apple substantially complete production of documents from a witness's custodial files "at least two weeks" before that witness's deposition). But Plaintiffs' suggestion that they "must" be allowed to re-depose a witness if the documents are produced without an ability to "meaningfully review and utilize" them during the deposition—even if a party substantially completes custodial productions more than fourteen days in advance—goes against the Court's clear guidance (*see* Apr. 27, 2026 Hr'g Tr. at 20:5–17 ) and is too vague and indeterminate to practically apply, allowing MDL Plaintiffs to demand an additional deposition whenever they assert they did not have a "meaningful" opportunity to use certain documents. As such, the Court should reject Plaintiffs' proposal. In addition, to avoid any further disagreements, Apple asks the Court to confirm that to the extent that they will occur, any such "redepositions" be "limited" in both scope and duration of questioning to the subsequently produced materials under the "substantial completion" standard. Apr. 27, 2026 Hr'g Tr. at 20:10–13.

Separately, the Government Plaintiffs have insisted on taking early depositions of eight Apple witnesses. In the interest of advancing the litigation and operating in good faith, Apple is making those witnesses available for the Government Plaintiffs to depose in May, June, and July. To ensure Apple can satisfy its commitment to substantially complete production of documents from the custodial files of a witness fourteen days prior to that witness's deposition in the MDL, and to avoid any unnecessary burden to the witnesses and to the parties, Apple has proposed that MDL Plaintiffs' depositions of these first eight witnesses be conducted separate from the Government Plaintiffs' depositions. Under Apple's proposal, these depositions would occur on a date in the future to be determined between Apple and the MDL Plaintiffs for each witness once Apple has substantially completed document production from that witness's custodial files. This is the most appropriate course forward because Apple and the MDL Plaintiffs are continuing to negotiate the scope of responses and search parameters for MDL Plaintiffs' first sets of document requests and, separately, MDL Plaintiffs served additional sets of document requests in February 2026 for which all parties agree Apple is not required to, and will not, substantially complete production of documents until a later point in the case. Given the unique circumstances present here, the parties agree in principle to take these witnesses' depositions in the MDL case at a subsequent date, that Apple may prepare these eight deponents between their deposition in the Government Action and deposition in the MDL, and that Apple will otherwise not prepare witnesses scheduled for other depositions between their consecutive deposition days.

Apple anticipates that as part of coordinated discovery, future depositions of Apple witnesses will be scheduled to minimize the burden on witnesses, including setting consecutive deposition dates that reasonably allow Apple to comply with the Court's order to substantially



complete production of witnesses' documents in the MDL in advance of their depositions. Future depositions of Apple witnesses should be scheduled on consecutive dates to minimize witness burden and allow for orderly preparation.  Achieving that goal—and allowing Apple to comply with the Court's order to substantially complete production of witnesses' documents in advance of their deposition—will require that the parties reach reasonable agreements about the scope of MDL Plaintiffs' outstanding Requests for Production, the search terms, and the custodians Apple will use to identify potentially responsive documents.  While the parties have agreed on the vast majority of MDL Plaintiffs' document requests, some outstanding requests disproportionately call for significant volumes of materials with no or little relevance to this litigation.  While the parties continue to negotiate search terms, MDL Plaintiffs' initial proposal would have required Apple to review over thirty million documents, based only on the custodians Apple proposed for its review in the MDL—vastly greater than the entire universe of approximately ten million documents that Apple reviewed in the Government Action.  And in addition to that, MDL Plaintiffs asked Apple to add over sixty additional custodians—more than doubling the universe of custodians from the Government Action.  More than doubling the number of custodians would unreasonably inflate MDL Plaintiffs' search term proposal even further.  All these proposals would impose undue and disproportionate burden on Apple with little, if any, material addition to this litigation.  Apple is confident the parties will be able to reach reasonable agreements on the scope of Apple's responses to MDL Plaintiffs' document requests appropriately limited to actual incremental discovery necessary in the MDL and with appropriately limited burden to Apple.

To avoid any doubt, as Apple has already communicated to MDL Plaintiffs, Apple is actively reviewing and preparing to produce documents based on its good-faith search term and custodian proposal to MDL Plaintiffs.  Given the case schedule, it will not be possible for Apple to substantially complete review and production of documents based on any significant deviation from Apple's proposal by the current deadline for the substantial completion of document productions.

**b.  Incremental Number of 30(b)(1) Depositions for MDL Plaintiffs**

The Government Plaintiffs previously represented to the Court that they intend to take no more than thirty depositions of Apple witnesses in the Government Action.  Gov't Action Case Mgmt. Conf. Tr., Mar. 18, 2026, at 11:12–24.  As previously agreed between Apple and the MDL Plaintiffs, MDL Plaintiffs are entitled to cross-notice each of those depositions if they choose to do so.  And as the Court has previously ordered, MDL Plaintiffs will have the opportunity to conduct their own deposition of each of those witnesses for seven hours on the record.  MDL Plaintiffs thus will be able to rely on: (1) the Government Plaintiffs' depositions of up to thirty Apple witnesses for up to seven hours each; (2) MDL Plaintiffs' own depositions of all of those Apple witnesses for another seven hours each; (3) Apple 30(b)(6) testimony in the Government Action; (4) incremental Apple 30(b)(6) testimony provided in the MDL; (5) and all the depositions already conducted during the Government's pre-litigation investigation (transcripts of all of which Apple has already produced to MDL Plaintiffs).  Given this significant body of testimony on which MDL Plaintiffs will be able to rely, MDL Plaintiffs'



request for twenty *additional* depositions for *each* MDL Plaintiff group is excessive.  That would potentially amount to *sixty* additional depositions if the Government takes thirty depositions of fact witnesses as it has indicated.  Apple proposes that MDL Plaintiffs collectively be allowed to take ten additional depositions of Apple witnesses.

"[A] party seeking more than ten depositions must overcome this presumptive limit by demonstrating that the additional depositions are reasonable and necessary." *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2006 WL 6487632, at *3 (D.N.J. Aug. 22, 2006).  MDL Plaintiffs cannot make that showing.[2]  They have identified two areas in which they will seek additional testimony:  issues unique to their class certification burdens and narrow areas in which they challenge different or additional conduct than the Government.  But those issues can and should be addressed during MDL Plaintiffs' cross-noticed depositions of Apple witnesses the Government Plaintiffs will depose, who are knowledgeable about Apple's sales practices and relevant aspects of the relevant lines of business.  To the extent MDL Plaintiffs perceive areas of necessary additional discovery after the Government Plaintiffs' depositions of Apple witnesses, MDL Plaintiffs' own examination of those same witnesses, and Apple 30(b)(6) testimony provided in both the Government Action and the MDL, ten incremental depositions in the MDL should be more than sufficient.  And if MDL Plaintiffs eventually develop a good-faith basis to ask to depose specific additional Apple witnesses, Apple will of course meet and confer with MDL Plaintiffs in good faith about such a concrete request.

MDL Plaintiffs assert that they need flexibility to "determine for themselves how best to expend deposition resources."  But nothing in Apple's proposal precludes Plaintiffs from allocating their resources as they see fit.  MDL Plaintiffs need only coordinate amongst one another as to which depositions they should take in each category—as the JPML contemplated when it consolidated these cases and this Court has advised the parties they must do.  The only thing MDL Plaintiffs may not do is subject Apple to a disproportionate number of party depositions.  That is the fairest and most workable framework.

In contrast, under MDL Plaintiffs' proposed structure, each of the three MDL tracks could use all of its allotted twenty depositions to examine Apple witnesses—potentially, another sixty depositions of Apple witness in the MDL, on top of thirty or more depositions in the Government Action (each of which will last for fourteen hours if noticed by both the Government Plaintiffs and MDL Plaintiffs).  That proposal would obviously impose an undue

---

[2] Plaintiffs rely only on product liability MDL cases that have no bearing on the antitrust class action case here.  None of the cases cited to justify MDL Plaintiffs' request for sixty incremental depositions explain whether plaintiffs in those cases had made the relevant showing of need for additional depositions, and Plaintiffs simply rely on case management orders that do not offer any reasoning behind the deposition cap.  *See In re Bard IVC Filters Prods. Liab. Litig.*, No. 15-02641 (D. Ariz. June 21, 2016); *In re C.R. Bard, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:10-md-02187 (S.D.W. Va. June 7, 2012); *In re General Motors LLC Ignition Switch Litigation*, 2015 WL 1382085, at *1–2 (S.D.N.Y. Feb. 23, 2015).



burden on Apple disproportionate to any legitimate needs of the litigation.  Separate caps for party and non-party depositions would actually serve Plaintiffs' stated goal of allowing each track to allocate its resources according to its distinct needs, while simultaneously ensuring that Apple can plan for a defined and reasonable number of depositions of its own witnesses.  Courts overseeing complex litigation with extensive third-party discovery have recognized the need to impose separate limits on party and non-party depositions.  *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 1:14-md-02542, ECF No. 888 (S.D.N.Y. Mar. 27, 2020) (setting 500 hours of party depositions per side and a separate aggregate cap of 300 hours for non-party depositions); *United States v. Bazaarvoice, Inc.*, No. 3:13-cv-00133, ECF No. 29 (N.D. Cal. Feb. 19, 2013) (ordering 170 total hours per side with a separate 90-hour sublimit for non-party witnesses).  The Court should provide similar certainty here, and the parties may conduct depositions accordingly.

The Court should not credit MDL Plaintiffs' false equivalence between the limit on depositions of Apple witnesses and of the named plaintiffs.  Each named plaintiff chose to sue Apple and purports to be an adequate and typical representative of one or more putative classes.  Apple is entitled as a matter of basic fairness to depose each of them as a party to this case—just as Plaintiffs are allowed to examine Apple as a corporation about their own allegations.  Their numbers provide no basis for expanding the number of percipient witnesses, and Plaintiffs point to no rule or case supporting their assertion.  By contrast, the number of Apple witnesses MDL Plaintiffs reasonably need to depose is governed by the proportionality principles of Rule 26, in light of the substantial body of testimony MDL Plaintiffs will have at their disposal before they take a single deposition in the MDL.  That is an independent question that should have an independent answer.  Under MDL Plaintiffs' approach, they could justify more depositions of Apple witnesses simply by recruiting more putative class representatives to join their case.  But of course whether there are hundreds of putative class representatives or only one (as there is in the Direct Watch Purchaser complaint in this action) makes no difference to what volume of evidence is proportional to the needs of the litigation.

## II.    Privilege Log—Logging Communications with Outside Counsel

### *Plaintiffs' Position*

The parties continue to be at impasse on the question, raised in September, of whether Apple should be excused from producing a privilege log under Fed. R. Civ. P. 26(b)(5)(A) for responsive documents and communications sent solely between Apple and its "outside counsel" that Apple is withholding on the basis of privilege or work product protection.

To recap: Apple does not dispute that it has documents and communications exchanged with outside counsel that are responsive to Plaintiffs' discovery demands. Thus, the carveout Apple seeks would, in fact, shield from view Apple's unilateral decisions of what is and is not privileged among those responsive documents. Indeed, during the meet and confer process, Apple revealed that its proposed carveout for "outside counsel" is not just for outside *litigation*



counsel, but for *any* outside counsel, such that its carveout would include documents and communications exchanged with outside counsel on the business practices and transactions at issue here, as well as other relevant information. Yet Apple is seeking a blanket exemption from logging any and all responsive documents and communications exchanged with outside counsel that Apple is withholding on a claim of privilege—including communications that primarily seek business and not legal advice or simply cc: outside counsel for "cover" and, therefore, are not properly withheld as privileged.

Bottom line, under Apple's proposal, Plaintiffs (and the Court) would not even know how much is being withheld, let alone the basic facts that Rule 26(b)(5)(A) requires when a party withholds documents on the basis of an alleged privilege. The who, what, and why that a privilege log provides is needed to actually consider and, where appropriate, challenge Apple's claims of privilege with respect to the responsive documents it is withholding.

Apple's position—and the positions it has taken since September (described below)—are unreasonable. The Court should instruct the parties to abide by the Federal Rules' default provisions regarding privilege logging and submit an amended ESI Protocol confirming the same.

Fed. R. Civ. P. 26(b)(5)(A) requires that "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Apple's "trust us" approach is contrary to this rule. That should be enough to resolve the issue.

Further, Apple's comments raise serious concerns as to its approach to privilege designations and logging. Apple claims that its carveout would only apply to a "presumptively privileged category." But *there is no presumption of privilege*. Apple misunderstands this critical issue—this is not the first time Apple has made the "presumptively privileged" argument— which makes them likely to incorrectly over-designate privilege. This should serve as a red flag that ends any consideration as to whether a privilege log is necessary. Making matters worse, Apple (remarkably) asserts that a log would not provide any useful information for the Plaintiffs or Court to scrutinize Apple's privilege claims. This ignores the entire premise of Rule 26(b)(5)(A) logs and raises serious concerns about how Apple intends to approach privilege logging generally—*i.e.*, will it make a good faith effort to provide information to scrutinize the claim of privilege or generic, conclusory descriptions designed to keep Plaintiffs and the Court largely in the dark. Protections are clearly necessary here.

The only justifications Apple has provided for ignoring Rule 26(b)(5)(A) are that (1) the Government Plaintiffs agreed to the carveout in the Government Action, and (2) the carveout would reduce Apple's burden.



As to the first, agreements between Apple and the Government Plaintiffs in a separate action cannot bind the Plaintiffs in this action. MDL Plaintiffs do not know why the Government Plaintiffs gave Apple this concession, but MDL Plaintiffs would not have done so, and will not do the same.[3] In any event, to provide an appropriate log to Plaintiffs here, Apple does not need to change anything about the log it provides to the Government Plaintiffs. It simply needs to *add* entries for the withheld outside counsel documents and communications on top of the entries it already is providing to the Government Action log.[4] The logs in the two cases were never going to be identical anyway since the scope of materials Plaintiffs are seeking in this case is broader than what the Government Plaintiffs have sought—and, therefore, there will almost certainly be additional withheld materials that were not called for in the Government case.

As to the second, the Court should reject Apple's reduced-burden justification for three reasons.

First, any burden on Apple is outweighed by the importance of the privilege log to shine a bright light on what Apple is withholding and why. It is well-settled that communications with outside counsel are not always privileged.[5] Moreover, privilege claims are narrowly construed "because the privilege obstructs the search for the truth," *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir. 1979), and they are susceptible to abuse for the same reason.

Privilege logs safeguard against such abuse. They are critical in all cases, but especially this one because Apple is a party that has been held in contempt and sanctioned by a federal court just one year ago for "abuse of attorney-client privilege designations" by withholding

---

[3] Apple portrays the privilege logging exception in the Government Action as the Court's doing, but all the Court did was enter a stipulated provision. The privilege logging exception issue was not disputed in the Government Action, and the Court did not rule in Apple's favor.

[4] Apple's reference below to logs it provided in the Government's pre-litigation investigation phase is a bit perplexing. On the one hand, Apple concedes that it *did* log communications involving outside counsel in that phase—undermining its claim of burden here. On the other hand, by definition, those prior logs covered only materials Apple withheld during the government investigation phase. The scope of discovery here is broader and Plaintiffs need that same level of logging to the extent Apple is withholding documents in this litigation.

[5] "[C]ommunications between corporate officers or employees transacting the general business of the company do not attain privileged status solely because in-house counsel or outside counsel is 'copied in' on correspondence or memoranda." *LifeScan, Inc. v. Smith*, 2024 WL 4913027, at *11 (D.N.J. May 16, 2024) (quoting *Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.*, 174 F.R.D. 609, 633 (M.D. Pa. 1997)). *See also In re Diisocyanates Antitrust Litig.*, 2025 WL 2181686, at *4 (W.D. Pa. June 3, 2025), *report and recommendation adopted*, 2025 WL 2181697 (W.D. Pa. June 20, 2025) (compelling disclosure of documents that plaintiffs identified from privilege logs as "facially appear[ing] to involve business advice rather than legal advice," after in camera review revealed that the communications were not privileged despite the involvement of outside counsel).



responsive documents and communications under the guise of "attorney-client privilege," which proceedings revealed efforts by Apple to make it appear documents were "Prepared at the request of **External Counsel**." *Epic Games, Inc. v. Apple Inc.*, 781 F. Supp. 3d 943, 996 (N.D. Cal.), *aff'd in part, rev'd in part and remanded*, 161 F.4th 1162 (9th Cir. 2025) (emphasis added). It was only by making a careful inspection of the privilege log in that case that the parties and the court were able to see that Apple intentionally "integrated the presence of legal personnel into documentation of business decisionmaking" and wrongly asserted privilege based on their presence, even though the documentation "did not involve the provision of legal advice." *Id.* at 996. In that case, Apple asserted privilege over *more than a third* of all responsive documents. *Id.* at 959. Once caught, Apple ultimately withdrew approximately 42% of its privilege calls—tens of thousands of documents that would have remained hidden but for the privilege log and challenge process. *Id.* Many of the same attorneys representing Apple in that case represent it here. Apple can hardly seek leniency given its history of privilege abuse.

Second, Apple's proposal would hardly reduce its burden. Withholding on the basis of privilege involves two steps: (1) reviewing documents to determine whether they are privileged or otherwise protected, and (2) memorializing that determination in a privilege log. There is virtually no burden associated with memorializing privilege determinations; the burden lies in the underlying privilege review that Apple must conduct regardless of whether logging is required.[6]

Third, during the meet and confer process, it became abundantly clear that Apple's "burden" position is disingenuous. Despite Plaintiffs' right to a complete privilege log, they have offered generous compromises to address burden issues, each of which Apple rejected. Plaintiffs offered to limit the scope of what needs to be logged to documents and communications exchanged with outside counsel that pre-date Apple's receipt of the CID (January 6, 2020). This would have allowed Apple to withhold—without logging—years of responsive documents and communications exchanged with outside counsel. Plaintiffs also offered that, for documents and communications exchanged with outside counsel, Apple could provide a "metadata log" *without any narratives*—a log that, for each withheld document, would include metadata showing the date, sender, recipients, subject line (if any), and privilege designation (*e.g.*, attorney-client privilege). These are fields Apple must generate during privilege review regardless of any logging requirements, and could have been shared in a few keystrokes—*i.e.*, virtually no burden. Plaintiffs also confirmed they would have agreed to a Federal Rule of Evidence 502(d) "non-waiver" order entitling Apple to clawbacks and allowing Apple to produce the metadata log without fly-specking every line to see whether the metadata somehow revealed privileged information.

---

[6] Privilege reviews involve more than just reading documents for privilege—they also require the reviewers to tag or explain the reason for any privilege designation. The memorialization step, in contrast, merely involves converting those tags or explanations into a log. The hard part is the review, not the memorialization.



But Apple rejected each of the above proposals. Clearly, Apple is not primarily concerned with the burden of privilege logging. Rather, Apple seeks to avoid the transparency and accountability that privilege logs provide.

Plaintiffs respectfully request that the Court reject Apple's proposed exception to Fed. R. Civ. P. 26(b)(5)(A) and instruct it to provide a privilege log for all documents Apple withholds on the basis of privilege or any other protection.

### *Apple's Position*

MDL Plaintiffs seek to undo what the Court has already done.  Almost one year ago, the Court granted Apple's and the Government Plaintiffs' position in its Stipulation and Order Governing Electronically Stored Information and Hard Copy Documents (the "Government Action ESI Stipulation").  Government Action Dkt. No. 264 at 18–19.  Specifically, the Court ordered that Apple may exclude from privilege logs and production "[d]ocuments or communications sent solely between outside counsel for Defendant (or persons employed by or acting on behalf of such counsel)," "[d]ocuments or communications sent solely between outside counsel for Defendant (or persons employed by or acting on behalf of such counsel) and Defendant," "[p]rivileged draft regulatory filings," and "[p]rivileged draft investigation or litigation filings."  *Id*.  Apple seeks to maintain the Court's order here.

Consistent with the approach adopted in the Government Action ESI Stipulation, and to maintain coordination, consistency, and efficiency across the two parallel proceedings, Apple asks the Court to order that Apple may omit the same categories of documents or communications from its privilege log.  *See* Dkt. No. 100-2 (Apple's proposed ESI stipulation) at 18–19.  Outside of those narrow and well-defined categories, Apple will continue to provide document-by-document privilege logs in the ordinary course.  Apple will continue to review each document within those categories and to make individualized privilege determinations. Documents within those categories that are not to be withheld as privileged but that are responsive to MDL Plaintiffs' requests will be produced and logged if redacted as privileged.

MDL Plaintiffs argue that Apple should log all of these materials so they can "consider and, where appropriate, challenge Apple's claims of privilege."  But the additional logging MDL Plaintiffs seek to compel Apple to provide would not meaningfully advance any such inquiry. The carveout is limited to communications solely between Apple and its outside counsel and to draft regulatory and litigation filings.  Those categories of documents and communications are highly likely to be privileged.  And where Apple makes an individualized determination that documents and communications in those categories are privileged, logging such documents and communications would not provide any meaningful information that MDL Plaintiffs would realistically use to challenge such privilege assertions:  the log would tell MDL Plaintiffs Apple had withheld documents exchanged with its counsel.



The Court's approval of the Government Action ESI stipulation does not reflect a "trust us" approach; it is a recognition that document-by-document logging of communications that are highly likely to be privileged would impose real burden in exchange for no realistic incremental advantage to MDL Plaintiffs.  The carveout covers a defined set of communications that, by their nature and participants, are highly likely to have been made for the purpose of obtaining or rendering legal advice.  Apple will continue to review each document and produce any document determined not to be privileged.  The carveout does not exempt Apple from making privilege determinations; it streamlines the logging of a defined and presumptively privileged category, consistent with the approach this Court adopted in the parallel Government Action.

MDL Plaintiffs' reliance on *Epic Games, Inc. v. Apple Inc.*, 781 F. Supp. 3d 943 (N.D. Cal. 2025), is misplaced.  *Epic* principally involved disputes about the substantive privilege designations applied to mixed business-and-legal communications to comply with that court's injunction and other changes to the App Store due to regulatory matters.  MDL Plaintiffs misrepresent many aspects of the proceedings in *Epic*.  As one example, the vast majority of documents reviewed by special masters in *Epic* did not involve privilege assertions invoking outside counsel.  But more importantly, nothing in the *Epic* case related in any way to the privilege logging carveout already adopted in the Government Action and that Apple proposes should be maintained in this action as well.  *In re Diisocyanates Antitrust Litigation*, 2025 WL 2181686 (W.D. Pa. June 3, 2025), is similarly inapposite—the court there compelled disclosure of documents that, after in camera review, appeared to be facially concerned with business advice rather than legal advice.  MDL Plaintiffs cite no authority saying that all communications between an outside lawyer and the lawyer's client must be logged in every case, nor does either case displace the well-established principle that Rule 26(b)(5)(A)'s logging requirement may be tailored to provide efficiency where individualized logging would yield little marginal benefit.

MDL Plaintiffs' proffered "compromises" do not solve the burden problem or cure the unreasonable mismatch MDL Plaintiffs propose between Apple's logging obligations in the MDL and its logging obligations that the Court approved in the Government Action.  MDL Plaintiffs' proposal of cutting off logging when the first Civil Investigative Demand was served in the Government's pre-litigation investigation is an arbitrary line that has nothing to do with whether a particular communication was made for the purpose of obtaining legal advice.  Communications between Apple and its outside counsel are no less privileged before 2020 than after 2020, and MDL Plaintiffs identify no basis for treating those categories differently.

MDL Plaintiffs' proposal that Apple provide only a metadata privilege log is also an illusory compromise.  Apple would still be required to review all the metadata fields on the log to ensure none of those fields themselves disclosed privileged information (such as email subject lines or attachment filenames).

MDL Plaintiffs also propose that the parties enter into a Rule 502(d) clawback order.  First, the Court has already entered such an order in this action.  Dkt. No. 124 at ¶ 43.  And while that order ensures all parties can avoid inadvertent waiver of privileged information, it does not



alleviate the significant burden to Apple of creating and reviewing any log for these narrow categories of materials that are highly likely to be privileged.  Apple of course remains willing to confer regarding targeted, practical solutions to address any specific and concrete concerns that may arise, but MDL Plaintiffs' proposals either offer nothing or simply impose exactly the burden that the carveout is designed to avoid.  And none of these compromise proposals could address the underlying unfairness of compelling Apple to undertake a burdensome logging exercise in the MDL that it is *not* required to undertake in the Government Action.

Finally, Apple confirms, as previously discussed with MDL Plaintiffs, that the privilege logs served in connection with the Government Investigation (regarding CID documents) do not omit outside-counsel communications or other categories of withheld documents.  All privilege assertions relating to those documents are reflected on those logs, which are identical to the privilege logs served on the Government in connection with the Government Investigation.

For the foregoing reasons, Apple respectfully requests that the Court approve the carveout Apple proposed in the Parties' ESI stipulation, consistent with the Court's order in the parallel Government Action.

## III.  Rule 30(b)(6) Deposition

### *Plaintiffs' Position*

Apple has failed to present and prepare a Rule 30(b)(6) witness on data issues relevant to the MDL Plaintiffs, despite the Court's requirement that Apple provide corporate testimony on data issues to streamline discovery.

The Government Plaintiffs and each MDL Plaintiff group issued Rule 30(b)(6) deposition notices to Apple about data- and discovery-related issues. Apple designated two witnesses to testify about these four notices and Apple's many repositories which contain data and information responsive to the Plaintiffs' discovery requests. Apple's first Rule 30(b)(6) witness was deposed on April 29–30, 2026. The second Rule 30(b)(6) deposition is scheduled to occur on May 14–15, 2026.

Direct Purchaser Watch Plaintiffs and Direct iPhone Purchaser Plaintiffs each requested granular transaction data necessary to identify the names of all direct purchaser class members, their contact information, and specific transactions and prices paid, among other data relevant to class certification and damages. Indirect iPhone Purchaser Plaintiffs requested this same data as to indirect purchaser class members. Each plaintiff group noticed topics for the Rule 30(b)(6) deposition which track these MDL-specific data issues. This information is undisputedly relevant to the MDL Plaintiffs' claims and has not been the focus of data discovery for the Government Plaintiffs, who are not required to satisfy Rule 23's class-certification requirements or prove damages.



Apple's first Rule 30(b)(6) witness was not adequately prepared to testify about these topics, even though Apple had represented that the witness would have responsive knowledge and testimony. At that deposition, the MDL Plaintiffs learned that Apple maintains data responsive to their requests in data systems for which Apple has not even provided data samples, impairing the MDL Plaintiffs' ability to understand and ask questions about these systems. Apple has *still* not provided samples for these data systems, in advance of the second Rule 30(b)(6) deposition. Similarly, Apple's corporate witness was not prepared to testify about financial data relevant to the Indirect Purchaser Plaintiffs' claims.

The parties are continuing to meet and confer on this issue. The MDL Plaintiffs expect that Apple will adequately prepare its second Rule 30(b)(6) witness on these topics, in compliance with its obligations under the Federal Rules and this Court's instructions, and provide responsive data samples before this deposition. Given that the deposition will occur before the Court's conference, however, the MDL Plaintiffs wish to alert the Court to this potential dispute, and respectfully reserve the right to seek leave of Court to supplement the issues in dispute pending the outcome of the May 14–15 Rule 30(b)(6) deposition.

### *Apple's Position*

MDL Plaintiffs' arguments are premature and incomplete.  They are premature because they reflexively make the claim that Apple's Rule 30(b)(6) testimony is insufficient *before the second witness on the topics has even testified*.  Apple has already informed MDL Plaintiffs that the identified second witness will be prepared to testify regarding the process and data that Apple has to identify direct purchasers of its products (i.e., data relevant to "identify the names of all direct purchaser class members").  MDL Plaintiffs know and acknowledge that such testimony is scheduled for May 14 and 15.

And MDL Plaintiffs fail to acknowledge that their notices—which are supposed to streamline discovery—sought information on more than 100 topics and subtopics across a significant number of data types not mentioned in their statement, including what Apple may have by way of financial data, survey data, app transaction data, app usage data, device switching data, device purchase data, service purchase data, user characteristics data, retail price data, third-party data on retail sales, linking of indirect purchasers within data, and A/B testing data.  This extensive and diverse list required Apple to prepare two separate Rule 30(b)(6) witnesses.  The first witness whom MDL Plaintiffs already deposed was knowledgeable and testified at length on a number of these topics.  Among other things, he spoke to the structure and contents of Apple's financial data, and data that associates devices with user accounts.  The witness prepared extensively with counsel and by consulting with other subject-matter experts within Apple to supplement his own expertise and work experience.  Apple has demonstrated its good faith and diligence in preparing one data 30(b)(6) witness already.  MDL Plaintiffs should not complain about Apple's efforts to prepare these data 30(b)(6) witnesses until at least after they have deposed the second deponent, who Apple has already informed them will testify about the topic they focus on here.



In contrast to Apple's good faith approach, MDL Plaintiffs have made unreasonable and belated demands—for example, sending more than 130 unnoticed questions for Apple's first witness just days before his deposition. They have insisted on over twenty combined hours of testimony, and now they complain about the preparedness of Apple's witnesses to cover the noticed topics before even learning whether the information and testimony Apple is willing to provide will satisfy their requests.

## IV.    Document Processing & Imaging Errors

### *Plaintiffs' Position*

Apple's productions contain errors that omit or obscure discoverable information—omitting, garbling, blurring, blacking out, shrinking, and reformatting text, images, and sometimes entire pages. Plaintiffs asked Apple to identify these errors and provide replacement images; Apple refused. Apple instead proposed that *Plaintiffs* identify errors for Apple's consideration. Plaintiffs rejected this proposal because it would improperly shift Apple's burden onto Plaintiffs, and because Plaintiffs cannot identify errors invisible without native files for comparison. Plaintiffs then proposed that if Apple did not want to identify its own errors, it could reproduce all documents as natives so Plaintiffs could identify errors and possess usable files. Apple refused. Plaintiffs now ask the Court to order Apple to provide native files of all production documents except those containing redactions.

Federal Rule of Civil Procedure 34(b)(2)(E)(ii) requires ESI to be produced "in a reasonably usable form or forms" or else "in a form or forms in which it is ordinarily maintained." The Advisory Committee Notes explain that a producing party may not "convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use."

Watch Plaintiffs have found production errors in approximately one of every twenty documents reviewed. This figure counts only visible errors—it does not account for errors invisible without a native file for comparison, such as omitted pages or text. The actual error rate could be much higher.

These errors hamper review: images with missing or obscured material are less searchable, harder to parse, and make issue tagging more time consuming. If Apple's errors increase review time by just one second per already-produced document, the result is an additional 1,000 hours of review. And they will impair the parties' ability to use documents in depositions or at trial—indeed many documents with errors are custodial documents of witnesses whose depositions are imminent, including one witness whose deposition will begin as soon as May 28, 2026.

Apple does not deny this is a problem, but nevertheless proposes merely to (1) produce natives only of Numbers and Keynote files (Apple's version of Excel and PowerPoint) with



scaling problems—something already required under the ESI Order (Dkt. No. 100-2 at 10); (2) "reinforc[e] protocols with [its] contract reviewers"; and (3) consider providing replacement images for errors Plaintiffs identify. T. Bedel Apr. 30, 2026 email. This proposal is insufficient, improper, unworkable, and unreliable.

First, Apple's proposal improperly places the burden of error identification on Plaintiffs. Rule 34(b)(2)(E)(ii) requires the *producing* party to produce usable material or natives—not the receiving party. What Apple refuses to do on burden grounds—review its own production for errors—is exactly what it asks Plaintiffs to do. Moreover, Plaintiffs cannot reliably identify errors imperceptible without a native for comparison.

Second, Apple's "reinforc[ed]" contract reviewer protocols would not fix the problem. They would not correct any already-produced errors, nor prevent all prospective ones—even Apple admits its reviewers "cannot detect [certain types of errors] on the pre-production side." T. Bedel Apr. 30, 2026 email; *see also* Apr. 17, 2026 Meet & Confer (explaining that Apple's reviewers cannot prevent certain errors because they do not review the production image). Moreover, Apple made this promise before—*see* D. Epstein Mar. 13, 2026 letter (memorializing Apple's statement at a March 6, 2026 meet & confer that it "provided additional direction to document review teams to try to catch document processing errors before they are produced")—and it did not fix the problem; Apple continues to produce documents with the same types of errors.

Third, sanctioning Apple's framework would create perverse incentives for producing parties to seek (or decline to fix) poor vendor quality. Apple blames its vendors for the errors, but those errors impair *Plaintiffs* while Apple gains a strategic advantage. Apple has an established pattern of blaming vendors for deficiencies that advantage it—including in this case (blaming its vendor for slow reproduction of Government Investigation documents) and in *Epic v. Apple* (blaming its vendor for over-designating privilege, an excuse the Epic Court rejected).[7] If Apple can blame its vendor while Plaintiffs bear the burden, Apple will never fix its problems, and other producing parties will view this as a successful strategy.

---

[7] *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal. Apr. 30, 2025), ECF No. 1508, at 66 ("In its defense, Apple blames everyone but itself [. . .]. The first to be faulted are Apple's third-party document review vendors, Deloitte and Consilio. Apple claims that it appropriately instructed those teams on designating for privilege and argues that those instructions reflected Ninth Circuit precedent. Although Apple's outside counsel purportedly gave 'weekly and often daily feedback to the vendor and outside counsel quality control teams,' Apple did not catch, *and should have caught*, those errors. The notion that Apple mistakenly over-designated documents is not credible. Almost all 'mistakes' and 'inconsistencies' flow in one direction: toward withholding and redacting.") (internal citation omitted) (emphasis original).



In contrast, Plaintiffs' proposal—providing natives of all documents without redactions—is straightforward and involves virtually no burden. Apple would simply exclude documents with redactions, click "export" as to the rest, and either upload them or send them on hard drives.

Plaintiffs' proposal would also resolve other issues that would expedite review and reduce burden on both parties. For example, Apple represented that certain hyperlinked URLs are hidden from Plaintiffs for no reason other than that they are visible only in native; production of those natives would therefore obviate the need for Plaintiffs to request, and Apple to provide, those URLs on a case-by-case basis. Apple also produced certain color documents in black and white, obscuring material that conveys information and enables more efficient review; native production would solve that entirely. Additionally, many of Apple's documents were produced in unusual formatting that makes them harder to parse; native production could resolve that as well.

Now, however—after months of written correspondence and meet & confers on the subject—Apple for the first time raises security vulnerabilities as a reason it opposes producing natives. But Apple's rationale is all fearmongering and obfuscation.

Apple states that the "vast majority of Apple's production consists of email[8] communications" that "routinely contain [. . .] live hyperlinks to internal [content]," some of which "carry edit—not merely view—permissions, raising the prospect that receiving parties or bad actors could exploit, alter, or delete Apple files." But unless Apple does not utilize user permissions (the most basic form of data security), receiving parties could do no such thing because Apple has not made them authorized users. If Apple does not restrict editing permissions to authorized users, it would be inconsistent with the company's marketing as an industry leader in security, and with Apple counsel's own statements: In March 6 and April 3, 2026 meet & confers, Apple counsel objected to reviewing non-public hyperlinked documents for responsiveness because, they claimed, their reviewers lacked access permissions and could only access hyperlinked documents by tracking down someone at Apple with access (commonly, the document's author). MDL Plaintiffs considered the possibility that some subset of documents may not use user permissions, and so asked Apple counsel if they were "aware of any hyperlinks to Apple systems that do not utilize user permissions, such that anyone with the link could alter or delete Apple files?" May 12, 2026 Meet & Confer. Apple's counsel said they were not able to answer the question. *Id.*

Apple next raises the specter that "[n]ative emails may also include attachments with executable or auto-executing content that present security risks," like "an Apple engineer attaching a non-public configuration profile or signed certificate," which could "expose the underlying signing infrastructure or grant the holder access to internal services." But Apple has *already produced hundreds* (if not more) of such documents in image form, which are virtually indistinguishable from their native versions. Certificates, for example, are just long strings of

---

[8] Apple does not raise any concern with respect to non-email material.



letters, numbers, and symbols that act as a key when applied to their corresponding application. That long string is the potentially sensitive part, and it looks the same whether it comes in an image or native file. In other words, if Apple were truly concerned about these materials, it would not have already produced them, and producing them in native presents no meaningful security difference. In any event, configuration profiles, certificates, and similar files all have easily identifiable file extensions (*e.g.*, .crt, .cer, .xml, etc.) that would allow Apple to quickly identify and remove them from the production, and MDL Plaintiffs would not object.

Last, Apple threatens that the extremely protective Discovery Confidentiality Order this Court entered might not be protective enough for Apple, and "would likely require implementation of additional protections." Apple drives this point home by contending that "only twenty-three of approximately sixty-eight plaintiffs' firms involved over the lifetime of these lawsuits have self-certified compliance with the data security provisions of the Discovery Confidentiality Order." This is pure fearmongering. Non-compliant firms do not receive *any* Protected Material, whether image or native. And the reference to 68 firms is just silly—it includes firms terminated from the litigation before the Discovery Confidentiality Order was even in place and firms with no involvement in discovery at all.

For all these reasons, Plaintiffs respectfully ask the Court to order Apple to provide native files of all production documents that contain no redactions.

### *Apple's Position*

Apple continues to produce documents on a rolling basis and continues to meet and confer with MDL Plaintiffs in good faith on the discrete production-related issues they have raised. Apple respectfully submits that this issue is not ripe for the Court's intervention. In each instance, Apple is following the procedures the Court already approved in the Government Action ESI Protocol—procedures the Parties agreed should govern this MDL to maintain coordination, consistency, and efficiency across the two parallel proceedings. *See* Dkt. No. 100-2 (the Parties' proposed ESI stipulation); Government Action Dkt. No. 264. MDL Plaintiffs' sweeping demand—that Apple reproduce in native form every document in its production that is not redacted—would impose significant additional burden and substantial risk to Apple, as described below, with little corresponding benefit.

The discussion below illustrates why protective orders and ESI stipulations routinely specify for production of documents—particularly emails—to be in image form, rather than in native form. For example, the Stipulation Establishing Electronic Discovery Protocol posted on this Court's Discovery webpage, provides as its general rule that "ESI that can be readily converted to TIFF documents will be produced as TIFF documents," with narrow native carve-outs only for spreadsheets, presentations, audio/video, and databases—not email. Stipulation Establishing Electronic Discovery Protocol, *In re Benicar (Olmesartan) Prods. Liab. Litig.*, No. 1:15-md-02606 (RBK/JS) (D.N.J. July 17, 2015), https://www.njd.uscourts.gov/sites/njd/files/



ESIProt.pdf. Like Apple's proposal, this Court's standard ESI protocol permits document-specific native re-production only "upon good cause shown" by the receiving party.

MDL Plaintiffs materially overstate the issue. In response to issues identified by MDL Plaintiffs, Apple has instructed and retrained its reviewers to identify and flag the specific processing artifacts during document review so that processing artifacts can be remediated before production. Apple has also committed to investigate and replace, as appropriate, any documents MDL Plaintiffs identify as containing processing artifacts.— Additionally, in response to MDL Plaintiffs' requests Apple will produce all spreadsheets and presentations in native format.

MDL Plaintiffs' proposal—that Apple reproduce its entire production in native format—is not a tailored response to a documented problem; it is a wholesale rewrite of the ESI framework portions that the Parties have already agreed to and that the Court has already ordered in the parallel Government Action. The vast majority of Apple's production consists of email communications. Producing email in native file format carries unique and recognized risks that imaged production avoids. Specifically, Apple's emails routinely contain non-responsive live hyperlinks to internal collaboration tools and data, calendar and meeting invitations, embedded objects with paths to internal resources, remote-loaded images, and other active content. In native form, these create working pathways into Apple's internal systems and expose information about Apple's internal infrastructure that has no bearing on the issues in this litigation. Some of those links carry edit—not merely view—permissions, raising the prospect that receiving parties or bad actors could exploit, alter, or delete Apple files, creating a host of concerns. Native emails may also include attachments with executable or auto-executing content that present security risks to receiving parties and to Apple alike. For example, a native internal email from an Apple engineer attaching a non-public configuration profile or signed certificate could, if produced natively, expose the underlying signing infrastructure or grant the holder access to internal services that have no relevance to this litigation. Conversely, a native email from Apple's App Review team attaching a developer-submitted binary could deliver auto-executing code directly into a party's machine or network. Image-based production eliminates both risks at the source.

These risks are heightened in this multi-firm-plaintiff coordinated proceeding. The data security protections Apple sought in the Discovery Confidentiality Order were predicated on the expectation of imaged productions. Dkt. No. 124 at ¶ 40. The introduction of email natives would significantly increase the risks of producing documents in discovery and would likely require implementation of additional protections to control those additional risks. (Notably, to date, only twenty-three of approximately sixty-eight plaintiffs' firms involved over the lifetime of these lawsuits have self-certified compliance with the data security provisions of the Discovery Confidentiality Order.)

Again, MDL Plaintiffs' reliance on *Epic* is misplaced. Apple is not blaming its vendors for processing artifacts; it has acknowledged that processing artifacts have occurred and has implemented concrete remediation steps: reviewer retraining, reviewer-side flagging,



replacement images of processing artifacts MDL Plaintiffs identify, and native production of the document categories most likely to be affected. And while MDL Plaintiffs' indiscriminate estimate that approximately one in twenty documents contains a "visible" processing artifacts, they offer no assessment of how many of those purported issues actually interfere with MDL Plaintiffs' review.

Apple respectfully submits that the appropriate path forward is the simple one Apple has already proposed: continued reviewer-side identification and flagging of processing artifacts for imaging replacement, replacement documents where MDL Plaintiffs identify specific issues, native production of spreadsheets and presentations, and continued meet-and-confer on any specific category of documents for which the imaged format genuinely impairs usability. The Parties should be permitted to continue conferring, and Apple stands ready to address any specific, concrete dispute the parties cannot resolve.

## V.    Negotiations Regarding Plaintiffs' RFPs to Apple

### *Plaintiffs' Position*

MDL Plaintiffs wish to address the status of document discovery and search term negotiations with the Court. MDL Plaintiffs understand that Apple's position is that it will not be able to produce documents responsive to MDL Plaintiffs' RFPs by the June 15, 2026 substantial completion deadline. Apple has further failed to provide a search term counterproposal for the vast majority of the RFPs for which MDL Plaintiffs provided a proposal over a month ago.

On March 13, 2026, Apple shared its proposed list of search terms and custodians with Plaintiffs. Plaintiffs responded with proposed revisions (including coordinated, jointly proposed searches for overlapping RFPs) and additional custodians on April 16. Apple responded with clarifying questions on April 28, which Plaintiffs answered on May 1.

On May 12, 2026—approximately one month after MDL Plaintiffs sent their combined proposal—Apple responded with its counterproposal, which offered incremental search terms that address only 43 of the 261 RFPs served by the MDL Plaintiffs. Apple also stated that it would not produce documents responsive to MDL Plaintiffs' RFPs by the June 15 substantial completion deadline. Furthermore, Apple rejected all of MDL Plaintiffs' proposed additional custodians.

During a meet and confer held on May 13, Apple said that MDL Plaintiffs needed to identify which of the remaining 218 RFPs MDL Plaintiffs wanted a counterproposal for, and then Apple would consider sending a counterproposal. Apple's justification for failing to provide a counterproposal for all of the RFPs is twofold. First, Apple falsely claims that "MDL Plaintiffs have acknowledged that [63 of their] requests are identical to or subsumed by the Government Action," and that they will not "re-open negotiations" as to those requests. But MDL Plaintiffs have consistently maintained that—though their first 63 requests use the same language as the



Government Plaintiffs' requests—they are substantively different because the scope of the cases are different, MDL Plaintiffs propounded them with the explicit purpose of ensuring that they could obtain *different* discovery than what the Government Plaintiffs agreed to receive (otherwise they would have been unnecessary),[9] and MDL Plaintiffs are not bound by any compromises the Government Plaintiffs made in their negotiations. Second, Apple contends that MDL Plaintiffs' counterproposal yielded too many hits—although Apple never responded to MDL Plaintiffs' April 28 email asking whether the reported hits were all unique (*i.e.*, were de-duped, were not counted multiple times for each custodian holding the otherwise identical document, and were incremental to Government Investigation and Government Action documents). MDL Plaintiffs believe that, if the hit counts are too high, the solution is to continue negotiating the search terms for all of the RFPs for which the parties have reached agreement. MDL Plaintiffs further note that it would be much more efficient for Apple to propose search terms that result in a more acceptable number of hits than for MDL Plaintiffs to take a stab in the dark at what new search terms will result in that acceptable number.

Apple's failure to provide a search term counterproposal for the vast majority of the RFPs that MDL Plaintiffs served over a month ago should not be a basis for deferring the substantial completion deadline. MDL Plaintiffs ask the Court to reaffirm that Apple must comply with the substantial completion deadline, and order Apple to continue negotiating search terms in time to meet it. MDL Plaintiffs are willing to continue negotiating in good faith, and hope that Apple can send a counterproposal for the remaining RFPs in less time than the month that it took for Apple to send a proposal for 43 RFPs.

### *Apple's Position*

Apple has engaged with MDL Plaintiffs in good faith on the negotiation of search terms, and MDL Plaintiffs did not indicate that they intended to submit argument on this topic until 4:00 p.m. ET on the day of this filing.

The MDL Action was centralized in this district to take advantage of "common discovery" with the Government Action. JPML Dkt. No. 116. As MDL Plaintiffs have acknowledged, "private plaintiffs' complaints overlap in substantial part with those raised in the Government Action." Dkt. No. 61 at 4; see also Dkt. No. 139 at 7-8 ("In every material respect, DIP's allegations parallel the allegations [made by the Government]," and "[t]here is no daylight between the DIP Complaint and Government Complaint with respect to the relevant markets and Apple's anticompetitive conduct in those markets").

Apple's position has been—and continues to be—that Apple will prepare a set of additional search terms ("MDL search terms") targeted to identifying documents MDL Plaintiffs assert are relevant to their cases, but which they say the Government Plaintiffs did not seek.

---

[9] The search terms the Government Plaintiffs agreed to, in many instances, omit terms that are critical to MDL Plaintiffs' cases.



Apple circulated its proposed MDL search terms two months ago on March 13, 2026 ("Apple's March 13 Proposal").[10]  Given that the parties are continuing to negotiate search terms and custodians, Apple anticipates substantially completing by June 15 the production of documents, except those undergoing privilege review, based on Apple's March 13 Proposal.  Insofar as the parties agree upon additional search terms that generate a significant additional volume of documents for review, Apple anticipates that it will have to produce those documents on a rolling basis, including after June 15.

MDL Plaintiffs' first set of RFPs consisting of 205 total requests (270 including subparts) was served on December 17, 2025.  MDL Plaintiffs' first 63 requests are parallel to Government Plaintiff's RFPs.  MDL Plaintiffs have acknowledged that these various requests are identical to or subsumed by the Government Action.  For these parallel RFPs, Apple has in multiple correspondence informed MDL Plaintiffs that it will rely on the negotiated search terms from the Government Action for these RFPs.  Apple's review burden in the Government Action is significant, approximately 10 million documents (including families).  Apple's position in the MDL Action is that Apple will not re-open negotiations related to the search terms Apple has agreed to in the Government Action, but to the extent MDL Plaintiffs identify substantive gaps that are not covered by the Government Action search terms, Apple is amenable to negotiating additional search terms.

Apple has worked diligently to move the negotiation process forward with MDL Plaintiffs.  MDL Plaintiffs' April 16 Counterproposal to Apple's March 13 Proposal contains at least seven syntax errors or missing information.  Apple asked for clarification on MDL Plaintiffs' proposals, requesting clarification on these undefined terms and syntax errors, to which MDL Plaintiffs responded on May 1.  In the spirit of moving search term negotiations forward, Apple began running MDL Plaintiffs' search terms, despite the undefined terms and syntax errors, and informed MDL Plaintiffs that their proposal results in approximately 22.5 million documents and 30.3 million documents with families—in other words, MDL Plaintiffs' proposed search terms would more than triple the scope of document discovery.  MDL Plaintiffs also proposed changes to the Government Action search strings for various parallel RFPs.  This goes against the JPML's purpose of centralizing the MDL Action.  Moreover, this is counter to MDL Plaintiffs' own acknowledgment that their complaints overlap "in substantial part" with the Government Action.  Dkt. No. 61 at 4; *see also* Dkt. No. 139 at 7-8.  On May 12, Apple sent a reasonably tailored counterproposal to MDL Plaintiffs' April 16 counterproposal containing additional search terms tailored to address the narrow gaps between the Government Action search terms and MDL Plaintiffs' RFPs in this action.  This counterproposal would result in adding approximately 97,968 documents and 872,077 documents, including families.

For these reasons, the record demonstrates that Apple has engaged in good faith throughout the search term negotiation process. Any delay in finalizing search terms is

---

[10] Subject to the withdrawal of the search terms for iPhone 96, 97, and 102 made in Apple's correspondence on April 21.



attributable to MDL Plaintiffs' overbroad demands, not to any dilatory conduct by Apple, and Apple remains on track to substantially complete production of documents, except for those undergoing privilege review, based on its March 13 Proposal by June 15, 2026.

*    *    *

Thank you for Your Honor's continued attention to this matter.

Respectfully submitted,

*/s/ J. Taylor Hollinger*
J. Taylor Hollinger

*Interim Co-Lead Counsel*
*Indirect iPhone Purchaser Plaintiffs*

cc:    All Counsel of Record (via ECF)