LITE DEPALMA GREENBERG & AFANADOR

570 Broad Street / Suite 1201 / Newark, NJ 07102
**P:** 973.623.3000 / **F:** 973.623.0858 / litedepalma.com

Newark ▮ Philadelphia ▮ Morristown

July 28, 2026

**VIA ECF**

Honorable Leda Dunn Wettre, U.S.M.J.
U.S. District Court for the District of New Jersey
50 Walnut Street
Newark, New Jersey 07102

Re: *In re Apple Inc. Smartphone Antitrust Litigation*, 2:24-md-03113-JXN-LDW
Direct and Indirect iPhone Purchaser Plaintiffs' Letter Brief Regarding Expedited Joint Notice of Impasse, Dkt. 246

Dear Judge Wettre,

Pursuant to ¶5 of the Court's Special Master Appointment Order, and the Court's order directing the parties to file letter briefs, Dkt. 249, Direct and Indirect iPhone Purchaser Plaintiffs ("Phone Plaintiffs") respectfully submit this letter brief regarding the issues raised in the expedited joint notice of impasse, Dkt. 246.

## I. Apple Must Produce Global Documents for Relevant Requests for Production.

Phone Plaintiffs have requested that Apple produce documents related to its conduct outside of the United States in connection with a handful of RFPs. Apple has refused, and Your Honor should now overrule those objections. Apple implemented elements of the challenged conduct in the United States *after* observing consumer patterns abroad; Apple has modified its challenged conduct in various ways in other countries; and differences in Apple's conduct and consumer adoption of the iPhone in foreign markets provide natural experiments about the impact of the challenged conduct in the United States.

Apple objects to producing these documents based on relevance, but a plain reading of Plaintiffs' complaints and even Apple's own documents disprove that claim. Apple is a global corporation with sales and operations around the world—its decision-making is naturally informed by global considerations, and policy variations across the globe inform Apple's arguments about its conduct and defenses here. The mere fact that the United States is the relevant market in a case does not necessarily limit discovery to the United States. *United States v. Dentsply Int'l, Inc.*, WL 654286, at *5 (D. Del. May 10, 2000).

In sum, Your Honor should compel Apple to produce documents responsive to RFPs 11, 31, 34 and 79 on an international basis.

### A. Request No. 11

RFP 11 seeks all documents related to any actual or potential barriers to entry, expansion, or repositioning related to Smartphones, mobile operating systems, or any Identified Product or Service (i.e., the conduct, among others, which Plaintiffs challenge as anticompetitive). Although Apple concedes the relevance of these documents on a global basis with respect to Smartphones, it has refused to produce documents on a global basis for Identified Products and Services.[1]

Apple's position is unreasonably narrow. Plaintiffs' case is premised on allegations that Apple's conduct related to its Identified Products and Services has allowed it to monopolize the U.S. smartphone market. Apple's attempt to distinguish conduct related to Identified Services and Products in foreign countries—as opposed to conduct specifically directed at Smartphones—that can be used to insulate Apple's position in smartphone markets as somehow irrelevant disregards Plaintiffs' claims about *how* Apple has achieved its monopoly in the U.S. For example, Plaintiffs allege that Apple uses the iMessage application to aid its monopoly and lock consumers into its ecosystem. *See, e.g.,* ECF No. 109 at ¶113. Documents evidencing how Apple responds to competition from WeChat in China would be probative on why Apple has not been able to obtain similar iPhone market share in China compared to the U.S., where Apple treats WeChat differently. Apple's proposed limitation on global production disregards Plaintiffs' complaints, which specifically discuss the relevance of the Identified Products and Services to how Apple has obtained and maintained its monopoly, as well as Apple's own documents which demonstrate this type of relationship.[2]

---

[1] Identified Products and Services include Cloud Streamed Games, Messaging Systems, Digital Wallets and Payment Apps, Super Apps, and Smartwatches.

[2] For example, Apple has acknowledged the specific hypothetical that Plaintiffs discuss here: [redacted] Ex. 1 (APLAPPDOJ2-01783948).

**B. Request No. 31**

RFP 31 seeks documents relating to smartphone customer segments, including in global markets. These documents would include Apple's analysis of how often smartphone users switch between iPhones and other smartphones; and these types of country-by-country analyses could aid Plaintiffs in understanding how differences in Apple's alleged anticompetitive conduct affects switching. In a 2017 presentation, for example, [redacted][3] This reflects Apple's understanding of foreign markets, informs how changes in Apple's features across the world shape user preferences and demand, and can be used to support Plaintiffs' claims and damages models.

**C. Request Nos. 34 and 79**

The same logic regarding the relevance and comparative value of foreign documents applies to Request 34, which seeks information regarding the use or potential use of web apps or third-party app stores, and Request 79, which seeks documents regarding the actual or potential impact of offering third-party apps. Here too, a worldwide scope is appropriate because expansion, repositioning, or barriers to entering the relevant markets in other countries—where Apple is unable to engage in some of the conduct that it engages in within the United States—informs whether that conduct here is anticompetitive. Such documents may also rebut potential defenses by Apple, including Apple's position that third-party app stores and direct-downloading of third-party apps pose security risks. As one example, some countries require Apple to permit sideloading (i.e., direct downloads of applications from the internet or other non-Apple App Store sources). Documents related to barriers to entry into the relevant markets where sideloading is permitted are useful counterfactuals. These documents are not just hypothetical [redacted]

**D. The Relevance of Plaintiffs' Requests 11, 31, 34, and 79 are Not Subsumed by Request No. 25**

Apple argues that RFP 25, which seeks documents related to the actual or potential effects of ending or altering any aspect of the Alleged Conduct, and for which Apple has agreed to produce documents on a global scale, encompasses any relevant document that may be responsive to the above Requests. But unlike the above Requests, RFP 25 is limited to the "ending or altering" of conduct. In situations where there is no change in conduct, like the existence of WeChat in China which has been an ongoing concern, the above Requests provide the breadth that RFP 25 does not. Moreover, RFP 25 largely fails to capture the types of relevant documents discussed above that are responsive to RFP 31, which seeks analyses related to customer segments and is not tethered to the ending or altering of the Alleged Conduct.

In sum, Plaintiffs respectfully request that Your Honor compel production of global materials responsive to all subparts of RFP No. 11, as well as RFPs Nos. 31, 34 and 79.

[3] Ex. 2 (APLAPPDOJ2-03010842 and attachment) at 850, 852.

## II. Apple Must Produce Documents Relating to Google's Protections for Privacy and Security and Apple's Decision to Make Google the Default Search Engine in Safari

At issue are Phones RFPs 102 and 103 which seek all documents related to Apple's decision to make Google the default search engine in Safari, and documents relating to Google's protections (or lack thereof) for user security and privacy compared to the protections of other search engines; and documents sufficient to show the payments that Apple has received from Google in relation to this decision.

These documents are relevant. Apple has already argued at length that the challenged conduct was part of Apple's procompetitive goal of "emphasizing privacy and security." ECF 123-1 at 5. Documents that can rebut that argument are relevant. Apple does not dispute that broadly, but maintains that documents about Apple's agreement with Google are too attenuated. They are not. Apple entered into an agreement with Google to make its search engine the default search for Safari, the iPhone's web browser. Apple's consideration of privacy and security when making that decision is relevant to its privacy and security argument here: if Apple argues that the challenged conduct is necessary to differentiate itself from Android in terms of privacy and security, Apple's decision to allow Android's developer's products to become a key part of iPhone software is relevant. "Pursuant to Rule 26(b)(1) of the Federal Rules of Civil Procedure, '[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.'" *In re Gerber Probiotic Sales Pracs. Litig.*, 306 F.R.D. 527, 528 (D.N.J. 2015). "To be relevant, the information sought must at least be 'reasonably calculated' to lead to admissible evidence." *Id.* (citing Fed.R.Civ.P. 26(b)(1)). "[R]elevance is a broader inquiry at the discovery stage than at the trial stage," *Leibholz v. Hariri*, 2008 WL 2697336, at *2 (D.N.J. June 30, 2008) (citing *Nestle Foods Corp. v. Aetna Cas. and Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J.1990)), and courts consistently construe Rule 26 liberally. *See e.g. Gerber*, 306 F.R.D. 527, 528.

RFPs 102 and 103 are relevant to Plaintiffs' claim that "Apple chooses to make the iPhone private and secure when doing so benefits Apple; Apple chooses alternative courses when those courses help Apple protect its monopoly power." DPP Am. Complaint ¶ 187. *See also* IPP Am. Compl. ¶ 187. Apple's decision to make Google the default search engine in Apple's proprietary web browser, which is a default application on the iPhone, is an example of Apple choosing "alternative courses," where Apple chooses to benefit itself versus the privacy and security of its users, which Plaintiffs have a right to explore under Rule 26.

Plaintiffs seek information about the security of the search engine that Apple is affirmatively steering its customers towards and the monetary payments Apple receives from Google for making this choice. The Phone Plaintiffs' complaints plainly include specific allegations regarding Apple's behavior, including that Apple chose Google as the default search engine knowing it is less secure than other search engines and did so for billions of dollars of payments from Google. DPP Am. Compl. ¶¶ 12, 185; IIP Am. Compl ¶ ¶ 35, 184. In addition, Apple is presenting privacy and security concerns as procompetitive justifications to rationalize these decisions. Ex. 3 (APLDOJLIT07965818) at '5829, '5837. Sherman Act Section 2 claims involve a burden shifting framework whereby "the party seeking to impose liability must initially provide evidence of the anticompetitive nature of a defendant's conduct. Once established, the defendant then has the burden of proffering non-pretextual procompetitive justifications for its conduct, and the plaintiff may then either rebut those justifications or demonstrate that the

anticompetitive harm outweighs the procompetitive benefit." *United States v. Apple, Inc.*, 2025 WL 1829127, at *12 (D.N.J. June 30, 2025) (citing *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co*., 838 F.3d 421, 438 (3d Cir. 2016)). Plaintiffs cannot effectively rebut Apple's privacy and security justifications without the full context of how iPhone users get exposed to privacy and security risks.

Taken together, Apple's decision to set Google search as the default search engine, plus the payments it receives, are plainly relevant to the case. *See Gerber*, 306 F.R.D. at 528 (Rule 26 allows for discovery which "encompass[es] any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case."). This is particularly true of Apple's asserted procompetitive justifications of privacy and security, where Apple's behavior in how it understands and makes decisions on the inclusion of certain apps or settings, such as the default search engine, gets to the core of their justification. Indeed, Apple's own documents support the allegations that there are privacy and security risks associated with Apple's selection of Google as Safari's default search engine despite the existence of more secure alternatives. Am. Compl. ¶ 185; IPP Am. Compl. ¶ 184. For example, Apple has identified itself as different from the rest of big tech in the documentary record, because it is not a "data-driven business," although Apple has identified Google as a data-drive business that explicitly devalues users' privacy, which directly calls into question why Apple would voluntarily direct its users to Google, rather than more secure search engines. Ex. 4 (APLCIDLIT01022309) at '2316.

In addition, the payments Apple has received from Google in exchange for potentially compromising user privacy and security is relevant context for understanding whether Apple's proffered procompetitive business justifications are legitimate or not. If Apple compromised user privacy and security for a certain dollar amount while "protecting" it only in instances where the decision is profit-maximizing, that would be evidence supporting Plaintiffs' theory that Apple uses privacy and security as a sword and shield to advance its monopoly power, consistent with the allegations in each complaint. DPP Am. Compl. ¶ 180-188; IPP Am. Compl. ¶ 35.

Therefore, RFPs 102 and 103 are necessary for Phone Plaintiffs to have a "fair opportunity to present an effective case at trial." *Gerber*, 306 F.R.D. 527, 528. This is particularly true because there is an informational asymmetry between Apple and individual consumer Plaintiffs, who have little way of assessing which features and technologies pose legitimate privacy and security concerns without understanding what Apple itself was saying in its contemporaneous documents. Courts are to consider such asymmetry when construing Rule 26. *See Penn Eng'g & Mfg. Corp. v. Peninsula Components, Inc.,* 2021 WL 4037857, at *4 (E.D. Pa. Sept. 3, 2021) (citing Fed. R. Civ. P. 26 Advisory Committee's Note to 2015 Amendment).

For the foregoing reasons, Plaintiffs respectfully move the Court to compel responses to RFP 102 and 103.

Respectfully submitted,
*/s/ Joseph J. DePalma*
Joseph J. DePalma

cc: All Counsel of Record (via ECF)
Hon. Ronald J. Hedges (ret.)
Hon. Jose L. Linares (ret.)
Hon. Peter F. Barisco, Jr. (ret.)

# Exhibit 1

EXHIBIT SHAH 5 6/23/6 YAN 14316

**Subject:** Re: WeChat PRO 2019 - Conference Summary Report
**From:** "Joe Weil" <jweil@apple.com>
**Received(Date):** Fri, 18 Jan 2019 16:13:29 +0000
**To:** "Steve Gedikian" <ssg@apple.com>
**Cc:** "Roger Rosner" <rock@apple.com>, "Mike Abbott" <m_abbott@apple.com>
**Date:** Fri, 18 Jan 2019 16:13:29 +0000

[redacted]

On Jan 18, 2019, at 7:53 AM, Steve Gedikian <ssg@apple.com> wrote:

WeChat and other Asian messaging services are focused on replacing the operating system with their services.

Steve

Sent from my iPad

Begin forwarded message:

> **From:** Chi-Hoong Kok <chihoong@apple.com>
> **Date:** January 18, 2019 at 7:40:15 AM PST
> **To:** App Store Team - Global <App_Store_Team_-_Global@group.apple.com>
> **Cc:** Joseph Ji <joseph_ji@apple.com>, Yiting Jiang <yiting_jiang@apple.com>
> **Subject: WeChat PRO 2019 - Conference Summary Report**
>
> Hi All,
> On Jan 9 and 10 WeChat held their 4th annual developer's conference in Guangzhou. Please see below for a wrap up from Yiting and Joseph from the App Store team who were at the conference.
>
> Thanks,
> Chi-Hoong.
>
> # WeChat PRO 2019
>
> ## Key Takeaways
>
> • Rapidly deepening reach into the "next generation" of mobile internet users (tier 3-4 cities) and young developers
> • Significant investments in ecosystem technology and features including AI assistant and

hardware level optimizations which may develop into significant threats for our hardware and services
• Continuing focus on bringing on board small-medium businesses and government organizations that traditionally have not had their own app
• Monetisation via IAP still in early stages but gaining traction (Android only) - could be a potential opportunity for iOS

## Platform Numbers

• WeChat reached 1B DAU
• WeChat Moments (akin to Facebook newsfeed) 750M DAU
• Mini Program opens reached 100B in 2018
• Mini Game reached 400M MAU
• WeChat Pay reached 800M MAU and used in 20+ countries

## Keynote

The conference held under the theme "WITH US", and the keynote highlighted Mini Program, Mini Game, WeChat Pay and other major achievements during the past year and WeChat's plans and efforts in building the ecosystem to improve users' experience as well as help developers' growth. WeChat Work and WeChat AI voice assistance were also highlighted at the keynote.

"Father of WeChat" Zhang Xiaolong made a 4 hour speech on the first evening elaborating the evolving history of WeChat and his view for each function and new feature. 4000 attendees stayed till midnight listening to his speech.

## Mini Programs

Mini Programs have become an industry solution for shopping, travel and other daily life scenarios for Chinese people. The platform continues to improving by tools, systems and support to help developers and businesses. Initiatives include:

• Launch 'High Quality Mini Program' to give more exposure and support to high quality Mini Programs meeting certain criteria. Mini Programs will also receive review from users. User can like a mini program and refer to friends leveraging Wechat's social platform;
• Refine search and "Nearby" function to help users better discover related Mini Programs. e.g. When user searches "Spider Man", Mini Programs for movie review, ticket booking will display accordingly;
• Promote rewarded video, interstitial ads. and lead to sale as business model for Mini Programs;
• Official Mini Program "Developer Zone" as developers' society to find resources including industry insights, plugin and support;
• Enhanced developer review guidelines including user security and data privacy, copy right and UGC content pre-review. Speed up the review process and provide timely feedback;
• WeCloud service free of charge for over 1M developers.

## Mini Games

Wechat Mini Game reached 400M MAU, as big population as the whole Chinese mobile game users. 10 titles have achieved over 10M RMB monthly in-app billing on Android and 11 titles have achieved over 10M RMB monthly ads. billing. In 2019, WeChat seeks to support developers from creation, game performance and abilities, development tools and services, discoverability. In the meantime, WeChat aim to create a healthy ecosystem by enhance review and live moderation.

A host of new platform features and developer tools were announced including:

• Creative Games Project: A targeted, application based program that seeks to give the "high quality games" increased exposure in the mini games ecosystem
• Games Performance Optimization: New developer features including mini program cloud, social functions that include real time voice and screen recording and AR
• Improved analytics tools: Data tools, including user demographic, industrial data and analysis by cohort
• For new developers, provide starting fund and loans on advertising budget;
• 24 hour mini program review times

## WeChat Pay

Since launched in 2013, WeChat Pay has been changing peoplès life beyond just payment. With online and offline payment solution and support package for traditional industries, WeChat Pay helped to change consumers' payment preference and lead traditional industries to a digital and intelligent stage. By 2018, WeChat Pay has helped 36 industries found successful digital solution for business optimization, including retail, transportation, consumer service, health care, education, insurance etc.

## WeChat Work

WeChat Work's enterprise users increased 100% during 2018, covering over 50 categories. 80% of Top 500 Enterprises in China are using WeChat Work. WeChat Work will focus on 3 perspectives to help enterprise to build both internal and external connections:

• Build internal social network based on enterprise human resource structure;
• Implement OA and other supporting system;
• Connect with external clients and consumers.

## Other WeChat Technologies

• Announced Wechat voice assistant "Xiao Wei" which leveraging Tencent's strength on its social networks, Tencent owned mobile apps and cloud services. "Xiao Wei" is already incorporated in some hardware eg. Tencent TingTing soundbox.
• Hardcoder - Framework that enables Android developers to optimize performance on most Android devices.

# WeChat World

WeChat World showcased several typical scenarios of using WeChat Pay and Mini Program in real life including buying coffee, shopping in convenient stores and even hair cuts. Some 3rd party Mini Program solution providers built their booths too.

<PastedGraphic-9.tiff>

Yiting & Joseph.

# Exhibit 2

**Subject:** Smartphone Market Trends Keynote: FQ1'17
**From:** "Ted Butz" <tbutz@apple.com>
**Received(Date):** Sat, 04 Mar 2017 02:20:43 +0000
**To:** "Gregory Joswiak" <joz@apple.com>, "Kaiann Drance" <drance@apple.com>
**Cc:** "Kevan Parekh" <kparekh@apple.com>,"Alex Roman" <alejandro_roman@apple.com>, "Mark Y Tian" <mtian@apple.com>
**Attachment:** Smartphone Market Trends 2017.03.03.pdf
**Date:** Sat, 04 Mar 2017 02:20:43 +0000

---

Hi Joz and Kaiann,

Attached below is the Smartphone Market Trends presentation that we walked thru this afternoon. Please let us know if you have any questions/comments.

Hope you have a nice weekend.

Thanks,
Ted

---

THIS PAGE IS LEFT INTENTIONALLY BLANK

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Exhibit 3

# Apple's Approach to User Experience Across Its Platform

**November 27, 2023**

**CONFIDENTIAL**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Exhibit 4

**DATA PRACTICES WHITE PAPER**

**APPLE**

1. Apple believes that data privacy is a fundamental human right and it builds that value into every product and service it offers. "*Privacy to us is a human right. It's a civil liberty*."[1] Apple shares Executive Vice-President Vestager's conviction that "*[c]ontrolling what happens with [personal] data is a fundamental part of human freedom, and it always has been. Throughout our history, human beings have the right to decide what information we share about ourselves and with whom.*"[2]

2. Apple has long been committed to data privacy and championed privacy and data protection well before it became a widespread concern. More than ten years ago, Steve Jobs explained that "*a lot of people in [Silicon] Valley think we're really old-fashioned about this*," but Apple "*take[s] privacy very seriously*."[3] Apple has a decades-long track record of designing privacy protections into its products and Apple's CEO, Tim Cook, has repeatedly stressed the importance of privacy to Apple and promoted increased data protection rules across the world.[4]

3. Apple sells products and services, like the iPhone and iCloud, to consumers. It does not operate a data-driven business to sell its customers' data to advertisers. That is not, and never has been, Apple's business model. Apple products and services reflect the Company's core privacy principles of: (i) data minimization; (ii) on-device intelligence; (iii) user control and transparency; and (iv) implementing security best practices to protect user data. Apple has a long history of integrating leading privacy and security technologies into its products. Apple works constantly on raising the bar via new tools and enhancements to safeguard user data from evolving privacy and security threats and to promote user awareness of data collection risks. Apple's CEO Tim Cook has stressed that increasing consumer awareness is particularly important because many violations are "*invisible*",[5] something which also concerns Executive Vice-President Vestager, who has

---

1 See https://www.cnbc.com/2018/04/10/apple-ceo-tim-cook-on-the-importance-of-consumer-privacy.html

2 See https://iapp.org/news/a/vestager-from-dpc-enforcement-critical-to-success-of-gdpr/

3 See https://www.digitalmusicnews.com/2018/03/25/steve-jobs-user-privacy-2010/

4 See https://www.theverge.com/2018/10/24/18017842/tim-cook-data-privacy-laws-us-speech-brussels

noted that protection is *"difficult when companies are secretive about what they plan to do with our data."*[6]

4. For advertising-funded businesses, the user is the product. These companies favour broad data collection to develop comprehensive user profiles that they can sell to advertisers, which makes them and their users more vulnerable to the impact of data breaches or misuses. Any action to protect user privacy and limit dissemination and misuse of data is in tension with the company's bottom line. These companies have little incentive to develop and propose tools that make it easier for users to make informed choices and control the collection and use of their data.

5. Apple's differentiated approach and business model is fundamentally procompetitive and user-focused. Executive Vice-President Vestager has stressed the importance of data privacy and the role of competitive markets in helping to realize this essential freedom for every consumer. Competitive markets "*put consumers in control*" and allow them to "*... use that power to demand something we really maybe care about, including maybe our privacy.*"[7] In 2018, Executive Vice-President Vestager commented that "*I'd like a Facebook that I pay, with full privacy.*"[8] Apple's stance on privacy offers her and other consumers a choice between a product that is perceived as "free" but in fact is paid through the monetization of the consumer data, and one that operates with a higher standard of data protection and takes privacy seriously. Apple's alternative to advertising-funded business models – such as Android – promotes product variety and generates greater trust and confidence among consumers concerned about privacy and security (**Section II**).

6. Apple's commitment to data privacy and security has always been one of Apple's core principles. Over time privacy has become closely associated with Apple and users demand Apple's adherence to and protection of its core privacy and security principles (**Section III**). Apple will continue to adhere to these core principles even where it involves short-term commercial sacrifices. Apart from its respect for privacy as a

---

[7] See https://iapp.org/news/a/vestager-from-dpc-enforcement-critical-to-success-of-gdpr/

[8] See https://www.euractiv.com/section/competition/interview/vestager-id-like-a-facebook-that-i-pay-with-full-privacy/

bedrock human right, Apple knows that it would incur incalculable damage to its brand if it engaged in deviations from its core privacy and security principles.

7. The commitment extends to the entire ecosystem surrounding Apple's products and services, including the apps available on the App Store. Data privacy and security are fundamental pillars of the App Store and are crucial elements of its success. Consumers trust that Apple will equip them with tools to control the data they share with apps and that Apple seeks continuously to improve the App Store's user privacy and security features and to confront novel privacy and security risks.

8. Consumers' demand for strong data privacy and security protections on the App Store manifests itself most clearly when bad actors misuse apps, and stakeholders call for a swift response from Apple. For example, when the US Senate, UK Parliament, and the public called for action when it was discovered that consumer data was being siphoned behind the scenes by some app developers,[9] Apple acted swiftly to safeguard user privacy in response to such misuse. It placed limitations on the invasive use of enterprise mobile device management (MDM) technology in consumer apps when some developers were using that technology to collect and sell the personal information of children. While privacy advocates expressed concern about how smartphone location data was being exploited by developers,[10] Apple had already added functionality giving users even greater control over how their location data could be used and continued to do so most recently in iOS 13 by adding the option for users to provide a one-time use of location data to developers. Apple also introduced the Sign-in with Apple app authentication tool amidst persistent concerns about over-used passwords and privacy-compromising social login services.[11] Without these actions, the public's perception of Apple devices and the App Store being a safe environment can be quickly eroded, which would hurt Apple and app developers alike.

---

9 See https://www.forbes.com/sites/daveywinder/2019/06/02/your-iphone-is-spying-on-you-heres-how-to-stop-it/ and https://techcrunch.com/2019/04/08/iphone-spyware-certificate/?guccounter=1&renderMode=ie11

10 See https://www.nytimes.com/interactive/2018/12/10/business/location-data-privacy-apps.html

11 See https://www.forbes.com/sites/kateoflahertyuk/2020/03/09/sign-in-with-apple-what-it-is-and-how-to-use-it/#118c8aa51b65 and https://www.wsj.com/articles/sign-in-with-apple-is-way-better-than-passwordsif-you-can-find-it-11568552401

9. The App Store provides developers with an abundance of privacy-friendly data and analytics tools, but it does not facilitate unfettered collection of user data so that developers can better monetize their users through targeted advertising. Apple obtains user identifying information, such as payment information, in order to execute user requests and facilitate the provision of services and features. Apple does not sell personal information or share personal information with developers absent user consent. Sharing users' personal information without their consent would violate Apple's privacy policy and the GDPR, and would constitute a breach of Apple's commitment to protect customer data.

10. Apple understands that its commitment to data privacy and security may be in tension with the commercial interests of some app developers who rely heavily on access to as much data, including personal information, as possible or who use technology in a way that exposes users to potential data misuses. Some developers, particularly those whose business models are built on invasive targeted advertising, would prefer more lax standards and confusion or ignorance among users as to the extent of their data being used. These developers may publicly vent their misgivings or even complain to authorities that the App Store's approach to user data raises an antitrust issue. What those developers ask is that Apple abandons or softens its stance on privacy and adopts a model that is closer to Android. This would not be in the best interests of consumers or competition. Respecting Apple's core principles and protecting user privacy and security are fundamentally pro-consumer and pro-competitive.

11. Apple will not sacrifice users' privacy to accommodate some developers' desire for unrestrained user data access. Developers must convince users, in a transparent manner, that they have a legitimate use for any requested data and that they are trustworthy stewards of user data. Apple holds itself to the same standard and does not pursue the "*ton of money*"[12] it could make short term if it were to jettison its principles and monetize user data, as doing so would be "*an invasion of privacy*".[13]

12. The App Store Review Guidelines and app review process reflect Apple's effort to strike a balance between user privacy and the legitimate needs of app developers. They

[12] See https://www.cnbc.com/2018/04/10/apple-ceo-tim-cook-on-the-importance-of-consumer-privacy.html

[13] See https://www.cnbc.com/2018/04/10/apple-ceo-tim-cook-on-the-importance-of-consumer-privacy.html

facilitate an iterative dialogue between Apple and developers (1) to ensure that app developers respect user privacy and security, (2) to adapt the Guidelines to the ever-changing parameters of data-accessible apps, and (3) to allow Apple to accommodate app developer needs. Ultimately, the long-term success of the entire ecosystem is predicated on maintaining user trust by protecting user privacy and security, and Apple will work to ensure that the App Store reflects its unwavering commitment to user privacy and security while also supporting the needs of developers (**Section IV**).

## II. Apple's Commitment to Privacy Reflects its Differentiated, Hardware-Driven Approach

### *Apple's Privacy-by-Design Philosophy*

13. Apple recognized that *"[p]rivacy is a fundamental human right"*[14] well before it became trendy. In an interview with then CEO Steve Jobs in 2010, he explained that "*Silicon Valley is not monolithic. We've always had a very different view of privacy than some of our colleagues in the Valley. We take privacy very seriously.*"[15] In the interview, Steve Jobs went on to explain that "*That's one of the reasons why we have the curated App Store. We've rejected a lot of apps that want to take a lot of your personal data, and suck it up into the cloud.*" Steve Jobs also stressed transparency as a critical component of the protection of privacy saying that "*Privacy means that people know what they are signing up for. In plain English, and repeatedly.*"

14. Apple's commitment to privacy and security requires significant up-front and ongoing investments. Steve Jobs acknowledged that Apple's privacy and security efforts prolonged the development of the initial iOS Software Development Kit, which allowed third parties to write apps for iOS. In a news update from October 2007, Steve Jobs explained that "*we're trying to do two diametrically opposed things at once, provide an advanced and open platform to developers while at the same time protect iPhone users from viruses, malware, privacy attacks, etc.*"[16] More than ten years later, Apple has invested hundreds of millions of dollars in acquisitions to support its privacy and security

---

[14] See https://www.apple.com/privacy/

[15] See https://www.digitalmusicnews.com/2018/03/25/steve-jobs-user-privacy-2010/

[16] See https://appleinsider.com/articles/07/10/17/steve_jobs_confirms_native_iphone_sdk_by_february

initiatives and hired hundreds of engineers and other personnel to design, develop, implement, and ensure compliance with Apple privacy and security features and policies.

15. Apple's commitment to privacy is implemented through a number of core principles that are applied consistently to: (i) minimize the amount of data collected and shared by Apple or other partners operating within the Apple ecosystem; (ii) process data on the user's device (and not in the cloud or on servers) wherever possible; (iii) provide users transparency and control around data that is shared; and (iv) implement security best practices to protect user data.

16. These core principles are reflected in Apple's continuous innovation and introduction of new privacy and security features, tools, and enhancements.[17] For example:[18]

- **2005**: Apple's Safari browser was the first browser to offer Private Browsing mode and to block third-party tracking cookies by default. Private Browsing mode allowed users to surf the web without having their information and pages visited saved or cached. Default third-party cookie blocking provided users with seamless protection from unwanted tracking or profiling.

- **2010-11**: Apple introduced end-to-end encryption for all messages and conversations made through the FaceTime and iMessage communication services. With end-to-end encryption, conversations and texts cannot be accessed without the user's authentication.

- **2012**: With iOS 6, Apple ushered in a new era of privacy-focused app-based data use. Previously, developers sought access to a user's unique device identifier or UDID, which could disclose a user's personal information. Apple updated its app Guidelines to prohibit developer access to the UDID. In its place, Apple created a de-personalized identifier for advertisers or IDFA that users could reset or opt-out of altogether by selecting the "Limit Ad Tracking" feature in Settings.

---

[17] See, *e.g.*, the new features available with iOS 13: https://www.apple.com/ios/ios-13/features/, Privacy and Security.

[18] See https://www.apple.com/privacy/ and https://www.apple.com/privacy/features/. A selection of major Apple privacy and security features is set forth in **Appendix A**.

- **2016**: To improve the user experience without revealing personal data, Apple implemented Differential Privacy, by which Apple transforms certain user personal data before it ever leaves the device. In so doing, Differential Privacy masks the user's personal information and prevents the personal information from being reproduced.

- **2017**: With the iPhone X, Apple launched the A11 Bionic Chip with the Neural Engine and Face ID. The Neural Engine powers machine learning algorithms that provide on-device intelligence and minimize the amount of data leaving the user's device. Face ID offers users fast and secure biometric authentication. The probability that a random person could unlock a user's Face ID-enabled device is approximately 1 in 1,000,000, which represents a 20-fold improvement over the already robust Touch ID authentication tool. In 2017, Apple also introduced Intelligent Tracking Prevention (ITP) on Safari, which uses machine learning to determine the sites that advertisers used to track users, and then immediately isolated and purged the tracking cookies that third-party advertisers attempted to store on a user's device without the user's permission. Despite significant resistance from advertisers in the years following ITP's introduction, including efforts to identify loopholes and workarounds, Apple continued to refine ITP to prevent third-party advertisers from engaging in permission-less, cross-site user tracking.

- **2019**: Introduced with iOS 13, Sign in with Apple (SIWA) allows users to sign in to apps and websites quickly and easily, but also minimizes the amount of information users are required to share in order to prevent user tracking and profiling. SIWA offers users a privacy-focused alternative to invasive social login services.

- **2020**: Building on its prior success with ITP, and in response to continued attempts by advertisers to circumvent its tracking prevention features, Apple updated Safari to completely block all third-party cookies by default. In doing so, Apple reaffirmed the principle that third-party advertisers must not track and recreate a user's web history without permission for the purpose of serving them targeted advertisements.

17. Apple's efforts demonstrate its focus on confronting evolving privacy and security threats across the Apple ecosystem. In a rapidly changing industry rife with actors that do not share its commitment to privacy and security, Apple will continue to ask what more it can do to protect its users and transform its promise to users into action.

***Apple's Business Model And Approach To Privacy Differ Vastly From The Rest Of Big Tech***

18. Apple is not a data-driven business, and this allows it to put its users' privacy interests first. As Eddy Cue, Apple's Senior Vice President of Internet Software and Services, explained: *"We're not collecting a ton of information about you, where you are, what you do, etc. We are really not interested in it in most cases. When we do, we keep the minimal amount that we need in order to do exactly what we tell you we are going to do with it".*[19]

19. Apple could have pursued a different strategy of collecting as much data as possible and monetized the data to which it would have access, but it committed instead to protect user privacy and security. As Tim Cook stated: "*The truth is we could make a ton of money if we monetized our customer. [...] We've elected not to do that. [...] Our products are iPhones and iPads and Macs and HomePods and the Watch, et cetera, [...] But you are not our product. [...] We care about the user experience. And we're not going to traffic in your personal life. I think it's an invasion of privacy. I think it's – privacy to us is a human right*".[20]

20. Google and Facebook, on the other hand, use data collected from their users to provide services that are advertising-funded and offer a seemingly "free" product. In fact, the users are the "product" for whom the users are the customers. Google and Facebook track user behaviour across the internet to help develop elaborate profiles that power targeted advertisements. This is why, even though services offered by Google and Facebook are "free" to their users (in the sense of a zero money price), there is a hidden, undisclosed cost because the users "pay" with their data. Indeed, one study found that

---

19 See https://digitalcontentnext.org/blog/2018/06/14/once-bitten-comparing-apple-and-facebooks-privacy-policies/ or interview with Eddie Cue on https://www.youtube.com/watch?v=k1oStkflzmI.

20 See https://www.vox.com/2018/4/6/17197754/watch-apple-ceo-tim-cook-msnbc.

Android devices make nearly ten times more data requests to Google than iPhones make to Apple.[21]

21. In addition to paying with their data, users may also suffer from the lax privacy practices of advertising-funded companies that allow other parties to collect large amounts of personal data. Recently, Facebook suspended 69,000 apps from its platform following revelations that some apps were *"improperly sucking up users' personal information and [committing] other transgressions."*[22]

22. The distinction between Google and Apple is likewise borne out by Google's stance toward third-party apps on the Google Play Store. While Apple's App Store undertakes a rigorous vetting process, until recently Google's curation was largely limited only to screening apps for malware or restricted APIs. Indeed, Google often updated its app screening processes to promote user safety and privacy only after Apple made similar moves first.[23]

23. Amazon, with its online marketplace and cloud computing offerings, has also come to rely on and use data collected from users. This is best illustrated by Amazon's rapidly growing advertising business, which is fuelled by its vast store of consumer data.

24. Apple's status as a hardware-driven business focused on creating a superior user experience allows it to be a leader, rather than a laggard on data privacy issues. Unlike companies whose revenues and profits derive from the collection and sale of consumer data, Apple's business simply does not monetize its users. This means that, as it relates to privacy, Apple's interests are aligned with those of its customers. In doing so, Apple provides consumers with an alternative to the data-driven solutions, and thereby enhances consumer choice and welfare.

## III. Apple's Brand Is Inextricably Linked With Privacy

[21] See https://www.macrumors.com/2018/08/22/android-sends-data-google-10-times-ios-to-apple/; https://digitalcontentnext.org/wp-content/uploads/2018/08/DCN-Google-Data-Collection-Paper.pdf

[22] See https://www.nytimes.com/2019/09/20/technology/facebook-data-privacy-suspension.html.

[23] See https://techcrunch.com/2018/07/27/google-follows-in-apples-footsteps-by-cleaning-up-its-play-store/

25. Apple's longstanding commitment to privacy has always been a reflection of its core values and business model, even when user privacy was not a hot button issue for consumers and politicians.[24] Over the years, Apple has become recognized as a company that values and protects the privacy of its users.[25] Apple's privacy-driven efforts, its statements, and subsequent press coverage have all contributed to the strong association that now exists between 'privacy' and 'Apple' among users and other stakeholders.

26. In 2018, for example, data protection advocates and journalists welcomed Apple's CEO Tim Cook's strong affirmation of Apple's privacy commitment at the Annual International Data Protection Commissioners' Conference in Brussels. Tim Cook, delivering the keynote address, endorsed the GDPR and called for other countries, including the US, to follow Europe's leadership.[26] Data security journalist Kim Zetter called his comments *"a privacy manifesto for the corporate world that is long overdue"*.[27]

27. In 2019, Apple was recognized for publishing four Privacy Overviews or Tech Briefs[28] that explain in detail the measures taken by Apple to protect the privacy of its users: *"Apple on Wednesday took another step in its privacy efforts, updating the section of its website that's focused on data protection and controls. It's the company's latest move as it looks to be the privacy leader among tech giants."*[29] These efforts underscore the importance of data privacy and security in the digital economy and of leading by example: *"'Right now there is more private information on your phone than in your*

---

24 See footnote 3.

25 See https://www.nytimes.com/2016/02/21/technology/apple-sees-value-in-privacy-vow.html : *"Privacy and security have become part of its brand, especially internationally…"* See https://www.fastcompany.com/90236195/forget-the-new-iphones-apples-best-product-is-now-privacy : *"Apple's devices and software and the company's ethos are now steeped in user privacy protections that other tech companies would never dream of embracing. And this isn't a stance Apple has only recently adopted. It is something that has been building for years at the company[.]"*

26 See https://edps.europa.eu/press-publications/press-news/press-releases/2018/edps-welcomes-delegates-brussels-40th_en

27 See e.g. https://www.theguardian.com/technology/2018/oct/24/tim-cook-us-federal-privacy-law-weaponized-personal-data; https://www.telegraph.co.uk/technology/2018/10/24/apples-tim-cook-takes-aim-google-facebook-weaponised-data/ ; https://www.dailymail.co.uk/wires/afp/article-6312319/Apple-chief-pushes-US-privacy-law-stop-weaponizing-data.html; https://twitter.com/KimZetter/status/1055095844536369152; https://twitter.com/chrismessina/status/1055226382219804672

28 Safari Privacy Overview, Photos tech brief, Location Services Privacy Overview and Sign in with Apple tech brief, all available at https://www.apple.com/privacy/features/.

29 See https://www.cnet.com/news/apple-updates-privacy-website-to-highlight-data-protection-tools/.

*home,' Apple says. 'Think about that. So many details about your life right in your pocket. This makes privacy more important now than ever'. [...] As a company, Apple consistently touts user privacy as a core institutional belief, one that is built into every product it develops."*[30]

28. These press articles are echoed by more thorough analyses carried out by institutional bodies. In its 2019 Market Study Into Mobile App Stores (the ***ACM Report***), the Netherlands Authority for Consumers & Markets (the ***ACM***) found that: *"Apple clearly focuses on the user experience over the developer experience, and also puts much more emphasis on privacy"*[31].

29. Data protection authorities have also welcomed Apple's leadership in designing privacy protections in the development of a COVID-19 contact tracing solution.[32] UK Information Commissioner Elizabeth Denham has acknowledged that the contact tracing solution "*appear[s] aligned with the principles of data protection by design and by default*."[33] New Zealand Privacy Commissioner John Edwards hailed the solution as "*extraordinary*," noting that it "*will not allow governments to access location data about users*."[34]

30. Apple's data privacy policy also formed part of the European Commission's (the ***Commission***) assessment of the company's merger with Shazam.[35] In its decision, the Commission explains: *"[...] the Notifying Party stated that, in any event, it plans to change Shazam's data collection practices to bring them in line with Apple's industry leading-positions on privacy and to update the Shazam app for OSs other than Apple's OSs so it will not send to Apple information concerning the presence of non-Apple music streaming services on the users' device, unless the music streaming service provider of*

---

30 See https://appleinsider.com/articles/19/10/25/apple-shares-new-privacy-on-iphone-ad-urges-users-to-protect-personal-data

31 See the ACM Report, page 27.

32 See https://ico.org.uk/about-the-ico/news-and-events/news-and-blogs/2020/04/combatting-covid-19-through-data-some-considerations-for-privacy/ and https://thespinoff.co.nz/society/16-04-2020/even-in-extraordinary-times-the-right-to-privacy-remains/

33 See https://ico.org.uk/media/about-the-ico/documents/2617653/apple-google-api-opinion-final-april-2020.pdf

34 See https://thespinoff.co.nz/society/16-04-2020/even-in-extraordinary-times-the-right-to-privacy-remains/

35 See Case M.8788 – APPLE / SHAZAM.

*that user agrees to allow this information to be sent."*[36] In its competitive assessment of the transaction, the Commission recognised Apple's leading position on data protection: *"Third, the Commission notes that, in response to an RFI pursuant to Article 11(2) of the Merger Regulation, Apple has stated its plans to change Shazam's data collection practices to bring them in line with Apple's industry leading-positions on privacy… ".*[37]

## IV. The App Store Reflects Apple's Privacy Approach

31. Apple's commitment to privacy means that Apple must continue to meet high expectations for data privacy and protection, and any deviation would cause Apple significant reputational damage and invariably lead to reduced sales. Any significant data privacy or security lapses would undermine the trust that users have in both Apple's hardware and the ecosystem developed around it. The long-term success of the App Store, and its app developers, is therefore bound to the protection of user privacy and security. To safe-guard users and the ecosystem, Apple must consistently apply its privacy and security principles across the ecosystem, including to its own apps and apps distributed through the App Store.

32. Apple created the App Store because it recognized that the user experience on iOS devices could be enhanced by offering a digital platform that distributed high-quality native apps from third-party developers. To preserve user privacy and security, and address other issues occasioned by a digital platform, Apple developed a clear set of guidelines—the App Store Review Guidelines—and an app review process to rigorously vet apps before they could be displayed on the App Store.

33. The Guidelines, first published in 2010, reflect Apple's core privacy and security principles. To minimize data collection, for example, apps "*should only request access to data relevant to the core functionality of the app and should only collect and use data that is required to accomplish the relevant task.*"[38] To promote transparency and user control of data, all apps that collect user data "*must secure user consent for the collection.*"[39] To protect the user's identity when sharing information, apps must not

[36] See Case M.8788 – APPLE / SHAZAM, para. 208.

[37] See Case M.8788 – APPLE / SHAZAM para. 45.

[38] See App Store Review Guideline 5.1.1(iii).

[39] See App Store Review Guideline 5.1.1(ii).

"*surreptitiously build a user profile based on collected data*" and may not "*attempt, facilitate, or encourage others to identify anonymous users*."[40] The Guidelines require every app to implement measures sufficient to ensure secure handling of any collected user data.[41] The Guidelines are stringent and comprehensive, but have proven to be crucial to ensure that the App Store experience—like that of Apple devices—is private and secure.

34. Apple also invests substantial time and effort in the app vetting process to ensure that apps adhere to the user privacy and security provisions of the Guidelines and uphold other core Apple values. The App Store review team inspects all apps—roughly 100,000 per week—prior to distribution on the App Store. This review process also includes roughly 1,000 calls per week to developers to diagnose and cure issues. While this sometimes pits Apple's commitments to users against the short-term interests of a small minority of app developers who might prefer a more hands-off approach, the App Store review team acts on behalf of Apple's user base and the long-term interests of the ecosystem, including all app developers, to protect users from fraud, malware, and unwarranted intrusion into their privacy.

35. The privacy and security principles built into the App Store Review Guidelines and the app review process are critical enablers of the App Store's success. Users need not undertake a time consuming review of the privacy protections offered by every available app regarding information collected via iOS and instead can be assured that Apple has given them the tools to efficiently and effectively control the collection of such data.

36. When facilitating interactions between users and developers on the App Store, Apple also goes to great lengths to ensure that user privacy and security are protected. Apple has access to personal user information, such as account and payment information, to provide the services and features requested by the user (Apple's own privacy practices place limitations on how it may use this data). Apple does not disclose personal information to developers absent a user's express consent, but it provides developers with a plethora of privacy-friendly data, including detailed data on app performance and

[40] See App Store Review Guideline 5.1.2(iii).

[41] See App Store Review Guideline 1.6.

sales trends. To further promote user control over their data, the App Store's Guidelines also allow developers to request and obtain a user's personal information directly.

***Apple's Privacy Approach Balances the Legitimate Interests of Developers With the Long-Term Interests of the Ecosystem***

37. App developers and the App Store itself operate in a dynamic environment. As Apple's innovations bring new features to Apple devices and are used by apps, new potential privacy challenges can emerge and Apple has revised its Guidelines to ensure that users continue to be adequately protected. Apple builds robust privacy protections into every new technology, such as Face ID or Touch ID, at launch. But as Apple allows third-party apps to use these technologies, Apple must develop a set of rules in order to clearly establish the scope of appropriate use of the technology and to prevent misuse.

38. Location tracking is an example of a case where third parties have failed to measure up to Apple's privacy-minded use of technology. Apple's "Find My" feature requires that a user explicitly consent to enable Location Services and the feature is built so that Apple receives as little location data as possible and holds it for a matter of hours. However, third-party apps that obtain user consent via iOS to collect location data often seek to maximize the location data they collect and, if unchecked, would collect as much data as possible, which may lead to significant data privacy concerns.[42]

39. Whether based on new Apple technologies or not, the vibrant developer community continues to push the boundaries of what is possible with apps and drive the innovation that the App Store aims to generate. Apple believes that it has a duty to its users to ensure that developer innovations delivered via the App Store are employed in a way that protects user privacy and security. Apple therefore closely monitors app developments on the App Store and updates its Guidelines accordingly.

40. Many of the updates to the Guidelines reflect Apple's commitment to data privacy.[43] For example, in 2013, Apple added new rules concerning apps developed for children under

[42] See https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html

[43] Another example of Apple's balanced approach to data privacy can be seen in its approach to sharing user engagement data. Through App Store Connect, Apple shares a wealth of aggregated, non-personally identifiable user engagement data, such as impressions, page views, app units, sales, installations, sessions, deletions, active devices, app referrers, web referrers, paying users, crashes, customer ratings and reviews, trends, and user retention. Developers can use this information to monitor user engagement and improve

age 13.[44] These changes afforded additional privacy protections and security for this vulnerable class of users.[45] In 2018, Apple updated the Guidelines again to curtail data collection and sharing by app developers, and it required developers to display a link to their privacy policy.

41. Most recently, Apple introduced additional location data controls in iOS 13 itself;[46] these controls struck a balance between developer access to and user control over location data. Devices running iOS 13 offer the user a choice to grant access to location data only once and, where they do choose to grant "always" access to location data, the devices periodically remind users about apps that are tracking their location in the background. Specifically, users are shown how many times an app has recently tracked their location, along with a small map of the location points, and users are provided with the opportunity to limit this tracking. These reminders have been extremely helpful for users that want to limit third-party tracking; reports show that third-party access to users' background location data has declined by 68 percent since the launch of iOS 13.[47] While this location data could be valuable to some app developers, Apple's core principles dictate that users must have control over whether developers have access to their location data. Any developer who wants access to user location data must inform the user and obtain the user's consent and then continue to demonstrate the benefit to the user of such location data use.

42. Apple's balancing approach is widely understood and accepted by app developers, but occasionally individual app developers or groups of app developers attempt to circumvent or seek a relaxation of the rules when applied to them. For example, some apps misused Apple's MDM technology and carried out much more invasive data collection from children's devices that anyone had envisaged or indeed intended. The misuse allowed those developers to monetize data, including children's data, through Google's advertising tools. As a result of cases involving excessive data use, in 2018 and

---

*(Cont'd from previous page)*

user experience. However, Apple strictly protects users' personally identifiable information and does not share it with developers.

44 See App Store Review Guideline 1.3, 5.1.4.

45 See https://www.theguardian.com/technology/2013/aug/15/apps-apple.

46 See https://techcrunch.com/2019/09/19/ios-13-security-privacy/.

47 See https://www.macrumors.com/2020/01/24/apple-ios-13-location-privacy-controls-work.

2019, Apple faced inquiries by the US Senate and the UK Parliament.[48] Apple therefore put the development and use of MDM technology by apps on hold pending a review. Apple's action, which was taken to safe-guard users' privacy and the long-term interests of the ecosystem, was met with antitrust complaints. While Apple believes that the antitrust complaints were misguided, Apple diligently sought out a compromise solution by (1) carefully evaluating the privacy and security risks of parental control apps using MDM technology; and (2) updating the Guidelines to allow use of the MDM technology by apps subject to a set of appropriate conditions that guaranteed the careful protection of privacy and security of Apple users.

43. Spotify offers another example. Spotify advocates for "*access to data about users*" and says that "*such data should not be the property of platforms*".[49] Spotify pretends that its inability to freely access unmitigated amounts of data from users should be an antitrust abuse. The reality is that Spotify, whose burgeoning ad business posted more than €600 million in revenue in 2019,[50] and some other developers already obtain large quantities of helpful, privacy-friendly data and analytics tools from the App Store, but they want unlimited access to personal user data so that they can better monetize that data through targeted advertising. This is not an antitrust concern. On the contrary, Apple's balanced approach to privacy on the App Store—preventing disclosure of personal information for purposes not contemplated by the user and providing conditions under which developers can seek and obtain personal information directly from users—enhances consumer and developer welfare by providing a true privacy-focused alternative to data-driven options and ensuring that users have trust and confidence in the apps available on the App Store. Users are better off with this choice and while Spotify might be able to boost its own earnings if Apple were forced to pave the way for Spotify's unfettered ability to collect more data, this does not warrant antitrust scrutiny.

44. Apple is convinced that its approach to the App Store—grounded in the core privacy and security principles that are synonymous with the Apple brand and crucial to maintaining user trust and confidence—is in the long-term best interest of users, third party

---

[48] See Apple paper of 1 August 2019 submitted to the Commission in the context of Case AT.40639.

[49] See Spotify and others policy document "Digital Platforms – Fairness Principles", available at: https://smeunited.eu/admin/storage/smeunited/principles-for-platforms-fairness.pdf.

[50] See https://investors.spotify.com/financials/press-release-details/2020/Spotify-Technology-SA-Announces-Financial-Results-for-Fourth-Quarter-2019/default.aspx

developers, and Apple itself, even if it may periodically lead to frustration, or antitrust complaints, among some app developers that see an opportunity to make more money in the short-term with a laissez-faire approach to privacy.

## V. Conclusion

45. In conclusion, Apple maintains a commitment to data privacy and security that is in line with its hardware-driven business model, and it will continue to champion a privacy-focused approach to give users an alternative to data-driven options from Google and other advertising-funded businesses. This requires that Apple give users the ability to understand and decide how and when their data is collected and used and that Apple provide users with access to the tools to manage their choices. The success of Apple's device business is predicated in significant part on its privacy and security commitments, and fulfilling these commitments has only become more important as Apple's ecosystem has expanded and developers create more data-accessible apps. As a result, Apple must implement a rigorous but balanced approach to ensure that developers can offer innovative apps through the App Store while abiding by the data privacy and security principles reflected in the App Review Guidelines. The long-term success of the App Store, from which so many app developers benefit, is critically dependent on a shared commitment to maintaining the trust of users by protecting their privacy and security.