# EXHIBITS 1-6

## REDACTED IN FULL

# EXHIBIT 7

ORDER OF THE PRESIDENT OF THE GENERAL COURT

3 August 2026 (*)

( Interim relief – Competition – Article 18(3) of Regulation (EC) No 1/2003 – Request for information – Application for suspension of operation of a measure and for interim measures – No need to adjudicate in part – No prima facie case – Weighing up of competing interests )

In Case T-280/26 R,

**Broadcom Inc.,** established in Palo Alto, California (United States),

**VMware International Unlimited Company,** established in Dublin (Ireland),

represented by F. González Díaz, R. Lepetska and R. Pimentel Torres, lawyers, and by P. Stuart, Barrister-at-Law,

applicants,

v

**European Commission,** represented by P. Berghe, P. Caro de Sousa and M. Martínez Navarro, acting as Agents,

defendant,

THE PRESIDENT OF THE GENERAL COURT

having regard to the order of 22 May 2026, *Broadcom and VMware International* v *Commission* (T-280/26 R, not published),

makes the following

**Order**

1 By their application under Articles 278 and 279 TFEU, the applicants, Broadcom Inc. and VMware International Unlimited Company, seek in essence, inter alia, a suspension of the operation of Commission Decision C(2026) 1477 final of 26 February 2026 relating to a proceeding pursuant to Article 18(3) of Council Regulation (EC) No 1/2003 (Case AT.40924 – VMware software licensing) ('the contested decision') to the extent that that decision

requires the applicants to produce documents protected by professional privilege by the law of third countries, until the Court has ruled on the action for annulment.

**Background to the dispute and forms of order sought**

2 The first applicant, Broadcom, is a company governed by the law of the United States. The second applicant, VMware International, is an entity within the Broadcom group, registered in Ireland, which carries out, inter alia, activities in the field of licensing of VMware goods and services within the European Economic Area (EEA).

3 On 26 February 2026, the European Commission adopted the contested decision, addressed to the applicants, asking them, pursuant to Article 18(3) of Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles [101] and [102 TFEU] (OJ 2003 L 1, p. 1), to provide the information specified in Annex 1 to that decision within five weeks of the date of notification of that decision.

4 Paragraph 18 of Annex 1 to the contested decision states that all documents covered by the request for information that do not fall under Union rules governing legal professional privilege must be provided to the Commission, even if they may be privileged in other jurisdictions.

5 On 20 March 2026, Broadcom sent an email to the Commission setting out its approach to legal professional privilege and requesting it to apply EU law protection to all external lawyers and all categories of legal advice, as well as to exclude documents protected by legal professional privilege under US rules.

6 By email of 26 March 2026, the Commission replied that it '[could] exceptionally agree to withhold in their entirety, at this stage of the investigation, all communications from/to outside counsel containing legal advice, and related attachments'.

7 By application lodged at the Court Registry on 6 May 2026, the applicants brought an action for annulment of the contested decision to the extent that that decision compels the production of documents located outside the territory of the European Union and of documents relating to legal advice from countries which are not members of the European Union that are privileged under the laws of jurisdictions that are not members of the European Union. The applicants have requested, in the alternative, in the event that the Court should find that the contested parts of the contested decision cannot be severed from the remainder of that decision, that the contested decision be annulled in full.

8 By separate document lodged at the Court Registry on 7 May 2026, the applicants brought the present application for interim measures, in which they claim that the President of the General Court should:

– order the suspension of operation of the contested decision, in so far as that decision compels the production of documents that are privileged under the laws of third States, until the Court has ruled on the action for annulment;

– in the alternative, order the Commission to accept the placement of all responsive documents that are privileged under the laws of third States concerned by the contested decision, on a dedicated electronic device, under electronic seal with an independent trusted third party within a period that is reasonable and compatible with the material constraints associated with making copies of the devices containing those documents;

– order the Commission to pay the costs.

9 On 13 May 2026, the Commission adopted Decision C(2026)3350 final relating to a proceeding pursuant to Article 18(3) of Regulation No 1/2003, amending the contested decision (Case AT.40924 – VMware software licensing) ('the amending decision'), in which it found that its services had already informed Broadcom that, although communications between independent lawyers qualified to practise in third countries outside the territory of the European Union and their clients are not privileged under the case-law of the EU Courts, it would exceptionally accept to exclude from the scope of the contested decision communications to and from all external independent lawyers, including those who are qualified to practise in third countries outside the territory of the European Union, that contain legal advice and related attachments.

10 By a measure of organisation of procedure of 22 May 2026, the President of the General Court put to the applicants a question to be answered in writing.

11 In its observations on the application for interim measures, which were lodged at the Court Registry on 28 May 2026, the Commission contends that the President of the General Court should:

– dismiss the application for interim measures in its entirety;

– in the alternative, order that all the documents that are responsive to the search terms set out in Annex 1 to the contested decision and are privileged under the laws of third States be produced to the Commission on a dedicated device that is electronically sealed and will remain sealed until the Court has ruled on the merits of the main action, alongside a privilege log complying with paragraph 14(a) to (h) of Annex 1 to the contested decision;

– order the applicants to pay the costs.

12 On 29 May 2026, the applicants replied to the question put by the President of the General Court.

13 On 23 June 2026, the Commission lodged its observations on the applicants' reply to the question put by the President of the General Court.

**Law**

***The subject matter of the application for interim measures after the adoption of the amending decision***

14 As is apparent from paragraph 9 above, the Commission adopted the amending decision after the date on which the present application for interim measures was lodged. It agreed, exceptionally, to exclude from the scope of the contested decision communications to or from all external independent lawyers, including those qualified to practise in third countries outside the territory of the European Union, that contain legal advice and related attachments.

15 As a preliminary point, it should be noted that the amending decision amends in part the contested decision and therefore the subject matter of the application for interim measures.

16 In response to a measure of organisation of procedure of the judge hearing the application for interim measures, the applicants submitted that, in view of the limited scope of the amending decision, they retained an interest in the suspension of the contested decision. They therefore maintain their request on the ground that, despite the amending decision, the Commission continues not to recognise the legal professional privilege for lawyers qualified to practise in non-EU Member States, and the amending decision is expressly limited to the specific circumstances of the case and remains silent as to in-house counsel outside the European Union.

17 However, the fact remains that the amending decision has an impact on the subject matter of the application for interim measures.

18 The Court points out that a suspension of operation, by its very nature, presupposes the existence of a measure that could produce certain legal effects capable of being the subject of a suspension of operation. For the purpose of the present case, the effect of the amending decision is that the legal effects of the contested decision capable of being the subject of a suspension of operation are limited to communications involving in-house counsel outside the European Union advising on the law of third countries.

19 In the light of the foregoing, there is no longer any need to adjudicate on the application for suspension of operation of the contested decision in so far as that decision refers to

communications to or from all independent external lawyers, including those qualified to practise in third countries outside the territory of the European Union, that contain legal advice and related attachments.

20 By contrast, the amending decision does not contain any provisions concerning communications involving in-house counsel outside the European Union advising on the law of third countries. The application for interim measures therefore retains its subject matter in so far as it relates to those communications, in respect of which the obligation to provide documents has been maintained.

21 Accordingly, the President of the General Court will examine the application for interim measures below only in so far as the contested decision provides for an obligation to produce communications involving in-house counsel outside the European Union advising on the law of third countries.

***Substance***

*General considerations*

22 It is apparent from reading Articles 278 and 279 TFEU together with Article 256(1) TFEU that the judge hearing an application for interim measures may, if he considers that the circumstances so require, order that the operation of a measure challenged before the General Court be suspended or prescribe any necessary interim measures, pursuant to Article 156 of the Rules of Procedure of the General Court. Nevertheless, Article 278 TFEU establishes the principle that actions do not have suspensory effect, since acts adopted by the institutions of the European Union are presumed to be lawful. It is therefore only exceptionally that the judge hearing an application for interim measures may order the suspension of operation of an act challenged before the General Court or prescribe any interim measures (order of 19 July 2016, *Belgium* v *Commission*, T-131/16 R, EU:T:2016:427, paragraph 12).

23 The first sentence of Article 156(4) of the Rules of Procedure provides that applications for interim measures are to state 'the subject matter of the proceedings, the circumstances giving rise to urgency and the pleas of fact and law establishing a prima facie case for the interim measure applied for'.

24 The judge hearing an application for interim relief may thus order the suspension of operation of an act and other interim measures if it is established that such an order is justified, prima facie, in fact and in law, and that it is urgent in so far as, in order to avoid serious and irreparable harm to the applicant's interests, it must be made and produce its effects before a decision is reached in the main action. Those conditions are cumulative, and consequently an application for interim measures must be dismissed if any one of them is not satisfied. The judge hearing an application for interim relief is also to undertake, when

necessary, a weighing of the competing interests (see order of 2 March 2016, *Evonik Degussa* v *Commission*, C-162/15 P-R, EU:C:2016:142, paragraph 21 and the case-law cited).

25 In the context of that overall examination, the court hearing the application for interim measures enjoys a broad discretion and is free to determine, having regard to the particular circumstances of the case, the manner and order in which those various conditions are to be examined, there being no rule of law imposing a pre-established scheme of analysis within which the need to order interim measures must be assessed (see order of 19 July 2012, *Akhras* v *Council*, C-110/12 P(R), not published, EU:C:2012:507, paragraph 23 and the case-law cited).

26 Having regard to the material in the case file, the President of the General Court takes the view that he has all the information needed to rule on the present application for interim measures without there being any need first to hear oral argument from the parties.

*The condition relating to a prima facie case*

27 According to settled case-law, the requirement for there to be a prima facie case is met where at least one of the pleas in law relied on by the applicant for interim measures in support of the main action appears, prima facie, not unfounded. That is the case, inter alia, where one of the pleas relied on reveals the existence of complex issues of law the solution to which is not immediately obvious and therefore calls for a detailed examination that cannot be carried out by the court hearing the application for interim relief but must be the subject of the main proceedings, or where the discussion of issues by the parties reveals that there is a major legal disagreement whose resolution is not immediately obvious (see order of the Vice-President of the Court of 24 May 2022, *Puigdemont i Casamajó and Others* v *Parliament and Spain*, C-629/21 P(R), EU:C:2022:413, paragraph 188 and the case-law cited).

28 In order to show that the contested decision is, prima facie, unlawful, the applicants rely on two pleas in law put forward in support of the main action.

29 By their first plea, the applicants claim that the contested decision infringes EU law, public international law and fundamental rights in that it unlawfully requires the production of documents that are outside the territory of the European Union, including privileged documents protected by the fundamental rights in third States. That plea comprises several parts.

30 In essence, the applicants claim that the Commission exceeded its powers to compel the production of documents that are located overseas, including documents subject to legal professional privilege under the law of third States.

31 By their second plea, the applicants claim that the contested decision infringes the principle of proportionality in so far as it requires the production of documents privileged

under the law of third States.

32 In particular, the applicants claim that the contested decision does not demonstrate, to the requisite legal standard, that the production of documents privileged outside the territory of the European Union is appropriate and necessary.

33 In addition, the applicants submit that it is wholly disproportionate for the Commission to compel the production of documents privileged outside the European Union where such production gives rise to a cascade of serious and irreversible disadvantages entirely disproportionate to any purported investigative benefit.

34 The Commission disputes the applicants' line of argument.

35 Before assessing whether the condition that there be a prima facie case is satisfied, the Court points out, as a preliminary point, that it is settled case-law that the rights of the defence in any proceedings in which penalties, especially fines or penalty payments, may be imposed, such as those provided for in Regulation No 1/2003, are fundamental rights forming an integral part of the general principles of law, whose observance the EU Courts ensure (see, to that effect, judgment of 8 July 2008, *AC-Treuhand* v *Commission*, T-99/04, EU:T:2008:256, paragraph 46 and the case-law cited).

36 It also follows from the case-law that the principle of the protection of the confidentiality of communications between lawyer and client is an essential corollary to the effective exercise of the rights of the defence (judgments of 18 May 1982, *AM & S Europe* v *Commission*, 155/79, EU:C:1982:157, paragraph 23, and of 17 September 2007, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission*, T-125/03 and T-253/03, EU:T:2007:287, paragraph 120). The protection of the confidentiality of communications between lawyer and client precludes the Commission reading the content of such communications and – were the Commission to have read them – the protection of confidentiality would preclude the Commission using such communications as the basis for a decision imposing a fine for an infringement of European Union competition law (judgment of 29 February 2016, *Deutsche Bahn and Others* v *Commission*, T-267/12, not published, EU:T:2016:110, paragraph 49; see also, to that effect, judgment of 17 September 2007, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission*, T-125/03 and T-253/03, EU:T:2007:287, paragraph 86).

– *The first plea in law*

37 In the first place, the applicants argue that the contested decision compels the production of documents located outside the territory of the European Union, without taking account of the fact that they are privileged in a third State. In addition, the applicants claim that the Commission is misreading or misapplying the judgments of 18 May 1982, *AM & S Europe* v *Commission* (155/79, EU:C:1982:157), and of 17 September 2007, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission* (T-125/03 and T-253/03, EU:T:2007:287), which do not relate

to its powers to compel the production of documents privileged outside the territory of the European Union.

38 In that regard, first, the General Court notes that, in the judgment of 18 May 1982, *AM & S Europe* v *Commission* (155/79, EU:C:1982:157, paragraph 21), the Court of Justice, taking account of the common criteria and similar circumstances existing at the time in the national laws of the Member States, has held that the confidentiality of communications between lawyers and clients should be protected at Community level. However, the Court of Justice stated in that judgment that that protection was subject to two cumulative conditions (judgment of 14 September 2010, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission and Others*, C-550/07 P, EU:C:2010:512, paragraph 40).

39 In that context, the Court of Justice stated, first, that the exchange with the lawyer must be connected to 'the client's rights of defence' and, second, that the exchange must emanate from 'independent lawyers', that is to say 'lawyers who are not bound to the client by a relationship of employment' (judgment of 14 September 2010, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission and Others*, C-550/07 P, EU:C:2010:512, paragraph 41).

40 As to the second condition, the Court of Justice observed, in the judgment of 18 May 1982, *AM & S Europe* v *Commission* (155/79, EU:C:1982:157, paragraph 24), that the requirement as to the position and status as an independent lawyer, which must be fulfilled by the legal adviser from whom the communications which may be protected emanate, is based on a conception of the lawyer's role as collaborating in the administration of justice and as being required to provide, in full independence and in the overriding interests of that cause, such legal assistance as the client needs. The counterpart to that protection lies in the rules of professional ethics and discipline which are laid down and enforced in the general interest. The Court of Justice also held that such a conception reflected the legal traditions common to the Member States and was also to be found in the legal order of the European Union, as was demonstrated by the provisions of Article 19 of the Statute of the Court of Justice (judgment of 14 September 2010, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission and Others*, C-550/07 P, EU:C:2010:512, paragraph 42).

41 The Court of Justice has repeated those findings from paragraph 27 of the judgment of 18 May 1982, *AM & S Europe* v *Commission* (155/79, EU:C:1982:157), according to which written communications which may be protected by legal professional privilege must be exchanged with 'an independent lawyer, that is to say one who is not bound to his client by a relationship of employment' (judgment of 14 September 2010, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission* and Others, C-550/07 P, EU:C:2010:512, paragraph 43).

42 It follows that the requirement of independence means the absence of any employment relationship between the lawyer and his or her client, with the result that legal professional privilege does not cover exchanges within a company or group with in-house lawyers

(judgment of 14 September 2010, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission and Others*, C-550/07 P, EU:C:2010:512, paragraph 44).

43 The concept of the independence of lawyers is determined not only positively, that is by reference to the rules of professional ethics and discipline, but also negatively, by the absence of an employment relationship. An in-house lawyer, despite his or her enrolment with a Bar or Law Society and the rules of professional ethics and discipline to which he is, as a result, subject, does not enjoy the same degree of independence from his or her employer as a lawyer working in an external law firm does in relation to his or her client. Consequently, an in-house lawyer is less able to deal effectively with any conflicts between his or her professional obligations and the aims of his or her client (judgment of 14 September 2010, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission and Others*, C-550/07 P, EU:C:2010:512, paragraph 45).

44 The protection thus afforded by EU law to written communications between lawyer and client must apply without distinction to any lawyers entitled to practice his or her profession in one of the Member States, regardless of the Member State in which the client lives. Such protection may not be extended beyond those limits, which are determined by the scope of the common rules of the exercise of the legal profession (see, to that effect, judgment of 18 May 1982, *AM & S Europe* v *Commission*, 155/79, EU:C:1982:157, paragraphs 25 and 26).

45 Second, it is clear from case-law that, although the protection of the confidentiality of communications between lawyer and client takes account of principles and concepts common to the laws of the Member States, what is covered by that protection and the scope thereof constitute an autonomous concept of EU law (see, to that effect, judgment of 18 May 1982, *AM & S Europe* v *Commission*, 155/79, EU:C:1982:157, paragraphs 21 and 22).

46 Therefore, it seems, prima facie, that the uniform and consistent application of EU law would be undermined if the national laws of third countries were decisive in establishing the protection of communications with in-house lawyers qualified to practise in a third country outside the territory of the European Union. The validity of the contested decision and any measure taken pursuant to that decision must be assessed in the light of EU law and not in the light of the law of third countries.

47 Third, recent case-law of the Court of Justice in areas other than competition law continues to emphasise the importance of the independence of lawyers and of their role in a democratic society in defending litigants, namely their status as external legal advisers, for the purposes of recognising legal professional privilege.

48 According to that case-law, the specific protection that Article 7 of the Charter of Fundamental Rights of the European Union ('the Charter') and Article 8(1) of the European Convention for the Protection of Human Rights and Fundamental Freedoms, signed in Rome

on 4 November 1950, afford to lawyers' legal professional privilege, which primarily takes the form of obligations on them, is justified by the fact that lawyers are assigned a fundamental role in a democratic society, that of defending litigants. That fundamental role entails, on the one hand, the requirement, the importance of which is recognised in all the Member States, that any person must be able, without constraint, to consult a lawyer whose profession encompasses, by its very nature, the giving of independent legal advice to all those in need of it and, on the other, the correlative duty of the lawyer to act in good faith towards his or her client (judgment of 26 September 2024, *Ordre des avocats du Barreau de Luxembourg*, C-432/23, EU:C:2024:791, paragraph 50 and the case-law cited).

49 Fourth, in so far as the applicants seek to base their position on the fundamental rights guaranteed by Articles 7, 47 and 48 of the Charter and Articles 6 and 8 of the European Convention for the Protection of Human Rights and Fundamental Freedoms, the Court notes that the claim alleging an infringement of fundamental rights does not add any new complaint to the complaints that have already been relied on in order to demonstrate a breach of the principle of the protection of confidentiality (see, to that effect, judgment of 17 September 2007, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission*, T-125/03 and T-253/03, EU:T:2007:287, paragraph 182).

50 In the second place, the applicants submit that the EU Courts have never examined the Commission's jurisdiction to require the production of documents that are located overseas.

51 First, the Court finds, in that regard, that requests for information, even when they require the production of documents located in a third country, do not involve any coercive or implementing measures on the part of Commission officials on foreign soil.

52 Second, it follows from the case-law applicable in matters of competition law that, in order to justify the Commission's jurisdiction under public international law, it is sufficient to establish either the qualified effects of the practice or its implementation in the European Union (see, to that effect, judgment of 12 December 2018, *Unichem Laboratories* v *Commission*, T-705/14, not published, EU:T:2018:915, paragraph 102).

53 In order to justify the application of the implementation test, the Court of Justice has emphasised that if the applicability of prohibitions laid down under EU law were made to depend on the place where the practice was formed, the result would obviously be to give undertakings an easy means of evading those prohibitions (see, by analogy, judgment of 6 September 2017, *Intel* v *Commission*, C-413/14 P, EU:C:2017:632, paragraph 44 and the case-law cited).

54 The qualified effects test pursues the same objective, namely preventing conduct which, while not adopted within the European Union, has effects liable to have an impact on the EU

market (see, to that effect, judgment of 6 September 2017, *Intel* v *Commission*, C-413/14 P, EU:C:2017:632, paragraph 45).

55 The qualified effects test allows the application of EU and EEA competition rules to be justified under public international law when it is foreseeable that the conduct at issue will have an immediate and substantial effect in the internal market or the EEA (see, to that effect, judgments of 6 September 2017, *Intel* v *Commission*, C-413/14 P, EU:C:2017:632, paragraph 49, and of 25 March 1999, *Gencor* v *Commission*, T-102/96, EU:T:1999:65, paragraph 90).

56 It follows from the foregoing that the Commission must also be entitled to request information from undertakings located outside the European Union in order to assess whether their conduct infringes EU law and is likely to produce a substantial effect on the internal market (order of 12 August 2024, *Nuctech Warsaw Company Limited and Nuctech Netherlands* v *Commission*, T-284/24 R, not published, EU:T:2024:564, paragraph 40).

57 If the Commission did not have such a right, it would not be able to carry out its investigation effectively and this would jeopardise its ability to hold non-EU entities liable for conduct substantially affecting the internal market. Such a situation would also encourage entities established in the European Union to store their data outside the European Union in an attempt to thwart the Commission's investigations (order of 12 August 2024, *Nuctech Warsaw Company Limited and Nuctech Netherlands* v *Commission*, T-284/24 R, not published, EU:T:2024:564, paragraph 41).

58 In the third place, the applicants claim that requiring the production of documents located overseas constitutes an exercise of extraterritorial enforcement jurisdiction that infringes public international law, at a minimum in so far as it concerns documents that are privileged under the law of third States. In addition, the applicants submit that, if the Commission wished to obtain documents located outside the territory of the European Union, including documents that are privileged under the law of a third State, in particular the United States, it must obtain the consent of that State and use the mechanisms recognised by public international law.

59 First, as regards the applicants' argument that the documents are privileged under US law, the Court finds that, even if the applicants might have had a legitimate expectation that communications between lawyer and client, including communications from in-house lawyers, would remain confidential under US law, such an expectation would apply only to requests from US authorities.

60 However, US law cannot be relied on to give rise to a legitimate expectation under EU law, since, in the first place, as is clear from the case-law referred to in paragraphs 42 to 44 above, in-house lawyers qualified to practise in countries outside the European Union do

not enjoy legal professional privilege in competition proceedings and, in the second place, in so far as the applicants suggest that the protection of documents by virtue of professional privilege under the law of third States is required in order to safeguard 'fundamental sovereign interests', they do not put forward any basis, either in EU law or in public international law, in support of their argument that such interests should also be recognised in EU law in the same terms as in the law of a foreign country or that they could affect the scope of the territorial jurisdiction of the European Union.

61 Second, the existence of international cooperation mechanisms, such as the Agreement between the Government of the United States of America and the Commission of the European Communities regarding the application of their competition laws (OJ 1995 L 95, p. 47), concluded on 23 September 1991, the Agreement between the European Communities and the Government of the United States of America on the application of positive comity principles in the enforcement of their competition laws (OJ 1998 L 173, p. 28), concluded on 4 June 1998, or the possibility for the Commission to request the US courts to assist it in the collection of evidence located in the United States, does not affect the Commission's power to require the production of documents which may be stored in the United States.

62 No provision of those cooperation agreements between the European Union and the United States appears, prima facie, to limit the Commission's power to request the information at issue in the present case. Moreover, the possibility of requesting the cooperation of the US courts in enforcing such a request seems instead to indicate that those agreements do not preclude a request for information such as that at issue in the present case.

63 Lastly, it should be added that the Agreement between the Government of the United States and the Commission of the European Communities regarding the application of their competition laws is limited to promoting cooperation and coordination and lessening the possibility or impact of differences between the parties in the application of their competition laws (see, to that effect, judgment of 2 February 2012, *Dow Chemical* v *Commission*, T-77/08, not published, EU:T:2012:47, paragraph 102 and the case-law cited).

64 In the fourth place, while acknowledging that the Commission has implementing powers enabling it to require the production of documents which are located abroad, the applicants submit that it should exercise that power in accordance with the public international law principle of comity.

65 First, as is apparent from the Opinion of Advocate General Léger in *Ingmar* (C-381/98, EU:C:2000:230, point 18 and footnote 4), comity 'means rules of convention, usage or international courtesy which most often guide the conduct of States [;] these are not mandatory rules of law'.

66 Admittedly, international comity presupposes that restraint is called for in asserting extraterritorial jurisdiction (Opinion of Advocate General Wahl in *Intel* v *Commission*, C-413/14 P, EU:C:2016:788, point 283).

67 As the Commission observes, the EU institutions are to take into account important interests of other States and, in particular, the Commission is routinely guided by the principle of international comity. Thus, the Commission applied that principle in the present case by excluding Broadcom's communications with independent external lawyers qualified to practise in the United States from the scope of the contested decision 'based on considerations of international comity in the context of this case'.

68 However, this does not mean that the principle of comity has binding force, which would require the Commission to recognise claims of legal privilege in third countries.

69 Second, it appears, prima facie, that, in any event, international comity is not being disregarded in the present case.

70 Indeed, the Court notes that the present investigation concerns the licensing of VMware's products and services in the EEA. There is therefore a clear internal link with the European Union. The only foreign element is the fact that the undertaking under investigation also operates outside the EEA, where relevant evidence may be located.

71 Consequently, the Court does not find that, prima facie, the territorial jurisdiction of the Commission is not established and that the principle of comity has been infringed.

72 In the fifth place, the applicants observe that the Commission cannot circumvent the limits of its enforcement jurisdiction by targeting Broadcom's EU subsidiary with criminal sanctions.

73 First, the Court finds that the contested decision does not circumvent the alleged limits of the Commission's jurisdiction, in light of the single economic entity theory and Broadcom's business activities in the European Union.

74 Article 18(1) of Regulation No 1/2003 provides that 'in order to carry out the duties assigned to it by this Regulation, the Commission may, by simple request or by decision, require undertakings and associations of undertakings to provide all necessary information'.

75 In that regard, it should be stated that, for the purposes of applying the competition rules, referred to in Articles 101 and 102 TFEU, the concept of 'undertaking' covers any entity engaged in an economic activity, irrespective of the legal status of that entity and the way in which it is financed. The concept of an undertaking therefore designates an economic unit even if in law that economic unit consists of several persons, natural or legal. That economic unit consists of a unitary organisation of personal, tangible and intangible elements, which

pursues a specific economic aim on a long-term basis (see judgment of 13 February 2025, *ILVA (Fine for an infringement of the GDPR)*, C-383/23, EU:C:2025:84, paragraph 22 and the case-law cited).

76 Therefore, it seems, prima facie, that the concept of 'undertaking' underpins the substantive and procedural rules of competition law, including the Commission's investigative powers.

77 It follows, in the present case, that, even if the Commission could have addressed the request for information only to the subsidiary VMware International, the obligations of the parent company Broadcom would have been the same as in the present situation where both companies are addressees of the contested decision.

78 Second, the Court observes that, as regards US companies, decisions adopted under Article 18(3) of Regulation No 1/2003, non-compliance with which entails a risk of fines and periodic penalty payments, are generally adopted in order to prevent a response to a 'mere' request for information under Article 18(2) of that regulation from being regarded as a waiver of professional privilege under US law.

– *The second plea in law*

79 As regards the second plea in law, alleging that the contested decision infringes the principle of proportionality in so far as it requires the production of documents that are privileged under the law of third States, the Court notes that, according to settled case-law, the principle of proportionality requires that acts of the institutions of the Union be appropriate for attaining the legitimate objectives pursued by the legislation at issue and that they not exceed the limits of what is necessary in order to achieve those objectives, on the understanding that, where there is a choice between several appropriate measures, recourse must be had to the least onerous, and the disadvantages caused must not be disproportionate to the aims pursued (see judgment of 18 June 2026, *Fachverband Eisenhüttenschlacken* v *Commission*, C-754/24 P, not published, EU:C:2026:501, paragraph 133 and the case-law cited).

80 In addition, the Court finds that, having regard to the broad powers of investigation conferred on the Commission by Regulation No 1/2003, it is for the Commission to decide whether a particular item of information is necessary to enable it to bring to light an infringement of the competition rules (see judgment of 28 January 2021, *Qualcomm and Qualcomm Europe* v *Commission*, C-466/19 P, EU:C:2021:76, paragraph 69 and the case-law cited).

81 As regards the judicial review exercised by the EU judicature of the Commission's finding that an item of information is necessary, the Court of Justice has held that necessity had to be judged in relation to the purpose stated in the request for information, namely the

suspected infringement which the Commission intends to investigate. The requirement that a correlation must exist between the request for information and the suspected infringement is satisfied if the Commission could reasonably suppose, at the time of the request, that the information may help it to determine whether the infringement has taken place (see judgment of 28 January 2021, *Qualcomm and Qualcomm Europe* v *Commission*, C-466/19 P, EU:C:2021:76, paragraph 70 and the case-law cited).

82 Thus, first, it is appropriate to rule, prima facie, on the lawfulness of the contested decision, in particular by examining, in the context of the present plea, the applicants' arguments alleging that the information requested was not appropriate and necessary.

83 In the present case, the Court finds that, according to recital 7 of the contested decision, the information listed in Annex 1 to that decision is necessary to assess the compatibility of the practices mentioned in recitals 1 and 3 of that decision with EU competition rules in full knowledge of the facts and in their correct economic context.

84 According to recital 1 of the contested decision, the subject matter of the Commission's investigation is potentially anticompetitive behaviour by Broadcom and its subsidiaries with regard to the development of VMware products and services, and their licensing in the EEA. According to recital 3 of that decision, the Commission received information alleging that Broadcom is abusing its dominant position in several markets for virtualisation software, in particular by tying or bundling VMware products and services, charging abusive prices, limiting interoperability and applying other unfair contract terms and negotiating practices increasing customer lock-in.

85 Contrary to what is claimed by the applicants, it appears, prima facie, likely that the documents that (i) are responsive to the search terms set out in the contested decision, (ii) were prepared for Broadcom's board of directors or senior management and (iii) concern the development and licensing of VMware products and services are relevant to both the EEA and other territories. Broadcom operates globally and its main strategic decisions relating to the development and licensing of VMware virtualisation software also have a global dimension.

86 While Broadcom's licensing agreements may be tailored to specific regions or customers, the main elements of Broadcom's licensing strategy are intended to apply worldwide. Given that the market is global, any document relating to the development and licensing of VMware virtualisation software that is explicitly linked to the EEA, or which is not linked to any other particular geographic area, is, prima facie, relevant to the Commission's investigation. Accordingly, even documents that appear, prima facie, to be linked to third countries may also be relevant when they are responsive to the search terms set out in the contested decision, irrespective of their nature or authors, including in-house lawyers qualified to practise in a third country outside the territory of the European Union.

87 Therefore, the fact that all documents responsive to the search terms set out in the contested decision are, in all likelihood, relevant establishes, prima facie, that it is appropriate and necessary that those documents be produced, including communications with in-house lawyers qualified to practise in a third country outside the territory of the European Union.

88 Second, as regards the applicants' arguments alleging lack of proportionality 'stricto sensu', it appears, prima facie, that requiring the production of all the documents responsive to the search terms set out in the contested decision is also 'proportionate stricto sensu'.

89 In that regard, the Court notes that, where several fundamental rights and principles enshrined in the Treaties are at issue, the assessment of observance of the principle of proportionality must be carried out in accordance with the need to reconcile the requirements of the protection of those various rights and principles at issue, striking a fair balance between them (see judgment of 26 April 2022, *Poland* v *Parliament and Council*, C-401/19, EU:C:2022:297, paragraph 66 and the case-law cited).

90 As is apparent from paragraphs 37 to 49 above, according to case-law, the enhanced protection accorded to legal advice by virtue of the rights of the defence and the right to a fair trial enshrined in Article 47 of the Charter and the right to respect for communications enshrined in Article 7 of the Charter does not cover communications with in-house lawyers. On the contrary, the EU Courts have already ruled against it covering such communications on the ground that in-house lawyers are not independent (judgment of 14 September 2010, *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission and Others*, C-550/07 P, EU:C:2010:512, paragraph 44).

91 In the context of the review of proportionality referred to in Article 52(1) of the Charter, in the first place, the Court notes that the obligation to produce documents responsive to the search terms set out in the contested decision is laid down by law, namely by Article 18(3) of Regulation No 1/2003.

92 In the second place, the obligation to produce all the documents responsive to the search terms set out in the contested decision meets a general interest objective recognised by the European Union, namely to enable the Commission to carry out the task entrusted to it by the Treaties of ensuring compliance with the competition rules in the internal market and to prevent competition from being distorted to the detriment of the general interest, individual undertakings and consumers.

93 In the third place, as is made clear in the amending decision, the obligation to produce documents responsive to the search terms set out in the contested decision excludes communications with independent external legal counsel established in non-EU countries that contain legal advice. Given the fundamental differences between independent external

legal counsel and in-house lawyers, that exclusion is sufficient to avoid undermining the substance of the rights of defence, the right to a fair trial or the right to respect for private life.

94 In the fourth place, as regards 'proportionality stricto sensu', the requirement to produce documents responsive to the search terms set out in the contested decision is appropriate for the purposes of attaining the general interest objectives pursued by the Commission and does not go beyond what is necessary. Communications with independent external lawyers are excluded, and the Commission acknowledges that documents responsive to the criteria in the contested decision that are unrelated to the subject matter of the investigation must be returned.

95 In addition, it appears, prima facie, that the applicants have not demonstrated, to the requisite legal standard, that the production of communications with in-house lawyers qualified to practise in a third country outside the territory of the European Union as a result of the contested decision would require them to waive the professional privilege recognised in other States.

96 Indeed, Annex A.37 to the application for interim relief contains a note from the Organisation for Economic Cooperation and Development (OECD) on the treatment of legally privileged information in competition proceedings, in which it is stated that '… if the information that would be privileged is voluntarily shared, the privilege is lost[;] however, disclosure of privileged information made following a compulsory agency request (for example, by an agency in another jurisdiction) may not waive the privilege, either vis-à-vis third parties or in other jurisdictions with a higher level of privilege protection' (Annex A.37 to the application for interim relief, page 965, paragraph 37). In particular, that note confirms that, according to US case-law, compulsory disclosures do not waive privilege in the US (Annex A.37 to the application for interim relief, page 966, Box 9).

97 Similarly, the judgment delivered on 20 April 1978 by the United States Court of Appeals for the Ninth Circuit (United States) confirms that the compulsory production of documents does not entail a waiver of the legal professional privilege (Annex IM.B.7 to the Commission's observations).

98 In a note from the United States to the OECD of 26 November 2018 on the treatment of legally privileged information in competition proceedings, the US authorities stated that an entity providing documents to a non-US competition authority should clearly identify the information that would be subject to US legal privilege. In such a case, if the US agencies receive information from a non-US competition authority that an entity claims is privileged in the United States, the US agencies are to treat such information as inadvertently produced privileged information (Annex IM.B.7 to the Commission's observations,

paragraph 17), with the result that such production would not entail a waiver of professional privilege under US law.

99 In the present case, it appears, prime facie, first, that the disclosure of the information was made following a compulsory request, namely the contested decision, adopted under Article 18(3) of Regulation No 1/2003, which provides that fines and periodic penalty payments could be imposed in the event of an incomplete reply and, second, that Broadcom expressly requested the Commission to exclude documents covered by professional privilege under US law, which was refused in part by the Commission.

100 There is therefore no basis for claiming that Broadcom would have waived professional privilege under US law as a result of it producing the documents to the Commission.

101 It follows from all the foregoing that, without in any way prejudging the Court's position in the action in the main proceedings, it cannot be concluded that there is a prima facie case.

*The weighing up of interests*

102 According to settled case-law, the weighing up of interests requires the judge hearing the application for interim measures to determine whether or not the applicant's interest in obtaining the interim measures sought outweighs the interest in the immediate application of the contested measure by examining, more specifically, whether the possible annulment of that measure by the Court when ruling on the main application would allow the situation which would have been brought about by its immediate operation to be reversed, and, conversely, whether suspension of operation of the measure would prevent it from being fully effective in the event of the main application being dismissed (see order of the President of the Court of 26 June 2003, *Belgium and Forum 187* v *Commission*, C-182/03 R and C-217/03 R, EU:C:2003:385, paragraph 142 and the case-law cited).

103 As regards more particularly the condition that the legal situation created by an interim relief order must be reversible, it must be recalled that the purpose of the procedure for interim relief is to guarantee the full effectiveness of the future decision on the main action. Consequently, that procedure is merely ancillary to the main action to which it is an adjunct, and accordingly the decision made by the judge hearing an application for interim relief must be provisional in the sense that it cannot either prejudge the future decision on the substance of the case or render it illusory by depriving it of practical effect (see order of 1 September 2015, *Pari Pharma* v *EMA*, T-235/15 R, EU:T:2015:587, paragraph 65 and the case-law cited).

104 In the present case, it is a question of weighing up, on the one hand, the interest in avoiding the alleged harm that may arise from the fact that, in order to implement the contested decision, the applicants are required to produce documents located outside the territory of the European Union relating to communications with in-house lawyers qualified

to practise in a third country outside the territory of the European Union and, on the other hand, the public interest in ensuring the effectiveness of EU law and the proper functioning of the internal market.

105 In that regard, as regards the applicants' interests, the Court notes, as a preliminary point, that, according to Article 18(1) of Regulation No 1/2003, headed 'Requests for information', in order to carry out the duties assigned to it by that regulation, the Commission may, by simple request or by decision, require undertakings and associations of undertakings to provide all necessary information.

106 In the context of the above, first, it must be stated that the applicants have chosen to carry out commercial activities in the internal market of the European Union. Like any other economic operator, they are therefore subject to the EU rules which govern the functioning of that market. If the Commission seeks to assess whether those rules are being complied with by means of requests for information, such as those provided for in Article 18 of Regulation No 1/2003, the applicants cannot, in principle, rely on the rules of a third State to object to the application of EU law to which they intentionally submitted (see, to that effect, order of 12 August 2024, *Nuctech Warsaw Company Limited and Nuctech Netherlands* v *Commission*, T-284/24 R, not published, EU:T:2024:564, paragraph 80).

107 Second, even if the risks arising from the application of the law of a third State should exceptionally be weighed against the need to ensure compliance with EU law, the Court observes that, as is stated in paragraphs 95 to 100 above, the applicants have not demonstrated that complying with the contested decision would constitute a sufficiently direct cause of any kind of waiver of professional privilege recognised in third States.

108 Third, assuming that the applicants are successful in the main proceedings, all communications with in-house lawyers qualified to practise in a third country outside the territory of the European Union which have been provided to the Commission will be removed from the file, with the result that the Commission will not be able to rely on any of those documents against the applicants, which would remedy any potential damage resulting from the Commission's reading of the documents in question.

109 On the other hand, as regards the interest defended by the Commission, it must be borne in mind that that institution's task is to ensure that the conditions of competition within the European Union's internal market are not distorted. As referred to in paragraph 57 above, the Commission must therefore be in a position to carry out its investigations effectively and be entitled to request information from all undertakings which carry out commercial activities in the European Union, whether they are controlled by entities in the Member States or in third States, in order to assess whether their conduct in that market infringes EU law. If that were not the case, undertakings controlled from third States would benefit from a competitive and procedural advantage compared with those which are controlled by

entities located inside the European Union (see, to that effect, order of 12 August 2024, *Nuctech Warsaw Company Limited and Nuctech Netherlands* v *Commission*, T-284/24 R, not published, EU:T:2024:564, paragraph 85).

110 In that context, it is for the Commission to decide whether a particular item of information is necessary to enable it to bring to light an infringement of the EU competition rules.

111 If the undertaking under investigation was itself able to decide which documents are, in its view, relevant for the purposes of that investigation, that would seriously undermine the Commission's powers of investigation, given the risk of the documents that the Commission might consider relevant for the purposes of its investigation being omitted and never being submitted to it, in the absence of any possibility of review.

112 Furthermore, the Court notes, as the Commission did, that an order granting a suspension of operation of the contested decision would encourage any undertaking under investigation to raise similar arguments in any pending or future case and to seek interim measures in the event that the Commission does not grant the request for exclusion of communications with in-house lawyers qualified to practise in a third country outside the territory of the European Union. Even if that authority of precedent goes beyond the scope of the present case, there is a genuine risk of the Commission being prevented from accessing any communication with in-house lawyers, irrespective of the third country in which those lawyers are qualified to practise, until the decision on the substance in the main proceedings has become final. Systemic consequences for the enforcement of EU competition rules such as those run counter to the general interest in the effective application of those rules.

113 It follows from the foregoing that the interest defended by the Commission must prevail over the applicants' interest.

***Conclusion***

114 In the light of all the foregoing, there is no longer any need to adjudicate on the application for suspension of operation of the contested decision in so far as that decision refers to communications to or from all independent external lawyers, including those qualified to practise in third countries outside the territory of the European Union, that contain legal advice and related attachments.

115 The application for interim measures must be dismissed as to the remainder.

116 Since the present order closes the proceedings for interim measures, the Court must cancel the order of 22 May 2026, *Broadcom and VMware International* v *Commission* (T-280/26 R, not published), adopted on the basis of Article 157(2) of the Rules of Procedure,

pursuant to which the Commission had been ordered to suspend the operation of the contested decision.

**Costs**

117 Under Article 158(5) of the Rules of Procedure, the costs are to be reserved.

On those grounds,

THE PRESIDENT OF THE GENERAL COURT

hereby orders:

**1. There is no longer any need to adjudicate on the application for suspension of operation of the contested decision in so far as that decision refers to communications to or from all independent external lawyers, including those qualified to practise in third countries outside the territory of the European Union, that contain legal advice and related attachments.**

**2. The application for interim measures is dismissed as to the remainder.**

**3. The order of 22 May 2026, *Broadcom and VMware International* v *Commission* (T-280/26 R), is cancelled.**

**4. The costs are reserved.**

Luxembourg, 3 August 2026.

V. Di Bucci M. van der Woude

Registrar President

---

* Language of the case: English.