THREE GATEWAY CENTER
100 Mulberry Street, 15th Floor
Newark, NJ 07102
T: 973.757.1100
F: 973.757.1090
WALSH.LAW

Liza M. Walsh
Direct Dial: (973) 757-1100
lwalsh@walsh.law

**HIGHLY CONFIDENTIAL**

**VIA ECF** September 2, 2026

Honorable Leda Dunn Wettre, U.S.M.J.
U.S. District Court for the District of New Jersey
Martin Luther King Jr. Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

**Re:** ***In re: Apple Inc. Smartphone Antitrust Litigation***
**Civil Action No. 2:24-md-03113-JXN-LDW (MDL 3113)**

**Apple's Response Regarding Watch Plaintiff's Proposed Additional Custodians**

Dear Judge Wettre:

This firm, together with Gibson, Dunn & Crutcher LLP, represents Defendant Apple Inc. ("Apple") in the above-captioned matter. Apple respectfully submits this letter brief in opposition to Watch Plaintiff's request that Apple designate twelve additional document custodians (Dkt. 294).[1]

---

[1] Watch Plaintiff characterizes the dispute as concerning fourteen custodians. However, there are only twelve custodians in dispute.

Apple has agreed to produce documents from 59 custodians in addition to many other sources. The millions upon millions of documents that Apple has and continues to review as a result touch upon every facet of this litigation. A week ago, Special Master Linares rejected a request by iPhone Plaintiffs to compel additional custodians relevant to Apple's relationship with retailers because identifying them and searching their documents was not "proportional to the needs of the case" in light of other custodians who covered the same subjects. Dkt. 296 at 8. This dispute is no different: As Watch Plaintiff's own exhibits show, agreed-upon custodians wrote or received the documents relevant to Watch Plaintiff's claims. Watch Plaintiff's request for additional, burdensome discovery should be rejected.

## I. BACKGROUND

Custodian negotiations began in the Government Action, which implicates essentially the same factual issues as this case. Just as Government Plaintiffs allege Apple uses "control of critical APIs[] to degrade the functionality of third-party cross-platform smartwatches," Gov't Compl. ¶ 100, Watch Plaintiff claims that Apple "us[ed] anticompetitive contracts and its control over iOS to limit, disrupt, and degrade competitor smartwatches," Am. Compl. ¶ 31; that "by designating certain APIs private" Apple can "selectively limit the functionality of competitor smartwatches when paired to an iPhone," *id.* ¶ 49; and that Apple "used its ability to approve or reject third-party apps under the App Review Guidelines to delay the launch of smartwatch competitors' companion apps," *id.* ¶ 115. As a result, many of the fifty-four custodians negotiated in the Government Action have documents related to Apple's Watch business: For example, the Director of Apple Watch Software; the Senior Director of Software Engineering for watchOS; the Vice President of Product Marketing responsible for Apple Watch; and Apple's former Chief Operating Officer, who oversaw the Watch business.

Watch Plaintiff protests that MDL Plaintiffs "had no role in selecting" these custodians. But they received invitations to the parties' relevant meet-and-confers from December 2025 to February 2026. Def. Ex. 1. MDL Plaintiffs either chose not to attend or to attend and be silent. Either way, they raised no concerns until surfacing months later with a demand that Apple add *sixty-one* additional custodians. Apple objected to that proposal, which would have more than doubled the significant burden of document discovery in this litigation. It then took months for MDL Plaintiffs to explain why they thought their proposed custodians had unique information. Apple ultimately agreed to add five more custodians as a compromise, all from MDL Plaintiffs' proposed list. *See* Pl. Ex. 2. Among them are a VP of Sensing & Connectivity; a VP of Software Engineering; and a former executive who has a decades-long history of providing developers with technical support.

Watch Plaintiff now seeks to add *12* more custodians to the agreed-upon set of 59. Each of the first eleven (a) reports to individuals who are already agreed custodians, so relevant information about their work will already be in the files Apple has collected and searched; (b) performed work that was routed to and visible to agreed custodians; and/or (c) worked on matters that are not at issue in this case. The twelfth "custodian" is an administrative email inbox that cannot receive outside mail. If each proposed custodian has the same number of documents as the first 54, Apple would need to review about 2.5 million more documents—on top of the 11 million it took several months to review in response to Government Plaintiff RFPs (and MDL Plaintiffs' similar RFPs), the millions more Apple is currently reviewing with TAR, the voluminous data Apple is producing,

and other burdensome discovery such as production of certain submissions to, communications with, and productions to the European Commission in three investigations. Dkt. 293.

While Watch Plaintiff's current demand would imperil the extended schedule the parties now seek (*see* Dkt. 312), this dispute is just the beginning. Ignoring Apple's repeated requests, each iPhone Plaintiff group refuses to say how many more custodians it will seek—or when it will come to the Court with that request. Even when proposing the custodians in dispute here in June, Watch Plaintiff said he may ask for more custodians at a later time. This serial approach has no apparent end and appears aimed to understate the actual burden of their requests and then, if more custodians are compelled, allow MDL Plaintiffs to blame Apple for any resulting delay. *See, e.g.*, Dkt. 312.

## II. ARGUMENT

A party is entitled only to discovery that is relevant and proportional to the needs of the case, and a court must limit discovery that is "unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(1), (b)(2)(C)(i). As the producing party, Apple is presumed best positioned to identify its own custodians, and a party seeking to compel additional custodians bears "a noticeably heavy burden . . . to demonstrate that the custodial choices . . . were deficient or lacking." *LifeScan, Inc. v. Smith*, 2023 WL 11986899, at *3 (D.N.J. Sept. 27, 2023).

Watch Plaintiff argues he does not face a "heavy burden" because Watch Plaintiffs "cannot rely on custodians selected for the Government's smartphone-centric action." Br. at 2. But as the JPML explained in rejecting Watch Plaintiff's argument of "minimal overlap," these actions "involve substantial factual overlap and common discovery." Dkt. 1 at 2. Many of the agreed-upon custodians were selected because of their Watch work, which included supervising most of the custodians Watch Plaintiff now seeks. So even if Watch Plaintiff asserts "legal theories" that are "distinct," Dkt. 34 at 5, these cases were centralized precisely to "avoid duplicative discovery" of the kind sought here. Dkt. 1 at 2. Because Watch Plaintiff has not shown that each proposed custodian holds meaningful information "different from [and] not merely duplicative of" what Apple already has agreed to provide, his duplicative and disproportionate demand should be rejected. *LifeScan, Inc. v. Smith*, 2022 WL 20853087, at *10 (D.N.J. July 29, 2022); *see also* Dkt. 296 at 7-8 (requiring that ESI from new custodians must be "different from and not simply duplicative of, information that the responding party has already produced").[2]

### A. Custodians with "Relationships With Third Parties"

[redacted]. [redacted] is a developer-partnership manager. He is a non-supervisory employee who reports to [redacted], an agreed-upon custodian who in turn reports to another agreed-upon custodian who in turn reports to another agreed-upon custodian. Watch Plaintiff cites [redacted] deposition testimony describing [redacted] as the "Apple Watch specialist," but she also

[2] The decisions Watch Plaintiff cites do not suggest he faces a diminished burden here. *See City of Sterling Heights Gen. Emp. Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5055241, *3-4 (D.N.J. Aug. 21, 2015) (rejecting majority of proposed custodians because they were likely duplicative and implicated "sizeable costs"); *NLRB v. 710 Long Ridge Road Operating Co. II, LLC*, 2020 WL 3026523, at *2–3 (D.N.J. June 5, 2020) (adding one custodian for a total of three where no party claimed undue burden).

testified that he is "an individual contributor." Pl. Ex. 5 at 24:17–25:9. The contributions he made that apparently interest Watch Plaintiff included escalating developer feedback on "APIs, Programs, App Review" to "management" and his work in "Weekly reports" and "1:1 meetings with [his] manager"—all of which involved or flowed to agreed-upon custodians. Pl. Ex. 6 at -177–78; *see also, e.g.*, Def. Ex. 3 (escalating proposal about Watch feature strategy to agreed-upon custodian). Watch Plaintiff cites a single email in which [redacted] remarked that a developer should have "start[ed] with [redacted] and I." Pl. Ex. 7. A lone remark about where a developer should have *begun* its inquiry does not show that agreed-upon custodians are inadequate: Discovery "is not designed to unveil every piece of information"; it exists to give parties information needed "at trial to prove a claim or defense." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000).

[redacted]. [redacted] is a strategic-partnerships manager in the Worldwide Developer Relations organization. He is part of a reporting line consisting of six agreed-upon custodians: [redacted], [redacted], [redacted], [redacted], [redacted], and [redacted]. His day-to-day exchanges about Garmin—the principal point of supposed relevance—were visible up that chain, as the very documents Watch Plaintiff cites show. *See* Def. Ex. 4 at -986 (escalated to [redacted] as part of weekly update); Def. Ex. 5 at -495 (similar to [redacted]). And the Garmin meeting Watch Plaintiff says no agreed custodian attended, Br. at 3, was memorialized in a report to an existing custodian, [redacted]. *See* Def. Ex. 6. The supposed "missing document" is a link to a different employee's working notes. Pl. Ex. 12 at -420. Watch Plaintiff has not shown the six agreed-upon custodians are inadequate.

[redacted]. Watch Plaintiff describes [redacted] as a "senior leader" who "directs large teams" and was responsible for addressing Garmin's alleged interoperability concerns. Br. at 3. But the reference to "direct[ing] large teams" was about tallying bug fixes across more than a dozen Apple organizations—program-management reporting, not team leadership. Pl. Ex. 8. [redacted]'s work on issues related to Garmin was shared with a supervisor who is among the agreed-upon custodians. Pl. Ex. 9. That includes the meeting about which Watch Plaintiff says he "took notes" and "shared updates." Br. 3. Those notes and updates were shared with an agreed-upon custodian (Pl. Ex. 10) who received reports from [redacted] and directed his work about Garmin's requests. Def. Ex. 19.

### B. "APIs and App Review" Custodians

[redacted]. [redacted] is the former director of App Review, the team that reviews third-party apps for compliance with App Review Guidelines. Watch Plaintiff argues that [redacted] documents are relevant to his allegations that the Guidelines were enforced in a way that harmed smartwatch competition. Br. at 4. But [redacted] left Apple in 2016, four years before the beginning of the purported class period; and Apple has already agreed on custodians who worked closely with him while he was at Apple [redacted], *see* Def. Ex. 7) and who replaced him and have led App Review since [redacted] departure. Watch Plaintiff's own exhibits show that issues related to his claims were raised to, decided by, and documented in the files of agreed-upon custodians. *See* Pl. Ex. 43. For example, [redacted]. Pl. Ex. 40. Watch Plaintiff has the text of the Guidelines themselves to argue that their content was anticompetitive; and agreed-upon custodians already have documents reflecting the interpretation and enforcement of the Guidelines during the period

relevant to his claims.

[redacted] is an administrative channel, not a person. [redacted] The substantive communications about API review reside in the files of agreed-upon custodians who conduct and oversee that process. *See, e.g.*, Def. Ex. 8; Def. Ex. 9. Potentially relevant emails thus likely were sent to an agreed-upon custodian in addition to the administrative mailbox, as Watch Plaintiff's own exhibit shows. *See* Pl. Ex. 42. Collecting the mailbox would simply yield a large volume of automated, administrative traffic and essentially nothing of substance.[3]

### C. "Software Engineering" Custodians

Watch Plaintiff seeks to add four current and former Watch software engineers. Br. at 4-5. But Apple has already designated as a custodian its former Chief Operating Officer, who led the team responsible for "software and hardware engineering" for the Watch. Def. Ex. 2 at 253:20-23. Apple's custodians also include six software engineering and connectivity custodians who worked on Watch as well as an additional senior Watch software engineering leader.

[redacted]. [redacted], an engineering manager, reported to agreed custodian [redacted] within a Watch software organization co-led by agreed custodian [redacted]. *See* Pl. Ex. 28; Def. Ex. 10 (similar); Def. Ex. 11 (similar). Watch Plaintiff contends that [redacted] leads the "Messages app on the watch," that Apple employees contact him about messaging interoperability, and that he discussed RCS support. Br. at 4-5. But the documents Watch Plaintiff cites show routine engineering work performed under and reported to agreed custodians. *See, e.g.*, Pl. Ex. 29; *see also* Def. Ex. 12; Def. Ex. 13. As an illustrative example, [redacted] "checked with" an existing custodian ([redacted]) and directed his colleagues to two other custodians ([redacted] and [redacted]) for information about the "[d]ecision to support RCS"—all on a thread copying yet another agreed-upon custodian ([redacted]). Pl. Ex. 30.

[redacted]. Watch Plaintiff contends that [redacted] "built the team that launched Apple Watch," has deep knowledge of the technology for pairing Apple devices, and "directed third-party app developers to route technical issues through his team." Br. at 5. But his launch-era work on watchOS is duplicative of other engineering custodians. When a third party contacted Apple engineers directly, for example, he responded that "the technical parts of this relationship should be handled by WWDR"—routing the matter away from his own team to an organization already covered by agreed custodians ([redacted], [redacted], [redacted]). Pl. Ex. 34. The exhibits

[3] The ESI protocol Watch Plaintiff invokes does not help him either. *See* Br. at 4 n.4. Appendix A defines the "Custodian" metadata field that accompanies produced documents, an instruction for formatting production load files. Dkt. 100-2. It does not set out a standard for which sources must be designated as custodians.

cited for his claimed knowledge of pairing technology and of a discontinued compatibility project show the same routing. *See* Pl. Ex. 32 (routing information to [redacted]); Pl. Ex. 33 (similar). And [redacted] work is routinely captured in the already-collected files of agreed custodians, including [redacted] (Def. Ex. 14) and [redacted] (Def. Ex. 15).

[redacted]. Engineering director [redacted] is duplicative of [redacted], who holds the same position and reports to the same manager, [redacted]—both agreed custodians. Watch Plaintiff contends that [redacted] "is responsible for requests to make APIs available to third-party developers" and is "uniquely attuned" to developer needs. Br. at 5. But their evidence does not bear that out. In the first exhibit, [redacted] included [redacted] on a request to pre-review an API entitlement request before it went to two executives, both of whom are custodians, for approval. Pl. Ex. 36. In the other exhibit, for custodian [redacted], [redacted] compiled a summary of Apple's framework documentation on third-party hardware access for an internal inquiry. Pl. Ex. 35. In short, [redacted] prepares requests; the decisions are made and documented in already-collected custodial files. *See, e.g.*, Def. Ex. 16 (entitlement request submitted by [redacted] and approved by an existing custodian, on a thread with six other agreed custodians). In fact, the remark that Watch Plaintiff cites to supposedly demonstrate [redacted] relevance was made by an agreed-upon custodian who [redacted] merely quoted back. Pl. Ex. 37.

[redacted]. Watch Plaintiff requests to add [redacted], an engineer no longer at Apple. That request is based on a single document which describes [redacted] as an internal testing resource, not a decision-maker. Pl. Ex. 31. Testing whether pairing works says nothing about Apple's decisions on how pairing works. Watch Plaintiff asserts that it is "more than fair to infer" that [redacted] "possesses relevant, unique documents." Br. at 5. But other documents show that when [redacted] was asked about this project in the ordinary course, others on the team—including agreed custodian [redacted]—handled it without him. Def. Ex. 17; *see also* Def. Ex. 18 (showing that almost all pairing issues were handled by others).

### D. "Product Marketing, Design, and Strategy" Custodians

[redacted]. [redacted] is a market research analyst who reports to an agreed-upon custodian who in turn reports to another agreed-upon custodian. Watch Plaintiff contends that [redacted] is Apple's "go-to person" for Watch market research and that senior executives contact her for market data. Br. at 5. But her role was to circulate market data purchased from third-party vendors to others, including agreed-upon custodians. *See* Def. Ex. 20. Watch Plaintiff relies on a truncated email (Pl. Ex. 25) in which an executive asked about Apple's worldwide smartwatch share. But the full thread shows [redacted] an agreed-upon custodian, supplied both the market-share figure and the "Smartwatch Market Share" slide. Def. Ex. 21. The document listing her as the "Directly Responsible Individual" for certain market analyses (Pl. Ex. 23 at -469)—confirms only her role in preparing analyses that were delivered up her reporting chain into agreed custodians' files.

[redacted]. As Director of Apple Watch Product Marketing, [redacted] sits in a reporting chain that runs through four agreed custodians ([redacted], [redacted], and [redacted]), and his marketing work is almost certainly captured within their custodial files. *See, e.g.*, Def. Ex. 22; Def. Ex. 23. Watch Plaintiff contends that [redacted] participates in "unique and highly probative

conversations" about competition and strategy. Br. at 6. But in the thread cited by Watch Plaintiff (Pl. Ex. 21), the answer to the question posed by [redacted] came from an agreed custodian, [redacted], who set out Apple's position and participated in every message in the thread. Decisions about RCS again likewise sat with agreed custodians: the 2017 marketing agenda noted that they "need[ed]" executives, all of whom are custodians, to "make the call" and "sign off." Def. Ex. 24 at -944. And the "one-on-one meeting *without* any of the custodians he purportedly reports to" (Br. at 6) was with [redacted]—an agreed custodian. Pl. Ex. 21.

[redacted]. [redacted] work concerned how Apple products physically look and feel, not the alleged pricing, distribution, contractual, or platform-access conduct relevant to Watch Plaintiff's claims. The magazine interview cited by Watch Plaintiff shows just that: it describes what Apple set out to build, not [redacted] role in building it. Br. at 6. Although "[redacted] and the design team" conceived Watch, [redacted] led "the development of the Apple Watch." Def. Ex. 2 at 47:4-13. Watch Plaintiff responds that [redacted] had "broad influence over the direction of the Apple Watch," but the exhibits Watch Plaintiff cites highlight his role as a designer—a press release discusses craftsmanship, straps, and watch faces (Pl. Ex. 15 at -541), for example, consistent with his focus on "user interface" and "user experience" during the Watch's development (Pl. Ex. 16 at 23:1-9). The original development of Watch's user interface has little if any bearing on a case with a class period beginning in 2020 that challenges Apple's alleged restrictions on interoperability and API access. In any event, Watch's initial development is already covered by agreed custodians, including [redacted] and other long-time engineering and marketing leaders. *See* Pl. Ex. 17 (a one-line "tech roadmap" email forward from [redacted] to [redacted], answered by two other agreed custodians); Pl. Ex. 18 (email about competitor research that does not include [redacted] at all).

* * *

Having failed to justify the inclusion of any additional custodians, Watch Plaintiff cannot fault Apple for failing to provide hit counts for his proposed custodians. *See* Br. at 6. Generating hit counts would require Apple first to collect and process the files of the very individuals whose addition is in dispute—imposing the disputed burden before the question is resolved. In the case Watch Plaintiff cites, hit reports there were ordered to test counsel's unsubstantiated representation that no responsive documents existed. *Arconic Inc. v. Novelis Inc.*, 2018 WL 5660142, at *3 (W.D. Pa. Aug. 28, 2018). By contrast, the burdens associated from collecting, processing, hosting, and searching the files of custodians who hold cumulative and duplicative information are well-documented and clear in this case. Against a 59 custodian set built for substantially overlapping claims, any marginal value from 11 more custodians—each drawn from a collected reporting line or from matters not at issue—or the API-Central administrative channel, cannot justify the burden of collection, processing, review, and production.

## III. REQUESTED RELIEF

Watch Plaintiff's request for additional custodians should be denied. Apple respectfully submits that oral argument is unnecessary unless the Court or Special Master would find it helpful to the resolution of this dispute. Apple also respectfully requests that, if this dispute is referred, the Special Master issue written findings of fact and conclusions of law when resolving this dispute.

Respectfully submitted,

*/s/Liza M. Walsh*

Liza M. Walsh

cc: All Counsel of Record (via ECF and Email)