SEEGERWEISS LLP
NEW YORK • NEW JERSEY • PHILADELPHIA

**VIA ECF** September 15, 2026

The Honorable Ronald J. Hedges, U.S.M.J. (ret.)
United States District Court
Martin Luther King Federal Building
50 Walnut Street
Newark, New Jersey 07102

Re: *In re Apple Inc. Smartphone Antitrust Litigation*, No. 2:24-md-03113-JXN-LDW

Dear Special Master Hedges:

We write on behalf of the three private Plaintiff groups concerning Apple's failure to comply with the August 7, 2026 order concerning the use of a TAR 1.0 model (ECF 272-1, the "TAR Order").[1]

The TAR Order requires Apple to use a TAR 1.0 model with "a 75% recall rate" (*id.*, ¶ 1), meaning that the TAR model should score at least 3 of every 4 responsive documents above the "Cutoff" score, so that they are actually produced to Plaintiffs. Based on Plaintiffs' detailed review of the first sample Apple provided, however, the model Apple is using does not have a "75% recall rate." Instead, the results Apple is producing are so full of "False Negatives" and "False Positives" that, statistically, Apple's model has a recall rate of no more than approximately 60%.[2] The difference between a 75% and 60% recall rate works out to hundreds of thousands of responsive documents that Plaintiffs will not receive unless Apple's model is retrained to meet the required 75% recall rate. In short, Apple's model is not off by just a little; it is performing substantially below the recall rate mandated by the TAR Order and prejudicing Plaintiffs.

Given where we are in the schedule, Your Honor certainly can simply order Apple to stop using TAR 1.0 and produce all of the search term hits on or before October 21 on a rolling basis, prioritized by deponents, subject only to screening for privilege. Alternatively, Apple could be required to work collaboratively with Plaintiffs to quickly retrain the model to achieve at least the required 75% recall rate within the next 30 days, and produce on a similarly rolling basis the additional responsive documents that should have been identified the first time had the model been properly trained and validated to comply with the TAR Order no later than October 21.

[1] Plaintiffs have met and conferred with Apple concerning the issues raised in this letter. Declaration of Jennifer Scullion, ¶¶ 18-20. The parties have been unable to resolve their disputes. *Id.*

[2] These results are based on the examples of False Negatives and False Positives Plaintiffs have verified to date. Additional examples are under review which, if verified, will show that the recall rate is even lower. But the issues currently identified establish that the recall rate of the model is below 75%. Plaintiffs can provide updated data and calculations if requested.

**Background**

**A. The TAR Order**

On July 7, 2026, Your Honor ordered Apple to run Plaintiffs' search terms and produce the responsive "hits" by the first week of August. Apple sought reconsideration. ECF 226. Then, on July 21, Apple announced it had developed a "TAR 1.0" model that it planned to run stacked on top of the search terms. Apple came up with its TAR 1.0 model unilaterally and without negotiating with Plaintiffs in advance, as the ESI Protocol requires. ECF 100, Ex. B, at Sec. IV ¶ 3. On July 29, Your Honor held a hearing at which MDL Plaintiffs raised their concerns about Apple's proposal—including Apple's failure to provide the MDL Plaintiffs with any information to evaluate Apple's TAR model. The result was the August 7 TAR Order, which (a) required Apple to use a TAR model with a "75% recall rate," (b) required Apple to provide a series of four randomly selected sample batches of 25,000 documents each "with the purpose of allowing Plaintiffs to assess the recall rate" of the model, and (c) required the parties to meet and confer weekly concerning the sample batches. ECF 272-1, ¶¶ 1, 2, and 8.

**B. Plaintiffs' Review of the TAR Scored Documents**

On August 21, Apple produced its first sample batch of 23,933 documents to Plaintiffs ("Sample 1"). Scullion Decl., ¶¶ 2-7.[3] As required by the TAR Order, Apple told Plaintiffs that 2,494 of those documents had been scored by the TAR 1.0 model as above the cutoff score. *Id.*[4] Plaintiffs' counsel immediately began reviewing Sample 1. *Id.* ¶ 8. The review process included multiple layers of review, including by senior lawyers to maximize accuracy. *Id.* ¶¶ 8-9.

By the time of the parties' first weekly meet and confer session on August 28, Plaintiffs already had found a significant number of clearly responsive documents that the TAR 1.0 model had scored below the "cutoff score" (meaning they would not be produced) and identified eleven exemplars to Apple. *Id.* ¶ 11. Plaintiffs' counsel told Apple they were very concerned, based on these early results, that the TAR 1.0 model was not working. *Id.* ¶ 12. Apple agreed all the exemplar documents were responsive and stated it would "retrain" the TAR 1.0 model by adding these examples as "responsive" documents to the training set. *Id.* However, Apple stated that, as part of its retraining, it would not revisit its coding of its original training set. *Id.* ¶ 13.[5]

---

[3] Apple withheld 1,067 documents from Sample 1 on the grounds of privilege. *Id.*, ¶ 4.

[4] As explained in the accompanying Declaration of Jonathan Jaffe, in a TAR 1.0 model, documents that the model scores at or above the "cutoff score" are documents the model predicts are likely enough to be responsive that they will be included in the "Positive" set for production (absent withholding for privilege, etc.). Jaffe Decl., ¶ 16. Conversely, documents that the model scores below the "cutoff score" are in the "Negative" or "Null" set that will not be produced. *Id.*

[5] On a separate note, Apple did say it would adjust the model to cover additional issues in response to Special Master Bariso's August 18 decision that ordered discovery to be expanded to cover certain additional topics. Scullion Decl., ¶ 14. That substantive expansion of the model, however, addresses a different set of issues and does not cure the recall rate violation addressed in this letter brief.

As Plaintiffs' review of Sample 1 continued, Plaintiffs uncovered even more responsive documents that the TAR 1.0 model scored below the "cutoff"—i.e., were "False Negatives." *Id.* ¶ 15. Plaintiffs also found that roughly half of the documents that TAR 1.0 model scored above the "cutoff" were, in fact, non-responsive —i.e., were "False Positives." *Id.* ¶ 15 & Exh. B-1.

**C. Apple's Refusal to Cooperate to Fix Its TAR Model**

In light of the increasing numbers of both False Negatives and False Positives in Sample 1, Plaintiffs proposed to Apple that the parties work together to retrain and re-validate the model to the recall rate (75%) required under the TAR Order. *Id.* ¶ 16.

The parties met and conferred on September 9. *Id.* ¶ 19. Apple did not dispute any of the False Negatives or False Positives Plaintiffs had identified from Sample 1. Nonetheless, Apple refused to work with Plaintiffs to collaboratively fix the model. And, despite the mathematical relationship between False Negatives, False Positives, and Recall, Apple said it would not use the hundreds of additional False Negatives and False Positives Plaintiffs identified to retrain the model at all. *Id.* Indeed, despite the TAR Order's requirement of 75% recall and the established process for Plaintiffs to use the sample batches to "assess the recall rate," Apple said it would focus only on the different TAR concept of "conceptual diversity." *Id.*, ¶ 20.

On September 14, Plaintiffs' counsel wrote to Apple again. By this time, Plaintiffs had identified a total of 901 False Negatives and 1,144 False Positives in Sample 1. *Id.* ¶ 21 & Exh.D-1. As Apple requested, Plaintiffs had substantiated each of the 901 of the False Negatives by identifying at least one Request for Production to which the document was responsive. *Id.* Plaintiffs' counsel informed Apple that, in light of Apple's refusal to use the results of Plaintiffs' review to work together to fix the TAR model, Plaintiffs would bring the issue to Your Honor.

**Argument**

Apple chose to use a TAR 1.0 model, rather than using linear attorney review based on the search terms the parties negotiated or a TAR 2.0 approach. Apple told Plaintiffs and Your Honor that it had validated its model to have a 75% recall rate. Your Honor held Apple to that representation by specifying in the TAR Order that the model must have a "75% recall rate." ECF 272-1, ¶ 1. And, importantly, the TAR Order ensured Plaintiffs could test Apple's representation: Plaintiffs were given the right to review randomly selected documents in large "sample batches" "with the purpose of allowing Plaintiffs to assess the recall rate." *Id.*, ¶ 2.

Plaintiffs have done their work. Over the past weeks, Plaintiffs have diverted considerable resources to reviewing Sample 1. Scullion Decl., ¶¶ 8-9. The results are clear: Apple's TAR 1.0 model is fundamentally flawed and does not have a recall rate of 75%. Jaffe Decl., ¶¶ 30-38.

*First*, in TAR parlance, Apple's model is producing substantial numbers of both "False Negatives"—responsive documents scored below the "cutoff"—and "False Positives"—non-responsive

---

Specifically, the "False Negatives" and "False Positives" Plaintiffs have identified to Apple are not impacted by Special Master Bariso's order.

documents at or above the "cutoff." Jaffe Decl., ¶ 14-19, 36-38. Some of the misses are extreme[6]—a red flag that the model was not properly trained. Jaffe Decl., ¶ 55-58. Apple has not disputed any of the False Negatives or False Positives Plaintiffs have identified.

*Second*, the numbers of False Negatives and False Positives are simply too great for a TAR model with a recall of 75%. As Mr. Jaffe lays out in detail in his accompanying declaration, recall is calculated based on an established formula. Jaffe Decl., ¶ 12 (citing Grossman and Cormack). Using the results from Plaintiffs' review verified thus far, the formula shows Apple's TAR model has a recall of about **60%**. Jaffe Decl., ¶ 37.[7]

*Third*, Plaintiffs' conclusions are statistically robust. Mr. Jaffe's analysis shows that there is less than 1 chance in a million that the error rate found in Sample 1 are not representative of the larger set from which that sample was randomly drawn. Jaffe Decl., ¶ 43-50. Put another way, the data from Sample 1 establishes statistically that Apple's TAR model does not have a recall rate of 75%. The recall rate is far lower, violating the TAR Order and leaving hundreds of documents unproduced.

The question is what to do now. Your Honor could throw out Apple's TAR 1.0 model given its violation of the TAR Order and return to where the parties started: an order requiring Apple to make a rolling production (prioritized by deponents) on or before October 21 of all of the documents hit by search terms (screened for privilege). Alternatively, Your Honor can order Apple to work collaboratively with Plaintiffs to retrain the model and validate it with a recall rate of at least 75% within the next 30 days, and produce to Plaintiffs on a rolling basis (prioritized by deponents) the additional responsive documents that should have been identified the first time had the model been properly trained and validated to comply with the TAR Order no later than October 21. Plaintiffs proposed such a collaborative retraining to Apple on September 3. Scullion Decl., ¶ 16 & Exh. B. Apple refused.

What makes no sense, respectfully, is to allow Apple to continue using a model that violates the TAR Order and deprives Plaintiffs of hundreds of thousands of responsive documents. Apple had its chance to get the model right on its own. The data shows its training and validation were way off the mark. And allowing Apple to "retrain" the model on its own will simply require Plaintiffs to receive random sample batches from that model—and spend weeks analyzing the results to test recall all over again—potentially to wind up in the same place, namely a model with a recall rate barely better than the flip of a coin, inviting further delay.

Plaintiffs are prepared to address the above following the September 16 case management conference or at such other time as Your Honor directs.

---

[6] For example, Apple's model scored a restaurant menu above the "cutoff," but an "iPhone Market update" scored below the "cutoff." Scullion Decl., ¶ 23, Exhs. J (SAMPLE-APLMDL_00171328) & I (SAMPLE-APLMDL_00203549).

[7] Mr. Jaffe has also conducted a "stress test" that assumes 15% of Plaintiffs' conclusions about False Negatives and False Positives were incorrect. Jaffe Decl, Appendix B, ¶ 4. Even with that additional, conservative assumption, the formula shows a recall rate of just 66.25%. *Id.*

Respectfully submitted,

*/s/ Jennifer R. Scullion*

Jennifer R. Scullion
SEEGER WEISS LLP
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
Tel: 973.639.9100
jscullion@seegerweiss.com

*On Behalf of the MDL Plaintiffs*