**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: APPLE INC. SMARTPHONE ANTITRUST LITIGATION | Case No. 2:24-md-03113 (JXN) (LDW) |

# DECLARATION OF JONATHAN JAFFE

I, Jonathan Jaffe, pursuant to 28 U.S.C. § 1746, declare:

## I. SUMMARY OF OPINIONS

1. I am a technology consultant, data scientist, and the founder and owner of a software, data, and litigation support consulting firm.

2. I have been asked by Plaintiffs' counsel to provide expert advice and opinions concerning the TAR[1] 1.0 model Apple is using as part of its review and production of responsive materials in this matter, including whether Apple's TAR model complies with the August 7, 2026 Special Master Case Management Order ( ECF 272), which I refer to as the "TAR Order."

3. For reference, here, the TAR Order requires Apple to use a TAR 1.0 model with a Recall of at least 75%.[2] Apple's counsel, Robert Keeling, further represented during

[1] "TAR" as used here in refers to the Technology-Assisted Review machine learning model determining a document's likely responsiveness.

[2] In the August 7, 2026 Special Master Case Management Order (*see* ECF 272 at ¶ 1), the Court ordered that "Apple shall use a Technology-Assisted Review ('TAR') 1.0 model (the 'Model') using a **75% recall rate**."

the parties' August 28, 2026 meet and confer video conference (which I attended) that Apple's model also has a Precision[3] of 90%.

4. For the reasons I explain below, it is my opinion that:

(a) based on Plaintiffs review of TAR Sample 1, the Recall for Apple's TAR model is not 75%, but instead appears to be just under 60%.

(b) the Recall level is so low that it indicates the training done to create Apple's TAR model was fundamentally flawed and, therefore, that the model needs to be retrained;

(c) if properly retrained, Apple's TAR model would not materially increase any production burden on Apple (because the model is currently scoring documents incorrectly in both directions, yielding substantial rates of "False Negatives," as well substantially high levels of "False Positives); and

(d) Apple's TAR model also does not appear to have the 90% Precision level Apple's counsel has represented in the meet and confer process, which exacerbates the model's failures, although the Recall rate is so far below the 75% required under the TAR Order that the model fails regardless of whether it meets the 90% Precision level.

## II. BACKGROUND AND QUALIFICATIONS

5. A copy of my *curriculum vitae* is attached as **Exhibit A**. My *curriculum vitae* contains a summary of my credentials and a list of other matters in which I have testified at trial or by deposition within the preceding four years.

[3] "Precision," as used herein, refers to the percentage of documents TAR identified as likely responsive that are determined to be truly responsive after manual review.

6. I have spent over 30 years, dating back to 1993, building and evaluating large-scale distributed systems, both consulting directly for corporations and in the context of litigation. This includes extensive experience with data analysis, working with both structured and unstructured data.

7. Since 2002, I have provided ESI[4] discovery and technical consulting for attorneys in complex litigation from inception to ultimate resolution.

8. In multi-district litigations ("MDLs") and class actions, I have assisted with discovery efforts regarding corporate ESI and methods by which to collect, review, and produce voluminous documents and data. These corporate systems included the primary systems for multiple Fortune 500 companies including for the three major credit bureaus, the largest pharmaceutical companies, pharmacies, large banks, and technology companies such as Google, and Uber. My work frequently concerns the appropriate design, training, measurement, and validation of TAR models (both for TAR 1.0 and 2.0 models).

9. In roles both as a consulting and testifying expert, I have worked to filter, join, and summarize government and corporate datasets that have had *hundreds of millions* to ***hundreds of billions*** of records ranging up to multiple petabytes in size, including in the Opioid Litigations,[5] various Medical Device and Drug Litigations,[6] various Environmental and Toxic tort litigations, antitrust litigations, data breaches, and Class Action cases involving alleged violations of the Fair Credit Reporting

[4] "ESI" or Electronically Stored Information

[5] This included analysis of the DEA's ARCOS database, company internal transaction databases detailing shipments, and drug dispensing record databases.

[6] Inclusive of data produced from Apache Hive, No-SQL, Oracle, and other SQL databases.

Act ("FCRA"), the Electronic Funds Transfer Act ("EFTA"), the Telephone Consumer Protection Act ("TCPA"), the Fair Labor Standards Act ("FLSA"), and unjust enrichment and contractual interference.

## III. TAR 1.0 AND THE CALCULATION OF RECALL

10. The basic premise of TAR is to use machine-learning to largely replace human review of documents for responsiveness to a set of discovery requests.

11. Recall is a key metric to assess the robustness and reliability of a TAR model.

12. Recall is "[t]he fraction of Relevant Documents that are identified as Relevant by a search or review effort."[7] For our purposes, where TAR is being used to produce documents in response to Requests for Production, this can be restated as "[t]he fraction of [Responsive] Documents that are identified as [Responsive] by [TAR]."[8]

13. The formula for Recall is: True Positive ("TP")/(TP + False Negative ("FN")).[9]

14. Let me explain what is meant by True Positive and False Negative in this context.

15. A TAR 1.0 model "scores" each document fed into the model, typically on a scale between 0-1. The score represents the model's prediction of how likely a document is to be responsive. The stronger the model's confidence of likely responsiveness (based on its training), the higher the score is for a document.[10]

---

[7] *See* Maura R. Grossman & Gordon V. Cormack, The Grossman-Cormack Glossary of Technology-Assisted Review, 7 Fed. Cts. L. Rev. 1, at 27 (2013), https://www.fclr.org/fclr/articles/html/2010/grossman.pdf; ; *see also* Tara Emory, Jeremy Pickens & Wilzette Louis, TAR 1 Reference Model: An Established Framework Unifying Traditional and GenAI Approaches to Technology-Assisted Review, 25 Sedona Conf. J. 109, at 125 n.13 (2024), https://www.thesedonaconference.org/node/10575.

[8] *Id.* at 28 (defining Relevance and Responsiveness).

[9] *Id.* at 12.

[10] A higher score simply means the document is more likely to be responsive (matching training documents), and is not an indication of the degree of responsiveness. For example, a highly responsive document may have a lower score

16. A TAR 1.0 model also uses a "Cutoff score." Documents scored above the Cutoff will be produced as likely responsive.[11] For our purposes, we will call those the "Positive" Set. Conversely, documents scored below the Cutoff (sometimes called the "Null Set") are below the cutoff line for production as likely non-responsive.[12] For our purposes, we will call those the "Negative" Set.

17. The Positive Set may contain both True Positives ("TPs") (documents that are in fact responsive), as well as False Positives ("FPs") (documents that are not in fact responsive, despite receiving a score at or above the Cutoff). By definition, as the number of False Positives in a Positive Set goes up, the number of True Positives goes down.

18. Similarly, the Null (or Negative) Set may contain have both True Negatives ("TNs") (documents that are not responsive) and False Negatives ("FNs") (documents that are in fact responsive, despite receiving a score below the Cutoff).

19. Thus, the total number of responsive documents in a set is the sum of the True Positives ("TPs") and the False Negatives ("FNs") or TP + FN.

20. Hence, to calculate Recall (what percentage of the actually responsive documents the model scored as Positive), we get the formula TP / (TP + FN).

21. Appendix A, Visualizing Recall and Precision for Validation of TAR, elaborates upon these relationships with visual diagrams.

---

than a marginally responsive document.

[11] *See* Grossman et al., *supra* note 7, at 13 ("Documents above the Cutoff are deemed to be Relevant [Responsive] and Documents below the Cutoff are deemed to be Non-Relevant [Non-Responsive]."). Here, I understand Apple is doing further screening of documents in the Positive Set for privilege and other issues and reserving the right to withhold some of the otherwise responsive documents in the Positive set from actual production. That does not change the basic concepts at play or my analysis and opinions.

[12] *Id.* at 25.

## IV. APPLE'S TAR 1.0 MODEL DOES NOT HAVE A RECALL RATE OF 75%

22. As noted above, the TAR Order requires Apple to use a TAR model with a "75% recall rate." EFC 272-1, ¶ 1.[13]

23. Furthermore, the Court ordered that "Apple shall provide Plaintiffs with a review sample totaling 100,000 documents, consisting of four sample batches of approximately 25,000 documents each," *Id*. at ¶ 2.

24. The TAR Order requires that the documents in each sample batch "shall be selected randomly." *Id*.

25. The TAR Order further requires Apple to tell Plaintiffs which of the documents in each sample were scored at or above the Cutoff—*i.e.*, in the Positive set. *Id*. at ¶ 7. By definition, the remainder of the sample scored below the Cutoff—*i.e.*, in the Negative set.

26. Apple was not required to provide Plaintiffs with the actual scores for any document or the Cutoff Score for the model and, I understand, Apple has not done so.

27. I understand that Plaintiffs' counsel received the first sample batch on August 21, 2026[14] ("Sample 1"). I also understand that Apple withheld a little over

[13] The Special Master's Case Management Order does not specify whether the 75% recall requirement refers to a point estimate or to the lower bound of a confidence interval. For purposes of my analysis herein, I adopted the less stringent interpretation and treated 75% as the required point estimate. It is worth noting that the better practice is to use the more stringent interpretation, where the lower bound of a specified confidence interval, such as a 95% confidence interval, would have to be at least 75%. *See* David D. Lewis, Eugene Yang & Ophir Frieder, *Certifying One-Phase Technology-Assisted Reviews, in Proceedings of the 30th ACM International Conference on Information and Knowledge Management* 893, 896–97 (2021), https://doi.org/10.1145/3459637.3482415 (developing a statistically valid TAR stopping rule that provides a specified level of confidence that recall is at least the target); *see also* Eugene Yang, David D. Lewis & Ophir Frieder, *Heuristic Stopping Rules for Technology-Assisted Review, in Proceedings of the 21st ACM Symposium on Document Engineering* 31:1, 31:4–31:5 (2021), https://doi.org/10.1145/3469096.3469873 (explaining that stopping when a point estimate equals the recall goal can frequently miss that goal and describing a rule based on the lower bound of a confidence interval); Alessio Molinari & Andrea Esuli, *SALτ: Efficiently Stopping TAR by Improving Priors Estimates, 38 Data Mining & Knowledge Discovery* 535, 541–42 (2024), https://doi.org/10.1007/s10618-023-00961-5.

[14] I understand that a small number of documents from Sample 1 were produced after August 21, 2026 after additional

1,000 documents from Sample 1 for privilege or other reasons, resulting in a sample size of 23,933 documents. Given that the size of Sample 1 was still relatively large and close to the original desired sample size of 25,000, it is my opinion that the removal and sequestration of the 1,067 documents from Sample 1 does not affect the statistical validity of my opinions which are based upon the 23,933 documents in Sample 1 that Apple provided to Plaintiffs' counsel.

28. I understand Plaintiffs' counsel have reviewed all of the documents in the Positive portion of Sample 1 to determine how many were False Positives. I also understand that Plaintiffs' counsel have reviewed the Negative portion of Sample 1 for False Negatives.

29. Plaintiffs' counsel asked me to ascertain whether, based on the numbers of False Positives and False Negatives they have identified to Apple, Sample 1 was statistically likely to have been drawn from a Production Set with a 75% recall rate.

30. For the reasons I explain below, the answer is no. Rather, it is my opinion that Apple's TAR 1.0 Model does not have a Recall rate of 75% (or higher) and that the chances that it does have a Recall rate of 75% (or higher) appear to be less than one in a million.

31. I explain the math here step by step.

32. Apple represented that, of the 23,933 documents in Sample 1, Apple's TAR 1.0 Model scored **2,494** of the documents (**10.4%**) as above the cutoff for likely responsiveness ("Positive") and scored **21,439** of the documents (**89.6%**) below the cutoff ("Negative").

---

privilege and redaction review by Apple.

33. I have been advised that Plaintiffs' counsel's review of Sample 1 has thus far yielded **1,144** documents in the Positive set that Plaintiffs' counsel contend are non-responsive ("False Positives" or "FPs"). That would leave a maximum of **1,350** True Positives or "TPs") (**2,494** Positives - **1,144** False Positives = **1,350** True Positives.)

34. I also have been advised that Plaintiffs' counsel's review of Sample 1 has thus far yielded **901** documents in the Negative set that Plaintiffs' counsel contend are responsive to one or more of Plaintiffs' requests ("False Negatives" or "FNs").

35. The two documents below are illustrative of documents that Plaintiffs' counsel marked as False Negative (SAMPLE-APLMDL_00203549) and False Positive (SAMPLE-APLMDL_00173088) in their review:

**SAMPLE 1: FALSE NEGATIVE** | **SAMPLE 1: FALSE POSITIVE**






36. From Plaintiffs' counsel's review, I constructed the following matrix:

| | | PLAINTIFFS' DETERMINATION | |
|---|---|---|---|
| | | Responsive | Non-Responsive |
| TAR | Positive | 1,350 (“True Positive” or “TP”) | 1,144 (“False Positive” or “FP”) |
| | Negative | (at least) 901 (“False Negative” or “FN”) | 20,538 (“True Negative” or “TN”) |

37. Using the formula for Recall set forth above (TP / (TP + FN)), Plaintiffs' results yield a Recall just under **60%**: 1,350 / (1,350 + 901) = 1,350 / 2,251 = **59.97%**. (Using a 95% exact binomial confidence interval, **57.92%** to **62.01%**).[15]

38. Put in plain English, based on Plaintiffs' counsel's review of Sample 1, Apple's TAR 1.0 Model missed half of the documents Plaintiffs identified as Responsive (TPs and FNs) and, conversely, nearly half of the documents Apple's TAR 1.0 Model scored as Positive were not responsive.

## V. THE RECALL RESULTS ARE NOT A RANDOM SAMPLING ERROR

39. I was also asked to opine on whether one can reliably estimate the Recall rate of Apple's TAR 1.0 model from the True Positives and False Negatives found in a sample, such as Sample 1. For the reasons I explain below, the answer is yes.

40. The principles behind random sampling are the bedrock foundation on which TAR 1.0 (and all machine learning) is based.

41. The standard for validating the results of any TAR model is taking repeated random samples.

[15] Using the formula for Precision set forth above (TP / (TP + FP)), Plaintiffs' results yield a Precision of about **54.13%**: 1,350 / (1,350 + 1,144) = 1,350 / 2,494 = **54.13%**. (Using a 95% exact binomial confidence interval, **52.15%** to **56.10%**).

42. In their TAR 1.0 Reference Model, the Sedona Conference included the following reference diagram of the TAR 1.0 process as part of a relatively recent[16] 2024 TAR 1.0 Reference Model Paper:[17,18]




43. On the August 28, 2026 meet and confer I attended, Robert Keeling–Apple's counsel from Redgrave LLP–cautioned Plaintiffs: "I would not try to infer a pattern from a random sample" in the context of Sample 1. I strongly disagree. As seen above, random sampling is the bedrock foundation on which TAR 1.0 is based. While, of course, the composition in random samples will vary, this is well mitigated by taking larger samples.

44. To illustrate this how larger samples reduce uncertainty, I took 3 hypothetical samples below of different sizes (250 documents, 2,500 documents, and 25,000 documents) where 10% of the documents were coded after review as responsive.

---

[16] TAR 1.0 Models have been largely supplanted by TAR 2.0 Models also known as Continuous Active Learning.

[17] *See* Tara Emory, Jeremy Pickens & Wilzette Louis, TAR 1 Reference Model: An Established Framework Unifying Traditional and GenAI Approaches to Technology-Assisted Review, 25 SEDONA CONF. J. 109 (forthcoming 2024), https://thesedonaconference.org/publication/TAR_Reference_Model_Unifying_Traditional_and_GenAI_Approaches.

[18] Note that the authors of this paper credit the diagram of the TAR 1.0 process to Redgrave Data.

While all would predict that 1 million documents out of a 10 million document collection would be responsive, the confidence intervals would be very different.




45. The Reference Manual on Scientific Evidence supports that "[l]arger samples generally will reduce the level of random error ('sampling error')."[19]

46. Note that the validation of TAR methodology relies on this probabilistic not deterministic approach. Unlike the precise and verifiable determination that a document contains a given search term or that an email was sent or received by counsel, a TAR 1.0 Model returns a <u>probability</u> of responsiveness on a sliding scale.

[19] David H. Kaye & Hal S. Stern, Reference Guide on Statistics and Research Methods, in Reference Manual on Scientific Evidence vol. I, 463, 510 (4th ed., FJC version 2025).

47. I was asked to opine of whether the results from Sample 1 described above could be attributable merely to the fact that this was a randomly drawn sample from a larger set of documents scored by Apple's Model ("sampling error"). For the reasons I explain below, the answer is 1 million to 1 no.

48. First, I note that Sample 1 was 23,933 documents with 2,494 Positive documents (**10.42%**). Sample 2 was 23,715 documents with 2,432 Positive documents (**10.26%**). Sample 3 was 23,731 documents with 2,766 Positive documents (**11.66%**). Even understanding that Sample 3 involved an model updated in responsive to Judge Bariso's order on responsiveness and certain False Negatives identified by Plaintiffs, nevertheless, the consistency between these samples further gives me confidence that Sample 1 was a representative sample.

49. To further address the "sampling error" question and test whether random sampling had materially impact precision and recall, I conducted a joint parametric-bootstrap simulation[20] under the assumption that the TAR 1.0 model had the represented Recall of 75%.[21] This simulation ran a total of 1 million simulated samples.[22]

50. None of the 1 million simulated samples had Recall and Precision results that were so far from the 75% and 90% marks as was Sample 1.

---

[20] *See generally* A.C. Davison & D.V. Hinkley, Bootstrap Methods and Their Application § 4.2, at 140–55 (1997), https://doi.org/10.1017/CBO9780511802843.005 (describing parametric-bootstrap hypothesis testing); *see also* Voratas Kachitvichyanukul & Bruce W. Schmeiser, Binomial Random Variate Generation, 31 Commc'ns ACM 216, 216–22 (1988), https://doi.org/10.1145/42372.42381 (describing an algorithm for generating binomial random values). I used the rbinom function from the stats package in R; *see* R Core Team (2026). _R: A Language and Environment for Statistical Computing_. R Foundation for Statistical Computing, Vienna, Austria. doi:10.32614/R.manuals <https://doi.org/10.32614/R.manuals>. <https://www.R-project.org/>.

[21] and the represented Precision of 90%

[22] This represented a simulated Sample 2, 3, … 1,000,000.

51. As described in Appendix B, Sensitivity Analysis (Recall and Precision), I tested to see if some error in Plaintiffs' False Positive and False Negative Findings would affect my conclusions. It did not. Indeed, there was still a less than one in a million chance that even inverting some of Plaintiffs' findings that Sample 1 could have been sampling error.

52. As illustrated below by my simulations and sensitivity analysis, it is my opinion that to achieve a true *Recall* of 75%, Apple's TAR 1.0 Model would have to undergo significant retraining, not merely a "tweak" or "fine-tuned" adjustment.

## VI. RETRAINING APPLE'S TAR 1.0 MODEL IS NOT EXPECTED TO MATERIALLY INCREASE THE NUMBER OF DOCUMENTS THAT WILL BE PRODUCED, BUT WILL ASSURE THAT AT LEAST 75% OF THE RESPONSIVE DOCUMENTS ARE PRODUCED

53. Based on Plaintiffs' review of Sample 1, it does not appear that retraining Apple's TAR 1.0 model to achieve a true 75% Recall rate will increase the total number of documents to be produced.

54. As detailed in Appendix C, Plaintiffs' Counsel's Review and Apple's Model Disagree on Which Documents Are Responsive, I demonstrate the math that shows this.

55. Conceptually, this is because Apple's TAR 1.0 Model and Plaintiffs' review are both coming up with similar numbers of Positive documents, but the model and Plaintiffs disagree as to which documents are responsive. Hence, Plaintiffs are not only identifying a substantial number of responsive documents in the Negative set ("False Negatives") but also identifying a substantial number of non-responsive documents in the Positive set ("False Positives"). If anything, the results Plaintiffs

are identifying indicate the total percentage of responsive documents is less than Apple's TAR 1.0 Model predicts—but Plaintiffs are finding Apple's model is missing too many of the responsive documents.

56. It is my opinion that such disagreement is strongly indicative of a disagreement on how the model was trained and validated.[23]

57. Indeed, I understand that the False Positives identified by Plaintiffs' counsel include vacation chats and lunch menus, while the False Negatives include Smartphone Market and "Barriers to Entry" analyses—both of which tend to indicate that the model was not well trained either to weed out obviously non-responsive materials or to predict the responsiveness of documents concerning core concepts in the case.

58. Because there is such a substantive disagreement on *which* documents are responsive, it is my opinion that both how the model was trained and how it was validated need to be re-examined.

## VII. IMPORTANCE OF TRAINING, CONTROL, AND VALIDATION

59. Training, Control and Validation are critically important ways in which a TAR 1.0 Model is assured of meeting a prescribed Recall.

60. In Appendix D, TAR Model Training and Recall Validation, I explain why.

[23] On the August 28, 2026 meet and confer, I understood Apple to represent that it had performed validation against the null set. The null set is what I have referred to herein as the Negative set. If Apple had assumed a 90% precision, then it is unsurprising that validation against the null set alone would not have disproven a recall of 75%. Logically, there would have been more documents thought to be responsive, and thus the 25% thought to be categorized as unresponsive would have been bigger. For example, in Sample 1, assuming that the 2,494 Positive set was at a 90% precision, the number of expected FN documents in the Negative set would be expected to be 748 or 748 / 21,439 (3.5%). Plaintiffs review yielded 901 FN or 901 / 21,439 (4.2%). A difference of 0.7% may have been within Apple's predefined margin of error.

61. I understand that Plaintiffs have served dozens of requests for production ("RFPs") in this case including over 53 joint RFPs, 26 iPhone Plaintiff RFPs, and 40 Apple Watch Plaintiff RFPs.

62. Based upon my review of the RFPs, it is my opinion that the documents responsive to certain RFPs may be relatively rare (*e.g.,* RFP 1/1.3 which appends the clause "including all communications between Apple and Brazil's Administrative Council for Economic Defense (CADE) related to Apple's restrictions on NFC technology.")

63. It is my opinion that if adequate numbers of these rarer categories of documents were not part of Apple's TAR 1.0 Model Training Documents Sets that it would be unlikely for the Model to be intelligently scoring these documents.

64. Model stabilization and stopping is a complicated and debated process with multiple peer reviewed articles discussing it and proposing methods.[24]

65. Apple's TAR vendor who developed Apple's TAR 1.0 Model, OpenText, cautioned about the practical problems of TAR 1.0 in a 2025 whitepaper:[25]

[24] For example, *see* Alessio Molinari & Andrea Esuli, *SALτ: Efficiently Stopping TAR by Improving Priors Estimates, 38 Data Mining & Knowledge Discovery* 535 (2024), https://doi.org/10.1007/s10618-023-00961-5.

[25] *See* OpenText, *Choosing the Right Technology-Assisted Review Protocol to Meet Objectives* 9 (2025), https://www.opentext.com/media/white-paper/choosing-the-right-technology-assisted-review-protocol-to-meet-objectives-wp-en.pdf.

### 5. Key differences between TAR 1.0 and TAR 2.0

The TAR 1.0 process comes with a number of practical problems that limits its effectiveness.

**TAR 1.0 requires SMEs for training.** With TAR 1.0, to make certain that the algorithm correctly reflects the pertinent characteristics, an SME must review thousands of documents before the algorithm is ready to use. This creates a bottleneck where discovery cannot proceed until the SME—whose time is likely both limited and expensive—has spent 60 or more hours training the TAR system.

**The SME must train the TAR 1.0 algorithm until it stabilizes.** In document collections with low richness or numerous distinct issues, this may require the SME to review thousands of additional documents.

**You only get "one bite at the apple."** The better the algorithm is trained, the more accurately it can identify the most likely relevant documents and classify them, or rank them highly, so they ultimately end up in the presumptively relevant set. Yet, with TAR 1.0, the training period is limited, so the algorithm cannot incorporate additional feedback or continue to improve. Because the bulk of review occurs after the TAR 1.0 algorithm has evaluated and segregated the collection, lessons learned during review cannot inform the algorithm's operation.

**TAR 1.0 is not flexible or adaptive.** Because the TAR 1.0 algorithm is fully trained before review begins, it does not accommodate changes to the scope of discovery that occur during review, such as the addition of documents in a rolling production. It also cannot adapt to an evolving understanding of the case or the legal issues involved.

**The structure of TAR 1.0 invites legal challenges.** Opponents may object to the seed set or the protocol that was used to train the algorithm. Because training is a limited process, weaknesses in its foundation are both readily apparent and potentially fatal.

66. As OpenText wrote: "[b]ecause training is a limited process, weaknesses in its foundation are both readily apparent and potentially fatal."[26]

## VIII. WHAT APPLE HAS NOT (YET) DISCLOSED

67. Given the discrepancy between the representation Apple has made regarding the recall and precision of Apple's TAR 1.0 Model and the calculated recall and precision based upon Plaintiffs' review, it is my opinion that the following information yet disclosed would be helpful to further evaluate both why there is a such a discrepancy and whether Apple's TAR 1.0 Model could be retrained or otherwise modified to reach the desired recall rate:

[26] *Id.*

(a) the numerical size and composition[27] of Apple's Labeled Control Set,

(b) the complete set of Training Documents and accompanying coding Apple used to train Apple's TAR 1.0 Model,

(c) whether and how validation was done including, if so, the complete set of validation documents,

(d) the scores Apple's TAR 1.0 Model gave to control and validation documents,

(e) the scores Apple's TAR 1.0 Model gave to the documents in Sample 1,

(f) the confidence level and confidence interval for the represented 75% recall and 90% precision,

(g) the distribution of the scores for documents scored to date by Apple's TAR 1.0 Model, and

(h) the cut off score decided on by Apple to separate responsive from non-responsive.

68. To help visualize the importance of these disclosures, I prepared a number of diagrams. I have included these in Appendix E, Visualizing Training, Responsiveness, Recall, Precision and Conceptual Diversity.

I declare under penalty of perjury that the foregoing is true and correct.



Digitally signed by Jonathan Jaffe
Date: 2026.09.15 20:40:35 -04'00'
Adobe Acrobat version: 2026.002.21901

Executed on September 15, 2026.

Jonathan Jaffe

[27] This would include the specific documents in the Labeled Control Set and how they were coded.

## APPENDIX A – VISUALIZING RECALL AND PRECISION FOR VALIDATION OF TAR

1. The basic premise of TAR is to use machine-learning to largely replace human review to identify documents responsive to a set of discovery requests. Several statistics are used to measure how well a TAR model is accomplishing that task. Two of those statistics are "recall" and "precision," which I explain below.

2. Validation of a TAR model generally requires determining whether the model meets certain agreed or ordered levels of recall and precision. Here, Apple's counsel, Robert Keeling, represented during the parties' August 28, 2026 meet and confer session (which I attended), that the model has a recall of 75% and a precision of 90%. And the August 7, 2026 Order [ECF 272-1] requires Apple to use a TAR 1.0 model with a recall of at least 75%.[1]

3. Let's assume that in a sample of ~24,000 documents, we have ~2,400 responsive documents.[2] Let's start by representing groups of 100 responsive documents with black squares (24 squares):



[1] In the August 7, 2026 Special Master Case Management Order (*see* ECF 272-1 at ¶ 1), the Court ordered that "Apple shall use a Technology-Assisted Review ('TAR') 1.0 model (the 'Model') using a **75% recall rate**." (emphasis added)

[2] These correspond to the rough numbers from the TAR validation sample in this case.

4. Conceptually, a recall rate of 75% implies the TAR model is most likely to *correctly* score 75% of the responsive ("true") documents and *incorrectly* score 25% of the responsive documents ("false"). Visually, this means that the responsive documents now fall into two sets as faithfully indicated below by the red line. Documents to the left of the red line that the TAR model scored as responsive are thus in the "Positive" set. Documents to the right of the red line that the TAR model scored as non-responsive are thus in the "Negative" set.



5. The red line above depicts the "Cutoff" score. The TAR model scores each document (typically on a scale between 0-1). The Cutoff score represents the score (*e.g.*, 0.79) above which documents will be produced as likely responsive ("Positives"). Documents the TAR model scores below the Cutoff score are below the cutoff line for production as likely non-responsive ("Negatives").

6. The Cutoff score is selected to ensure the recall rate; here, 75% of the responsive documents are likely to be above the Cutoff (to the left of the red line).[3]



[3] The Cutoff score is picked by the Party applying the TAR model.

7. Since in our visualization, the black squares each represent 100 responsive documents, the documents on the left are "True Positives" or "TP": they are both responsive ***and*** were *correctly* identified as responsive by the TAR model.



8. The documents on the right are "False Positives" or "FP": they are responsive documents that were *incorrectly* scored as non-responsive by the TAR model.



9. The formula for *recall* is as follows: TP / (TP + FN).[4]

10. So using our squares, we have 18 / (18 + 6) = 18 / 24 = .75 = 75% *recall*.

11. Of course, our sample (and the broader collection) has both responsive and non-responsive documents. I have represented the non-responsive documents using gray squares below.



[4] *See* Maura R. Grossman & Gordon V. Cormack, The Grossman-Cormack Glossary of Technology-Assisted Review, 7 Fed. Cts. L. Rev. 1, 12 (2013), https://www.fclr.org/fclr/articles/html/2010/grossman.pdf; *see also* Tara Emory, Jeremy Pickens & Wilzette Louis, TAR 1 Reference Model: An Established Framework Unifying Traditional and GenAI Approaches to Technology-Assisted Review, 25 Sedona Conf. J. 109, 125 n.13 (2024), https://www.thesedonaconference.org/node/10575.

12. Again, let's assume that our TAR model has scored all of the documents, including the non-responsive documents.



13. The gray boxes on the left are non-responsive documents that the TAR model *incorrectly* scored as responsive. Thus, those represent "False Positives" or "FP."



14. The gray boxes on the right are non-responsive documents that the TAR model *correctly* scored as non-responsive. Thus, those represent "True Negatives" or "TN."



15. The recall rate is independent of the distribution of the False Positives and False Negatives. To illustrate this, the two diagrams below have the same recall rate of 75%, but a very different distribution of the non-responsive documents.





16. Indeed, in an ideal world, the Positive set would contain only True Positives.



17. But it is also possible that the Positive set contains many False Positives and still has a recall of 75%.



18. In TAR, *precision* describes the ratio of True Positives to the documents the TAR model has scored above the Cutoff score (the number of documents in the Positive set).

19. The formula for *precision* is as follows: TP / (TP + FP).[5]

20. If there are no False Positives, such as in my idealized example, then the model's precision is 100%.



21. However, a model with a 75% recall rate can have a much lower precision. I have illustrated this below by depicting many more gray boxes than black to the left of the red line, but keeping the 75% recall rate.



22. As noted, the Positive set will contain both True Positives and False Positives: Positive = TP + FP.

23. As noted, the Negative set will contain both True Negatives and False Negatives: Negative = TN + FN.

---

[5] *Id.*

24. Mathematically, if the recall rate is a fixed percentage (*e.g.*, 75%) and the number of documents the TAR model scored above the Cutoff is held constant, then as precision rises: the number of False Positives drops, the number of False Negatives rises, and the number of True Negatives drops.

25. For example, in both diagrams below, the recall is fixed at 75%, and the Positive sets are identically sized. In the top diagram below, precision is 50%. In the bottom diagram, precision is 90%. Since there are more true positives when precision is 90%, the number of true negatives is also significantly larger, 9 black squares as opposed to 5.





26. In other words, if the Positive set contains ~2400 documents and the recall rate is 75%, a higher precision means more overall responsive documents ***and*** more anticipated False Negatives.

27. That is why when validating whether a TAR sample meets a represented recall rate, it is important to know the precision; otherwise, it is easy to dismiss False Negatives as anticipated as within the 25% of responsive documents expected to be missed by the TAR model.

28. Both recall and precision are statistical measures. Each thus comes with their own degree of uncertainty. I have depicted the uncertainty around the recall rate below by blurring the red line. In the illustration below, the uncertainty is narrow and, as such, does not meaningfully affect the confidence in the 75% recall rate.



29. If the degree of uncertainty for the recall is wider, it can meaningfully affect the confidence in the recall, meaning that the true rate could be significantly below the represented rate. In the illustration below, some of the black squares could fall to

the right of the line, reducing the number of True Positives, which would cause the recall rate to fall.



30. This is why the best practice, statistically speaking, is to use the lower confidence interval for the represented rate rather than the point estimate. Visually, I illustrate that below by shifting the blurred divider to the right such that we now can say that the recall rate is likely to be 75% or more, but unlikely to be less than 75%.



31. As discussed herein, Apple's represented precision and recall are very different:

**APPLE: 90% PRECISION, 75% RECALL**



**MEASURED: 54.13% PRECISION, 59.97% RECALL**



32. Focusing only on responsive documents:

**APPLE: 90% PRECISION, 75% RECALL**



**MEASURED: 54.13% PRECISION, 59.97% RECALL**



33. As noted, each black box represents 100 documents. The sample only contains ~24,000 documents out of a ~9MM document collection. As such, these are meaningful differences at that scale with both meaningfully more False Positives and False Negatives.

## APPENDIX B – SENSITIVITY ANALYSIS (RECALL AND PRECISION)

1. I also conducted a sensitivity analysis (or "stress test") to see what the results looked like if one assumes some error in Plaintiffs' False Positive and False Negative findings.

2. To do this, I assume as a hypothetical that 15% of the documents Plaintiffs coded were coded incorrectly as either False Positives or False Negatives, even though I understand that Plaintiffs have subject matter experts performing the review and every single document coded as a false positive or a false negative has passed through at least two independent levels of review. (A 15% assumed error rate is based on real-world observations documented in the ESI literature.[1])

3. Accordingly, let's adjust the Matrix with updated numbers:

| | | MODIFIED PLAINTIFF CODING (15% ADJUSTED IN MODEL FAVOR) | |
|---|---|---|---|
| | | Responsive | Non-Responsive |
| TAR | Positive | 1,522 ("True Positive" or "TP") | 972 ("False Positive" or "FP") |
| TAR | Negative | 766 ("False Negative" or "FN") | 20,673 ("True Negative" or "TN") |

4. Under this stress test, the *recall* would be: 1,522 / (1,522 + 766) = **66.52%**.

5. Under this stress test, the *precision* would be: 1,522 / (1,522 + 972) = **61.03%**.

[1] *See* Maura R. Grossman & Gordon V. Cormack, *Inconsistent Responsiveness Determination in Document Review: Difference of Opinion or Human Error?*, 32 Pace L. Rev. 267, 287–88 (2012), https://doi.org/10.58948/2331-3528.1800; see also Douglas W. Oard & William Webber, *Information Retrieval for E-Discovery*, 7 Found. & Trends Info. Retrieval 99, 196–97 (2013), https://doi.org/10.1561/1500000025. ("Scholer et al. [122], in a study of TREC assessors from other tracks, found that they disagree with themselves around 15% of the time when asked to later judge the same document at different times")

6. Thus, even if 15% of the documents were switched toward the Model's favor, the estimated *recall* for Apple's TAR Model 1.0 would be **66.25%** (95% exact binomial confidence interval: **64.54%** to **68.45%**) and the estimated *precision* would be **61.02%** (95% exact binomial confidence interval: **59.08%** to **62.95%**).

7. I again ran the same 1,000,000 sample simulation using these new numbers. Again, not one of the 1,000,000 simulated samples was at least as inconsistent with the represented recall and precision as the adjusted numbers above.

8. Even assuming that the parties disagree on the relevance of **15%** of the documents that Plaintiffs' counsel contends are responsive (as well as the 15% that Plaintiffs' counsel contends are non-responsive) and, further, assuming that all those documents were ultimately decided in Apple TAR 1.0 Model's favor, Plaintiffs' Sample 1 review provides statistically significant evidence to reject any claim that Sample 1 was drawn from a population with a 75% recall rate.

| | represented by Apple | calculated results from Plaintiffs' review | 15% sensitivity test[2] |
|---|---|---|---|
| recall<br>TP / (TP + FN) | **75%** | **59.97%**<br>(57.92, 62.01) | **66.25%**<br>(64.54, 68.45) |
| precision<br>TP / (TP + FN) | **90%** | **54.13%**<br>(52.15, 56.10) | **61.02%**<br>(59.08, 62.95) |

9. Thus, it is my opinion that Apple's TAR 1.0 Model does not have a recall rate of 75% (or higher); put more precisely, the chances of that appear to be less than one in a million. I have attached code that shows my statistical methodology below.

10. Given that not one of my simulated samples was at least as inconsistent as Plaintiffs' counsel's results from the represented recall and precision, it is my

[2] assumes 15% of Plaintiff coded documents were reversed in Apple's TAR 1.0 Model's favor

opinion that it would be an efficient use of scarce resources to conduct similar reviews of the other samples (Samples 2, 3, and 4).

R CODE:

```
# Joint validation of represented recall and precision
#
# Purpose
# -------
# Given an independently reviewed validation sample, this function evaluates
# whether its observed recall/precision pair is statistically compatible with
# a represented (claimed) recall/precision pair.
#
# Required 2 x 2 counts
# ---------------------
#                        Actually responsive   Actually nonresponsive
# Predicted responsive            TP                     FP
# Predicted nonresponsive         FN                     TN
#
# Recall    = TP / (TP + FN)
# Precision = TP / (TP + FP)
#


joint_recall_precision_test <- function(
    tp,
    fp,
    fn,
    tn,
    claimed_recall,
    claimed_precision,
    conf.level = 0.95,
    B = 1000000L,
    seed = 1L
) {
  counts <- c(tp = tp, fp = fp, fn = fn, tn = tn)

  # Validate counts and requested test settings.
  if (any(!is.finite(counts)) || any(counts < 0) ||
      any(counts != floor(counts))) {
    stop("tp, fp, fn, and tn must be nonnegative integer counts.")
  }
  if (tp + fn == 0) {
    stop("Recall is undefined because the sample has no responsive documents.")
  }
  if (tp + fp == 0) {
    stop("Precision is undefined because no document was predicted responsive.")
  }
  if (fp + tn == 0) {
    stop("The joint model requires at least one actually nonresponsive document.")
  }
  if (!is.finite(claimed_recall) || claimed_recall <= 0 ||
      claimed_recall >= 1) {
    stop("claimed_recall must be strictly between 0 and 1.")
  }
  if (!is.finite(claimed_precision) || claimed_precision <= 0 ||
      claimed_precision >= 1) {
    stop("claimed_precision must be strictly between 0 and 1.")
  }
  if (!is.finite(conf.level) || conf.level <= 0 || conf.level >= 1) {
    stop("conf.level must be strictly between 0 and 1.")
  }
  if (!is.finite(B) || B < 1000 || B != floor(B)) {
    stop("B must be an integer of at least 1000.")
```

```
    }

    n_relevant <- tp + fn
    n_nonrelevant <- fp + tn
    sample_size <- n_relevant + n_nonrelevant
    prevalence <- n_relevant / sample_size

    observed_recall <- tp / n_relevant
    observed_precision <- tp / (tp + fp)

    # Bayes-rule identity:
    # precision = recall * prevalence /
    #   (recall * prevalence + FPR * (1 - prevalence))
    # Solve it for the false-positive rate implied by the represented pair.
    claimed_fpr <-
      claimed_recall * prevalence * (1 - claimed_precision) /
      (claimed_precision * (1 - prevalence))

    if (!is.finite(claimed_fpr) || claimed_fpr < 0 || claimed_fpr > 1) {
      stop(
        "The represented recall and precision are incompatible with ",
        "the observed sample prevalence because they imply an invalid ",
        "false-positive rate: ", format(claimed_fpr)
      )
    }

    # These exact tests provide separate Clopper-Pearson intervals, their p-values are dependent
  and are not combined.
    recall_test <- stats::binom.test(
      tp,
      n_relevant,
      p = claimed_recall,
      conf.level = conf.level
    )

    precision_test <- stats::binom.test(
      tp,
      tp + fp,
      p = claimed_precision,
      conf.level = conf.level
    )

    # Binomial likelihood-ratio contribution. At k = 0 or k = n, dbinom()
    # correctly handles the saturated estimate p_hat = 0 or 1.
    binomial_deviance <- function(k, n, p0) {
      p_hat <- k / n
      2 * (
        stats::dbinom(k, n, p_hat, log = TRUE) -
          stats::dbinom(k, n, p0, log = TRUE)
      )
    }

    observed_deviance <-
      binomial_deviance(tp, n_relevant, claimed_recall) +
      binomial_deviance(fp, n_nonrelevant, claimed_fpr)

    # Parametric bootstrap under the represented recall/precision pair. TP and FP
    # are generated conditional on the actual-class margins. Precision is not
    # simulated independently; it remains linked to the same simulated TP.
    set.seed(seed)
    tp_sim <- stats::rbinom(B, n_relevant, claimed_recall)
    fp_sim <- stats::rbinom(B, n_nonrelevant, claimed_fpr)

    simulated_deviance <-
      2 * (
        stats::dbinom(
          tp_sim, n_relevant, tp_sim / n_relevant, log = TRUE
        ) -
          stats::dbinom(
            tp_sim, n_relevant, claimed_recall, log = TRUE
          ) +
```

```
          stats::dbinom(
            fp_sim, n_nonrelevant, fp_sim / n_nonrelevant, log = TRUE
          ) -
          stats::dbinom(
            fp_sim, n_nonrelevant, claimed_fpr, log = TRUE
          )
      )

    # The +1 correction prevents an estimated p-value of exactly zero and gives
    # the usual finite-Monte-Carlo estimate for an upper-tail bootstrap test.
    # Retain the number of exceedances so the print method can distinguish an
    # actual simulated exceedance from the minimum value created by the +1
    # correction. For example, zero exceedances in 1,000,000 simulations yields
    # a corrected estimate of 1 / 1,000,001, not evidence that p is exactly zero.
    bootstrap_exceedances <-
      sum(simulated_deviance >= observed_deviance)
    joint_p_value <-
      (1 + bootstrap_exceedances) / (B + 1)

    # Probability mass of exactly these TP and FP counts under the represented
    # model. Report log10 probability to avoid numerical underflow.
    log_exact_pair_probability <-
      stats::dbinom(tp, n_relevant, claimed_recall, log = TRUE) +
      stats::dbinom(fp, n_nonrelevant, claimed_fpr, log = TRUE)

    structure(list(
      counts = counts,
      sample_size = sample_size,
      observed = c(
        recall = observed_recall,
        precision = observed_precision,
        prevalence = prevalence
      ),
      represented = c(
        recall = claimed_recall,
        precision = claimed_precision,
        implied_false_positive_rate = claimed_fpr
      ),
      confidence_level = conf.level,
      confidence_intervals = list(
        recall = unname(recall_test$conf.int),
        precision = unname(precision_test$conf.int)
      ),
      separate_p_values = c(
        recall = recall_test$p.value,
        precision = precision_test$p.value
      ),
      joint_deviance = observed_deviance,
      joint_bootstrap_p_value = joint_p_value,
      bootstrap_exceedances = bootstrap_exceedances,
      bootstrap_replicates = B,
      random_seed = seed,
      log10_probability_of_exact_counts =
        log_exact_pair_probability / log(10)
    ), class = "joint_recall_precision_result")
  }

  # Augment with a plain-English report.
  print.joint_recall_precision_result <- function(x, ...) {
    pct <- function(value, digits = 1) {
      paste0(formatC(100 * value, format = "f", digits = digits), "%")
    }

    ci_label <- formatC(
      100 * x$confidence_level,
      format = "fg",
      digits = 6
    )

    n_relevant <- x$counts[["tp"]] + x$counts[["fn"]]
    n_predicted_responsive <- x$counts[["tp"]] + x$counts[["fp"]]
```

```
direction <- function(observed, represented) {
  if (observed < represented) "below" else if (observed > represented) {
    "above"
  } else {
    "equal to"
  }
}

# Prepare results
cat("\nDETAILED NUMERICAL RESULTS\n")
cat("==========================\n")
print(unclass(x), ...)

cat("\nJOINT VALIDATION OF REPRESENTED RECALL AND PRECISION\n")
cat("====================================================\n\n")

cat("What the validation sample showed\n")
cat(
  "* Recall: ", pct(x$observed[["recall"]]),
  " (", ci_label, "% confidence interval: ",
  pct(x$confidence_intervals$recall[1]), " to ",
  pct(x$confidence_intervals$recall[2]), ").\n",
  sep = ""
)
cat(
  "  The process identified ", x$counts[["tp"]], " of the ",
  n_relevant, " actually responsive documents and missed ",
  x$counts[["fn"]], ".\n",
  sep = ""
)
cat(
  "* Precision: ", pct(x$observed[["precision"]]),
  " (", ci_label, "% confidence interval: ",
  pct(x$confidence_intervals$precision[1]), " to ",
  pct(x$confidence_intervals$precision[2]), ").\n",
  sep = ""
)
cat(
  "  Of the ", n_predicted_responsive,
  " documents identified as responsive, ", x$counts[["tp"]],
  " were responsive and ", x$counts[["fp"]], " were not.\n\n",
  sep = ""
)

cat("The represented performance\n")
cat("* Recall: ", pct(x$represented[["recall"]]), ".\n", sep = "")
cat(
  "* Precision: ", pct(x$represented[["precision"]]), ".\n\n",
  sep = ""
)

cat("Joint simulation result\n")
if (x$bootstrap_exceedances == 0) {
  cat(
    "None of the ", format(x$bootstrap_replicates, big.mark = ",", scientific = FALSE),
    " simulated samples was at least as inconsistent with the represented ",
    "rates as the observed sample.\n",
    sep = ""
  )
  cat(
    "With the +1 correction, the joint bootstrap p-value is ",
    format(x$joint_bootstrap_p_value, scientific = TRUE, digits = 4),
    " (approximately 1 in ",
    format(x$bootstrap_replicates + 1, big.mark = ",", scientific = FALSE),
    ").\n\n",
    sep = ""
  )
} else {
  cat(
    format(x$bootstrap_exceedances, big.mark = ",", scientific = FALSE),
```

```
      " of ", format(x$bootstrap_replicates, big.mark = ",", scientific = FALSE),
      " simulated samples were at least as inconsistent with the represented ",
      "rates as the observed sample.\n",
      sep = ""
    )
    cat(
      "The corrected joint bootstrap p-value is ",
      format(x$joint_bootstrap_p_value, scientific = TRUE, digits = 4),
      ".\n\n",
      sep = ""
    )
  }

  cat("Plain-English conclusion\n")
  cat(
    "The observed recall is ",
    direction(x$observed[["recall"]], x$represented[["recall"]]),
    " the represented recall, and the observed precision is ",
    direction(x$observed[["precision"]], x$represented[["precision"]]),
    " the represented precision. ",
    sep = ""
  )
  if (x$joint_bootstrap_p_value < 0.05) {
    cat(
      "Taken together, the validation results are statistically inconsistent ",
      "with the represented performance.\n"
    )
  } else {
    cat(
      "Taken together, the validation results do not show statistically ",
      "significant inconsistency with the represented performance at the ",
      "5% level.\n"
    )
  }

  cat(
    "This p-value is not the probability that the representation is false. ",
    "It measures how unusual the validation result would be under the ",
    "represented rates. The analysis also depends on the sampling and ",
    "labeling assumptions described in the comments at the top of this file.\n\n"
  )

  invisible(x)
}

# run for actual numbers
result <- joint_recall_precision_test(
  tp = 1350,
  fp = 1144,
  fn = 901,
  tn = 20538,
  claimed_recall = 0.75,
  claimed_precision = 0.90,
  conf.level = 0.95,
  B = 1000000L, # 1 million simulations
  seed = 1L
)

print(result)



# sensitivity at 15% incorrectly coded (favor TAR Model)
stress_test_result <- joint_recall_precision_test(
  tp = 1522,
  fp = 972,
  fn = 766,
  tn = 20673,
  claimed_recall = 0.75,
  claimed_precision = 0.90,
  conf.level = 0.95,
```

```
  B = 1000000L, # 1 million simulations
  seed = 1L
)

print(stress_test_result)
```

## APPENDIX C – PLAINTIFFS' COUNSEL'S REVIEW AND APPLE'S MODEL DISAGREE ON WHICH DOCUMENTS ARE RESPONSIVE

1. Apple represented that its TAR 1.0 Model had 75% *recall* and 90% *precision*.

2. Apple's TAR 1.0 Model scored 2,494 documents above the cutoff for Sample 1.

3. Let's take Apple's numbers for a moment. 90% of 2,494 is ~2,245. Apple's represented 90% precision thus gives us that Apple expected that its model identified correctly 2,245 responsive documents. 2,245 is 75% of ~2,993. Apple's represented 75% recall thus gives us that Apple expected that there would be **2,993** responsive documents in Sample 1.[1]

4. Plaintiffs' counsel's manual review of the 23,933 documents in Sample 1 identified **2,251** responsive documents.

5. Thus, Plaintiffs' review determined **9.4%** of Sample 1 contained responsive documents, but Apple's TAR 1.0 Model predicted **12.5%**, that is 33% more.

6. Furthermore, Plaintiffs and Apple's TAR 1.0 Model only agreed on 1,350 documents that were coded as responsive.

[1] To keep these numbers simple, I have not included confidence intervals.

APPENDIX C – PLAINTIFFS' COUNSEL'S REVIEW AND APPLE'S MODEL DISAGREE ON WHICH DOCUMENTS ARE RESPONSIVE




7. Apple's TAR 1.0 Model predicted **1,643** documents would be responsive that Plaintiffs' review coded were non-responsive.[2]

8. Apple's TAR 1.0 Model predicted **748** documents would be false negatives,[3] but Plaintiffs' review coded **901** documents as false negatives (a delta of **153** documents or **20.4%** more).

9. Thus the total disagreement is 2,993 - (1,030 + 153) or **1,810** documents out of **2,993** predicted documents (**60.5%**).

---

[2] Plaintiffs' review found 1,144 non-responsive documents in the Positive set. Using the represented 90% precision from Apple, 90% of 1,144 is 1,030.

[3] 90% of 2,494 is 2,245. 2,245 is 75% of 2,993. So, at a 75% recall and 90% precision, Apple's TAR 1.0 Model would have predicted 2,993 responsive documents existing in Sample 1, divided into 2,245 in the Positive set and 748 (2,993-2,245) in the Negative set.

10. As such, it is apparent that Apple's TAR 1.0 Model and Plaintiffs significantly disagree on which documents are responsive, contesting over half of the coding decisions of the other party.

## APPENDIX D – TAR MODEL TRAINING AND RECALL VALIDATION

1. The Sedona TAR 1.0 Reference Model specifies use of a "Label Control Set" which "functions as a test to estimate the predictive model's performance."[1] Sedona's guidance is that this should be a random sample from the TAR Eligible population of documents.

2. The Label Control Set is distinct from "Training Document Sets," which are sets of coded responsive/non-responsive documents used to teach the Model as part of the "Evolve" step:[2]

> a. **Evolve:** This step involves improving the selection of information used to update a model's predictions.




> Select additional training documents: Training documents are added as examples. Modern approaches to discriminative TAR 1 usually focus on selecting documents that will increase diversity (representativeness) of the examples or decrease uncertainty in areas where the model is most unsure. Examples can be selected in other ways, such as through random sampling or by human determination.

> 2024] TAR 1 REFERENCE MODEL: TRADITIONAL AND GENAI 123

> Review training documents: The new training documents are then reviewed and tagged by humans. This process may require a decent volume of training document review.

[1] *See* Emory et al., *supra* note 7, at 121.

[2] *See id.* at 123-4.

3. The initial set of training documents is sometimes referred to as the "seed set."

4. The TAR 1.0 Model uses the Training Documents to help it distinguish between responsive and non-responsive documents.

5. To use a poor analogy, I often think of this like using oars to steer a rowboat. Once the Model has some training, it goes off in one direction and feeding in training documents may not be enough to change its course or, even worse, risks overshooting the correction.

6. Training is critically important to the outcome.

7. The Sedona TAR 1.0 Reference Model cautions to:[3]

(a) select a random sample as a Label Control Set which is sufficiently large,

(b) make sure the Label Control Set does not influence the Training Documents by excluding those documents from the Training Documents,

(c) increase the diversity of the documents in the Training Documents by ensuring that the Training Documents include what may be underrepresented or rarer types of responsive documents, especially where the Model is demonstrating uncertainty,

(d) add a sufficient number of training documents (as the guidance states: "this process may require a decent volume of training document review"),

(e) test the Model against the Label Control Set,

(f) determine a stopping point,

(g) determine the cutoff score to meet a recall or precision requirement and,

[3] *See id.* at 121-4.

(h) optionally, to determine to validate "through precision and recall, whether the model's extrapolation to the project population is as effective as was expected based on the control set[, by] validat[ing] the result rather than the model, which can eliminate subtle biases that may be introduced by repeated control set evaluation."[4]

8. The effective accuracy of any TAR 1.0 Model is thus dependent on the following parameters:

(a) the size of the Label Control Set,

(b) the representativeness of the Label Control Set and Training Documents,

(c) the accuracy of the coding of the Label Control Set and Training Documents,

(d) the cutoff score determined to label a document as responsive, and

(e) whether validation was performed to test the actual recall and precision independent of the comparison against the Label Control Set.

9. With machine learning in general, there are two primary concerns: overfitting and underfitting.

10. A Model that is overfitted has little predictive value. It is a Model that effectively performs well for the documents in the Label Control Set and Training Document Sets but may not generalize beyond those sets (to documents it has not seen coded).

11. Likewise, a Model that is underfitted may skew toward more false positives, more false negatives, or both, effectively reducing both the richness of responsive documents in the Positive set and the number of true positives.

[4] *Id.*

12. Grossman and Cormack point out that using pure random samples for Training Documents may "exclude an identifiable population of responsive documents."[5]

> There are situations in which a finite random sample used as a training set could exclude an identifiable population of relevant documents. By way of example, consider a collection consisting of 1,000,000 emails and 100,000 spreadsheets, of which 10,000 emails and 1,000 spreadsheets were relevant. A random training set consisting of 1,100 documents would contain about 1,000 emails, of which about 10 were relevant, and about 100 spreadsheets, of which, as likely as not, none would be relevant. A machine-learning method might well infer that spreadsheets generally were not relevant, thereby exhibiting a blind spot. Random training tends to be biased in favor of commonly occurring types of relevant documents, at the expense of rare types. Non-random training can counter this bias by uncovering relevant examples of rare types of documents that would be unlikely to appear in a random sample.

[5] *See* Maura R. Grossman & Gordon V. Cormack, *Evaluation of Machine-Learning Protocols for Technology-Assisted Review in Electronic Discovery, in Proceedings of the 37th International ACM SIGIR Conference on Research and Development in Information Retrieval* 153, 159–60 (2014), https://doi.org/10.1145/2600428.2609601.

## APPENDIX E – VISUALIZING TRAINING, RESPONSIVENESS, RECALL, PRECISION AND CONCEPTUAL DIVERSITY

1. In the representations below, I use fish to represent responsive documents, rocks to represent non-responsive documents, and a net to represent the collection of Positive documents. Different shapes of fish ("fish categories") are used to symbolize meaningfully different RFPs (what is commonly referred to as "conceptual diversity").



2. You can visualize the population of documents thus as fish and rocks in a lake. In the diagram below, I kept the proportions of the actual numbers of responsive and non-responsive documents as generally agreed upon by both Apple's TAR 1.0 Model and Plaintiffs' review. Notice the more common fish are more common here and vary in relative responsiveness. The goal of a TAR model is to identify the fish and exclude the rocks.



3. Developing the model involves iterating on sets of Training Documents that are manually coded and comparing against a Labeled Control Set.



4. The diagram below illustrates an outcome (fish and rocks in and outside the net) where precision is 90% and recall is 75%. Notice that in this idealized model, different types of fish are captured (representative of documents responsive to a variety of RFPs).



5. The diagram below illustrates the difference between a model with 50% precision and 50% recall (similar to what Plaintiffs' review yielded) versus the prior diagram which had the values Apple represented. You can see that recall and precision alone do not account for the diversity or relative responsiveness of documents (here denoted by the share and redness of the fish). Indeed, in this example, the most responsive documents are outside the net.



6. In this second diagram, I have overlaid this to indicate the decisions made by the model.



7. In the following diagram, I illustrate how Training Document and Label Control Set problems can affect the performance of the resultant model. These are reasons why the disclosures I enumerated matter.



8. On the August 28, 2026 meet and confer, Apple's counsel stated Apple would consider adding a small number of documents to the existing Training Documents set. Below, I illustrate why this not only might not improve the model's performance against documents that are being incorrectly coded (false negatives and false positives) but could also impact documents that are currently being correctly coded (true positives).



9. On the August 28, 2026 meet and confer, Apple implied that it had confidence in its model specifically because it had examined the "null set" or the Negative population. The illustration below is intended to show why in a population with a richness of 10%, examination of the Negative set alone might lead to an erroneous conclusion about the performance of the model.



10. The diagram below is intended to illustrate that merely moving the cutoff (threshold score) lower is not guaranteed to fix a model where there is 50% disagreement between the model and human reviewers. In the example below, lowering the cutoff results in capturing more documents that are responsive, but not more diversity of documents, nor the most responsive documents, which still remain outside the net.



11. Knowing the distribution of scores is informative to tell whether the model is truly performant or if a good deal of the decisions are random coinflips on the edge.



12. Knowing the precise scores is important as well. Scores spread across a wider range alone to not inform as to whether the model is properly able to distinguish and rank responsiveness across a diverse spectrum of categories. This also helps inform whether lowering the cutoff score is a viable option likely to improve the performance of the model.



13. There are valid reasons for utilizing more than one TAR 1.0 Model. If a given model is achieving a lower recall, but a high precision, and a high recall within specific categories (*e.g.*, correctly coding one or more common categories of documents), retraining the model to account for categories of documents on which the model is underperforming risks making the model less performant where it is accurately coding.

14. To put this in the context of my prior illustrations, this would be akin to a model that is good at identifying fish, but not good at identifying fish eggs. Rather than try to adapt one model to try to distinguish both fish and fish eggs from rocks, it might be more efficient to develop a second model to specifically identify fish eggs.



Illustrative outcomes, not measured results. Retraining can help without causing this tradeoff; multiple models do not guarantee improvement.

# Exhibit A

**JONATHAN JAFFE**
www.its-your-internet.com (866) 526-1836
Forest Hills, New York 11375 jjaffe@its-your-internet.com
linkedin.com/in/jonathankjaffe

**EXPERT TECHNOLOGY + LITIGATION ESI CONSULTING**

**Database/Data Analysis…Bespoke Technical Solutions**
**Federal Expert Witness…ESI Discovery Consulting…Forensics**

**Its-Your-Internet** **2008-present**

Its-Your-Internet specializes in bespoke technical solutions, data science, and ESI litigation support. I established the firm in March 2008.

***Founding Owner,*** *2008-present;*

- Plaintiffs' Designated ESI Representative on Federal Opioid MDL Litigation, Federal Data Breach Case, and other cases involving very large technology litigants
- Plaintiffs' Designated ESI Representative for Over 500 Firms on Multiple Mass Tort Litigations involving Product Liability with Medical Devices and Drugs (hundreds of thousands of individual plaintiffs collectively) extensive engagement from early discovery through trial
- Plaintiffs' Designated ESI Representative in Multiple Class Action Suits (majority involving alleged violations of the Fair Credit Reporting Act)
- Plaintiffs' Designated ESI Representative in Attorney General Suits involving Product Liability
- Expert Witness in Multiple Federal Cases (Product Liability ("PL"), Fair Credit Reporting Act ("FCRA"), Electronic Funds Transfer Act ("EFTA"), and the Fair Labor Standards Act ("FLSA"))
- Database Analysis (medical data, consumer reports, adverse event/safety, clinical trial, registry, call note, sales and marketing, statistical analysis)
- Assisting with Class List development and certification
- Working with Extremely Large Document Productions (50MM+ documents)
- Working with Extremely Large Database Productions and Extracts (100B+ record tables)
- Analysis of Statistical Results from Clinical Studies
- Trial Support (exhibit list document selection and preparation, helping find documents used with adverse witnesses and in cross examination, translating finds into usable exhibits, demonstratives, jury charges)
- Plaintiff Document Production including Social Media (workflow, redaction, privilege review, staging and producing)
- Built Bespoke Production Review Software
- Discovery Format and Production Negotiation
- Redaction / Privilege Review Management
- Keyword Search Term Recommendations, Predictive Coding Recommendations
- Custodial Production Forensics
- Custodial Production Storage Recommendations
- Drafting ESI Related Interrogatories, Requests for Production, Requests for Admission
- Deduplication, Gap Analysis, Statistical Sampling, Forensic Analysis, Discovery Issues Analysis

- Assisting Attorneys on 30(b)(6) Depositions, Meet and Confers, Hearings, Motions, Draft Orders, Stipulations, Rule 34 issues
- Supporting other Expert Witnesses
- Creating Supporting ESI Reports for Court Hearings
- Deposition Workup and Providing Deposition Assistance
- Supervising and participating (design, coding, analysis) over a large variety of projects, most with significant teams, inclusive of:
  - Litigation Support Custom Applications / Software / Data Analysis
  - Subscription Site for M&A Information, Oauth2 Authentication, Graph Analysis, and Internal Application Development for Investment Bank
  - Real-time Chat Extension for Large VoIP Provider
  - Redesign of Class Action Support System for a Top 3 Legal Administrative Services Firm (Billions of Dollars of Administration)
  - LMS and Exam SaaS applications for West African Market
  - Mobile West Africa #1 App – FindAMed
  - Subscription Based Site for Theater and Performing Arts Companies
  - School Based Management Systems Development
  - Raffle Contest Site and Variations
  - Writing and Support for Core Remake of Multi-Million Page Web Site
  - SEO and SEM Management for Multiple Clients
  - Finalist in Multi-Billion $ RFP for NYC DOE
  - > 50 original web sites inclusive of e-Commerce
  - Countless consultations with Entrepreneurs
- Multiple Entrepreneurial Projects Using Bleeding Edge Technology
- Established a Dozen Key Reciprocal Partnerships
- > 30 Talks and Lectures on Technology and Social Media for Chambers of Commerce, SBA, Charities and Non-Profit, Business Groups and Organizations
- Day to Day Resource Management, Staffing, Administration
- Oversight of Remote and Offshore Resources
- Branding, Marketing, Materials (for Firm and Clients)

General Technologies: R, AI, Python, Rust, NoSQL, SQL, C#, C++, PHP, NodeJS, Django, NPM, PaaS, Heroku, HTML5, AngularJS, MongoDB, Cloudant, Redis, MSSQL, Oracle, MySQL, MariaDB, Postgres SQL, Tableau, ExpressJS, Git/GitHub, GruntJS, E2E Testing, ASP.NET MVC, ASP.NET, Cordova PhoneGap, Amazon Web Services (S3, Athena, SageMaker, EMR, Glue, RedShift, CloudFront, EC2, ECS, ECR, EBS, KMS, Batch, IAM), Azure (Data Lake, Synapse, AI, PowerBI), XML, XML Schema, LESS, CSS3, SocketJS, Bower, Joomla, Drupal, WordPress, Office365, SharePoint, SalesForce, JIRA, Photoshop, Illustrator, GIMP, RESTful and Agile Methodologies, Quantum Computing (early exploration).

Legal Review Platforms: Relativity, Reveal, Everlaw, iConect-Xera, Eclipse, Disco, Crivella, Nuix Ringtail, Catalyst Insight, Opus, Nextpoint

Forensic Software: FTK Imager, Encase, Cellebrite PA UFED, Transend Migrator, Magnet IEF

**Weitz & Luxenberg, P.C.** **2002-2008**

Weitz & Luxenberg is one of the nation's original and foremost firms in mass tort asbestos litigation handling nearly one million simultaneous pending court actions, 250,000 bankruptcy claims, and over 50 other personal injury litigations.

***Manager of Software Development,*** *2003-2008*
***Sr. Project Manager,*** *2002-2003*

- Federal Expert Witness resulting in substantial eDiscovery Sanctions
- Collection of documents for litigation; Validation; Forensic Analysis
- Coordinated activities of 5 teams, comprising 20 resources
- Achievements included: establishing and overseeing the 4th largest personal injury law firm site, www.weitzlux.com, all internal development, sales/marketing efforts, public relations, and client services.
- Chief software architect.
- Increased site traffic 5,000% (to 12,000+ unique visitors/day) and original content by 2MM+ pages.
- Positioned web site as a new sales channel, netting $MM in new revenue, 45,000% increase in leads to 1,500 new case leads/week.
- Gained first page ranking for 750,000+ search terms used to find the site including some of the most competitive (ex. *asbestos lawyer*).
- Reduced annual Internet marketing costs by $3.6 million, or 96%, while increasing returns.
- Transformed internal development into a premier asset of the firm resulting in joint development efforts with Federal Express, 2 case studies on our use of Web Services by Microsoft, and the adoption of our proprietary document management technologies by other law firms across the country.
- Oversaw distribution of $300 million/year in settlements to tens of thousands of clients.
- Increased overall internal system performance 500% with a 75% reduction in system downtime.
- Mentored technical team, developers, analysts, SEO (search engine optimization)

Technologies: C#. VB.NET, ASP.NET, SQL2005, SQL2000, OLTP, OLAP, JavaScript, HTML, Exchange2003, Win2003, IPSec, CISCO VPN, Citrix Presentation Server, Win2000, WinNT4, Project, PowerPoint, WebSense, eSafe, Active Directory (LDAP) Interface, XML, xHTML, Web Services, Visual Studio Team Foundation Server, VSS, VB6, Access, Microsoft Office, Cisco PIX (Firewall), Tape Library Backup, Document Management, CRM, ERP, Great Plains 7.0, Great Plains 6.0, Goldmine, ASP3.0, IIS 6.0, Windows Services, Snap NAS, LeadTools (Imaging), SharePoint, AscentCapture, Concordance, Summation, iConnect, ComponentOne for .NET, Flash, Mac OSX, Photoshop, SEO

Case Studies (Business + Technology):

http://download.microsoft.com/documents/customerevidence/27250_Weitz_Lux_Final_BA.doc

http://download.microsoft.com/documents/customerevidence/27249_Weitz_Lux_Final_CS.doc

**IMJ Group Inc. 2001-2002**

IMJ was a startup business/technology consulting think tank and solution implementation firm I started with two partners.

***Vice President, Technology / Founding Partner***

- Established corporate status for the firm and branding.
- Recruited and supervised staff.

Technologies: Linux, BSD, Java, Access, Microsoft Project, Microsoft PowerPoint, Microsoft Excel.

**Winstar Communications, Inc., Web Development Group 2000-2001**

The Winstar Web Development Group was an Internet consultancy, part of Winstar (a dot-com telecommunications firm), specializing in large Intranets and Internet sites.

***Acting Director of Technology,*** *2001;*
***Senior Technology Architect,*** *2000-2001*

*Technical Leadership*

- Directed a team of 17 – project managers, developers, system engineers, and site designers.
- Managed full project lifecycle for six and seven digit budgets.
- Chief Software Architect.
- Designed Internet and Intranet sites, including Hosting Solutions.
- Established procedures and process, integrating what had been five company acquisitions into one team.
- Mentored development team.

*Business Development*

- Increased average project value 10,000% (from $50,000) to $5 million, including winning the team's first $1 million contract.
- Liaised successfully with other Winstar divisions (Hosting, Office.com, Professional Services, and Winstar for Buildings) resulting in improved sales and project coordination.
- Led Winstar team on a $50 million proposal for the NYC Board of Education with partners Sun, Oracle, Lucent, Microsoft and Compaq.

Technologies: ASP 3.0, SQL2000, SQL 7.0, JavaScript, HTML, Project, PowerPoint, VSS, Exchange2000, Win2000, WinNT4, WebSense, Active Directory, VB6, VB5, Visio, Microsoft Office, Flash, Photoshop, QuarkXpress.

Example web site: http://www.nationalmssociety.org still largely uses the same information architecture laid out over 20 years ago.

**Valinor, Inc.** **1995-2000**

Valinor Inc., a wholly owned subsidiary of IKON Office Solutions, was the original Microsoft Solutions Partner/Provider & Authorized Technical Education Center in New York City, consulting for Fortune 500 firms.

***Technical Project Manager / Microsoft Certified Trainer***, 1998-2000
(after graduating Columbia);

***Technical Project Leader / Senior Technical Architect***, 1996-1998
(while attending Columbia full time 20+ hrs/wk);

***Senior Application Developer / Application Developer***, 1995-1996
(while attending Columbia full time, 20+ hrs/wk)

*General Achievements*

- Increased average project value, formerly $100,000 average, 500% to $500,000
- Led teams of up to 10 developers

*Valinor Key Consulting Projects*

- **AIG/AIU NAD** — migration of AIG Europe's mainframe-based quotation and policy generation system to Microsoft Windows/Office workstation platforms, reducing the time to policy from days to minutes.
- **Berkery, Noyes & Co.** — a company-wide line of business application matching companies seeking to sell themselves with potential buyers.
- **The College Board** — Internet application to gather annual survey data for all United States accredited colleges and universities.
- **DLJ** — on site training.
- **Garban Intercapital** — a cash derivatives trading system utilized by 60 brokers.
- **IKON Office Solutions** — reconciled revenue reporting data from multiple disparate databases.
- **Matsushita** — workflow support ticketing system.
- **Maersk Shipping** — reconciled multiple shipping databases.
- **Merrill Lynch** — on site training on active trading floors.
- **NYC Department of Technology** — on site training.
- **Sumitomo Mitsui** — application to monitor, track and handle all transactions and interest calculations for a multi-billion per year transfer of high risk loans.
- **Sun Chemical** — on site training and follow up consulting.
- **Yankee Copyrights Management** — a large eCommerce application for a startup to create a marketplace for permissions to use and replicate copyrighted materials.

Technologies: ASP2.0. SQL7.0,  SQL6.0, Sybase, Oracle, MTS, COM, JavaScript, HTML, Project, Powerpoint, VSS, Exchange5, WinNT4, WinNT3.51, Unix-Solaris, C++, MFC, VB6, VB5, VB4, VB3, Access, Visio, Goldmine, Microsoft Word, Excel

## ADJUNCT PROFESSOR

**Columbia University School of Continuing Education, evening classes 2003-2005**

- Taught Database Design/Advanced SQL, and .NET Programming courses — QC7304, QC7305, QC7403.
- Developed curriculum for courses, part of SASE track certificate program.

## EDUCATION

Bachelor of Arts, Economics/Mathematics, *magna cum laude*, Columbia University, 1999

Stuyvesant High School, 1995

## CERTIFICATIONS

Microsoft Certified Professional, 1998

Microsoft Certified Trainer, 1998

## MAJOR LAW FIRMS

LANIER LAW FIRM

BARON BUDD

SIMMONS HANLY CONROY

SEEGER WEISS

MOTLEY RICE

FARRELL & FULLER

WEITZ & LUXENBERG

BERGER MONTAGUE

NORTON ROSE FULBRIGHT

MAZIE SLATER KATZ & FREEMAN

BAILEY PEAVY BAILEY

KAISER GORNICK

SANDERS VIENER GROSSMAN

SALIM BEASLEY

CRONIN FRIED

NEBLETT, BEARD & ARSENAULT

BLASINGAME BURCH GARRARD ASHLEY

NICHOLS KASTER

PODHURST ORSECK

KIRTLAND & PACKARD

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ

BEASLEY ALLEN

KAZAN, MCCLAIN, SATTERLEY & GREENWOOD

NAPOLI SHKOLNIK

LEVIN PAPANTONIO

FRANCIS MAILMAN SOUMILAS

THE HOLLAND LAW FIRM

**EXPERT TESTIMONY**

*Depositions*

**2026**

DIANE WATTS, *et al.* v. LIBERTY MUTUAL PERSONAL INSURANCE COMPANY

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

No. 1:23-cv-12845-BEM

RIDDICK v. CHEX SYSTEMS, INC.

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF VIRGINIA

No. 2:24-cv-00700-JKW-LRL

WILLIAM NORMAN BROOKS, III, *et al.* v. TRANS UNION LLC

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA

No. 2:22-CV-00048-GEKP

**2025**

YAAKOV CINNER, *et al.* v XACTUS, LLC, CREDIT PLUS, LLC

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA

No. 2:23-cv-04531-JMY

IN RE GEICO CUSTOMER DATA BREACH LITIGATION

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

No. 21-CV-02210-KAM-SJB

WILLIAM NORMAN BROOKS, III, *et al.* v. TRANS UNION LLC

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA

No. 2:22-CV-00048-GEKP

RICKY CHRISTIAN, *et al.* v. TRANS UNION LLC

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA

No. 2:22-cv-02253 MSG

PAULA SPARKMAN, *et al.* v COMERICA BANK, *et al.*

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA

No. 2:24-cv-01206-DJC-DMC

**2024**

MANDY WILSON, *et al.* v TRANSUNION, LLC

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF INDIANA

No. 1:23-cv-00131-JPH-MJD

LARS F. BRAUER, *et al.* v. EXAMONE WORLD WIDE INC., *et al.*

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

No. 2:22-cv-07760-MEMF-JC

GARY NELSON and KAYLEIGH POTTER, *et al.* v. BANK OF AMERICA, NATIONAL ASSOCIATION

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA

No. 5:23-cv-00255-JS

WILLIAM NORMAN BROOKS, III, *et al.* v. TRANS UNION LLC

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA

No. 2:22-CV-00048-GEKP

**2023**

DONNA WOOD, *et al.* v MIKE BLOOMBERG 2020, INC.

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

No. 1:20-CV-2489-LTS-GWG

JAMES HEALY, *et al.* v. MILLIMAN, INC. d/b/a INTELLISCRIPT

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON

No. 2:20-CV-01473 JCC

DR. ANTHONY TORRES, D.O. , *et al.* v. EQUIFAX INFORMATION SERVICES LLC.,

UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF PENNSYLVANIA

No. 1:21-cv-02056-CCC

MARCO A. FERNANDEZ, *et al.* v. CORELOGIC CREDCO, LLC

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA

No. 3:20-cv-01262-JM-AGS

**2022**

DUANE E. NORMAN, SR., *et al.* v. TRANS UNION, LLC

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF PENNSYLVANIA

No. 18-cv-05225-GAM

JAMES HEALY, *et al.* v. MILLIMAN, INC. d/b/a INTELLISCRIPT

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON

No. 2:20-CV-01473 JCC

**2019**

RALPH GAMBLES, THOMAS MERCK, AND ELISE COMPO, *et al.* v. STERLING INFO SYSTEMS

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

No. 1:15-cv-09746-PAE

SCOTT RILLEY, MICHELLE KUNZA, VENUS COLQUITT-MONTGOMERY, JONATHON ALDRICH, AND KENDRA BUETTNER, *et al.* v. MONEYMUTUAL, LLC, SELLING SOURCE, LLC, AND PARTNERWEEKLY, LLC

UNITED STATES DISTRICT COURT MINNESOTA

No. 16-cv-4001 (DWF/LIB)

**2015**

PLAINTIFFS V. SMITHKLINE BEECHAM CORPORATION D/B/A,

GLAXOSMITHKLINE

PHILADELPHIA COUNTY COURT OF COMMON PLEAS

Nos. 01144, 0402, 3694, 3678, 3672, 3758, 3686, 3727, 0489

JOSEPH JAUHOLA VS. CANADIAN NATIONAL RAILWAY COMPANY,

AND WISCONSIN CENTRAL, LTD.

UNITED STATES DISTRICT COURT MINNESOTA

No. 14-cv-1433

**2007**

In re SEROQUEL PRODUCTS LIABILITY LITIGATION.

UNITED STATES DISTRICT COURT MIDDLE DISTRICT FLORIDA, ORLANDO DIVISION

No. 6:06-md-1769-Orl-22DAB.

*(deposed twice)*

*Hearings*

**2025**

IN RE: TIKTOK, INC., MINOR PRIVACY LITIGATION

UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

No. 2:25-ml-03144-GW-RAO

**2015**

IN RE BENICAR (OLMESARTAN) PRODUCTS LIABILITY LITIGATION.

UNITED STATES DISTRICT COURT NEW JERSEY, CAMDEN VICINAGE

No. 1:15-md-02606

**2010**

IN RE: GADOLINIUM BASED CONTRAST AGENTS LITIGATION.

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

No. 1:08-GD-50000, MDL NO. 1909

**2007**

In re SEROQUEL PRODUCTS LIABILITY LITIGATION.

UNITED STATES DISTRICT COURT MIDDLE DISTRICT FLORIDA, ORLANDO DIVISION

No. 6:06-md-1769-Orl-22DAB.

## SPEAKING ENGAGEMENTS

*Chambers of Commerce*

- Greater NY Chamber of Commerce
- Forest Hills Chamber of Commerce
- Franklin Square Chamber of Commerce
- Medford Chamber of Commerce
- Rockville Centre Chamber of Commerce
- Oceanside Chamber of Commerce
- BRiSC - the Unofficial Silicon Alley Chamber of Commerce

*Small Business Administration*

- USSBA (March 2010)
- USSBA (April 2010)
- USSBA (May 2010)

*Business Groups and Organizations*

- Independent Business Women's Group
- Associated Builders & Contractors – Lower NY State
- Associated Builders & Contractors – Nassau/Suffolk
- East End Women's Network

*Charities and Non-Profits*

- Northport Rotary
- Kiwanis International

*Continuing Education*

- Columbia University – School of Continuing Education – adjunct professor
- Locust Valley Adult Education
- College of New Rochelle – Graduate Program
- Monroe College – Graduate Program