# EXHIBIT 44

# Timeline of Custodian Discovery Dispute

**JAN 24, 2025**
MDL requests CID documents to "streamline this case" and "enable Plaintiffs to narrow and tailor future discovery" (Dkt. 66 at 2)

**FEB 14, 2025**
Order denying MDL request for CID documents (Dkt. 74)

**SEPT 16, 2025**
Status Conference: Apple & Gov't have agreed to 22 custodians **MDL has no access to CID documents.** (Pls. Ex. 45)

**OCT 7, 2025**
Discovery Confidentiality Order (Dkt. 124)

**NOV 26, 2025**
Apple begins producing CID documents to MDL (Pls. Ex. 46)

**DEC 5, 2025**
Joint Scheduling and Case Management Order: "Apple will promptly make rolling productions" of CID documents (Dkt. 142 at 5)

**DEC 22, 2025 and FEB 5 & FEB 12 2026**
Apple circulates invitations to Gov't M&C (Dkt. 313 at 1)

**JAN 26-29, 2026**
Apple & MDL M&C: Apple tells MDL to identify custodians by reviewing CID documents (Pls. Ex. 48)

**FEB 11, 2026**
Apple & Gov't have agreed to 52 out of 54 custodians (Pls. Ex. 49)

**MAR 13, 2026**
Apple proposes MDL rely on Gov't custodians (Dkt. 192 at 22)

**APR 16, 2026**
MDL propose additional custodians (Dkt. 192 at 22)

**MAY 12, 2026**
Apple rejects MDL custodians (Dkt. 192 at 22)

**JUN 24, 2026**
Watches narrow custodian proposal from 36 to 17 (Dkts. 294-2, 294-3)

**JUL 9, 2026**
Apple makes final CID reproduction (Pls. Ex. 47)

**JUL 24, 2026**
After repeated requests (see timeline below) Apple provides substantive positions on Watches narrowed proposal (Dkt. 294-3)

**AUG 18, 2026**
Watches, Apple submit Notice of Impasse (Dkt. 283)

←Apple's piecemeal reproductions of CID documents run from November 2025 through July 2026 →

FEB 2025 | MAR 2025 | APR 2025 | MAY 2025 | JUN 2025 | JUL 2025 | AUG 2025 | SEP 2025 | OCT 2025 | NOV 2025 | DEC 2025 | JAN 2026 | FEB 2026 | MAR 2026 | APR 2026 | MAY 2026 | JUN 2026 | JUL 2026 | AUG 2026 | SEP 2026

## Apple's Delayed Responses (June 24, 2026 to August 14, 2026)

- **Jun 24** Watches narrow proposal to 17 custodians
- **Jun 25** Apple promises a response
- **Jul 7** Watches request response
- **Jul 9** Final CID reproduction
- **Jul 13** Watches request response
- **Jul 17** Watches send draft impasse letter
- **Jul 20** Apple responds to 2 of 17
- **Jul 20** Watches request response
- **Jul 23** Watches send draft impasse letter
- **Jul 24** Apple responds
- **Jul 28** Watches send draft impasse letter
- **Jul 29** Apple demands another letter before agreeing to impasse
- **Aug 3** Watches letter reply
- **Aug 6** Watches send draft impasse letter
- **Aug 14** Apple agrees to impasse filing

# EXHIBIT 45

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

**CIVIL ACTION NUMBER:**

**24-cv-04055**

**STATUS CONFERENCE**

**UNITED STATES OF AMERICA, et al,**

**Plaintiffs,**

**v.**

**APPLE, INC.,**

**Defendant.**

**Martin Luther King Building & U.S. Courthouse**
**50 Walnut Street**
**Newark, New Jersey 07101**
**Tuesday, September 16, 2025**
**Commencing at 2:00 p.m.**

**B E F O R E:** **THE HONORABLE LEDA DUNN WETTRE, UNITED STATES MAGISTRATE JUDGE**

**A P P E A R A N C E S:**

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
BY: AARON M. SHEANIN, ESQUIRE
450 Golden Gate Avenue - Suite 10-0101
San Francisco, California 94102
Counsel for Plaintiff United States of America

U.S. DEPARTMENT OF JUSTICE
Antitrust Division
BY: JACK G. LERNER, ESQUIRE
26 Federal Plaza
New York, New York 10018
Counsel for Plaintiff United States of America

Melissa A. Mormile
Official Court Reporter
melissa_mormile@njd.uscourts.gov
(973) 776-7710

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

**A P P E A R A N C E S (Continued):**

OFFICE OF THE UNITED STATES ATTORNEY
DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
BY: ANDREW BOCCIO, ESQUIRE
970 Broad Street - 7th Floor
Newark, New Jersey 07102
Counsel for Plaintiff United States of America

OFFICE OF THE UNITED STATES ATTORNEY
DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
BY: MICAH D. STEIN, ESQUIRE
450 5th Street NW
Washington, D.C. 20530
Counsel for Plaintiff United States of America

OFFICE OF THE UNITED STATES ATTORNEY
DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
BY: MATTHEW C. MANDELBERG, ESQUIRE
950 Pennsylvania Avenue NW - Room 3224
Washington, D.C. 20530
Counsel for Plaintiff United States of America

STATE OF NEW JERSEY
OFFICE OF THE ATTORNEY GENERAL
BY: SURINDER AGGARWAL, ESQUIRE
124 Halsey Street - 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Counsel for Plaintiff State of New Jersey

KIRKLAND ELLIS LLP
BY: CRAIG PRIMIS, ESQUIRE
BY: TRACIE L. BRYANT, ESQUIRE
BY: SOOWAN JULIA CHOI, ESQUIRE
1301 Pennsylvania Avenue NW
Washington, DC 20003
Counsel for the Defendant

KIRKLAND ELLIS, LLP
BY: ALEXIA BRANCATO, ESQUIRE
601 Lexington Avenue
New York, New York
Counsel for Apple, Inc.

**A P P E A R A N C E S (Continued):**

WALSH PIZZI O'REILLY FALANGA LLP
BY: LIZA M. WALSH, ESQUIRE
BY: HON DOUGLAS E. ARPERT (RET.)
Three Gateway Center
100 Mulberry Street - 15th Floor
Newark, New Jersey 07102
Counsel For Apple, Inc.

(PROCEEDINGS held in open court before The Honorable Leda Dunn Wettre, United States Magistrate Court Judge.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Thank you. Please be seated. Good afternoon, everyone. We have to get rid of that background, the feedback.

We are on the record in *United States of America v. Apple*, 24-cv-4055.

May I have appearances, starting with the plaintiffs, please.

MR. SHEANIN: Good afternoon, your Honor. Aaron Sheanin, on behalf of the United States, with several colleagues of mine who will introduce themselves.

THE COURT: Good afternoon.

MR. LERNER: Good afternoon, your Honor. Jack Lerner, for the United States.

THE COURT: Good afternoon.

MR. STEIN: Good afternoon, your Honor. Micah Stein, for the United States.

THE COURT: Good afternoon.

MR. MANDELBERG: Your Honor, Matthew Mandelberg, for the United States.

THE COURT: Slow down because I just want you in order.

So that was Mr. Stein.

And then?

MR. MANDELBERG: Matthew Mandelberg, for the United States.

THE COURT: Matthew Mandelberg. Okay. Great. There are a number of you. Okay. Great.

MR. CARMAN: And Sean Carman, for the United States.

THE COURT: Say it again.

MR. CARMAN: Sean Carman, for the United States.

THE COURT: Okay.

MR. REIKENBERG: Good afternoon, your Honor. David Reikenberg on behalf of the State of New Jersey as well as on behalf of all plaintiff states and several of them are listening on the line.

THE COURT: Okay. Very good. Welcome.

MR. AGGARWAL: Good afternoon, Judge. Surinder Aggarwal, for the State of New Jersey.

THE COURT: For Apple.

MS. BRYANT: Good afternoon, your Honor. I might mention I don't think anyone is listening on the line. I just got a note from my colleagues that the phone line is not working.

THE COURT: Uh-oh. Maybe when we turned down the volume --

MS. BRYANT: It shut it off?

THE COURT: -- they also can't hear.

Go ahead with your appearances.
MS. BRYANT: It sounds like it's back on. Tracie Bryant, from Kirkland & Ellis, on behalf of Apple.
With me at counsel table --
THE COURT: Right. Okay.
MS. BRYANT: -- I also have Craig Primis, Number two.
MR. PRIMIS: Good afternoon, your Honor.
THE COURT: Good afternoon.
MR. PRIMIS: Number two.
MS. BRYANT: Julia Choi.
MS. CHOI: Good afternoon, your Honor.
THE COURT: Number three.
MS. BRYANT: And Alexia Brancato.
MS. BRANCATO: Good afternoon.
THE COURT: Number four.
MS. BRYANT: Number five, Liza Walsh.
MS. WALSH: Good afternoon, your Honor.
THE COURT: Good afternoon.
JUDGE ARPERT (RET.): And Judge Arpert.
THE COURT: Good afternoon.
MR. SHEANIN: And, your Honor, if I could, Andrew Boccio, from the United States Attorney's Office IS with us as well.
THE COURT: Oh, nice to see you.
MR. BOCCIO: Good afternoon, your Honor.

THE COURT: We are having feedback again, and we are going to do whatever we did before to stop that. We decreased the volume. Then if you all on the phone can't hear, Ms. Bryant is standing by for your emergency email.

MS. BRYANT: Yes, I am.

THE COURT: Testing for feedback. We're still getting a lot of feed back. It just went away.

Ms. Bryant, just interrupt me if you get a panicked email that they can't hear. Okay?

MS. BRYANT: I certainly will. I appreciate it. Thank you.

THE COURT: Thank you.

We are on the record, as I said, *U.S. v. Apple*. We took appearances.

I received, as directed, a joint status letter, August 18, 2025. Then I received an unsolicited letter from the United States and the plaintiff states.

Let me just say that there is a method to my madness. I really like to prepare deeply for a hearing. I know I asked for the letter substantially ahead of the hearing, so on you feet I anticipated that at the hearing you would give me updates that were pertinent.

But when I receive an unsolicited unilateral letter -- I know the government tried to make it joint -- but Apple did not want to participate because they were correct that I did not

want another letter.

You have to seek leave to file such a letter. The reason being, when I prepared, I put out three letters instead of digesting and focusing on one. And I'd have to cross-reference, and I don't want to that. I got to the point in my career where I could direct how I want things submitted. And that works for me, so follow what works for me.

And if you have something that works better for you, you can ask to submit it, but otherwise, it just has the effect of getting me a little aggravated, which is contrary to what you want to achieve, I think.

Mr. Sheanin.

MR. SHEANIN: Your Honor, I am going to apologize to you. We certainly did not mean to cause you problems or to frustrate you in the way that you are going to conduct the conference.

We are prepared for the conference. We did understand that there was a significant lag, and we thought that it would be valuable to the Court to understand what has happened over the course of the last --

THE COURT: Then ask me if it is valuable to me.

MR. SHEANIN: And I appreciate that and will do so in the future.

THE COURT: This almost went directly in the garbage pail. The only reason it did not was Apple responded to it

because I had not said that I wouldn't consider it, so I understand they probably felt hamstrung if they didn't respond.

But don't do it again.

MR. SHEANIN: Certainly, your Honor. We will in the future, if necessary, ask for leave.

THE COURT: Okay.

And the consequence of it is I will consider no new issues that were not mentioned.

I considered the PSs to the issues that were in the August 18th letter, but I did not take anew, on the fly, with my hundreds and thousands of other cases, your new issues. I had enough to deal with.

And then the new issues, which are obviously not even meet and conferred about -- because they only arose after August 18th -- for you to submit them later, and haven't been adequately vetted, I will take up at the appropriate time. Okay?

MR. SHEANIN: Appreciate that, your Honor.

THE COURT: All right. I just intended to go through the items in the letter unless counsel wanted to propose another way to address the conference.

MS. BRYANT: No, I think that is reasonable. Thank you, your Honor.

MR. SHEANIN: That's fine with us.

THE COURT: Investigation materials and their

production, I got an FYI in the first letter saying it is scheduled to continue.

The second letter said it is continuing.

And the third letter from Apple said something is going off the rails. So I guess I have to discuss that.

Is there anything I can -- I know it is in meet-and-confer mode, but, Ms. Bryant, is there anything that Apple wanted to address today?

MS. BRYANT: Your Honor, you are right. We did want to be respectful of the Court's time. I think that it is in meet-and-confer mode, and it would probably be premature to raise any of those issues at this point especially without having met the obligation with the negotiations.

THE COURT: Okay. All right.

Anything?

MR. SHEANIN: Just briefly, if I could respond, because Apple did suggest that they think our production of investigative materials has lagged in their letter, and I'd just like to respond to that, if I may.

THE COURT: Okay.

MR. SHEANIN: Plaintiffs have produced about 100,000 documents more than Apple has to date. We think that we met our obligations. We think Apple's concern may stem from a misreading of the discovery confidentiality order. I would just like to clarify what we've done.

THE COURT: Okay.

MR. SHEANIN: Paragraph 2(m) of the confidentiality order defines investigation as plaintiffs' precomplaint investigation. That ended in March 2024 when we filed the complaint.

THE COURT: Okay.

MR. SHEANIN: The next two subparagraphs, 2(n) and 2(o), describe investigative materials as precomplaint -- 2(o) as litigation materials post complaint.

The Court ordered plaintiffs to produce their investigation materials and the precomplaint materials in June of 2025, and we did that. We produced about 112,000 documents.

Then Apple served its request for production as directed in the pretrial scheduling order.

It asked for additional documents, including additional postcomplaint materials and, perhaps, some additional other materials.

Then we produced those documents earlier this month. We produced postcomplaint materials, as well as some communications from the public that we didn't consider part of our investigation, but that related to Apple and were responsive to the request.

That was about 3,000 documents in total.

We did it in September because of the rolling production obligations. Though that rolling production need not be

complete until about mid-December, we wanted to get that out as soon as possible.

If we find additional documents, we will produce them promptly. We don't want any delay in what Apple is getting. But we think that we have met our obligations at this point and produced what we have at this point.

And to the extent that there are any issues to discuss, we have had some meet-and-confers. We have not heard from Apple in a while about those, but we'll be happy to meet and confer further as necessary.

THE COURT: Thank you. Thank you for the elaboration. I trust I will learn if you reach an impasse on this issue.

MS. BRYANT: You most certainly will. Thank you.

THE COURT: Okay.

All right. Then there are a few FYIs about a number of subpoenas served to date. Then I got the distinct feeling a lot of disputes are being teed up on written discovery.

But getting into the only items as to which detail of those discovery disputes was given, the first one I noted was identifying document custodians, Apple's identified document custodians. This seemed to fall into two subcategories of disputes.

Plaintiffs had asked Apple to produce org charts to facilitate the government's identifying custodians; and, secondly, the total number of custodians seemed to the

government to be inadequate for a case of this size and breadth.

You were looking for guidance, and you'll get it. I will give you something that jumped out to me from the letters.

I have wondered, with respect to the request for spreadsheets. It's always surprising to me, but I see it very, very often in litigation that corporations regard their org charts as confidential or that they protect it.

Also, getting an overall org chart might not really help you as to who would be a custodian with a lot of relevant information.

However, I did take Apple's point that it did seem like the government should have a leg up from receiving lot of documents from Apple during the investigation. For instance, if the government received emails, you would see who is on the heavy-traffic chains or who is copied frequently, who is a participant of the key emails. That should give you a hint as to custodians.

And then I felt that maybe the government could target, take those people and see who they report to and who reports to them in order to broaden the custodians and maybe get some custodians with unique documents.

With that said, why does the government feel the need for spreadsheets or org charts to be produced? Org charts, I call them. You call them spreadsheets.

MR. SHEANIN: Thank you, your Honor.

A few thoughts about this. One is, I have been in complex litigation for about 25 years. In every case, there is always some production of an organizational chart, a corporate directory, a spreadsheet, something that identifies people from which the parties can address questions about potential custodians.

You are right. That we did learn a lot of information from our investigation and we did provide Apple with a list of potential custodians from our investigation. They had originally proposed 22 individuals. We added an additional 63. They subsequently accepted 12 of those and have never identified any reason why the other 51 are not acceptable custodians or why they would oppose them in any way, despite the fact we asked for that information.

But the custodians who we identified were based upon the investigation that we conducted, which was based upon the status of the documents that were produced at the time.

It's been several years, right, and Apple is a sizeable company where people move around. Maybe not necessarily -- well, there have been people who have moved around at the top, but there are also people who have moved around one and two and three levels further down who are likely to have relevant information that would be responsive that would be valuable to this case.

Now, that's what we are trying to find out, as to who those individuals could be, and we would like to have a good and productive negotiation with Apple about it.

There are a couple of things about this. One is we've suggested ways to minimize those spreadsheets so they aren't producing everyone and everything in the world. Right? We suggest that they identify for us business units that they think have no relevance to the case; we would be happy to eliminate those.

One example that I would suggest is people who work in an Apple store. I don't think they are at all going to be custodians in this case. We certainly wouldn't need those.

THE COURT: You are talking about starting very broad, what I call a dragnet, and narrowing from there? I think it should be the other way, where it is targeted. For instance, in your point about the investigation docs being dated, you know that someone who held a particular position at Apple has historically had very relevant communications and you know that person has left. Ask for their successor. Ask for that department.

But why are we starting broad and then funneling it down rather than the other way around?

MR. SHEANIN: We are trying to do this multiple ways at once so that we can ultimately get to the appropriate people. That is the position the government has taken.

THE COURT: I mean, maybe it's small case stuff, but usually interrogatory 1 and also initial disclosures would have had Apple identify witnesses.

MR. SHEANIN: So we did not serve an interrogatory to specifically identify potential custodians or witnesses in this matter. We absolutely can do that if that is a suggested way to approach this.

We had thought that we would be able to have a further discussion because we had already had some notion of individuals who mattered. And like I said, we have proposed those people who were based on a particular time frame and have not gotten a response from Apple on most of them. We simply don't know.

Now, Apple had suggested to us that they would present us with information about reporting chains, for example, for their individuals who they've identified, /and we think that that is a valuable thing and we would encourage them to do that.

But up until Friday's letter, Apple had always presented that to us as, in exchange for us withdrawing our request for the spreadsheets, we will give you this reporting chain. We don't think it should be simply that way. That's information that I think is valuable and easy to produce. It would reflect well and enable us to have further conversation. It would enable to say who else? Right? Did somebody from one of our

51 custodians who they haven't accepted leave the company as somebody who replaced them that they report to?

So we think that is appropriate information.

With respect to the spreadsheets, I would also just point out that Apple has already produced a -- not redacted, but a narrowed version of a couple of spreadsheets for an earlier time period in the course of the investigation. We think it is no problem for them to do the same thing again for us in the context of the more recent years. And that's all that we are asking for.

Simply put, we would like to get to a good custodian set. Let's do it quickly. We are happy to do that. Hopefully, if we get the right information from Apple, we could do that in the next couple of weeks.

THE COURT: Ms. Bryant, are you going to address this?

MS. BRYANT: Yes, your Honor.

I am going to start with the argument with respect to the number of custodians that Apple has proposed. As your Honor knows, document custodians is not a quantitative exercise. It is a question of do we have the right people? Do we have the people who might have responsive documents? And that is what we identified.

However, we are not standing on our custodians. We did not say we are going to give you 22, nobody else, ever, ever, ever.

Instead, what we have done is we've asked the government countless times if you think we have some deficiencies with our set of document custodians, tell us. And they said, well, we don't know the names of the people.

We respectfully disagree, in part, because of what your Honor said. They have over four years of documents from an investigation. Millions of documents with people's names. Not to mention the Internet. Often --

THE COURT: But they could have left.

MS. BRYANT: They certainly could have left. They certainly could've left, your Honor, and I think that point is well taken.

If the ask would have been well, we want to know if you have people from the current time, I think there is a way to do that without starting with what you termed to be a dragnet. That really wouldn't -- that is what it is.

What the government has asked us for is not org charts. They asked that we give them information from Apple's HR system every single employee at Apple in the last 11 years. Full stop. No limitation. Nothing else of that matter.

I believe that I heard counsel say, you know, it should be no problem for Apple, this is easy for them to do. It is not, and it is a problem, if I could take a second to explain why.

You heard during the tech tutorial, and you will

probably continue to hear it throughout this case, so let me say it now. Apple prioritizes privacy and security. It is in their obsession that the company has with privacy and security and that is not just for users. That is also for its employees. It is how Apple interacts with its own employees to say I will protect things that we think people are not entitled to.

THE COURT: There are pages of confidential information produced to end this litigation that can be stamped "confidential."

MS. BRYANT: It certainly could be, your Honor, but we talked this morning, but that's not sacrosanct. There are data security breaches. They do happen. We understand. We are in litigation. We may have to turn over -- we already turned over confidential information.

This is not in that category because it is not information that the government is entitled to. They don't need it.

However, like I said before --

THE COURT: But I want to be clear.

MS. BRYANT: Please.

THE COURT: Apple's means to be a good employer, they don't have any right to tell employees don't worry, we won't put you up as a witness, so to speak.

That's not within the fair game, and I don't think that

is what you are saying, but you might want to clarify that.

MS. BRYANT: That certainly is not what I am saying, your Honor.

My only point was when they say -- when the government says it's no problem for Apple, I want to underscore it is. This is a problem, that it is information that is private that is about the employees that we are not required to --

THE COURT: An org chart?

MS. BRYANT: All of the information, every single employee over the last several years, yes, that is something Apple considers to be confidential and they consider to be private to the employees.

THE COURT: Okay.

MS. BRYANT: With that said, we understood the government's point to be: One, we don't know that you have people from current times; and, two, we are worried that you only have top-level people and you don't have enough people below that.

The way to get that information is what we believe we proposed -- that was rejected out of hand -- which was to say, okay, we have our custodians. We will give you the positions that the custodians held throughout their entire tenure at Apple so you can understand where they have been, what they are doing, if they have the current position. That's important.

We will also give you that current person's manager so

you know who is above, and we'll give you their direct reports so you know what is below. Doesn't that solve your problem?

The government has said no. They completely rejected that.

I would ask that they do revisit that because I think it is a reasonable compromise and of course something that could be negotiated as well. They say you only give it to for us 22. We want it for 30.

We are not here to try to bring these kind of ticky-tack fights before the Court. That is also something that can be negotiated.

I believe this has come to your Honor, though, because the government has said either give us information about hundreds of thousands of employees full stop, or we don't want to talk about this any more.

I think there is still room for compromise here and something that I hope the everyone burdens to do.

THE COURT: I am not ready today to order the production of these spreadsheets. I think there are at lot of other ways to get to the right custodians.

Do you want to say something first?

MR. SHEANIN: I am happy to, but only if it is going to be helpful for the Court.

THE COURT: I'm not deciding it today, so you can even say it after I finish.

But we all know that there doesn't have to be, but there is, a traditional order of discovery; and production of information is usually first. In a case of this size, if you don't get the right custodians and you have to add people on later, it's a nightmare. So I think it is really important. This is a top issue that I want you to spend your time on to identify custodians. And be creative by all means necessary. I want to see transparency on the side of Apple. I want to see flexibility on the side of the government.

You will get a custodian list. It may not be perfect. It may be someone who the government becomes cognizant of later. Apple wasn't hiding them. And then there has to be a redo of sorts, but hopefully that will be very limited.

But why don't you close the loop on this soon. What is your suggestion as to how soon?

MR. SHEANIN: Your Honor, I think we can do this probably within the next two weeks. I would like to see if we can get this done by September 30th. I think that in order to do that, that would require Apple to respond to the 51 custodians we proposed. It would require Apple to be prepared to recognize that whatever they are going to produce, while we recognize the privacy and security concerns, would be subject to the confidentiality order and can be marked as "confidential" or "highly confidential" as appropriate. And that to the extent that there is anything that is really

personal information -- addresses, compensation -- we don't need that information. It would be excluded in the first place.

THE COURT: You don't need to tell me. You can tell them in the coming weeks.

MR. SHEANIN: Sure. We would like to be able to do that within two weeks so they can provide us with the appropriate information to enable us to have that conversation.

THE COURT: Okay.

MS. BRYANT: I don't take any issue at all, your Honor, with the two weeks.

We do -- and I should have said this earlier -- we have not said we are not adding any of your additional custodians you mentioned.

We added the ones that we could quickly; and then we are continuing to scope and vet the rest. That is something we can do in the next two weeks, if that is your Honor's order.

With respect to this all hinging, though, on us providing the information to the government, if that means the information I just conveyed with respect to the managers, direct reports, maybe some other information about other custodians, then that is something we will certainly work towards.

If that means HR spreadsheets for the hundreds of thousands of employees, then I think we are still at the same

place.

THE COURT: Okay. Talk to one another further.

MS. BRYANT: Of course, your Honor.

THE COURT: At the end, I will circle back on how we are going to follow up with an ultimate deadline, but it will be in sufficient time to have this discussion. It is too soon to use a word like "special master," but when you start hitting me with search terms, custodians, it is a classic for me not to spend three days of my time. I do my job and I do it diligently, but I have got to spread my resources among a lot of cases.

I always like to keep it in my own control as a lawyer. That's just me. I didn't like to toss it to the Court who may toss it to somebody else. Okay? So try to get to the bottom of this.

The next issue, I will call it the scope of plaintiffs' request for production. I know I asked you to keep the letter short, but your references were, I think, because of that, a little general, and a lot of the cases too general for me to understand what the heck you were talking about.

I will tell you to address various issues so you can help me understand.

For instance, at the bottom of page 2, the first letter, plaintiffs' position Apple responded to 23 of plaintiffs' request by offering to produce documents that do not correspond

to their scope.

I don't understand that. Why don't you give me some examples?

MR. SHEANIN: Absolutely, your Honor.

So this issue comes up in context of Rule 34(b)(2)(C) which says that...

THE COURT: Go ahead.

MR. SHEANIN: Which, as the Third Circuit has explained in a case called *Crozer-Chester Medical Center v. NLRB*. For the Court's knowledge is 976 F.3d, 276 at 292. It is a Third Circuit case from 2000 --

THE COURT: Is that in your letter?

THE COURT REPORTER: From 2000?

MR. SHEANIN: No, it is not, but I'm trying to provide this information.

THE COURT: Okay. Then you can -- just answer my question.

MR. SHEANIN: Sure. Let me give you an example. The case about competition between smartphones, and one of our requests is request number 27. We ask for all documents and data related to smartphones' usable life -- any smartphones' useable life, the length of time over which consumers use it, number of types of consumers that use it, its quality and value at any point in time, and all related metrics or key performance indicators. It's complex. There is a lot in it.

Apple gave us what are effectively some boilerplate objections: Vague and ambiguous terms, breadth proportionality, seeking documents outside of possession and custody and control, duplicative of other requests --

THE COURT REPORTER: Duplicative?

MR. SHEANIN: Of other requests.

THE COURT REPORTER: Please slow down a little bit for me.

MR. SHEANIN: Yes, I will.

And then Apple said subject to, and without waiving its objections, Apple will conduct a reasonable search for and produce studies, analyses, and reports sufficient to show the number and type of iPhone users in any geography.

And so that response does not correspond to the request.

Now, in a few different ways, one of them is the "sufficient to show," right; one of them is "limiting it to studies, analyses, and reports" as opposed to all documents. One of it is they only addressed one of the issues that were requested.

THE COURT: So you would say they reframed your request and made it more narrow?

MR. SHEANIN: I would say they've rewritten it, but, yes, they have reframed the request and made it far more narrow.

The problem that we have is we can't understand what

they excluding. Perhaps their studies, analyses, and reports are going to address those broader issues, but I don't think so based upon what they are actually saying. And we don't know what objection any of that applies to, right, on what basis they are choosing to exclude those materials.

One more thing. They also limited it there to the iPhone as opposed to all smartphones, so there's a lot where it is different.

Plaintiffs can't agree with Apple to limit Apple's productions unless plaintiffs know what Apple is willing to produce and not willing to produce and in the basis of what objection.

There are many other examples, but I think that one is pretty clear and gives you --

THE COURT: Can we stop on that one?

MR. SHEANIN: Sure.

THE COURT: I would like to hear from Apple.

MR. SHEANIN: Yes.

THE COURT: You did my job on proportionality for me, but no one gave you the black robe.

MS. BRYANT: Not yet, your Honor. We certainly tried to.

Counsel is right. We did narrow that request. They asked for a request. We looked at it. Many of them start with things like "all documents that show" and then a laundry list

of topics.

In an attempt to not just say we are objecting, we are objecting as to everything, let's try to be helpful. Let's offer up something narrower in line with the government's advice that they have been given to third parties in the case where in all of their subpoenas to third parties they say modifications to the subpoenas' RFPs may reduce the burden of searching for responsive documents and information in a way that is consistent with the DOJ's needs.

That is the step that we are taking.

In talking about the specifics for that one RFP, I don't know if that is what your Honor was asking, but I think at a broad level that is true, that is what we tried to do. We tried to narrow things so we can move the case forward as opposed to just stonewalling and saying we object outright, we won't be responding to the overbroad request.

And then with respect to our obligation of what we need to tell plaintiffs, I admittedly have not studied that Third Circuit case. I didn't take down the case cite. I would be happy to look it up quickly.

But our obligation is founded in Federal Rule of Civil Procedure 34, which numerous courts have repeatedly found, that requires that the responding party, like Apple, to either state what it is withholding or describe the scope of the production it is willing to make.

Here, we have done both. We have provided --

THE COURT: I know the first prong, but I am not sure about the second prong. I wish I had my Rule book.

MS. BRYANT: If it would be helpful for your Honor, we would be happy to brief this. I don't think that's what you're asking.

THE COURT: It doesn't really feel like a Rule 34 consistent response to me.

Yes, you have to identify what you are objecting to. "We're objecting to overbreadth and everything under the sun." "Subject to and notwithstanding this, we are not withholding any documents based on these objections." So that is compliant with the first, what I call, the first prong of 34.

But reframing and narrowing yourself without having had a conversation with the government in advance about whether they are willing to accept that, feels like you've gone over your skis.

MS. BRYANT: We do have, your Honor -- and I appreciate your don't have the responses in front of you -- we have made several objections.

THE COURT: I don't have them. That is another thing. You know, I said to my career clerk this morning did I miss something because you guys are arguing about RFPs and citing them, by reference, both sides, in the footnotes. I don't have them. So how could I possibly understand what you are talking

about? That is to both sides.

MS. BRYANT: Of course. I think that might be consistent, though, with my understanding that this discussion is probably premature.

But with respect to what you just said about we need to make sure we are clear about what our objections are, we have done that as well. So we stated what our objections are, why we were objecting, and then we told the government what we were going to provide.

We have also spent -- and you have seen this in the letters -- and I was on each and every one of these, hours, long hours, on meet-and-confers, 13-plus hours, talking about each and every one of these requests to the extent there is confusion about what we intend to produce.

THE COURT: But it was after, I presume --

MS. BRYANT: It was after, that's correct.

THE COURT: It was after you served the response that says we will give you sufficient to show, we are reframing it in this manner.

MS. BRYANT: That's correct, your Honor. That's correct.

I think our thought was the run of show could be -- like I said before, this is overbroad, facially overbroad. We are not going to respond. Let's just meet and confer.

THE COURT: Right.

MS. BRYANT: However, we were trying to be working to be consistent with your order that said let's get started. That is, obviously, not a direct quote, but I read it to say let's get started.

THE COURT: That is a good interpretation.

MS. BRYANT: Thank you, your Honor. It cut it down to the bottom, and that's what we wanted to do, so we got started.

We provided our custodians, we provided our search terms, we provided a narrowing, all subject to negotiation and to discussion. But in the meantime, we got started. So we have been producing documents in line with that.

If there were any questions, we have spent hours and hours on the phone. Counsel knows how to reach us. And we would be happy to talk about it further, but I don't think this is one where we need the Court's intervention given the parties' consistent communication about the responses.

THE COURT: Yet.

MS. BRYANT: Yet, yes. Yet.

THE COURT: All right.

Mr. Sheanin?

MR. SHEANIN: If I may.

I do appreciate the position of my colleague. We did spend a number of hours on calls. My colleague, Mr. Lerner, spent many, many hours on these calls. Most of what we spent time on we were dealing with responses where Apple simply

objected or said we would be willing to meet and confer. We have spent -- that was about half of the requests. We have spent quite an amount of time on that.

We do appreciate the Court's guidance where you identify that the response to the 27 does not feel like a Rule 34 response in that it simply reframed or didn't identify exactly what they are withholding versus not withholding.

If that is the Court's guidance with respect to 27, and that can be the Court's guidance with respect to the rest of the request, generally, that would be helpful for us in our further meet-and-confers.

THE COURT: Can I stop you. That is my guidance without having read either the request or the response. It maybe that in the end, if it is challenged and comes before me, I say sufficient to show that's brilliant for this one, but it doesn't work for that other request where you need the universe.

So don't over-read. I am sending you back. Apple is not done by responding in that way. That is the message I am trying to communicate.

You all need to work on this more; and I think a bunch of them are going to bubble up and have to be decided by the Court.

MR. SHEANIN: We appreciate that. We do not want to burden the Court with the request and responses in light of

what we understood --

THE COURT: Okay. There will be time for that.

MR. SHEANIN: I am certain there will.

THE COURT: I just want to touch on one little aspect. I don't want to keep you here all day.

I think we discussed "documents sufficient to show" just in passing.

I need to put eyes on "we need to talk with each other more." That may be a good way of responding to somewhere an exemplar of we'll do it; and not others where they need to see everything that exists that is responsive and relevant.

Well, you described generally the dispute over numbers 5 and 6. I am not in a position to decide that today. Apple says it's not right. That may work its way into a discovery dispute letter at the end of the day, but keep talking about it.

Before we move on to Apple's document collection protocol, I am up to page four of the letter. Is there anything from the first three pages that I didn't discuss that you need guidance on? I don't think anything is really teed up for a ruling. Not much, at least. I appreciate your letter, though.

MR. SHEANIN: I don't have anything further on these. I do want to make sure that the parties, with the Court's guidance, get to a point of submitting a schedule or coming up

with a schedule for your Honor to resolve these disputes and tee up any issue outstanding.

THE COURT: I will circle back early. What I am thinking of is requiring you to meet and confer and exhaust that. I want one letter. Well, why don't we say I want the dispute submitted by the end of October, so October 30th. I think that is adequate time, at least for preliminary issues. It doesn't preclude one of the parties from coming back and saying table this because it will be more obvious to decide in context. If there is something that controls the getting started part, then I think it should be teed up by October 30th so I can decide it soon after that.

MR. SHEANIN: Your Honor, our only concern with that, we appreciate October 30th -- if that is what Court wants, we will do it -- is to make sure that Apple has enough time to substantially complete production by December 15th as ordered by the Court previously. So that is our primary concern. If we could go faster than that, we would be happy to, but we understand if the Court thinks that is the amount of time necessary and it gives Apple sufficient time to meet its deadline.

THE COURT: I want you to do a thorough job of meeting and conferring. I don't want you to rush you into more disputes for me to decide.

Ms. Bryant, do you think that's an adequate amount of

time?

MS. BRYANT: We do, your Honor. I think end of October will give us sufficient time to help with meet and conferring for the issues to limit the ones we that need to come before the Court, if any.

THE COURT: What is your feeling about joint versus separate letters?

MS. BRYANT: I heard you this morning.

THE COURT: It doesn't have to be joint on that. Tell me what you think would be better.

MS. BRYANT: I think in the earlier hearings you said something about ships passing in the night, and that would be my fear on this.

THE COURT: I don't like simultaneous submissions. That's what I mean by that. I never liked them.

MS. BRYANT: I think practically what would end up happening is, and I don't want to speak for the government, is that it would ultimately be the same as us going back and forth.

My preference would probably be that if somebody has an issue, much like a motion, you would bring the issue. The other side would respond.

THE COURT: That is a question of reply and sur-reply. That is why --

MS. BRYANT: You just prefer everybody get it in.

THE COURT: What is your suggestion?

MR. SHEANIN: We are prepared to do whatever is convenient for the Court.

MS. BRYANT: That was probably a better answer.

MR. SHEANIN: An appropriate response.

THE COURT: Why don't you take it back at a joint Local Civil Rule 37.1 by October 30th.

MS. BRYANT: Thank you, your Honor.

THE COURT: And if you find it is unworkable and you need one letter followed by the other, then just tell me so.

MS. BRYANT: Of course.

THE COURT: But you ask. You have to ask.

Permission, not forgiveness, because you see forgiveness is hard to come by around here.

Document collection protocol. We already talked about custodians.

What is there to say about search terms at this point?

MS. BRYANT: I don't think there is, your Honor. I would be happy to update you on the current status, but the last is that we received a search term proposal from the government counterproposal, rather, from the government late last week just a couple minutes before they filed the response. I think that would have been Thursday.

Obviously, I haven't had a chance to fully scope it, but we intend to, and I think we can raise any issues with the

Court that might come from that.

THE COURT: Okay.

MR. SHEANIN: We don't think there are issues right now.

We recognize this is going to be an iterative process. We look forward to seeing Apple's responses, which hopefully will have meaningful hit counts on other things that will enable us to discuss these out. But we've been able to do that in any other matters, I am sure we will do that.

THE COURT: Okay.

Addressing witness lists, I do recall this came up at the initial conference, but remind me. This was a different animal you are describing from what I am used to seeing where witnesses are identified in initial disclosures and witnesses for trial are in the final pretrial order. So what are we talking about? What is the dispute?

MR. PRIMIS: Your Honor, Craig Primis for Apple.

I popped up initially to say that by comparison to the document issues where there has been substantial meet-and-confers, there is comparatively less on the remainder of the letter. Mr. Sheanin and I can address the Court's questions about witness lists. In a nutshell, we think it is premature and we would wait, but I don't think it needs decided right now.

MR. SHEANIN: Your Honor, we actually met and

conferred quite substantially about this with Mr. Primis' colleague, Winn Allen, for several months in advance of the April 1st joint status letter. The issues were sort of outstanding issues on witness lists and on depositions from that letter.

We had further discussion. There really wasn't any movement by either party on the witness list issue. There was a little bit of movement on the deposition issues, but the parties have sort of said this is where we are. I am happy to describe that --

THE COURT: What I need you to remind me of is what does this witness list pertain to? Trial witnesses? Identifying people for depositions?

MR. SHEANIN: Certainly. We were looking at trial witnesses. What we had proposed, what the government had proposed, as we have done in many other cases, is that the parties submit preliminary trial witness lists 90 days after Apple filed an answer, which would enable the parties to focus and limit their discovery efforts on really the key and most important witnesses, the ones who are likely to testify at trial. That's because Apple thought that we had a very broad initial disclosure list that had something like 111 potential people in companies because those were the people part of the communication and contacts in our investigation. We identified for them actually in that list -- the preliminary disclosures,

the initial disclosures, we identified for Apple those who we thought were most important. And we viewed this as a mechanism, the preliminary witness list, as a mechanism to further focused and narrowed the discovery, as a mechanism for both convenient for us and for Apple. And then to have a final trial witness list as we get closer to trial.

THE COURT: But it feels like you are taking a final pretrial order witness list and you are using it as something you would ask for in the beginning of discovery. That is what I am not getting my head around. Isn't there another way to get at who the likely witnesses are?

MR. SHEANIN: We identified that in terms of our initial disclosures. Like I said, we had identified something like 111 third parties who we spoke to. And then we asterisked something like 60 of them and said these are the ones we think really matter. And we said that because we didn't want to hide anything from Apple on this so that we could point Apple to the key things. We were continuing to try to find a way to narrow this because Apple was concerned about the overbreadth, potential overbreadth.

THE COURT: It does seem a little premature only in there are other tools to get at who you should be deposing. Who they call at trial probably won't be determined until they see how they do at deposition and if they are still employed or they are out of the fold or in an unfriendly way. Who knows?

That's why it seems premature. Try to get at the information you need in another way that is more traditional under the Federal Rules.

MR. SHEANIN: Sure. We understand that.

THE COURT: But the bottom line is I will not make a ruling on this right now. I do think it is premature, so I am agreeing with Apple as far as that goes.

It doesn't preclude you from raising it at a time when it develops more urgency in the case.

MR. SHEANIN: Of course.

THE COURT: Depositions, how far away are you from depositions because I am inclined to, again, punt on this.

MR. SHEANIN: So what I would like to say is that the way we read your Honor's pretrial order was the bulk of document discovery should be now through the end of the year. Depositions should largely be in the first half of next year. That is not exclusive. Some can slop over in one direction or the other. That is probably consistent with most of what we are thinking.

However, there are certain things that might come up earlier, and one of them is an early 30(b)(6) of Apple particularly concerning data ESI, perhaps some source code related issues, which we think is separate from anything related to the merits, the substantive issues in the case.

We have proposed -- the parties agree on 21 hours for a

30(b)(6) deposition, but Apple is holding fast to the notion that we should only be able to serve a single deposition notice.

Now, we've told Apple that we are not interested in having multiple bites at the proverbial apple on this particular issue. We would want certain issues for certain topics first, other topics later, but we can envision the possibility of some of those issues coming up earlier, an early 30(b)(6) on data, on ESI, on source code issues. And so we would ask for that opportunity on an early basis and not to be precluded from -- not to be limited to having certain one single 30(b)(6) notice for the entire case.

THE COURT: Ms. Bryant, you or Mr. Primis?

MS. BRYANT: Mr. Primis.

MR. PRIMIS: Thank you, your Honor.

What we are trying to avoid is preparing witnesses for 30(b)(6) and then find out there are other topics they could have covered and then having to bring them back later, have multiple depositions.

We would like to get one 30(b)(6) deposition notice so we can scope out who is going to cover what.

As long as we are not being requested to have people come back or we are having people that could have testified when they testified in a personal capacity come back later for some unknown 30(b)(6) topic that we get later on in the case,

we can avoid all of those sorts of pitfalls and gains, we are not going to stand on formality. We understand that this 21-hour deposition will not occur on three straight days. They are going to be broken up by topic, different witnesses.

THE COURT: It may not be 21 hours.

MR. PRIMIS: It may not be 21 hours. I think this is another area where we can continue to talk, but we were told that they needed multiple 30(b)(6) depositions at different points in the case. That seems very unbounded to us and could create a lot of issues, so we were just saying give it to us all at once. We will look at it. And we will get the right people. But if this is going to be done two separate times very distant, we will be reasonable and give them what they need. But we really are concerned that we're going to have missed opportunities if they can come back later to say, oh, we want another topic.

THE COURT: I understand, but what the government I think is talking about is 30(b)(6) that is focused on streamlining discovery. When I balance the interest versus an employee being bothered twice, I am going to go for focus ing and streamlining discovery. So I am warm to the idea if it were abused, and I have a whiff of that, you know how I would react, but I think it could be an entirely different 30(b)(6) if it is for the purpose of guiding discovery.

MR. PRIMIS: Understood.

THE COURT: Come to me if you think it is abusive, but I would carve that out of the 21 hours. I am somewhat liberal. It is a point of pride that I never decided on the number of witnesses total, a dispute. I never decided on the number of hours, a cap. I never had to decide that because I pushed it back with guidance, and I expect that here.

MR. PRIMIS: Thank you, your Honor.

MR. SHEANIN: Thank you, your Honor.

THE COURT: Thank you.

So that -- I think that's it.

I told you I wouldn't get to the government's new issues. I just didn't have time to prepare on them.

Oh, there is one another issue that came up at the MDL conference.

Will the government provide this confidentiality metadata in its production?

MR. SHEANIN: Your Honor, I think it is a great idea, but I can't tell you the answer to that question right now. We just really heard about it at the end of last week. We have 20 state plaintiffs from the United States. We have to run down the feasibility of it. But if it is feasible, we would be interest in doing so.

THE COURT: I would probably order it unless you can show me that there is prejudice. I am putting my thumb on the scale.

MR. SHEANIN: For us it is not an issue of prejudice, your Honor. It is an issue of can we actually do it.

We will try to figure that out and get back to the parties, MDL and Apple as soon as we can.

THE COURT: I know I have some of the MDL lawyers here. Tell the crew that the government is working on this.

Is there anything else from the government?

MR. SHEANIN: We just wanted to see -- I think it makes sense to continue to have status conferences on a regular basis.

THE COURT: Sure.

MR. SHEANIN: We think that, particularly in the sort of heat of discovery, there is great value in doing that.

We would propose something on more of a monthly schedule to the extent that the Court wants to -- we think a monthly schedule would probably make sense.

We are in mid October. Somewhere in mid November would certainly afford the opportunity -- we are in mid September now.

Somewhere in mid October, check in. Certainly, in mid November we certainly have an opportunity to address whatever outstanding discovery issues are there.

THE COURT: That sounds right. Is Apple okay with that?

MS. BRYANT: You have already said that sounds right,

so I was going to say that something else.

THE COURT: Again, my thumb is on the scale.

MS. BRYANT: I think that is a great idea. That is fine, your Honor. I think previously you had mentioned quarterly. There is going to be kind of the working-to-the-deadline mentality. I don't want us to get into forcing disputes so we can get into the next hearing, but I am confident that we will both be open-minded to meet and confer.

MR. SHEANIN: I do want to ask one clarification. We had talked about custodians and trying to resolve those by the end of the month. Is that something the Court is still considering? Has the Court wanted to move that to a later time frame?

THE COURT: I just figured that if you have a dispute on that, it is good that you meet and confer so that you fold it into the letter or letters that I will receive by October 30th.

After I receive that later, give me two quiet weeks to prepare. I will probably have a conference before Thanksgiving. Not Thanksgiving week, I don't want to put people in a bind, but maybe the week prior to that. And I will schedule without supplemental submissions, other than to say "you don't have to worry about this one issue, we've since resolved it."

MR. SHEANIN: Thank you.

With respect to joint letters, because I assume the Court would like a joint letter in advance of the status conferences?

THE COURT: Well, the discovery dispute letter, I think that will be all I can handle at one hearing. I guess for the case management issues that are separate from the discovery disputes, you could do a simultaneous letter by October 30th.

Ms. Bryant.

MS. BRYANT: That's fine, your Honor. I would -- perhaps, Mr. Sheanin was gearing up for this -- but I would ask for some guidance from the Court on the tone and what you want to be in these letters leading up to the case management conferences. Our understanding is we would, obviously, update the Court on anything that was ongoing, but really reserve the kind of prearguing on ripe disputes until those actually needed to be before the Court. But we would appreciate guidance.

THE COURT: I turn it over to you. I thought the letter, the joint letter, you submitted was fine.

MS. BRYANT: Perfect.

THE COURT: It was general, but it wasn't burdensome. I could then carve out issues and say, All right, when you are done meeting and conferring, address this in a separate letter. So I think that is fine. I don't really have more guidance to give you. I don't have any preconceived notions about what you

should be doing.

MS. BRYANT: That is helpful. Thank you, your Honor.

THE COURT: Thank you.

MR. SHEANIN: Thank you.

THE COURT: You are welcome, everyone. Have a nice night.

THE COURTROOM DEPUTY: All rise, please.

(Time noted 2:58 p.m.)

* * *

FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Melissa A. Mormile RDR, CCR, CRCR September 16, 2025

Official Court Reporter Date

## /

**/and** [1] - 16:16
**/S** [1] - 47:15

## 0

**07101** [2] - 1:10, 2:17
**07102** [2] - 2:4, 3:4

## 1

**1** [1] - 16:2
**10-0101** [1] - 1:16
**100** [1] - 3:4
**100,000** [1] - 10:21
**10018** [1] - 1:20
**11** [1] - 18:19
**111** [2] - 38:22, 39:14
**112,000** [1] - 11:12
**12** [1] - 14:12
**124** [1] - 2:16
**13-plus** [1] - 30:12
**1301** [1] - 2:21
**15th** [2] - 3:4, 34:16
**16** [2] - 1:10, 47:15
**18** [1] - 7:16
**18th** [2] - 9:10, 9:15
**1st** [1] - 38:3

## 2

**2** [1] - 24:23
**2(m** [1] - 11:2
**2(n** [1] - 11:7
**2(o** [2] - 11:8
**20** [1] - 43:19
**2000** [2] - 25:11, 25:13
**20003** [1] - 2:21
**2024** [1] - 11:4
**2025** [4] - 1:10, 7:16, 11:12, 47:15
**20530** [2] - 2:9, 2:13
**21** [5] - 40:25, 42:2, 42:5, 42:6, 43:2
**22** [3] - 14:11, 17:24, 21:7
**23** [1] - 24:24
**24-cv-04055** [1] - 1:4
**24-cv-4055** [1] - 4:8
**25** [1] - 14:3
**26** [1] - 1:19
**27** [3] - 25:20, 32:5, 32:8
**276** [1] - 25:10
**292** [1] - 25:10
**2:00** [1] - 1:11
**2:58** [1] - 47:8

## 3

**3,000** [1] - 11:23
**30** [1] - 21:8
**30(b)(6** [10] - 40:21, 41:1, 41:9, 41:12, 41:17, 41:20, 41:25, 42:8, 42:18, 42:23
**30th** [7] - 22:18, 34:6, 34:11, 34:14, 36:7, 45:17, 46:8
**3224** [1] - 2:13
**34** [4] - 28:22, 29:7, 29:13, 32:5
**34(b)(2)(C** [1] - 25:5
**37.1** [1] - 36:7

## 4

**450** [2] - 1:16, 2:8
**45029** [1] - 2:17

## 5

**5** [1] - 33:12
**50** [1] - 1:9
**51** [3] - 14:13, 17:1, 22:19
**5th** [2] - 2:8, 2:16

## 6

**6** [1] - 33:13
**60** [1] - 39:15
**601** [1] - 2:24
**63** [1] - 14:11

## 7

**776-7710** [1] - 1:24
**7th** [1] - 2:4

## 9

**90** [1] - 38:17
**94102** [1] - 1:16
**950** [1] - 2:13
**970** [1] - 2:4
**973** [1] - 1:24
**976** [1] - 25:10

## A

**AARON** [1] - 1:15
**Aaron** [1] - 4:11
**able** [4] - 16:8, 23:6, 37:8, 41:2
**above-entitled** [1] - 47:13
**absolutely** [2] - 16:6, 25:4
**abused** [1] - 42:22
**abusive** [1] - 43:1
**accept** [1] - 29:16
**acceptable** [1] - 14:13
**accepted** [2] - 14:12, 17:1
**achieve** [1] - 8:11
**ACTION** [1] - 1:3
**add** [1] - 22:4
**added** [2] - 14:11, 23:15
**adding** [1] - 23:13
**additional** [6] - 11:15, 11:16, 12:3, 14:11, 23:13
**address** [9] - 9:21, 10:8, 14:6, 17:15, 24:21, 27:2, 37:21, 44:21, 46:23
**addressed** [1] - 26:18
**addresses** [1] - 23:1
**addressing** [1] - 37:11
**adequate** [2] - 34:7, 34:25
**adequately** [1] - 9:16
**admittedly** [1] - 28:18
**advance** [3] - 29:15, 38:2, 46:2
**advice** [1] - 28:5
**afford** [1] - 44:18
**afternoon** [18] - 4:5, 4:11, 4:14, 4:15, 4:17, 4:18, 4:20, 5:10, 5:15, 5:18, 6:7, 6:8, 6:11, 6:14, 6:17, 6:18, 6:20, 6:25
**Aggarwal** [1] - 5:16
**AGGARWAL** [2] - 2:16, 5:15
**aggravated** [1] - 8:10
**agree** [2] - 27:9, 40:25
**agreeing** [1] - 40:7
**ahead** [3] - 6:1, 7:20, 25:7
**aided** [1] - 1:25
**al** [1] - 1:4
**ALEXIA** [1] - 2:23
**Alexia** [1] - 6:13
**Allen** [1] - 38:2
**almost** [1] - 8:24
**ambiguous** [1] - 26:2
**America** [6] - 1:17, 1:20, 2:5, 2:9, 2:14, 4:7
**AMERICA** [1] - 1:3
**amount** [3] - 32:3, 34:19, 34:25
**analyses** [3] - 26:12, 26:17, 27:1
**Andrew** [1] - 6:21
**ANDREW** [1] - 2:3
**anew** [1] - 9:10
**animal** [1] - 37:13
**answer** [4] - 25:16, 36:4, 38:18, 43:18
**anticipated** [1] - 7:21
**ANTITRUST** [4] - 1:15, 2:3, 2:7, 2:12
**Antitrust** [1] - 1:18
**apologize** [1] - 8:13
**appearances** [3] - 4:9, 6:1, 7:14
**apple** [1] - 41:5
**APPLE** [1] - 1:7
**Apple** [68] - 2:25, 3:5, 4:8, 5:17, 6:3, 7:13, 7:24, 8:25, 10:4, 10:8, 10:17, 10:22, 11:13, 11:21, 12:4, 12:9, 12:23, 13:14, 14:9, 14:19, 15:3, 15:11, 15:17, 16:3, 16:12, 16:14, 16:19, 17:5, 17:13, 17:18, 18:19, 18:22, 19:2, 19:5, 20:5, 20:11, 20:23, 22:8, 22:12, 22:19, 22:20, 24:24, 26:1, 26:10, 26:11, 27:9, 27:10, 27:17, 28:23, 31:25, 32:18, 33:13, 34:15, 34:20, 37:17, 38:18, 38:21, 39:1, 39:5, 39:17, 39:19, 40:7, 40:21, 41:1, 41:4, 44:4, 44:23
**Apple's** [8] - 10:23, 12:20, 13:12, 18:18, 19:22, 27:9, 33:17, 37:6
**applies** [1] - 27:4
**appreciate** [10] - 7:10, 8:22, 9:18, 29:19, 31:22, 32:4, 32:24, 33:21, 34:14, 46:17
**approach** [1] - 16:7
**appropriate** [6] - 9:16, 15:24, 17:3, 22:24, 23:8, 36:5
**April** [1] - 38:3
**area** [1] - 42:7
**arguing** [1] - 29:23
**argument** [1] - 17:17
**arose** [1] - 9:14
**Arpert** [1] - 6:19
**ARPERT** [2] - 3:3, 6:19
**aspect** [1] - 33:4
**assume** [1] - 46:1
**asterisked** [1] - 39:14
**attempt** [1] - 28:2
**ATTORNEY** [4] - 2:2, 2:6, 2:11, 2:15
**Attorney's** [1] - 6:22
**August** [3] - 7:15, 9:10, 9:15
**Avenue** [4] - 1:16, 2:13, 2:21, 2:24
**avoid** [2] - 41:16, 42:1

## B

**background** [1] - 4:5
**balance** [1] - 42:19
**based** [5] - 14:16, 14:17, 16:11, 27:3, 29:12
**basis** [4] - 27:4, 27:11, 41:10, 44:10
**becomes** [1] - 22:11
**beginning** [1] - 39:9
**behalf** [4] - 4:12, 5:11, 5:12, 6:3
**below** [2] - 20:18, 21:2
**better** [3] - 8:8, 35:10, 36:4
**between** [1] - 25:19
**bind** [1] - 45:21
**bit** [2] - 26:7, 38:8
**bites** [1] - 41:5
**black** [1] - 27:20
**BOCCIO** [2] - 2:3, 6:25
**Boccio** [1] - 6:22
**boilerplate** [1] - 26:1
**book** [1] - 29:3
**bothered** [1] - 42:20
**bottom** [4] - 24:14, 24:23, 31:7, 40:5
**Box** [1] - 2:17
**Brancato** [1] - 6:13
**BRANCATO** [2] - 2:23, 6:14
**breaches** [1] - 19:13
**breadth** [2] - 13:2, 26:2
**brief** [1] - 29:5
**briefly** [1] - 10:16
**brilliant** [1] - 32:15
**bring** [3] - 21:9, 35:21, 41:18
**Broad** [1] - 2:4
**broad** [4] - 15:13, 15:21, 28:13, 38:21
**broaden** [1] - 13:21
**broader** [1] - 27:2
**broken** [1] - 42:4
**Bryant** [8] - 6:3, 7:4, 7:8, 10:7, 17:15,

34:25, 41:13, 46:9
**BRYANT** [46] - 2:20, 5:18, 5:24, 6:2, 6:6, 6:10, 6:13, 6:16, 7:5, 7:10, 9:22, 10:9, 12:13, 17:16, 18:10, 19:11, 19:21, 20:2, 20:9, 20:14, 23:10, 24:3, 27:21, 29:4, 29:18, 30:2, 30:16, 30:20, 31:1, 31:6, 31:18, 35:2, 35:8, 35:11, 35:16, 35:25, 36:4, 36:8, 36:11, 36:18, 41:14, 44:25, 45:3, 46:10, 46:20, 47:2
**bubble** [1] - 32:22
**Building** [1] - 1:9
**bulk** [1] - 40:14
**bunch** [1] - 32:21
**burden** [2] - 28:7, 32:25
**burdens** [1] - 21:17
**burdensome** [1] - 46:21
**business** [1] - 15:7
**BY** [12] - 1:15, 1:19, 2:3, 2:8, 2:12, 2:16, 2:19, 2:20, 2:20, 2:23, 3:2, 3:3

## C

**California** [1] - 1:16
**cap** [1] - 43:5
**capacity** [1] - 41:24
**career** [2] - 8:6, 29:22
**CARMAN** [2] - 5:6, 5:8
**Carman** [2] - 5:6, 5:8
**carve** [2] - 43:2, 46:22
**case** [22] - 13:1, 14:3, 14:25, 15:8, 15:12, 16:1, 19:1, 22:3, 25:9, 25:11, 25:19, 28:5, 28:14, 28:19, 40:9, 40:24, 41:12, 41:25, 42:9, 46:6, 46:13
**cases** [4] - 9:11, 24:11, 24:19, 38:16
**category** [1] - 19:16
**CCR** [1] - 47:15
**Center** [2] - 3:3, 25:9
**certain** [5] - 33:3, 40:20, 41:6, 41:11
**certainly** [13] - 7:10, 8:14, 12:13, 15:12, 18:10, 18:11, 19:11, 20:2, 23:22, 27:21, 44:18, 44:20, 44:21
**Certainly** [2] - 9:4, 38:14
**CERTIFICATE** [1] - 47:10
**certify** [1] - 47:12
**chain** [1] - 16:21
**chains** [2] - 13:16, 16:15
**challenged** [1] - 32:14
**chance** [1] - 36:24
**chart** [3] - 13:9, 14:4, 20:8
**charts** [5] - 12:23, 13:8, 13:24, 18:17
**check** [1] - 44:20
**Chester** [1] - 25:9
**Choi** [1] - 6:10
**CHOI** [2] - 2:20, 6:11
**choosing** [1] - 27:5
**circle** [2] - 24:4, 34:3
**Circuit** [3] - 25:8, 25:11, 28:19
**cite** [1] - 28:19
**citing** [1] - 29:23
**Civil** [2] - 28:21, 36:7
**CIVIL** [1] - 1:3
**clarification** [1] - 45:9
**clarify** [2] - 10:25, 20:1
**classic** [1] - 24:8
**clear** [3] - 19:20, 27:14, 30:6
**clerk** [1] - 29:22
**close** [1] - 22:14
**closer** [1] - 39:6
**code** [2] - 40:22, 41:9
**cognizant** [1] - 22:11
**colleague** [3] - 31:22, 31:23, 38:2
**colleagues** [2] - 4:13, 5:20
**collection** [2] - 33:17, 36:15
**coming** [4] - 23:5, 33:25, 34:8, 41:8
**Commencing** [1] - 1:11
**communicate** [1] - 32:20
**communication** [2] - 31:16, 38:24
**communications** [2] - 11:20, 15:18
**companies** [1] - 38:23
**company** [3] - 14:20, 17:1, 19:3
**comparatively** [1] - 37:20
**comparison** [1] - 37:18
**compensation** [1] - 23:1
**competition** [1] - 25:19
**complaint** [2] - 11:5, 11:9
**complete** [2] - 12:1, 34:16
**completely** [1] - 21:3
**complex** [2] - 14:3, 25:25
**compliant** [1] - 29:12
**compromise** [2] - 21:6, 21:16
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concern** [3] - 10:23, 34:13, 34:17
**concerned** [2] - 39:19, 42:14
**concerning** [1] - 40:22
**concerns** [1] - 22:22
**conduct** [2] - 8:15, 26:11
**conducted** [1] - 14:17
**confer** [8] - 10:7, 10:11, 12:10, 30:24, 32:1, 34:4, 45:8, 45:15
**CONFERENCE** [1] - 1:5
**conference** [6] - 8:16, 8:17, 9:21, 37:12, 43:14, 45:19
**conferences** [3] - 44:9, 46:3, 46:14
**conferred** [2] - 9:14, 38:1
**conferring** [3] - 34:23, 35:4, 46:23
**confers** [4] - 12:8, 30:12, 32:11, 37:20
**confident** [1] - 45:8
**confidential** [7] - 13:8, 19:8, 19:10, 19:15, 20:11, 22:24
**confidentiality** [4] - 10:24, 11:2, 22:23, 43:15
**confusion** [1] - 30:14
**consequence** [1] - 9:7
**consider** [4] - 9:1, 9:7, 11:20, 20:11
**considered** [1] - 9:9
**considering** [1] - 45:12
**considers** [1] - 20:11
**consistent** [6] - 28:9, 29:8, 30:3, 31:2, 31:16, 40:18
**consumers** [2] - 25:22, 25:23
**contacts** [1] - 38:24
**context** [3] - 17:9, 25:5, 34:10
**continue** [4] - 10:2, 19:1, 42:7, 44:9
**Continued** [2] - 2:1, 3:1
**continuing** [3] - 10:3, 23:16, 39:18
**contrary** [1] - 8:10
**control** [2] - 24:12, 26:4
**controls** [1] - 34:10
**convenient** [2] - 36:3, 39:5
**conversation** [3] - 16:24, 23:8, 29:15
**conveyed** [1] - 23:20
**copied** [1] - 13:16
**corporate** [1] - 14:4
**corporations** [1] - 13:7
**correct** [5] - 7:25, 30:16, 30:20, 30:21, 47:12
**correspond** [2] - 24:25, 26:14
**could've** [1] - 18:11
**Counsel** [10] - 1:17, 1:20, 2:5, 2:9, 2:14, 2:18, 2:22, 2:25, 3:5, 27:23
**counsel** [4] - 6:4, 9:20, 18:21, 31:13
**counterproposal** [1] - 36:21
**countless** [1] - 18:2
**counts** [1] - 37:7
**couple** [4] - 15:4, 17:6, 17:14, 36:22
**course** [7] - 8:20, 17:7, 21:6, 24:3, 30:2, 36:11, 40:10
**court** [1] - 4:1
**Court** [23] - 1:23, 4:2, 8:19, 11:10, 21:10, 21:23, 24:13, 32:23, 32:25, 34:14, 34:17, 34:19, 35:5, 36:3, 37:1, 44:15, 45:11, 45:12, 46:2, 46:12, 46:15, 46:17, 47:16
**COURT** [105] - 1:1, 4:4, 4:14, 4:17, 4:20, 4:23, 5:4, 5:7, 5:9, 5:14, 5:17, 5:22, 5:25, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:24, 7:1, 7:6, 7:12, 8:21, 8:24, 9:6, 9:19, 9:25, 10:14, 10:20, 11:1, 11:6, 12:11, 12:14, 15:13, 16:1, 17:15, 18:9, 19:8, 19:20, 19:22, 20:8, 20:13, 21:18, 21:24, 23:4, 23:9, 24:2, 24:4, 25:7, 25:12, 25:13, 25:16, 26:5, 26:7, 26:20, 27:15, 27:17, 27:19, 29:2, 29:7, 29:21, 30:15, 30:17, 30:25, 31:5, 31:17, 31:19, 32:12, 33:2, 33:4, 34:3, 34:22, 35:6, 35:9, 35:14, 35:23, 36:1, 36:6, 36:9, 36:12, 37:2, 37:10, 38:11, 39:7, 39:21, 40:5, 40:11, 41:13, 42:5, 42:17, 43:1, 43:9, 43:23, 44:5, 44:11, 44:23, 45:2, 45:14, 46:4, 46:18, 46:21, 47:3, 47:5, 47:10
**Court's** [8] - 10:10, 25:10, 31:15, 32:4, 32:8, 32:9, 33:24, 37:21
**Courthouse** [1] - 1:9
**COURTROOM** [2] - 4:3, 47:7
**courts** [1] - 28:22
**cover** [1] - 41:21
**covered** [1] - 41:18
**CRAIG** [1] - 2:19
**Craig** [2] - 6:6, 37:17
**CRCR** [1] - 47:15
**create** [1] - 42:10
**creative** [1] - 22:7
**crew** [1] - 44:6
**cross** [1] - 8:5
**cross-reference** [1] - 8:5
**Crozer** [1] - 25:9
**Crozer-Chester** [1] - 25:9
**current** [5] - 18:14, 20:16, 20:24, 20:25, 36:19
**custodian** [3] - 13:10, 17:11, 22:10
**custodians** [30] - 12:20, 12:21, 12:24, 12:25, 13:18, 13:21,

13:22, 14:7, 14:10, 14:14, 14:16, 15:12, 16:5, 17:1, 17:18, 17:19, 17:23, 18:3, 20:21, 20:22, 21:20, 22:4, 22:7, 22:20, 23:13, 23:22, 24:8, 31:8, 36:16, 45:10
**custody** [1] - 26:4
**cut** [1] - 31:6

## D

**D.C** [2] - 2:9, 2:13
**data** [4] - 19:12, 25:21, 40:22, 41:9
**Date** [1] - 47:16
**date** [2] - 10:22, 12:16
**dated** [1] - 15:16
**David** [1] - 5:10
**days** [3] - 24:9, 38:17, 42:3
**DC** [1] - 2:21
**deadline** [3] - 24:5, 34:21, 45:6
**deal** [1] - 9:12
**dealing** [1] - 31:25
**December** [2] - 12:1, 34:16
**decide** [5] - 33:13, 34:9, 34:12, 34:24, 43:5
**decided** [4] - 32:22, 37:23, 43:3, 43:4
**deciding** [1] - 21:24
**decreased** [1] - 7:2
**deeply** [1] - 7:19
**Defendant** [2] - 1:8, 2:22
**deficiencies** [1] - 18:2
**defines** [1] - 11:3
**delay** [1] - 12:4
**department** [1] - 15:20
**DEPARTMENT** [5] - 1:14, 1:18, 2:2, 2:7, 2:11
**deposing** [1] - 39:22
**deposition** [6] - 38:8, 39:24, 41:1, 41:2, 41:20, 42:3
**depositions** [7] - 38:4, 38:13, 40:11, 40:12, 40:16, 41:19, 42:8
**DEPUTY** [2] - 4:3, 47:7
**describe** [3] - 11:8, 28:24, 38:10
**described** [1] - 33:12
**describing** [1] - 37:13
**despite** [1] - 14:14
**detail** [1] - 12:18
**determined** [1] - 39:23
**develops** [1] - 40:9
**different** [6] - 26:15, 27:8, 37:12, 42:4, 42:8, 42:23
**digesting** [1] - 8:4
**diligently** [1] - 24:10
**direct** [4] - 8:6, 21:1, 23:21, 31:3
**directed** [2] - 7:15, 11:13
**direction** [1] - 40:17
**directly** [1] - 8:24
**directory** [1] - 14:5
**disagree** [1] - 18:5
**disclosure** [1] - 38:22
**disclosures** [5] - 16:2, 37:14, 38:25, 39:1, 39:13
**discovery** [16] - 10:24, 12:17, 12:19, 22:2, 33:14, 38:19, 39:4, 39:9, 40:15, 42:19, 42:21, 42:24, 44:13, 44:22, 46:4, 46:7
**discuss** [4] - 10:5, 12:7, 33:19, 37:8
**discussed** [1] - 33:6
**discussion** [5] - 16:9, 24:6, 30:3, 31:10, 38:6
**dispute** [7] - 33:12, 33:15, 34:6, 37:16, 43:4, 45:14, 46:4
**disputes** [8] - 12:17, 12:19, 12:22, 34:1, 34:24, 45:7, 46:7, 46:16
**distant** [1] - 42:13
**distinct** [1] - 12:16
**DISTRICT** [2] - 1:1, 1:1
**Division** [1] - 1:18
**DIVISION** [4] - 1:15, 2:3, 2:7, 2:12
**docs** [1] - 15:16
**document** [8] - 12:20, 17:19, 18:3, 33:17, 36:15, 37:19, 40:15
**documents** [21] - 10:22, 11:12, 11:15, 11:18, 11:23, 12:3, 13:14, 13:22, 14:18, 17:21, 18:6, 18:7, 24:25, 25:20, 26:3, 26:17, 27:25, 28:8, 29:12, 31:11, 33:6
**DOJ's** [1] - 28:9
**done** [9] - 10:25, 18:1, 22:18, 29:1, 30:7, 32:19, 38:16, 42:12, 46:23
**DOUGLAS** [1] - 3:3
**down** [8] - 4:23, 5:22, 14:23, 15:21, 26:7, 28:19, 31:6, 43:20
**dragnet** [2] - 15:14, 18:15
**DUNN** [1] - 1:12
**Dunn** [1] - 4:2
**duplicative** [1] - 26:4
**Duplicative** [1] - 26:5
**during** [2] - 13:14, 18:25

## E

**early** [4] - 34:3, 40:21, 41:8, 41:10
**easy** [2] - 16:23, 18:22
**effect** [1] - 8:9
**effectively** [1] - 26:1
**efforts** [1] - 38:19
**either** [4] - 21:13, 28:23, 32:13, 38:7
**elaboration** [1] - 12:11
**eliminate** [1] - 15:9
**Ellis** [1] - 6:3
**ELLIS** [2] - 2:19, 2:23
**email** [2] - 7:4, 7:9
**emails** [2] - 13:15, 13:17
**emergency** [1] - 7:4
**employed** [1] - 39:24
**employee** [3] - 18:19, 20:10, 42:20
**employees** [7] - 19:5, 19:23, 20:7, 20:12, 21:14, 23:25
**employer** [1] - 19:22
**enable** [5] - 16:24, 16:25, 23:8, 37:8, 38:18
**encourage** [1] - 16:17
**end** [10] - 19:9, 24:4, 32:14, 33:15, 34:6, 35:2, 35:16, 40:15, 43:19, 45:11
**ended** [1] - 11:4
**entire** [2] - 20:22, 41:12
**entirely** [1] - 42:23
**entitled** [3] - 19:6, 19:17, 47:13
**envision** [1] - 41:7
**ESI** [2] - 40:22, 41:9
**especially** [1] - 10:12
**ESQUIRE** [11] - 1:15, 1:19, 2:3, 2:8, 2:12, 2:16, 2:19, 2:20, 2:20, 2:23, 3:2
**et** [1] - 1:4
**exactly** [1] - 32:6
**example** [3] - 15:10, 16:15, 25:18
**examples** [2] - 25:3, 27:13
**exchange** [1] - 16:20
**exclude** [1] - 27:5
**excluded** [1] - 23:2
**excluding** [1] - 27:1
**exclusive** [1] - 40:17
**exemplar** [1] - 33:10
**exercise** [1] - 17:20
**exhaust** [1] - 34:4
**exists** [1] - 33:11
**expect** [1] - 43:6
**explain** [1] - 18:23
**explained** [1] - 25:9
**extent** [4] - 12:7, 22:25, 30:13, 44:15
**eyes** [1] - 33:8

## F

**F.3d** [1] - 25:10
**facially** [1] - 30:23
**facilitate** [1] - 12:24
**fact** [1] - 14:15
**fair** [1] - 19:25
**FALANGA** [1] - 3:2
**fall** [1] - 12:21
**far** [3] - 26:23, 40:7, 40:11
**fast** [1] - 41:1
**faster** [1] - 34:18
**fear** [1] - 35:13
**feasibility** [1] - 43:21
**feasible** [1] - 43:21
**Federal** [3] - 1:19, 28:21, 40:3
**FEDERAL** [1] - 47:10
**feed** [1] - 7:7
**feedback** [3] - 4:6, 7:1, 7:6
**feet** [1] - 7:21
**felt** [2] - 9:2, 13:19
**few** [3] - 12:15, 14:2, 26:15
**fights** [1] - 21:10
**figure** [1] - 44:3
**figured** [1] - 45:14
**file** [1] - 8:2
**filed** [3] - 11:4, 36:22, 38:18
**final** [3] - 37:15, 39:5, 39:7
**fine** [5] - 9:24, 45:4, 46:10, 46:19, 46:24
**finish** [1] - 21:25
**first** [12] - 10:1, 12:19, 21:21, 22:3, 23:2, 24:23, 29:2, 29:13, 33:19, 40:16, 41:7
**five** [1] - 6:16
**flexibility** [1] - 22:9
**Floor** [3] - 2:4, 2:16, 3:4
**fly** [1] - 9:10
**focus** [2] - 38:18, 42:20
**focused** [2] - 39:4, 42:18
**focusing** [1] - 8:4
**fold** [2] - 39:25, 45:15
**follow** [2] - 8:7, 24:5
**followed** [1] - 36:10
**footnotes** [1] - 29:24
**FOR** [1] - 1:1
**forcing** [1] - 45:7
**foregoing** [1] - 47:12
**forgiveness** [2] - 36:13, 36:14
**formality** [1] - 42:2
**forth** [1] - 35:19
**forward** [2] - 28:14, 37:6
**founded** [1] - 28:21
**four** [3] - 6:15, 18:6, 33:18
**frame** [2] - 16:11, 45:13
**Francisco** [1] - 1:16
**frequently** [1] - 13:16
**Friday's** [1] - 16:19
**front** [1] - 29:19
**frustrate** [1] - 8:15
**full** [2] - 18:19, 21:14
**fully** [1] - 36:24
**funneling** [1] - 15:21
**future** [2] - 8:23, 9:5
**FYI** [1] - 10:1
**FYIs** [1] - 12:15

## G

**gains** [1] - 42:1
**game** [1] - 19:25
**garbage** [1] - 8:24
**Gate** [1] - 1:16
**Gateway** [1] - 3:3
**gearing** [1] - 46:11
**GENERAL** [1] - 2:15
**general** [3] - 24:19, 46:21
**generally** [2] - 32:10, 33:12
**geography** [1] - 26:13
**given** [3] - 12:19, 28:5,

31:15
**Golden** [1] - 1:16
**government** [26] - 7:24, 13:1, 13:13, 13:15, 13:19, 13:23, 15:25, 18:1, 18:17, 19:17, 20:4, 21:3, 21:13, 22:9, 22:11, 23:19, 29:15, 30:8, 35:17, 36:21, 38:15, 42:17, 43:15, 44:6, 44:7
**government's** [4] - 12:24, 20:15, 28:4, 43:11
**Great** [2] - 5:4, 5:5
**great** [3] - 43:17, 44:13, 45:3
**guess** [2] - 10:5, 46:5
**guidance** [11] - 13:3, 32:4, 32:8, 32:9, 32:12, 33:20, 33:25, 43:6, 46:12, 46:17, 46:24
**guiding** [1] - 42:24
**guys** [1] - 29:23

**H**

**half** [2] - 32:2, 40:16
**Halsey** [1] - 2:16
**hamstrung** [1] - 9:2
**hand** [1] - 20:20
**handle** [1] - 46:5
**happy** [10] - 12:9, 15:8, 17:12, 21:22, 28:20, 29:5, 31:14, 34:18, 36:19, 38:9
**hard** [1] - 36:14
**head** [1] - 39:10
**hear** [5] - 5:25, 7:3, 7:9, 19:1, 27:17
**heard** [5] - 12:8, 18:21, 18:25, 35:8, 43:19
**hearing** [5] - 7:19, 7:20, 7:21, 45:7, 46:5
**hearings** [1] - 35:11
**heat** [1] - 44:13
**heavy** [1] - 13:16
**heavy-traffic** [1] - 13:16
**heck** [1] - 24:20
**held** [3] - 4:1, 15:17, 20:22
**help** [3] - 13:9, 24:22, 35:3
**helpful** [5] - 21:23, 28:3, 29:4, 32:10, 47:2
**hide** [1] - 39:16
**hiding** [1] - 22:12
**highly** [1] - 22:24
**hinging** [1] - 23:18
**hint** [1] - 13:17
**historically** [1] - 15:18
**hit** [1] - 37:7
**hitting** [1] - 24:7
**holding** [1] - 41:1
**HON** [1] - 3:3
**Honor** [49] - 4:11, 4:15, 4:18, 4:21, 5:10, 5:18, 6:7, 6:11, 6:17, 6:21, 6:25, 8:13, 9:4, 9:18, 9:23, 10:9, 14:1, 17:16, 17:19, 18:6, 18:11, 19:11, 20:3, 21:12, 22:16, 23:11, 24:3, 25:4, 27:21, 28:12, 29:4, 29:18, 30:20, 31:6, 34:1, 34:13, 35:2, 36:8, 36:18, 37:17, 37:25, 41:15, 43:7, 43:8, 43:17, 44:2, 45:4, 46:10, 47:2
**Honor's** [2] - 23:17, 40:14
**HONORABLE** [1] - 1:12
**Honorable** [1] - 4:1
**hope** [1] - 21:17
**hopefully** [3] - 17:13, 22:13, 37:6
**hour** [1] - 42:3
**hours** [12] - 30:11, 30:12, 31:12, 31:13, 31:23, 31:24, 40:25, 42:5, 42:6, 43:2, 43:5
**HR** [2] - 18:18, 23:24
**hundreds** [3] - 9:11, 21:14, 23:24

**I**

**idea** [3] - 42:21, 43:17, 45:3
**identified** [10] - 12:20, 14:13, 14:16, 16:16, 17:22, 37:14, 38:24, 39:1, 39:12, 39:13
**identifies** [1] - 14:5
**identify** [7] - 15:7, 16:3, 16:5, 22:7, 29:9, 32:4, 32:6
**identifying** [3] - 12:20, 12:24, 38:13
**impasse** [1] - 12:12
**important** [4] - 20:24, 22:5, 38:20, 39:2
**inadequate** [1] - 13:1
**INC** [1] - 1:7
**Inc** [2] - 2:25, 3:5
**inclined** [1] - 40:12
**including** [1] - 11:15
**indicators** [1] - 25:25
**individuals** [4] - 14:11, 15:2, 16:10, 16:16
**information** [26] - 13:11, 14:8, 14:15, 14:24, 16:15, 16:22, 17:3, 17:13, 18:18, 19:9, 19:15, 19:17, 20:6, 20:9, 20:19, 21:13, 22:3, 23:1, 23:2, 23:8, 23:19, 23:20, 23:21, 25:15, 28:8, 40:1
**ing** [1] - 42:20
**initial** [6] - 16:2, 37:12, 37:14, 38:22, 39:1, 39:13
**instance** [3] - 13:14, 15:15, 24:23
**instead** [2] - 8:3, 18:1
**intend** [2] - 30:14, 36:25
**intended** [1] - 9:19
**interacts** [1] - 19:5
**interest** [2] - 42:19, 43:22
**interested** [1] - 41:4
**Internet** [1] - 18:8
**interpretation** [1] - 31:5
**interrogatory** [2] - 16:2, 16:4
**interrupt** [1] - 7:8
**intervention** [1] - 31:15
**introduce** [1] - 4:13
**investigation** [13] - 9:25, 11:3, 11:4, 11:11, 11:21, 13:14, 14:9, 14:10, 14:17, 15:16, 17:7, 18:7, 38:24
**investigative** [2] - 10:18, 11:8
**iPhone** [2] - 26:13, 27:7
**IS** [1] - 6:22
**issue** [14] - 12:12, 22:6, 23:10, 24:16, 25:5, 34:2, 35:21, 38:7, 41:6, 43:13, 44:1, 44:2, 45:23
**issues** [27] - 9:8, 9:9, 9:11, 9:13, 10:12, 12:7, 24:21, 26:18, 27:2, 34:7, 35:4, 36:25, 37:3, 37:19, 38:3, 38:4, 38:8, 40:23, 40:24, 41:6, 41:8, 41:9, 42:10, 43:12, 44:22, 46:6, 46:22
**items** [2] - 9:20, 12:18
**iterative** [1] - 37:5

**J**

**Jack** [1] - 4:15
**JACK** [1] - 1:19
**JERSEY** [2] - 1:1, 2:15
**Jersey** [7] - 1:10, 2:4, 2:17, 2:18, 3:4, 5:11, 5:16
**job** [3] - 24:9, 27:19, 34:22
**joint** [9] - 7:15, 7:24, 35:6, 35:9, 36:6, 38:3, 46:1, 46:2, 46:19
**Judge** [3] - 4:2, 5:15, 6:19
**JUDGE** [2] - 1:12, 6:19
**Julia** [1] - 6:10
**JULIA** [1] - 2:20
**jumped** [1] - 13:4
**June** [1] - 11:11
**JUSTICE** [5] - 1:14, 1:18, 2:2, 2:7, 2:11

**K**

**keep** [4] - 24:12, 24:17, 33:5, 33:15
**key** [4] - 13:17, 25:24, 38:19, 39:18
**kind** [3] - 21:9, 45:5, 46:16
**King** [1] - 1:9
**KIRKLAND** [2] - 2:19, 2:23
**Kirkland** [1] - 6:3
**knowledge** [1] - 25:10
**knows** [3] - 17:19, 31:13, 39:25

**L**

**lag** [1] - 8:18
**lagged** [1] - 10:18
**largely** [1] - 40:16
**last** [6] - 8:20, 18:19, 20:10, 36:20, 36:22, 43:19
**late** [1] - 36:21
**laundry** [1] - 27:25
**lawyer** [1] - 24:12
**lawyers** [1] - 44:5
**leading** [1] - 46:13
**learn** [2] - 12:12, 14:8
**least** [2] - 33:21, 34:7
**leave** [3] - 8:2, 9:5, 17:1
**LEDA** [1] - 1:12
**Leda** [1] - 4:2
**left** [4] - 15:19, 18:9, 18:10, 18:11
**leg** [1] - 13:13
**length** [1] - 25:22
**Lerner** [2] - 4:15, 31:23
**LERNER** [2] - 1:19, 4:15
**less** [1] - 37:20
**letter** [31] - 7:15, 7:16, 7:20, 7:23, 8:1, 8:2, 9:10, 9:20, 10:1, 10:3, 10:4, 10:18, 16:19, 24:17, 24:23, 25:12, 33:15, 33:18, 33:21, 34:5, 36:10, 37:21, 38:3, 38:5, 45:16, 46:2, 46:4, 46:7, 46:19, 46:23
**letters** [7] - 8:3, 13:4, 30:11, 35:7, 45:16, 46:1, 46:13
**level** [2] - 20:17, 28:13
**levels** [1] - 14:23
**Lexington** [1] - 2:24
**liberal** [1] - 43:2
**life** [2] - 25:21, 25:22
**light** [1] - 32:25
**likely** [3] - 14:23, 38:20, 39:11
**limit** [3] - 27:9, 35:4, 38:19
**limitation** [1] - 18:20
**limited** [3] - 22:13, 27:6, 41:11
**limiting** [1] - 26:16
**line** [6] - 5:13, 5:19, 5:20, 28:4, 31:11, 40:5
**list** [10] - 14:9, 22:10, 27:25, 38:7, 38:12, 38:22, 38:25, 39:3, 39:6, 39:8
**listening** [2] - 5:13, 5:19
**lists** [4] - 37:11, 37:22, 38:4, 38:17

**litigation** [5] - 11:9, 13:7, 14:3, 19:9, 19:14
**LIZA** [1] - 3:2
**Liza** [1] - 6:16
**LLP** [3] - 2:19, 2:23, 3:2
**Local** [1] - 36:7
**look** [3] - 28:20, 37:6, 42:11
**looked** [1] - 27:24
**looking** [2] - 13:3, 38:14
**loop** [1] - 22:14
**Luther** [1] - 1:9

## M

**madness** [1] - 7:18
**Magistrate** [1] - 4:2
**MAGISTRATE** [1] - 1:12
**management** [2] - 46:6, 46:13
**manager** [1] - 20:25
**managers** [1] - 23:20
**Mandelberg** [3] - 4:21, 5:2, 5:4
**MANDELBERG** [3] - 2:12, 4:21, 5:2
**manner** [1] - 30:19
**March** [1] - 11:4
**marked** [1] - 22:23
**Martin** [1] - 1:9
**master** [1] - 24:7
**materials** [10] - 9:25, 10:18, 11:8, 11:9, 11:11, 11:16, 11:17, 11:19, 27:5
**matter** [4] - 16:6, 18:20, 39:16, 47:13
**mattered** [1] - 16:10
**matters** [1] - 37:9
**MATTHEW** [1] - 2:12
**Matthew** [3] - 4:21, 5:2, 5:4
**MDL** [3] - 43:13, 44:4, 44:5
**mean** [3] - 8:14, 16:1, 35:15
**meaningful** [1] - 37:7
**means** [4] - 19:22, 22:7, 23:19, 23:24
**meantime** [1] - 31:10
**mechanical** [1] - 1:24
**mechanism** [3] - 39:3, 39:4
**Medical** [1] - 25:9
**meet** [15] - 9:14, 10:7, 10:11, 12:8, 12:9, 30:12, 30:24, 32:1, 32:11, 34:4, 34:20, 35:3, 37:19, 45:8, 45:15
**meet-and** [1] - 37:19
**meet-and-confer** [2] - 10:7, 10:11
**meet-and-confers** [3] - 12:8, 30:12, 32:11
**meeting** [2] - 34:22, 46:23
**Melissa** [2] - 1:22, 47:15
**melissa_mormile@njd.uscourts.gov** [1] - 1:23
**mentality** [1] - 45:6
**mention** [2] - 5:19, 18:8
**mentioned** [3] - 9:8, 23:14, 45:4
**merits** [1] - 40:24
**message** [1] - 32:19
**met** [4] - 10:13, 10:22, 12:5, 37:25
**metadata** [1] - 43:16
**method** [1] - 7:18
**metrics** [1] - 25:24
**MICAH** [1] - 2:8
**Micah** [1] - 4:18
**mid** [6] - 12:1, 44:17, 44:18, 44:20
**mid-December** [1] - 12:1
**might** [7] - 5:18, 13:9, 17:21, 20:1, 30:2, 37:1, 40:20
**millions** [1] - 18:7
**minded** [1] - 45:8
**mine** [1] - 4:13
**minimize** [1] - 15:5
**minutes** [1] - 36:22
**misreading** [1] - 10:24
**miss** [1] - 29:22
**missed** [1] - 42:15
**mode** [2] - 10:7, 10:11
**modifications** [1] - 28:7
**month** [2] - 11:18, 45:11
**monthly** [2] - 44:14, 44:15
**months** [1] - 38:2
**Mormile** [2] - 1:22, 47:15
**morning** [3] - 19:12, 29:22, 35:8
**most** [6] - 12:13, 16:12, 31:24, 38:19, 39:2, 40:18
**motion** [1] - 35:21
**move** [4] - 14:20, 28:14, 33:17, 45:12
**moved** [2] - 14:21, 14:22
**movement** [2] - 38:7, 38:8
**MR** [64] - 4:11, 4:15, 4:18, 4:21, 5:2, 5:6, 5:8, 5:10, 5:15, 6:7, 6:9, 6:21, 6:25, 8:13, 8:22, 9:4, 9:18, 9:24, 10:16, 10:21, 11:2, 11:7, 14:1, 15:23, 16:4, 21:22, 22:16, 23:6, 25:4, 25:8, 25:14, 25:18, 26:6, 26:9, 26:22, 27:16, 27:18, 31:21, 32:24, 33:3, 33:23, 34:13, 36:2, 36:5, 37:3, 37:17, 37:25, 38:14, 39:12, 40:4, 40:10, 40:13, 41:15, 42:6, 42:25, 43:7, 43:8, 43:17, 44:1, 44:8, 44:12, 45:9, 45:25, 47:4
**MS** [48] - 5:18, 5:24, 6:2, 6:6, 6:10, 6:11, 6:13, 6:14, 6:16, 6:17, 7:5, 7:10, 9:22, 10:9, 12:13, 17:16, 18:10, 19:11, 19:21, 20:2, 20:9, 20:14, 23:10, 24:3, 27:21, 29:4, 29:18, 30:2, 30:16, 30:20, 31:1, 31:6, 31:18, 35:2, 35:8, 35:11, 35:16, 35:25, 36:4, 36:8, 36:11, 36:18, 41:14, 44:25, 45:3, 46:10, 46:20, 47:2
**Mulberry** [1] - 3:4
**multiple** [4] - 15:23, 41:5, 41:19, 42:8

## N

**names** [2] - 18:4, 18:7
**narrow** [5] - 26:21, 26:24, 27:23, 28:14, 39:18
**narrowed** [2] - 17:6, 39:4
**narrower** [1] - 28:4
**narrowing** [3] - 15:14, 29:14, 31:9
**necessarily** [1] - 14:20
**necessary** [4] - 9:5, 12:10, 22:7, 34:20
**need** [20] - 11:25, 13:23, 15:12, 19:18, 23:2, 23:4, 28:17, 30:5, 31:15, 32:16, 32:21, 33:8, 33:10, 33:20, 35:4, 36:10, 38:11, 40:2, 42:14
**needed** [2] - 42:8, 46:16
**needs** [2] - 28:9, 37:23
**negotiated** [2] - 21:7, 21:11
**negotiation** [2] - 15:3, 31:9
**negotiations** [1] - 10:13
**never** [5] - 14:12, 35:15, 43:3, 43:4, 43:5
**new** [4] - 9:7, 9:11, 9:13, 43:11
**NEW** [2] - 1:1, 2:15
**New** [11] - 1:10, 1:20, 2:4, 2:17, 2:18, 2:24, 3:4, 5:11, 5:16
**Newark** [4] - 1:10, 2:4, 2:17, 3:4
**next** [7] - 11:7, 17:14, 22:17, 23:17, 24:16, 40:16, 45:7
**nice** [2] - 6:24, 47:5
**night** [2] - 35:12, 47:6
**nightmare** [1] - 22:5
**NLRB** [1] - 25:10
**nobody** [1] - 17:24
**note** [1] - 5:20
**noted** [2] - 12:19, 47:8
**nothing** [1] - 18:20
**notice** [3] - 41:3, 41:12, 41:20
**notion** [2] - 16:9, 41:1
**notions** [1] - 46:25
**notwithstanding** [1] - 29:11
**November** [2] - 44:17, 44:21
**NUMBER** [1] - 1:3
**number** [11] - 5:5, 6:12, 12:15, 12:25, 17:18, 25:20, 25:23, 26:13, 31:23, 43:3, 43:4
**Number** [4] - 6:6, 6:9, 6:15, 6:16
**numbers** [1] - 33:12
**numerous** [1] - 28:22
**nutshell** [1] - 37:22
**NW** [3] - 2:8, 2:13, 2:21

## O

**O'REILLY** [1] - 3:2
**object** [1] - 28:15
**objected** [1] - 32:1
**objecting** [5] - 28:2, 28:3, 29:9, 29:10, 30:8
**objection** [2] - 27:4, 27:12
**objections** [6] - 26:2, 26:11, 29:12, 29:20, 30:6, 30:7
**obligation** [3] - 10:13, 28:17, 28:21
**obligations** [3] - 10:23, 11:25, 12:5
**obsession** [1] - 19:3
**obvious** [1] - 34:9
**obviously** [3] - 9:13, 31:3, 46:14
**Obviously** [1] - 36:24
**occur** [1] - 42:3
**October** [10] - 34:6, 34:11, 34:14, 35:3, 36:7, 44:17, 44:20, 45:16, 46:8
**OF** [12] - 1:1, 1:3, 1:14, 1:18, 2:2, 2:2, 2:6, 2:7, 2:11, 2:11, 2:15, 2:15
**offer** [1] - 28:4
**offering** [1] - 24:25
**Office** [1] - 6:22
**OFFICE** [4] - 2:2, 2:6, 2:11, 2:15
**OFFICIAL** [1] - 47:10
**Official** [2] - 1:23, 47:16
**often** [2] - 13:7, 18:8
**once** [2] - 15:24, 42:11
**One** [2] - 14:2, 15:4
**one** [33] - 8:4, 12:19, 14:22, 15:10, 16:25, 20:15, 24:2, 25:19, 26:15, 26:16, 26:18, 27:6, 27:13, 27:15, 27:20, 28:11, 30:11, 30:13, 31:15, 32:15, 33:4, 34:5, 34:8, 36:10, 40:17, 40:21, 41:11, 41:20, 43:13, 45:9, 45:23, 46:5
**ones** [4] - 23:15, 35:4, 38:20, 39:15
**ongoing** [1] - 46:15
**open** [2] - 4:1, 45:8
**open-minded** [1] -

45:8
**opportunities** [1] - 42:15
**opportunity** [3] - 41:10, 44:18, 44:21
**oppose** [1] - 14:14
**opposed** [3] - 26:17, 27:7, 28:15
**order** [15] - 4:24, 10:24, 11:3, 11:14, 13:21, 21:18, 22:2, 22:18, 22:23, 23:17, 31:2, 37:15, 39:8, 40:14, 43:23
**ordered** [2] - 11:10, 34:16
**org** [7] - 12:23, 13:7, 13:9, 13:24, 18:17, 20:8
**organizational** [1] - 14:4
**originally** [1] - 14:11
**otherwise** [1] - 8:9
**outright** [1] - 28:15
**outside** [1] - 26:3
**outstanding** [3] - 34:2, 38:4, 44:22
**over-read** [1] - 32:18
**overall** [1] - 13:9
**overbreadth** [3] - 29:10, 39:19, 39:20
**overbroad** [3] - 28:16, 30:23
**own** [2] - 19:5, 24:12

**P**

**p.m** [2] - 1:11, 47:8
**P.O** [1] - 2:17
**page** [2] - 24:23, 33:18
**pages** [2] - 19:8, 33:19
**pail** [1] - 8:25
**panicked** [1] - 7:8
**paragraph** [1] - 11:2
**part** [4] - 11:20, 18:5, 34:11, 38:23
**participant** [1] - 13:17
**participate** [1] - 7:25
**particular** [3] - 15:17, 16:11, 41:6
**particularly** [2] - 40:22, 44:12
**parties** [11] - 14:6, 28:5, 28:6, 33:24, 34:8, 38:9, 38:17, 38:18, 39:14, 40:25, 44:4
**parties'** [1] - 31:16
**party** [2] - 28:23, 38:7
**passing** [2] - 33:7, 35:12
**Pennsylvania** [2] - 2:13, 2:21
**people** [24] - 13:20, 14:5, 14:20, 14:21, 14:22, 15:10, 15:25, 16:11, 17:20, 17:21, 18:4, 18:14, 19:6, 20:16, 20:17, 22:4, 38:13, 38:23, 41:22, 41:23, 42:12, 45:21
**people's** [1] - 18:7
**perfect** [2] - 22:10, 46:20
**performance** [1] - 25:25
**perhaps** [4] - 11:16, 27:1, 40:22, 46:11
**period** [1] - 17:7
**permission** [1] - 36:13
**person** [1] - 15:19
**person's** [1] - 20:25
**personal** [2] - 23:1, 41:24
**pertain** [1] - 38:12
**pertinent** [1] - 7:22
**phone** [3] - 5:20, 7:3, 31:13
**pitfalls** [1] - 42:1
**PIZZI** [1] - 3:2
**place** [2] - 23:3, 24:1
**plaintiff** [2] - 5:12, 7:17
**Plaintiff** [6] - 1:17, 1:20, 2:5, 2:9, 2:14, 2:18
**Plaintiffs** [1] - 1:5
**plaintiffs** [8] - 4:9, 10:21, 11:10, 12:23, 27:9, 27:10, 28:18, 43:20
**plaintiffs'** [4] - 11:3, 24:16, 24:24
**Plaza** [1] - 1:19
**point** [15] - 8:5, 10:12, 12:5, 12:6, 13:12, 15:16, 17:5, 18:11, 20:4, 20:15, 25:24, 33:25, 36:17, 39:17, 43:3
**points** [1] - 42:9
**popped** [1] - 37:18
**position** [6] - 15:17, 15:25, 20:24, 24:24, 31:22, 33:13
**positions** [1] - 20:21
**possession** [1] - 26:3
**possibility** [1] - 41:8
**possible** [1] - 12:2
**possibly** [1] - 29:25
**post** [1] - 11:9
**postcomplaint** [2] - 11:16, 11:19
**potential** [5] - 14:6, 14:10, 16:5, 38:22, 39:20
**practically** [1] - 35:16
**prearguing** [1] - 46:16
**preclude** [2] - 34:8, 40:8
**precluded** [1] - 41:11
**precomplaint** [3] - 11:3, 11:8, 11:11
**preconceived** [1] - 46:25
**prefer** [1] - 35:25
**preference** [1] - 35:20
**prejudice** [2] - 43:24, 44:1
**preliminary** [4] - 34:7, 38:17, 38:25, 39:3
**premature** [6] - 10:11, 30:4, 37:22, 39:21, 40:1, 40:6
**prepare** [3] - 7:19, 43:12, 45:19
**prepared** [4] - 8:3, 8:17, 22:20, 36:2
**preparing** [1] - 41:16
**present** [1] - 16:14
**presented** [1] - 16:19
**presume** [1] - 30:15
**pretrial** [4] - 11:14, 37:15, 39:8, 40:14
**pretty** [1] - 27:14
**previously** [2] - 34:17, 45:4
**pride** [1] - 43:3
**primary** [1] - 34:17
**Primis** [4] - 6:6, 37:17, 41:13, 41:14
**PRIMIS** [8] - 2:19, 6:7, 6:9, 37:17, 41:15, 42:6, 42:25, 43:7
**Primis'** [1] - 38:1
**prioritizes** [1] - 19:2
**privacy** [3] - 19:2, 19:3, 22:22
**private** [2] - 20:6, 20:12
**problem** [7] - 17:8, 18:22, 18:23, 20:5, 20:6, 21:2, 26:25
**problems** [1] - 8:14
**Procedure** [1] - 28:22
**Proceedings** [1] - 1:24
**proceedings** [1] - 47:13
**PROCEEDINGS** [1] - 4:1
**process** [1] - 37:5
**produce** [10] - 11:10, 12:3, 12:23, 16:23, 22:21, 24:25, 26:12, 27:11, 30:14
**produced** [10] - 1:25, 10:21, 11:12, 11:18, 11:19, 12:6, 13:24, 14:18, 17:5, 19:9
**producing** [2] - 15:6, 31:11
**production** [12] - 10:1, 10:17, 11:13, 11:24, 11:25, 14:4, 21:19, 22:2, 24:17, 28:24, 34:16, 43:16
**productions** [1] - 27:10
**productive** [1] - 15:3
**promptly** [1] - 12:4
**prong** [3] - 29:2, 29:3, 29:13
**proportionality** [2] - 26:3, 27:19
**proposal** [1] - 36:20
**propose** [2] - 9:20, 44:14
**proposed** [8] - 14:11, 16:10, 17:18, 20:20, 22:20, 38:15, 38:16, 40:25
**protect** [2] - 13:8, 19:6
**protocol** [2] - 33:18, 36:15
**proverbial** [1] - 41:5
**provide** [5] - 14:9, 23:7, 25:14, 30:9, 43:15
**provided** [4] - 29:1, 31:8, 31:9
**providing** [1] - 23:19
**PSs** [1] - 9:9
**public** [1] - 11:20
**punt** [1] - 40:12
**purpose** [1] - 42:24
**pushed** [1] - 43:5
**put** [5] - 8:3, 17:11, 19:24, 33:8, 45:20
**putting** [1] - 43:24

**Q**

**quality** [1] - 25:23
**quantitative** [1] - 17:19
**quarterly** [1] - 45:5
**questions** [3] - 14:6, 31:12, 37:21
**quickly** [3] - 17:12, 23:15, 28:20
**quiet** [1] - 45:18
**quite** [2] - 32:3, 38:1
**quote** [1] - 31:3

**R**

**rails** [1] - 10:5
**raise** [2] - 10:12, 36:25
**raising** [1] - 40:8
**rather** [2] - 15:22, 36:21
**RDR** [1] - 47:15
**reach** [2] - 12:12, 31:13
**react** [1] - 42:23
**read** [4] - 31:3, 32:13, 32:18, 40:14
**ready** [1] - 21:18
**really** [14] - 7:19, 13:9, 18:16, 22:5, 22:25, 29:7, 33:20, 38:6, 38:19, 39:16, 42:14, 43:19, 46:15, 46:24
**reason** [3] - 8:3, 8:25, 14:13
**reasonable** [4] - 9:22, 21:6, 26:11, 42:13
**receive** [3] - 7:23, 45:16, 45:18
**received** [4] - 7:15, 7:16, 13:15, 36:20
**receiving** [1] - 13:13
**recent** [1] - 17:9
**recognize** [3] - 22:21, 22:22, 37:5
**record** [3] - 4:7, 7:13, 47:13
**recorded** [1] - 1:24
**redacted** [1] - 17:5
**redo** [1] - 22:13
**reduce** [1] - 28:7
**reference** [2] - 8:5, 29:24
**references** [1] - 24:18
**reflect** [1] - 16:23
**reframed** [3] - 26:20, 26:23, 32:6
**reframing** [2] - 29:14, 30:18
**regard** [1] - 13:7
**regular** [1] - 44:9
**REIKENBERG** [1] - 5:10
**Reikenberg** [1] - 5:11
**rejected** [2] - 20:20, 21:3
**related** [5] - 11:21, 25:21, 25:24, 40:23, 40:24

**relevance** [1] - 15:8
**relevant** [4] - 13:10, 14:23, 15:18, 33:11
**remainder** [1] - 37:20
**remind** [2] - 37:12, 38:11
**repeatedly** [1] - 28:22
**replaced** [1] - 17:2
**reply** [2] - 35:23
**report** [2] - 13:20, 17:2
**REPORTER** [3] - 25:13, 26:5, 26:7
**Reporter** [2] - 1:23, 47:16
**REPORTER'S** [1] - 47:10
**reporting** [2] - 16:15, 16:21
**reports** [6] - 13:20, 21:1, 23:21, 26:12, 26:17, 27:1
**request** [17] - 11:13, 11:22, 13:5, 16:20, 24:17, 24:25, 25:20, 26:14, 26:21, 26:23, 27:23, 27:24, 28:16, 32:10, 32:13, 32:16, 32:25
**requested** [2] - 26:19, 41:22
**requests** [5] - 25:20, 26:4, 26:6, 30:13, 32:2
**require** [2] - 22:19, 22:20
**required** [1] - 20:7
**requires** [1] - 28:23
**requiring** [1] - 34:4
**reserve** [1] - 46:15
**resolve** [2] - 34:1, 45:10
**resolved** [1] - 45:24
**resources** [1] - 24:10
**respect** [10] - 13:5, 17:4, 17:17, 23:18, 23:20, 28:17, 30:5, 32:8, 32:9, 46:1
**respectful** [1] - 10:10
**respectfully** [1] - 18:5
**respond** [6] - 9:2, 10:16, 10:19, 22:19, 30:24, 35:22
**responded** [2] - 8:25, 24:24
**responding** [4] - 28:16, 28:23, 32:19, 33:9
**response** [9] - 16:12, 26:14, 29:8, 30:17, 32:5, 32:6, 32:13, 36:5, 36:22
**responses** [5] - 29:19, 31:16, 31:25, 32:25, 37:6
**responsive** [5] - 11:22, 14:24, 17:21, 28:8, 33:11
**rest** [2] - 23:16, 32:9
**RET** [2] - 3:3, 6:19
**revisit** [1] - 21:5
**rewritten** [1] - 26:22
**RFP** [1] - 28:11
**RFPs** [2] - 28:7, 29:23
**rid** [1] - 4:5
**ripe** [1] - 46:16
**rise** [2] - 4:3, 47:7
**robe** [1] - 27:20
**rolling** [2] - 11:24, 11:25
**Room** [1] - 2:13
**room** [1] - 21:16
**Rule** [6] - 25:5, 28:21, 29:3, 29:7, 32:5, 36:7
**Rules** [1] - 40:3
**ruling** [2] - 33:21, 40:6
**run** [2] - 30:22, 43:20
**rush** [1] - 34:23

**S**

**sacrosanct** [1] - 19:12
**San** [1] - 1:16
**scale** [2] - 43:25, 45:2
**schedule** [5] - 33:25, 34:1, 44:14, 44:16, 45:22
**scheduled** [1] - 10:2
**scheduling** [1] - 11:14
**scope** [6] - 23:16, 24:16, 25:1, 28:24, 36:24, 41:21
**Sean** [2] - 5:6, 5:8
**search** [5] - 24:8, 26:11, 31:8, 36:17, 36:20
**searching** [1] - 28:8
**seated** [1] - 4:4
**second** [3] - 10:3, 18:23, 29:3
**secondly** [1] - 12:25
**security** [4] - 19:2, 19:3, 19:13, 22:22
**see** [11] - 6:24, 13:6, 13:15, 13:20, 22:8, 22:17, 33:10, 36:13, 39:24, 44:8
**seeing** [2] - 37:6, 37:13
**seek** [1] - 8:2
**seeking** [1] - 26:3
**seem** [2] - 13:12, 39:21
**sending** [1] - 32:18
**sense** [2] - 44:9, 44:16
**separate** [5] - 35:7, 40:23, 42:12, 46:6, 46:23
**September** [5] - 1:10, 11:24, 22:18, 44:18, 47:15
**serve** [2] - 16:4, 41:2
**served** [3] - 11:13, 12:16, 30:17
**set** [2] - 17:12, 18:3
**several** [6] - 4:12, 5:12, 14:19, 20:10, 29:20, 38:2
**SHEANIN** [49] - 1:15, 4:11, 6:21, 8:13, 8:22, 9:4, 9:18, 9:24, 10:16, 10:21, 11:2, 11:7, 14:1, 15:23, 16:4, 21:22, 22:16, 23:6, 25:4, 25:8, 25:14, 25:18, 26:6, 26:9, 26:22, 27:16, 27:18, 31:21, 32:24, 33:3, 33:23, 34:13, 36:2, 36:5, 37:3, 37:25, 38:14, 39:12, 40:4, 40:10, 40:13, 43:8, 43:17, 44:1, 44:8, 44:12, 45:9, 45:25, 47:4
**Sheanin** [5] - 4:12, 8:12, 31:20, 37:21, 46:11
**ships** [1] - 35:12
**short** [1] - 24:18
**show** [8] - 26:12, 26:16, 27:25, 30:18, 30:22, 32:15, 33:6, 43:24
**shut** [1] - 5:24
**side** [3] - 22:8, 22:9, 35:22
**sides** [2] - 29:24, 30:1
**significant** [1] - 8:18
**simply** [5] - 16:12, 16:22, 17:11, 31:25, 32:6
**simultaneous** [2] - 35:14, 46:7
**single** [4] - 18:19, 20:9, 41:2, 41:12
**size** [2] - 13:1, 22:3
**sizeable** [1] - 14:19
**skis** [1] - 29:17
**slop** [1] - 40:17
**Slow** [1] - 4:23
**slow** [1] - 26:7
**small** [1] - 16:1
**smartphones** [2] - 25:19, 27:7
**smartphones'** [2] - 25:21
**solve** [1] - 21:2
**someone** [2] - 15:17, 22:11
**somewhat** [1] - 43:2
**somewhere** [2] - 33:9, 44:20
**Somewhere** [1] - 44:17
**soon** [6] - 12:2, 22:14, 22:15, 24:6, 34:12, 44:4
**SOOWAN** [1] - 2:20
**sort** [3] - 38:3, 38:9, 44:12
**sorts** [2] - 22:13, 42:1
**sounds** [3] - 6:2, 44:23, 44:25
**source** [2] - 40:22, 41:9
**special** [1] - 24:7
**specifically** [1] - 16:5
**specifics** [1] - 28:11
**spend** [3] - 22:6, 24:9, 31:23
**spent** [6] - 30:10, 31:12, 31:24, 32:2, 32:3
**spread** [1] - 24:10
**spreadsheet** [1] - 14:5
**spreadsheets** [9] - 13:6, 13:24, 13:25, 15:5, 16:21, 17:4, 17:6, 21:19, 23:24
**stamped** [1] - 19:9
**stand** [1] - 42:2
**standing** [2] - 7:4, 17:23
**start** [3] - 17:17, 24:7, 27:24
**started** [5] - 31:2, 31:4, 31:7, 31:10, 34:11
**starting** [4] - 4:9, 15:13, 15:21, 18:15
**STATE** [1] - 2:15
**state** [2] - 28:23, 43:20
**State** [3] - 2:18, 5:11, 5:16
**STATES** [6] - 1:1, 1:3, 1:12, 2:2, 2:6, 2:11
**states** [2] - 5:12, 7:17
**States** [17] - 1:17, 1:20, 2:5, 2:9, 2:14, 4:2, 4:7, 4:12, 4:16, 4:19, 4:22, 5:3, 5:6, 5:8, 6:22, 7:17, 43:20
**STATUS** [1] - 1:5
**status** [6] - 7:15, 14:18, 36:19, 38:3, 44:9, 46:2
**Stein** [2] - 4:18, 4:25
**STEIN** [2] - 2:8, 4:18
**stem** [1] - 10:23
**stenography** [1] - 1:24
**step** [1] - 28:10
**still** [5] - 7:6, 21:16, 23:25, 39:24, 45:11
**stonewalling** [1] - 28:15
**stop** [5] - 7:2, 18:20, 21:14, 27:15, 32:12
**store** [1] - 15:11
**straight** [1] - 42:3
**streamlining** [2] - 42:19, 42:21
**Street** [5] - 1:9, 2:4, 2:8, 2:16, 3:4
**studied** [1] - 28:18
**studies** [3] - 26:12, 26:17, 27:1
**stuff** [1] - 16:1
**subcategories** [1] - 12:21
**subject** [4] - 22:22, 26:10, 29:11, 31:9
**submissions** [2] - 35:14, 45:22
**submit** [3] - 8:9, 9:15, 38:17
**submitted** [3] - 8:6, 34:6, 46:19
**submitting** [1] - 33:25
**subparagraphs** [1] - 11:7
**subpoenas** [2] - 12:16, 28:6
**subpoenas'** [1] - 28:7
**subsequently** [1] - 14:12
**substantial** [1] - 37:19
**substantially** [3] - 7:20, 34:16, 38:1
**substantive** [1] - 40:24
**successor** [1] - 15:19
**sufficient** [8] - 24:6, 26:12, 26:16, 30:18, 32:15, 33:6, 34:20, 35:3
**suggest** [3] - 10:17, 15:7, 15:10
**suggested** [3] - 15:5,

16:6, 16:14
**suggestion** [2] - 22:15, 36:1
**Suite** [1] - 1:16
**sun** [1] - 29:10
**supplemental** [1] - 45:22
**sur** [1] - 35:23
**sur-reply** [1] - 35:23
**SURINDER** [1] - 2:16
**surinder** [1] - 5:15
**surprising** [1] - 13:6
**system** [1] - 18:18

**T**

**table** [2] - 6:4, 34:9
**tack** [1] - 21:9
**target** [1] - 13:19
**targeted** [1] - 15:15
**tech** [1] - 18:25
**tee** [1] - 34:2
**teed** [3] - 12:17, 33:20, 34:11
**tenure** [1] - 20:22
**term** [1] - 36:20
**termed** [1] - 18:15
**terms** [5] - 24:8, 26:2, 31:9, 36:17, 39:12
**testified** [2] - 41:23, 41:24
**testify** [1] - 38:20
**Testing** [1] - 7:6
**Thanksgiving** [2] - 45:20
**that..** [1] - 25:6
**THE** [111] - 1:1, 1:12, 2:2, 2:6, 2:11, 2:15, 4:3, 4:4, 4:14, 4:17, 4:20, 4:23, 5:4, 5:7, 5:9, 5:14, 5:17, 5:22, 5:25, 6:5, 6:8, 6:12, 6:15, 6:18, 6:20, 6:24, 7:1, 7:6, 7:12, 8:21, 8:24, 9:6, 9:19, 9:25, 10:14, 10:20, 11:1, 11:6, 12:11, 12:14, 15:13, 16:1, 17:15, 18:9, 19:8, 19:20, 19:22, 20:8, 20:13, 21:18, 21:24, 23:4, 23:9, 24:2, 24:4, 25:7, 25:12, 25:13, 25:16, 26:5, 26:7, 26:20, 27:15, 27:17, 27:19, 29:2, 29:7, 29:21, 30:15, 30:17, 30:25, 31:5, 31:17, 31:19, 32:12, 33:2, 33:4, 34:3, 34:22, 35:6, 35:9, 35:14, 35:23, 36:1, 36:6, 36:9, 36:12, 37:2, 37:10, 38:11, 39:7, 39:21, 40:5, 40:11, 41:13, 42:5, 42:17, 43:1, 43:9, 43:23, 44:5, 44:11, 44:23, 45:2, 45:14, 46:4, 46:18, 46:21, 47:3, 47:5, 47:7
**themselves** [1] - 4:13
**they've** [2] - 16:16, 26:22
**thinking** [2] - 34:4, 40:19
**thinks** [1] - 34:19
**third** [4] - 10:4, 28:5, 28:6, 39:14
**Third** [3] - 25:8, 25:11, 28:18
**thorough** [1] - 34:22
**thoughts** [1] - 14:2
**thousands** [3] - 9:11, 21:14, 23:25
**Three** [1] - 3:3
**three** [6] - 6:12, 8:3, 14:23, 24:9, 33:19, 42:3
**throughout** [2] - 19:1, 20:22
**thumb** [2] - 43:24, 45:2
**Thursday** [1] - 36:23
**ticky** [1] - 21:9
**ticky-tack** [1] - 21:9
**today** [4] - 10:8, 21:18, 21:24, 33:13
**tone** [1] - 46:12
**took** [1] - 7:13
**tools** [1] - 39:22
**top** [3] - 14:21, 20:17, 22:6
**top-level** [1] - 20:17
**topic** [3] - 41:25, 42:4, 42:16
**topics** [4] - 28:1, 41:7, 41:17
**toss** [2] - 24:13, 24:14
**total** [3] - 11:23, 12:25, 43:4
**touch** [1] - 33:4
**towards** [1] - 23:23
**TRACIE** [1] - 2:20
**Tracie** [1] - 6:2
**traditional** [2] - 22:2, 40:2
**traffic** [1] - 13:16
**transcript** [2] - 1:24, 47:12
**transcription** [1] - 1:25
**transparency** [1] - 22:8
**trial** [8] - 37:15, 38:12, 38:14, 38:17, 38:21, 39:6, 39:23
**tried** [4] - 7:24, 27:21, 28:13, 28:14
**true** [1] - 28:13
**trust** [1] - 12:12
**try** [6] - 21:9, 24:14, 28:3, 39:18, 40:1, 44:3
**trying** [7] - 15:1, 15:23, 25:14, 31:1, 32:20, 41:16, 45:10
**Tuesday** [1] - 1:10
**turn** [2] - 19:14, 46:18
**turned** [2] - 5:22, 19:14
**tutorial** [1] - 18:25
**twice** [1] - 42:20
**two** [12] - 6:6, 6:9, 11:7, 12:21, 14:22, 20:16, 22:17, 23:7, 23:11, 23:17, 42:12, 45:18
**type** [1] - 26:13
**types** [1] - 25:23

**U**

**U.S** [4] - 1:9, 1:14, 1:18, 7:13
**Uh-oh** [1] - 5:22
**ultimate** [1] - 24:5
**ultimately** [2] - 15:24, 35:18
**unbounded** [1] - 42:9
**under** [2] - 29:10, 40:2
**underscore** [1] - 20:5
**understood** [3] - 20:14, 33:1, 42:25
**unfriendly** [1] - 39:25
**unilateral** [1] - 7:23
**unique** [1] - 13:22
**United** [17] - 1:17, 1:20, 2:5, 2:9, 2:14, 4:2, 4:7, 4:12, 4:16, 4:19, 4:22, 5:2, 5:6, 5:8, 6:22, 7:17, 43:20
**UNITED** [6] - 1:1, 1:3, 1:12, 2:2, 2:6, 2:11
**units** [1] - 15:7
**universe** [1] - 32:17
**unknown** [1] - 41:25
**unless** [3] - 9:20, 27:10, 43:23
**unsolicited** [2] - 7:16, 7:23
**unworkable** [1] - 36:9
**up** [24] - 9:16, 12:17, 13:13, 16:19, 19:24, 24:5, 25:5, 28:4, 28:20, 32:22, 33:18, 33:20, 33:25, 34:2, 34:11, 35:16, 37:11, 37:18, 40:20, 41:8, 42:4, 43:13, 46:11, 46:13
**update** [2] - 36:19, 46:14
**updates** [1] - 7:22
**urgency** [1] - 40:9
**usable** [1] - 25:21
**useable** [1] - 25:22
**users** [2] - 19:4, 26:13

**V**

**vague** [1] - 26:2
**valuable** [5] - 8:19, 8:21, 14:24, 16:17, 16:23
**value** [2] - 25:23, 44:13
**various** [1] - 24:21
**version** [1] - 17:6
**versus** [3] - 32:7, 35:6, 42:19
**vet** [1] - 23:16
**vetted** [1] - 9:16
**viewed** [1] - 39:2
**volume** [2] - 5:23, 7:3

**W**

**wait** [1] - 37:23
**waiving** [1] - 26:10
**Walnut** [1] - 1:9
**WALSH** [3] - 3:2, 3:2, 6:17
**Walsh** [1] - 6:16
**wants** [2] - 34:14, 44:15
**warm** [1] - 42:21
**Washington** [3] - 2:9, 2:13, 2:21
**ways** [4] - 15:5, 15:23, 21:20, 26:15
**week** [4] - 36:22, 43:19, 45:20, 45:21
**weeks** [7] - 17:14, 22:17, 23:5, 23:7, 23:11, 23:17, 45:18
**welcome** [1] - 47:5
**Welcome** [1] - 5:14
**Wettre** [1] - 4:2
**WETTRE** [1] - 1:12
**whiff** [1] - 42:22
**willing** [5] - 27:10, 27:11, 28:25, 29:16, 32:1
**Winn** [1] - 38:2
**wish** [1] - 29:3
**withdrawing** [1] - 16:20
**withholding** [4] - 28:24, 29:11, 32:7
**witness** [10] - 19:24, 37:11, 37:22, 38:4, 38:7, 38:12, 38:17, 39:3, 39:6, 39:8
**witnesses** [11] - 16:3, 16:5, 37:14, 38:12, 38:15, 38:20, 39:11, 41:16, 42:4, 43:4
**wondered** [1] - 13:5
**word** [1] - 24:7
**working-to-the-deadline** [1] - 45:6
**works** [3] - 8:7, 8:8
**world** [1] - 15:6
**worried** [1] - 20:16
**worry** [2] - 19:23, 45:23
**written** [1] - 12:17

**Y**

**year** [2] - 40:15, 40:16
**years** [6] - 14:3, 14:19, 17:9, 18:6, 18:19, 20:10
**York** [4] - 1:20, 2:24
**yourself** [1] - 29:14

# EXHIBIT 46
# CONFIDENTIAL

GIBSON DUNN

Dana Lynn Craig
Partner
T: +1 415.393.8253
M: +1 213.507.7036
dcraig@gibsondunn.com

CONFIDENTIAL

November 26, 2025

VIA E-MAIL

William Christopher Carmody
Susman Godfrey LLP
One Manhattan West, 50th Floor
New York, NY 10001-8602

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue
Suite 2000
Seattle, WA 98101

George A. Zelcs
Korein Tillery LLC
205 North Michigan, Suite 1950
Chicago, IL 60601

Thomas R. Curtin
McElroy, Deutsch, Mulvaney & Carpenter LLP
1300 Mount Kemble Avenue
Morristown, NJ 07962

Re: *In Re: Apple Inc. Smartphone Antitrust Litigation*, No. 2:24-md-03113-JXN-LDW

Dear Counsel:

On behalf of Apple Inc. ("Apple"), we are providing a document production volume responsive to certain of MDL Plaintiffs' Requests for Production that will also be produced by Apple in the Government Action (*United States v. Apple,* No. 2:24-cv-04055-JXN-LDW) to the U.S. Department of Justice (DOJ) and Plaintiff States, APLCIDLITVOL001. The documents, which constitute volume APLCIDLITVOL001, are Bates-labeled APLCIDLIT00000001 thru APLCIDLIT00184020.

This production volume is made available via ShareFile secure file transfer platform. The password for the production will be provided separately.

The enclosed materials are entitled to confidential treatment pursuant to the Discovery Confidentiality Order entered in this case (Dkt. No. 124). Concerning production in the Government Action, the materials are also entitled to confidential treatment pursuant to the

5004502117.1

confidentiality protections provided under the Antitrust Civil Process Act, 15 U.S.C. §§ 1311-1314, and Apple's submission of materials to the MDL Plaintiffs in response to their requests for production does not constitute waiver of these protections. These documents cannot be shared with groups or individuals who have not certified compliance with the Discovery Confidentiality Order entered in this case (Dkt. No. 124).

Sincerely,

/s/ Dana Lynn Craig

Dana Lynn Craig
Partner

DLC

# EXHIBIT 47
# CONFIDENTIAL

GIBSON DUNN

Dana Lynn Craig
Partner
T: +1 415.393.8253
M: +1 213.507.7036
dcraig@gibsondunn.com

CONFIDENTIAL

July 9, 2026

VIA E-MAIL

William Christopher Carmody
Susman Godfrey LLP
One Manhattan West, 50th Floor
New York, NY 10001-8602

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Second Avenue
Suite 2000
Seattle, WA 98101

George A. Zelcs
Korein Tillery LLC
205 North Michigan, Suite 1950
Chicago, IL 60601

Thomas R. Curtin
McElroy, Deutsch, Mulvaney & Carpenter LLP
1300 Mount Kemble Avenue
Morristown, NJ 07962

Jack G. Lerner
Trial Attorney
Antitrust Division, U.S. Department of Justice
450 5th Street, N.W.
Washington, DC 20530

Re: *In Re: Apple Inc. Smartphone Antitrust Litigation*, No. 2:24-md-03113-JXN-LDW

Dear Counsel:

On behalf of Apple Inc. ("Apple"), we are providing document productions responsive to certain of Plaintiffs' Requests for Production. The documents constitute (1) volume APLCIDLITVOL052, Bates-labeled APLCIDLIT14292051 through APLCIDLIT14679015, (2) overlay volume APLCIDLITOVR001, which consists of replacement images for documents to correct confidentiality stamping and slipsheets (with relation to volume APLCIDLITVOL052), and (3) overlay volume APLCIDLITOVR002, which consists of replacement images for two documents

GIBSON DUNN



previously produced in the APLCIDLIT volumes. Cross-reference files are also being provided. The production volumes have been posted to ShareFile.

The password for the production files will be provided separately.

This production is made pursuant to (1) the Government Action Discovery Confidentiality Order (Dkt. No. 235), entered February 19, 2025, and the Stipulation and Order Governing Electronically Stored Information and Hard Copy Documents (Dkt. No. 264), entered May 22, 2025 and (2) the MDL Action Discovery Confidentiality Order (Dkt. No. 124), entered October 7, 2025. By producing these documents Apple does not waive any objection it may have to their relevance or admissibility, or any other objection available at law or in equity. By producing these documents Apple does not waive any rights or privileges, including the attorney-client and work product privileges.

This production includes confidential business information, the release or publication of which could substantially harm Apple. Apple's submissions are made with the express understanding that their content be kept confidential to the maximum extent provided by the Discovery Confidentiality Order and all applicable laws and regulations, including protection from disclosure under the Freedom of Information Act.

Sincerely,

/s/ Dana Lynn Craig

Dana Lynn Craig
Partner

DLC

# EXHIBIT 48

MoloLamken

Lauren F. Dayton
MoloLamken LLP
300 North LaSalle Street
Chicago, IL 60654
T: 312.450.6707
ldayton@mololamken.com
www.mololamken.com

February 6, 2026

**VIA EMAIL**

Connor Sullivan
Jason Lo
Gibson, Dunn & Crutcher LLP
cssulivan@gibsondunn.com
jlo@gibsondunn.com

Re: *In re Apple Inc. Smartphone Antitrust Litigation*, No. 2:24-md-03113
Summary of Meet and Confers on January 26, 27, and 29, 2026

Connor and Jason,

Thank you for meeting and conferring with us on January 26, 27, and 29, 2026. Below is our summary of the discussion, which I am sending to you on behalf of the Direct Apple Watch Purchaser Plaintiffs ("Watch Plaintiffs"). We look forward to reconvening to continue our discussion.

**Watch RFPs 64 and 65**

We agreed that these requests are resolved by the Case Management Order's provision requiring Apple to "promptly make rolling productions to Plaintiffs' counsel . . . of materials in its possession, custody, or control that have been produced in the Government Investigation, Government Action, and MDL Action, regardless of whether those materials were initially produced by Apple, the Government, or third parties." Please confirm that Apple interprets that provision as an ongoing obligation, and does not interpret the words "have been produced" to mean that Apple is only ordered to produce the Government Investigation, Government Action, and MDL Action documents that had been produced as of the date of the Case Management Order's entry.

**Watch RFP 66**

You expressed Apple's view that this request is overbroad because it includes issues that you do not believe are at issue in the litigation, and that the Documents the request asks for would include the identities, titles, and time of service of at least some individuals who would not be relevant to the litigation. You asked, therefore, if we would consider asking for documents that relate to a smaller list of roles, departments, or topics. We expressed our view that the request is reasonably designed and proportionally tailored to elicit discoverable

information relevant to the claims or defenses, but that we would be willing to consider narrowing the request if Apple would identify the roles, departments, and topics that it believes would be irrelevant—which, we explained, Apple is in the best position to do. You responded that you did not think that would be a manageable process, and suggested that we should instead obtain the requested information from the Government Investigation documents. We explained that we are doing our best to obtain this information from the documents we have received (none of which were pursuant to Watch Plaintiff requests), but that we do not possess the CID that defined the contours of the Government Investigation, or the search and production parameters used to provide documents for the Government Investigation, which precludes us from knowing what types of documents the Government did and did not request, and what types of documents relevant to the Watch case Apple may not have produced. We explained that is one reason such a process would be insufficient to identify the titles and times of service of Apple employees relevant to the Watch case.

You then expressed concern that our request would include all Apple employees as custodians. We explained that the request does not ask for that—it asks for documents sufficient to show Apple employees, their titles, and time in service, so that (among other things) we can determine which individuals would be appropriate custodians. We asked why it would be a problem to provide this information and you explained that in the "normal course" of civil litigation it might be appropriate, but that you do not think it is appropriate here because we possess the Government Investigation documents that, in your view, can help us obtain custodian information. You explained that you think we should review the Government Investigation documents and if we think there is anything missing, we should come back to Apple with a draft motion to compel production of documents covering the missing information, at which point you would agree to review the documents yourselves and, if you agree that documents are missing, you would provide them. We expressed our view that such a process would be more unmanageable than the one we proposed, and that Apple is wrongly assuming that because we may be able to identify certain relevant individuals from the Government Investigation documents, that we do not need and are not entitled to obtain documents identifying other individuals that are relevant but who cannot be identified from the Government Investigation documents. You responded by providing an example: we could review the documents and if we did not see anything on the topic of notifications, then we would know that no documents touch on that topic and could request them. We provided a counterexample illustrating why that would not work: Apple and Government may have agreed to search terms and to produce the top 100 documents based on a relevance metric, and that yield may include some documents touching on a relevant topic, but there could have been 100,000 documents past that first set within which there is relevant and highly probative information, and we would have no way of knowing.

You then said that you understood the request to be aimed at identifying custodians and that you questioned the relevance of the requested information outside of that purpose. We explained that identifying custodians was not the request's only purpose, and that there are certainly Apple employee identities, titles, and time in service that are discoverable, independent of whether that information is used to identify custodians. We then agreed to advance the discussion in writing.

Our view remains that our request is reasonably designed and proportionally tailored to elicit discoverable information relevant to the claims or defenses, and that you should agree to produce the material requested. Further, to the extent you object on the basis of overbreadth, Rule 34(b)(2)(C) places the burden on you to specify the portion you contend is overbroad and to provide the rest. To the extent you are willing to specify the roles, departments, or topics that you believe are objectionable, we remain willing to consider narrowing the request.

**Watch RFP 67**

You explained that, in this response, "sufficient to show" indicates a targeted collection, and thus you are offering to make a targeted collection of Apple's formal internal policies or guidelines relating to U.S. antitrust compliance. We asked what you meant by "formal," and you explained that you were attempting to exclude, for example, emails discussing minutiae related to antitrust compliance, like scheduling trainings on the topic. We explained that we are not interested in such minutiae, but asked whether Apple had any "informal" policies or practices regarding U.S. antitrust laws—including, for example, any instructing employees on ways to communicate to avoid creating material probative of antitrust violations—and, if so, whether those would be included or excluded. You said that you would look into whether such informal policies or practices exist and, if so, how to address them.

**Watch RFP 68**

You expressed your view that this request is overbroad because it may include consumer comments regarding the Apple Watch that do not relate directly to issues we described in Watch Plaintiffs' complaint, and that to the extent they relate to Apple's defenses, any obligation would ultimately be satisfied once Apple disclosed the documents it intended to rely on at trial. We explained that the scope of discovery exceeds the documents that Apple intends to rely on at trial and that if Apple will identify topics that it thinks should be excluded, we would consider them. You responded that you do not believe it is Apple's burden to identify the portions of the request that are the basis of its overbreadth objection. We disagree and think that it is your burden, pursuant to Rule 34(b)(2)(C).

Our position remains that this request is reasonably designed and proportionally tailored to elicit discoverable information relevant to the claims or defenses, that you should agree to produce the material requested, and that to the extent you are willing to specify the material that you believe is objectionable, we remain willing to consider narrowing the request.

**Watch RFP 69**

You expressed your view that this request is overbroad because it may include iPhone customer Communications that are not relevant to Watch Plaintiffs' claims. We disagreed and noted that, even assuming for the sake of argument that were true, the proper scope of discovery would also include material that is relevant to Apple's defenses. You responded that such material would be covered by Apple's obligation to produce material it intends to rely on at trial.

We explained that the scope of documents relevant to a defense exceeds that of documents the defendant relies on. You said that you would consider our position.

Our view remains that this request is reasonably designed and proportionally tailored to elicit discoverable information relevant to the claims or defenses, but that if you are willing to specify the material that you believe is objectionable, we are willing to consider narrowing the request.

**Watch RFP 70**

You asked what the words "criticisms" and "complaints" meant in our request. We explained that we meant them to be interpreted based on their ordinary usage. You said that you would consider your response in light of that clarification.

You also asked if we would consider limiting the request to criticisms or complaints relating to *differences* between the interoperability of, on one hand, iPhones and Apple Watches and, on the other hand, iPhones and Third-Party Smartwatches. We said that we would consider it, but that there were a number of important reasons why that would exclude relevant material—including but not limited to material that would help us determine timelines related to interoperability issues, and material relevant to reasonably anticipated defenses. You said that you would consider our position and get back to us.

Our position is that this request is reasonably designed and proportionally tailored to elicit discoverable information relevant to the claims or defenses and that you should produce the requested information. If you propose portions of the requested material that you think are objectionable, however, we are willing to consider narrowing the request.

**RFP 71**

RFP 71 seeks all Communications or Agreements with third parties relating to Smartwatches. You asked if the list of third parties we provided in our RFP was exhaustive and we confirmed that it was a non-exhaustive list. We confirm here that the list is non-exhaustive and identifies third parties that either made smartwatches or provided services related to smartwatches, and in some cases also developed pertinent apps.

You asked that we narrow the "Agreement" component of RFP 71 to "Agreements that relate to smartwatches that relate to alleged conduct in the Complaint." We responded that we would get back to you and conveyed a belief that agreed-upon search terms would achieve a similar goal.

You stated burden and overbreadth objections to the "Communication" component of this request. We asked whether Apple would still be making a burden objection if we limited it to the entities listed in RFP 71. You said you would consider that proposal.

You further stated that you believed such a search would still yield irrelevant documents. The existence of some irrelevant documents in a search's yield does not necessarily invalidate the search, and this one is reasonably designed and proportionally tailored to elicit discoverable information relevant to the claims or defenses. Moreover – and as with our position on the "Agreement" component – we are willing to consider narrowing the request by curating search terms and custodians.

**RFP 72**

RFP 72 seeks all Documents related to the App review of any Identified Product or Service like any App, Companion App, or Sister App for any Smartwatch. You raised confidentiality concerns like financial information from the developer and potential privacy issues in how the App operates in the context of App review. We asked if your position was that Apple is not obligated to produce third party confidential information. You answered: no.

You asked that we narrow it to specific Apps or features. We said that we would consider proposing a list by name or category. A proposal is forthcoming.

**RFP 73**

RFP 73 seeks all Documents relating to incentive programs for Developers of Third-Party Smartwatch Apps, including any eligibility restrictions prohibiting Developers of Third-Party Smartwatch Apps from directing consumers to make out-of-app transactions, and any restrictions prohibiting App Developers from directing consumers to Third-Party Smartwatch Apps.

Your objection included "sufficient to show" language. We asked what that meant here and you answered that you would get back to us. We also asked Apple to confirm that it will search for related Documents from items we listed after the word "including" in RFP 73, and you said you would get back to us.

**RFP 74**

RFP 74 seeks all Documents related to any threat to user security or privacy due to the inability to send encrypted messages between iPhones and Third-Party Smartphones or Third-Party Smartwatches.

We asked about the "sufficient to show" component of your objection. You answered that it referred to a non-custodial production – that Apple would gather any kind of analysis from specific people or specific sources.

Your response to RFP 74 said that Apple was willing to provide "Documents sufficient to show its analyses regarding potential security or privacy risks." We asked if that would exclude communications and you answered that your counter was not intended to categorically exclude anything. We said we would consider your proposal and get back to you.

Our position is that this request is reasonably designed and proportionally tailored to elicit discoverable information and that you should produce all of the requested information, including all relevant documents and communications, not just Apple's analyses. If you intend to maintain your objection as to burden and proportionality, please explain in concrete terms what the burden would be (number of documents, number of custodians, etc.) and what you've done to arrive at that information.

**RFP 75**

RFP 75 seeks all Documents related to any effort or decision by Apple to prevent or limit any Third-Party Developer's ability or permission to provide or enable end-to-end encryption for messages sent from Third-Party Smartwatches.

We asked about the "sufficient to show" component of your objection and you answered that, similar to your response to RFP 74, "sufficient to show" referred to a targeted, rather than a custodial collection.

We also stated that your response was limited to "analyses Apple prepared" and omitted other Document types like communications. We noted that we could not accept that position and that we need all relevant, non-privileged Documents responsive to this request. You stated that you would get back to us.

**RFP 76**

RFP 76 seeks all Documents related to any threat to user security or privacy due to the inability to send encrypted messages from Third-Party Smartwatches. You asked about the difference between RFP 76 and RFP 74, and we clarified that RFP 76 would cover the inability to send encrypted messages from Third-Party Smartwatches to, for example, Android phones or an Apple Watch, including in a group text situation (e.g., a user with an iPhone and a Garmin smartwatch is sending texts to another user with an Apple Watch or to another user with an Android phone). You stated that Apple would get back to us on RFP 76.

Additionally, we ask that you confirm whether the use of "sufficient to show," in your response to RFP 76 is the same as the phrase was used as in RFP 74.

**RFP 77**

RFP 77 seeks all Documents related to coding bugs affecting Apps and iOS updates relating to Third-Party Smartwatches, including, but not limited to, bug reports and bug tickets. We asked if Apple would be willing to provide categories or data fields about how bug tickets are stored to aid us in narrowing the request. You responded by asking us to identify specific apps or specific bugs, contending that our request seeks an immense volume of irrelevant Documents. We responded by asking what you have done to determine the responsive volume of Documents and you answered that you were making a preliminary point of relevance objection. We then asked if you would rest on the same objection if we were to narrow the Apps

portion of our request to a discrete list of Apps that we would identify. You answered that you may still object because, for example, there could be bugs that impact a Third-Party Smartwatch App that without specifically naming the App. We propose to limit to this request as follows:

> All Documents related to coding bugs: (1) associated with the incidents identified in the Watch Plaintiffs' Amended Complaint, including but not limited to ¶¶131-187; or (2) affecting Listed Products (as defined below) or Identified Apps (that list is forthcoming) including, but not limited to, bug reports and bug tickets identifying (or, through Apple's records, associated with) a Listed Product or Identified App. Watch Plaintiffs reserve the right to amend this request if they become aware of other relevant third-party smartwatches or apps, or other incidents similar to those described in the Amended Complaint. "Listed Products" means a smartwatch or wearable device or platform made by Amazfit, Citizen, Core Devices LLC, Fitbit, Fossil, Garmin, Google, HMD America, HMD Global, MijoConnected, Motorola, Pebble, Polar, Samsung, and Withings.

This narrowed request is intended to capture bug reports and bug tickets that explicitly reference the Listed Products or Identified Apps, or bug reports and bug tickets that Apple has identified as being associated with those Listed Products or Identified Apps through, for example, how Apple stores the reports and tickets.

**RFP 78**

Apple's objections include a vagueness objection to "changes" and "project management documentation." We clarified that by "changes" we mean: additions or deletions to software code. And by "project management documentation," we mean: documentation that is created in or by a project management tool like Jira – the one that we named in the request. We asked if you had any further questions about those terms; you did not posit any.

You asked what it means to track and log, and we clarified that we are looking for documents sufficient to show ***how*** Apple records changes to software code that affect the Apple Watch and Third-Party Smartwatches. You asked whether this would include situations where Apple employees discuss coding changes via messaging channels like Slack. We confirmed that if Slack conversations were the only place where documentation of those coding changes existed, then yes, we would want documents sufficient to demonstrate that. You indicated that actual software code changes are identified in a type of repository.

You additionally asked how this request is relevant to our allegations. We answered that it is relevant, among other things, to allegations that Apple made software changes to negatively impact Third-Party Smartwatches and that this request is tailored to avoid asking for all the changes to software code. *See, e.g.*, Amend. Compl., ECF 86 ¶¶131-187. You asked us to consider limiting our request to the functionalities described in the complaint. We agreed to consider that request, although we noted that although we have specific allegations about particular instances of Apple's changes to its code disrupting or degrading competitor

smartwatches, it is impossible for us to identify all of the ways in which Apple may have changed its code to accomplish that. We also reiterated that we are not asking for documents sufficient to show all of Apple's code or all of the changes to Apple's code, but rather documents sufficient to show ***how*** Apple tracks, logs, and monitors changes to software code related to the Apple Watch and Third-Party Smartwatches.

We confirm here that we are not willing to limit this request to particular functionalities. This request is reasonably designed and proportionally tailored to elicit discoverable information and Apple should produce the requested information. As we stated during the meet and confer, if you can identify certain sources that you believe contain only irrelevant information, we are willing to consider that.

**RFP 79**

As discussed during the call, RFP 79 is a data request and we deferred discussion on that request until the data-specific meet and confer.

**RFP 80**

RFP 80 seeks Documents related to the display of health and fitness data collected from a Third-Party Smartwatch in Apple's iPhone Health App or Apple's iPhone Fitness App. We first asked what "sufficient to show" means in the context of Apple's response and you responded that Apple was proposing a targeted collection as opposed to a custodial collection. We responded by asking you to perform a custodial collection.

You asked us what some phrases in this RFP meant and we offered responses but agreed to confirm in writing. We confirm here that: the phrase "steps required to enable" refers to the steps that a developer or a user would be required to take to enable the display of health and fitness data collected by a third-party; and the phrases "requirements" and "procedures" refer to requirements or procedures for developers or users to display health and fitness data. In response to your question about whether it was relevant to the allegations, we answered that it was relevant to ¶143 as just one example. For other examples of relevant allegations, see the section of the Amended Complaint entitled "Apple has degraded the delivery of health data from third-party smartwatches and the companion and sister apps that support them." Amend. Compl. ¶¶153-155. You also asked whether there are allegations about the use of Third-Party Smartwatch data with Apple's movement rings in Watch Plaintiffs' Amended Complaint. Although the term "movement rings" does not appear in the Amended Complaint, the request is calculated to discover information directly relevant to Watch Plaintiffs' allegations about delivery of health data from third-party smartwatches versus Apple Watches—*e.g.*, t ¶¶ 47, 124, 133, 141-43, 153-155, 185, 229.

**RFP 81**

As discussed during the call, RFP 81 is a data request and we deferred discussion on that request until the data-specific meet and confer.

**RFPs 82 and 83**

Without waiving the right to address these RFPs in the future, Watch Plaintiffs proposed during the meet and confer to defer discussion of these RFPs in order to prioritize other RFPs.

**RFP 84**

RFP 84 requests Documents relating to requests by third parties to access iPhone protocols used by AirPods for Third-Party connected devices. You asked how this is relevant to our allegations. We answered that it is relevant to the allegations that third-parties may seek API access to Apple's products and relevant to your justification defenses, e.g., about privacy and security issues in the connection between third-party devices, from a comparator/control group standpoint. You stated that you would get back to us on this.

**RFP 85**

Watch Plaintiffs request Documents relating to Apple's use of Privacy Warning Screens relating to Third-Party Smartwatches and their apps. You asked us to define the terms "use," "require" and "decision." We explained that these three terms' definitions accord with their ordinary usage.

We explained that what Apple's proposal to produce "documents sufficient to show Apple's use of privacy warning screens" would be insufficient, that this request is directly relevant to our allegations (we note here, for example, the allegations at Amended Complaint ¶¶164-174, referring to Privacy Warning Screens as "scare screens"). And that we were happy to discuss another proposal or to hear why, in Apple's view, this request would be unduly burdensome or not proportional. You agreed to consider our comments and get back to us.

**RFP 86**

Watch Plaintiffs request All Documents related to Apple's decision to display heart rate variability in the Health App based on the Standard Deviation of Normal-to-Normal interval (SDNN) method as opposed to another method like the Root Mean Square of Successive Differences (RMSSD). We first asked you why your response changed the word "display" to "exported." You answered that the term "exported" accurately describes what the health app interaction with smartwatches is, and was not intended to hide information, and that you will get back to us.

We additionally asked about your use of the phrase "sufficient to show" in your response. You stated that you were proposing a targeted collection but would be willing to consider a custodial collection.

We asked to confirm that Apple was agreeing to search for the two heart rate methods that we identified (SDNN and RMSSD). You said that was your understanding, but that you could confirm to be perfectly clear.

**RFP 87**

RFP 87 seeks Documents related to Apple's decision to have the Bluetooth toggle button in the iPhone Control Center disconnect non-Apple devices, as well as the decision to have the button not disconnect the Apple Watch.

We first asked what you meant by using "sufficient to show," and you answered that your initial proposal was to respond to this request on a targeted basis, but that you were open to discussing a custodial search. We responded we would confirm in our letter, but that a custodial search would be better for this RFP because it was trying to identify the *decision* to establish differential treatment. We noted that it seems unlikely that many Apple employees were involved in this decision. We confirm here that we believe a custodial search is appropriate.

You asked us what we meant by "decision." We stated that it referred to the decision to disconnect as to the third-party devices and/or the decision not to do that as to Apple devices, because we do not know the exact source for the difference in how Apple Watches and third-party devices respond to the Bluetooth toggle button. You additionally asked us what we mean by the word "disconnect." We referred you to the allegations that Apple creates problems that cause competitor smartwatches to lose connection from paired iPhones and constrain the information competitor smartwatches can provide their users. *See, e.g.*, Amend. Compl. ¶¶ 3, 131, 156, 160, 161, and 175-87.

* * *

We look forward to your responses.

Sincerely,

/s/ Lauren Dayton
Lauren Dayton

# EXHIBIT 50

## Moody, Ian

**From:** Tondrowski, Katherine V. via Apple all plaintiffs <appleallplaintiffs@lists.locklaw.com>
**Sent:** Wednesday, October 15, 2025 4:22 PM
**To:** Walchak, David; Anderson, Brian W.; Kleinbrodt, Julian W.; Rose, Joseph R.; Richman, Cynthia; Swanson, Daniel G.; lwalsh@walsh.law
**Cc:** *** Apple-SmartphoneMDL - (External); appleallplaintiffs@lists.locklaw.com; Migdal, Ariela
**Subject:** Apple all plaintiffs - Apple MDL - Apple Watch Plaintiffs' First Set of Requests for Production
**Attachments:** 2025 10 15 Watch Purchaser First RFPs to Apple.pdf

Counsel,

Please see attached Direct Apple Watch Purchaser Plaintiffs' First Set of Requests for Production to Apple, Inc.

Best,
Katie

**Katherine V. Tondrowski**
**KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC**
Sumner Square | 1615 M Street, NW | Suite 400 | Washington, DC 20036
Tel: (202) 326-7996 | Fax: (202) 326-7999

NOTICE: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately via reply e-mail, and then destroy all instances of this communication. Thank you.