WALSH PIZZI O'REILLY

**THREE GATEWAY CENTER**
100 Mulberry Street, 15th Floor
Newark, NJ 07102
T: 973.757.1100
F: 973.757.1090
**WALSH.LAW**

Liza M. Walsh
Direct Dial: (973) 757-1100
lwalsh@walsh.law

**VIA ECF**

November 18, 2026

Honorable Leda Dunn Wettre, U.S.M.J.
U.S. District Court for the District of New Jersey
Martin Luther King Jr. Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

**Re:** ***United States of America, et al. v. Apple Inc.*, No. 2:24-cv-04055 (JXN-LDW)**
***In re Apple Inc. Smartphone Antitrust Litigation*, No. 2:24-md-03113 (JXN-LDW)**
**Apple's Brief re: Impasse with Third-Party Oura (Dkt. 588 (DOJ); 438 (MDL))**

Dear Judge Wettre:

This firm, together with Gibson, Dunn & Crutcher LLP, represents Defendant Apple Inc. ("Apple") in the above-captioned matters. Apple respectfully submits this letter brief pursuant to the Court's November 10, 2026 Orders (Dkt. 588 (DOJ); 438 (MDL)) regarding non-party Ouraring Inc.'s ("Oura's") response to Apple's subpoena under Federal Rule of Civil Procedure 45, served on July 13, 2026 (the "Subpoena").

## I. Introduction

Oura competes head-to-head with Apple and other wearables[1] manufacturers. That competition is central to this litigation, where all Plaintiffs challenge Apple's alleged restrictions on Apple Watch competitors, and Watch Plaintiff accuses Apple of monopolizing an alleged smartwatch market. Oura has vital information about the relevant market in which it and Apple compete, the supposed degree of power Apple exercises in that market, and its own practices toward interoperability, cross-platform usage, privacy, and security—all of which bear directly on Plaintiffs' allegations that Apple degrades Apple Watch competitors on iPhone, and that Apple's security and privacy rationales are purportedly a pretext for anticompetitive conduct.

Apple subpoenaed Oura in the first instance—prior to follow-on subpoenas from Plaintiffs—requesting relevant documents and data. Apple attempted to compromise by narrowing its requests, revising its search terms, and offering concessions on custodians and the time period of productions. But Oura has refused to further engage on those issues unless Apple first agrees to let it withhold broad categories of highly relevant information: (1) internal marketing, competitive, and pricing strategies for Oura's products; and (2) all non-public financial and usage information and data. The remaining disputes, which Oura has refused to discuss further unless Apple

[1] "Wearables" includes "Smartwatch[es]," as defined in the Complaints, as well as "fitness trackers, smart rings, and smart glasses." Ex. B at 6.

capitulates to letting Oura withhold these internal documents and data, include: (1) whether Oura must produce documents sufficient to show Oura's security and privacy practices; (2) whether Oura must review the custodial documents responsive to Apple's proposed searches; and (3) whether Oura must apply a date range of January 1, 2019 to present to its go-get productions.

Oura objects that its non-public financial data and internal documents it labels as "trade secrets" are too sensitive to produce. But this is the precise kind of information that is critical to Apple's defense. And the Discovery Confidentiality Orders ("DCOs") entered in these cases afford heightened protection to third parties, including an Outside Counsel Only designation barring Apple employees, including in-house counsel, from viewing highly confidential information—the protections third parties themselves requested to safeguard their records in this case. Apple respectfully requests this Court order Oura to produce all information Apple has requested.

## II. Background

Oura's flagship product is the Oura Ring, a popular smart ring that tracks users' health metrics and syncs them to companion apps on iPhone and Android. Ex. A at 4, 154–55. As Oura noted in a recent public filing, the "consumer wearable and digital health markets in which [Oura] operate[s] are competitive and rapidly evolving" with Oura "compet[ing] with a range of solutions, including general-purpose smartwatches and trackers offered by large technology companies such as Apple[.]" *Id.* at 165; *see id.* at 24 (noting Oura competes with, among others, "broad-based consumer electronics and technology companies that offer general-purpose smartwatches and fitness trackers"). Oura itself is a growing competitor in the wearables space, growing more than 120% in revenue from FY 2024 to FY 2025. *Id.* at 23.

The Government and MDL Plaintiffs allege that Apple unlawfully maintains monopolies over smartphones and, in the Watch Plaintiff's case, smartwatches. Three allegations related to wearables are particularly relevant here. *First*, Watch Plaintiff alleges that smartwatches are a distinct market, "not reasonably interchangeable" with other health and fitness trackers, yet he defines smartwatches by function, including collecting health and fitness data that is synced to a smartphone, which Oura Ring does. MDL Dkt. 86 ("DAWP Compl.") ¶¶ 23, 209–10. *Second*, all Plaintiffs allege that Apple undermines Apple Watch competitors' performance on iPhone by limiting their ability to exchange data with an iPhone in the "background" (while a user is on other apps) and receive or respond to messages or app notifications. *See* DAWP Compl. ¶¶ 131, 135–38, 149; DOJ Dkt. 51 ("DOJ Compl.") ¶¶ 98, 100–02; MDL Dkt. 87 ("DPP Compl.") ¶¶ 128, 131–33; MDL Dkt. 109 ("IPP Compl.") ¶¶ 131, 133–35. Watch Plaintiff further alleges that iPhone users cannot readily switch smartphones to avoid these limitations. DAWP Compl. ¶¶ 43, 216–17. *Third*, all Plaintiffs allege that Apple's security and privacy rationales are pretext for anticompetitive conduct, including conduct allegedly directed toward Apple Watch competitors. *See* DOJ Compl. ¶¶ 16, 141–47; DAWP Compl. ¶¶ 62–63, 149–52; DPP Compl. ¶¶ 12, 181–87; IPP Compl. ¶¶ 35, 181–87.

Apple's requests fall principally into six groups. *First*, RFPs 3, 4, 9, 11–13, and 17–18 seek documents showing the features of Oura's wearables and apps and how they connect to and sync data with iPhone and Android smartphones and health apps. *Second*, RFPs 14, 19, and 20 seek documents on how Apple and non-Apple platforms and products have affected Oura's wearables, apps, and business. *Third*, RFPs 7, 8, 15, 16, and 22 seek documents on competition between

Oura's wearables and other wearables, including Oura's internal competitive analyses, pricing strategies, and sales data. *Fourth*, RFPs 5, 6, and 10 seek financial and usage data, including prices, unit sales, revenue, and costs for Oura's wearables, apps, and subscriptions. *Fifth*, RFPs 21, 23, and 24 seek documents on customer switching between wearables (including Oura's) and Oura user switching between iPhone and Android smartphones. *Sixth*, RFP 25 seeks documents on the security, privacy, and reliability of Oura's wearables and apps. Ex. B at 10–17.

These requests call for documents central to Apple's defense. Each Plaintiff alleges Apple impairs products that compete with Apple Watch. *See* DAWP Compl. ¶¶ 3, 131; DOJ Compl. ¶ 100; DPP Compl. ¶ 131; IPP Compl. ¶ 133. Apple's requests about performance, connectivity, background operation, and syncing of Oura's wearables and companion apps on iPhone and Android (RFPs 4, 11–14, 17–18) test that allegation. Watch Plaintiff alleges Apple monopolizes a smartwatches (or narrower iOS-connected smartwatches) market that could exclude competing wearables like Oura Ring. DAWP Compl. ¶¶ 197, 210, 212–13, 219. Apple seeks evidence about whether Apple Watch, Oura Ring, and other products are substitutable, and belong in the same market, such as whether consumers buy Oura Ring instead of or alongside smartwatches, why they switch between Oura Ring and Apple Watch, and whether Oura Ring ownership affects one's ability to switch between iPhone and Android smartphones. RFPs 16, 21–24.

For months, Apple sought to engage with Oura to find a compromise. And Apple has reiterated it is not asking Oura to produce source code. In addition, to allay Oura's confidentiality concerns and mitigate any potential undue burden, Apple has (1) agreed that Oura may withhold or redact and log documents containing source code or discussing unreleased products; (2) offered to treat RFP 25—which requests documents concerning the security, privacy, and reliability of Oura's wearables and companion apps—as a "go-get," which Oura has accepted, and identified four areas for which it sought documents (two of which Oura has agreed to); (3) truncated its proposed search terms, reducing the total hits to 32,182 unique documents; and (4) agreed to narrow the scope of Oura's custodial searches to two custodians over limited time periods, *provided* that Oura produce go-gets (including data) from January 1, 2019, to present.

By contrast, Oura has refused to meaningfully negotiate. It categorically refuses search terms that in the aggregate yield more than 10,000 unique documents—far fewer than other third parties have agreed to—*and only if* Apple first accepts Oura's demand to withhold and log highly relevant internal documents related to Oura's marketing, competitive, and pricing strategies as well as non-public financial information. *Infra* Part III.A–B. Oura also continues to refuse to produce documents sufficient to show Oura's security and privacy practices for its wearables and companion apps, and Oura's policies governing third-party developers' access to Oura data in response to RFP 25.

Throughout these negotiations, Oura has objected to its significance as an Apple Watch competitor and its relevance to Apple's defense. Those objections contradict Oura's public statements and ignore Apple's right to discovery. *See* Fed. R. Civ. P. 26(b)(1).

## III. Argument

"The scope of discovery under the Federal Rules of Civil Procedure is broad." *In re Novo Nordisk Sec. Litig.*, 530 F. Supp. 3d 495, 501 (D.N.J. 2021). "Pursuant to Rule 45, a party may compel

production of documents within the 'possession, custody, or control' of non-parties." *Id.* Courts compel compliance with third-party subpoenas where the balance of relevance, need, confidentiality, and burden favors production. *See id.*; *Pontes v. Rowan Univ.*, 2024 WL 3507737, at *1 (D.N.J. July 23, 2024). The subpoenaing party first shows relevance under Rule 26(b)(1); the burden then shifts to the non-party to show a "clearly defined and serious injury" under Rule 45(d)(3); if it does so, the requesting party must show substantial need. *In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234, 238–39, 244 (E.D. Pa. 2014).

Apple respectfully requests the Court order that Oura: (1) produce marketing, pricing, and competitive strategy documents; (2) produce non-public financial and usage information and data; (3) produce documents sufficient to show Oura's security and privacy policies governing third-party developers' access to Oura data; (4) conduct custodial searches using Apple's search terms; and (5) produce go-gets and data from January 1, 2019, to present.

### A. Oura Should Produce Responsive Marketing and Pricing Strategies for Existing Products and Analyses of Its Competitive Strategy

The Court should compel Oura to produce internal documents regarding existing Oura products, including responsive marketing and pricing strategies, as well as analyses of its competitive strategy. Oura has refused to produce such documents if it considers them "trade secrets," which it appears to define as including all non-public information related to Oura's marketing, pricing, and competitive strategies—broad categories of documents responsive to many of Apple's RFPs. *See, e.g.*, RFP 5(d) (pricing); RFP 7 (decisions to develop or discontinue products and apps, "including any market research or competitive intelligence related to those decisions"); RFP 8 (forecasts and demand, pricing, and competition analyses); RFP 15 (pricing and pricing strategies); RFP 16 (competition); RFP 23 (switching between wearables); and RFP 24 (switching between iPhone and non-Apple Smartphones).[2] These internal documents Oura would withhold bear directly on the extent to which Oura's wearables compete with Apple Watch, a question Plaintiffs' market definition, market power, and conduct allegations put directly at issue.

To start, these documents are important to test the alleged relevant markets. Watch Plaintiff alleges an iOS-connected smartwatches market (or, alternatively, all smartwatches)—the latter of which is repeated by Indirect iPhone Plaintiffs, *see* IPP Compl. ¶ 30—and contends that smartwatches are "not reasonably interchangeable" with other health and fitness trackers. DAWP Compl. ¶¶ 197, 208–10, 216, 219, 224. Whether Plaintiffs' distinction between smartwatches and other wearables should define the relevant market turns on "the reasonable interchangeability of use or the cross-elasticity of demand." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Oura's competitive strategy analyses test Plaintiffs' smartwatch market boundaries. While Plaintiffs claim only "smartwatches" compose the relevant market, they define relevant products based on the ability to "collect health and fitness data that is synced to a smartphone"—functions Oura's rings also perform. DAWP Compl. ¶¶ 23, 209; Ex. A at 4, 155–58. In addition, Oura's public statements assert that Oura competes with the general-purpose smartwatches offered by Apple, Google, and Samsung. Ex. A at 165. That is inconsistent with Watch Plaintiff's allegations

[2] Oura objected on the basis of "trade secret" to RFPs 3–8 and 10–24 in an October 11, 2026 letter. Apple and Oura exchanged additional letters, which Apple is happy to provide, if helpful.

and is the kind of "industry or public recognition" relating to the appropriate definition of an alleged market. *See Brown Shoe*, 370 U.S. at 325. Oura's internal marketing, pricing, and competitive strategies and analyses likely speak to that point in greater detail than is publicly available, including as to the "peculiar characteristics and uses, distinct customers, distinct prices, [and] sensitivity to price changes" of Oura's and competitors' products. *Id.* at 327.[3]

Oura's competitive analyses also bear on Apple's challenged conduct. The Government and iPhone Plaintiffs allege that Apple's conduct impedes "wearables" and that many users say other devices linked to their iPhone "are the reason they do not switch to Android." *See* DOJ Compl. ¶¶ 98, 202, 208, 214, 221; DPP Compl. ¶¶ 128, 255, 263; IPP Compl. ¶¶ 131, 254. Oura's analyses of why its customers choose and switch among competitor wearables and among smartphones, and of how its wearables perform and are marketed on iOS versus Android, show whether wearables, like Oura's, contribute to the iPhone "lock-in" Plaintiffs allege. They also show whether the iOS limits Plaintiffs allege degrade Apple Watch competitors in a way that affects customer choice. *See* DOJ Compl. ¶¶ 98, 100. If Oura's rings compete successfully on both iPhone and Android, and other factors drive customers' smartphone and wearable choices, that undercuts Plaintiffs' theory that Apple impedes Apple Watch competitors or keeps iPhone users from switching.

Oura has cited an order in the *Pepper* Litigation to argue that Apple cannot show substantial need for Oura's competitive strategy analyses. This is misplaced. There, the court declined to compel Samsung's internal competitive assessments and marketing plans in part because there was "no dispute . . . as to the nuts and bolts of Apple and Samsung's competition." *In re Apple iPhone Antitrust Litig.*, 2020 WL 5993223, at *6 (N.D. Cal. Oct. 9, 2020) ("*Pepper*"). Here, Plaintiffs allege that there are relevant distinctions between smartwatches and wearables, like Oura Ring. DAWP Compl. ¶¶ 209–10; *see also* DOJ Compl. ¶ 95. Whether Oura's wearables compete with smartwatches, including with Apple Watch, is a central, disputed question. Oura's internal documents can show the extent to which its own pricing, positioning, and customer demand reflect substitution between rings and smartwatches (including not only Apple Watch, but Samsung, Google, and other wearables). *See New Mexico Oncology v. Presbyterian Healthcare Servs.*, 2016 WL 3452757, at *3 (D.N.M. May 10, 2016) (noting that "[w]ithout question, competitors' views and evaluation of the market are relevant to defining a market and evaluating market power" and requiring the production of certain third-party market plans and analyses).

Oura's confidentiality objections do not justify its refusal to produce this highly relevant information. Oura invokes Rule 45(d)(3)(B)(i), which permits courts to quash or modify a

---

[3] Oura has invoked the Special Master's August 18, 2026 Order to suggest non-smartwatch wearables are "not relevant to an antitrust action centered on alleged differences between Apple's treatment of Apple Watch and its treatment of third-party smartwatches." MDL Dkt. 284 at 14. But that Order resolved Plaintiffs' requests to Apple for documents about products such as CarPlay-connected vehicles and HomeKit devices, concluding that those products "do not relate to or interact with smartwatches." *Id.* at 3, 14. Oura's rings do relate: they perform the functions Plaintiffs use to define smartwatches and Plaintiffs put non-smartwatch wearables at issue and subpoenaed Oura on that exact subject. DAWP Compl. ¶¶ 23, 208–10; Ex. A at 165.

subpoena that requires "disclosing a trade secret or other confidential research, development, or commercial information." But the non-party invoking trade-secret protection still bears the burden of showing that production would cause harm *despite* a protective order. *See R.J. Reynolds Tobacco v. Philip Morris, Inc.*, 29 F. App'x 880, 882 (3d Cir. 2002) (rejecting non-party's trade secret objection given protective order). Here, Apple sought, and the Court ordered, robust protections, including stringent data security protocols, to protect the information Oura would withhold. Oura has not shown that the DCOs' protections, which provide Highly Confidential treatment for "trade secrets," "pricing information," "sales or marketing forecasts or plans," and "sales or marketing strategy," among other areas, and permit an Outside Counsel Only designation, are inadequate—especially where the requested materials do not include source code, large volumes of consumer PII, or other particularly sensitive information. DOJ DCO ¶¶ 2(i)–(j), 24 (Dkt. 235); MDL DCO ¶¶ 2(i)–(j), 24 (Dkt. 124). This falls far short of what Oura must show to avoid complying with the Subpoena. *See N.J. Physicians United Reciprocal Exch. v. Boynton & Boynton*, 2014 WL 12620806, at *3–4 (D.N.J. Apr. 29, 2014) (rejecting unsupported assertion that no protective order would suffice and compelling rival's presumed trade secrets with disclosure limited to outside counsel).[4]

The Court should therefore order Oura to produce responsive marketing and pricing strategies for existing, released products, and competitive strategy analyses.

### B. Oura Should Produce Non-Public Financial and Usage Information and Data

Oura also refuses to produce any non-public financial or usage information or data in response to RFPs 5, 6, 8, 10, 15, and 16, and has demanded to withhold and log as a "trade secret" all documents reflecting detailed or granular confidential financial information. Under these RFPs, Apple seeks revenue, units sold, active members, and subscriptions, broken out by smartphone operating system, product model, and country on a monthly or quarterly basis, plus Oura's pricing and promotion history maintained in the ordinary course. Apple asked Oura to identify ordinary-course data sources so the parties could agree on a reasonable production to satisfy these requests. Oura refused, questioning the worth of discussing the issue unless and until Apple accepted its proposals on other disputes. Oura does not contend that producing this information is burdensome. *See Cont'l Cas. Co. v. J.M. Huber Corp.*, 2017 WL 6492492, at *6 (D.N.J. Dec. 19, 2017) (requiring specific objections and harm). It asserts only that the discovery is unnecessary and raises confidentiality concerns. Neither objection withstands scrutiny.

The requested non-public financial and usage data from Oura are important to Apple's defense in three ways. *First*, they bear on whether Oura's wearables and Apple Watch compete. Watch Plaintiff claims Apple has kept Apple Watch prices artificially high without losing customers, that a smartwatch monopolist could profitably raise prices, and that Apple holds monopoly power. DAWP Compl. ¶¶ 192–95, 216, 224–26. Whether those claims hold up depends in part on how Apple Watch models affect Oura's prices and sales and how consumers view Oura's wearables as

[4] By contrast, in *UAB "Planner5D" v. Meta Platforms, Inc.*, which Oura has cited, Apple argued there was not a "true 'attorneys' eyes only'" designation for its confidential business information. Case No. 3:19-cv-03132-WHO (N.D. Cal.), ECF No. 363. The court ordered Apple to produce certain confidential information once an attorneys'-eyes-only order was in place. 2024 WL 2151704 (N.D. Cal. May 13, 2024).

alternatives to Apple Watch. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 435–37 (3d Cir. 2016) (finding cross-elasticity where defendants raised their price, their sales fell, and sales of competing products rose); *BanxCorp v. Bankrate, Inc.*, 847 F. App'x 116, 121 (3d Cir. 2021) (rejecting market definition where plaintiff's evidence lacked prices and demand for potential substitutes). For example, in *Covey Oil Co. v. Continental Oil Co.*, the court affirmed an order compelling non-party competitors to produce purchase and sale prices, and sales volumes because their price and volume "directly pertain" to the antitrust claims and the defenses to them, with competitive harm addressed through protective conditions. 340 F.2d 993, 997–99 (10th Cir. 1965).

*Second*, competitor sales are critical to accurately calculate market share. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) (identifying market share as a primary factor in assessing monopoly power); *Phila. Taxi Ass'n v. Uber Techs., Inc.*, 886 F.3d 332, 342 (3d Cir. 2018) (finding complaint failed to show defendant's share in the context of all competitors in the market). Oura's growth also suggests rivals may be able to enter and expand in the wearables space. *Dentsply*, 399 F.3d at 187 (identifying size and strength of competing firms, freedom of entry, and industry pricing trends as factors in assessing monopoly power); *Phila. Taxi*, 886 F.3d at 342 n.6 (explaining that easy entry indicates the absence of barriers protecting a dominant firm).

*Finally*, Oura's sales and active users by operating system show how Oura's wearables have grown between iPhone and Android users, testing, for instance, all Plaintiffs' claims that Apple makes Apple Watch competitors work worse on iPhone. DAWP Compl. ¶¶ 131, 152; DOJ Compl. ¶ 100; DPP Compl. ¶ 131; IPP Compl. ¶ 133. Data showing robust usage of the Oura Ring across both operating systems would cast doubt on the theory that Apple somehow degrades third-party Apple Watch competitors' performance on iOS. Courts "routinely" order this kind of competitor discovery in antitrust litigation. *See, e.g.*, *In re Novartis & Par Antitrust Litig.*, 2019 WL 5722055, at *6 (E.D. Pa. Nov. 5, 2019) (ordering production of non-party's confidential sales data and observing that information is "routinely produced"); *United States v. Am. Optical Co.*, 39 F.R.D. 580, 584–86 (N.D. Cal. 1966) (ordering production of non-party competitor's sales, pricing, and financial information where monopolization defendants sought to show the market was competitive). For example, in *Pepper*, the court ordered third-party Samsung to produce non-public usage and revenue data for its Galaxy Store and other app marketplaces as the data would show competition among app marketplaces, was unavailable elsewhere, and posed no substantial risk of competitive harm. 2020 WL 5993223, at *7–8.

With respect to confidentiality, the DCOs are in place to address Oura's concerns. DOJ DCO ¶¶ 2(i)–(j), 6; MDL DCO ¶¶ 2, 6–7, 24, 27 (presuming Highly Confidential treatment for, among other things, trade secrets, pricing, financial, and sales information; providing an Outside Counsel Only tier and a mechanism for additional protection). Courts have held that protective orders are sufficient to address such concerns. *See, e.g.*, *Novartis*, 2019 WL 5722055, at *4–5, *10–11 (sales data production limited to outside counsel); *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *5–6 (E.D. Pa. Jan. 31, 2012) (option to mark "business information, including sales data, pricing methodology, market share and customer lists" as "Highly Confidential—For Attorney's Eyes Only" provided "adequate protection" for confidentiality concerns). The protections offered here are no less robust, and Oura has identified no facts unique to this case to justify withholding. Apple is entitled to the non-public financial and usage data

relevant to contesting Plaintiffs' proposed market definitions and allegations about Apple's supposed conduct. DOJ DCO ¶¶ 2(i)–(j), 24, 27; MDL DCO ¶¶ 2(i)–(j), 24, 27.

The Court should therefore order Oura to produce non-privileged and non-public financial or usage data and information in response to RFPs 5, 6, 8, 10, 15, and 16, and any other responsive documents reflecting detailed or granular confidential financial information.

### C. Oura Should Produce Security, Privacy, and Reliability Documents

The remaining substantive dispute is narrow: whether Oura must produce certain categories of security, privacy, and reliability documents in response to RFP 25. Oura has accepted Apple's offer to treat RFP 25 as a go-get request, but has refused to produce two critically important categories of documents: (1) documents sufficient to show Oura's general security and privacy practices for its wearables and companion apps; and (2) Oura's policies governing third-party developers' access to Oura data.[5] Oura has cited no burden for obtaining these go-get requests, insisting that Oura documents regarding security, privacy, and reliability are irrelevant and disproportionate to the needs of the case. To the contrary, documents showing Oura's security and privacy practices for its wearables and companion apps and Oura's policies governing third-party developers' access to Oura data are central to Apple's defense.

Both the Government and MDL Plaintiffs allege that Apple's security, privacy, and reliability rationales are pretextual. The Government and iPhone Plaintiffs plead that Apple uses them as "an elastic shield that can stretch or contract to serve Apple's financial and business interests" and allege that "the pretextual nature of any claim that Apple's conduct is justified by protecting user privacy or security." *See* DOJ Compl. ¶¶ 16, 147; DPP Compl. ¶¶ 12, 187; IPP Compl. ¶¶ 35, 187. Watch Plaintiff alleges that Apple "has a well-established history of using alleged security concerns to impose anticompetitive restrictions," that its limits on background execution "serve no procompetitive purpose" and are "not technologically necessary," and that there is no procompetitive justification for some of its notification restrictions. *See* DAWP Compl. ¶¶ 62 n.10, 144, 149, 152. Apple's defense is that those limits are legitimate and that security, privacy, and reliability are dimensions on which wearables, like the Oura Ring and Apple Watch, compete.

Documents showing how a major wearable maker, like Oura, endeavors to protect health data on iPhone and Android, how successful those protections are, and how it markets those attributes against Apple Watch and other wearables bear directly on whether Apple's justifications are "reasonable and consistent with current industry practice." *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 996 (9th Cir. 2020); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985–87 (9th Cir. 2023) (discussing the importance of security and privacy to consumers of Apple and competitor products). These documents also bear on whether less restrictive alternatives could preserve Apple's security and privacy protections. Oura's policies governing who may access users' health data, and on what conditions, can help test whether broader, third-party access could provide

---

[5] Oura has agreed to produce the following for RFP 25: (1) analyses comparing the security, privacy, or reliability of Oura's products or companion apps on iOS versus Android; and (2) documents reflecting reliability concerns with Oura's products or companion apps, including connectivity and data-sync issues, when used with iPhone versus non-Apple smartphones.

comparable protection and what safeguards it would require. *See Epic Games*, 67 F.4th at 990–91.

For example, applying *Qualcomm*, the court in *Pepper* ordered non-party Samsung to produce its app-review policies and procedures, which documented Samsung's approaches to mobile security and privacy, finding they were "the sort of information which Samsung is uniquely able to provide." 2020 WL 5993223, at *10. Oura has argued that pretext depends on what Apple knew and what Apple believed. But the court ordered production even as to Samsung's practices that "were unknown to Apple when it designed the policies at issue." *Id.* Oura's argument overlooks that Apple seeks these documents to evaluate less restrictive alternatives, an inquiry that does not rely on Apple's knowledge when it adopted the challenged restrictions. Regarding confidentiality, to the extent Oura contends these high-level policy documents are sensitive, the DCOs provide any necessary protection. *See supra* Part III.A.

The Court should therefore order Oura to produce (1) documents sufficient to show Oura's security and privacy practices for its wearables and companion apps; and (2) Oura's policies governing third-party developers' access to Oura data in response to RFP 25.

### D. Oura Should Conduct a Custodial Review Using Apple's Search Terms

Oura has failed to meet its burden in demonstrating that Apple's search terms from October 22, 2026, across two custodians resulting in 32,182 additional documents to those requested by Watch Plaintiff, impose an undue burden disproportionate to the needs of this case. Oura, as the party resisting discovery, "bears the burden of showing specifically how the request is burdensome." *See Kelly v. City of Paterson*, 2021 WL 2821175, at *2 (D.N.J. July 7, 2021).

Oura objects to producing these documents because Apple's search terms reach beyond Watch Plaintiff's terms. This is illogical. Discovery extends to "any nonprivileged matter that is relevant to any party's claim or *defense*," Fed. R. Civ. P. 26(b)(1) (emphasis added), and Apple's requests (which were served prior to those of Watch Plaintiff) go directly to its defenses, including interoperability performance on iOS versus Android, switching, reliability, security, and privacy—topics Watch Plaintiff has no reason to search for. Oura cannot "dictate the scope of discovery based on [its] own view of the parties' respective theories of the case," *Penn Eng'g & Mfg. Corp. v. Peninsula Components, Inc.*, 2023 WL 4139375, at *4 (E.D. Pa. June 22, 2023) (quotation omitted), much less adopt the view of the parties suing Apple.

Oura's second assertion—that a review of 32,182 documents is unduly burdensome—fares no better. Proportionality weighs burden against the importance of the issues and the importance of the discovery in resolving them. Fed. R. Civ. P. 26(b)(1); *see also E.S. by & through Sanchez v. Elizabeth Bd. of Educ.*, 2022 WL 2106382, at *4 (D.N.J. June 10, 2022). Here, Oura's showing consists of a document count and a cost estimate: about $70,000 for contract reviewers and more than $200,000 for outside counsel to manage and oversee that review. This alone is an insufficient showing of burden. *See, e.g.*, *In re Wesco Distribution, Inc.*, 2013 WL 432932, at *2 (W.D. Pa. Feb. 4, 2013) (non-party "may not rely upon averments of counsel alone" but must "show how the subpoena is burdensome"). Oura is not a small player in this space—it witnessed roughly $908 million in revenue in FY 2025 and has already seen over $1.2 billion in revenue in the nine months ended June 30, 2026, Ex. A at 18, 23, and these costs are dwarfed by what other third parties have agreed to undertake. Apple's requests are reasonable, proportionate, and highly relevant to Apple's

needs: defending a multidistrict antitrust litigation allegedly impacting "hundreds of millions of Americans every day." DOJ Compl. ¶ 18.[6] *Supra* Part III.A–C.

The Court should therefore order Oura to run Apple's search terms across the collections of Oura's Chief Operating Officer and Chief Marketing Officer for their tenures at Oura (April 2019 and October 2022, respectively) to the collection date and produce non-privileged documents.

### E. Oura Should Produce Go-Get Documents and Data from 2019 to Present

Apple has agreed that custodial collections for Oura's two custodians may start at the beginning of their tenures, provided that Oura's go-get collections (including for data) begin on January 1, 2019, not January 1, 2021, the date Oura chose as consistent with the applicable limitations period. The limitations period does not automatically set the temporal scope of discovery in an antitrust case, *see Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 218 (D. Del. 1985), and the Watch Plaintiff's subpoena to Oura runs from January 1, 2014.

The pleadings put 2019 squarely at issue. Watch Plaintiff alleges that "[i]n 2019 alone, Apple slashed the time available for background execution by 83%," that iOS 13 introduced the BackgroundTasks framework and Low Power Mode, which restrict background execution by companion apps, and that after iOS 13, competitor smartwatches could not receive notifications unless iPhones displayed previews, a change Apple justified on privacy grounds. *See* DAWP Compl. ¶¶ 135–36, 145, 149; *id.* ¶¶ 137–38, 159–60, 184. The Government and iPhone Plaintiffs make similar allegations dating back to 2019. *See* DOJ Compl. ¶¶ 98, 102; DPP Compl. ¶¶ 128, 133; IPP Compl. ¶¶ 131, 135. The start date is particularly important for the data requests, which seek Oura's units, active members, and revenue by operating system and model (RFPs 5, 6, 10), and its pricing history (RFP 15). These data show if sales and engagement on iPhone, relative to Android, were disrupted when iOS 13 arrived, and if Oura changed its prices in response. A 2021 cutoff would exclude the year Plaintiffs identify as the turning point and the prior months that supply the baseline against which any effect is measured.

The Court should therefore order Oura to collect and produce non-privileged go-get documents and data in response to RFPs 3, 4, 5, 6, 10, 15, and 25.[7]

## IV. Conclusion

Apple respectfully requests that the Court overrule Oura's objections and order Oura to produce the documents and data requested herein.

Respectfully submitted,

cc: All Counsel of Record (via ECF)

*/s/Liza M. Walsh*
Liza M. Walsh

---

[6] Oura has cited a copyright case, *UAB "Planner5D"*, to suggest that even "reviewing 10,000 documents is excessive for a third party." 2024 WL 2151704, at *2. But *UAB*'s finding was case specific: many of the 10,000 documents were nonresponsive and only 700 hit on the relevant dataset. *Id.*

[7] Oura and Apple have agreed that RFP 25 can be treated as a go-get request.

**Appendix A: Exhibits Cited**

| Exhibit | Description |
|---|---|
| A | Excerpted Pages from Oura Inc., Amendment No. 1 to Registration Statement (Form S-1) (filed Sept. 21, 2026), https://www.sec.gov/Archives/edgar/data/2133022/000119312526381855/d119865ds1.htm |
| B | Apple Inc.'s Amended Subpoenas to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, directed to Ouraring Inc. in *United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J.), and in In re Apple Inc. Smartphone Antitrust Litigation, No. 2:24-md-03113 (D.N.J.) (July 13, 2026), each with Schedule A (Requests for Production Nos. 1–25). Subpoena exhibits excluded. |