# EXHIBIT 1

CONN KAVANAUGH
ATTORNEYS AT LAW

Hannah Y. Amadei
Senior Counsel
hamadei@connkavanaugh.com

October 6, 2026

*Via E-mail*

Matt Gold
MoloLamken LLP
300 North LaSalle Street
Chicago, IL 60654
mgold@mololamken.com

Kristopher Morton
Sarah Childs
Kirkland & Ellis LLP
95 South State Street
Salt Lake City, UT 84111
Kristopher.morton@kirkland.com
Sarah.childs@kirkland.com

**Re: Connectivity Standards Alliance |**
***In re Apple Watch Antitrust Litigation***

Dear Counsel:

I write on behalf of the Connectivity Standards Alliance (the "Alliance") with an update on the Alliance's efforts to respond to the subpoenas served on it in the above-referenced action as well as to provide additional background information about the Alliance. As you are already aware, the Alliance is a non-profit organization with approximately 35 employees, that enables Member companies across the globe to collaborate and develop standards for smart home devices. To be clear, the Alliance employees do not develop any standards, Alliance Members develop standards. The Alliance merely provides the platform and structure for Alliance Members to develop standards; the Alliance's role is to facilitate and support the work of the membership.

For that reason, the Alliance does not have internal "managers" or departments assigned to manage individual Members (*e.g.*, there is no internal Alliance employee responsible specifically for Apple or any other Alliance Member). Nor is there a single uniform or formal communication process between the Members and the Alliance. Members may contact the Alliance, but they do so at their option; communications are neither centralized nor routed through any single office or person. In fact, Alliance Members can and often do communicate directly with each other on Alliance-related matters, without using Alliance systems or, for example when using email, without copying any Alliance employee. These features of the

Alliance's structure directly affect where responsive materials reside and how they can be located.

With this background, the Alliance and its membership use a document repository system called Causeway. From our experience, Causeway is old software which does not have a sophisticated, modern search capability. Given the size of the repository and the fact that the subpoenas reach back approximately fourteen years, there is no reasonable way for the Alliance to perform an *en masse* export of the Causeway data. Additionally, the costs to process data spanning fourteen years, and then to host and review that volume, would impose a significant burden on the Alliance, a non-party. Therefore, the Alliance has not been able to collect or run the parties' proposed search terms against Causeway due to these limitations.

However, Causeway is a Member-driven repository. The Members, including Apple, have direct access to folders and documents in Causeway. In fact, with respect to standards development, the Members, not the Alliance, decide which folders and documents are created in Causeway. Therefore, many, if not all, of the documents that are being sought from the Alliance are equally available to Apple to collect and produce to the Watch Plaintiffs. In this regard, the Alliance proposes the parties seek documents relating to Apple's work with the Alliance through document requests directed to Apple, who are better positioned, and more knowledgeable about where documents related to the standards-development work are maintained in Causeway. Any documents collected from Causeway would be subject to appropriate confidentiality protections and attorney-client privilege review by the Alliance, which privilege is not waived.

Separately, collecting custodial email over a fourteen-year period is not proportional, and particularly burdensome to a very small, non-profit organization. As explained above, the Alliance has no managers or departments responsible for particular Members, so there is no defined set of custodians that maps neatly onto the subpoenas' subject matter.

The Alliance requests the parties agree to narrow the subpoenas in two respects: temporally and by subject matter. With respect to temporal limitation, the subpoenas seek roughly fourteen years of materials. Apple, however, did not join the Alliance until 2019. A fourteen-year reach is therefore overbroad and unduly burdensome as applied to a non-party, and much of the requested period predates any involvement by Apple with the Alliance at all. We propose that the relevant period begin in 2019, when Apple became a Member.

We also propose to narrow the parties' search strings. In our view, standards for smart home devices, which are the Alliance's focus, are not part of the allegations. The current search strings nonetheless reach broadly into that smart-home subject matter, and our proposed edits remove those terms which effectively reach everything

the Alliance does and are not meaningful limitations, while connecting the search specifically to the Apple Watch and wearables. Our proposed search string is attached for your review. We would run these searches against our Office 365, Google Drive, and Slack systems.

We are prepared to discuss this at the parties' next meet-and-confer on Wednesday, October 7, 2026. We appreciate the parties' consideration and look forward to continuing our discussions. I must continue to reserve all rights.

Regards,

s/Hannah Y. Amadei

**Connectivity Standards Alliance**

*In re Apple Inc. Smartphone Antitrust Litigation* (MDL 24-md-3113) and *United States v. Apple Inc.* (24-cv-4055), D.N.J.

| Parties' Joint Proposed Search Terms (Watch Plaintiffs/Apple) | The Alliance's Proposal |
|---|---|
| 1. ("Apple" OR "iOS*" OR "Android" OR "Wear OS" OR "@apple.com" OR (iPhone NOT W/1"sent from my")) OR phone* OR smartphone* OR "smart phone*" OR Samsung* OR Galaxy* OR Pixel* OR Google* OR Amazon* OR mobile OR "performance phone*" OR watch* OR smartwatch* OR "smart watch*" OR band* OR "fitbit*" OR "Pixel Watch*" OR "Galaxy Watch*" OR HTC OR Nexus OR (watch* AND (Apple* OR Samsung* OR Google* OR Android*)) OR "digital wallet*" OR ((digital OR virtual OR mobile*) AND (google* w/2 (wallet* OR pay*)))) <br><br> AND ((IoT OR "internet of things" OR Zigbee OR OTT OR "over the top" OR SMS OR "short message service*" OR MMS or"multimedia messaging service*" OR RCS OR "rich communication service*" OR API OR "Application Programming Interface" OR DPLA OR "Developer Program License Agreement!" OR "iOS and iPadOS Software License Agreement" OR "App Store" OR "iMessage*" OR "Wear OS*" OR "wearOS*" OR "iOS Agreement" OR WhatsApp* OR facebook OR telegram* OR text OR texts OR "cross-platform" OR "cross platform") <br><br> w/20 ("agree*" OR "contract*" OR "interop!" OR "compat!" OR "diminish*" OR "iOS Connected" OR "connect!" OR "degrad!" OR "compet!" OR "disrupt!" OR "facilitat*" OR "assist*" OR "support*" OR | 1. ("Apple" OR "iOS*" OR "Android" OR "Wear OS" OR "@apple.com" OR (iPhone NOT W/1"sent from my")) ~~OR phone* OR smartphone* OR "smart phone*" OR~~ Samsung* OR Galaxy* OR Pixel* OR Google* OR Amazon* ~~OR mobile OR "performance phone*"~~ OR watch* OR smartwatch* OR "smart watch*" OR band* OR "fitbit*" OR "Pixel Watch*" OR "Galaxy Watch*" OR HTC OR Nexus OR (watch* AND (Apple* OR Samsung* OR Google* OR Android*)) OR "digital wallet*" OR ((digital OR virtual OR mobile*) AND (google* w/2 (wallet* OR pay*)))) <br><br> AND ((~~IoT OR "internet of things" OR Zigbee OR~~ OTT OR "over the top" OR SMS OR "short message service*" OR MMS or"multimedia messaging service*" OR RCS OR "rich communication service*" OR API OR "Application Programming Interface" OR DPLA OR "Developer Program License Agreement!" OR "iOS and iPadOS Software License Agreement" OR "App Store" OR "iMessage*" OR "Wear OS*" OR "wearOS*" OR "iOS Agreement" OR WhatsApp* OR facebook OR telegram* OR text OR texts OR "cross-platform" OR "cross platform") <br><br> w/20 (~~"agree*" OR "contract*" OR "interop!" OR "compat!" OR~~ "diminish*" OR "iOS Connected" OR ~~"connect!" OR~~ "degrad!" OR "compet!" OR "disrupt!" OR ~~"facilitat*" OR "assist*" OR "support*" OR "enabl*" OR~~ |

| | |
|---|---|
| "enabl*" OR "allow*" OR "background execut*" OR "BackgroundTasks" OR "Low Power Mode" or"limit!" OR "text*" OR "reply" OR "send" OR "updat!" OR "companion*" OR "sister*" OR "sideload!" OR "SMS" OR "RCS" OR "Cell!" OR "Phone Number Sharing" OR "Number Twin*" OR "Phone Mirror*" OR "Notification Center Service" OR "ANCS" OR "BLE" OR "bluetooth*" OR "Notification Forwarding" OR "passbook*" OR "wallet*" OR "Near-field Communication*" OR "NFC" OR "App Review!" OR "delay*" OR "HealthKit*" OR "privacy warning screen*" OR "scare screen!" OR "beeper" OR "wearable*" OR "smart ring" OR "smartring" OR "ring" OR "privacy" OR "security" OR perform* OR "side load*" OR malic* OR malwar* OR (dev* w/3 (verif* OR consol*)) OR scam* OR imperson* OR threat* OR vulnerab* OR attack* OR virus* OR "risk assess*" OR pirat* OR function* OR viab* OR "Amazon Appstore*" OR "Amazon Underground*" OR "Android Market*" OR Aptoide* OR "Blackberry World*" OR "Chrome Web Store*" OR "Epic Games Store*" OR "Microsoft Store*" OR "Samsung Galaxy Store*" OR Steam* OR "Windows Phone Store*" OR appstore*)<br><br>2. "matter standard"<br><br>3. "Apple" w/20 "matter standard"<br><br>4. "@apple.com" | ~~"allow*" OR~~ "background execut*" OR "BackgroundTasks" OR "Low Power Mode" or "limit!" ~~OR "text*" OR "reply" OR "send" OR "updat!"~~ OR "companion*" OR "sister*" OR "sideload!" OR "SMS" OR "RCS" ~~OR "Cell!"~~ OR "Phone Number Sharing" OR "Number Twin*" OR "Phone Mirror*" OR "Notification Center Service" OR "ANCS" OR "BLE" OR "bluetooth*" OR "Notification Forwarding" OR "passbook*" OR "wallet*" OR "Near-field Communication*" OR "NFC" OR "App Review!" OR "delay*" OR "HealthKit*" OR "privacy warning screen*" OR "scare screen!" OR "beeper" OR "wearable*" OR "smart ring" OR "smartring" OR "ring" ~~OR "privacy" OR "security" OR perform*~~ OR "side load*" OR malic* OR malwar* OR (dev* w/3 (verif* OR consol*)) OR scam* OR imperson* OR threat* OR vulnerab* OR attack* OR virus* OR "risk assess*" OR pirat* ~~OR function* OR viab* OR~~ "Amazon Appstore*" OR "Amazon Underground*" OR "Android Market*" OR Aptoide* OR "Blackberry World*" OR "Chrome Web Store*" OR "Epic Games Store*" OR "Microsoft Store*" OR "Samsung Galaxy Store*" OR Steam* OR "Windows Phone Store*" OR appstore*)<br><br>~~2. "matter standard"~~<br><br>~~3. "Apple" w/20 "matter standard"~~<br><br>~~4. "@apple.com"~~ |

**Connectivity Standards Alliance**

*In re Apple Inc. Smartphone Antitrust Litigation* (MDL 24-md-3113) and *United States v. Apple Inc.* (24-cv-4055), D.N.J.

| | |
|---|---|
| 5. ("connectivity" OR "matter standard" OR "IoT" OR "internet of thing!" or "market") w/20 (Apple) | 5. ("connectivity" OR "matter standard" OR "IoT" OR "internet of thing!" or "market") w/20 (Apple) |
| 6. (Apple OR "@apple.com" OR AAPL OR (iPhone NOT W/1"sent from my") OR phone* OR smartphone* OR "smart phone*" OR Android* OR Samsung* OR Galaxy* OR Google* OR Amazon* OR Pixel* OR mobile OR "performance phone*" OR wear* OR watch* OR smartwatch* OR "smart watch*" OR band* OR "fitbit*" OR "Pixel Watch*" OR "Galaxy Watch*" OR HTC OR Nexus OR (watch* AND (Apple* OR Samsung* OR Google* OR Android*)) OR "digital wallet*" OR ((digital OR virtual OR mobile*) AND (google* w/2 (wallet* OR pay*))) OR iPad* OR "Apple Watch" OR watchOS OR HomeKit OR HomePod* OR "Apple Home" OR "Apple TV" OR tvOS OR AirTag* OR AirPod* OR "Find My" OR Siri OR CarPlay)<br><br>AND (IoT OR "Internet of Things" OR "smart home*" OR "connected home*" OR "home automation" OR "smart device*" OR "connected device*" OR wearable* OR "smart speaker*" OR "smart display*" OR "smart thermostat*" OR "smart lock*" OR "smart light*" OR "smart plug*" OR "smart appliance*" OR Zigbee OR "Z-Wave" OR ZWave OR "Connectivity Standards Alliance" OR "Zigbee Alliance" OR "Project CHIP" OR "Connected Home over IP" OR "NB-IoT" OR "LTE-M" OR (Matter W/5 (standard*OR protocol* OR certif* OR device* OR ecosystem* OR interoperab* OR smart OR | 6.2.(Apple OR "@apple.com" OR AAPL OR (iPhone NOT W/1"sent from my") OR phone* OR smartphone* OR "smart phone*" OR Android* OR Samsung* OR Galaxy* OR Google* OR Amazon* OR Pixel* OR mobile OR "performance phone*" OR wear* OR watch* OR smartwatch* OR "smart watch*" OR band* OR "fitbit*" OR "Pixel Watch*" OR "Galaxy Watch*" OR HTC OR Nexus OR (watch* AND (Apple* OR Samsung* OR Google* OR Android*)) OR "digital wallet*" OR ((digital OR virtual OR mobile*) AND (google* w/2 (wallet* OR pay*))) OR iPad* OR "Apple Watch" OR watchOS OR HomeKit OR HomePod* OR "Apple Home" OR "Apple TV" OR tvOS OR AirTag* OR AirPod* OR "Find My" OR Siri OR CarPlay)<br><br>AND (IoT OR "Internet of Things" OR "smart home*" OR "connected home*" OR "home automation" OR "smart device*" OR "connected device*" OR wearable* OR "smart speaker*" OR "smart display*" OR "smart thermostat*" OR "smart lock*" OR "smart light*" OR "smart plug*" OR "smart appliance*" OR Zigbee OR "Z-Wave" OR ZWave OR "Connectivity Standards Alliance" OR "Zigbee Alliance" OR "Project CHIP" OR "Connected Home over IP" OR "NB-IoT" OR "LTE-M" OR (Matter W/5 (standard*OR protocol* OR certif* OR device* OR ecosystem* OR interoperab* OR smart OR CSA)) OR |

| | |
|---|---|
| CSA)) OR (Thread W/5(protocol* OR network* OR "border router*" OR mesh OR standard* OR "Thread Group")) OR ((Bluetooth OR BLE OR "Wi-Fi" OR WiFi OR "ultra-wideband" OR UWB OR NFC OR 5G OR cellular OR mesh)<br><br>W/15 (standard* OR protocol* OR interoperab* OR certif* OR specification* OR connectivity OR ecosystem*))) | ~~(Thread W/5(protocol* OR network* OR "border router*" OR mesh OR standard* OR "Thread Group")) OR ((Bluetooth OR BLE OR "Wi-Fi" OR WiFi OR "ultra-wideband" OR UWB OR NFC OR 5G OR cellular OR mesh)~~<br><br>W/~~15~~ 5 (standard* OR protocol* OR interoperab* OR certif* OR specification* OR connectivity OR ecosystem*))) |
| 7. (member* OR partner* OR Verizon* OR Samsung* OR LG* OR Google* OR Amazon* OR standard*)<br><br>AND ((limit* OR curtail* OR barrier* OR harm* OR undermine* OR obstruct* OR lessen* OR proposal*)<br><br>W/20 (interop* OR compatib* OR connectivity OR standard* OR specification*)) OR "pain point*" OR "cross platform*" OR "cross- platform*" OR "cross device*" OR "cross- device*" | ~~7.~~3.(~~member* OR partner* OR~~ Verizon* OR Samsung* OR LG* OR Google* OR Amazon*~~ OR standard*~~)<br><br>AND ((limit* OR curtail* OR barrier* OR harm* OR undermine* OR obstruct* OR lessen*~~ OR proposal*~~)<br><br>W/20 ~~(interop* OR compatib* OR connectivity OR standard* OR specification*)) OR~~ "pain point*" OR "cross platform*" OR "cross- platform*" OR "cross device*" OR "cross- device*" |

# EXHIBIT 2

MOLOLAMKEN

Matthew E. Gold
MoloLamken LLP
300 North LaSalle Street
Chicago, IL 60654
T: 312.450.6711
mgold@mololamken.com
www.mololamken.com

July 24, 2026

Connectivity Standards Alliance
c/o Amy Tsui
508 2nd Street, Suite 109B
Davis, CA 95616

Re: *In re: Apple Inc. Smartphone Antitrust Litigation*, 2:24-md-03113-JXN-LDW (D.N.J.)

Counsel for Connectivity Standards Alliance:

Attached please find a subpoena issued to your company in connection with the above referenced matter. You are required to respond as specified in the attached subpoena. As described in the subpoena and as directed by the Court's Discovery Confidentiality Order in this matter, you are requested, among other things, to stamp each document with a production number and to produce documents in accordance with the applicable ESI protocol and Discovery Confidentiality Order entered in this matter. *See* Amended Complaint (Exhibit A); *see also* Proposed ESI Protocol, ECF No. 100-2 (Exhibit B); Discovery Confidentiality Order, ECF No. 124 (Exhibit C); Joint Scheduling & Case Management Order, ECF No. 142 (Exhibit D); Amended Scheduling Order, ECF No. 175 (Exhibit E).

Thank you for your time, attention, and assistance. Please do not hesitate to contact me if you have any questions or concerns.

Sincerely,

/s/ Matthew E. Gold

**Matthew E. Gold**
MOLOLAMKEN
300 N. LaSalle Street
Chicago, IL 60654
T: (312) 450-6711
M: (312) 339-8259
mgold@mololamken.com
www.mololamken.com

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

In re: Apple Inc. Smartphone Antitrust Litigation
*Plaintiff*
v.

*Defendant*

Civil Action No. 2:24-md-03113-JXN-LDW

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: Connectivity Standards Alliance c/o Amy Tsui, 508 2nd Street, Suite 109B, Davis, CA 95616

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: First Legal Records<br>1000 G Street, Suite 120<br>Sacramento, CA 95814 | Date and Time:<br>08/24/2026 9:00 am |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 7/24/2026

*CLERK OF COURT*

OR

/s/ Matthew E. Gold

*Signature of Clerk or Deputy Clerk* *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Joseph Giamanco and Direct Apple Watch Purchasers, who issues or requests this subpoena, are:

Matthew E. Gold, 300 North LaSalle Street, Chicago, IL 60654, mgold@mololamken.com, 312-339-8259

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 2:24-md-03113-JXN-LDW

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ____________
______________________________________________
______________________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________
______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# SCHEDULE A

## DEFINITIONS

1. The definitions, instructions, words, and phrases used in the Requests shall have the meanings ascribed to them under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of New Jersey. The definitions referenced herein apply without regard to capitalization. In addition, the following terms shall have the meanings set forth below whenever used in any Request.

2. The use of the singular includes the plural and vice versa.

3. The use of a verb in any tense shall be construed as the use of the verb in all other tenses, as necessary, to bring within the scope of the Requests all responses that might otherwise be construed to be beyond their scope.

4. "Agreement" means any oral, written, or implied contract, arrangement, understanding, or plan, or term thereof, whether formal or informal, between two or more Persons, together with all modifications or amendments.

5. "Aliro" means the access credential protocol for unlocking doors via smartphones developed by the Connectivity Standards Alliance.

6. "All," "any," and "each" shall be construed as encompassing "any and all."

7. "Alleged Conduct" shall mean all conduct alleged in the Direct Apple Watch Purchaser Complaint and any component thereof.

8. The terms "and" and "or" are to be construed either disjunctively or conjunctively, whichever is appropriate in each instance so as to bring within the scope of each of these Requests any information that might otherwise be considered beyond that scope.

9. “Application Programming Interfaces” or “APIs” means application programming interfaces.

10. “App” means a software program or programs designed to run on a computing device.

11. “App Review Guidelines” means Apple’s App Review Guidelines, all predecessor and successor guidelines, and all attachments, schedules, and exhibits to the App Review Guidelines.

12. “App Store” means the digital store that Apple operates to offer iOS Apps for digital distribution.

13. “Apple Inc.,” “Apple,” or “Defendant” means Apple Inc. and its predecessor and successor entities, officers, directors, parents, subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, or other persons acting or authorized to act on its behalf.

14. “Apple Watch” means any Smartwatch developed by Apple, including, but not limited to, the first generation Apple Watch, Apple Watch Series 1, Apple Watch Series 2, Apple Watch Series 3, Apple Watch Series 4, Apple Watch Series 5, Apple Watch SE (first generation), Apple Watch Series 6, Apple Watch Series 7, Apple Watch Series 8, Apple Watch SE (second generation), Apple Watch Ultra, Apple Watch Series 9, Apple Watch Ultra 2, Apple Watch Ultra 3, Apple Watch SE (third generation), Apple Watch Series 10, and Apple Watch Series 11.

15. “Background Execution” means the execution of a task, performance of a function, or processing of data by an App on a smart device when the App is operating in the background or in a suspended state, as opposed to in the foreground.

16. "Communication" shall mean any exchange or transmission of words or ideas to another Person or entity, whether accomplished Person to Person, by telephone, in writing, via electronic mail or text message, via social media, or through any other medium, and shall include discussions, conversations, negotiations, conferences, meetings, speeches, memoranda, letters, correspondence, notes, blogs, postings, statements, and questions.

17. The terms "concern," "concerning," "reflect," "reflecting," "relate," "relating to," "refer," "referring to," "regard," and "regarding" mean, without limitation, constituting, comprising, containing, embodying, reflecting, referring to, identifying, stating, dealing with, for use in, commenting on, responding to, describing, analyzing, or in any way pertaining to, or in any way being relevant, in whole or in part, to the particular subject matter identified.

18. "Copies" means all copies of any documents that are not identical in every respect to the documents being produced.

19. "Direct Apple Watch Purchaser Complaint" means the First Amended Class Action Complaint filed by Direct Apple Watch Purchaser Plaintiffs in *Giamanco v. Apple Inc.*, 24-cv-7238-JXN-LDW (D.N.J.), Dkt. No. 86, attached hereto as Exhibit A

20. "Document" is to be given the broadest meaning contemplated by Federal Rule of Civil Procedure 34(a)(1)(A) and includes, without limitation, any electronically or physically stored information or Communications, including, but not limited to, written, recorded, printed, or graphic matter, whether produced, reproduced, or stored on paper, cards, film, audio or video tapes, computer storage device, Source Code, software code, and other types of code, or any other media of any kind, whether sent or received or neither, including, but not limited to, originals, copies (with or without notes or changes), drafts, appendices, schedules, exhibits, attachments, and things similar to the foregoing however denominated by You, in the possession,

custody or control of You, or of any officer, agent, employee, representative, counsel, or other person acting or purporting to act for or on behalf of You or in concert with You.

21. "DPLA" means the Apple Developer Program License Agreement, all predecessors and successors to the Apple Developer Program License Agreement, and all attachments, schedules, and exhibits to the Apple Developer Program License Agreement.

22. "Electronically stored information" or "ESI" is defined to be synonymous with the broadest possible meaning of the term "electronically stored information," as used in Federal Rules of Civil Procedure 26 and 34.

23. "Government" means the plaintiffs in United States of America v. Apple, Inc., No. 2:24-cv-4055-JXN-LDW (D.N.J.).

24. "Government Action" means United States of America v. Apple, Inc., No. 2:24-cv-4055-JXN-LDW (D.N.J.).

25. "Interoperability" means the ability of different devices, software, systems, or platforms to communicate, exchange data, connect with, or work together effectively.

26. "iOS" means the operating system used by the iPhone.

27. "iOS-Connected Smartwatch" means any Smartwatch configured to interoperate with an iPhone.

28. "iOS Update" means an update to the mobile operating system developed by Apple for iPhone and other mobile devices.

29. "IoT" or "Internet of Things" means the vast network of devices and objects that are embedded with sensors, software, and other technologies for the purpose of connecting and exchanging data with other devices and systems over the Internet.

30. “iPhone” means any smartphone developed by Apple, including, but not limited to, the first generation iPhone, iPhone 3G, iPhone 3GS, iPhone 4, iPhone 4s, iPhone 5, iPhone 5c, iPhone 5s, iPhone 6, iPhone 6 Plus, iPhone SE (first generation), iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XR, iPhone XS, iPhone XS Max, iPhone 11 Pro, iPhone 11 Pro Max, iPhone SE (second generation), iPhone 12, iPhone Mini, iPhone 12 Pro, iPhone 12 Pro Max, iPhone 13, iPhone 13 Mini, iPhone 13 Pro, iPhone 13 Pro Max, iPhone SE (third generation), iPhone 14, iPhone 14 Plus, iPhone 14 Pro, iPhone 14 Pro Max, iPhone 15, iPhone 15 Plus, iPhone 15 Pro, iPhone 15 Pro Max, iPhone 16, iPhone 16e, iPhone 16 Plus, iPhone 16 Pro, iPhone 16 Pro Max, iPhone 17, iPhone 17 Pro, iPhone 17 Pro Max, and iPhone Air.

31. “Matter” refers to the Matter standard developed and maintained by the CSA for smart home interoperability.

32. “MDL Action” means *In re Apple Inc. Smartphone Antitrust Litigation*, 24-md-3113-JXN-LDW (D.N.J.).

33. “Over-the-Top” or “OTT” means any application, service, or platform that delivers voice, video, messaging, or other communications content to end users over the internet, without the involvement of a traditional telecommunications network operator in the control, management, or distribution of such content or service. The term includes, without limitation, services capable of internet-based messaging (such as iMessage, WhatsApp, Signal, and Telegram).

34. “Person” means any natural person (alive or deceased), any firm, corporation, proprietorship, joint venture, trust or estate, business, association, partnership, or any other form of legal entity, unless the context indicates otherwise.

35. "Possession" means all information or documents within Your knowledge, possession, custody, or control, including, but not limited to, any employee, consultant, aide, or other representative (including, but not limited to, attorneys and accountants) and any other Person acting or purporting to act on Your behalf or in concert with You, and includes any temporary placing of possession, custody, or control in any third party by any of the foregoing Persons.

36. "Relevant Markets" means the relevant product and geographic markets alleged in the Direct Apple Watch Purchaser Complaint, or any amended complaint filed in *Giamanco v. Apple Inc.*, including, but not limited to the market for iOS-connected smartwatches, the market for smartwatches, the market for iOS smartphones, the market for smartphones generally.

37. "Scare Screens" are pop-up warnings describing risks of given course or activity—for example, pop-ups warning a user about the risks of allowing an application to receive the user's location data.

38. "Smart Home Device" means any device designed for residential use that connects to the Internet and can be monitored and/or controlled remotely, including but not limited to smart thermostats, smart refrigerators, smart speakers, smart locks, and smart lighting systems.

39. "Smartphone" means any mobile device that combines the functions of cell phones with those of a mobile computer, including the iPhone and any Third-Party Smartphone. Smartphone does not include Smartwatch.

40. "Smartwatch" means any wrist-worn device that tells time while extending and improving the capabilities of Smartphones, including, in many instances, by allowing users to collect health and fitness data that is synced to a Smartphone, view and act on messages and

notifications received by the Smartphone, track and share location information, exercise control over a Smartphone and Smartphone Apps, access and use a mobile wallet, and take advantage of an App ecosystem for additional functionalities.

41. “Third-Party Smartphone” means any Smartphone other than the iPhone.

42. “Third-Party Smartwatch” means any Smartwatch made by a Smartwatch Maker other than Apple.

43. “Third-Party Smartwatch Apps” means Third-Party Smartwatch Companion Apps, Third-Party Smartwatch Sister Apps, and all other Apps developed by any entity other than Apple that interact or interoperate with Third-Party Smartwatches, including, but not limited to, iPhone Apps and Apps configured for installation on Smartwatches.

44. “Third-Party Smartwatch Companion App” or “Smartwatch Companion App” means any App required for the interoperability of a Third-Party Smartwatch, such as Garmin Connect, Wear OS by Google, Samsung Galaxy Fit (Gear Fit), Samsung Galaxy Watch (Gear S), and the Withings App (formerly “Health Mate”).

45. Third-Party Smartwatch Maker” is any entity that has developed, produced, manufactured, or sold a Third-Party Smartwatch, including, but not limited to, Pebble, Garmin, Fitbit, Google, and Samsung.

46. “Third-Party Smartwatch Sister App” means any App that is not essential to Smartwatch pairing, but is designed to enhance the way a Smartwatch works with a Smartphone.

47. “Wearable Device” means any software-enabled device designed to be worn on the body when in use.

48. “You,” “Yours,” or “CSA” means the Connectivity Standards Alliance (formerly the Zigbee Alliance) and its predecessor and successor entities, officers, directors, parents,

subsidiaries (whether direct or indirect), affiliates, employees, agents, attorneys, representatives, independent contractors, or other Persons acting or authorized to act on its behalf.

49. "Zigbee" means the Zigbee low-power mesh protocol standard managed by the CSA.

---

## INSTRUCTIONS

1. All Documents should be produced in electronic form in accordance with the Electronically Stored Information ("ESI") Protocol entered by the Court in the MDL Action, attached hereto as Exhibit B.

2. For purposes of interpreting or construing the scope of these Requests, the terms used shall be given the most expansive and inclusive interpretation, unless specifically limited in the Request.

3. All Documents requested herein must be produced in their entirety, with all attachments and enclosures.

4. In responding to these Requests, You shall produce all Documents in Your possession, custody, or control, and all Documents reasonably available to You, including those in the possession, custody, or control of any Person acting on Your behalf.

5. These Requests shall not be interpreted to call for multiple productions of Documents with identical hash values (e.g., MD5, SHA 256, or other industry standard). For example, if a document with a particular hash value is responsive to multiple requests, it must only be produced once. "Identical" means precisely the same in all respects; for example, a Document with handwritten notes or editing marks shall not be deemed identical to one without such notes or marks. Additionally, for Documents with attachments, the hash value

shall be generated based on the parent/child document grouping. Otherwise identical Documents with unique family members are not identical, and both must be produced. You shall produce as a separate Document any Document that contains any notation, addition, insertion, or marking of any kind that renders it not entirely identical to a version of that Document without such marks.

6. If there are no Documents responsive to a category in these Requests, You shall so state in writing.

7. If You object to a portion of any Request, You shall state the legal and factual basis for Your objection with specificity and respond to all parts of the Request to which You do not object.

8. If You encounter any ambiguity in the Requests, in a definition, or in an instruction relevant to the Requests, explain what You find to be ambiguous and what construction You used in providing Your response. If You contend that You do not understand the definition of any term or phrase used in a Request, You shall explain in detail what it is that You do not understand about the term or phrase at issue, and You shall respond to that part of the Request that You do understand.

9. If You object to any Request on the grounds that responding is unduly burdensome, describe the undue burden.

10. If You contend that any part of a Request is overbroad, You shall explain in detail why it is that You consider that part of the Request to be overbroad, and You shall produce Documents in response to the remainder of the Request that You do not consider to be overbroad.

11. In producing Documents responsive to these Requests, You must Bates stamp them in a manner that clearly identifies that each such Document has been produced by You.

12. If any requested Document is withheld on the basis of any claim of privilege, You must set forth the information necessary for Plaintiffs to ascertain whether the privilege properly applies, including all information described in Paragraph VI.1 of the ESI Protocol attached hereto as Exhibit B.

13. All productions shall be governed, as applicable, by the Discovery Confidentiality Order in the MDL Action, attached hereto as Exhibit C.

14. If any portion of any Document responsive to these Requests is withheld under claim of privilege, all non-privileged portions must be produced with the portion(s) claimed to be privileged redacted and logged in a privilege log pursuant to the preceding instructions.

15. Specified date ranges are inclusive. Unless otherwise stated, a year includes all days of that year from and including January 1 to and including December 31.

16. Unless otherwise specified, the relevant time period is September 9, 2012, until the end of fact discovery.

17. To the extent required by the Federal Rules of Civil Procedure and applicable case law, these Requests are continuing and require further and supplemental production if additional Documents are received, generated, or discovered after the time of the original production. If after responding to these Requests, You obtain or become aware of any additional Documents that are directly or indirectly responsive to any part of any of these Requests, You shall promptly produce any additional responsive Documents.

18. Plaintiff serves these Requests without prejudice to its right to serve additional requests for production of Documents or other requests or subpoenas.

## **REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS**

**Request for Production No. 1**

All Documents and Communications produced or provided in connection with any Civil Investigative Demand issued by the United States Department of Justice regarding Apple.

**Request for Production No. 2**

All Documents and Communications that are responsive to requests for production served on You by any party in the Government Action or the MDL Action.

**Request for Production No. 3**

All Documents and Communications produced or provided by You in connection with investigations:

a. By the European Commission into Apple, including but not limited to DMA.100203, DMA.100204, or any other investigation concerning Apple's conduct in Smartphone or Smartwatch markets;

b. By any other regulatory authorities, competition authorities, or government agencies in any jurisdiction concerning connectivity with Apple products and Apple's privacy and security considerations.

**Request for Production No. 4**

All Documents and Communications concerning IoT interoperability with Apple products and Apple's privacy and security policies and restrictions.

**Request for Production No. 5**

Documents and Communications sufficient to describe the Matter standard, including its purpose, effect, and technical specifications.

**Request for Production No. 6**

All Documents and Communications concerning the development, adoption, and implementation of the Matter standard, to the extent they relate to: (a) Apple's participation in the development of the Matter standard; (b) discussions, negotiations, or Communications regarding Interoperability between Apple devices and Third-Party devices; (c) any objections, concerns, or disputes raised by Apple regarding Interoperability requirements under the Matter standard; and (d) any limitations, exceptions, carve-outs, features, or elements to Interoperability requirements that were discussed, proposed, or adopted at Apple's request or insistence.

**Request for Production No. 7**

All Documents and Communications concerning Apple's membership, participation, and involvement in the CSA, including:

a. Materials identifying Apple's CSA representatives;

b. Membership agreements, participation agreements, licensing agreements, or any other contracts or understandings;

c. Apple's membership tier, participation and voting rights, and place in the organizational structure;

d. Apple's participation in working groups, committees, or standard-setting processes including those related to Matter, Zigbee, Aliro, or any other standard;

e. Positions taken by Apple in standard-setting discussions;

f. Any Communications between CSA and Apple concerning IoT Interoperability;

g. Any efforts by Apple to influence, delay, modify, or limit the scope of Interoperability standards;

h. All meeting minutes, agendas, presentations, correspondence, and other Documents from CSA board meetings, working group meetings, or committee meetings at which Apple's positions, conduct, policies, or practices relating to Interoperability or connectivity standards or protocols were discussed; and

i. Any formal or informal complaint, grievance, or dispute filed by or against Apple within CSA, or any mediation, arbitration, or other dispute resolution proceeding involving Apple and any other CSA member.

**Request for Production No. 8**

All Documents and Communications concerning Interoperability between iOS, iPhone, or Apple Watch and IoT devices, including: (a) Technical specifications, protocols, or standards that facilitate or could facilitate such Interoperability; (b) Any restrictions, limitations, or barriers to such Interoperability; and (c) the way Apple products interoperate with non-Apple products—for example, the way an iPhone interoperates with a smart refrigerator, smart thermostat, or health monitor.

**Request for Production No. 9**

All Documents and Communications concerning API or entitlement access, data sharing, or technical integration capabilities that Apple provides or has refused to provide for IoT devices, including but not limited to smart home devices, smart thermostats, and similar devices.

**Request for Production No. 10**

All Documents and Communications concerning complaints, objections, or concerns raised by CSA members regarding Apple's Interoperability positions, policies, or practices, including: (a) complaints about Apple's restrictions on Interoperability; (b) complaints about Apple's API or entitlement access policies; (c) complaints about Apple's differential treatment of products; and (d) any responses by Apple or CSA to such complaints.

**Request for Production No. 11**

All Documents and Communications concerning Interoperability of IoT devices with Apple products, to the extent they related to pairing, Bluetooth connectivity, Wi-Fi Connectivity, background execution, Low Power Mode, notifications, messaging, phone number sharing,

health data, privacy warnings, location data sharing, digital wallets, NFC technology, bug tracking, Apple's App review process, Apple's App store, and problems caused by software updates.

**<u>Request for Production No. 12</u>**

All Documents and Communications concerning the Zigbee standard or any other IoT or device connectivity standard developed, managed, or promoted by CSA, to the extent such Documents relate to Apple's participation in, promotion of, or objections to such standards, or to Interoperability between Apple devices and Third-Party devices.

**<u>Request for Production No. 13</u>**

All Documents and Communications concerning Apple's claims that its positions, policies, and practices exist to promote user privacy or security, including (a) any evaluations, analyses, or responses by CSA or its members to such claims; (b) materials concerning privacy and security vulnerabilities caused by Apple's policies, practices, or positions—for example, Apple's refusal to timely implement protocols that adopt end-to-end encryption for information transmitted between Apple and non-Apple devices; (c) materials concerning notifications, alerts, or "scare screens" displayed by iOS to users of IoT device companion apps; (d) and any materials concerning safety, privacy, or security concerns related to pairing or otherwise connecting Apple devices to non-Apple IoT devices.

**<u>Request for Production No. 14</u>**

All Documents and Communications, including market research, competitive intelligence, consumer surveys, or industry analyses, concerning IoT devices and connectivity standards, to the extent they mention Apple.

**<u>Request for Production No. 15</u>**

All Documents and Communications concerning OTT, including iMessage, SMS, and RCS messaging protocols and standards, including: (a) Apple's participation in, promotion of, or resistance to any messaging interoperability standards; (b) messaging Interoperability between Apple devices and Third-Party devices; (c) any efforts by Apple to limit, restrict, or prevent Third-Party devices from accessing messaging APIs; and (d) any efforts by Apple to facilitate Third-Party access to APIs.

**<u>Request for Production No. 16</u>**

All Documents and Communications concerning Apple's positions, policies, and practices regarding health and fitness data sharing, including IoT products' ability to write data to, or read data from Apple products.

# EXHIBIT 3

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

United States of America, et al.
*Plaintiff*
v.
Apple Inc.
*Defendant*

Civil Action No. 2:24-cv-04055 (JXN-LDW)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Connectivity Standards Alliance, c/o Amy Tsui
508 2nd Street, Suite 109B, Davis, CA 95616

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A (attached)

| Place: Kirkland & Ellis LLP<br>555 California Street, 27th Floor<br>San Francisco, CA 94104 (or electronically) | Date and Time:<br>09/25/2026 11:59 pm |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/26/2026

*CLERK OF COURT*

OR

_______________________
*Signature of Clerk or Deputy Clerk*

/s/ Stephen Tensmeyer
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Apple Inc. , who issues or requests this subpoena, are:

Stephen Tensmeyer, Kirkland & Ellis LLP, 95 South State Street, Salt Lake City, UT 84111, stephen.tensmeyer@kirkland.com, (801) 877-8090

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 2:24-cv-04055 (JXN-LDW)

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ____________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ____________________
____________________________________________________________
____________________________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ____________________
____________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

____________________________________
*Server's signature*

____________________________________
*Printed name and title*

____________________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | | |
|---|---|---|
| In re: Apple Inc. Smartphone Antitrust Litigation<br>*Plaintiff*<br>v.<br><br>*Defendant* | ) ) ) ) ) ) | Civil Action No. 2:24-md-3113 (JXN-LDW) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Connectivity Standards Alliance, c/o Amy Tsui
508 2nd Street, Suite 109B, Davis, CA 95616

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A (attached)

| Place: Kirkland & Ellis LLP<br>555 California Street, 27th Floor<br>San Francisco, CA 94104 (or electronically) | Date and Time:<br>09/25/2026 11:59 pm |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/26/2026

*CLERK OF COURT*

OR

/s/ Stephen Tensmeyer

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Apple Inc. , who issues or requests this subpoena, are:

Stephen Tensmeyer, Kirkland & Ellis LLP, 95 South State Street, Salt Lake City, UT 84111, stephen.tensmeyer@kirkland.com, (801) 877-8090

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 2:24-md-3113 (JXN-LDW)

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________

on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________________

______________________________________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________

______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## DEFINITIONS

Unless otherwise defined, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense. As used in the below requests for production of documents ("Requests") and the Definitions and Instructions, the words set forth below shall be defined as follows:

1. "Alleged Conduct" shall mean all (and any component of) the conduct alleged to be unlawful in the Complaints, including any alleged monopolization or attempted monopolization by Apple of the Alleged Markets. Alleged Conduct includes but is not limited to:

   a. Any alleged restrictions that Apple has placed on third-party developers' ability to offer Apps for download in the Apple App Store or in any other App Marketplace;

   b. Any alleged restrictions Apple has placed on third-party developers' access to iPhone features and development tools, including APIs and SDKs;

   c. Any alleged restrictions Apple has placed on third-party access to Apple's In-App Purchase or alternatives to In-App Purchase;

   d. Any alleged restrictions Apple has placed on products, services, Apps, or technology that allegedly facilitate users' ability to switch between iPhone and non-Apple Smartphones, or vice versa, including those described in the Complaints as middleware;

   e. Any alleged restrictions Apple has placed on interoperability concerning Smartphones or policies or practices that allegedly make it harder for consumers to switch between competing Smartphones; and

f. Any alleged restrictions Apple has placed on Super Apps, Cloud Streaming Apps, Messaging Apps, Wearables, and Digital Wallets.

2. "Alleged Markets" shall mean the product markets alleged in the Complaints, including the "Alleged Smartphone Market," the "Alleged Performance Smartphone Market," the "Alleged Smartwatch Markets," and any other product markets alleged in the DOJ Complaint or any of the MDL Complaints. The "Alleged Smartphone Market" shall be defined as Smartphone Market is defined in the Complaints, including without limitation in Paragraphs 172 through 179 of the DOJ Complaint. The "Alleged Performance Smartphone Market" shall be defined as Performance Smartphone Market is defined in the Complaints, including without limitation in Paragraphs 165 through 171 and 176 through 179 of the DOJ Complaint. The "Alleged Smartwatch Markets" shall include the alleged market for Smartwatches as defined in the Smartwatch Complaint, including in Paragraphs 143 and 152, and the alleged iOS-connected smartwatches market as defined in the Smartwatch Complaint, including in Paragraphs 144 through 151.

3. "API" shall mean an application programming interface and shall have the same meaning as used in the Complaints, including without limitation Paragraphs 158 through 163 of the DOJ Complaint.

4. "Apple" shall mean Apple Inc. and its predecessors, wholly owned or controlled subsidiaries or affiliates, successors, parents, departments, divisions and any organization or entity managed or controlled by Apple Inc.

5. "App" or "Application" shall be defined as in the Complaints, including in Paragraphs 158 through 163 of the DOJ Complaint.

6. "App Marketplace" shall mean any online storefront where Apps are offered for download or purchase, including the Apple App Store, Amazon Appstore, Amazon Underground, Android Market, Aptoide, Blackberry World, Chrome Web Store, Epic Games Store, GetJar, Google Play Store, Microsoft Store, Origin, Samsung Galaxy Store, Steam, Windows Phone Store, Altstore, TutuApp, and online storefronts distributing games and digital content for Xbox, PlayStation, and Nintendo.

7. "App Review" shall mean Apple's or any other Person's processes of reviewing Apps or App updates for potential inclusion on App Marketplaces.

8. "Background Execution" means a software or Application's ability to continue running and updating in the background, without requiring user interaction or after the user has moved it to the background (e.g., by returning to the home screen or switching between Apps).

9. "Business" shall be defined as all actual or potential operations, services, products, technologies, activities, and business opportunities conducted or pursued by or on behalf of CSA.

10. "Cloud Streaming App" shall be defined as in the Complaints, including in Paragraphs 10 and 71 through 79 of the DOJ Complaint.

11. "Communication" shall mean any exchange or transmission of words or ideas to another Person or entity, whether accomplished Person to Person, by telephone, in writing, via electronic mail or text message, via social media, or through any other medium, and shall include discussions, conversations, negotiations, conferences, meetings, speeches, memoranda, letters, correspondence, notes, blogs, postings, statements, and questions.

12. "Companion App" shall mean any App required for the interoperability of a Wearable device, such as Garmin Connect, Wear OS by Google, Samsung Galaxy Fit (Gear Fit), Samsung Galaxy Watch (Gear S), and the TAG Heuer Connected App.

13. "Complaints" shall mean the DOJ Complaint and any MDL Complaint.

14. "CSA," "You," and "Your" shall mean Connectivity Standards Alliance (formerly "Zigbee Alliance") and any of its officers, directors, employees, representatives, consultants, agents, accountants, and any other Person acting on its behalf, as well as Connectivity Standards Alliance's predecessors, successors, parents, and subsidiaries, and each of their predecessors, successors, parents, and subsidiaries; departments and divisions of Connectivity Standards Alliance; and any Person that Connectivity Standards Alliance manages or controls.

15. "Digital Wallet" shall be defined as in the Complaints, including in Paragraphs 10 and 104 through 118 of the DOJ Complaint.

16. "Document" shall have the full meaning ascribed to it under Rule 34 and Rule 45 of the Federal Rules of Civil Procedure and shall include Communications; memoranda; records; Reports; books; summaries of personal conversations or interviews; diaries; presentations; slide decks; graphs; charts; spreadsheets; diagrams; tables; photographs; recordings; tapes; microfilms; minutes; records and summaries of meetings or conferences; press releases; blog posts; stenographic, handwritten, or any other notes; work papers; checks, front and back; check vouchers, check stubs, or receipts; tape data sheets or data processing cards or discs; or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced or reproduced; and any paper or writing of whatever description, including information contained in any computer although not yet printed out. The term "Document" further includes all copies where the copy is not identical to the original.

17. "DOJ Complaint" shall mean the First Amended Complaint or any future amended complaints against Apple filed by the United States Department of Justice, several states, and the

District of Columbia in the United States District Court for the District of New Jersey on June 11, 2024 (Case No. 2:24-cv-04055, Dkt. No. 51), which is attached hereto as Exhibit A.

18. "Government Action" means *United States of America v. Apple, Inc.*, No. 2:24-cv-4055-JXN-LDW (D.N.J.).

19. "Identified Products or Services" means each product or service within one or more of the following categories: Cloud Streaming Apps, Super Apps, Messaging Apps, Digital Wallets, and Wearables.

20. "In-App Purchase" shall mean the purchase of features or functionality within an App, processed through the purchasing framework provided by the App Marketplace provider (e.g., Apple's In-App Purchase, Google Play's Billing System).

21. "Including," "included," "includes," and "include" shall not be construed as limiting any Request, and shall mean the same as "including, but not limited to."

22. "Internet of Things" or "IoT" means the network of devices and objects that are embedded with sensors, software, and other technologies for the purpose of connecting and exchanging data with other devices and systems over the internet.

23. "Low Power Mode" shall mean a feature designed to extend battery life by reducing power consumption.

24. "MDL Complaint" shall mean any of the consolidated complaints in any actions coordinated as part of *In re Apple Inc. Smartphone Antitrust Litigation*, No. 24-MD-3113 (D.N.J.), including the Direct iPhone Purchaser Plaintiffs' Consolidated Class Action Complaint (Dkt. No. 87) filed on July 30, 2025, attached hereto as Exhibit B; the Indirect iPhone Purchaser Plaintiffs' Corrected Consolidated Class Action Complaint (Dkt. No. 109) filed on September 11, 2025, attached hereto as Exhibit C; and the Direct Apple Watch Purchaser Plaintiffs' First Amended

Class Action Complaint (Dkt. No. 86) ("Smartwatch Complaint") filed on July 30, 2025, attached hereto as Exhibit D.

25. "Messaging App" shall be defined as in the Complaints, including in Paragraphs 10 and 80 through 93 of the DOJ Complaint, and shall include Beeper Mini, BlueChat, Discord, Facebook Messenger, Google Messages, Skype, Microsoft Messaging, Signal, Slack, Snapchat, Teams, Telegram, Texts, Viber, WhatsApp, and Apple's Messages App.

26. "Multimedia Messaging Service" or "MMS" shall be defined as in the Complaints, including in Paragraph 83 and Footnote 1 of the DOJ Complaint.

27. "Operating System" or "OS" means the software that coordinates and manages the hardware and software on a computer, mobile, or Wearables device. iOS and Android are examples of mobile operating systems.

28. "Performance Smartphone" shall be defined as in the Complaints, including in Paragraphs 165 through 171 of the DOJ Complaint.

29. "Person" shall mean any natural individual, partnership, corporation, company, association, organization, joint venture, government, agency, or entity.

30. "Report" shall mean any reports, research, papers, memoranda, presentations, reviews, statistical compilations, or other analyses.

31. "Rich Communication Services" or "RCS" shall be defined as in the Complaints, including in Paragraph 89 of the DOJ Complaint.

32. "SDK" shall mean Apple's Software Development Kit.

33. "Short Message Service" or "SMS" shall be defined as in the Complaints, including in Paragraphs 45 and 82 through 83 of the DOJ Complaint.

34. "Sister App" shall be defined as in the Smartwatch Complaint, including in Paragraph 34 of the Smartwatch Complaint, and shall include any App that is designed to communicate with the same or similar Application installed on a Wearable device, including, but not limited to, Spotify and Strava.

35. "Smartphone" shall be defined as in the Complaints, including in Paragraphs 148 through 163 of the DOJ Complaint.

36. "Super App" shall be defined as in the Complaints, including in Paragraphs 10 and 60 through 70 of the DOJ Complaint.

37. "Use Rates" shall be defined as data sufficient to identify number of downloads and total amount paid for such downloads, number of active users, average time per user per day with App in the foreground, average amount spent and number of transactions per user on In-App Purchases, and number and share of users making In-App Purchases.

38. "Wearables" shall have the same meaning as used in the Complaints, including in Paragraphs 21, 131, 202, 208, 214, and 221 of the DOJ Complaint. The term Wearables shall include but not be limited to any "Smartwatch" as that term is defined in the Complaints, including in Paragraphs 10 and 94 through 103 of the DOJ Complaint, fitness trackers, smart rings, and smart glasses.

39. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Requests all Documents, Communications, materials, or responses that might otherwise be construed to be outside of its scope.

40. The terms "any," "each," and "all" are mutually interchangeable and are meant to encompass each other.

41. The terms "concerning," "reflecting," "regarding," and "related to" mean in whole or in part, concerning, reflecting, regarding, related to, relating to, in connection with, involving, supporting, addressing, analyzing, constituting, containing, commenting on, discussing, describing, identifying, referring to, reporting on, stating, dealing with, or in any way pertaining or bearing a logical connection to.

42. The use of the singular form of any word includes the plural and vice versa as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

43. The use of the feminine form of any word includes the masculine form and vice versa as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

44. The past tense shall be construed to include the present tense and vice versa as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

## INSTRUCTIONS

1. All Documents should be produced in electronic form in accordance with the Electronically Stored Information ("ESI") Protocol attached hereto as Exhibit E.

2. For purposes of interpreting or construing the scope of these Requests, the terms used shall be given the most expansive and inclusive interpretation, unless specifically limited in the Request.

3. All Documents requested herein must be produced in their entirety, with all attachments and enclosures.

4. In responding to these Requests, You shall produce all Documents in Your possession, custody, or control, and all Documents reasonably available to You, including those in the possession, custody, or control of any Person acting on Your behalf.

5. These Requests shall not be deemed to call for identical hash duplicates (e.g., MD5, SHA 256, or other industry standard) of Documents. "Identical" means precisely the same in all respects; for example, a Document with handwritten notes or editing marks shall not be deemed identical to one without such notes or marks. Additionally, for Documents with attachments, the hash value shall be generated based on the parent/child document grouping. Otherwise identical Documents with unique family members are not identical, and both must be produced. You shall produce as a separate Document any Document that contains any notation, addition, insertion, or marking of any kind that renders it not entirely identical to a version of that Document without such marks.

6. If there are no Documents responsive to a category in these Requests, You shall so state in writing.

7. If You object to a portion of any Request, You shall state the legal and factual basis for Your objection with specificity and respond to all parts of the Request to which You do not object.

8. If You encounter any ambiguity in the Requests, in a definition, or in an instruction relevant to the Requests, explain what You find to be ambiguous and what construction You used in providing Your response. If You contend that You do not understand the definition of any term or phrase used in a Request, You shall explain in detail what it is that You do not understand about the term or phrase at issue, and You shall respond to that part of the Request that You do understand.

9. If You object to any Request on the grounds that responding is unduly burdensome, describe the undue burden.

10. If You contend that any part of a Request is overbroad, You shall explain in detail why it is that You consider that part of the Request to be overbroad, and You shall produce Documents in response to the remainder of the Request that You do not consider to be overbroad.

11. In producing Documents responsive to these Requests, You must Bates stamp them in a manner that clearly identifies that each such Document has been produced by You.

12. If any requested Document is withheld on the basis of any claim of privilege, You must set forth the information necessary for Apple to ascertain whether the privilege properly applies, including all information identified in Paragraph VI.1 of the ESI Protocol attached hereto as Exhibit E.

13. All productions shall be governed, as applicable, by the Discovery Confidentiality Orders attached hereto as Exhibits F and G.

14. If any portion of any Document responsive to these Requests is withheld under claim of privilege, all non-privileged portions must be produced with the portion(s) claimed to be privileged redacted and logged in a privilege log pursuant to the preceding instructions.

15. In searching for and producing Documents responsive to these Requests, You shall use a reasonable time period to be agreed upon with Apple in advance of productions.

16. Specified date ranges are inclusive. Unless otherwise stated, a year includes all days of that year from and including January 1 to and including December 31.

17. To the extent required by the Federal Rules of Civil Procedure and applicable case law, these Requests are continuing and require further and supplemental production if additional Documents are received, generated, or discovered after the time of the original production. If after

responding to these Requests, You obtain or become aware of any additional Documents that are directly or indirectly responsive to any part of any of these Requests, You shall promptly produce any additional responsive Documents.

18. Apple serves these Requests without prejudice to its right to serve additional requests for production of Documents or other requests or subpoenas.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:** All Documents responsive to Requests for production of Documents served by any party in the Government Action or the MDL.

**REQUEST FOR PRODUCTION NO. 2:** To the extent You produce Documents in response to the subpoena attached hereto as Exhibit H regarding Wearables, Smartphones, App Review, App Marketplaces, Digital Wallets, and APIs, Documents about those same topics for non-Apple Wearables, non-Apple Smartphones, non-Apple App Review, non-Apple App Marketplaces, non-Apple Digital Wallets, and non-Apple APIs.

**REQUEST FOR PRODUCTION NO. 3:** All Documents and Communications concerning any effort, whether direct or indirect, alone or in concert with any Person, to change, influence, circumvent, lobby for legislation related to, or draw government or public attention to any of Apple's policies, including any contractual or policy terms related to Wearables, Smartphones, App Review, App Marketplaces, Digital Wallets, and APIs, or (b) any technical limitations, restrictions, or requirements imposed by Apple related to Wearables, Smartphones, App Review, App Marketplaces, Digital Wallets, or APIs.

**REQUEST FOR PRODUCTION NO. 4:** All Documents and Communications concerning (a) IoT interoperability with any Smartphones, Wearables, or Digital Wallets, and (b) any Apple or non-Apple entity's privacy and security policies, restrictions, or concerns raised by

any device manufacturer or service provider or shared with You in connection with any discussion related to interoperability.

**REQUEST FOR PRODUCTION NO. 5:** All Documents and Communications concerning interoperability between any OS, Smartphone, or Wearable and IoT devices (*e.g.*, a smart refrigerator or smart thermostat), including: (a) technical specifications, protocols, or standards that facilitate or could facilitate such interoperability; and (b) any restrictions, limitations, or barriers to such interoperability.

**REQUEST FOR PRODUCTION NO. 6:** All Documents and Communications concerning API or entitlement access, data sharing, or technical integration capabilities that Apple or another non-Apple Smartphone or Wearable manufacturer provides or has refused to provide for IoT devices, including smart home devices.

**REQUEST FOR PRODUCTION NO. 7:** All Documents and Communications concerning interoperability of IoT devices with Smartphones, Wearables, and Digital Wallets, to the extent they relate to pairing, Bluetooth connectivity, Wi-Fi Connectivity, background execution, Low Power Mode, notifications, messaging, phone number sharing, health data, privacy warnings, location data sharing, NFC technology, bug tracking, App Review, App Marketplace, and/or problems caused by software updates.

**REQUEST FOR PRODUCTION NO. 8:** All Documents and Communications concerning any Smartphone or Wearables manufacturer's claims that its positions, policies, and practices related to interoperability or connectivity exist to promote user privacy or security or that another Smartphone or Wearables manufacturers' positions, policies, or practices related to interoperability or connectivity harm privacy or security, including (a) any evaluations, analyses, or responses by CSA or its members to such claims; (b) materials concerning privacy and security

vulnerabilities caused by any Smartphone or Wearable manufacturer's policies, practices, or positions related to interoperability or connectivity; and (c) any materials concerning privacy or security concerns related to pairing or otherwise connecting Smartphones or Wearables to non-Smartphone and non-Wearable IoT devices.

**REQUEST FOR PRODUCTION NO. 9:** All Documents and Communications concerning OTT, including Messaging Apps, SMS, and RCS messaging protocols and standards, including: (a) any Messaging App company's participation in, promotion of, or resistance to any messaging interoperability standards; (b) messaging interoperability between Messaging App devices; (c) any efforts by Messaging App companies to limit, restrict, or prevent other Messaging App companies from accessing messaging APIs; and (d) any efforts by Messaging App companies to facilitate other Messaging App companies access to APIs.

**REQUEST FOR PRODUCTION NO. 10:** All Documents and Communications concerning Apple's membership, participation, and involvement in CSA, including (a) any effort by Apple to influence, modify, or expand the scope of interoperability standards, and (b) any entity's opposition to Apple's attempts to influence, modify, or expand the scope of such interoperability standard.

**REQUEST FOR PRODUCTION NO. 11:** All Documents and Communications concerning any non-Apple entity that, through its participation, membership, or involvement with CSA, attempted to limit the scope of interoperability standards, including the entity's reasoning for attempting to limit such standards.

# EXHIBIT 4

# ZIGBEE ALLIANCE

## PROMOTER MEMBER AGREEMENT

**Parties:**

ZIGBEE ALLIANCE

("***ZIGBEE***" or "***ALLIANCE***")

508 Second Street
Suite 206
Davis, California 95616

Attn: Director of Operations

Apple Inc., One Apple Park Way
Corporate Name ("***Promoter***") Address

Cupertino, CA 95014
City, State, Zip Code

Andreas Gal
Contact/Director Name

agal@apple.com
E-Mail Address

669-227-2187
Phone

---

This Promoter Member Agreement ("***Promoter Member Agreement***") is made as of the date accepted by ZIGBEE as set forth below. By executing this Promoter Member Agreement, Promoter agrees to be bound by the terms and conditions attached to this cover page.

**ZIGBEE ALLIANCE:**

______________________________
President or Director of Operations

Date Accepted: ______________

**Promoter:**

By: ______________________________

Its: Vice President

Date: December 16, 2019

# PROMOTER MEMBER AGREEMENT

# TERMS AND CONDITIONS

**1. Incorporation**

The ALLIANCE is organized as a nonprofit corporation under the laws of the State of California. The Articles of Incorporation and Corporate Bylaws of the ALLIANCE are set forth on the ALLIANCE website, as such documents may be amended by the ALLIANCE from time-to-time ("***Corporate Documents***"). By executing this Promoter Member Agreement, Promoter agrees to abide by the Corporate Documents. Promoter acknowledges that the Corporate Documents may be amended from time-to-time in accordance with the provisions of the Corporate Documents and as may be allowed by law. The ALLIANCE has filed for tax exempt status under Section 501(c)(6) of the Internal Revenue Code of 1986, as amended, and Promoter agrees not to engage in activities for or on behalf of the ALLIANCE that may adversely affect the nonprofit or tax-exempt status of the ALLIANCE.

**2. Purposes of ALLIANCE**

The ALLIANCE is a non-profit mutual benefit corporation formed to promote the use of two-way wireless communications standards for consumer electronics, home and building automation, industrial controls, PC peripherals, medical sensor applications, toys and other related applications.

The purposes for which the ALLIANCE is organized are to:

**(a)** Bring about the existence of a broad range of interoperable consumer and industrial devices by promoting open industry Specifications for unlicensed, untethered, peripheral, control and entertainment devices;

**(b)** Provide a forum and environment whereby the Promoter, Participant, Adopter and Associate Members of the ALLIANCE may meet to approve suggested revisions and enhancements to Specifications; make appropriate submissions to established agencies and bodies with the purpose of ratifying Specifications as an international standard; and provide a forum whereby users may meet with developers and providers of related products and services to identify requirements for interoperability and general usability;

**(c)** Educate the business and consumer communities as to the value, benefits and applications for wireless consumer products and services through public statements, publications, trade shows demonstrations, seminar sponsorships and other programs established by the ALLIANCE;

**(d)** Protect the needs of consumers and increase competition among vendors by supporting the creation and implementation of uniform, industry-standard conformance test procedures and processes which assure the interoperability of wireless consumer products and services;

**(e)** Maintain relationships and liaison with educational institutions, government research institutes, other technology consortia, professional organizations, trade groups and other

organizations that support and contribute to the development of the ALLIANCE's specifications and standards; and

**(f)** Foster competition in the development of new products and services based on ALLIANCE's specifications developed and/or adopted by the ALLIANCE in conformance with all applicable antitrust laws and regulations.

The ALLIANCE and its Promoter, Participant, Adopter and Associate Members shall individually and collectively be committed to open competition in the development of products, technology and services, and Promoter, Participant, Adopter and Associate Members shall not be restricted in any way from designing, developing, marketing and/or procuring hardware, software, systems, technology or services. Implementation or use of specific Adopted Specifications is voluntary. No Promoter, Participant, Adopter and/or Associate Member shall be required or obliged to implement Adopted Specifications by virtue of being a Promoter, Participant, Adopter or Associate Member, as applicable, of the ALLIANCE.

**3. Participation as a Promoter; Dues and Fees**

Subject to the terms of **Section 9**, upon acceptance of this Promoter Member Agreement by the ALLIANCE and payment of the appropriate dues and/or fees, Promoter shall hold the status of a Promoter of the ALLIANCE for a period of twelve (12) months commencing on the acceptance date. Subject to the terms of **Section 9**, Promoter may renew its Promoter status for subsequent twelve (12) month periods by paying any then-current annual dues and/or fees established by the Board of Directors. Failure to pay annual or specially assessed dues and/or fees when due shall result in termination and/or non-renewal of Promoter's membership pursuant to **Section 9(d)**. Membership dues and fees are non-refundable, except in the case of a distribution upon the event of a dissolution as set forth in the Corporate Bylaws. The Board of Directors may increase or decrease the annual dues and/or fees required of Promoters in accordance with the Corporate Bylaws. All dues and fees shall be used in furtherance of the purposes of the ALLIANCE. Subject to the survival provisions of **Section 9(e)**, upon expiration or termination of the Promoter's status as a Promoter of the ALLIANCE, all rights and privileges provided and/or granted to Promoter and/or any Affiliate of Promoter pursuant to **Section 4** of this Promoter Member Agreement and/or pursuant to any policies and procedures of the ALLIANCE shall terminate.

**4. Duties and Rights of Promoters**

The duties, rights, privileges and obligations of Promoters are set forth in the Corporate Bylaws and as may otherwise be provided under California law. Without limiting the generality of the foregoing, and subject to the terms and conditions of the Corporate Bylaws, each Promoter shall be entitled to one (1) vote in the following:

**(a)** All matters presented before the Board of Directors for vote;

**(b)** All matters presented before the Promoters of the ALLIANCE for vote; and

**(c)** Approval of Proposed Specifications to become Adopted Specifications. The designated representative of Promoter on the Board of Directors is identified by Promoter on the first page of this Promoter Agreement. The designated representative of Promoter on the Board of Directors may be changed by Promoter in accordance with the Corporate Bylaws.

If Promoter is a consortium, association or other similar organization or otherwise has members or sponsors, the rights and privileges granted to Promoter as a Promoter Member shall extend only to Promoter, and not to Promoter's members or sponsors.

**5. Intellectual Property Rights**

Promoter agrees to the terms and conditions of the Intellectual Property Rights ("***IPR***") Policy set forth on the ALLIANCE website, as such IPR Policy may be revised from time-to-time in accordance with the provisions of the Corporate Bylaws.

**6. Confidential Information**

Except as otherwise identified by Promoter, any information Promoter submits or discloses to the ALLIANCE, including any committee or working group thereof, shall be treated as non-confidential and shall be available to all Promoter, Participant, Adopter and Associate Members of the ALLIANCE without restriction. Any information pertaining to the business of the ALLIANCE which Promoter submits or discloses to the ALLIANCE, including any committee or working group thereof, and which is: (a) marked by Promoter as "***Confidential***" information; or (b) if orally disclosed, identified as Confidential prior to disclosure and reduced to writing and marked as Confidential within three (3) business days from the date of disclosure, shall be treated as Confidential information with respect to third parties, except for any portion thereof that constitutes information: (c) rightfully in the public domain other than by a breach of a duty to the disclosing party; (d) rightfully received from a third party without any obligation of confidentiality; (e) rightfully known to the receiving party without any limitation on use or disclosure prior to its receipt from the disclosing party; (f) independently developed by employees of the receiving party; or (g) generally made available to third parties by the disclosing party without restriction or disclosure. Such Promoter Confidential information shall be maintained by each Promoter, Participant, Adopter and Associate Member of the ALLIANCE in confidence with at least the same degree of care that it uses to protect its own proprietary information and in no event with less than reasonable care, and each Promoter, Participant, Adopter and Associate Member of the ALLIANCE that receives such Promoter Confidential information shall only use such Confidential information for the ALLIANCE purpose for which it was submitted. In the event a Promoter, Participant, Adopter and/or Associate Member of the ALLIANCE breaches the obligation of confidentiality with respect to Confidential information of Promoter, the sole and exclusive remedy of Promoter shall be to seek recourse against the breaching Promoter, Participant, Adopter and/or Associate Member of the ALLIANCE and the ALLIANCE shall have no liability with respect to such breach. Third parties seeking access to Promoter's Confidential information that has been provided to the ALLIANCE must reach an agreement with Promoter as a condition for being provided the Promoter's Confidential information. The rights and obligations set forth in this **Section 6** shall expire three (3) years after the date the Promoter discloses or submits the Promoter Confidential information to the ALLIANCE or to any other Promoter, Participant, Adopter and/or Associate Member of the ALLIANCE.

**7. Prohibited Activities**

Promoter agrees to the terms and conditions of the Antitrust Guidelines set forth on the ALLIANCE website, as such Antitrust Guidelines may be revised from time-to-time by the ALLIANCE.

**8. Application to Affiliates**

**(a) Definition**

"***Affiliate***" shall mean, with respect to Promoter, any entity controlling, controlled by or under common control with Promoter, where "control" means direct or indirect ownership of or the right to exercise: (i) greater than fifty percent (50%) of the outstanding shares or securities entitled to vote for the election of directors or similar managing authority of the subject entity; or (ii) greater than fifty percent (50%) of the ownership interest representing the right to make decisions for the subject entity. Notwithstanding the foregoing, Affiliate shall not mean any entity that has previously been or which is currently a Promoter, Participant, Adopter or Associate Member of the ALLIANCE.

**(b) Rights of Affiliate**

As of the effective date of this Promoter Member Agreement and subject to all the terms of this Promoter Member Agreement, including without limitation, this **subsection (b)** and **subsection (c)** below, Affiliates of Promoter shall have the right to exercise the rights and benefit from the licenses granted to Promoter hereunder, provided that such Affiliates acknowledge and agree to be bound by: (i) all terms and conditions set forth in **Sections 5** through **22** of this Promoter Member Agreement; and (ii) any policies and procedures applicable to Affiliates of Promoter as may be determined by the Board of Directors from time-to-time. For purposes of the foregoing Sections of this Promoter Member Agreement, all references to "Promoter" shall be deemed to also include such Affiliates of Promoter. Notwithstanding the foregoing, unless otherwise determined by the Board of Directors, Affiliates of Promoter will not have any right to vote in any matters presented for vote before the Board of Directors and/or the Promoters of the ALLIANCE. The rights granted under this **Section 8** shall terminate immediately upon: (iii) the Affiliate's material breach of any of its obligations under this **Section 8**; or (iv) termination or expiration of this Promoter Member Agreement pursuant to **Section 9**.

**(c) Right to Bind**

An Affiliate of Promoter shall not have the right to exercise the rights granted to Promoter hereunder until the Board of Directors, or at the direction of the Board of Directors, an officer of the ALLIANCE reviews and approves of such Affiliate’s participation in the ALLIANCE through this Promoter Member Agreement. As a condition of such approval, the Board of Directors, or at the direction of the Board of Directors, an officer of the ALLIANCE, may require written documentation that such Affiliate has duly authorized Promoter and/or Promoter has the corporate authority to bind such Affiliate. The Board of Directors, or at the direction of the Board of Directors, an officer of the ALLIANCE, may require additional proof of the relationship between Promoter and such Affiliate and/or may impose additional conditions or terms governing such Affiliate's participation in the ALLIANCE through this Promoter Member Agreement at any time, including, without limitation, prior to any access and/or use of any intellectual property or Confidential information by Promoter and/or any Affiliate under the terms of this Promoter Member Agreement.

## 9. Term and Termination

**(a) Term**

Promoter acknowledges that the ALLIANCE shall have a perpetual corporate term. This Promoter Member Agreement shall commence on the acceptance date and remain in effect until the earlier of: (i) expiration of the ALLIANCE's corporate term; (ii) such time as Promoter elects not to renew its Promoter status as provided in **Section 3**; (iii) such time as

Promoter elects to voluntarily withdraw as a Promoter of the ALLIANCE as provided in **Section 9(b)**; and (iv) termination of Promoter's status as a Promoter as provided in **Section 9(c)**.

**(b) Voluntary Withdrawal as Promoter**

Upon written notice to the ALLIANCE, Promoter shall have the right to withdraw as a Promoter of the ALLIANCE. Upon such withdrawal, Promoter shall have no right to receive a refund of any previously paid dues, and the terms of **Section 9(e)** shall apply.

**(c) Termination of Membership**

Upon the affirmative vote of not less than two-thirds (2/3) of the Board of Directors, and subject to the requirements of Section 7341 of the California Nonprofit Corporation Law, the ALLIANCE shall have the right to terminate Promoter's status as a Promoter of the ALLIANCE for cause. The term "for cause" shall mean Promoter's failure to materially comply with its obligations under this Promoter Member Agreement. Upon such termination, Promoter shall have no right to receive a refund of any previously paid dues and the terms of **Section 9(e)** shall apply.

**(d) Failure to Pay Annual or Specially Assessed Dues**

Promoter acknowledges that Promoter status is conferred on an annual basis and that any renewal of membership, or in the case of a special assessment, continuation of membership, is contingent upon payment of the applicable dues. If Promoter fails to pay the applicable annual or special assessment dues when required: (i) Promoter's status in the ALLIANCE will not be renewed in the case of failure to pay the annual dues or will be terminated in the case of failure to pay the specially assessed dues; (ii) Promoter shall be entitled to continue participation only upon re-application to the ALLIANCE; (iii) Promoter waives any notice or process requirements in connection with such non-renewal and/or termination of membership status; and (iv) the terms of **Section 9(e)** shall apply.

**(e) Survival**

Upon expiration or termination of a Promoter's status as a Promoter of the ALLIANCE: (i) the following terms shall survive: (A) this **Section 9(e)** and **Sections 6**, **11** and **12** of this Promoter Member Agreement; and (B) Sections 2 and 3 of the IPR Policy with respect to Necessary Claims of the Promoter and of other Promoter, Participant, Adopter and/or Associate Members incorporated into or a part of any Adopted Specifications existing prior to the effective date of expiration or termination of such Promoter's status as a Promoter; and (ii) the terms Sections 2 and 3 of the IPR Policy shall not apply to any portions of Proposed Specifications which have been expressly identified and affirmatively withdrawn from the Proposed Specifications by such Promoter prior to the effective date of expiration or termination of such Promoter's status as a Promoter.

**10. Disclaimer of Warranties**

**NEITHER PARTY HERETO MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO ANY SOFTWARE, DOCUMENTATION, INTERFACES, SAMPLE IMPLEMENTATIONS, SPECIFICATIONS OR ANY OTHER ITEMS PROVIDED OR MADE AVAILABLE TO PROMOTER, THE ALLIANCE OR ANY OTHER PROMOTER,**

**PARTICIPANT, ADOPTER AND/OR ASSOCIATE MEMBER OF THE ALLIANCE, OR WITH RESPECT TO ANY STANDARD OR INTERFACE OR SPECIFICATIONS APPROVED, PROMOTED OR ENDORSED BY THE ALLIANCE OR ANY OTHER PROMOTER, PARTICIPANT, ADOPTER AND/OR ASSOCIATE MEMBER OF THE ALLIANCE, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR THAT ANY OF THE FOREGOING ITEMS DO NOT INFRINGE OR CONSTITUTE A MISAPPROPRIATION OF THE PROPRIETARY RIGHTS OF ANY THIRD PARTIES. EACH PARTY AGREES THAT ALL SUCH ITEMS ARE PROVIDED OR MADE AVAILABLE HEREUNDER "AS IS."**

**11. Limitation of Liability**

Except for the indemnity obligations under **Section 12** below, neither party shall be liable to the other for any indirect, special, exemplary, consequential, special or punitive damages, including without limitation, lost profits, even if advised of the possibility of such damages. In addition to the foregoing, with respect to Promoter's participation in the ALLIANCE, the ALLIANCE shall not be liable to Promoter for any direct, indirect, incidental, consequential, special or punitive damages including, without limitation, lost profits, sustained or incurred by Promoter which are not attributable to the actions or inactions of the ALLIANCE under this Promoter Member Agreement.

**12. Indemnification**

Promoter shall indemnify, defend and hold harmless the ALLIANCE and its directors, officers, employees, representatives, agents, attorneys, successors and assigns (collectively, the "***Indemnified Parties***") from and against any and all claims, suits, proceedings, liabilities, obligations, judgments, causes of action, costs and expenses (including reasonable attorneys' fees) to the extent arising out of or resulting from Promoter's failure to materially comply with any of its obligations under this Promoter Member Agreement. The Indemnified Parties promptly shall notify Promoter of any such claims, suits or proceedings and, at Promoter's sole cost and expense, reasonably cooperate with Promoter in the defense of such claims, suits or proceedings. Promoter's cumulative liability pursuant to this **Section 12** shall not exceed One Hundred Thousand Dollars ($100,000).

**13. Insurance**

The ALLIANCE may purchase and maintain insurance on behalf of any person who is or was a director, committee member, officer, employee or working group member of the ALLIANCE covering the activities of such persons related to the business of the ALLIANCE.

**14. Notices**

Any written notice required or permitted to be delivered pursuant to this Promoter Member Agreement shall be in writing and shall be deemed delivered: (a) upon delivery if delivered in person; (b) three (3) business days after deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid; (c) upon transmission if sent via telecopier, with a confirmation copy sent via overnight mail, provided that such overnight delivery is received by the sender; (d) one (1) business day after deposit with a national overnight courier, provided that such overnight delivery is received by the sender; and/or (e) by email to Promoter's email address on file, which notice shall be deemed received when sent by the ALLIANCE; provided that in each case under subsections (a) through (d) addressed to the following:

If to Promoter:

The Contact/Representative at the address
identified on the cover page of this Promoter
Member Agreement

If to the ALLIANCE:

ZIGBEE ALLIANCE
508 Second Street, Suite 206
Davis, CA 95616
Attention: Director of Operations
Telecopier: (530) 564-4721

or to such other individual or address as may be specified by either party hereto upon notice given to the other.

**15. Binding Nature and Assignment; Transfer of Membership Interest**

This Promoter Member Agreement shall be binding on the parties and their successors and assigns. Promoter shall not assign or otherwise transfer its membership interest nor this Promoter Member Agreement, or any part hereof, whether by operation of law, change of control (including a merger, exchange of stock or otherwise) or otherwise, without the prior written consent of the ALLIANCE. Any assignment or transfer or attempted assignment or transfer by Promoter in violation of the terms of this Section shall be null and void and of no force or effect.

**16. Certification of Products; Use of Trademarks and Logos**

Promoter acknowledges and agrees that use of ALLIANCE trademarks and logos are highly proprietary to and regulated by ALLIANCE, and that no product or service manufactured by Promoter shall be marked, packaged, sold or distributed using ALLIANCE trademarks or logos without complying with the certification processes and policies adopted by ALLIANCE and only then in strict compliance with the ALLIANCE's Trademark and Logo Usage Guidelines and Terms published on the ALLIANCE's website, as may be updated or amended from time-to-time by the ALLIANCE ("***Trademark and Logo Usage Guidelines and Terms***"). Without limiting the foregoing, at all times Promoter shall comply with the Trademark and Logo Usage Guidelines and Terms. Further, to the extent Promoter becomes aware of any other member or non-member of ALLIANCE not complying with the Trademark and Logo Usage Guidelines and Terms, Promoter will report such non-compliance to ALLIANCE.

Promoter shall have the right to list the ALLIANCE's name and logo on Promoter's website and in advertising and promotional materials in accordance with and subject to the Trademark and Logo Usage Guidelines and Terms. Promoter agrees that the ALLIANCE shall have the right to list Promoter's name and logo on the ALLIANCE website and in advertising and promotional materials, in accordance with written instructions provided to the ALLIANCE by Promoter. Except as provided herein or as may be agreed by the parties in writing, neither party shall use the name or any trademark or logo of the other party without such other party's prior written consent.

## 17. Counterparts

This Promoter Member Agreement may be executed in one (1) or more duplicate originals, all of which together shall be deemed one and the same instrument.

## 18. Severability

If any provision of this Promoter Member Agreement is found by a court of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable any other part of this Promoter Member Agreement, but this Promoter Member Agreement shall be construed as not containing the particular provision or provisions held to be invalid or unenforceable.

## 19. Waiver

No delay or omission by either party to exercise any right occurring upon any noncompliance or default by the other party with respect to any of the terms of this Promoter Member Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by either of the parties hereto of any of the covenants, conditions or agreements to be performed by the other shall not be construed to be a waiver of any succeeding breach thereof or of any covenant, condition or agreement herein contained.

## 20. Governing Law

This Promoter Member Agreement, and all the rights and duties of the parties arising from or relating in any way to the subject matter of this Promoter Member Agreement or the transaction(s) contemplated by it, shall be governed by, construed and enforced in accordance with the laws of the State of California (excluding any conflict of laws provisions of the State of California that would refer to and apply the substantive laws of another jurisdiction).

## 21. Relationship of Parties

Nothing set forth in this Promoter Member Agreement shall be deemed or construed to render the parties as joint venturers, partners or employer and employee.

## 22. Entire Agreement; Modifications

This Promoter Member Agreement, together with the Corporate Documents, sets forth the entire, final and exclusive agreement between the parties as to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, between the parties. This Promoter Member Agreement may be modified only pursuant to a writing executed by authorized representatives of the ALLIANCE and Promoter.

**Apple Inc. Written Instructions Accompanying Promoter Member Agreement**
**Media Releases and Use of Trademarks and Logos**

Pursuant to section 16 of the Zigbee Alliance Promoter Member Agreement, entitled “Media Releases and Use of Trademarks and Logos”, Apple provides the following instructions regarding use of its name and logo and any media releases naming Apple. Use of Apple’s name and logo is conditioned on agreement and adherence to the following terms:

1. The Zigbee Alliance’s use of Apple trademarks is prohibited unless expressed authorized herein or by prior written consent. The Zigbee Alliance cannot use the Apple Logo or any other Apple-owned graphic symbol, logo, or icon on or in connection with web sites, products, packaging, manuals, promotional or advertising materials, or for any other purpose absent prior written consent and an express written trademark license from Apple. When the Zigbee Alliance is authorized to use Apple’s trademarked name, Apple, it must do so according to the Guidelines for Using Apple Trademarks and Copyrights at https://www.apple.com/legal/intellectual-property/guidelinesfor3rdparties.html.
2. Upon written confirmation at a time determined in Apple’s sole discretion, the Zigbee Alliance will be permitted to list “Apple” in plain text and without any other accompanying logo or graphic symbol, in the list of members on its website and in promotional materials. Apple shall not be singled out from this list or highlighted without express written consent. The Apple logo must be treated in the same manner as other member logos and names. It should be shown at the same relative size and placement as the other logos.
3. Upon written confirmation at a time determined in Apple’s sole discretion, the Zigbee Alliance will be permitted to list Apple as a Board member and publish Apple’s designated Director’s name, image, and biography on its website.
4. The Zigbee Alliance shall not publish any media releases or provide any comments in response to inquiries that name Apple Inc. or reference Apple Inc.’s membership without Apple’s express written consent.

# EXHIBIT 5

# CORPORATE BYLAWS

# OF

# CONNECTIVITY STANDARDS ALLIANCE

**(a nonprofit mutual benefit corporation)**

# TABLE OF CONTENTS

PAGE


| | | |
|---|---|---|
| **Article I** | **Offices** | 1 |
| 1.1 | Principal Office | 1 |
| 1.2 | Other Offices | 1 |
| **Article II** | **Purposes** | 1 |
| 2.1 | Purposes | 1 |
| **Article III** | **Membership** | 2 |
| 3.1 | Classes of Membership | 2 |
| 3.2 | Membership Qualifications | 2 |
| | 3.2.1 Qualifications for Participants/Adopters/Associates /Non-Profits and Other Non-Promoter Members | 2 |
| | 3.2.2 Qualifications for Promoters | 3 |
| | 3.2.3 Membership Agreements | 3 |
| 3.3 | Fees, Dues and Assessments | 3 |
| 3.4 | Termination of Membership | 4 |
| | 3.4.1 Resignation | 4 |
| | 3.4.2 Expiration and Disqualification | 4 |
| | 3.4.3 Dues and Assessments | 4 |
| | 3.4.4 Termination of the Member Agreements | 4 |
| 3.5 | Non-Liability | 4 |
| 3.6 | Transferability | 4 |
| 3.7 | Distribution of Assets Upon Dissolution | 5 |
| **Article IV** | **Membership Meetings** | 6 |
| 4.1 | Place of Meetings | 6 |
| 4.2 | Regular Meetings | 6 |
| 4.3 | Special Meetings | 6 |
| 4.4 | Notice of Meetings | 6 |
| 4.5 | Adjourned Meetings | 6 |
| 4.6 | Quorum | 7 |
| 4.7 | Voting | 7 |
| 4.8 | Action Without Meeting by Written Ballot | 7 |
| 4.9 | Proxies | 7 |
| 4.10 | Conduct of Meetings | 7 |
| 4.11 | Electronic Communications | 7 |
| 4.12 | Electronic Meetings | 8 |
| **Article V** | **Board of Directors** | 8 |
| 5.1 | Powers | 8 |
| 5.2 | Number and Composition of Board of Directors | 8 |

PAGE


| | | | |
|---|---|---|---|
| 5.3 | Alternate Directors | | 9 |
| | 5.3.1 | Alternate Directors; Voting | 9 |
| | 5.3.2 | Role of Alternate Director | 9 |
| | 5.3.3 | Application of Bylaws | 9 |
| 5.4 | Observers and Invitees | | 9 |
| 5.5 | Restrictions on Eligibility to Serve as a Director; Control Groups | | 9 |
| 5.6 | Vacancies | | 10 |
| 5.7 | Regular Meetings | | 10 |
| 5.8 | Special Meetings | | 10 |
| 5.9 | Notice of Meetings; Attendance | | 10 |
| 5.10 | Consent to Meetings | | 10 |
| 5.11 | Action Without Meeting | | 10 |
| 5.12 | Telephonic/Electronic Meetings | | 11 |
| 5.13 | Quorum and Vote | | 11 |
| 5.14 | Adjournment | | 11 |
| 5.15 | Fees and Compensation | | 11 |
| 5.16 | Indemnity for Litigation | | 11 |
| 5.17 | Standard of Conduct | | 12 |
| 5.18 | Self-Dealing Transactions | | 12 |
| | 5.18.1 | Membership Approval | 12 |
| | 5.18.2 | Board or Committee Approval | 12 |
| | 5.18.3 | Just and Reasonable Contract | 13 |
| 5.19 | Resignation and Removal | | 13 |
| | 5.19.1 | Resignation | 13 |
| | 5.19.2 | Removal | 13 |
| 5.20 | Advisory Board | | 13 |
| **Article VI** | **Officers** | | 13 |
| 6.1 | Officers | | 13 |
| 6.2 | Election | | 14 |
| 6.3 | Removal and Resignation | | 14 |
| | 6.3.1 | Removal | 14 |
| | 6.3.2 | Resignation | 14 |
| 6.4 | Vacancies | | 14 |
| 6.5 | Chairperson of the Board | | 14 |
| 6.6 | Vice-Chairperson of the Board | | 14 |
| 6.7 | President and Chief Executive Officer | | 15 |
| 6.8 | Treasurer | | 15 |
| 6.9 | Secretary | | 15 |
| **Article VII** | **Committees and Working Groups** | | 15 |
| 7.1 | Appointment of Committees | | 15 |

**PAGE**

| | | |
|---|---|---|
| 7.2 | Powers and Authority of Committees | 15 |
| 7.3 | Executive Committee | 16 |
| 7.4 | Marketing Committee | 17 |
| 7.5 | Legal Committee | 18 |
| 7.6 | Working Groups | 18 |
| 7.7 | Compensation | 18 |
| **Article VIII** | **IPR Policy and Approval of Specifications** | 18 |
| 8.1 | General | 18 |
| 8.2 | Modifications to the IPR Policy | 18 |
| 8.3 | Application of Modified IPR Policy | 19 |
| 8.4 | Approval of Specifications | 19 |
| **Article IX** | **Miscellaneous** | 19 |
| 9.1 | Fiscal Year | 19 |
| 9.2 | Inspection of Corporate Records | 19 |
| 9.3 | Representation of Shares of Other Corporations | 20 |
| 9.4 | Checks, Drafts, Etc. | 20 |
| 9.5 | Execution of Contracts | 20 |
| 9.6 | Corporate Loans, Guarantees and Advances | 20 |
| 9.7 | Inspection and Disclosure | 20 |
| 9.8 | Not for Profit Status | 20 |
| 9.9 | Forms of Notice | 20 |
| 9.10 | Severability | 20 |
| **Article X** | **Effective Date and Amendment** | 21 |
| 10.1 | Effective Date | 21 |
| 10.2 | Amendments | 21 |

# CORPORATE BYLAWS

# OF

# CONNECTIVITY STANDARDS ALLIANCE

**(a nonprofit mutual benefit corporation)**

## ARTICLE I
## OFFICES

**1.1 Principal Office**. The principal office of the Corporation shall be located at such location within the State of California as the Board of Directors so prescribes. The principal office may be changed from time-to-time to another location within the State of California by the Board of Directors.

**1.2 Other Offices.** Branch or subordinate offices may at any time be established by the Board of Directors at any place or places where this Corporation is qualified to do business.

## ARTICLE II
## PURPOSES

**2.1 Purposes**. The Corporation is a non-profit mutual benefit corporation formed to create, evolve and promote universal, open, global standards for wireless device-to-device communications for the Internet of Things (IoT).

The purposes for which the Corporation is organized are to:

(a) Bring about the existence of a broad range of interoperable consumer and industrial devices by establishing open industry specifications for unlicensed, untethered, peripheral, control and entertainment devices;

(b) Provide a forum and environment whereby the Corporation's Members may meet to approve suggested revisions and enhancements that evolve the relevant specifications; make appropriate submissions to established agencies and bodies with the purpose of ratifying these specifications as an international standard; and provide a forum whereby users may meet with developers and providers of related products and services to identify requirements for interoperability and general usability;

(c) Educate the business and consumer communities as to the value, benefits and applications for universal, open, global standards for wireless communications for the IoT through public statements, publications, trade shows demonstrations, seminar sponsorships and other programs established by the Corporation;

(d) Protect the needs of consumers and increase competition among vendors by supporting the creation and implementation of uniform, industry-standard certification test procedures and processes which assure the interoperability of wireless products and services using the Corporation's standards;

(e) Maintain relationships and liaison with educational institutions, government research institutes, other technology consortia, professional organizations, trade groups and other organizations that support and contribute to the development of the Corporation's specifications and standards; and

(f) Foster competition in the development of new products and services based on specifications developed by the Corporation in conformance with all applicable antitrust laws and regulations.

## ARTICLE III
## MEMBERSHIP

**3.1 Classes of Membership**. There shall be only one class of Members in the Corporation within the meaning of Section 5056 of the California Nonprofit Corporation Law, and such Members shall be known as "***Promoter Members***." Promoter Members of the Corporation shall be those entities qualified and approved as set forth in **Section 3.2.2**. A Promoter Member shall automatically cease to be a Promoter Member upon the occurrence of an event set forth in **Section 3.4**. The Corporation may, pursuant to resolutions adopted by the Board of Directors, create one or more classes of non-member participants of the Corporation, and currently the non-member participants are Participants, Adopters, Associates and Non-Profits (collectively referred to in the Bylaws as "***Participants/Adopters/Associates/Non-Profits***"). Participants/Adopters/Associates/Non-Profits shall have only the rights and privileges specifically given to them by the resolutions adopted by the Board of Directors and shall be subject to any conditions imposed thereon by the Board of Directors. Participants/Adopters/Associates/Non-Profits shall not be entitled to any voting rights with respect to the business or proceedings of the Corporation, including without limitation, any matters relating to the adoption of a deliverable or any other matters presented to the Corporation and/or the Promoter Members for voting or election. Any classes of Participants/Adopters Associates/Non-Profits may be referred to as "***Participants***," "***Adopters***", "***Members***," "***Associates***," "***Non-Profits***" or by any other designation given to them by the Board of Directors; however all such classes of Participants/Adopters/Associates/Non-Profits shall not be considered "statutory members" within the meaning of Section 5056 or any other applicable section of the California Nonprofit Corporation Law. Notwithstanding the foregoing, this **Section 3.1** and **Sections 3.4** through **3.7, Section 4.11** and **Articles 7** through **10** of these Bylaws shall apply to such Participants/Adopters/Associates/Non-Profits and references to "***Members***" in therein shall also be deemed to include such Participants/Adopters/Associates/Non-Profits. Otherwise, all references to "***Members***" in these Bylaws shall be limited to Promoter Members only.

**3.2 Membership Qualifications**.

**3.2.1 Qualifications for Participants/Adopters/Associates/Non-Profits and Other Non-Promoter Members**. Any company shall be eligible to be a Participant, Adopter,

Associate, Non-Profit or other non-Promoter member if it demonstrates that it is dedicated to the purposes of the Corporation by:

(a) Publicly displaying a legitimate business interest; and

(b) Publicly supporting, in the form of a press release or as evidenced by shipping products or enabling technology, such as, for example, chip sets, software, *etc*. for Corporation certified products; and

(c) Receiving approval of the membership application by the Board of Directors or the President and Chief Executive Officer; and

(d) Paying such dues and fees as the Board may fix from time-to-time; and

(e) Such other criteria and conditions of membership that may be adopted by the Board of Directors from time-to-time.

**3.2.2 Qualifications for Promoters**. Any company shall be eligible for Promoter membership that satisfies the requirements for membership as a Participant/Adopter/Associate/Non-Profit as referenced above, and, in addition:

(a) Agrees to actively promote Corporation specifications for connected devices that comply with Corporation Adopted Specifications; and

(b) Is shipping or deploying or intends to ship or deploy for public access, Corporation products or enabling technology, such as, for example, chip sets, software, *etc*., for Corporation certified products; and

(c) Receives a vote of approval by a two-thirds (2/3) majority of the Board of Directors; and

(d) Such other criteria and conditions of membership that may be adopted by the Board of Directors from time-to-time.

In determining whether an applicant should be approved as a new Promoter Member, the Board of Directors shall consider the Corporation's goal of having Promoter Member diversity in terms of representing various segments of the Internet of Things industry in such proportions as deemed advisable by the Board of Directors, from time-to-time.

**3.2.3 Membership Agreements**. Subject to the prior approval as required in these Bylaws, the President and Chief Executive Officer, or their designee, shall be authorized to sign on behalf of the Corporation, and to process and administer Member agreements.

**3.3 Fees, Dues and Assessments**. The Board of Directors shall determine the initial membership fees, dues and assessments for membership and/or participation in the Corporation. Fees, dues and assessments for membership in the Corporation may be increased or decreased by the Board, in its discretion, at any time. Membership in the Corporation will automatically renew on an annual basis, and membership fees will be invoiced at each subsequent anniversary period. Members shall be obligated to make payment of annual fees, dues and assessments within thirty

(30) calendar days of the due date for payment of such fees, dues or assessments, and the Corporation may suspend benefits and privileges or terminate membership if such fees, dues or assessments are not paid within such thirty (30) day period.

**3.4 Termination of Membership.** The membership of any Member shall terminate upon the occurrence of any one or more of the conditions set forth in this **Section 3.4**. Upon termination or expiration of the status of a Member in the Corporation, all rights and privileges associated with being a Member shall terminate:

**3.4.1 Resignation**. A Member may resign from the Corporation at any time by filing a resignation letter with the Chairperson or Secretary of the Corporation. No *pro rata* refund of any membership fees, dues or assessments shall be made for the balance of the calendar year in which the resignation is effective.

**3.4.2 Expiration and Disqualification**. A membership issued for a period of time shall expire when such period of time has elapsed unless the membership is renewed.

**3.4.3 Dues and Assessments**. Membership may be terminated by the Corporation following the failure of the applicable Member to pay any fees, dues or assessments within the time periods established by the Board of Directors.

**3.4.4 Termination of the Member Agreements**. Membership shall terminate upon termination or expiration of the applicable Promoter Member Agreement, Participant Member Agreement, Adopter Member Agreement, Associate Member Agreement or Non-Profit Member Agreement.

**3.5 Non-Liability**. No Member shall be personally liable for the debts, liabilities or obligations of this Corporation.

**3.6 Transferability**. Except as provided below, a Member shall not assign or otherwise transfer for value or otherwise its membership interest or any right arising therefrom.

**(a) Transfer in Connection with a Restructuring, Reorganization, Consolidation or Other Similar Corporate Transaction**. A Member ("***Transferor Member***") may assign or otherwise transfer its membership interest and associated Member agreement to an Affiliate of Member ("***Transferee Member***") in connection with a restructuring, reorganization, consolidation or other similar corporate transaction, provided that the Transferor Member maintains a relationship with the Corporation as a Member (Promoter or Participant, Adopter, Associate, Non-Profit or other category of non-statutory member as referenced in **Section 3.1** of these Bylaws) pursuant to the Corporation's standard agreement for such membership category, and provided further that if the Transferor Member fails to maintain its membership in the Corporation or is otherwise no longer a Member for any reason, Transferee Member's membership in the Corporation will terminate and such Transferee Member will be required to reapply for membership. Upon request of the Corporation, Transferor Member and/or Transferee Member shall provide such documents as may be required to validate and verify the Affiliate status of Transferee Member. Any such permitted assignment or other transfer

under this **Section 3.6(a)** of these Bylaws shall be effective and contingent on such agreement being duly executed by Transferor Member and delivered to the Corporation and any associated membership fees being paid. The form of transfer shall be prescribed by the Corporation or otherwise be acceptable to the Corporation in its sole discretion.

For purposes of this **Section 3.6(a)** of these Bylaws, the term "Affiliate of Member" means any legal entity that directly or indirectly, controls, is controlled with or by or under common control with a Member, and the term "control" shall mean the direct or indirect control of fifty percent (50%) or more of the voting power to elect directors thereof, or any other entity, the power to direct the management of such entity.

**(b) Transfer in Connection with a Merger, Acquisition or Other Transaction Involving a Change in Control.** In the case of a merger, acquisition or other transaction wherein there is a Change in Control of a Member, the membership interest and the associated membership agreement of such Member shall continue in full force and effect through and until the next renewal time period for such Member. At the time for renewal, such Member's membership in the Corporation shall terminate and the Member must reapply for membership, subject to all the then-current conditions and criteria for membership. In the case of a Promoter Member undergoing a Change in Control, such Promoter Member shall not be required to pay the Corporation initiation fee (but shall be responsible for the then-current Promoter Member dues).

For purposes of this **Section 3.6(b)** of these Bylaws, the term "Change in Control" means: (a) any transaction or combination of transactions as a result of which either a person, an entity or a group of persons and/or entities that customarily has acted in concert and that presently is in control of Member ceases to be in control of Member; or (b) the sale, transfer, exchange or other disposition (including disposition in full or partial dissolution) of fifty percent (50%) or more of the beneficial ownership (as defined in Rule 13(d) of the Securities Exchange Act of 1934) of the voting power of Member, or of the assets of Member that constitute a substantial or material business segment of Member; or (c) the divestiture, in whole or in part, of the business unit or division of Member that has participated in the Corporation's activities.

**3.7 Distribution of Assets Upon Dissolution**. Upon a dissolution or liquidation of this Corporation, and after all of the known debts and liabilities of this Corporation have been paid or adequately provided for in accordance with Section 8713 of the California Nonprofit Corporation Law, the Board of Directors shall: (a) return to the Members any unused portions of dues paid by Members for any particular fiscal year; and (b) thereafter, transfer remaining assets and/or intellectual property rights of the Corporation which are not appropriate for transfer to the general public, such as any trademarks or logos of the Corporation, to another Section 501(c)(6) organization, as determined by the Board of Directors whose purposes are similar to the Corporation. Any such assets not disposed of in accordance with the aforementioned procedures shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located to such organization or organizations, as said court shall determine, that are organized and operated exclusively for such purposes. No part of the Corporation's net earnings will inure to the benefit of any Member, Director or any third person.

# ARTICLE IV
## MEMBERSHIP MEETINGS

**4.1 Place of Meetings**. All meetings of Members shall be held at any place which may be designated by the Board of Directors pursuant to the authority hereinafter granted to the said Board of Directors, or by the written consent of a majority of Members entitled to vote thereat, given before the meeting and filed with the Secretary of the Corporation.

**4.2 Regular Meetings**. Regular meetings of Members of the Corporation shall be held at such dates and at such times and places as determined by resolution of the Board of Directors. Additional Member meetings may be set as determined by the Board of Directors and pursuant to notification as defined in these Bylaws.

**4.3 Special Meetings**. Special meetings of Members, for any lawful purpose or purposes whatsoever, may be called at any time by the Chairperson, the President and Chief Executive Officer, the Board of Directors, or by five percent (5%) or more of Members entitled to vote. Notice of such request must be submitted to the Chairperson, the Vice-Chairperson or Secretary. The notice must state the business to be transacted at the special meeting. It shall be the duty of the officer to cause notice to be given to the Members entitled to vote at the meeting scheduled and to be held not less than ten (10) days nor more than ninety (90) days after the receipt of such a request. A quorum of Members must be present at the special meeting pursuant to **Section 4.6** in order to conduct the business of the Corporation.

**4.4 Notice of Meetings**. A notice of each annual meeting, written ballot for election of Directors or otherwise, if any, and special meeting shall be given by the Chairperson or, in case of their failure or refusal, by any other officer or any Director. Each such notice shall specify: (a) the place, time, day and hour of the meeting or the date on which the ballot shall be returned, if applicable; (b) in the case of an annual meeting at which Directors shall be elected, shall specify the names of all those who are candidates for election of Directors and the agenda of the meeting as determined at the time the notice is given; and (c) in the case of special meetings, the nature of the business to be transacted thereat. Such notice shall be given to every Member of the Corporation who, on the record date for notice of the meeting, is entitled to vote thereat. Such notice shall be given at least ten (10) days but no more than ninety (90) days prior to the date fixed for such meeting.

**4.5 Adjourned Meetings**. Any Members' meeting, annual or special, whether or not a quorum is present, may be adjourned from time-to-time by the vote of a majority of the Members, entitled to vote thereat, either present in person or represented by proxy thereat, but in the absence of a quorum no other business may be transacted at any such meeting. Annual and special meetings may not be adjourned for more than forty-five (45) days to another time or place. It shall not be necessary to give any such notice of the time and place of the adjourned meeting or of the business to be transacted thereat, other than by an announcement at the meeting at which such adjournment is taken. If after the adjournment a new record date is fixed for notice or voting, a notice of the adjourned meeting shall be given to each Member who, on the record date for notice of the meeting, is entitled to vote at the meeting.

**4.6 Quorum**. The presence in person or by proxy of a majority of the Members of the Corporation entitled to vote shall constitute a quorum for the transaction of business. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the Members required to constitute a quorum. The presence of an authorized representative of a Member shall constitute presence of the Member for purposes of determining the establishment of a quorum.

**4.7 Voting**. Each Promoter Member in good standing (*i.e.*, Promoter Members who have paid their membership fees, dues and assessments in accordance with these Bylaws and whose membership has not been terminated pursuant to **Section 3.4**) is entitled to one (1) vote on each matter submitted to a vote of the Members. Voting shall be by voice vote, unless the Chairperson of the Corporation directs such voting to be by ballot. No single vote shall be split into fractional votes. Cumulative voting shall not be authorized.

**4.8 Action Without Meeting by Written Ballot**. Any action, which may be taken at any regular or special meeting of Members, may be taken without a meeting if the Corporation distributes a written ballot to every Member entitled to vote on the matter. Such ballot shall set forth the proposed action, provide an opportunity to specify approval or disapproval of any proposal, and provide a reasonable time within which to return the ballot to the Corporation. Approval by written ballot shall be valid only when the number of votes cast by ballot within the time period specified equals or exceeds a quorum of the Members, and the number of approvals equals or exceeds the number of votes that would be required to approve at a meeting at which the total number of votes cast was the same as the number of votes cast by ballot. Ballots shall be distributed to Members in accordance with delivery and timing requirements set forth in **Section 4.4**. All ballots distributed shall indicate the number of responses needed to meet the quorum requirement and shall state the percentage of approvals necessary to pass the measure submitted. All written ballots distributed shall specify the time by which the ballot must be received in order to be counted.

**4.9 Proxies**. Every Member entitled to vote shall have the right to do so in person or by one or more agents authorized by a written proxy executed by such person or their duly authorized agent and filed with the Secretary of the Corporation; but no such proxy shall be valid after the expiration of eleven (11) months from the date of its execution, unless the person executing it specifies therein the length of time for which such proxy is to continue in force.

**4.10 Conduct of Meetings**. Meetings of Members shall be presided over by the Chairperson of the Corporation, or in their absence, by the Vice-Chairperson, and in the absence of both of them, by the chair chosen by a majority of the Members present. The Secretary of the Corporation shall act as the secretary of all meetings of Members, provided that in their absence the presiding officer shall appoint another Member to act as acting secretary of the meeting.

**4.11 Electronic Communications**. The providing of notices, voting and any other action to be taken as given by the Corporation or by or for a Member may be given through electronic means such as email, and such notice, vote or other action shall be sufficient for purposes of notices, vote or other actions under these Bylaws. In any matter in which electronic voting is adopted as the procedure for voting, the quorum requirements and number of votes required for an

action or matter to pass shall be satisfied by determining the number of electronic votes cast by Members. For example, the 10% quorum requirement will be satisfied if 10% of the Members cast their vote electronically. For each matter using electronic voting, the Board of Directors shall establish a start and end date upon which ballots can be cast, and such end date may be extended from time-to-time by the Chairperson or Board of Directors.

**4.12 Electronic Meetings**. A meeting of the Members may be conducted, in whole or in part, by electronic transmission by and to the Corporation or by electronic video screen communication: (a) if the Corporation implements reasonable measures to provide Members in person (or, if proxies are allowed, by proxy) a reasonable opportunity to participate in the meeting and to vote on matters submitted to the Members, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with those proceedings; and (b) if any Member votes or takes other action at the meeting by means of electronic transmission to the Corporation or electronic video screen communication, a record of that vote or action is maintained by the Corporation.

## ARTICLE V
## BOARD OF DIRECTORS

**5.1 Powers**. Subject to the limitations of the Articles of Incorporation, the Bylaws, and the California Nonprofit Corporation Law and subject to the duties of Directors as prescribed by the Bylaws, all corporate powers shall be exercised by or under the authority of, and the business and affairs of this Corporation shall be controlled by, the Board of Directors. The Board of Directors shall have the power to select and remove all officers, agents, employees and contractors, and to fix reasonable compensation thereof, to authorize and empower officers or agents to enter into contracts and other commitments on behalf of this Corporation, and to appoint and delegate responsibilities and authority to committees, officers and agents.

**5.2 Number and Composition of Board of Directors**. The number of Directors shall be equal to the number of Promoter Members, plus the President and Chief Executive Officer who shall serve without vote. In addition, the Board of Directors may appoint and remove, from time-to-time, additional Board members when the Board of Directors believes that such appointment is in the best interests of the Corporation.

Each Promoter Member shall designate one (1) Director and one (1) Alternate Director (as more specifically defined in **Section 5.3**) to serve on the Board of Directors. Each Director and Alternate Director must be an employee, officer, director or duly authorized representative of the Promoter Member on behalf of which they are serving. Each of the Director and Alternate Director shall serve a one (1) year term unless otherwise provided under this **Section 5.2**. Each Director or Alternate Director shall have one (1) vote on each matter presented to the Board of Directors for action. No Director or Alternate Director may vote by proxy.

An individual's status as a Director shall be automatically terminated upon the termination of the Director's employment with or authority to represent the Promoter Member of which he/she was an employee or authorized representative, in which case the vacancy may be filled in accordance with **Section 5.6**.

In addition, upon resolution by a majority of the Board of Directors (not including the Director against whom action is being taken): (a) a Director may be removed for cause pursuant to **Section 5.19.2**, in which case the vacancy may be filled in accordance with **Section 5.6**; and (b) the Director and Alternate Director positions for a Promoter Member shall be eliminated through the remaining period of the Promoter Member's membership term if such Promoter Member's Director and Alternate Director fail to attend two (2) consecutive regular Board meetings, provided such absences are not excused based on exigent circumstances (*e.g.*, illness, bereavement, incapacity, *etc*.) as approved in advance of such meetings by the Chairperson or President and Chief Executive Officer. In the event of a **subsection (b)** elimination, the vacancy may not be filled under **Section 5.6** or otherwise, however, the Promoter Member may, upon written notice to the Chairperson and President and Chief Executive Officer, request the restoration of the Director and Alternate Director positions, and such positions will be reinstated upon the next membership renewal date of the Promoter Member.

The provisions of this **Section 5.2** may not be amended except upon the two-thirds (2/3) approval of the Board of Directors.

**5.3 Alternate Directors**. The following procedures shall apply to Alternate Directors:

**5.3.1 Alternate Directors; Voting**. Each Director shall have an alternate to serve in the capacity of Director in the event of the death, resignation, removal or absence of the Director; such alternate shall be referred to as an "***Alternate Director***." When serving in the capacity of Director, the Alternate Director shall have all the rights, privileges and responsibilities of the Director. Alternate Directors shall: (a) be entitled to attend all regular and special meetings of the Board of Directors; and (b) have all rights (including voting rights) of the Director in the absence of the Director.

**5.3.2 Role of Alternate Director**. In the event that the Alternate Director is serving as a Director due to the absence of the non-Alternate Director, such non-Alternate Director shall regain all of the rights, privileges and responsibilities of Director status upon the termination of their absence. In the event that the Alternate Director is serving as a Director due to the death, resignation or removal of the Director, the Alternate Director shall immediately become a Director, and the corresponding position of Alternate Director shall become vacant.

**5.3.3 Application of Bylaws**. All provisions of these Bylaws apply equally to the Alternate Directors as to the Directors, unless otherwise noted.

**5.4 Observers and Invitees**. If a Promoter Member wants to invite an observer or invitee to a Board meeting, the Promoter Member must provide prior written notice to the Chairperson and President and Chief Executive Officer and any such observation and/or invitee must be approved by the Chairperson and President and Chief Executive Officer prior to the Board meeting.

**5.5 Restrictions on Eligibility to Serve as a Director; Control Groups**. No more than one (1) individual employed by or affiliated with an entity that constitutes a Control Group shall be permitted to serve as a Director or Alternate Director of the Corporation at one time. For purposes of this section, "***Control(s)***," "***Controlled***" or "***Controlling***" shall mean: (a) the

ownership, directly or indirectly, of 50% or more of the total voting securities of another entity; or (b) in the case of unincorporated entities, shall mean the ownership of more than 50% of the ownership interest representing the right to make decisions for the entity. "***Control Group***" shall include a Member and all corporations or other entities which are Controlled by such Member or which Control such Member.

**5.6 Vacancies**. Subject to the restrictions on filling vacancies in **Section 5.2**, if there is a Director vacancy which is not filled by an Alternate Director pursuant to **Section 5.3** and/or upon the vacancy of an Alternate Director, the affected Promoter Member shall have sixty (60) calendar days from the date of notice of the vacancy from the Corporation to appoint a replacement Director and/or Alternate Director to the Board of Directors for the remaining term. If the Promoter Member fails or refuses to make such appointment within such sixty (60) calendar day period, the position shall be vacated.

**5.7 Regular Meetings**. Meetings of the Board of Directors will be held approximately four (4) times a year, and at such other times as may be necessary or advisable. All meetings of the Board of Directors may be held at any place that has been designated from time-to-time by the Board of Directors or by the notice of the Chairperson or Secretary.

**5.8 Special Meetings**. Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the Chairperson or by any two (2) Directors.

**5.9 Notice of Meetings; Attendance**. Notice of the time and place of each meeting of the Board of Directors not fixed by resolution of the Board of Directors shall be given electronically to each Director not less than: (a) two (2) business days in advance of the Board of Directors meeting, for telephonic meetings; and (b) twenty one (21) calendar days, in advance of the Board of Directors meeting, for in-person meetings.

**5.10 Consent to Meetings**. The transactions of the Board of Directors at any meeting however called and noticed or wherever held, shall be as valid as though done at a meeting duly held after call and notice if a quorum be present and if either before or after the meeting each Director not present: (a) signs a written waiver of notice; (b) signs a consent to the holding of such meeting; or (c) approves the minutes thereof. Each Director who attends the meeting without protesting, prior thereto or at its commencement, shall be deemed conclusively to have consented to the holding of the meeting and to have waived the lack of notice to such Director. All such waivers, consents or approvals shall be filed with the corporate records and made a part of the minutes of the meeting.

**5.11 Action Without Meeting**. Any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all members of the Board of Directors shall individually or collectively consent in writing to such action. Such written consent or consents may be by email, signature on a PDF document, digital or electronic signature or other evidence of written consent, and shall be filed with the minutes of the proceedings of the Board of Directors. Such action by written consent shall have the same force and effect as a unanimous vote of such Directors. Any certificate or other document filed under any provision of the California Nonprofit Corporation Law which relates to action so taken shall state that the action was taken by unanimous written consent of the Board of Directors without a meeting, and that the Bylaws authorize the

Directors to so act. For the purposes of this section only, "all members of the Board" shall not include any "***Interested Director***" as defined in **Section 5.18**.

**5.12 Telephonic/Electronic Meetings**. Directors may participate in a meeting through use of conference telephone, electronic video screen communication, or electronic transmission by and to the corporation. Participation in a meeting through use of conference telephone or electronic video screen communication constitutes presence in person at that meeting as long as all Directors participating in the meeting are able to hear one another. Participation in a meeting through use of electronic transmission by and to the Corporation, other than conference telephone and electronic video screen communication, constitutes presence in person at that meeting if both of the following apply: (a) each Director participating in the meeting can communicate with all of the other Directors concurrently; and (b) each Director is provided the means of participating in all matters before the Board, including, without limitation, the capacity to propose, or to interpose an objection to, a specific action to be taken by the Corporation.

**5.13 Quorum and Vote**. A majority of the Directors from Promoter Members then in office shall be necessary to constitute a quorum for the transaction of business, except to adjourn as hereinafter provided in **Section 5.14**. Every act or decision done or made by a majority of the Directors from Promoter Members present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board of Directors unless a greater number be required by law, the Articles of Incorporation or these Bylaws. The presence of the President and Chief Executive Officer shall not be counted for purposes of determining a quorum and shall not be counted for purposes of determining a majority in voting on any motion or action of the Board of Directors.

**5.14 Adjournment**. A majority of the Directors present, whether or not a quorum is present, may adjourn any Directors' meeting to meet again at another time or place. In the event a meeting of the Board of Directors is adjourned for more than forty-eight (48) hours, notice of any adjournment to another time or place shall be given prior to the time set for the rescheduled meeting to the Directors who were not present at the time of the adjournment.

**5.15 Fees and Compensation**. Directors shall serve without compensation, but by resolution of the Board of Directors, may be reimbursed for expenses paid while acting on behalf of the Corporation and/or expenses incurred in attending meetings of the Board of Directors. Nothing herein contained shall be construed to preclude any Director from serving the Corporation in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation therefore so long as such compensation is approved by a majority of Directors, excluding any Interested Director as defined in **Section 5.18**.

**5.16 Indemnity for Litigation**. This Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any proceeding by reason of the fact that such person is or was a Director, Alternate Director, officer, or member of any committee or working group of this Corporation, to the full extent allowed under the provisions of Section 7237 of the California Nonprofit Corporation Law relating to the power of a corporation to indemnify any such person. The amount of such indemnity shall be so much as the Board of Directors determines and finds to be reasonable, or, if required by said Section 7237 of the California Nonprofit Corporation Law, the amount of such indemnity shall be so much as the court determines and finds to be reasonable.

**5.17 Standard of Conduct**. Pursuant to Section 7231 of the California Nonprofit Corporation Law, a Director (and Alternate Director, as applicable) shall perform the duties of a Director, including duties as a member of any committee or working group upon which the Director may serve, in good faith, in a manner such Director believes to be in the best interests of this Corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. In performing the duties of a Director, a Director or Alternate Director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:

(a) One or more officers or employees of this Corporation whom the Director believes to be reliable and competent in the matters presented;

(b) Legal counsel, independent accountants or other professionals as to matters which the Director believes to be within such person's professional or expert competence; or

(c) A committee of the Board upon which the Director does not serve, as to matters within the committee's designated authority, which committee the Director believes to merit confidence; provided that, in any such case, the Director acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.

**5.18 Self-Dealing Transactions**. As used in this section, a "self-dealing contract" is any contract or transaction: (a) between this Corporation and one or more of its Directors, or between this Corporation and any corporation, firm or association in which one or more of the Directors has a material financial interest; or (b) between this Corporation and a corporation, firm or association of which one or more of its directors are Directors of this Corporation (collectively, "***Interested Director(s)***"). Pursuant to Section 7233 of the California Nonprofit Corporation Law, no self-dealing contract shall be void or voidable because such Interested Director(s) or corporation, firm or association are parties or because such Interested Director(s) are present at the meeting of the Board or committee which authorizes, approves or ratifies the self-dealing contract, if:

**5.18.1 Membership Approval**. All material facts are fully disclosed to or otherwise known by the Members and the self-dealing contract is approved by the Members in good faith including the abstention from voting by any membership owned by such Interested Director(s);

**5.18.2 Board or Committee Approval**. All material facts are fully disclosed to or otherwise known by the Board or committee and the Board or committee authorizes, approves, or ratifies the self-dealing contract in good faith (including the abstention from voting by the Interested Director(s)), and, in the case of a self-dealing contract described above, the Board or committee resolves and finds that the contract is just and reasonable at the time it is authorized, approved or ratified; or

**5.18.3 Just and Reasonable Contract**. The person asserting the validity of the self-dealing contract sustains the burden of proving that the contract was just and reasonable as to the Corporation at the time it was authorized, approved or ratified.

Interested Director(s) may be counted in determining the presence of a quorum at a meeting of the Board or a committee thereof which authorizes, approves or ratifies a contract or transaction as provided in this **Section 5.18**.

**5.19 Resignation and Removal**.

**5.19.1 Resignation**. Any Director or Alternate Director may resign at any time by giving written notice to the Board of Directors, to the Chairperson or to the Secretary of this Corporation.

**5.19.2 Removal**. In addition to the removal of a Director under **Section 5.2**, any Director and/or Alternate Director may be removed upon resolution by the Board of Directors terminating such individual's status as such a Director or Alternate Director for any of the following, all of which constitute removal for cause: (a) conviction or entry of a plea of *nolo contendere* by such Director or Alternate Director for a crime; (b) intentional breach of fiduciary duties by such Director or Alternate Director; (c) public disparagement or ridicule of the Corporation by such Director or Alternate Director; or (d) gross mismanagement or waste by such Director or Alternate Director. Upon termination of an individual's status as a Director or Alternate Director or if there is otherwise a vacancy on the Board of Directors, the vacancy may be filled pursuant to **Section 5.6**.

**5.20 Advisory Board**. The Board of Directors may, at its sole discretion, appoint a board of advisors ("***Advisory Board***") with which the Board of Directors shall consult on matters relating to the operation of the Corporation. The members of the Advisory Board shall not have the rights or privileges of Directors or Members as set forth in Sections 5047 and 5056 of the California Nonprofit Corporation Law and shall have no power or authority over the operation of the Corporation. The Advisory Board may be restructured and/or terminated by resolution of the Board of Directors at any time. A member of the Advisory Board may be removed at any time by the Board of Directors in its sole and absolute discretion.

## ARTICLE VI
## OFFICERS

**6.1 Officers**. The principal officers of this Corporation shall be a Chairperson of the Board, one Vice-Chairperson of the Board, the President and Chief Executive Officer, a Treasurer, a Secretary and such other officers as the Board of Directors may appoint. One person may only hold one such office. The Chairperson of the Board and the Vice-Chairperson of the Board must be Directors (*i.e.*, not an Alternate Director) of a Promoter Member of the Corporation to be eligible to be appointed Chairperson of the Board and Vice-Chairperson, as applicable. Other than the Chairperson of the Board and the Vice-Chairperson of the Board, officers of the Corporation may be any person nominated by a Director and nothing herein shall require such individual to be a Director or an employee or duly authorized representative of any Member of the Corporation.

**6.2 Election**. The officers of this Corporation shall be appointed by the Board of Directors in accordance with this **Article VI**, and, except for the President and Chief Executive Officer under contract, each Board officer shall hold their office for a term of two (2) years, or until they shall resign or shall be removed or their successor shall be elected and qualified.

**6.3 Removal and Resignation.**

**6.3.1 Removal**. Any officer may be removed at any time, either with or without cause, by the Board of Directors or by any officer upon whom such power of removal may be conferred by the Board of Directors. Upon such time as the Chairperson of the Board ceases to be the primary Director of a Promoter Member of the Corporation, such Chairperson of the Board shall be automatically and immediately deemed to have resigned as Chairperson of the Board.

**6.3.2 Resignation**. Any officer may resign at any time by giving written notice to the Board of Directors or the Secretary of the Corporation. Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Such resignation shall not prejudice the rights of the Corporation under any contract to which the officer is a party.

**6.4 Vacancies**. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled by the Board of Directors for the unexpired term, provided that the Executive Committee may appoint an interim officer until such time as the Board of Directors convenes its next Board meeting.

**6.5 Chairperson of the Board.** The Chairperson of the Board shall be a member of the Board of Directors and shall preside at all meetings at the Board of Directors. Subject to the control of, and in conjunction with the Board of Directors, the Chairperson of the Board shall lead the Board of Directors in establishing the Corporation's long term strategy, annual objectives and priorities and in establishing the measures of performance against those objectives. The Chairperson of the Board shall serve as the chairperson of the Executive Committee and as an *ex-officio* voting or non-voting member of other committees as may be designated from time-to-time by the Board, shall have the authority to represent the decisions of the Board of Directors, and shall have such other powers and duties as may be designated from time-to-time by the Board of Directors. The Chairperson of the Board shall not serve as the chairperson of any other Board committee or Working Group Steering Committee.

**6.6 Vice-Chairperson of the Board**. In the absence of the Chairperson of the Board, or in the event of their removal, resignation, termination or inability or refusal to act, the Vice-Chairperson of the Board shall perform all the duties of the Chairperson of the Board, and when so acting shall have all the powers of, and be subject to all the restrictions on, the Chairperson of the Board. The Vice-Chairperson of the Board shall have such other powers and duties as may be designated from time-to-time by the Board of Directors or the Chairperson of the Board.

**6.7 President and Chief Executive Officer**. The President and Chief Executive Officer shall serve as the general manager and principal officer of the Corporation. The President

and Chief Executive Officer shall be responsible for acting on the directions and decisions as provided by the Board of Directors and for managing, directing, and supervising the Corporation's staff in support of those directions and decisions. The President and Chief Executive Officer shall manage and supervise the Corporation's contracting process and shall have the authority to execute any document on behalf of the Corporation, subject to the control and approval of the Board of Directors. The President and Chief Executive Officer shall preside over various Corporation meetings and events (other than Board meetings), and have such other responsibilities, powers and duties as may be assigned from time-to-time by the Chairperson and/or Board of Directors.

**6.8** **Treasurer**. The Treasurer shall oversee the financial and accounting matters of this Corporation with respect to the receipt and deposit of funds. The Treasurer shall have such other powers and duties as may be designated from time-to-time by the Board of Directors.

**6.9** **Secretary**. The Secretary shall keep a full and complete record of the proceedings of the Board of Directors, shall keep the seal (if one is maintained) of this Corporation and affix it to such papers and instruments as may be required in the regular course of business, shall make service of such notices as may be necessary or proper, and shall supervise the keeping of the records of this Corporation. The Secretary shall have such other powers and duties as may be designated from time-to-time by the Board of Directors.

## ARTICLE VII
## COMMITTEES AND WORKING GROUPS

**7.1** **Appointment of Committees**. The Board of Directors may create committees as the Board from time-to-time deems necessary or appropriate to conduct the business and further the objectives of this Corporation. Such committees shall have the responsibilities and duties established by the Board of Directors. Any such committees may be restructured and/or terminated by the Board of Directors at any time. The Charter of a committee shall be developed by the committee and provided to the Board of Directors for its approval.

**7.2** **Powers and Authority of Committees**. Without limiting the generality of **Section 7.1**, the Board of Directors may delegate to any committee any of the powers and authority of the Board of Directors in the management of the business and affairs of this Corporation, except the following:

(a) The approval of any action for which California law requires the approval of members of a corporation;

(b) The filling of vacancies on the Board or in any committee that has the authority of the Board;

(c) The fixing of compensation of the Directors for serving on the Board or on any committee;

(d) The amendment or repeal of Bylaws or the adoption of new Bylaws;

(e) The amendment or repeal of any resolution of the Board, which by its express terms is not so amendable or repealable;

(f) Subject to **Section 7.3** relating to the *ex-officio* members of the Executive Committee, the appointment of committees of the Board or the members thereof; and

(g) The expenditure of corporate funds to support a nominee for Director after there are more people nominated for Director than can be elected.

**7.3 Executive Committee**. The Executive Committee shall be comprised of ten (10) *ex-officio* members, as follows: (i) the Chairperson of the Board of Directors, who shall serve as the chairperson of the Executive Committee; (ii) the Vice Chairperson of the Board of Directors; (iii) the chairpersons each of the Strategy Committee, the Finance Committee, the Governance Advisory Committee, the Test Certification & Oversight Committee (TCOC), the Marketing Committee (MC), and the Public Affairs Committee; and (iv) the President and Chief Executive Officer, and Secretary. Each member of the Executive Committee shall have one (1) vote, other than the President and Chief Executive Officer, and Secretary, who shall serve without vote. The Executive Committee shall meet on a monthly basis, and at such other times as may be advisable at the direction of the Chairperson or President and Chief Executive Officer.

The Executive Committee shall have the following limited delegated responsibilities and authorities:

(a) Provide advice and direction to the Chairperson and President and Chief Executive Officer;

(b) Recommend priorities for the Board of Directors, and make recommendations to the Board of Directors for any matter requiring a $2/3^{rds}$ vote of the Board of Directors or requiring a vote of members under California law, including recommendations with respect to Proposed Specifications and any changes to the IPR Policy;

(c) Approve Liaisons/Memoranda of Understanding;

(d) Approve expenditures and contracts for services with suppliers and vendors in the ordinary course of the business of the Corporation;

(e) Approve changes to technology and marketing policies (PKI (Public Key Infrastructure) policy, marketing RACI);

(f) Approve changes to compliance policies (Conflict of Interest Policy, *etc*.);

(g) Approve changes to miscellaneous operational policies;

(h) Approve new Authorized Test Labs;

(i) Approve new DCL (Distributed Compliance Ledger) trustees and Validator Nodes;

(j) Approve Policy Position Papers;

(k) Approve Public Release of Specifications;

(l) Approve Brands;

(m) Approve Annual marketing plan;

(n) Develop the agenda for the Board of Directors meetings;

(o) Monitor and assess the effectiveness of the Board of Directors and determine ways to improve its decision-making process and efficiencies;

(p) Without the President and Chief Executive Officer as a member, provide input to the Compensation Committee on the performance of the President and Chief Executive Officer;

(q) Advise on personnel issues as requested by the President and Chief Executive Officer; and

(r) Such other matters as may be referred to the Executive Committee by the Chairperson and/or Board of Directors.

The Executive Committee shall not have the authority, other than to recommend to the Board of Directors, to take any action on matters requiring a 2/3$^{rds}$ vote of the Board of Directors or the approval of any action for which the California law requires the approval of the Board of Directors and/or members of the Corporation.

A member of the Executive Committee shall continue to serve on the Executive Committee until such member no longer serves in the applicable position described in **subsection (i)** through **(iv)** of this Section; or resigns. Upon any of the foregoing events, the successor *ex-officio* member shall fill such vacancy, or, if there is not then a successor *ex-officio* member, the Board of Directors may fill the vacancy on a temporary basis until such successor *ex-officio* member is appointed or elected.

If a member of the Executive Committee fails to participate (without a permitted excuse based on exigent circumstances (*e.g.*, illness, bereavement, incapacity, *etc.*) as approved in advance of such meetings by the Chairperson or President and Chief Executive Officer), in Executive Committee meetings for a period of ninety (90) days, such member of the Executive Committee will be deemed automatically resigned without further notice, and in such case, the Board of Directors may fill the vacancy.

**7.4 Marketing Committee.** A marketing committee ("***MC***") is established, which committee shall report directly to the Board of Directors. MC responsibilities include: (a) propose, evaluate, approve, develop, prioritize and execute marketing strategies for the Corporation

according to the strategic direction approved by the Board of Directors; and (b) such other responsibilities or duties as may be established by the Board of Directors. MC may be restructured and/or terminated by resolution of the Board of Directors at any time. MC shall elect its own chairperson and vice-chairperson from its members.

**7.5 Legal Committee.** A legal committee ("***LC***") is established, which committee shall report directly to the Board of Directors. LC responsibilities include: (a) providing advice and recommendations to the Board of Directors related to legal issues defined by the Board of Directors; and (b) such other responsibilities or duties as may be established by the Board of Directors. The LC may be restructured and/or terminated by resolution of the Board of Directors at any time. The chairperson of the LC shall be the General Counsel of the Corporation, or their designee. Promoter Members shall be entitled to appoint representatives on the LC as set forth in the Charter of the LC.

**7.6 Working Groups.** Working groups may be formed, restructured and/or terminated at any time by resolution of the Board of Directors for the purpose of, among other things, developing, analyzing and writing technical specifications and deliverables ("***Working Group***"). Unless otherwise directed by the Board of Directors, a Working Group shall have a steering committee, which shall report directly to the Board of Directors. A Working Group steering committee shall review and recommend proposed specifications and deliverables to the Board of Directors for publication and/or endorsement by the Corporation. Members may appoint any number of its employees or duly authorized representatives to a Working Group. The Charter of Working Groups shall be provided to the Board of Directors for its approval.

**7.7 Compensation**. Any individuals appointed to the MC, LC or any committee and/or any Working Group of the Corporation shall not receive compensation for their services as such, but, upon prior approval of each expenditure by the Board of Directors, may be reimbursed for bona fide expenses incurred arising out of conducting business on behalf of the Corporation. Nothing herein shall prohibit payment of compensation to an individual serving on the MC, LC or any committee or Working Group who renders services to the Corporation in another capacity.

## ARTICLE VIII
## IPR POLICY AND APPROVAL OF SPECIFICATIONS

**8.1 General**. The terms and conditions relating to the intellectual property rights of Members ("***IPR Policy***") are set forth in the Promoter Member Agreement, Participant Member Agreement, Adopter Member Agreement, Associate Member Agreement and Non-Profit Member Agreement.

**8.2 Modifications to the IPR Policy**. The IPR Policy may be modified from time-to-time in accordance with the procedures below:

> (a) The Board of Directors may, upon a two-thirds (2/3) affirmative vote, modify the IPR Policy if such modifications do not adversely affect a Promoter Member's or Participant's/Adopter's/Associate's/Non-Profit's obligations, rights and protections under the current IPR Policy.

(b) If any proposed modifications adversely affect a Promoter Member's or Participant's/Adopter's/Associate's/Non-Profit's obligations, rights or protections, such proposed modifications shall be submitted to the Promoter Members for approval, and a two-thirds (2/3) affirmative vote of the Promoter Members shall be required for such modifications to become effective.

**8.3 Application of Modified IPR Policy**. The modified IPR Policy will apply to all Promoter Members and/or Participants/Adopters/Associates/Non-Profits of the Corporation prospectively in lieu of the previous IPR Policy, from the date the modified IPR Policy is approved pursuant to **Section 8.2**, provided that:

(a) prior to adoption of such modifications, the Promoter Members and Participants/Adopters/Associates/Non-Profits are provided with a thirty (30) calendar day review and comment period with respect to the proposed modifications;

(b) each Promoter Member and Participant/Adopter/Associate/Non-Profits shall have the right to withdraw from the Corporation pursuant to the terms and conditions of the Promoter Member Agreement, Participant Member Agreement, Adopter Member Agreement, Associate Member Agreement, and Non-Profit Member Agreement, as applicable, within thirty (30) calendar days after approval of the modifications; and

(c) the Promoter Members and Participants/Adopters/Associates/Non-Profits shall be provided written notice in accordance with these Bylaws of the foregoing time periods and their ability to withdraw.

**8.4 Approval of Specifications**. Proposed Specifications (as defined in the IPR Policy) submitted to the Board of Directors for adoption shall require a two-thirds ($^2/_3$) vote for approval, and upon such approval shall become "Adopted Specifications." The Board of Directors may adopt policies and procedures to solicit and obtain public comment to Proposed Specifications. The Board of Directors may, from time-to-time, establish one or more committees, groups or bodies under **Section 7.1** of these Bylaws to approve Proposed Specifications that, in the determination of the Board of Directors, require broad industry concurrence.

## ARTICLE IX
## MISCELLANEOUS

**9.1 Fiscal Year**. The fiscal year of this Corporation shall end on the last day of December of each year.

**9.2 Inspection of Corporate Records**. The books of account and minutes of the proceedings of the Board of Directors, and of any committees of the Board of Directors, shall be open to inspection at the principal office of this Corporation by each Promoter Member at any reasonable time upon the written demand of any Promoter Member. Such inspection may be made in person or by an agent or attorney and shall include the right to make photocopies and extracts at the requesting Promoter Member's expense.

**9.3 Representation of Shares of Other Corporations**. Any officer of this Corporation is authorized to vote, represent and exercise on behalf of this Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this Corporation. The authority herein granted to said officers may be exercised by such officers in person or by other persons authorized to do so by proxy duly executed by such officers.

**9.4 Checks, Drafts, *Etc*.** All checks, drafts or other orders for payment of money, notes or other evidences of indebtedness issued in the name of or payable to this Corporation and any and all securities owned by or held by this Corporation requiring signature for transfer shall be signed or endorsed by such person or persons and in such manner as from time-to-time shall be determined by the Board of Directors.

**9.5 Execution of Contracts**. The Board of Directors may authorize any officer, employee, or agent to enter into any contract or execute any contract or execute any instrument in the name of and on behalf of this Corporation and such authority may be general or confirmed to specific instances. Unless so authorized by the Board of Directors, no officer, agent, or employee shall have any power or authority to bind this Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or in any amount.

**9.6 Corporate Loans**, **Guarantees and Advances**. This Corporation shall not make any advances or make any loan of money or property to or guarantee the obligation of any Director or officer.

**9.7 Inspection and Disclosure**. The Corporation shall keep or cause to be kept correct and complete books and records of account and shall also keep minutes of the proceedings of the Board of Directors or other documents as may be required by law on its own behalf. The Corporation shall have available for inspection at its principal office a copy of its three (3) most recent annual exempt organization information returns and a copy of its application for recognition of exemption and determination letter.

**9.8 Not for Profit Status**. Neither the Corporation nor any of its Members shall individually or collectively, directly or indirectly, engage in any act that will result in the loss of, or otherwise adversely affect, its status as a tax-exempt organization under the United States Internal Revenue Code.

**9.9 Forms of Notice**. Any notice or writing required or permitted under these Bylaws may be given in writing, in person, by mail, by private carrier or by telephone, electronic transmission (including facsimile and e-mail) or other form of wire or wireless communication.

**9.10 Severability**. The invalidity of any clause, provision, or Article of these Bylaws shall not affect the validity or enforceability of the remaining clauses, provisions or Articles.

## ARTICLE X
## EFFECTIVE DATE AND AMENDMENT

**10.1 Effective Date**. These Bylaws shall become effective immediately upon their adoption. Amendments to these Bylaws shall become effective immediately upon their adoption unless the Board of Directors of this Corporation in adopting them provide that they are to become effective at a later date.

**10.2 Amendments**. These Bylaws may be amended by an affirmative vote of a majority of the Board of Directors then in office, unless: (a) the specific provision(s) of these Bylaws being amended sets forth a greater number of affirmative votes for an action, in which case any amendments to such provision(s) shall require the greater number of affirmative votes set forth in such provision(s); and/or (b) such an amendment requires an affirmative vote of a majority of the Promoter Members as provided by Section 7150 of the California Nonprofit Corporation Law.

| | |
|---|---|
| Adopted: | November 19, 2002 |
| Revised: | February 7, 2011 |
| Revised: | April 5, 2012 |
| Revised: | February 3, 2016 |
| Revised: | June 8, 2016 |
| Revised: | July 25, 2019 |
| Revised: | October 16, 2019 |
| Revised: | February 12, 2020 |
| Revised: | April 8, 2020 |
| Revised: | December 2, 2020 (Deleted Section 7.4; Revised Section 7.7) |
| Revised: | December 1, 2021 (Revised Section 3.1; Name Change; Corrections to eliminate references to the Technical Committee (TC), Section 7.8) |
| Revised: | February 2, 2022 (Revised Sections 6.1, 6.5, 6.6, 7.3 and 7.4, and DEI reference changes) |
| Revised: | January 25, 2023 (Revised Section 7.3(g)) |
| Revised: | May 17, 2023 (Revised Section 7.3 to add delegated authorities) |
| Revised: | January 17, 2024 (Revised Section 6.2 to extend Board officer terms from one (1) to two (2) years) |

# EXHIBIT 6

# CONFIDENTIALITY POLICY

Connectivity Standards Alliance (Alliance) Members (including their representatives, agents and contractors) shall not disclose Alliance Confidential Information to non-Members.

"**Alliance Confidential Information**" means information: (a) marked as "Confidential" information, or (b) if orally disclosed, identified as Confidential prior to disclosure and reduced to writing and marked as Confidential within three (3) business days from the date of disclosure, except for any portion thereof that constitutes information: (c) rightfully in the public domain other than by a breach of a duty to the disclosing party; (d) rightfully received from a third party without any obligation of confidentiality; (e) rightfully known to the receiving party without any limitation on use or disclosure prior to its receipt from the disclosing party; (f) independently developed by employees of the receiving party; or (g) generally made available to third parties by the disclosing party without restriction or disclosure.

For clarity, all photographs and recordings (*i.e.*, audio, video, *etc.*) which include Alliance Confidential Information and all other copies of Alliance Confidential Information are subject to terms of this policy.

Alliance Confidential Information shall be maintained by each Member in confidence with at least the same degree of care that it uses to protect its own confidential information and in no event with less than reasonable care, and each Member that receives Alliance Confidential Information shall only use such Confidential information for the Alliance purpose for which it was submitted.

To the extent that an Alliance Member (including its representatives, agents and contractors) contributes information to the Alliance which thereafter becomes Alliance Confidential Information (e.g., a Member contributes specification text into an Alliance draft specification which constitutes Alliance Confidential Information or a Member contributes source code or documentation to an Alliance-sponsored open source software project), such contributing Alliance Member may use and disclose such information without restriction from this policy.

With respect only to Alliance Confidential Information developed in a specific Alliance Working Group (e.g., a draft specification from such Working Group), the applicable Working Group Steering Committee may (by a majority vote) permit the disclosure of such Alliance Confidential Information for purposes of developing open source software in support of Alliance standardization (e.g., in an Alliance-sponsored open source software project).

Members are reminded of the confidentiality and non-disclosure provisions in their Alliance Member Agreement. This policy does not replace or modify those provisions.