JAVERBAUM WURGAFT
HICKS KAHN WIKSTROM & SININS, P.C.

**STANLEY O. KING, ESQ.**
Partner
sking@lawjw.com

**1000 HADDONFIELD-BERLIN RD.**
**SUITE 203**
**VOORHEES, NJ 08043**
**Phone: (856) 596-4100**
**Fax: (856) 702-6640**
**WWW.LAWJW.COM**

November 18, 2026

**VIA ECF**
Honorable Leda Dunn Wettre, U.S.M.J.
U.S. District Court for the District of New Jersey
50 Walnut Street
Newark, New Jersey 07102

**Re:** ***In re Apple Inc. Smartphone Antitrust Litig*., No. 2:24-md-03113-JXN-LDW**
**Indirect iPhone Purchaser Plaintiffs' Letter Brief**
**Regarding Impasse with Red Pocket Inc.**

Dear Judge Wettre,

Pursuant to ¶ 5 of the Court's Special Master Appointment Order, and the Court's order determining that the parties reached impasse, ECF No. 456, Indirect iPhone Purchaser Plaintiffs ("IIPs") respectfully submit this letter brief regarding the issues raised in their Joint Notice of Impasse Regarding [IIPs'] Subpoena to Nonparty Red Pocket Inc. ("Red Pocket"), ECF No. 430.[1]

Unlike other third-party wireless carriers and iPhone retailers—virtually all of which have committed to produce at least some of the data and documents that IIPs sought to prosecute their case—Red Pocket has refused to produce ***anything*** in response to the IIPs' subpoena.[2] As explained in further detail below, the Court should order Red Pocket to produce its transactional data and profit-and-loss information concerning the service plans it offers.

## I. Background.

IIPs subpoenaed Red Pocket for data and documents about its iPhone sales and pricing to IIP class members. *See* Ex. A (subpoena), Ex. B (Red Pocket's R&Os). This information is relevant to IIPs' claims against Apple and is available only from Red Pocket.

---

[1] Red Pocket is a wireless company founded in 2006. It views itself as an affordable alternative to traditional wireless carriers. *See* https://www.redpocket.com/about-us.

[2] IIPs served subpoenas on ten other wireless carriers, including the three major carriers and smaller carriers. While IIPs have submitted disputes concerning the scope of other carriers' productions, *see, e.g.*, ECF Nos. 434, 439, Red Pocket is the only carrier that has categorically refused to produce any responsive documents.

For context, IIPs allege that Apple monopolized the smartphone market by pursuing a "lock-in" strategy that restricted the ability of competitor's devices, apps, and services to function with iPhones, making it inconvenient and expensive for consumers to switch to competing smartphones. IIP Compl., ECF No. 109. This strategy insulated Apple from competition and allowed it to charge more for iPhones than it could have in a competitive market. *Id.*

IIPs represent consumers who bought their iPhones through resellers, such as wireless carriers (*e.g.*, Verizon) and retailers (*e.g.*, Walmart). IIPs seek damages for their "overcharges"—the difference between the price they paid and what they would have paid but for Apple's conduct. *See Behrend v. Comcast Corp.*, 655 F.3d 182, 203 (3d Cir. 2011), *rev'd on other grounds*, 569 U.S. 27 (2013) ("The usual measure in an overcharge case is the difference between the illegal price that was actually charged and the price that would have been charged 'but for' the violation multiplied by the number of units purchased.") (citation and quotations omitted).

To prove their monopolization claims, IIPs will need to show two elements: (1) that Apple has monopoly power in the relevant market; and (2) that Apple acquired or maintained that power through anticompetitive conduct, rather than through a superior product or business acumen.[3] And at class certification, IIPs will have to demonstrate several more elements: (1) common impact, *i.e.*, that class members paid inflated prices for their iPhones due to Apple's alleged misconduct; (2) a method for measuring class-wide damages; and (3) ascertainability, meaning that there is a reliable and administratively feasible way to identify class members.[4]

Because IIPs are indirect purchasers, this requires evidence of both Apple's monopolization and overcharge for iPhones it sells, and that consumers who buy from third-party resellers (like IIPs who buy from Red Pocket) pay that overcharge downstream. Establishing these intertwined elements requires understanding a few basic facts: who bought an iPhone, what they bought, when they bought it, which reseller they bought it from, and how much they paid for it. Apple has already argued that resellers' "independent decisionmaking" on price breaks the connection to Apple's conduct. ECF No. 123-1 at 43. Resellers' transactional sales and service-line data are highly relevant to questions of whether Apple's conduct caused IIP class members to pay supracompetitive prices for their iPhones.

Having greatly narrowed their requests, IIPs now seek just two categories of information from Red Pocket. First, they seek transaction data concerning Red Pocket's iPhone sales, namely, sales data and service-line data, from January 2015 to present (RFP Nos. 11 & 16). Red Pocket appears to offer customers rebates on iPhones if they also purchase a Red Pocket service plan,[5]

---

[3] *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307–08 (3d Cir. 2007).

[4] *See In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 183 F.4th 178, 192 (3d Cir. 2026); *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 130 (3d Cir. 2023); *In re Generic Pharms. Pricing Antitrust Litig.*, 2025 WL 754567, at *8, 15, 20 (E.D. Pa. Mar. 7, 2025).

[5] *See* https://www.redpocket.com/shop.

and a picture of the full economic transaction may be relevant to analyzing or quantifying IIPs' injury. Second, they seek documents and data sufficient to show Red Pocket's costs, revenues, and profits associated with its iPhone sales and accompanying wireless service (RFP Nos. 12–13, 20). Together, this information will give insight into Red Pocket's pricing and IIPs' payments for new iPhones, which are often purchased together with wireless services.

Red Pocket has not agreed to produce *anything*. Indeed, Red Pocket has been unwilling to meaningfully engage with IIPs. *See* ECF No. 430 (noting two meet and confers over six months). Thus, IIPs remain in the dark about Red Pocket's pricing, whether it passed Apple's overcharges on to end consumers, and whether it even has this requested information to begin with. *See id.* (noting impasse over documents and data "to the extent such requested records exist and/or to the extent such records are in Red Pocket's possession and/or control"). In light of other resellers' agreements to produce the same relevant information—including such agreements from Verizon, TracFone, Consumer Cellular, and Spectrum—Red Pocket's blanket refusal cannot stand.

## II. Transaction data is relevant to ascertain class members, demonstrate impact, and calculate damages.

IIPs purchased their iPhones from retailers and carriers such as Red Pocket. To understand how Apple's supracompetitive prices have affected the prices paid by Red Pocket customers, IIPs are seeking information not only on every customer's purchase of an iPhone (the sales data, RFP No. 16), but also on their monthly service-plan costs (the service-line data, RFP No. 11), since Red Pocket appears to condition rebates on purchasing a service plan. This same transactional data will also serve to identify IIP class members, since each transaction shows a particular customer buying an iPhone on a particular date.

Red Pocket is plainly the best source of data about its own sales. Likewise, IIPs cannot obtain Red Pocket's service-line data from any other source. Together, this data is relevant to how Apple's supracompetitive prices affected the prices that Red Pocket customers (IIP class members) paid. Because Red Pocket apparently requires the purchase of a plan to purchase an iPhone, consideration of sales data alone may not tell the whole story.

Red Pocket has not disputed the relevance of this data. Indeed, such transaction-level data is the standard foundation for damages models and classwide-impact analyses in antitrust cases, so courts routinely require its production from third parties. *See, e.g.*, *Fusion Elite All Stars v. Nfinity Athletic LLC*, 2022 WL 1175691, at *5 (W.D. Tenn. Apr. 20, 2022) (explaining that "it is common practice for Plaintiffs in large antitrust cases such as this one to subpoena and receive detailed transactional data from third parties to better inform their expert's economic analyses") (collecting cases); *id.* at *6 (ordering production from a third party because "transactional third-party data of the type sought here is necessary to prove certain elements of [plaintiffs' antitrust] case" and "seeking third party data from a representative sample of the market . . . is common in antitrust cases to prove damages"); *In re Pork Antitrust Litig.*, No. 18-cv-1776 (D. Minn.), ECF No. 1073 (granting indirect purchasers' motion to compel third-party production of transactional sales and purchase data); *In re Broiler Chicken Antitrust Litig.*, 2019 WL 2764260, at *2 (N.D. Ill. May 6, 2019) (denying motion to quash third-party subpoena and explaining that, "[t]o show

impact on the indirect purchaser classes, the IPPs will have to establish that any overcharge due to the alleged conspiracy was passed through to the [indirect purchasers]. The transaction data and information being sought from [the third party] is directly relevant to the [indirect purchasers'] efforts to show that any alleged overcharge for the purchase of [the product] was passed through the distribution chain to the IPPs."). Here, Red Pocket's data is needed for the same purpose.

## III. Profit-and-loss information will help to demonstrate common impact and damages.

IIPs also seek documents and data sufficient to show Red Pocket's costs, revenues, and profits associated with its iPhone sales and accompanying wireless service (RFP Nos. 12–13, 20). This data is also relevant to understanding the full economic picture of IIP class members' iPhone purchases from Red Pocket. For instance, it will show whether Red Pocket's iPhone margins held steady as Apple's prices rose, and how those margins compared to its margins on competing smartphones. As courts have recognized, this type of evidence is probative of indirect purchasers' damages and antitrust injury. *See In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 1004 (D. Minn. 2023) (explaining that resellers' "small profit margins" indicated that "it is more likely that overcharges would be passed through" to indirect purchasers, because resellers could not "absorb those losses"); *Dale v. Deutsche Telekom AG*, No. 22-cv-03189, ECF No. 340, at 2–3 (compelling third-party AT&T to produce documents concerning its pricing and the costs of providing wireless service in antitrust case). Red Pocket has not contested the relevance of this information. And Red Pocket likely keeps such standard financial reports in the ordinary course of business, so it is well-suited to a "go-get" collection, or a targeted pull from central sources without search terms or custodians. Thus, the burden here is minimal.

## IV. The stakes are high, and Red Pocket has not substantiated any claim of burden.

The stakes in this case are significant. IIPs seek damages on behalf of tens of millions of iPhone purchasers. *See* IIP Compl., Dkt. 109, ¶¶ 235, 237. And the burden on Red Pocket, a well-established mobile carrier, is likely to be minimal, given that IIPs seek to compel it to produce only its transactional data and profit-and-loss information, which it may do under the robust Discovery Confidentiality Order in this case. Although Red Pocket has asserted that IIPs' requests are burdensome, it has made no effort to substantiate that objection. *See In re Novo Nordisk Sec. Litig.*, 530 F. Supp. 3d 495, 504 (D.N.J. 2021) ("While it is true that non-parties are entitled to broader discovery protections, there must be some showing that the burden imposed will be undue.").

* * *

For these reasons, IIPs respectfully request that the Court order Red Pocket to produce the requested transaction data and profit-and-loss information—to the extent this information exists and is within Red Pocket's possession, custody, or control—within 30 days. Red Pocket should produce its transaction data in accordance with the parties' uniform hashing protocol. ECF No. 465. That data should either include purchasers' personally identifiable information ("PII"), or Red Pocket should provide a declaration guaranteeing that all necessary class-member information will be preserved and available following class certification. *See* ECF No. 483 (notice of impasse).

Respectfully submitted,

Stanley O. King, Esq.
JAVERBAUM WURGAFT HICKS
KAHN WIKSTROM & SININS P.C.
1000 Haddonfield-Berlin Road,
Suite 203
Voorhees, NJ 08043
Tel: 856.596.4100
sking@lawjw.com

*Counsel for Indirect iPhone Purchaser Plaintiffs*

cc: All counsel of record (via ECF)
Jordan Matthews, Weinberg Gonser LLP, counsel for Red Pocket, Inc. (via email)